Hearing Date: October 11, 2019 at 10:00 am (Prevailing Eastern Time)
Objection Deadline: October 2, 2019 at 4:00 pm (Prevailing Eastern Time)

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.*, **Plaintiffs**, v. **COMMONWEALTH OF MASSACHUSETTS,** *et al.*, **Defendants.** | **Adv. Pro. No. 19-08289 (RDD)** |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS .........................................................................................................5

I.      The Relevant Parties ........................................................................................................5

II.     The Pending Actions.........................................................................................................6

III.    The Pending Actions Are Depleting Estate Assets and Consuming Substantial
        Resources .........................................................................................................................11

        A.      The Pending Actions Impose Staggering Costs on the Estates............................11

        B.      The Pending Actions Divert Management and Employees from Their
                Critical Efforts to Manage the Debtors' Businesses .............................................12

IV.     The Settlement Structure.................................................................................................14

ARGUMENT ............................................................................................................................15

I.      This Court Should Enjoin the Active Governmental Actions .........................................15

        A.      These Chapter 11 Cases Are Likely to Be a Success............................................19

        B.      The Debtors Will Suffer Irreparable Harm Unless the Active
                Governmental Actions Are Stayed .......................................................................23

        C.      The Balance of Harms Weighs Heavily in Favor of Issuing an Injunction ..........28

        D.      Granting the Requested Injunction Is in the Public Interest .................................29

II.     This Court Should Enjoin the Related Party Claims .......................................................31

        A.      The Court Has Jurisdiction to Enjoin Prosecution of the Related Party
                Claims ..................................................................................................................31

        B.      The Related Party Claims Should Be Stayed.......................................................32

CONCLUSION..........................................................................................................................39

i

# TABLE OF AUTHORITIES

### Cases

Page(s)

*A.H. Robins Co. Inc.*, *v. Piccinin*,
   788 F.2d 994 (4th Cir. 1986) ............................................. 35

*In re A.H. Robins Co., Inc.*,
   216 B.R. 175 (Bankr. E.D. Va. 1997) ................................ 22

*In re Alert Holdings, Inc.*,
   148 B.R. 194 (Bankr. S.D.N.Y. 1992) ............................... 24

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999) ........................................................ 38

*Browning v. Navarro*,
   743 F.2d 1069 (5th Cir. 1984) .......................................... 17

*In re Caesars Entm't Operating Co., Inc.*,
   808 F.3d 1186 (7th Cir. 2015) ..................................... 18, 37

*In re Caesars Entm't Operating Co., Inc.*,
   561 B.R. 451 (Bankr. N.D. Ill. 2016) ............................... 36

*In re Calpine Corp.*,
   365 B.R. 401 (S.D.N.Y. 2007) .................................. *passim*

*City of New Haven v. Purdue Pharma, L.P.*,
   No. X07HHDCV176086134S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019) .............. 10

*In re Cuyahoga Equip. Corp.*,
   980 F.2d 110 (2d Cir. 1992) ............................................. 32

*In re Dow Corning Corp.*,
   211 B.R. 545 (Bankr. E.D. Mich. 1997) ..................... 21, 23, 31

*In re Dow Corning Corp.*,
   215 B.R. 346 (Bankr. E.D. Mich. 1997) ........................... 21

*In re Fed.-Mogul Glob.*,
   684 F.3d 355 (3d Cir. 2012) ............................................. 20

*Fid. Mortg. Inv'rs v. Camelia Builders, Inc.*,
   550 F.2d 47 (2d Cir. 1976) .......................................... 18, 25

*Garrity v. Leffler (In re Neuman)*,
   71 B.R. 567 (S.D.N.Y. 1987) .................................. 16, 17, 18

*In re G-I Holdings, Inc.*,
   295 B.R. 211 (D.N.J. 2003) ............................................................... 38

*In re G-I Holdings, Inc.*,
   323 B.R. 583 (Bankr. D.N.J. 2005) ................................................... 23

*Gisinger v. Patriach*,
   No. 16-CV-1564, 2016 WL 6083981 (S.D.N.Y. Oct. 18, 2016) ........................................... 32

*In re Glob. Crossing, Ltd. Sec. Litig.*,
   No. 02-CV-10199, 2003 WL 21659360 (S.D.N.Y. July 15, 2003) ....................................... 32

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*,
   No. 06-CV-5358, 2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006) ..................................... 35, 38

*In re Hunt*,
   93 B.R. 484 (Bankr. N.D. Tex. 1988) .................................................... 28

*In re Ionosphere Clubs, Inc.*,
   111 B.R. 423 (Bankr. S.D.N.Y. 1990) ........................................... 27, 35

*In re Johns-Manville Corp.*,
   26 B.R. 420 (Bankr. S.D.N.Y. 1983) .................................................... 22

*In re Johns-Manville Corp.*,
   31 B.R. 627 (S.D.N.Y. 1983) ............................................................... 25

*Johns-Manville Corp. v. Colo. Ins. Guar. Assoc. (In re Johns-Manville Corp.)*,
   91 B.R. 225 (Bankr. S.D.N.Y. 1988) .................................................... 18

*In re Lazarus Burman Assocs.*,
   161 B.R. 891 (Bankr. E.D.N.Y. 1993) .................................................. 36

*In re Lyondell Chem. Co.*,
   402 B.R. 571 (Bankr. S.D.N.Y. 2009) ...................................... 18, 19, 23

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) ............................................................... 16

*In re Muralo Co.*,
   301 B.R. 690 (Bankr. D.N.J. 2003) .................................................... 25

*NLRB v. Superior Forwarding, Inc.*,
   762 F.2d 695 (8th Cir. 1985) ....................................................... 26, 28

*In re North Star Contracting Corp.*,
   125 B.R. 368 (S.D.N.Y. 1991) ........................................................... 31

*Penn Terra, Ltd. v. Dep't of Envtl. Res. of Pa.*,
   733 F.2d 267 (3d Cir. 1984) ............................................................. 17

iii

*In re Phila. Newspapers, LLC*,
  407 B.R. 606 (E.D. Pa. 2009) .......................................................... 33

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014) .......................................................... 31

*In re Rickel Home Ctrs.*,
  199 B.R. 498 (Bankr. D. Del. 1996) .......................................................... 38

*In re Sec. Gas & Oil, Inc.*,
  70 B.R. 786 (Bankr. N.D. Cal. 1987) .......................................................... 17

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
  460 B.R. 106 (Bankr. S.D.N.Y. 2011).......................................................... 16, 18

*Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*,
  922 F.2d 984 (2d Cir. 1990) .......................................................... 2

*In re Soundview Elite Ltd.*,
  543 B.R. 78 (Bankr. S.D.N.Y. 2016) .......................................................... 18

*In re SunEdison, Inc.*,
  576 B.R. 453 (Bankr. S.D.N.Y. 2017) .......................................................... 32

*In re The 1031 Tax Grp., LLC*,
  397 B.R. 670 (Bankr. S.D.N.Y. 2008) .......................................................... 16

*In re The Billing Res.*,
  No. 07-52890-ASW, 2007 WL 3254835 (Bankr. N.D. Cal. Nov. 2, 2007) .......................................................... 27

*In re Third Eighty-Ninth Assoc.*,
  138 B.R. 144 (S.D.N.Y. 1992) .......................................................... 36

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  818 F.3d 98 (2d Cir. 2016) .......................................................... 37

*Union Tr. Phila., LLC v. Singer Equip. Co.  (In re Union Tr. Phila., LLC)*,
  460 B.R. 644 (E.D. Pa. 2011) .......................................................... 35, 38

*In re United Health Care Org.*,
  210 B.R. 228 (S.D.N.Y. 1997) .......................................................... 36

*In re USG Corp.*,
  290 B.R. 223 (Bankr. D. Del. 2003) .......................................................... 23

*In re Vantage Petroleum Corp.*,
  25 B.R. 471 (Bankr. E.D.N.Y. 1982) .......................................................... 17

*In re W.R. Grace & Co.*,
  355 B.R. 462 (Bankr. D. Del. 2006) .......................................................... 23

iv

*In re W.R. Grace & Co.*,
   386 B.R. 17 (Bankr. D. Del. 2008) ............................................................... 19, 35

STATUTES & RULES

11 U.S.C. § 105 .......................................................................................... *passim*

11 U.S.C. § 362 .......................................................................................... *passim*

11 U.S.C. § 502(c) ............................................................................................21

11 U.S.C. § 544(b) .......................................................................................... 37

28 U.S.C. § 1334(b) ........................................................................................ 31

Fed. R. Bankr. P. 3007(d) ............................................................................... 21

Fed. R. Bankr. P. 7042 .................................................................................... 21

Fed. R. Bankr. P. 7065 .................................................................................... 15

OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ........................................ 17

Barbara J. Houser, *Chapter 11 as a Mass Tort Solution*,
   31 Loy. L.A. L. Rev. 451 (1998) ........................................................................... 25

David Rosenberg, *Of End Games and Openings in Mass Tort Cases: Lessons from a Special Master*,
   69 B.U. L. Rev. 695 (1989) ................................................................................... 23

Georgene M. Vairo, *Georgine, The Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution*,
   31 Loy. L.A. L. Rev. 79 (1997) ............................................................................. 22

Jack B. Weinstein, Individual Justice in Mass Tort Litigation (1995) ........................................ 22

S. Elizabeth Gibson, *Judicial Management of Mass Tort Bankruptcy Cases*,
   Federal Judicial Center (2005),
   https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf ................................................... 20

## PRELIMINARY STATEMENT

*"There needs to be some vehicle to provide resolution of these cases.  Everyone knows that trying probably 2,500 [cases] now, between the federal ones and the ones in State Court . . . would sink the state and federal judiciaries, but also the amount of private resources would be staggering.  And no one—no one would want to do that."*—Hon. Dan A. Polster, U.S. District Judge, United States District Court for the Northern District of Ohio.[2]

\*          \*          \*

Unless stayed, the over 2,625 civil actions pending against the Debtors[3] in various state and federal courts and other fora across the United States and its territories (the "**Pending Actions**") will eviscerate the fundamental goals of these bankruptcy cases—and of the Bankruptcy Code itself.  As long as the Pending Actions are actively prosecuted, the value of the estates will continue to be rapidly eroded by the staggering costs of litigation.  Purdue Pharma, L.P. ("**Purdue Pharma**"), the Debtors' main operating entity, spends an average of over **$2 million per week** in legal and professional costs directly related to defending the Pending Actions, on top of another $3 million per week in legal fees and other expenses in large part related to the Pending Actions, government investigations, and the financial pressure resulting therefrom.  And that is just the hard costs.  The endless, relentless pressure on the business and its employees is equally material.  As long as pursuit of the Pending Actions fosters a race to the courthouse in which plaintiffs attempt ever-more creative ways to jump ahead of one another,

---

[2] Decl. of Benjamin S. Kaminetzky in Supp. of Mot. for Prelim. Inj., dated September 18, 2019 ("**Kaminetzky Decl.**") Ex. A (Hr'g Tr., *In Re: Nat'l Prescription Opiate Litig.*, No. 17-MD-2804 (N.D. Ohio Aug. 6, 2019)), at 72:19-24.

[3] Not all of the debtors in these chapter 11 proceedings have been named as defendants in the Pending Actions (as defined below).  Those who have been named include:  Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Purdue Transdermal Technologies L.P.; Purdue Pharmaceutical Products L.P.; Purdue Pharma of Puerto Rico; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; and Avrio Health L.P. (formerly known as Purdue Products L.P.).  For ease of reference, this Memorandum refers to these defendants as the Debtors.

1

claims against the estates will proceed by the luck of the draw instead of fairly and equitably under the principles of the Bankruptcy Code.

The Bankruptcy Code provides for stays of litigation to avoid precisely this inequitable and value-destroying dynamic.  In the wide range of situations to which it applies, the automatic stay provided by section 362(a) of the Code allows "the bankruptcy court to centralize all disputes concerning property of the debtor's estate in bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas."  *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2d Cir. 1990); *see also* 11 U.S.C. § 362(a).  And section 105(a) of the Code empowers this Court to stay actions that will frustrate a successful reorganization even if those actions are not automatically stayed by section 362—or if the application of section 362 is unclear or disputed.

The Debtors therefore respectfully request that the Court issue a preliminary injunction pursuant to 11 U.S.C. § 105(a) to stay, for 270 days, active[4] cases against the Debtors brought by governmental entities ("**Governmental Defendants,**" and their actions, "**Governmental Actions**") as well as a preliminary injunction to stay active claims against the current and former owners (including any trusts and their respective trustees and beneficiaries), officers, directors, employees, and associated entities ("**Related Parties,**" and the claims against them, "**Related Party Claims**").[5]  To be clear, the Debtors in no way concede that the Governmental Actions

---

[4] Solely to preserve judicial and estate resources, the Debtors do not, in this motion, seek a stay of Pending Actions against them or the Related Parties that are not currently active.  However, the Debtors reserve their right to move to stay any action not subject to this motion that becomes active during the Debtors' chapter 11 cases.

[5] As described in the Motion for a Preliminary Injunction, Related Party Claims include the commencement or continuation of active judicial, administrative, or other actions or proceedings, identified in Exhibit B to the Complaint, and the commencement or continuation of other actions alleging substantially similar facts or causes of action as those alleged in the actions identified in

2

fall within the limited "police power" exception to the automatic stay of 11 U.S.C. § 362(b)(4), or that none of the Related Party Claims are subject to the automatic stay. But, because the vast majority of plaintiffs in the Pending Actions (over 85% by number) are governmental entities, and because the scope of Pending Actions is so vast and the stakes to the Debtors are so high, the Debtors cannot risk a case-by-case or claim-by-claim litigation of the scope of the automatic stay, any exceptions thereto, and any lift-stay motions that may be filed—in hundreds of separate cases. Instead, the Debtors ask that this Court stay the tidal wave of litigation that will drown the Debtors and most certainly frustrate their successful reorganization. Indeed, this is a paradigmatic case for a section 105(a) injunction, even if the automatic stay does not apply.

The standard for such an injunction is amply met here. First, the Debtors have a reasonable likelihood of a successful reorganization—if (and likely only if) granted the requested pause of the Pending Actions. The Debtors have already made great strides towards a successful reorganization through the agreement in principle between the Debtors and the Debtors' ultimate owners (trusts for the benefit of members of the Sackler families ("**Sackler Families**")), on the one hand, and 24 state attorneys general, analogous officials from five U.S. territories, and the court-appointed Plaintiffs' Executive Committee ("**PEC**") and Co-Lead Counsel in the federal multidistrict litigation pending in Ohio ("**Ohio MDL**"), on the other hand, to completely resolve the litigation ("**Settlement Structure**"). Although there are certainly open points to be further refined and resolved, if the Debtors can successfully translate the Settlement Structure into the core of a confirmed plan, billions of dollars of cash and critical resources from the Debtors would be made available to the American people to address the opioid crisis, and the Debtors'

---

Exhibit A or Exhibit B to the Complaint, brought by the Government Defendants and the Private Defendants (defined below) against the Related Parties.

intellectual property, accumulated expertise, knowledge, and manufacturing capacity would be put to essential public uses.

Second, absent a stay of the Pending Actions, the Debtors—and their prospects of successful reorganization—will suffer crushing and irreparable injury. The Debtors' assets and dwindling cash balance will continue to be consumed by legal fees. The Debtors' management will be forced to dedicate ever increasing time and effort to defending the Pending Actions rather than operating the business to maximize the value of the Debtors' estates. The actions against Related Parties will further consume the Debtors' resources, distract the Debtors' management, and threaten the billions of dollars of Related Party contributions that are a keystone of the Settlement Structure. And the Settlement Structure—as well as any concept of equitable distribution among like creditors—will be further undermined at every turn by plaintiffs' endless intramural jockeying for leverage and races to the courthouse. Every party in interest—whether supporting the Settlement Structure, opposing it, or on the fence—will lose if this value-destroying and inequitable dynamic continues.

Third, there is little harm caused by granting the requested relief. While there may be a temporary delay, the Governmental Defendants' ability to underline enforce any money judgment is unquestionably stayed by section 362 of the Bankruptcy Code. Furthermore, the Debtors have requested that this Court enjoin the underline Debtors to enforce their commitment to refrain from engaging in key aspects of the conduct implicated in the Governmental Actions ("**Voluntary Injunction**"). The Debtors voluntarily subject themselves to the coercive power of this Court to make absolutely clear that they are not in any way using chapter 11 as an improper shield for the kind of past conduct challenged in the Pending Actions. Finally, and perhaps most importantly under these circumstances, it is clearly in the public interest to halt these actions. The Settlement

Structure, and the collective process ensuring equality and finality provided by these chapter 11

cases, present a unique opportunity to benefit millions of Americans in need.  Without this

injunction, that opportunity may be lost and billions of dollars in value—likely for the public

itself—destroyed for the benefit of no one.

## STATEMENT OF FACTS[6]

### I.    The Relevant Parties

The Debtors are pharmaceutical companies.  They manufacture, among other things,

FDA-approved, abuse-deterrent, opioid medications, including OxyContin, indicated for the

management of pain severe enough to require daily, around-the-clock, long-term opioid

treatment and for which alternative treatment options are inadequate.  The Debtors are also

developing, among other things, two opioid overdose rescue medications and one opioid

addiction treatment medication.  (*See* Decl. of Jamie O'Connell in Supp. of Mot. for Prelim. Inj.,

dated September 18, 2019 ("**O'Connell Decl.**") ¶ 34.)

Purdue Pharma is the main operating entity for the Debtors' business.  (O'Connell Decl.

¶ 16.)  Purdue Pharma is a limited partnership that is managed and operated by its general

partner, Purdue Pharma Inc. ("**PPI**"), and is governed by PPI's Board of Directors.  Purdue

Pharma and its 22 wholly owned operating and non-operating subsidiaries are ultimately owned

by various trusts for the benefit of the Sackler Families.

The Related Parties are former or current owners (including any trusts and their

respective trustees and beneficiaries), directors, officers, employees, and associated entities of

---

[6] For background regarding the Debtors, the Debtors' corporate structure, and Debtors' business,
see the Debtors' Informational Brief, *In re Purdue Pharma L.P., et al.*, No. 19-23649 (RDD)
(Bankr. S.D.N.Y. Sept. 16, 2019) (ECF No. 17).

the Debtors.[7]  They include, among others, Purdue Pharma's current CEO, two current directors, and members of the Sackler Families.

The defendants in this adversary proceeding are plaintiffs in the active Pending Actions. The vast majority of these plaintiffs are governmental entities.  The defendants also include non-governmental plaintiffs—including individuals and hospital groups—in the Pending Actions ("**Private Defendants**") who have asserted claims against both the Debtors (which are unquestionably subject to the automatic stay) and the Related Parties (which may not be).

## II.    The Pending Actions

The Pending Actions are more than 2,625 ongoing civil proceedings against the Debtors, the Related Parties, and other entities involved in the manufacture, distribution, or sale of opioid medications.[8]  (*See* Compl. Ex. C.)  Approximately 2,200 of the actions have been consolidated

---

[7] The Related Parties are listed in Exhibit B of the Complaint and include: The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Purdue Pharma Technologies Inc.; PLP Associates Holdings L.P.; PLP Associates Holdings Inc.; BR Holdings Associates L.P.; BR Holdings Associates Inc.; Rosebay Medical Company L.P.; Rosebay Medical Company, Inc.; Beacon Company; PRA Holdings Inc.; Pharmaceutical Research Associates Inc.; Purdue Holdings L.P.; Rhodes Pharmaceuticals Inc.; Rhodes Technologies Inc.; Coventry Technologies L.P.; MNP Consulting Limited; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Estate of Mortimer Sackler; Estate of Raymond Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Raymond Sackler Trust; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees Under Trust Agreement Dated November 5, 1964; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees Under Trust Agreement Dated November 5, 1974; Paulo Costa; Cecil Pickett; Ralph Snyderman; Judith Lewent; Craig Landau; Mark Timney; Stuart D. Baker; Frank Peter Boer; John Stewart; Russell Gasdia; Marv Kelly; Shelli Liston; Heather Weaver; Doug Powers; Lori Fuller; Rodney Davis; Brandon Worley; Donald Leathers; Wendy Kay; Michael Madden; LeAvis Sullivan; Jeffrey Ward; Beth Taylor; Leigh Varnadore; Paul Kitchin; Mark Waldrop; Mark Radcliffe; Mark Ross; Patty Carnes; Carol Debord; Jeff Waugh; Shane Cook; James David Haddox; Aida Maxsam; Tessa Rios; Amy K. Thompson; Joe Coggins; Lyndsie Fowler; Mitchell "Chip" Fisher; Rebecca Sterling; Vanessa Weatherspoon; Chris Hargrove; Brandon Hassenfuss; Joe Read; and Andrew T. Stokes.

[8] In addition to the Pending Actions, Purdue Pharma has been responding to subpoenas and civil investigative demands issued by various components of the DOJ.  To avoid any doubt, the Debtors' motion in no way seeks to enjoin those investigations.

in a multidistrict litigation pending in the United States District Court for the Northern District of

Ohio.  (*See id.*)  There are also hundreds of actions pending against the Debtors and Related

Parties in state and territorial courts all around the country.  (*See id.*)  The state court actions

include those asserted by the attorneys general of 46 states; these are not part of the Ohio MDL.

(*See id.*)

The Governmental Actions assert substantially overlapping and similar allegations and

claims.  Plaintiffs generally allege that the Debtors acted improperly in the marketing and sale of

opioid medications and seek monetary damages based on public nuisance, consumer protection

laws, unjust enrichment, false claims acts, and similar claims.[9]  Although some of the plaintiffs

also seek injunctive relief against the Debtors, requests for such relief are only ancillary to the

monetary claims in the Governmental Actions—which overwhelmingly allege past

misconduct—and, as discussed in more detail below, that past conduct is addressed by the

Voluntary Injunction.[10]

In addition to the Governmental Actions, the Debtors face actions in state and federal

courts brought by private parties that assert various claims for personal injury, wrongful death,

---

[9] *See, e.g.*, Transfer Order, *In re Nat'l Prescription Opiate Litig.*, No. 17-MD-2804, at 3 (J.P.M.L Dec. 12, 2017) (ECF No. 1) (centralizing complaints where "[p]laintiffs variously bring claims for violation of RICO statutes, consumer protection laws, state analogues to the Controlled Substances Act, as well as common law claims such as public nuisance, negligence, negligent misrepresentation, fraud and unjust enrichment" raising "common factual questions about, *inter alia*, the manufacturing and distributor defendants' knowledge of and conduct regarding the alleged diversion of these prescription opiates, as well as the manufacturers' alleged improper marketing of such drugs").

[10] *See, e.g.*, Kaminetzky Decl. Ex B (First Am. Compl., *Commonwealth of Massachusetts v. Purdue Pharma L.P. et al*., No. 1884-CV-01808 (Mass. Dis. Ct. Jan. 31, 2019) ("Mass First. Am. Compl.")); First Am. Compl., *State of Minnesota v. Purdue Pharma L.P et al*.., No. 27-CV-18-10788 (Dist. Ct. Hennepin Cty. Aug. 5, 2019); First Am. Compl., *State of New York v. Purdue Pharma L.P. et al.*, No. 400016/2018 (N.Y. Sup. Ct. Suffolk Cty. Mar. 28, 2019); Second Am. Compl., *County of Cuyahoga v. Purdue Pharma L.P. et al.*, No. 17-OP-45004 (N.D. Ohio May 18, 2018).

and economic damages ("**Private Actions**").  While these actions are automatically stayed as against the Debtors, many of the Private Actions also assert claims against the Related Parties who are not debtors in this bankruptcy.  (Compl. Ex. B.)

The Debtors and the Related Parties are also named in 13 actions in Canada ("**Canadian Actions**").  (Compl. Ex. C.)  The Canadian Actions are brought on behalf of both private individuals and governmental entities and raise claims predicated on similar allegations and causes of action as the Pending Actions in the United States.[11]

Substantially all of the Pending Actions name Purdue Pharma as a defendant, and the vast majority also name PPI and the Purdue Frederick Company, Inc.  A growing number of the Pending Actions name as defendants other Debtors and/or other Related Parties.  In 2019, a trend of naming certain Related Parties—specifically, the members of the Sackler Families—emerged and accelerated, recently culminating in several suits that name only those parties as defendants. (*See* Compl. Ex. B.)  Indeed, within the past week, as news of the Debtors' settlement negotiations and potential chapter 11 filings were reported in the press, the attorneys general of seven states have done (or announced their intention to do) just that.[12]  Although these actions

---

[11] The Debtors do not seek an injunction regarding the Canadian Actions.  However, Purdue Pharma will seek recognition of these chapter 11 proceedings in Canada under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Proceeding**"), which will result in a stay against the Debtors if granted.  Debtors will also seek a stay of the claims against the Related Parties in the Canadian Court so that the Canadian Proceeding is coordinated with these proceedings and all claims are resolved in an efficient and equitable manner.

[12] *See, e.g.*, Compl., *State of Rhode Island, by and through, Peter F. Neronha, Attorney General v. Richard S. Sackler, et al.*, No. PC 2019-9399 (R.I. Sup. Ct. Sept. 11, 2019); *Statement from Attorney General Peter F. Neronha Regarding Settlement Talks With Purdue Pharma and New RI Lawsuit Against Sackler Family*, Rhode Island Office of the Attorney General (Sept. 11, 2019), *accessible at* https://www.ri.gov/press/view/36704; Compl., *State of Delaware, ex rel. Kathleen Jennings v. Richard Sackler, et al.*, No. N19C-09-062 (Del. Super. Ct. Sept. 9, 2019); *AG Jennings Files Suit Against Sackler Family For Role In Opioid Crisis*, Delaware Department

nominally omit Purdue and other Debtors from their captions, the claims and allegations in the

complaints concern the Debtors' manufacture and sale of opioid products and essentially

replicate the claims against the Debtors in the Pending Actions.

To date, not one of the Pending Actions has resulted in any finding of liability against the

Debtors or Related Parties.[13]  In fact, the only cases that have been litigated to judgment have

been decided in the Debtors' favor.  On May 10, 2019, a North Dakota court granted the

Debtors' motion to dismiss an action brought by the State of North Dakota that asserted causes

of action for deceptive marketing practices, consumer fraud, and public nuisance.  (Kaminetzky

Decl. Ex. C, at 27 (Order Granting Defendants' Motion to Dismiss, *State of North Dakota ex rel.*

*Wayne Stenehjem v. Purdue Pharma L.P., et al.*, No. 08-2018-CV-01300 (N.D. Dist. Ct. May 10,

2019).)  In a thorough opinion, the court rejected North Dakota's attempt to "essentially hold

[Purdue] liable for the impact of opioid overuse and addiction in North Dakota." *Id.* at 1.  First,

the court dismissed the state's deceptive marketing claims on the basis of federal preemption,

holding that those claims were impermissibly based on the "marketing of Purdue's medications

for their FDA-approved uses, including for treatment of chronic, non-cancer pain." *Id.* at 15.

The court next proceeded to dismiss North Dakota's consumer fraud claims on causation

grounds.  The North Dakota court found that the state's theory was predicated on "an extremely

attenuated, multi-step, and remote causal chain," *id.* at 20, and observed that the state's claim

that Purdue should be held liable for "the entire opioid epidemic in North Dakota [was] difficult

---

of Justice (Sept. 9, 2019), a*ccessible at* https://news.delaware.gov/2019/09/09/ag-jennings-files-suit-against-sackler-family-for-role-in-opioid-crisis/.

[13] On March 26, 2019, Purdue Pharma, PPI, and the Purdue Frederick Company settled an action brought by the Attorney General of the State of Oklahoma without any admission of liability. Consent Judgment as to the Purdue Defendants, *State of Oklahoma, ex rel., Mike Hunter v. Purdue Pharma L.P., et al.*, No. CJ-2017-816 (Okla. Dist. Ct. Mar. 26, 2019).

to comprehend," *id.* at 22.  Finally, the court dismissed North Dakota's public nuisance claim

because "[n]o North Dakota court has extended the public nuisance statutes [at issue] to cases

involving the sale of goods."  *Id.* at 27.  In the court's view, dismissal was particularly

appropriate because "[t]he reality is that Purdue has no control over its product after it is sold to

distributors, then to pharmacies, and then prescribed to consumers, i.e. after it enters the market."

*Id.* at 26-27.

Similarly, on January 8, 2019, a Connecticut court granted the Debtors' motion to dismiss

an action brought by various local Connecticut governments.  *City of New Haven v. Purdue*

*Pharma, L.P.*, *et al.*, No. X07HHDCV176086134S, 2019 WL 423990, at *8 (Conn. Super. Ct.

Jan. 8, 2019).  The court emphasized that "courts can't credibly consider cases derived from

harms allegedly connected to defendants by lengthy, multifaceted chains of causation that must

weigh their conduct while trying to separate that conduct from the myriad of independent factors

that make up most broadly defined social crises like . . . opioid abuse."  *Id.* at *3.  The court

dismissed the plaintiffs' claims because "they claim indirect damages that would turn on

conjectural analysis of causes and effects."  *Id.* at *2.

Nonetheless, case-by-case tort litigation of the type the Debtors face in the civil tort

system has incentivized a proverbial race to the courthouse, as various plaintiffs vie to be the

first to trial—and employ ever more creative means to that end.  Some state governmental

plaintiffs have opted to pursue claims in expedited administrative proceedings lacking in due

process protections rather than in court.[14]  Another state sought leave to file a bill of complaint in

---

[14] *See* Letter from Administrative Law Judge Stephen V. Thibodeau to Counsel, re: Consumer
Protection Division v. Purdue Pharma, at 3, *Consumer Protection Division v. Purdue Pharma*
*L.P.*, No. 19-023-311366 (Md. C.P.D. Aug. 6, 2019).

the United States Supreme Court, bypassing the trial and appellate courts altogether.[15]  And there

is even a dispute among the governmental plaintiffs as to which government entities are the

proper parties to bring claims on behalf of their citizens, as is currently being litigated in a

petition for mandamus in the United States Court of Appeals for the Sixth Circuit that the

Attorney General of Ohio recently filed.[16]

### III.    The Pending Actions Are Depleting Estate Assets and Consuming Substantial Resources

Irrespective of the merits, continued litigation of the Pending Actions in disparate fora on

the scale faced by the Debtors will only deplete estate assets, misdirect management attention,

and severely harm the Debtors' businesses.

### A.    The Pending Actions Impose Staggering Costs on the Estates

Purdue Pharma, the Debtors' main operating entity, is projected to spend approximately

$263 million on legal and related professional costs in 2019, the vast bulk of which is related to

the Pending Actions, government investigations, and the financial pressure resulting therefrom.

(O'Connell Decl. ¶ 16 & n.5.)  In the first half of 2019 alone, Purdue Pharma spent

approximately $63 million for legal representation, expert fees, and other expenses directly

related to litigating the Pending Actions, a number that is forecast to approach $121 million by

year-end—a rate of over $2 million per week.  (*Id.* ¶ 16.)

If Purdue Pharma's Pending Action-related expenditures remain at the projected 2019

level, they will constitute one of the largest annual expenses on Purdue Pharma's income

statement for the foreseeable future—higher than both projected general and administrative and

---

[15] *See* Mot. for Leave to File Bill of Compl., No. 22O151, *State of Arizona v. Richard Sackler* (U.S. July 31, 2019).

[16] *See* Pet. for Writ of Mandamus of State of Ohio (Dkt. No. 1), *In re State of Ohio*, No. 19-3827 (6th Cir. Aug. 30, 2019).

research and development.  (*Id.* ¶ 18.)  As the number of lawsuits nearing dispositive motion practice and trial increases in 2020 and beyond, there is no reason to think that litigation expenses directly connected to the Pending Actions will decrease. (*Id.* ¶ 19.)  Indeed, Purdue Pharma's legal expenses year-over-year have increased dramatically since 2015, when the Pending Actions against the Debtors numbered only a few cases.  (*Id.* ¶ 17.)

     **B.**     **The Pending Actions Divert Management and Employees from Their Critical Efforts to Manage the Debtors' Businesses**

In addition to these financial costs, the time and energy required to monitor, manage, and direct the Debtors' response to the Pending Actions is enormous, and it necessarily detracts from critical efforts to manage the business more generally and maximize its value for stakeholders. (Decl. of Jesse DelConte in Supp. of Mot. for Prelim. Inj., dated September 18, 2019 ("**DelConte Decl.**") ¶ 7)  As explained in the declaration of Jesse DelConte—a director at AlixPartners and one of Purdue's financial advisors who spends the majority of his time working from Purdue Pharma's headquarters in Stamford, Connecticut—many senior employees have been forced to devote significant time and efforts to litigation-related matters.  (*Id.* ¶¶ 6-7.)

As might be expected, considerable resources have been expended tending to an extremely large volume of discovery demands.  As just one example, the chief financial officer of Purdue Pharma was recently deposed in one state court action in the capacity of a corporate representative.  (*Id.* ¶ 10.)  This <u>single</u> deposition required approximately 30 hours of the chief financial officer's time to prepare and lasted a full day.  (*Id.*)  There have been many depositions of the Debtors' present or former directors, officers, or employees in the Pending Actions, which have in turn required current management and employees to sit through many more hours of preparation time.  (*Id.* ¶ 11.)  These depositions can only be expected to increase in frequency as more and more of the Pending Actions proceed to advanced stages.

12

Other discovery devices also consume the attention of the Debtors' management and employees.  The Debtors have been responding to interrogatories, requests for the production of documents, and requests for admission in actions all throughout the country.  (*Id.* ¶ 12.)  Although outside counsel is heavily involved, employees are necessarily required to perform research, provide answers, and verify the accuracy of responses to discovery requests, which at times requires them to gather large volumes of documents and data.  (*Id.*)  In addition to responding to written discovery demands, the Debtors have been subject to extensive document discovery.  (*Id.* ¶ 14.)  They have produced millions of documents in connection with the Pending Actions, including 50 million pages of documents in the MDL alone, with much more discovery yet to come.  (*Id.*)  The processes of collecting, reviewing, and approving productions inevitably distracts management and other employees from their core business responsibilities.  (*Id.*)

The Pending Actions have also caused or exacerbated various operational challenges and exacted significant human capital costs.  (*Id.* ¶ 15.)  For example, the Pending Actions have created and/or contributed to an environment of uncertainty and doubt that has both frustrated the Debtors' efforts to retain talent and made recruiting new talent difficult.  (*Id.*)  These issues have complicated the Debtors' efforts to operate their businesses and maximize their value for stakeholders.  (*Id.* ¶ 17.)

The drain of financial, human, and operational resources precipitated by the Pending Actions is to the severe detriment of all potential stakeholders.  Moreover, as detailed in the Declaration of John James O'Connell III—a partner at PJT Partners LP and Purdue's investment banker—against this backdrop of an ever increasing litigation docket and attendant costs, demand for opioid medications—which accounted for approximately 92% of Purdue Pharma's

13

revenue in 2018—has decreased significantly. (O'Connell Decl. ¶¶ 23-24 (noting that the market for opioids has fallen due to negative public opinion, initiatives to reduce prescriptions of opioid medications, and an adverse regulatory environment).) In 2010, Purdue Pharma generated $2.2 billion of revenue from opioid-related products. By 2018, that figure had dropped precipitously to $975 million and it is forecasted to be just $644 million for 2019. (*Id.* ¶¶ 23-24.) This decline in revenue will only impede the Debtors' ability to preserve estate value in the face of massive legal costs associated with the Pending Actions. This is particularly so in view of the fact that Purdue's new product pipeline will require investment over time and is not expected to generate revenue until 2022. (*Id.* ¶ 32.)

## IV.    The Settlement Structure

The Debtors spent the better part of the last year negotiating a global resolution of the Pending Actions. These efforts—which intensified in recent weeks and involved countless phone calls, in-person meetings, and other communications—culminated in an agreement in principle with critical and important constituents on a structure to resolve the Pending Actions that can be effectuated only through these chapter 11 proceedings.

This Settlement Structure would maximize the value of the Debtors' estates and result in an unprecedented transfer of value to the American people. Under the agreed-upon Settlement Structure, as part of a resolution of the litigation: (1) Purdue's existing shareholders will relinquish all of their equity interests in the Debtors and consent to the transfer of all of the Debtors' assets to a trust or similar post-emergence structure for the benefit of claimants and the U.S. public, "free and clear" of Purdue's liabilities to the fullest extent permitted by law; (2) Purdue's existing shareholders will engage in a sale process for their ex-U.S. pharmaceutical companies; and (3) Purdue's existing shareholders will contribute an additional $3 billion over

14

seven years (in addition to 100% of the value of all 24 Debtors), with the hope of substantial further contemplated contributions from the sales of their ex-U.S. pharmaceutical businesses.

This Settlement Structure has the strong support of key constituencies that represent a sizable portion of this country's citizens.  These include no fewer than 24 state attorneys general and analogous officials from five U.S. territories.  In addition, the Settlement Structure has the backing of the Plaintiffs' Executive Committee (PEC) and Co-Lead Counsel in the Ohio MDL.  The PEC is the court-appointed claimants' leadership team in the Ohio MDL that is charged with coordinating and organizing the various plaintiffs and litigation tracks.[17]  It comprises attorneys at law firms that collectively represent over 1,000 counties, municipalities (including cities, towns, and villages), Native American tribes, individuals, and third-party payors.  Among these plaintiffs are some of the nation's most populous cities and counties that, together with the supporting states and territories, comprise well over half of the country's population.

## ARGUMENT

## I.      This Court Should Enjoin the Active Governmental Actions

The Debtors request that this Court issue a preliminary injunction pursuant to section 105 of the Bankruptcy Code to stay the Governmental Actions for a period of 270 days (a period of time tied to the governmental bar date, which by statute cannot be fewer than 180 days from the petition date), and to impose the Voluntary Injunction on the Debtors.[18]

---

[17] *See* Renewed Mot. to Approve Co-Leads, Co-Liaisons, and Executive Committee, *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804 (N.D. Ohio Jan. 3, 2018) (Dkt. No. 34); Marginal Entry Order Granting Mot. to Approve Co-Leads, Co-Liaisons, and Executive Committee, *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804 (N.D. Ohio Jan. 4, 2018) (Dkt. No. 37).

[18] The Debtors also respectfully request that the Court not require the Debtors to give any security, as authorized by Federal Rule of Bankruptcy Procedure 7065.  *See* Fed. R. Bankr. P. 7065 ("Rule 65 . . . applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c).").

Section 105(a) authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" and provides this Court with broad, equitable powers to "assure the orderly conduct of the reorganization proceedings." 11 U.S.C. § 105(a); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987) (citing *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985)). Accordingly, the Court's authority under section 105(a) is additive to the automatic stay, as the Court may also "enjoin suits that might impede the reorganization process," *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988), even when such suits are not automatically stayed. *In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008) (section 105 "authorize[s] a bankruptcy court to exercise power outside the bounds of the automatic stay"); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 120 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012) ("A substantial threat to this Court's jurisdiction warrants the issuance of a[n] injunction pursuant to section 105(a) of the Code.").

The Debtors in no way concede and do not believe that the police power exception to the automatic stay applies. However, to confirm that the exception does not apply, the Court and the Debtors would be forced to engage in a time-consuming plaintiff-by-plaintiff and potentially claim-by-claim analysis of the nature of the entity pursuing the suit and the object of the claims pursued. Rather than consume estate and judicial resources with such an analysis, the Debtors now seek a stay under section 105(a), and reserve for later their right to assert in future proceedings that any of the Pending Actions, including any Governmental Action, is subject to the automatic stay and that no exception to the automatic stay applies.

Congress and the courts have made clear that section 105(a) permits the issuance of injunctions to stay governmental actions that fall within the police power exception, just as it

authorizes the Court to enjoin suits against non-debtors that are not subject to the automatic stay.

*See, e.g.*, *Penn Terra Ltd. v. Dep't of Envtl. Res. of Pa.*, 733 F.2d 267, 273 (3d Cir. 1984)

(holding that a bankruptcy court in "its discretion, may issue an appropriate injunction, even if

the automatic stay is not operative" as to a police power action); *Browning v. Navarro*, 743 F.2d

1069, 1084 (5th Cir. 1984) ("A bankruptcy court has the power to enjoin proceedings excepted

from a § 362 stay under [section 105]."); *In re Neuman*, 71 B.R. at 572 ("Even if [the police

power exception] does apply . . .  the Bankruptcy Court's broader equitable powers under § 105

permit it to enjoin the state proceeding."); *In re Vantage Petroleum Corp.*, 25 B.R. 471, 476-77

(Bankr. E.D.N.Y. 1982) (issuing injunction pursuant to section 105 to stay administrative

proceeding subject to police power exception); (Kaminetzky Decl. Ex. D (Hr'g Tr., *In re TK*

*Holdings Inc., et al.*, No. 17-11375 (BLS) (Bankr. D. Del. Aug. 16, 2017) ("*In re TK Holdings*

*Inc.* Hr'g Tr."), at 25-30 (enjoining lawsuits brought by state governments pursuant to section

105(a))).  Put another way, as the legislative history of section 362 makes clear, "[t]he effect of

an exception [to the automatic stay] is not to make the action immune from injunction," because

"the court has ample other powers" under Section 105 "to stay actions not covered by the

automatic stay."  *See* H.R. REP. NO. 95-595, at 342 (1977), *reprinted in* 1978 U.S.C.C.A.N.

5963, 6298.[19]

In assessing whether such a preliminary injunction under section 105(a) is appropriate,

courts look to the traditional requirements for a preliminary injunction under Federal Rule of

Civil Procedure 65, modified to fit the bankruptcy context.  Thus, courts in this Circuit consider:

---

[19] *See also In re Sec. Gas & Oil, Inc.*, 70 B.R. 786, 793 (Bankr. N.D. Cal. 1987) ("[Section 362(b)] lists seven exceptions to the automatic stay.  The effect of an exception is not to make the action immune from injunction." (citing S. REP. NO. 95-989, at 51 (1978), *reprinted in* 1978 U.S.C.C.A.N 5787, 5837; H.R. REP. NO. 95-595, at 342 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6298)).

(1) whether there is a reasonable likelihood of successful reorganization; (2) whether there is imminent irreparable harm to the estate and the bankruptcy process in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction. *See In re Soundview Elite Ltd.*, 543 B.R. 78, 118-19 (Bankr. S.D.N.Y. 2016); *In re Lyondell Chem. Co.*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009). "In evaluating these factors, the court takes a flexible approach and no one factor is determinative." *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (quotation omitted). Here, all four factors weigh heavily in favor of the requested injunction.[20]

---

[20] A number of courts have held that "[b]ecause injunctions under section 105(a) are authorized by statute, they need not comply with traditional requirements of Rule 65." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 120 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012). "Rather, a bankruptcy court may utilize section 105 of the Code to 'enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it.'" *Id.* (quoting *Johns–Manville Corp. v. Colo. Ins. Guar. Assoc. (In re Johns–Manville Corp.)*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988)). An injunction to stay an action under section 105(a) is proper so long as "the Bankruptcy Court finds that the action would embarrass, burden, delay or otherwise impede the reorganization proceedings." *In re Neuman*, 71 B.R. at 571-72 ("Since injunctions in bankruptcy cases are authorized by statute, the usual equitable grounds for relief, such as irreparable damage, need not be shown."); *see also In re Caesars Entm't Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015) (section 105(a) permits bankruptcy court to issue injunction if it is "likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy").

Under this alternative test, the Debtors' requested relief is clearly warranted. The continued prosecution of the Governmental Actions undoubtedly impedes and impairs the Debtors' bankruptcy cases and this Court's jurisdiction. The purpose of these proceedings is to permit a coordinated and equitable resolution of the opioid-related claims against the Debtors. Continued piecemeal litigation of the Governmental Actions would be fatal to that purpose, as it would continue the "chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *Fid. Mortg. Inv'rs v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir. 1976). And absent a stay, the Debtors' estates will inexorably be drained by massive litigation costs. Accordingly, a preliminary injunction staying the Governmental Actions is warranted.

### A.    These Chapter 11 Cases Are Likely to Be a Success

The first prong of the preliminary injunction standard in the bankruptcy context considers whether there is a reasonable likelihood of a successful reorganization.  *See In re Lyondell Chem. Co.*, 402 B.R. at 589; *In re W.R. Grace & Co.*, 386 B.R. 17, 33 (Bankr. D. Del. 2008); *In re Calpine*, 365 B.R. at 409.  An injunction is appropriate in this case because the Debtors are likely to successfully accomplish the goal of these chapter 11 proceedings:  to halt the drain on the Debtors' estates; centralize all of the claims against the Debtors; determine whether and to what extent they are liable, if required; and construct a confirmable plan of reorganization to implement the Settlement Structure for the benefit of the American people.

As noted above, the Settlement Structure has the support of 24 state attorneys general and analogous officials from five U.S. territories as well as the court-appointed PEC in the Ohio MDL, which consists of lawyers at firms that collectively represent over 1,000 counties, municipalities, Native American tribes, individuals, and third-party payors.  With this Settlement Structure in place, the Debtors, the Sackler Families and a critical mass of plaintiff constituencies have taken the first important steps towards a global resolution of the Pending Actions—a resolution that can be finalized and effectuated only in bankruptcy.

The Settlement Structure presents those who do not currently support it with a clear choice.  On the one hand, claimants could maximize the benefits to all claimants and to the public as a whole by pursuing a consensual plan of reorganization that will dedicate the Debtors' value to the public's benefit.  Or, on the other hand, each claimant could continue to jostle for a larger slice of the Debtors' dwindling value for itself—even though they will thereby destroy hundreds of millions of dollars or more of value available for all claimants and for the public. The Debtors are hopeful that these plaintiffs will come to recognize the Settlement Structure's value.  However, if some claimants insist on pressing their own claims to the detriment of all,

19

decades of experience demonstrate that bankruptcy is a proven and efficient vehicle to successfully, rationally, and equitably resolve such mass tort liability.[21]  It is clear that a number of procedures available in bankruptcy can and will move this case toward a successful resolution.

The present injunction motion is the first step in rationalizing the claims against the Debtors, as recent governmental mass tort cases have shown.  For example, the bankruptcy court in *In re TK Holdings* employed section 105 to enjoin actions brought by governmental entities against the debtors as well as a number of actions against related parties.  (Kaminetzky Decl. Ex. D (*In re TK Holdings* Hr'g Tr.) at 5.)  As here, this injunction was essential to shielding the debtors from destructive multi-front litigation, and it permitted them to focus their efforts on consummating a deal structure that was in its early stages and, ultimately, a consensual plan of reorganization.  *Id.* at 26.  Similarly, in the recently filed bankruptcy of opioid manufacturer Insys Therapeutics, Inc., the debtors have sought to deploy a number of tools uniquely available in bankruptcy to facilitate a resolution, including by moving for an injunction against the continued prosecution of litigation by governmental entities—a motion ultimately resolved on consent—resulting in the effective stay of all active litigation against Insys.  (*See* Kaminetzky Decl. Ex. E at 7-11 (Hr'g Tr., *In re Insys Therapeutics*, No. 19-11292 (KG), at 7-11 (Bankr. D. Del. Jul. 2, 2019) ("*In re Insys Therapeutics* Hr'g Tr.").)

---

[21] As courts have consistently recognized, the bankruptcy court is the most logical and best positioned forum for the resolution of such mass tort liability.  *See In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 359 (3d Cir. 2012) ("Bankruptcy has proven an attractive alternative to the tort system for corporations [facing mass tort claims] because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably."); S. Elizabeth Gibson, *Judicial Management of Mass Tort Bankruptcy Cases*, Federal Judicial Center, at 1 (2005), https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that "bankruptcy courts have become a forum for companies seeking the resolution of pending and threatened mass tort litigation" and that, as of the publication date, "over seventy companies, motivated primarily by their desire to reach a final resolution of their mass tort liabilities, have sought bankruptcy protection").

The next step would be for the Debtors to initiate the process by which the claims against them are centralized and crystalized in this Court.  To facilitate the identification and analysis of relevant claims, the Debtors, after working with other parties in these cases, intend to file a motion to establish bar dates, approve associated proof-of-claim forms, and approve the form and manner of notice to potential claimants.

This step will facilitate the efficient resolution of common issues in consolidated proceedings, through the use of bankruptcy tools such as: (1) the ability to implement coordinated and cost-effective discovery protocols; (2) the use of omnibus objections and consolidated hearings or trials to allow or disallow claims involving common questions of law or fact, *see* Fed. R. Bankr. P. 3007(d), 7042; and (3) the ability to craft flexible and efficient mechanisms for valuing claims through claims estimation pursuant to section 502(c) of the Bankruptcy Code.  *See In re Dow Corning*, 211 B.R. 545, 554 (Bankr. E.D. Mich. 1997) (*In re Dow Corning I*); *In re Dow Corning*, 215 B.R. 346, 348-49 (Bankr. E.D. Mich. 1997) (*In re Dow Corning II*).[22]

The use of omnibus objections and consolidated hearings and trials will be of particular importance in this case because the Pending Actions raise numerous common issues and defenses that will be amenable to consolidated resolution.  Examples include (1) the issue of causation, i.e., whether the Debtors can be held liable for any harms caused by individuals'

---

[22] In the Dow Corning bankruptcy, the debtor Dow Corning faced thousands of suits in connection with its manufacturing of silicone-gel breast implants, and filed for chapter 11 to manage and resolve that liability.  Disputing its liability, at the outset of its bankruptcy case, Dow Corning asked the bankruptcy court to adjudicate certain threshold legal issues common to most of the personal injury claims.  *See In re Dow Corning I*, 211 B.R. at 554; *In re Dow Corning II*, 215 B.R. at 348-49.  The court agreed that it could adjudicate such threshold issues on the merits in order to assess the validity of the asserted claims.  *In re Dow Corning II*, 215 B.R. at 352.  While Dow Corning's summary judgment motion was pending—and against that backdrop—the parties negotiated a consensual chapter 11 plan.

opioid abuse given the lengthy chain of intervening and superseding events; (2) the standing of

local governments to assert claims that may only be brought by state governments; (3) whether

claims against the Debtors are time-barred by applicable statutes of limitations; (4) whether the

state law claims against the Debtors are preempted by federal law; and (5) whether the expert

testimony upon which claims against the Debtors rely is admissible.  Whether any of these issues

will in fact be litigated to conclusion in the course of this bankruptcy remains to be seen, but

bankruptcy, unlike the current status quo, presents mechanisms that allow the claims against the

Debtors to be resolved in an efficient and uniform manner that avoids duplication, waste, and the

inequities of disparate outcomes.

    To date, achieving a truly global resolution of the pending claims has been impeded by

the uncoordinated nature of the Pending Actions, constant jockeying of plaintiffs for position and

leverage, and questions surrounding the implementation of a global resolution.  By providing a

collective process that ensures equal treatment of similarly situated claimants, and the finality

that is an essential part of any comprehensive settlement,[23] bankruptcy will help structure

negotiations and enable a comprehensive and equitable resolution.[24]  The proposal of the

---

[23] The Bankruptcy Court's power to issue a channeling injunction to direct mass tort claims toward a post-confirmation trust, and thereby allow debtors to globally resolve the claims against them and related persons and provide recoveries to injured plaintiffs, is just one example of how bankruptcy offers tools to achieve a global resolution that are not available in other mass tort litigation.  *See, e.g.*, *In re Johns–Manville Corp.*, 26 B.R. 420, 426 (Bankr. S.D.N.Y. 1983); Second Am. & Restated Plan of Reorganization & Related Docs. as Executed & Delivered at Plan Consummation, *In re Johns–Manville Corp.*, No. 82-11656 (CGM) (Bankr. S.D.N.Y. 1982) (ECF No. 4206-14); Jack B. Weinstein, *Individual Justice in Mass Tort Litigation*, at 280-81, n.88 (1995) ("Some trust mechanisms have functioned very well.  The Dalkon Shield Claimants Trust has been, on the whole, a success."); Georgene M. Vairo, *Georgene, The Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution,* 31 Loy. L.A. L. Rev. 79, 153 (1997) (observing that the Dalkon Shield Trust's approach to resolving claims "worked well").

[24] *See In re A.H. Robins Co., Inc.*, 216 B.R. 175, 179 (E.D. Va. 1997) ("The Bankruptcy Code permits and encourages holders of claims to reach a negotiated settlement of their respective positions under a plan of reorganization and allows the court to confirm a negotiated plan."),

22

Debtors' ultimate owners to, among other things, relinquish all of their equity interests in the

Debtors and consent to the transfer of all of the Debtors' assets to a trust or similar post-

emergence structure for the benefit of claimants and the U.S. public has laid the foundation for

the success of these proceedings.  (Kaminetzky Decl. Ex. D (*In re TK Holdings* Hr'g Tr.) at 25-

26 (granting requested injunction at early stage because the debtors' prospect for a successful

reorganization were "clearly enhanced if at this critical juncture" the debtors, their customers,

and stakeholders focused on the sale efforts)); *In re Lyondell Chem.*, 402 B.R. at 590 (granting

requested injunction where "there is no reason to believe or suspect that [the debtor's]

reorganization will fail—unless, of course, the acts sought to be enjoined *cause* it to fail").  By

using the critical tools available to mass tort chapter 11 debtors, the probability of the Debtors'

successful reorganization is high.  But this probability drops precipitously if this initial tool—a

stay of a staggering number of duplicative and costly litigations in courts around the country—is

left unused.

### B.    The Debtors Will Suffer Irreparable Harm Unless the Active Governmental Actions Are Stayed

Without a stay of the active litigation, there will be "imminent irreparable harm" to the

Debtors' reorganization and estates.  *In re Lyondell Chem.*, 402 B.R. at 590-91.  In the context of

bankruptcy proceedings, it is enough that "the action sought to be enjoined would embarrass,

---

*aff'd*, 163 F.3d 598 (4th Cir. 1998); *In re Dow Corning I*, 211 B.R. at 584 (noting that "virtually all [mass tort bankruptcies] were resolved by negotiated plans of reorganization"); *In re G-I Holdings, Inc.*, 323 B.R. 583, 626 (Bankr. D.N.J. 2005) (permitting debtor to move for issues on a "claims-wide consolidated basis," after which the parties reached a negotiated resolution); *In re USG Corp.*, 290 B.R. 223, 227 (Bankr. D. Del. 2003) (same); *In re W.R. Grace & Co.*, 355 B.R. 462, 468, 493-94 (Bankr. D. Del. 2006) (resolving threshold issue of whether debtor's product caused unreasonable risk of harm, after which the parties reached a negotiated resolution); David Rosenberg, *Of End Games and Openings in Mass Tort Cases: Lessons from a Special Master*, 69 B.U. L. Rev. 695, 729 (1989) (noting that "bankruptcy involves somewhat unique conditions which encourage settlement").

burden, delay or otherwise impede the reorganization proceeding, or if a stay is necessary to preserve or protect the debtor's estate and reorganization prospects." *In re Alert Holdings, Inc.*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992); *In re Calpine*, 365 B.R. at 409 (observing that an injunction is appropriate not only where irreparable harm is threatened to the estate but also "where the action to be enjoined is one that threatens the reorganization process") (quotation omitted).

There can be little doubt that the Debtors' estates and their prospects for successful reorganization will be irreparably harmed unless the requested injunction issues. If the Pending Actions continue as they had before the Debtors' bankruptcy filings, the Settlement Structure will be irretrievably undermined as the Debtors' estates continue to be consumed by legal fees and the plaintiffs' endless race to courthouses around the country continues. As long as some parties remain able to pursue litigation in disparate fora—rather than before this Court—even those plaintiff constituencies that support the Settlement Structure face a paradigmatic "prisoner's dilemma." They will be forced to choose to litigate in courts across the country to avoid being left behind as others pursue litigation, even though that strategy depletes the value of the estates.

The Pending Actions and the uncertainty that they foment impose significant human capital costs on the Debtors. The Debtors have already suffered several key resignations, complicating the Debtors ability to operate the business. (DelConte Decl. ¶ 16.) Uncertainty is also hindering the Debtors in recruiting new talent to fill vacancies. (*Id*. ¶ 17.) And negative public sentiment surrounding the Pending Actions has frustrated the Debtors' ordinary operation of their businesses: as one example, several financial intuitions refused to work with Purdue, requiring management to spend precious time securing replacements. (*Id*. ¶ 18.) Absent a stay

of the Pending Actions, management will continually be distracted from maximizing the
Debtors' value.

Simply put, the stay requested herein is essential to the orderly conduct of proceedings
and achieving a global resolution, and continued litigation is antithetical to fundamental
bankruptcy policies, such as the maximization of value and equal treatment of similarly situated
creditors.  In fact, it is hard to see how bankruptcy could achieve <u>any</u> of its goals without a stay
to "prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of
uncoordinated proceedings in different courts," and "insure[] that the debtor's affairs will be
centralized, initially, in a single forum in order to prevent conflicting judgments from different
courts and in order to harmonize all of the creditors' interests with one another." *Camelia
Builders*, 550 F.2d at 55; *see also In re Johns-Manville Corp.*, 31 B.R. 627, 628 (S.D.N.Y. 1983)
("The pendency of thousands of asbestos claims against the debtor, lodged as separate
proceedings in innumerable courts, is a textbook example of the kind of threat for which the
automatic stay provision was designed."); *In re Muralo Co., Inc.*, 301 B.R. 690, 701 (Bankr.
D.N.J. 2003) (noting that invoking the automatic stay to help address "the extraordinary turmoil
and expense of administering a nationwide asbestos mass tort litigation defense . . . would seem
to be thoroughly consistent with the purposes of [section] 362(a)"); Barbara J. Houser, *Chapter
11 as a Mass Tort Solution*, 31 LOY. L.A. L. REV. 451, 452 (1998) ("For a company whose very
existence is threatened by the overwhelming burden of defending against ongoing litigation
arising from its allegedly defective product, the automatic stay of all litigation is an enormous
benefit.").

The costs associated with the Pending Actions are enormous, and estate value is
irretrievably lost by the day.  Purdue Pharma is projected to spend approximately $263 million

25

on legal and related professional costs in 2019, the vast majority of which is related to the litigations, government investigations, and the financial pressure resulting therefrom. (*See* O'Connell Decl. ¶ 16.) Indeed, in the first half of 2019, Purdue Pharma spent approximately $63 million for legal representation, expert fees, and other expenses directly related to litigating the Pending Actions, a number that is forecast to approach $121 million by year-end—a rate of over $2 million per week. (*Id.*)

Unless the Governmental Actions and Related Party Actions are stayed, many millions of critical dollars will continue to be squandered on legal costs and associated expenses rather than being preserved for the greater benefit and being put to productive and potentially life-saving use by furthering the development and distribution of opioid overdose treatments. *See, e.g.*, *NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 696 (8th Cir. 1985) (affirming the issuance of an injunction because, among other reasons, the "expense which would have been required by the hearings w[as] substantial" and the "proceedings threatened the assets of the debtor's estate").

The Pending Actions' corrosive effect on estate value and threat to the reorganization efforts is not limited to the direct costs of litigation. The Pending Actions consume the time and attention of the Debtors' leadership and employees, all at the expense of diverting them from focusing on maximizing the value of the Debtors' businesses and ensuring that resources are properly devoted to productive, public-benefiting uses. (DelConte Decl. ¶¶ 7-14.) Indeed, if suits were to continue against the Debtors or against the Related Parties, it is almost certain that the Debtors' leadership would be forced to attend hearings and trials, prepare for and participate in depositions, and assist in responding to a wide array of time-consuming written discovery devices. Staying the Pending Actions will allow the Debtors and their leadership to focus their attention on their businesses and on achieving a global resolution of the Pending Actions in these

26

chapter 11 proceedings, for the benefit of all estate stakeholders.  *See In re Ionosphere Clubs,*

*Inc.*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (granting injunction where "[t]he massive drain

on [key officers'] time and energy at this crucial hour of plan formulation in either defending

themselves or in responding to discovery requests could frustrate if not doom their vital efforts at

formulating a fair and equitable plan or reorganization") (second alteration in original) (quotation

omitted); (Kaminetzky Decl. Ex. D (*In re TK Holdings* Hr'g Tr.) at 27 (finding that "the task of

monitoring hundreds of lawsuits" posed "a material risk[] for the[] debtors")); *In re Calpine*, 365

B.R. at 412 (enjoining actions against a non-debtor where the debtor's employee was "key to the

restructuring and to the business and that [the debtor and employee] would suffer irreparable

harm if he were distracted from his responsibilities in order to participate in the [ongoing]

litigation"); *In re The Billing Res.*, No. 07-52890-ASW, 2007 WL 3254835, at *14 (Bankr. N.D.

Cal. Nov. 2, 2007) (granting injunction where, *inter alia*, "[t]he diversion of [d]ebtor's

management—and [its president] in particular—in defending the [FTC] Enforcement Action

during the next few months seriously threatens [d]ebtor's reorganization");

As important context for the above, the Pending Actions are otherwise slated to continue

at a ferocious pace in the next weeks and months.  As of September 14, the Debtors were

scheduled to take or defend 60 depositions, file as many as 22 dispositive motions, and

participate in five hearings on dispositive motions in five different courts across the country over

the next month and a half.  (Kaminetzky Decl. ¶ 2.)

Section 105(a) authorizes the Court to enjoin suits not otherwise subject to the automatic

stay to prevent exactly this type of harm—wasteful and detrimental costs that would arise from

continued prosecution of actions—under circumstances far less extreme than those confronting

the Debtors.  For example, in *Superior Forwarding*, the Eighth Circuit affirmed the issuance of a

section 105(a) injunction to stay a regulatory proceeding—which was estimated to require "three

to four weeks of trial time at an approximate cost of $65,000"—based on the bankruptcy court's

finding that "the time and effort of management and the expense which would have been

required by the hearings were substantial" and harmful to the debtor's estate.  762 F.2d at 696,

699.  Similarly, the bankruptcy court in *In re Hunt* enjoined an administrative proceeding by the

Commodity Futures Trading Commission and found irreparable harm based on, among other

things, "the burdensome and potentially unnecessary dollar and time costs associated with the

preparation and presentation of a vigorous defense of the CFTC Action."  93 B.R. 484, 495

(Bankr. N.D. Tex. 1988).

A preliminary injunction to stay the active Governmental Actions here is warranted to

prevent irreparable harm to the Debtors' estates and prospects for reorganization.

### C.     The Balance of Harms Weighs Heavily in Favor of Issuing an Injunction

The certain harm facing the Debtors, their estates, and the reorganizational process more

generally in the absence of a stay far outweighs the minimal, if any, prejudice that the

Governmental Defendants would suffer if this Court were to grant the requested relief.

First, as discussed above, the Governmental Actions are actions that in large part

ultimately seek monetary relief.  Allowing these actions to continue to judgment would not

provide any real benefit to the Governmental Defendants, particularly in light of the Settlement

Structure endorsed by a number of these very same defendants.  Even if the Governmental

Actions were litigated to conclusion, the Governmental Defendants would be permitted only to

reduce their money claims to judgment, as they cannot enforce any monetary judgments against

the Debtors.  11 U.S.C. § 362(b)(4).  Thus, the expenditure of hundreds of millions of dollars in

attorneys' fees and the uncertainty and distraction of trials would win nothing more than proofs

of claim to be filed and addressed in this Court.  So while forcing the Debtors to expend millions

of critical post-petition dollars to litigate outside these bankruptcy cases, if any such plaintiff

prevails, it will have bought nothing more than a round-trip ticket back to this Court.

Second, the Debtors recognize that some actions seek injunctive relief.  Any need for

such relief is addressed by the unprecedented Voluntary Injunction that the Debtors ask this

Court to enter against them.  The terms of the proposed Voluntary Injunction—which include,

among other things, a prohibition on the promotion of opioids—are even broader than the

injunctive relief agreed to in the Debtors' settlement and global release of litigation by the

Oklahoma Attorney General.  The Debtors request that this Court enter the Voluntary Injunction

to underscore that they are in no way seeking to employ bankruptcy or the time-limited

injunction they now seek as some sort of improper refuge.

Finally, even if the Governmental Defendants were somehow prejudiced by a stay, the

time-limited nature of the stay requested here in the first instance—270 days—would

significantly limit that prejudice.  Postponements in the progress of litigation are neither

extraordinary nor unexpected, and a temporary stay will not cause the Governmental Defendants

to suffer any financial hardship or tangible harm.[25]

### D.    Granting the Requested Injunction Is in the Public Interest

The public interest weighs heavily in favor or granting the requested stay.

This is an extraordinary case.  After a year of intense and arduous negotiations, the

Debtors, the Debtors' ultimate owners, and a critical mass of governmental and representative

constituencies have reached an agreement in principle on the structure of a global resolution.

The requested stay would advance the prospects of a global, orderly, equitable (and hopefully)

---

[25] In fact, as mentioned previously, the Bankruptcy Code is clear that even if the police powers
exception does apply, that exception expressly and specifically prohibits enforcement of any
money judgment, thus rendering the continued prosecution of these claims which largely seek
monetary damages entirely wasteful.  11 U.S.C. 362(b)(4).

consensual resolution of the Pending Actions while stemming the enormous drain on party and

judicial resources caused by disjointed prosecution of those actions.  The Settlement Structure, if

implemented, would contribute billions of dollars in value for the benefit of the Debtors'

creditors.  Simply put, every dollar that is squandered litigating overlapping claims in disparate

fora throughout the country during the pendency of these bankruptcy proceedings is a dollar that

will not otherwise be preserved for the American public or other potential estate stakeholders,

including the plaintiffs in the Pending Actions.  Such a result would be antithetical to the public

interest.

As the State of Arizona recently stated in a petition for the Supreme Court to exercise

original jurisdiction over its case:  "Absent resolution in a single forum, these disputes will be

fought over and over in nearly every State in the Nation.  This is likely to take years, lead to

inconsistent judgments, and create an inequitable distribution of money damages."[26]  The

Debtors agree that protracted bilateral litigation between the Debtors and thousands of states,

counties, and municipalities in this country—with the inconsistent judgments that will inevitably

result—is not a desirable means of resolving this dispute with nationwide implications.

(Kaminetzky Decl. Ex. D (*In re TK Holdings* Hr'g Tr.) at 23-24 (in granting injunction to stay

governmental actions brought by individual states, finding it significant that "[t]he threat of

injury or loss posed by the debtors' products presents a substantial and identical risk in all 50

states in the U.S. territories," while "any relief obtained by those entities in the state actions will

necessarily be to the detriment of the citizens of other states")); *In re Dow Corning I*, 211 B.R. at

588 ("[I]t is anything but just when presenting the identical proofs, one plaintiff suffering nearly

---

[26] Mot. for Leave to File Bill of Compl. in the Supreme Court of the United States, *State of Arizona v. Purdue Pharma L.P., et al.*, No. 22O151, at 20 (July 31, 2019).

30

identical injuries or illness[] wins a multimillion dollar verdict against a defendant while another

takes nothing.").

For all these reasons, the requested injunction is in the public interest.

## II.     This Court Should Enjoin the Related Party Claims

The Governmental Actions are not the only actions that threaten the Debtors'

reorganization.  Claims are currently pending against certain of the Debtors' current and former

officers—including their current CEO—owners, directors, employees, and associated entities.  If

allowed to continue, these claims will undermine the Debtors' reorganization.  The Debtors do

not seek a stay of Related Party Claims out of a desire to benefit or protect any Related Party—

including any member of the Sackler Families.  In reality, the Debtors seek to avoid the

irreparable injury the Related Party Claims impose, directly and collaterally, on the Debtors by

imposing significant litigation costs and burdens, by risking record taint, by diminishing the

value of estate assets, and by threatening to undercut the Related Party contributions that are a

keystone of the Settlement Structure.[27]

### A.     The Court Has Jurisdiction to Enjoin Prosecution of the Related Party Claims

As an initial matter, the Court has jurisdiction to stay prosecution of the Related Party

Claims because their continued prosecution risks direct and substantial negative impact on the

Debtors' estates. [28]  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 211 (2d Cir. 2014) ("[A]

---

[27] As courts have recognized, the automatic stay of section 362(a)(1) may suspend an action
against a non-bankruptcy party under certain circumstances, such as where the debtor and non-
party have unity of interest.  *In re North Star Contracting Corp.*, 125 B.R. 368, 370 (S.D.N.Y.
1991).  To conserve judicial and estate resources, the Debtors now seek a stay of the Related
Party Claims under section 105(a), and reserve for later their right to assert in future proceedings
that any of the Related Party Claims are subject to the automatic stay.

[28] Under 28 U.S.C. § 1334(b), this Court's jurisdiction encompasses, among other things, all civil
proceedings "related to cases under title 11."  "The test for determining whether litigation has a

court has the power pursuant to section 105(a) to enjoin claims against a non-debtor third party

where those claims are derivative or otherwise pose[] the specter of direct impact on the *res* of

the bankrupt estate." (alteration in original) (citations and quotation omitted)).  Bankruptcy

courts routinely exercise "related to" jurisdiction over claims that, like the Related Party Claims,

are inextricably intertwined with claims against debtors or could give rise to indemnification

claims against debtors.  *See Gisinger v. Patriach*, No. 16-CV-1564, 2016 WL 6083981, at *3

(S.D.N.Y. Oct. 18, 2016) ("related to" jurisdiction existed where, among other things, the

proceedings were "inextricably intertwined by virtue of the identical facts and assertions")

(quotation omitted); *see also In re SunEdison, Inc.*, 576 B.R. 453, 462 (Bankr. S.D.N.Y. 2017)

("Where a third party claim may give rise to a potential indemnification or contribution claim

against the estate, the third party claim will have a conceivable effect on the estate, and

accordingly, the [c]ourt has the jurisdiction to enjoin it.").

### B.      The Related Party Claims Should Be Stayed

Applying the familiar four-part test detailed above, the Related Party Claims should be

stayed because the reorganization is likely to be successful if (and only if) the suits are stayed;

their continued prosecution would result in irreparable harm to the Debtors' estates and their

reorganization; and the balance of equities and public interest favors the limited stay the Debtors

---

significant connection with a pending bankruptcy [sufficient to confer bankruptcy jurisdiction] is
whether its outcome might have <u>any conceivable effect on</u> the bankrupt estate.  If that question is
answered affirmatively, the litigation falls within the 'related to' jurisdiction of the bankruptcy
court." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (emphasis added)
(quotation omitted).  "For a federal court to have 'related to' jurisdiction over an action, the
proceeding need not necessarily be against the debtor or against the debtor's property.  An action
is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or
freedom of action (either positively or negatively) and which in any way impacts upon the
handling and administration of the bankrupt estate." *In re Glob. Crossing, Ltd. Sec. Litig.*, No.
02-CV-10199, 2003 WL 21659360, at *1 (S.D.N.Y. July 15, 2003) (citation and quotation
omitted).

seek. *See, e.g.*, *In re Phila. Newspapers, LLC*, 407 B.R. 606, 617 (E.D. Pa. 2009) (affirming the injunction of claims against defendant non-debtors, where debtors were not named defendants, where the non-debtor litigation would result in "irreparable harm and have an adverse effect on the [d]ebtors' reorganization efforts").

> 1. *The Debtors Are Likely to Successfully Reorganize, and the Related Party Claims Will Irreparably Harm the Estates and Their Reorganization Prospects*

That the Debtors are likely to successfully reorganize—if the requested relief is granted—is detailed in Part I, above, and will not be repeated here. Yet, it is important to note that Related Parties are essential to this success. There would simply be no Settlement Structure without the existing shareholders' willingness to agree in principle, and as part of a global resolution, to voluntarily relinquish all of their equity interests in the Debtors, to consent to the transfer of the Debtors' enterprise in its entirety to a trust or similar post-emergence structure for the benefit of claimants and the U.S. public, "free and clear" of the Debtors' liabilities, and to contribute a minimum of $3 billion over seven years in additional funds. This foundation for success should not be undermined by allowing the Related Party Claims to deplete estate assets and to threaten the Settlement Structure.

The Related Party Claims are based on conduct substantially identical to, and inextricably intertwined with, that alleged to have been engaged in by the Debtors. Indeed, many of the Related Party Claims do not distinguish between the actions of the Debtors or Related Parties, but instead assert that both sets of defendants are jointly liable for the same alleged conduct, under the same theories. As just one example, the Massachusetts Attorney General's complaint (like many others) makes no attempt to differentiate between the conduct of the Related Parties and the Debtors. Indeed, the Commonwealth expressly seeks relief based on "their conduct . . . in the course of marketing and promoting its opioids in Massachusetts," making no distinction

33

between the Debtors and Related Parties and alleging that the parties collected hundreds of

millions of dollars and caused injury based on their alleged collective unfair and deceptive

actions.  Mass. First Am. Compl. at ¶¶ 895-99 (emphases added).  Indeed, the Commonwealth

does not allege that the Related Parties acted independent of their role at the Debtors; rather, in a

section titled "The Individual Defendants Led Purdue's Misconduct," Massachusetts alleges that

"[t]he individual defendants were the chief architects and beneficiaries of Purdue's deception,"

"controlled the misconduct [of Purdue]," and are "personally responsible for Purdue's illegal

scheme."  *Id.* at ¶¶ 159-61 (emphases added).  Nowhere in this 910-paragraph complaint—or for

that matter in the other substantially similar complaints brought elsewhere—are there any

allegations of misconduct that did not directly arise from the Related Parties' alleged conduct

while affiliated with the Debtors.

Because the claims against the Related Parties are inextricably linked to claims against

the Debtors, the Debtors will be forced to participate in actions in which the Debtors are the

party in interest in all but name—further diminishing the Debtors' resources and diverting

critical management focus and attention from the all-important task of achieving consensual

resolution of these chapter 11 proceedings.  Current directors, officers, and employees of the

Debtors will almost certainly be required to spend time overseeing and assisting in protecting the

Debtors' interests in the Related Party Claims.  The Debtors would also very likely be the subject

of burdensome third-party discovery requests—a risk made all the more acute because permitting

active litigation to proceed against Related Parties could very well incentivize other plaintiffs to

bring claims against those parties.

For these reasons, courts routinely enjoin such actions against third parties that will

impose burdensome litigation on debtors.  *See In re Calpine*, 365 B.R. at 412 (enjoining actions

against a non-debtor where the debtor "would suffer irreparable harm if [a key employee] were distracted from his responsibilities in order to participate" in ongoing litigation); *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06-CV-5358, 2006 WL 3755175, at *5 (S.D.N.Y. Dec. 20, 2006) (affirming the injunction of actions against a non-debtor where "the logistical stress on [the debtor] from attempting to simultaneously undertake a massive reorganization while monitoring and producing documents in the [s]tate [c]ourt [a]ction threatened to irreparably impair the company's reorganization process"); *see also A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 998 (4th Cir. 1986) (among other things, the purpose of the stay is "to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization").

That the Related Party Claims are inextricably intertwined with claims against the Debtors also creates a material risk that findings of law or fact with respect to the Related Party Claims would create an adverse record against the Debtors. Such findings could even embolden plaintiffs to argue that they are entitled to collateral estoppel against the Debtors based on findings against the Related Parties. These risks also support staying the Related Party Claims. *See In re Ionosphere Clubs*, 111 B.R. at 435 (enjoining third-party claims because, *inter alia*, "a finding of liability as to [the debtor]'s codefendants may be extended to [the debtor], and collateral estoppel may bar [the debtor] from litigating factual and legal issues critical to its defense"); *In re W.R. Grace & Co.*, 386 B.R. at 35 (taking into account "the risks of collateral estoppel and record taint" in issuing injunction to stay claims against third parties); *Union Tr. Phila., LLC v. Singer Equip. Co. (In re Union Tr. Phila., LLC)*, 460 B.R. 644, 657 (E.D. Pa. 2011) (in subsequent suits, debtor could be bound by "critical factual and legal issues" determined in the proceedings against non-debtor).

35

In addition, as noted above, continued prosecution of Related Party Claims against the Debtors' existing shareholders and their affiliates risks toppling the Settlement Structure and depriving the Debtors' estates of billions of dollars of value.  As discussed above, even if the requested stay does not issue, no money judgment may be enforced against the Debtors. 11 U.S.C. § 362(b)(4).  The Related Parties have no such protection—the risk that money judgments could be entered against them irreparably harms the Debtors and their reorganization in at least two critical ways.

For one, if forced to bear the risk of adverse money judgments, the Related Parties may be unwilling—or unable—to make the billions of dollars of contributions contemplated by the Settlement Structure.  Courts have routinely employed section 105(a) to enjoin such suits that threaten non-debtors' ability or willingness to contribute funds to a reorganization.  As just one example, the Bankruptcy Court presiding over *Caesars*, on remand, enjoined a suit against a debtor's parent company on the ground that a judgment against the parent company would "rule out" the parent company's contemplated significant financial contribution to a plan.  *In re Caesars Entm't Operating Co., Inc.*, 561 B.R. 441, 451 (Bankr. N.D. Ill. 2016); *see also, e.g.*, *In re United Health Care Org.*, 210 B.R. 228, 232 (S.D.N.Y. 1997) (enjoining suit against non-debtors because the Debtors "would be adversely effected [sic] because the [pending actions] would prevent the non-debtor from contributing funds to the reorganization"); *In re Lazarus Burman Assocs.*, 161 B.R. 891, 899 (Bankr. E.D.N.Y. 1993) (enjoining claims against defendant non-debtors, where debtors were not named defendants, because, *inter alia*, the non-debtors intend to "inject[] their own funds to assist in the reorganization efforts" and "[i]rreparable harm or injury to the [d]ebtors' reorganization efforts will be sustained by the . . . continuation of proceedings against the [non-debtors]"); *In re Third Eighty-Ninth Assoc.*, 138 B.R. 144, 147-148

36

(S.D.N.Y. 1992) (finding that "where present and substantial," a non-debtor's willingness to inject funds into reorganization may justify relief under section 105).

In addition, pursuit of the Related Party Claims risks diminishing the value of potential estate claims. The stay of Related Party Claims that the Debtors seek will in no way impede consideration of fraudulent transfer or veil-piercing and alter ego claims. The Bankruptcy Code vested those claims in the Debtors upon the filing of the bankruptcy petition. 11 U.S.C. § 544(b); *e.g.*, *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 111 (2d Cir. 2016). Those claims are the Debtors'—not the tort plaintiffs'—to pursue. *Id.* The Debtors, acting through their Special Committee, will continue their searching investigation and evaluation of these claims, and—once that investigation is complete—will address those claims in a manner that maximizes the value of their estates. But if the Related Party Claims are not stayed, a judgment in favor of a Related Party Claim plaintiff would deplete assets that could be used to satisfy or settle any such estate claims—meaning that assets that would otherwise be distributed fairly and equitably through these cases would be taken for the sole benefit of the Related Party Claim plaintiff that won the race to judgment. In an analogous circumstance, the Seventh Circuit reversed the bankruptcy court's <u>denial</u> of a section 105(a) injunction of a suit against the debtors' parent company, and specifically noted that a judgment against the parent company would reduce the value available for any debtor fraudulent transfer claims. *See In re Caesars Entm't Operating Co., Inc.*, 808 F.3d 1186, 1188-90 (7th Cir. 2015) ("The less capital [the parent company] has for [the debtor] to recapture through prosecution or settlement of its fraudulent-transfer claims, the less money its creditors will receive in the bankruptcy proceeding.").

2.    *The Equites and Public Interest Favor Enjoining the Related Party Claims*

The balance of harms and public interest favors staying the Related Party Claims.  As discussed above, there is minimal prejudice to the Defendants from a temporary stay of litigation.  That the Defendants may have to wait to prosecute their cases does not outweigh the potential harm to the Debtors—namely, the depletion of assets, the loss of the Settlement Structure, and a failed restructuring—if the Related Party Claims are allowed to proceed.  *See In re Union Tr. Phila., LLC*, 460 B.R. at 660-61 (affirming injunction of actions against non-debtors where the fact that efforts to collect on judgments against non-debtors might be delayed was insufficient to outweigh potential harm to the estate if debtor was deprived of full assistance of non-debtors in reorganization (quotation omitted)); *Haw. Structural*, 2006 WL 3755175, at *6 (recognizing that "if the injunction does not issue, the debtor will suffer real harm" and that "[t]here is no concomitant harm that will befall the . . . plaintiffs[] in a delay of the [non-debtor litigation]").  Indeed, staying the Related Party Claims would preserve the estates' assets and facilitate an equitable resolution of claims in the bankruptcy, which is to the benefit of all stakeholders.  *See In re G-I Holdings, Inc.*, 295 B.R. 211, 216 (D.N.J. 2003); *see generally* Part I.C, *supra*.

Staying the Related Party Claims would also be in the public interest, as it both fosters the strong interest in allowing debtors to reorganize and resolve their liabilities through a centralized and rational resolution of claims in bankruptcy, as well as the public interest in achieving such a reorganization through the consensual resolution proposed in the Settlement Structure.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999); *In re Rickel Home Ctrs.*, 199 B.R. 498, 501 (Bankr. D. Del. 1996); *see generally* Part I.D, *supra*.

## CONCLUSION

For the above reasons, the Debtors respectfully request that this Court (i) preliminarily enjoin the continued prosecution of the active Governmental Actions and Related Party Claims as set forth herein; and (ii) enter the Voluntary Injunction against the Debtors.

Dated:   September 18, 2019
         New York, New York

By: /s/ Benjamin S. Kaminetzky
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Proposed Counsel to the Debtors*
*and Debtors in Possession*