# Exhibit B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
C.A. No. 1884-cv-01808 (BLS2)

COMMONWEALTH OF MASSACHUSETTS,

v.

PURDUE PHARMA L.P., PURDUE PHARMA INC., RICHARD SACKLER, THERESA SACKLER, KATHE SACKLER, JONATHAN SACKLER, MORTIMER D.A. SACKLER, BEVERLY SACKLER, DAVID SACKLER, ILENE SACKLER LEFCOURT, PETER BOER, PAULO COSTA, CECIL PICKETT, RALPH SNYDERMAN, JUDITH LEWENT, CRAIG LANDAU, JOHN STEWART, MARK TIMNEY, and RUSSELL J. GASDIA

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

RECEIVED
JAN 31 2019
SUPERIOR COURT-CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

***Complete Unredacted Corrected Version***
***For The Public File***
***Submitted According To Court Order***
***January 31, 2019***

## I. INTRODUCTION

1. Dangerous opioid drugs are killing people across Massachusetts. Prescription medicines, which are supposed to protect our health, are instead ruining people's lives. Every community in our Commonwealth suffers from the epidemic of addiction and death.

2. Purdue Pharma created the epidemic and profited from it through a web of illegal deceit. First, Purdue deceived Massachusetts doctors and patients to get more and more people on its dangerous drugs. Second, Purdue misled them to use higher and more dangerous doses. Third, Purdue deceived them to stay on its drugs for longer and more harmful periods of time. All the while, Purdue peddled falsehoods to keep patients away from safer alternatives. Even when Purdue knew people in Massachusetts were addicted and dying, Purdue treated doctors and their patients as targets to sell more drugs. At the top of Purdue, a small group of executives led the deception and pocketed millions of dollars.

3. On behalf of the Commonwealth, the Attorney General asks the Court to end Purdue's illegal conduct and make Purdue and its culpable executives pay for the harm they inflicted in our state.

## II. PARTIES

4. The plaintiff is Attorney General Maura Healey, who brings this action in the public interest in the name of the Commonwealth of Massachusetts.

5. The defendants are two companies and seventeen individuals who engaged in a deadly, deceptive scheme to sell opioids in Massachusetts. This Amended Complaint addresses the bases for jurisdiction and liability as to each of the nineteen defendants, arising from their decade-long course of misconduct in Massachusetts that involved hundreds of deaths, hundreds of thousands of unlawful acts, and hundreds of millions of dollars.

6. Defendant Purdue Pharma Inc. is a drug company incorporated in New York with its principal place of business in Connecticut. It is the general partner of Defendant Purdue Pharma L.P., a limited partnership established in Delaware with its principal place of business in Connecticut. This Complaint refers to Purdue Pharma Inc. and Purdue Pharma L.P. collectively as "Purdue."

7. The seventeen individual defendants are current and former directors and officers of Purdue Pharma Inc. In Massachusetts, directors, officers, and employees of corporations are not immune from jurisdiction or liability when they break the law. Instead, every individual is accountable for his or her actions.[1]

8. Defendants Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler controlled Purdue's misconduct. Each of them took a seat on the Board of Directors of Purdue Pharma Inc. Together, they always held the controlling majority of the Board, which gave them full power over both Purdue Pharma Inc. and Purdue Pharma L.P. They directed deceptive sales and marketing practices deep within Purdue, sending hundreds of orders to executives and line employees. From the money that Purdue collected selling opioids, they paid themselves and their family billions of dollars.

9. Defendants Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, and Ralph Snyderman took seats on the Board and knowingly advanced the Sacklers' scheme.

---

[1] *E.g.*, *Kleinerman v. Morse*, 26 Mass. App. Ct. 819 (1989); *Hongyu Luo v. Tao Ceramics*, 32 Mass. L. Rptr. 134 (Mass. Sup. Ct. 2014); *Rissman, Hendricks & Oliverio v. MIV Therapeutics*, 901 F. Supp. 2d 255 (D. Mass. 2012); *Trans National Travel v. Sun Pacific Intern.*, 10 F. Supp. 2d 79 (D. Mass. 1998); *Yankee Group v. Yamashita*, 678 F. Supp. 20 (D. Mass. 1988); *Johnson Creative Arts v. Wool Masters*, 573 F. Supp. 1106 (D. Mass. 1983). "The question of personal jurisdiction over an individual, therefore, rests on whether there is an independent basis for jurisdiction based on an individual's actions, regardless of the capacity in which those actions were taken." *Rissman*, 901 F. Supp. 2d at 263. A defendant's "status as a corporate officer and director does not insulate him from personal jurisdiction." *Id.* at 264.

10. Defendants John Stewart, Mark Timney, and Craig Landau each directed Purdue's deception as CEO of Purdue Pharma Inc. and Purdue Pharma L.P. Defendant Russell Gasdia carried out the misconduct as Vice President of Sales and Marketing.

11. Beverly Sackler, Jonathan Sackler, Kathe Sackler, Paulo Costa, Mark Timney, and Craig Landau reside in Connecticut. David Sackler, Ilene Sackler Lefcourt, and Mortimer Sackler reside in New York. Richard Sackler, Peter Boer, and John Stewart reside in Florida. Judith Lewent and Cecil Pickett reside in New Jersey. Ralph Snyderman resides in North Carolina. Theresa Sackler resides in the United Kingdom. Russell Gasdia resides in Massachusetts.

12. The Court has jurisdiction over all the defendants for the reasons set forth on pages 51-269 below.

## III. OUTLINE OF THE COMPLAINT

13. On May 15, 2007, this Court entered Judgment ("2007 Judgment") to prohibit Purdue's deceptive conduct in the sale of opioids. This suit addresses Purdue's misconduct since that 2007 Judgment.

14. The Complaint begins with the story of Purdue's misconduct in Massachusetts (pages 1-51). The Complaint then explains how each individual defendant broke the law (pages 52-256). Sections addressing jurisdiction, the counts, prayers for relief, and the jury demand then follow, as outlined in the following Table of Contents.

## TABLE OF CONTENTS

I. INTRODUCTION ........ 2

II. PARTIES ........ 2

III. OUTLINE OF THE COMPLAINT ........ 4

IV. PURDUE'S DRUGS KILL HUNDREDS OF PEOPLE IN MASSACHUSETTS ........ 7

V. PURDUE TARGETED MASSACHUSETTS WITH ITS UNFAIR AND DECEPTIVE SALES CAMPAIGN ........ 11

VI. PURDUE DECEIVED DOCTORS AND PATIENTS TO GET MORE PEOPLE ON DANGEROUS DRUGS, AT HIGHER DOSES, FOR LONGER PERIODS ........ 14

A. More People ........ 14

B. Higher Doses ........ 22

C. Longer Periods ........ 28

VII. PURDUE PEDDLED FALSEHOODS TO KEEP PATIENTS AWAY FROM SAFER ALTERNATIVES ........ 34

VIII. PURDUE TARGETED DOCTORS WHO PRESCRIBED THE MOST DRUGS, EVEN WHEN THEY WROTE ILLEGITIMATE PRESCRIPTIONS AND THEIR PATIENTS DIED ........ 39

IX. PURDUE PHARMA INC. AND PURDUE PHARMA L.P. ARE BOTH RESPONSIBLE FOR THE DEADLY MISCONDUCT ........ 51

X. THE INDIVIDUAL DEFENDANTS LED PURDUE'S MISCONDUCT ........ 52

A. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler ... 54

B. Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa and Ralph Snyderman ........ 173

C. John Stewart, Russell Gasdia, Mark Timney, and Craig Landau ........ 197

XI. DISCOVERY RULE AND TOLLING ........ 257

XII. JURISDICTION AND VENUE ........ 258

XIII. CAUSES OF ACTION ........ 270

XIV. PRAYER FOR RELIEF ........ 273

XV. JURY DEMAND ........ 274

**KEY CHARTS AND ILLUSTRATIONS**

Opioid Deaths in Massachusetts ........................................7

Purdue Targeted Massachusetts ........................................11

Do You Have Patients Like Pam? ........................................21

Purdue Promotions for Higher Doses ........................................23

Impact of Changes in Dose Mix ........................................25

Keeping Patients on Opioids Longer Kills Them ........................................29

There Is a Direct Relationship Between OxyContin Length of Therapy and Dose ........................................31

Purdue Sales Rep Visits to One Massachusetts Doctor ........................................43

The Sacklers Ordered Purdue to Hire Hundreds of Sales Reps ........................................67

Purdue Board Minutes of February 2008 ........................................72

Massachusetts Communities Targeted in Purdue's 2008 Sales Force Expansion ........................................73

The Sacklers Paid Themselves Billions of Dollars ........................................79

The Sacklers Required Each Sales Rep to Visit 7 Prescribers per Day ........................................99

The Sacklers Required Sales Reps to Visit Prescribers Thousands of Times ........................................100

Massachusetts Communities Targeted in Purdue's 2010 Sales Force Expansion ........................................106

Map of the Abuse Environment ........................................114

Richard Sackler into the Field with Sales Reps ........................................120

True Physician Example: Wareham, Massachusetts ........................................140

*Project Tango*: End-to-End Pain Provider ........................................152

Massachusetts Communities Targeted in Purdue's 2015 Sales Force Expansion ........................................159

NARCAN Could Provide $24M in Net Sales to Purdue ........................................163

Critical Shifts in the National Discussion ........................................164

Sales Rep Districts for 2018 ........................................170

Planned Actions to Sell Higher Doses ........................................215

## IV. PURDUE'S DRUGS KILL HUNDREDS OF PEOPLE IN MASSACHUSETTS

15. Opioids are killing people all around us. More than 11,000 people died from opioid-related overdoses in the past decade in Massachusetts — more than everyone killed in car accidents and murders combined. The people of Massachusetts also survived more than 100,000 overdoses that were not fatal, but still devastating. This crisis is not natural or normal. Drug companies, particularly Purdue, created this tragedy by deceiving doctors and patients about their dangerous drugs.




*AGO graph from Massachusetts Department of Public Health data*

16. Opioids are dangerous narcotics that can be deadly, because they can cause patients to stop breathing and suffocate.

17. Opioids are also highly addictive. Patients using opioids for more than a few days can experience severe withdrawal symptoms if they stop taking the drugs, including: anxiety, insomnia, pain, blurry vision, rapid heartbeat, chills, panic attacks, nausea, vomiting, and tremors. Withdrawal can last so long and be so painful that it is difficult to stop taking opioids.

18. Putting patients on opioids puts them at risk. Patients who take opioids at higher doses and for longer periods face higher and higher risk of addiction and death. Compared to our general population, Massachusetts patients who were prescribed opioids for more than a year were ***51 times more likely to die*** of an opioid-related overdose.

19. Purdue took advantage of addiction to make money. For decades, physicians had reserved opioids for treating severe short-term pain, or for patients near the end of life. But the tradition of limiting opioids to short-term treatment ended after Purdue introduced OxyContin and began marketing it and other opioids with deceptive claims.

20. OxyContin’s sole active ingredient is oxycodone, a molecule nearly identical to heroin. Purdue later introduced another dangerous drug, Butrans, which releases opioids into the body from a skin patch. Then Purdue introduced Hysingla, which contains yet another opioid. Almost all of Purdue’s business is selling opioids.

21. Since May 2007, Purdue has sold more than 70,000,000 doses of opioids in Massachusetts. Purdue collected revenue of more than $500,000,000 from Massachusetts sales. For Purdue, the Massachusetts prescriptions were a gold mine.

22. For patients, it was a massacre. Hundreds of patients who took Purdue's opioids in Massachusetts became addicted and died. An investigation by the Massachusetts Attorney General found that, since 2009, ***671 people who filled prescriptions for Purdue opioids in Massachusetts subsequently died of opioid-related overdoses***.

23. The people we lost worked as firefighters, homemakers, carpenters, truck drivers, nurses, hairdressers, fishermen, waitresses, students, mechanics, cooks, electricians, ironworkers, social workers, accountants, artists, lab technicians, and bartenders. They lived and died in every part of our state. The oldest died at age 87. The youngest started taking Purdue's opioids at 16 and died when he was 18 years old.

24. Purdue's deception also imposed lasting hardship on the people who lost their loved ones. Because of Purdue's dishonesty, too many children in Massachusetts lost their parents. Too many parents in Massachusetts buried their children. Too many grandparents in Massachusetts are raising their grandchildren.

25. Patients who survive addiction need lengthy, difficult, and expensive treatment. People who are addicted to opioids are often unable to work. The addiction of parents can force their children into foster care. Babies are born addicted to opioids, because they are exposed to the drugs in the womb.

26. Purdue's misconduct has imposed heavy costs on the people of Massachusetts and on the Commonwealth. Intensive care for a newborn who has been harmed by opioids can cost $200,000, even before the baby comes home from the hospital. The injuries from addiction and overdose are staggering. For example, the White House Council of Economic Advisers determined that a middle estimate of the cost of each death from opioid overdose is $9.6 million. By that methodology, the 671 deaths that the Attorney General has already identified in

Massachusetts total more than $6 billion.

27. To profit from its dangerous drugs, Purdue engaged in a deadly and illegal scheme to deceive doctors and patients. First, Purdue deceived Massachusetts doctors and patients to get more people on its dangerous drugs. Purdue targeted vulnerable people who could be introduced to its opioids, including elderly patients, veterans, and people who had never taken opioids before. Second, Purdue misled them to take higher and more dangerous doses. Third, Purdue deceived them to stay on its drugs for longer and more harmful periods of time.

28. All the while, Purdue peddled falsehoods to keep patients away from safer alternatives. Even when Purdue knew people in Massachusetts were addicted and dying, Purdue treated doctors and patients as “targets” to sell more drugs.

29. Each part of the scheme earned Purdue more money from Massachusetts opioid sales and caused more addiction and death here in our Commonwealth. And each defendant participated in and profited from the scheme in Massachusetts, as set forth below.

## V. PURDUE TARGETED MASSACHUSETTS WITH ITS UNFAIR AND DECEPTIVE SALES CAMPAIGN

30. Hundreds of Massachusetts patients died after taking Purdue's drugs because Purdue targeted Massachusetts with a massive deceptive sales campaign.

31. Purdue's most powerful tool of deception was sending sales representatives to promote opioids to Massachusetts doctors, nurses, and pharmacists face to face. During sales visits, Purdue reps made false and misleading claims directly to the professionals who care for Massachusetts patients. Purdue assigned reps to specific territories in Massachusetts and gave them lists of Massachusetts doctors to visit. Purdue targeted doctors, nurses, and pharmacists in every part of our Commonwealth. The map below shows Massachusetts communities where Purdue promoted opioids since 2007. Each dot represents a city or town where Purdue sales reps promoted opioids in Massachusetts.

**Purdue Targeted Massachusetts**



32. Since the 2007 Judgment, Purdue sales reps visited Massachusetts prescribers and pharmacists ***more than 150,000 times***. A list of the exact date, location, sales rep, and "target" of each sales visit is attached as Exhibit 1.

33. Each of these in-person sales visits cost Purdue money — on average more than $200 per visit. But Purdue made that money back many times over, because it convinced doctors to prescribe its addictive drugs. When Purdue identified a doctor as a profitable target, Purdue visited the doctor frequently: often weekly, sometimes almost every day. Purdue salespeople asked doctors to list specific patients they were scheduled to see and pressed the doctors to commit to put the patients on Purdue opioids. By the time a patient walked into a clinic, the doctor, in Purdue's words, had already "guaranteed" that he would prescribe Purdue's drugs. Purdue rewarded high-prescribing doctors with coffee, ice cream, catered lunches, and cash. Purdue has given meals, money, or other gifts to more than 2,000 Massachusetts prescribers.

34. Purdue judged its sales reps by how many opioids they got doctors to prescribe. Sales reps who generated the most prescriptions won bonuses and prizes. Reps who failed to get enough Massachusetts patients on opioids were placed on probation, put on performance improvement plans, and fired.

35. Purdue used face-to-face sales visits to conceal its deception by trying to avoid witnesses or a paper trail. When one sales rep made the mistake of writing down in an email her sales pitch to a doctor, Purdue's Vice President of Sales Russell Gasdia ordered: "Fire her now!" Purdue's leaders did not want a record of their behavior because they knew they were breaking the law.

36. Purdue reinforced its sales visits with dozens of other deceptive tactics aimed at Massachusetts. Purdue wrote deceptive pamphlets and mailed them to doctors in Massachusetts.

Purdue streamed videos to Massachusetts doctors on its OxyContin Physicians Television Network. Purdue hired the most prolific opioid prescribers in Massachusetts as spokesmen to promote its drugs to other doctors. Purdue funded the *Massachusetts General Hospital Purdue Pharma Pain Program* and an entire degree program at Tufts University to influence Massachusetts doctors to use its drugs.

37. Purdue used all these deceptive tactics to collect money in Massachusetts, by getting more Massachusetts patients on opioids, at higher doses, for longer periods of time.

## VI. PURDUE DECEIVED DOCTORS AND PATIENTS TO GET MORE PEOPLE ON DANGEROUS DRUGS, AT HIGHER DOSES, FOR LONGER PERIODS

### A. Purdue Deceived Doctors and Patients to Get More and More People on Its Dangerous Drugs

#### *(i) Deception About Addiction*

38. Purdue always knew that its opioids carry grave risks of addiction and death. Instead of being honest about these risks, Purdue obscured them, including by falsely stating and implying that "appropriate" patients won't get addicted.

39. In a pamphlet for doctors, *Providing Relief, Preventing Abuse: A Reference Guide To Controlled Substance Prescribing Practices*, Purdue wrote that addiction "is not caused by drugs." Instead, Purdue assured doctors that addiction happens when the wrong patients get drugs and abuse them: "it is triggered in a susceptible individual by exposure to drugs, most commonly through abuse."[2]

40. Purdue promoted its opioids to Massachusetts patients with marketing that was designed to obscure the risk of addiction and even the fact that Purdue was behind the campaign. Purdue created a website, *In The Face of Pain*, that promoted pain treatment by urging patients to "overcome" their "concerns about addiction." Testimonials on the website that were presented as personal stories were in fact by Purdue consultants, whom Purdue had paid tens of thousands of dollars to promote its drugs.[3]

---

[2] Providing Relief, Preventing Abuse (2008), pg. 12, PTN000003587.
[3] 2011-10-24 website capture, In the Face of Pain, PVT0033890–891.

41. Another Purdue publication, the *Resource Guide for People with Pain*, falsely assured patients and doctors that opioid medications are not addictive:

> *"Many people living with pain and even some healthcare providers believe that opioid medications are addictive. The truth is that when properly prescribed by a healthcare professional and taken as directed, these medications give relief – not a 'high.'"*[4]

Purdue falsely denied the risk of addiction, falsely implied that addiction requires patients to get "high," and falsely promised that patients would not become addicted if they took opioids as prescribed.

42. Purdue funded and distributed many more publications that were similarly misleading. *Exit Wounds: A Survival Guide to Pain Management for Returning Veterans and Their Families* misleadingly claimed: "Long experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."[5]

43. *Opioid Prescribing: Clinical Tools and Risk Management Strategies* told doctors that "addiction is rare in patients who become physiologically dependent on opioids while using them for pain control."[6]

44. *Responsible Opioid Prescribing* told doctors that only "a small minority of people seeking treatment may not be reliable or trustworthy" and not suitable for addictive opioid drugs.[7]

45. Over and over, Purdue told Massachusetts doctors and pharmacists that they could give opioids to "trusted" patients without risk of addiction, even though that was false. To promote its drugs, Purdue pushed the myth that addiction is a character flaw, and "trustworthy"

---

[4] Resource Guide for People with Pain (2009), pg. 8, PVT0037321.
[5] Exit Wounds (2009), pg. 107, PTN000023114.
[6] Opioid Prescribing: Clinical Tools and Risk Management Strategies (2009), pg. 12, PWG000242087.
[7] Responsible Opioid Prescribing (2007), pg. 11, #448.1.

people don't get addicted to drugs.

46. A Purdue sales rep reported meeting with a Massachusetts pharmacist who said local doctors were reluctant to prescribe OxyContin. The Purdue rep pushed the pharmacist to get "older, trustworthy customers" on opioids:

> *"Made a case to her for those older, trustworthy customers that she knows well and committed her to step in and call the doctors. Said she would."*

47. Purdue managers praised Massachusetts sales reps for pitching doctors on the idea that prescribing to "trustworthy" patients was safe. A sales rep reported that one doctor: "let me know that she will Rx OxyContin when the pts [patients] has chronic pain and are trustworthy." The rep added that he would "Follow up with Dr and ask what pts does she consider 'trust worthy?'" A Purdue district manager responded: "Great follow up question on what patients does he consider trustworthy."

48. Purdue knew better. Blaming victims for being "untrustworthy" was another way to lie about Purdue's addictive drugs.

***(ii) Deception to Get Vulnerable Patients on Opioids***

49. Pushing opioids for "trustworthy" patients was only one of Purdue's methods for getting more people on drugs. To expand the market for opioids, Purdue also trained sales reps to target vulnerable populations and encourage doctors to put them on opioids, without disclosing the risks. In Massachusetts, Purdue deceptively promoted opioids for elderly patients, veterans, patients who had never taken opioids, and patients with osteoarthritis — putting thousands more patients at risk.

**Elderly Patients**

50. Purdue knew that prescribing opioids to elderly patients increases their risk of death. Elderly patients are at greater risk of dangerous interactions between drugs. They are also

at greater risk of respiratory depression — in which patients suffocate and die. But Purdue saw the opportunity to earn millions of dollars by getting elderly patients on opioids because the public would pay through Medicare. Purdue's internal documents show that it targeted "Patients over the age of 65 as more Medicare Part D coverage is achieved."[8]

51. Purdue disregarded and obscured the risks to elderly patients in its deceptive sales campaign. Purdue reps asked doctors to identify elderly patients and then solicited commitments from the doctors to give them Purdue opioids. In Massachusetts, a Purdue supervisor coached sales reps to "Keep the focus on the geriatric patients" and follow Purdue's "geriatric strategy."

52. Purdue trained its reps to show doctors charts emphasizing Medicare coverage for its opioids and use profiles of fake elderly patients, complete with staged photographs, to convince doctors to prescribe opioids. As a Massachusetts sales rep observed, a fake patient profile "brings the heart into it" and helps get the doctor to say: "Yes, they need this medication."

53. Purdue even made the false claim that elderly patients were especially likely to benefit from opioids. A rep reported to Purdue that she told a Massachusetts doctor that putting elderly patients on opioids would improve safety and quality of life by addressing "the need for sleep for elderly, increased risk for falls if they need to get up at night--take a pill, get glass, move across a dark room--and the potential impact that could have on healing and mobility." In fact, elderly patients taking opioids have ***increased*** risks of falling and breaking bones.

**<u>Veterans</u>**

54. Purdue also targeted veterans with its deceptive claims that they should take opioids. Like the elderly, many veterans' prescriptions are paid for by the public, providing

[8] 2015-01-28 Pain Products Presentation, pg. 12, PVT0029495.

another source of revenue when Purdue got veterans on its drugs. Records of sales meetings in Massachusetts show that Purdue reps emphasized insurance coverage by the veterans' Tricare program more than 500 times.

55. To target veterans, Purdue funded a book, *Exit Wounds*, which was packaged as the story of a wounded veteran but was really part of Purdue's deceptive marketing campaign. The book repeated Purdue's lie that patients would not become addicted to opioids:

> *"The pain-relieving properties of opioids are unsurpassed; they are today considered the 'gold standard' of pain medications, and so are often the main medications used in the treatment of chronic pain. Yet, despite their great benefits, opioids are underused. For a number of reasons, healthcare providers may be afraid to prescribe them, and patients may be afraid to take them. At the core of this wariness is the fear of addiction, so I want to tackle this issue head-on … Long experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."*[9]

56. Purdue held special events to encourage doctors to prescribe opioids to veterans:[10]




*Purdue flyer from 2011*

57. Purdue's campaign to target veterans had a terrible cost. Compared to non-veterans, Massachusetts veterans are three times more likely to die from opioid overdose.

**Opioid-Naive Patients**

58. Purdue also targeted patients who were not already taking opioids, described in

[9] Exit Wounds (2009), pgs. 106-107, PTN000023114.
[10] 2011 flyer, PTN000003864.

the field as "opioid-naive." Purdue unfairly and deceptively marketed its drugs as appropriate treatments for opioid-naive patients, without disclosing that they face even higher risks of overdose and death.

59. Purdue trained its sales reps to promote its drugs specifically for opioid-naive patients. In training calls, Purdue managers instructed:

- *"Your opportunity here is with the naive community, let's use the naive trial to make your case."*

- *"You created an epiphany with the doctor today (potentially) by reviewing the opiate naive patient profile. What made him more pat to write for this patient, being an amiable doctor, is the fact that he would not have to talk patients out of their short acting [opioids]."*

- *"This was an example of what a good call looks like … [Dr.] was particularly interested in the RM case study of Marjorie, which generated a robust discussion of opioid naive patients …"*

60. A sales script prompted sales reps to ask: "Would you consider OxyContin for an opioid-naive patient?" Another Purdue script read:[11]

> **CLOSE #1**
> Opioid-naïve (5 mcg/hour):
> - "Doctor, either today or tomorrow, do you anticipate seeing this commercially insured, opioid-naïve patient with moderate to severe chronic pain, who you believe would benefit from Butrans?

*Purdue sales script from 2011*

61. Purdue also promoted its drugs for opioid-naive patients using the deceptive term "first line opioid." "First line" is a medical term for the preferred first step in treating a patient. Opioids are not an appropriate first line therapy. Nevertheless, Purdue's internal documents and testimony from sales reps shows that Purdue repeatedly promoted OxyContin as "first line" — "the first thing they would take to treat pain."

---

[11] OxyContin sales script, pg. 10, PWG000334238.

62. Purdue also found vulnerable opioid-naive patients by targeting prescribers with the least training in the risks of opioids. Purdue determined that nurse practitioners, physician assistants, and primary care doctors were especially responsive to sales reps, so it targeted them to sell more drugs.

**Osteoarthritis**

63. Purdue also targeted new patients with the deceptive claim that its opioids should be used to treat the most common form of arthritis, osteoarthritis. Purdue decided osteoarthritis would be a money-maker because it is widespread. Purdue's documents emphasize that more than 20 million Americans have osteoarthritis, including most people over 75.

64. Opioids are not approved to treat osteoarthritis. Purdue conducted a single study on osteoarthritis for Butrans, and it failed. Purdue admitted in internal documents that its opioids "are not indicated for a specific disease" and "it is very important that you never suggest to your HCP [health care professional] that OxyContin is indicated for the treatment of a specific disease state such as Rheumatoid Arthritis or Osteoarthritis."

65. Nevertheless, to meet its business goals, Purdue trained its Massachusetts sales reps to mislead doctors by promoting opioids for osteoarthritis without disclosing Purdue's failed trial. Purdue even measured how often it targeted osteoarthritis patients. A Purdue marketing presentation concluded that its sales reps were "identifying appropriate patients" because osteoarthritis was specifically mentioned during 35% of sales visits.

66. Purdue also directed Massachusetts sales reps to use marketing materials that highlight patients with osteoarthritis, even though Purdue drugs were never indicated for that disease and Purdue's Butrans trial had failed.




*Purdue opioid promotion from 2015*[12]

[12] 2015 Butrans Patient Identification and Initiation Guide, pg. 16, PWG000080076.

**B. Purdue Deceived Doctors and Patients to Use Higher and Higher Doses**

67. For patients, taking higher doses of opioids increases the risk of addiction and death. But for Purdue, higher doses mean higher profits. So Purdue deceived doctors and patients to get people on higher and higher doses.

68. Purdue earns more money every time a patient moves to a higher dose. For example, Purdue's 2015 prices increased dramatically as patients move to higher doses:

**OxyContin Prices**

| | |
|---|---|
| **bottle of 100 tablets (10 mg)** | **$269.17** |
| **bottle of 100 tablets (15 mg)** | **$396.28** |
| **bottle of 100 tablets (20 mg)** | **$501.99** |
| **bottle of 100 tablets (30 mg)** | **$698.15** |
| **bottle of 100 tablets (40 mg)** | **$859.72** |
| **bottle of 100 tablets (60 mg)** | **$1,217.22** |
| **bottle of 100 tablets (80 mg)** | **$1,500.18** |

A patient taking the lowest dose pill twice a day for a week earns Purdue $38. But if the patient instead takes the highest dose, Purdue collects $210 — an increase of 450%.

69. To get that revenue, Purdue designed its sales tactics to increase doses. Purdue created a campaign for OxyContin around the slogan, *Individualize The Dose*, because Purdue determined that it would *Increase The Dose.* Purdue's CEO prepared a presentation to the Board of Directors explaining that Purdue would use *Individualize The Dose* to sell more of its highest doses. When Purdue decided to refresh the campaign with a new slogan, it hired consultants to study what would increase doses the most.

70. Purdue trained its sales reps that increasing a patient's dose ("titration") was a key move when making sales. Purdue's graphics show the one-way path of increasing doses that Purdue pushed doctors and patients to follow:




*Purdue opioid promotion from 2008*




*Purdue opioid promotion from 2013*[13]

[13] 2008-04 OxyContin Conversion/Titration Guide, pg. 14, PPLP003276594; 2013-12 Butrans core visual aid, pg. 20, PWG000076579.

71. Purdue tracked whether its sales reps were getting patients on higher doses and warned staff when doses were not increasing enough: "Titration up to higher strengths, especially the 40mg and 80mg strengths, is declining." Purdue required its sales reps to "practice verbalizing the titration message" to get patients' doses up.[14]

72. Purdue knew its promotion drove patients to higher doses. Purdue's internal analysis "found that there is greater loss in the 60mg and 80mg strengths (compared to other strengths) when we don't make primary sales calls."[15] Purdue's business plans emphasized that "OxyContin is promotionally sensitive, specifically with the higher doses, and recent research findings reinforce the value of sales calls." In 2014, when public health experts tried to save patients' lives by warning against high doses of opioids, Purdue pursued a "strategic initiative" to fight back and "maintain 2013 dose mix."[16]

73. Purdue encouraged Massachusetts doctors to prescribe high doses and did not tell doctors, or even its own sales reps, that higher doses carry heightened risk of addiction, overdose, and death. A Massachusetts sales rep testified:

> *Q: Are you aware of any risks in titrating to a higher dose with OxyContin?*
>
> *A. No.*

74. Purdue's deception about the risk of higher doses was deliberate. Purdue claimed that "dose was not a risk factor for opioid overdose," even while it admitted in internal documents that it was "very likely" that patients face "dose-related overdose risk."[17]

---

[14] 2013-08-19 OxyContin "Initiation, Conversion, and Titration" workshop, PWG000197629.
[15] 2013-08-19 OxyContin "Initiation, Conversion, and Titration" workshop, PWG000197635; 2013-09-23 OxyContin marketing plan, PWG000062680.
[16] 2013-09-23 OxyContin marketing plan, pgs. 35, 57, PWG000062688, -710.
[17] 2013-08-27 Opioid dosage data press release, PWG000216270; 2012-10-01 internal Purdue analysis, pg. 22, PWG000226041.

75. Purdue analyzed, down to the last dollar, how much of its profit depended on patients taking higher doses of opioids. In the slide below, Purdue reminded staff that a shift to lower doses, which reduces the danger to patients, would be bad for Purdue's bottom line.[18]




| Dose | Forecast (Rx) | Forecast ($) | 1% Shift | | 2% Shift | 3% Shift |
|---|---|---|---|---|---|---|
| 10 mg | 1,226,840 | $ 135,005,554 | 1,242,664 | $ 136,746,931 | $ 138,488,308 | $ 140,229,686 |
| 15mg | 180,831 | $ 33,261,232 | 179,023 | $ 32,928,620 | $ 32,596,008 | $ 32,263,395 |
| 20mg | 1,401,616 | $ 361,951,330 | 1,387,599 | $ 358,331,817 | $ 354,712,303 | $ 351,092,790 |
| 30mg | 519,945 | $ 193,796,793 | 519,945 | $ 193,796,793 | $ 193,796,793 | $ 193,796,793 |
| 40mg | 1,085,624 | $ 577,483,835 | 1,085,624 | $ 577,483,835 | $ 577,483,835 | $ 577,483,835 |
| 60mg | 436,272 | $ 326,705,155 | 436,272 | $ 326,705,155 | $ 326,705,155 | $ 326,705,155 |
| 80mg | 768,198 | $ 931,583,802 | 768,198 | $ 931,583,802 | $ 931,583,802 | $ 931,583,802 |
| **Total** | **5,619,324** | **$ 2,559,787,701** | **5,619,324** | **$ 2,557,576,952** | **$ 2,555,366,204** | **$ 2,553,155,456** |

*Purdue internal strategy presentation from 2012*

76. When the U.S. Centers for Disease Control issued a national warning against the highest and most dangerous doses of opioids, Purdue studied prescription data to calculate how much profit it would lose if doctors followed the CDC's advice. Purdue determined that the amount at stake in Massachusetts was $23,964,122 — that was the extra revenue that Purdue was getting from the most dangerous doses of opioids, every year, in Massachusetts alone.[19]

---

[18] 2012-08-14 OxyContin ACAM Presentation, slide 28, PWG00062610.
[19] 2016-04-13 April Board meeting Commercial Update, slide 74, PPLPC016000286167.

**Responding to Addiction by Increasing the Dose**

77. When patients showed signs of addiction to Purdue's opioids, Purdue urged doctors to respond by ***increasing*** the opioid dose. To convince doctors to increase the dose for addicted patients, Purdue peddled the false notion that patients suffered from "pseudoaddiction."

78. A Purdue presentation for doctors titled *Medication Therapy Management* recited what had been the consensus view for decades: "Many medical students are taught that if opioids are prescribed in high doses or for a prolonged time, the patient will become an addict." Purdue then assured doctors that this traditional concern about addiction was wrong — that patients instead suffer from "pseudoaddiction" because "opioids are frequently prescribed in doses that are inadequate."[20]

79. A Purdue pamphlet titled *Clinical Issues in Opioid Prescribing* urged doctors to look for pseudoaddiction:

> *"A term which has been used to describe patient behaviors that may occur when pain is undertreated. Patients with unrelieved pain may become focused on obtaining medications, may 'clock watch," and may otherwise seem inappropriately "drug-seeking.' Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."*

Purdue again urged doctors to prescribe higher doses, stating that opioids "are frequently underdosed - or even withheld due to a widespread lack of information … about their use among healthcare professionals."[21]

80. In another pamphlet, *Providing Relief, Preventing Abuse: A Reference Guide To Controlled Substances Prescribing Practices*, Purdue admonished doctors that "[u]ndertreatment

---

[20] 2007-11 Medication Therapy Management: Opportunities For Improving Pain Care, slide 31, PTN000006105.
[21] Clinical Issues in Opioid Prescribing (2008), pgs. 1-3, PWG0000058054-055.

of pain is a serious problem" and "pain should be treated aggressively." Purdue stated: "Facts About Addiction: 'Misunderstanding of addiction and mislabeling of patients as addicts result in unnecessary withholding of opioid medications.'"[22]

81. Purdue released a second edition of *Providing Relief, Preventing Abuse*, which continued to urge higher doses, and added a new deception about the scientific "literature":

> *"The term pseudoaddiction has emerged in the literature to describe the inaccurate interpretation of [drug-seeking] behaviors in patients who have pain that has not been effectively treated."*[23]

The revised pamphlet failed to disclose that none of the "literature" it cited included scientific or medical evidence supporting pseudoaddiction as a diagnosis separate from addiction. Nor did it disclose that all of the cited "literature" was linked to organizations and doctors paid by Purdue.

82. Purdue also urged doctors to prescribe higher doses in a Purdue-sponsored book, *Responsible Opioid Prescribing*, which again suggested that patients who appear to be addicted were instead "receiving an inadequate dose" and needed more drugs.[24]

83. Purdue knew its campaign to push higher doses of opioids was wrong. Doctors on Purdue's payroll admitted in writing that pseudoaddiction was used to describe "behaviors that are clearly characterized as drug abuse" and put Purdue at risk of "ignoring" addiction and "sanctioning abuse." But Purdue nevertheless urged doctors to respond to signs of addiction by prescribing higher doses of Purdue's drugs.

---

[22] Providing Relief, Preventing Abuse (2008), pgs. 4, 6, PTN00003569-570.
[23] Providing Relief, Preventing Abuse (2nd ed. 2011), pg. 9, PTN00003555.
[24] Responsible Opioid Prescribing (2011), pg. 90, Bates no. #729.1.

### C. Purdue Deceived Doctors and Patients to Stay on Its Drugs Longer and Longer

84. Just as Purdue made more money by pushing patients to higher doses, Purdue increased its profits by keeping patients on drugs for longer periods of time. Long-term opioid use causes addiction and death. But for Purdue, keeping patients on drugs longer meant more profits. So Purdue deceived doctors and patients to stay on its drugs longer.

85. According to Purdue's 2015 price list, a patient taking Purdue's 80mg OxyContin pill twice a day for a week earned Purdue $210. If that same patient could be kept on the drug for a year, Purdue collected far more money: $10,959.[25]

86. Purdue's profit came at a terrible human cost. The Massachusetts Department of Public Health studied more than a million real Massachusetts patients during the years of Purdue's misconduct and found that staying on prescription opioids longer dangerously increases the risk of overdose death. Compared to the general population, a patient who receives three months of prescribed opioids is ***30 times*** more likely to overdose and die. A patient who stays on prescription opioids for 6-11 months is ***46 times*** more likely to die. And a patient who stays on prescription opioids for a year — like the example that earns Purdue $10,959 — is ***51 times*** more likely to die.[26]

[25] 2015-01-12 Price Increase Notification, PWG000045843.
[26] 2017-08 Assessment of Opioid-Related Overdoses in Massachusetts 2011-2015, *available at* https://www.mass.gov/files/documents/2017/08/31/data-brief-chapter-55-aug-2017.pdf.




*AGO graph from Massachusetts Department of Public Health data*

87. Even compared to the most famous deadly and addictive products, these are extraordinary effects. Smoking increases the chance of lung cancer death by less than 51 times.

88. By getting patients addicted, Purdue greatly increased the patients' risk of harm from many drugs in the opioid class — including, heroin, fentanyl, and generic oxycodone — which share the same addictive chemistry as Purdue opioids.

89. To get patients to take that awful risk, Purdue deceived doctors into keeping patients on opioids for longer and longer periods of time. Purdue gave its salespeople explicit instructions to "extend average treatment duration."[27] Purdue's business plans valued patients by how long they could be kept on Purdue's opioids and targeted patients who could be kept on opioids for more than a year.[28] To "drive sales and profitability," Purdue deliberately worked to keep patients on its opioids longer.[29]

90. Purdue secretly determined that pushing patients to higher doses would keep them on opioids longer. Purdue developed tactics specifically to keep patients hooked on opioids longer, which it called by the euphemism: "*Improving the Length Of Therapy*" — sometimes abbreviated as "LOT" or "LoT."[30] Purdue taught its employees that there is "a direct relationship" between getting patients on higher doses and keeping them on Purdue's opioids longer.[31]

[27] 2011-10-18 OxyContin Level 300 Training, slide 49, PVT0050183.
[28] 2012-04-27 Marketing Welcome, slides 48-49, PVT0007742-743.
[29] 2012-02-15 10-Year Plan, slides 31-33, PWG000164238-240
[30] 2013-07 Sales & Marketing Opioid Market Overview, slide 35, PWG000163716.
[31] 2012-08-14 OxyContin marketing plan, slide 25, PWG000062607.

91. Purdue's internal marketing plan showed a graph that broke down exactly how getting patients on higher doses of opioids would get more patients to stay on drugs longer:




*Purdue internal strategy presentation from 2012*

Purdue's sales reps promoted higher doses, but they did not tell doctors and patients that the higher doses were a scheme to trap patients on Purdue's drugs.

92. To "extend average treatment duration," Purdue deceptively claimed that patients' becoming dependent on its drugs was not dangerous or deadly, but "normal." Purdue taught doctors that: "Healthcare professionals should recognize that tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not the same as addiction."[32] Purdue deceptively claimed that physical dependence on its opioids was "a normal physiologic response," "an expected occurrence," and no more dangerous than "many classes of

[32] 2009-11 FACETS, slide 9, PTN000006436.

medications" that are not addictive, including drugs used to treat high blood pressure.[33] Purdue set as one of its "key messages" that "data support the use of opioids beyond 90 days and maintained through 52 weeks."[34]

93. One of Purdue's most powerful tactics to keep patients on opioids longer was an opioid savings card that gave patients discounts on their first prescriptions. Discounts could have cut Purdue's revenue ***if*** patients took opioids for a short time. But Purdue's internal 10-year plan highlighted its discovery that opioid savings cards kept patients on opioids longer: "more patients remain on OxyContin after 90 days."[35] Purdue determined that opioid savings cards worked like the teaser rate on a long-term and very high-stakes mortgage. According to Purdue's internal analysis, the savings cards had the highest "return on investment" in the entire "OxyContin Marketing Mix." The return on investment for Purdue was 4.28, so that every $1,000,000 Purdue gave away in savings came back to Purdue as $4,280,000 in revenue because patients stayed on dangerous opioids longer.[36]

[33] Is It Pain (2011), slide 6, PTN000007194.
[34] 2013-07 Publication Plan for Long-Term Opioid Therapy for Chronic Non-Cancer Pain, pg. 3, PWG000323550.
[35] 2012-02-15 10-Year Plan, slide 33, PWG000164240.
[36] 2012-11-01 Board report, pg. 31, PWG000414917.




*Purdue internal strategy presentation from 2011*[37]

94. Keeping more patients on opioids for longer than 90 days was one of Purdue's "2011 Highlights."[38] Purdue's directors and CEO were briefed specifically on "emails targeted towards HCPs [healthcare professionals] practicing in Massachusetts" to push opioid savings cards.[39] But it was a public health disaster. The Massachusetts Department of Public Health found that patients who stayed on prescription opioids for more than 90 days were ***thirty times more likely to die of an overdose***.

95. Purdue aimed to "drive" patients to higher doses and longer periods on drugs so forcefully that it could control how many kilograms of opioids were taken within 2%:[40]

[37] 2011-12-06 Manager's Meeting Presentation, slide 13, PWG003840379.
[38] 2012-02-15 10-Year Plan, slide 33, PWG000164240.
[39] 2012-11-01 Board report, pg. 17, PWG000413518.
[40] 2012-08-14 OxyContin marketing plan, slide 23, PWG000062605.

**Drive appropriate titration and length of therapy with continuing patients, to maintain total Kg within 2% of forecast**

*Purdue internal strategy presentation from 2012*

96. When Purdue's sales reps talked with doctors about how to dose its drugs, and when Purdue sent opioid savings cards to patients, Purdue did not disclose that higher doses and savings were designed to keep patients on its drugs longer. Purdue did not disclose that its promotion to doctors was designed to drive the amount of drugs consumed by Massachusetts patients to within 2% of its desired profit. Purdue did not disclose that its business target would cause many more patients to get addicted and die.

97. Purdue's campaign to "extend average treatment duration" succeeded. A national study of tens of thousands of medical and pharmacy claims records published in the *Journal of General Internal Medicine* found that two-thirds of patients who took opioids for 90 days were still taking opioids five years later.[41]

## VII. PURDUE PEDDLED FALSEHOODS TO KEEP PATIENTS AWAY FROM SAFER ALTERNATIVES

98. Purdue not only lit the fire that killed so many patients; it also tried to block the exits that patients could have used to escape. Purdue peddled a series of falsehoods to push patients away from safer drugs and toward its opioids.

99. Purdue had no justification to steer patients away from safer alternatives, and it knew it. Purdue's internal documents admit that it "cannot represent or suggest" that its drugs are "safer" or "more effective" or make "any other sort of comparative claim," because it had <u>no drugs</u> with the evidence required for such a claim. In its internal documents, Purdue admitted

---

[41] Martin et al., Long-term chronic opioid therapy discontinuation rates from the TROUP study. J Gen Intern Med. 2011;26(12):1450-7. Summarized in Purdue's files on pg. 15, PWG000226034.

that "making comparative statements of our product versus a competitor's product is never appropriate."[42]




*Purdue internal presentation from 2011*

But Purdue went ahead and made deceptive claims to steer patients away from alternatives.

**<u>Deception about Tylenol and Ibuprofen</u>**

100. Purdue made deceptive claims about research by its own employees, designed to "highlight" the risks of non-opioid drugs. Purdue deceptively compared the risks of high doses of acetaminophen and NSAIDs (non-steroidal anti-inflammatory drugs, such as aspirin and ibuprofen) with its claim that opioids have "no ceiling dose," to falsely contend that opioids were safer, even though high doses of opioids pose grave risk of addiction and death.

---

[42] 2011-10 Guidelines on Product Promotion: Comparative Claims Workshop, slide 12, PWG000190160.

101. Purdue paid for deceptive propaganda by groups designed to appear independent from Purdue, promoting the message that NSAIDs and Tylenol have "life-threatening" side effects, but opioids are "the gold standard of pain medications."[43]

102. Purdue funded "switch research" to "understand what triggers prescribers to switch patients" from safer NSAIDs to more dangerous opioids. Purdue hired consultants to study how to make doctors "more comfortable" about opioids and "more cautious" about non-addictive drugs like ibuprofen.[44]

**<u>Deception about Lower-Dose Opioids</u>**

103. Just as Purdue deceptively steered patients away from ibuprofen and Tylenol, Purdue also deceived patients and doctors by claiming that Purdue's high-dose, extended-release opioids were superior to lower-dose, immediate-release opioids that had been used for decades before the epidemic.

104. In fact, Purdue's opioids (sometimes called ER/LA or extended release/long acting) are extraordinarily dangerous. The CDC found, based on published research, that there is "a higher risk for overdose among patients initiating treatment with ER/LA opioids than among those initiating treatment with immediate-release opioids." The CDC "did not find evidence that continuous, time-scheduled use of ER/LA opioids is more effective or safer than intermittent use of immediate-release opioids or that time-scheduled use of ER/LA opioids reduces risks for opioid misuse or addiction."[45]

105. Nonetheless, Purdue deceptively claimed that its opioids provided more effective pain relief than traditional immediate-release opioids (sometimes called IROs). Purdue sale reps

---

[43] 2009 Exit Wounds, pg. 104-106, PTN000023113-114.
[44] 2016-02 NSAID to ERO Switch Research Final Report, slides 3, 16, PWG000072028, -041.
[45] CDC Guideline for Prescribing Opioids for Chronic Pain (2016), *available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

admitted under oath that they told Massachusetts doctors that OxyContin provides more consistent pain relief with fewer peaks and troughs than IROs. Purdue records show that the sales reps repeatedly claimed that OxyContin's "steady state is better than peak and trough w/ [IROs]." Purdue claimed that OxyContin provides a "full tank of gas," but immediate-release opioids require "stopping at each exit to refuel." Purdue bolstered these misrepresentations with marketing materials that misrepresented data to indicate that Purdue drugs provided more consistent pain relief than more frequently dosed, lower-dose opioids.

**<u>Deception about Quality of Life</u>**

106. Purdue also steered patients away from safer alternatives with the false claim that its opioids improve patients' "quality of life." Purdue's internal documents admit that "Purdue has no clinical studies or other substantial evidence demonstrating that a Purdue Product will improve the quality of a person's life." Nevertheless, Purdue sales reps repeatedly claimed that its opioids improve quality of life. A Purdue sales rep noted the need to follow-up with a Massachusetts doctor to "get commitment from him that he is definitely going to improve the quality of life for the [rheumatoid arthritis patient] he has." Purdue also devised and funded third-party publications to say that opioids give patients the "quality of life we deserve."[46]

**<u>Deception about Risk of Abuse</u>**

107. Purdue also steered patients away from safer alternatives with false claims that its opioids had less risk of abuse. As more people died of addiction and overdose, Purdue created tamper-resistant versions of its drugs to be harder to crush. The FDA found that the changes had no effect on the most common way that the Purdue's pills were taken and abused: by swallowing them. "The tamper-resistant properties will have no effect on abuse by the oral route (the most

---

[46] Treatment Options: A Guide for People Living with Pain, pg. 15, PWG000243995.

common mode of abuse)."[47] Despite that warning, Purdue deceptively marketed its opioids in a manner falsely implying they stop abuse — and even prevent addiction.

108. Purdue also paid for and promoted articles which stated or implied that its tamper-resistant drugs were safe. For example, in 2014, Purdue placed three articles in *The Atlantic* as sponsored content, including one titled *Take My Pain Away ... A Physician's Perspective of Prescription Opioids and Pain Management* by Dr. Gerald Aronoff. That article calls the tamper-resistant formulations "safer alternatives" and encourages physicians to "embrace these additional choices, rather than decide to leave opioid prescribing."[48]

109. Purdue further created an unbranded marketing initiative, *Opioids with Abuse Deterrent Properties*, to encourage prescribers to switch to Purdue opioids. The initiative included a website, ads in medical journals, medical education events touting the benefits of the tamper-resistant drugs, and payments to doctors to promote Purdue opioids.[49]

110. Purdue's deceptive marketing convinced doctors of the falsehood that Purdue drugs are less addictive. In a national survey, conducted by the Johns Hopkins Bloomberg School of Public Health, almost half of doctors believed that tamper-resistant opioids were less addictive than other opioids, when in fact they are equally addictive.[50]

111. In addition to visiting Massachusetts prescribers and pharmacists more than 150,000 times, Purdue distributed in Massachusetts thousands of copies of its deceptive publications, including *Providing Relief, Preventing Abuse*; the *Resource Guide for People with Pain*; *Exit Wounds*; *Opioid Prescribing: Clinical Tools and Risk Management Strategies*;

---

[47] 2009-12-30 New Drug Application 22-272, OxyContin, Division Director Summary Review for Regulatory Action, pg. 7, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022272s000MedR.pdf.
[48] 2014-11-14 Take my Pain Away … A Physician's Perspective of Prescription Opioids and Pain Management, pg. 6, PWG000214681.
[49] Introducing Opioids with Abuse-Deterrent Properties (OADP), PVT0024614.
[50] 2015-06-23 Many Doctors Misunderstand Key Facets of Opioid Abuse, https://www.jhsph.edu/news/news-releases/2015/survey-many-doctors-misunderstand-key-facets-of-opioid-abuse html.

*Responsible Opioid Prescribing*; and *Clinical Issues in Opioid Prescribing*. Purdue's *In The Face of Pain* website was viewed in Massachusetts more than 11,700 times.

## VIII. PURDUE TARGETED DOCTORS WHO PRESCRIBED THE MOST DRUGS, EVEN WHEN THEY WROTE ILLEGITIMATE PRESCRIPTIONS AND THEIR PATIENTS DIED

112. Purdue pushed Massachusetts doctors to prescribe more and more opioids, because high-prescribing doctors earned Purdue millions of dollars. To make sure doctors prescribed more opioids, Purdue tracked Massachusetts doctors' prescriptions, visited their offices, bought them meals, and asked them to put specific patients on Purdue drugs.

113. Purdue selected doctors for target lists based on its estimates of which doctors could be influenced to increase opioid prescriptions the most. Purdue managers told reps to visit most often the doctors who were most likely to change their prescribing to benefit Purdue.

114. In Massachusetts, sales reps visited Purdue's 100 top targets an average of more than 200 times ***each***. Those visits cost Purdue more than $40,000 for each doctor. Purdue did not spend $40,000 per doctor so sales reps could watch doctors write prescriptions that they were already going to write anyway. Instead, Purdue paid to lobby these doctors because Purdue knew its reps would convince them to put more patients on opioids, at higher doses, for longer periods. Those extra prescriptions paid back Purdue's investment many times over.

115. Those extra prescriptions led Massachusetts patients to become addicted, overdose, and die. Just as taking opioids increases risks to a patient, meeting with Purdue sales reps increases the risk that a doctor will write dangerous prescriptions. Some of Purdue's top targets in Massachusetts lost their medical licenses because of their dangerous prescribing. Some went to prison. Most of Purdue's 100 top targets in Massachusetts prescribed Purdue opioids to patients who overdosed and died.

116. That disaster is not the normal effect of practicing medicine. It is not the

appropriate result of treating patients in pain. It is the consequence of Purdue breaking the law. Compared to Massachusetts doctors and nurses who prescribed Purdue opioids without lobbying from sales reps, Purdue's top targets wrote far more dangerous prescriptions. Purdue's top targets prescribed Purdue opioids to more of their patients, at higher doses, and for longer periods of time. Compared to Massachusetts doctors and nurses who prescribed Purdue opioids without seeing reps, Purdue's top targets were ***at least ten times more likely*** to prescribe Purdue opioids to patients who overdosed and died.

**North Andover, MA**

117. From 2008 until he lost his medical license in 2012, Purdue's top prescriber in Massachusetts was Dr. Walter Jacobs in North Andover.[51] He practiced alone. He often worked only three days a week. Nevertheless, in five years, he prescribed more than 347,000 pills of Purdue opioids.

118. Purdue knew Jacobs's practice inside and out. Purdue sales reps visited him more than a hundred times. Purdue pushed Jacobs to keep up a high rate of prescriptions – to keep writing "new scripts" – and to get patients on higher doses. Purdue's sales rep recorded his goal to "get Dr Jacobs to write more of the intermediate strengths." The doctor complied. He prescribed tens of thousands of Purdue's intermediate strength pills. He also prescribed more than 200,000 of Purdue's highest strength 80mg OxyContin — the pill that is the most dangerous and the most profitable.

119. Based on its marketing research showing that opioid savings cards kept patients on opioids longer, Purdue urged Jacobs to distribute savings cards. Purdue asked him to have his patients travel to New Hampshire to fill prescriptions because opioid savings cards were illegal

[51] Monthly prescription data by prescriber, PWG003984534.

in Massachusetts until 2012.[52]

120. Purdue's sales rep reported to the company that Jacobs "believes in Oxycontin" and "continues to switch patients from other medications to Oxycontin." A few weeks later, Purdue gave Jacobs a contract worth more than $50,000 to give speeches to other doctors to promote Purdue opioids. Purdue ended up paying him more than $80,000 — more than any other doctor in Massachusetts.

121. As Purdue's top paid consultant in Massachusetts, Jacobs exemplified Purdue's strategy of getting patients on higher doses and keeping them on opioids for longer periods of time. For one patient, he prescribed OxyContin for more than two years, at a rate of sixteen 80mg pills per day. For another patient, Jacobs prescribed OxyContin for more than two years — *at a rate of twenty-four 80mg pills per day*. When he lost his medical license, Jacobs admitted that he continuously prescribed narcotics to patients, ignored the risk of substance abuse, and kept prescribing narcotics even after his patients overdosed.

122. Purdue paid Jacobs to get more people on addictive opioids, at higher doses, for longer periods of time. By the time Jacobs lost his license, he had prescribed enough opioids for Purdue to collect more than $3 million.[53]

---

[52] Jacobs' patients filled dozens of OxyContin prescriptions using savings cards at out-of-state pharmacies. Purdue reps asked other Massachusetts doctors to do the same thing, and their patients used savings cards that were banned in Massachusetts to buy more than 40,000 pills of OxyContin in neighboring states. PWG004285076.

[53] The revenue allegations in paragraphs 122, 124, 127, 133, 134, 139, 143, and 153 are estimated based on prices and prescription data.

**Fitchburg and Waltham, MA**

123. Another of Purdue's high-value targets practiced in Fitchburg and Waltham.[54] Since 2008, Purdue sales reps visited him more than a hundred times. The Purdue reps encouraged the doctor to prescribe opioids to elderly patients, by emphasizing coverage on Medicare, and they asked him to find opioid-naive patients who could start taking opioids for the first time. The doctor gave Purdue what it wanted: when Purdue launched its Butrans opioid, the salesperson reported that the doctor was "looking for an opioid naive patient to start Butrans on." A few weeks later, the sales representative reported to Purdue that "Butrans is his new go to product." The next month, Purdue rewarded the doctor with a contract worth up to $48,000.

124. For years, Purdue paid the Fitchburg doctor tens of thousands of dollars to promote its opioids. And he delivered for Purdue. Since 2008, he prescribed more than 250,000 pills of Purdue opioids — enough to give Purdue more than $1.5 million.

[54] This Complaint does not identify by name the doctors in paragraphs 123-127 because they are not defendants in this suit and are still practicing medicine. The doctors named in paragraphs 117-122, 128-153, and 310-313 no longer hold medical licenses in Massachusetts.

**<u>Fall River, MA</u>**

125. In Bristol County, Purdue targeted a doctor in Fall River. Since 2008, Purdue sales reps visited this doctor ***more than six hundred times***. In 2015, Purdue's rep was in his office almost every workday:

**Purdue Sales Rep Visits to One Massachusetts Doctor**




*AGO graphic summarizing Purdue internal sales records*

126. Purdue repeatedly asked the Fall River doctor to "commit" to prescribing its opioids, and he agreed over and over, day by day. For example, during the week of April 6-10, 2015: Purdue's rep met the doctor at his office on Monday to discuss patients who would be coming in that day. On Tuesday, the salesperson met with the doctor again and confirmed that

the doctor had put the patients on Purdue opioids. On Wednesday, Purdue's salesperson came to the doctor's office again to discuss more patients. And again on Thursday. And again on Friday. On the following Monday, the Purdue rep came back to talk with the doctor again.

127. The Fall River doctor told Purdue that he "loves the idea" of Purdue's Butrans opioid and was putting "more and more" patients on Purdue's OxyContin. The next month, Purdue gave the doctor a consulting contract worth up to $48,000 to promote Purdue opioids. Purdue ended up paying him more than $50,000. In turn, the doctor prescribed more than 180,000 pills of Purdue opioids — enough for Purdue to collect more than $1.4 million.

**Hyannis, MA**

128. On Cape Cod, Purdue targeted Dr. Conrad Benoit. From 2008 until May 2016, Purdue sales reps met with Benoit more than 90 times.

129. By 2012, Purdue knew or should have known that Benoit was engaged in problematic prescribing practices, keeping patients on opioids for extended periods without proper medical exams. Purdue's rep met with the doctor and recorded: "he said that he does just refill meds out of ease of refilling given challenge with time in exam." At the next sales visit two weeks later, Purdue encouraged the doctor to prescribe more refills of its opioids.

130. Purdue's district manager went along on sales visits to coach the sales rep. In a written evaluation, the manager praised the rep for her control over the doctor: "Very good close and taking control of the call … [he] can get off topic, but you snapped fingers and said 'Dr. I need you focused.' He smiled and paid attention. Wow." The purpose of the in-person sales visits was to drive the doctors to prescribe.

131. In 2015, even after Purdue's sales rep reported "a huge concern with the issue of narcotics in the cape," Purdue continued to target Benoit, calling on him 27 times through 2015

and into 2016 and making particular note of efforts to promote Hysingla and OxyContin. In February 2016, Purdue's sales rep logged a "Report Of Concern" when a newspaper reported on Benoit's excessive opioid prescribing and police found a patient with 420 pills. Purdue kept promoting opioids to the doctor anyway.

132. When the Board of Registration in Medicine suspended Benoit's medical license on May 5, 2016, Purdue was still urging him to prescribe its drugs. Purdue last attempted to promote opioids to Benoit on May 10, 2016, five days after his suspension.

133. Since 2008, Benoit had prescribed more than 34,000 pills of Purdue opioids — so Purdue collected more than $250,000.

**Brockton, MA**

134. In Plymouth County, Purdue targeted Dr. Yoon Choi. Purdue promoted its opioids to Choi for a decade, from at least 2006 until July 2016, calling on him more than 200 times. In 2012 and 2014, Purdue salespeople reported concerns about Choi's prescribing behavior. Both times, Purdue advised the sales reps they could continue promoting opioids to him. In 2017, the Massachusetts Board of Registration in Medicine suspended Choi's license after concluding he had committed negligence on multiple occasions, including in connection with two patients – a mother and son – who both overdosed on opioids and died. By the time the authorities stopped him, Choi had prescribed more than 108,000 pills of Purdue opioids — enough to give Purdue more than $750,000.

**Ludlow, MA**

135. In Hampden County, Purdue targeted Dr. Fernando Jayma. Purdue promoted its opioids to Jayma from at least 2009 until in or around November 2013. Purdue's notes starting in 2010 are replete with red flags. In June 2010, Jayma told a Purdue sales rep that many of his

patients had failed drug screens and doctor shopped. In August 2011, Jayma told Purdue that he wrote six months' worth of prescriptions at a time and patients just came in and picked them up. In October 2011, Jayma told Purdue that an insurer was denying his OxyContin prescriptions. But, from Purdue's perspective, all was well. After a 2012 meeting with Jayma, the Purdue representative reported: "he has written 5 new OxyContin scripts this week," and "most are converting over to 40mg or higher."

136. In January 2013, a Purdue sales representative noted, to praise from her supervisor, that Jayma was taking opioid patients that other practices were turning away. In May 2013, Purdue's rep reported that Jayma was seeing a lot of patients from a doctor who had been arrested for improper prescribing and had his license seized.

137. Purdue kept promoting its opioids to Jayma until a new sales rep was assigned to his account and reported overwhelming signs of "inappropriate prescribing":

> *"Upon entering office it did not appear to be the typical internal med/general medicine practice. All patients appeared to be there for pain management and no other health concerns … While in the office the police had arrived because there had been 2 prescription pads stolen by a girlfriend of a patient. She tried to fill rx at local Stop and Shop and was turned down. [The medical assistant] further stated that they do see out of state patients and do not take drivers licenses and insurance card at time of check in. She stated that Rite Aid pharmacy as a corporation will not fill any of dr.'s Rx's. Many other local pharmacies require additional information"*

138. On November 26, 2013, Purdue finally told its sales reps to stop promoting opioids to Jayma. Within six months, Jayma's prescriptions of Purdue opioids fell by 99%. In the summer of 2014, when Jayma was no longer valuable to Purdue, Purdue reported him to the DEA.

139. Jayma was convicted of illegally prescribing controlled substances, and was sentenced to two-and-a-half years in the house of correction. But Purdue got what it wanted.

Since 2008, Jayma prescribed more than 68,000 pills of Purdue opioids — so Purdue took in more than $400,000.

**Stoneham, MA**

140. Another of Purdue's high-value targets was Dr. Ellen Malsky in Stoneham. Purdue promoted its opioids to Malsky from at least 2006 until April 2011. Purdue's records show that red flags about her prescribing became apparent at least as early as March 2006, when Purdue's sales rep recorded a note that Malsky "has issues with legal use of prescribing," and again, in May 2007, when Malsky raised concerns about attracting too much attention to her prescribing.

141. In December 2009, Purdue's sales rep noted that a patient of Malsky died from an overdose. Three months later, the Purdue representative recorded that Malsky "lost her affiliation with BCBS - however, 75% of those patients switched to other plans in order to stay in her practice; BCBS said she was writing too many opioids as an Internal Medicine doctor[.]" Meanwhile, Purdue kept asking Malsky to prescribe more of its drugs.

142. On September 29, 2010, Malsky told Purdue's sales rep she planned to close her practice "because of pressure from the MA board to write less opioids." Purdue continued promoting its opioids to Malsky until the bitter end, when the sales rep showed up at her practice to find it closed in April 2011. On April 22, 2011, Purdue finally told its sales reps to stop promoting opioids to Malsky because she had surrendered her medical license.

143. Purdue already had its money in the bank. Since 2008, Malsky prescribed more than 114,000 pills of Purdue opioids — enough to give Purdue hundreds of thousands of dollars.

**Holbrook, Weymouth, Winchester and Worcester, MA**

144. As a final example, Purdue targeted Dr. Fathalla Mashali, who ran pain clinics in Holbrook, Weymouth, Winchester, Worcester, and Rhode Island. Purdue promoted its opioids to Mashali from at least May 2009 until June 2013, calling on him more than 150 times.

145. Purdue should have been aware of red flags from the beginning. At a promotional visit in May 2010, the Purdue rep learned that Mashali had inherited the patients from a doctor who lost his license for improper opioid prescribing. Purdue recorded: "Dr. Mashali appears to be a very good new target."

146. Mashali went along with every part of Purdue's scheme. Purdue wanted patients to take its opioids instead of traditional lower-dose, shorter-acting "SA" drugs; Mashali told Purdue that he would "focus on switching pts from SA meds to Butrans and OxyContin where appropriate." Purdue promoted OxyContin as a "first line" treatment for opioid-naïve patients; Mashali told Purdue's sales rep he "will Rx OxyContin first line when possible" and would prescribe OxyContin "more than any other branded medication." At his next sales visit, the Purdue rep asked Mashali to continue prescribing OxyContin first line.

147. Purdue's rep met with Mashali, "introduced" Butrans, and asked the doctor "to start pts on Butrans today." Mashali immediately agreed that the opioid would be "great" for "opioid naïve patients." Five days later, at his next sales visit, Mashali told Purdue that he had already prescribed Butrans 10-15 times and, in the next week, prescribed Butrans 30 more times.

148. During another sales meeting, Mashali told Purdue that he was seeing 70 patients the next day and "guaranteed" that he would put some on Purdue's opioids. Later, Purdue's rep reported: "Dr. let me know he will continue to find more patients for" Purdue opioids. Later, the rep wrote that Mashali was "seeing 40 new patients each week" and "starting new patients on

Butrans every day." Purdue kept encouraging Mashali to prescribe its drugs. The manager overseeing all Purdue reps in the Boston area visited Mashali and got him to agree to write to Massachusetts insurance companies to ask for more generous coverage of Purdue opioids.

149. Finally, in January 2012, a sales rep sent Purdue a "Report Of Concern," because she heard that the DEA was investigating Mashali's office in Rhode Island. In February, Purdue emailed its sales reps that, "pending the outcome of any investigation of the Rhode Island office," they should not meet with Mashali in Rhode Island, but they could ***continue*** calling on him in Massachusetts. Purdue's records show that its sales reps continued to meet with Mashali at both his Rhode Island and Massachusetts offices. A few days later, the sales rep filed a second Report Of Concern, stating that insurance companies had cut off Mashali and he required patients to pay him $300 in cash. Purdue still did not instruct its reps to stop promoting opioids to him.

150. More than a year after that, in June 2013, Purdue's sales rep noted that she visited Mashali's office "to follow up on the rumor I heard about him losing his license." The doctor's staff gave her "a letter that is on the front door," announcing that Mashali was taking his patients off opioids. In an email, Purdue's sales manager worried about the bottom line: "Dr. Mashali is the largest prescriber of OxyContin in the District and most likely the Region." He was cutting back on OxyContin "because of so much scrutiny he's under." The sales reps were "nervous of what it would do to their business."

151. The Massachusetts-based sales rep wrote:

> *"on several occasions recently when calling on his office patients are literally lined out the door. I have spoken with this staff and some of these patients are waiting up to 4-5 hours before being seen by Dr Mashali . In addition, approximately 3 months ago he is no longer taking [Blue Cross Blue Shield] of MA. Dr Mashali claims it is because BCBS of MA, I could never get a straight answer. I suspect it could be for other reasons…. BCBS is not comfortable with the way he is practicing and trying to get reimbursement. Dr Mashali did state for many office visits he is now making patients pay cash for their office visits…Based on my observations and gut feeling including comments from other pain physicians in the area, lately there appears to be too many red flags with Dr Mashali."*

The Rhode Island-based sales rep replied:

> *"I agree…. My office has patients bringing their own 'beach type' folding chairs to sit on because at any given time, he can have 35 or more patients waiting only for him. All of his PA's have quit. He has patients scheduled at 9:30 am and he doesn't usually come 'sauntering' in until noon. He has changed his practice name yet again…3rd time in about 1 year. I even had one of his nurses tell me last visit that she has witnessed him deleting electronic records for certain patients…which makes her very uncomfortable. I've already reported him to Purdue several times."*

152. About a month later, on July 31, 2013, Purdue finally told its reps to stop promoting opioids to Mashali. The Rhode Island Board of Medicine revoked his license, finding that he was "an immediate threat to the health, welfare and safety of the public."

153. Seventeen patients who were prescribed Purdue opioids by Mashali died of opioid overdoses. Mashali was sentenced to eight years in prison for 27 counts of health care fraud. But Purdue profited. Since 2008, Mashali prescribed more than 367,000 pills of Purdue opioids — so Purdue collected nearly $2 million.

## IX. PURDUE PHARMA INC. AND PURDUE PHARMA L.P. ARE BOTH RESPONSIBLE FOR THE DEADLY MISCONDUCT

154. Purdue Pharma Inc. and Purdue Pharma L.P. acted together to carry out all of the misconduct alleged in this Complaint.

155. According to its official corporate documents, Purdue Pharma Inc.'s purpose is manufacturing, sales, distribution, and research and development with respect to pharmaceutical, toiletry, chemical and cosmetic products, directly or as the general partner of a partnership engaged in those activities. That is the conduct at issue in this suit.

156. Purdue Pharma Inc. controlled Purdue Pharma L.P. as its general partner and is liable for the misconduct of the partnership as a matter of law. Purdue Pharma Inc. is also the general partner of Purdue Holdings L.P., which holds the sole limited partnership interest in Purdue Pharma L.P.

157. Purdue Pharma L.P. employed the sales reps and paid the doctors to promote Purdue's drugs. That is a key element of the conduct at issue in this suit.

158. Purdue Pharma Inc. and Purdue Pharma L.P. shared the same physical offices, the same CEO, and many of the same officers.

## X. THE INDIVIDUAL DEFENDANTS LED PURDUE'S MISCONDUCT

159. This section of the Complaint identifies the individuals who are personally responsible for Purdue's illegal scheme. Massachusetts law against unfair and deceptive conduct in commerce applies to individuals regardless of whether they are officers, directors, or employees. Holding individuals personally liable for their misconduct does not require piercing a corporate veil. Individuals are personally liable if: (a) they participated in the misconduct; or (b) they knew about the misconduct and failed to stop it; or (c) they should have known about the misconduct and they failed to stop it.[55] In this case, the individual defendants made the decisions to break the law; they controlled the unfair and deceptive conduct; and they personally collected many millions of dollars from the deception.

### Summary Of The Individuals' Misconduct

160. The individual defendants were the chief architects and beneficiaries of Purdue's deception. In summary:

161. The individual defendants controlled the misconduct described in paragraphs 1-158 above.

162. Each individual defendant knowingly and intentionally sent sales representatives to promote opioids to prescribers in Massachusetts thousands of times.

163. Each individual defendant knew and intended that the sales reps in Massachusetts would unfairly and deceptively promote opioid sales that are risky for patients, including by:

---

[55] *See Thermoplastic Elastomers, Inc. v. McKenna*, No. 002018B, 2002 WL 968859, at *4 (Mass. Super. Feb. 5, 2002) ("A corporate officer may be held personally liable for his "participation in unfair and deceptive practices."), citing *Nader v. Citron*, 372 Mass. 96, 103 (1977); *Community Builders, Inc. v. Indian Motorcycle Associates, Inc*., 44 Mass. App. Ct. 537, 560 (1998). *See also Townsends, Inc. v. Beaupre*, 47 Mass. App. Ct. 747, 751 (1999) ("A corporate officer is personally liable for a tort committed by the corporation that employs him, if he personally participated in the tort by, for example, directing, controlling, approving, or ratifying the act that injured the aggrieved party."; "It is not necessary in all instances, however, to pierce the corporate veil in order to hold a corporate officer liable for a corporation's torts.").

- falsely blaming the dangers of opioids on patients instead of the addictive drugs;
- pushing opioids for elderly patients, without disclosing the higher risks;
- pushing opioids for patients who had never taken them before, without disclosing the higher risks;
- pushing opioids as substitutes for safer medications, with improper comparative claims;
- falsely assuring doctors and patients that reformulated OxyContin was safe;
- pushing doctors and patients to use higher doses of opioids, without disclosing the higher risks;
- pushing doctors and patients to use opioids for longer periods of time, without disclosing the higher risks; and
- pushing opioid prescriptions by doctors that Purdue knew were writing dangerous prescriptions.

164. Each individual defendant knew and intended that the sales reps would not tell Massachusetts doctors and patients the truth about Purdue's opioids. Indeed, they knew and intended these unfair and deceptive tactics achieved their purpose by concealing the truth.

165. Each individual defendant knew and intended that prescribers, pharmacists, and patients in Massachusetts would rely on Purdue's deceptive sales campaign to prescribe, dispense, and take Purdue opioids. Securing that reliance was the purpose of the sales campaign.

166. Each individual defendant knew and intended that staff reporting to them would pay top prescribers tens of thousands of dollars to encourage other doctors to write dangerous prescriptions in Massachusetts.

167. Each individual defendant knew and intended that staff reporting to them would reinforce these misleading acts through thousands of additional acts in Massachusetts, including by sending deceptive publications to Massachusetts doctors and deceptively promoting Purdue opioids at Boston University, Massachusetts General Hospital, the Massachusetts College of

Pharmacy, Northeastern University, and the Sackler School at Tufts University.

168. Each individual defendant knowingly and intentionally took money from Purdue's deceptive business in Massachusetts.

169. Each individual defendant knowingly and intentionally sought to conceal his or her misconduct.

**A. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler**

170. Eight people in a single family made the choices that caused much of the opioid epidemic. The Sackler family owns Purdue, and they always held a majority of the seats on its Board. Because they controlled their own privately held drug company, the Sacklers had the power to decide how addictive narcotics were sold. They hired hundreds of workers to carry out their wishes, and they fired those who didn't sell enough drugs. They got more patients on opioids, at higher doses, for longer, than ever before. They paid themselves billions of dollars. They are responsible for addiction, overdose, and death that damaged millions of lives. They should be held accountable now.

**The Sacklers' Misconduct Leading To The 2007 Judgment**

171. The misconduct of Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler was particularly unfair, deceptive, unreasonable, and unlawful because they already had been given a second chance. From the 1990s until 2007, they directed a decade of misconduct, which led to criminal convictions, a judgment of this Court, and commitments that Purdue would not deceive doctors and patients again. That background confirms that their misconduct since 2007 was knowing and intentional.

172. The Sackler family's first drug company was the Purdue Frederick Company, which they bought in 1952. In 1990, they created Purdue Pharma Inc. and Purdue Pharma L.P.

Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler took seats on the Board.[56] For events before July 2012, this Complaint uses "the Sacklers" to refer to them. David Sackler joined the Board in July 2012.[57] From that time forward, "the Sacklers" includes him as well.

173. The Sacklers always insisted that their family control Purdue. From 1990 until today, their family always held the majority of seats on the Board. In 1994, Jonathan Sackler issued a memorandum to Purdue staff requiring that the Sacklers should receive "all Quarterly Reports and any other reports directed to the Board."[58]

174. Purdue launched OxyContin in 1996. It became one of the deadliest drugs of all time.[59] The FDA scientist who evaluated OxyContin wrote in his original review: "Care should be taken to limit competitive promotion."[60] The Sacklers did not agree. From the beginning, the Sacklers viewed limits on opioids as an obstacle to greater profits. To make more money, the Sacklers considered whether they could sell OxyContin in some countries as an uncontrolled drug. Staff reported to Richard Sackler that selling OxyContin as "non-narcotic," without the safeguards that protect patients from addictive drugs, would provide "a vast increase of the market potential."[61] The inventor of OxyContin, Robert Kaiko, wrote to Richard to oppose this dangerous idea. Kaiko wrote that he was "very concerned" about the danger of selling

[56] Purdue Pharma Inc.'s 1991 filings with the Secretary of State of Connecticut state that it was incorporated in New York on October 2, 1990. Richard, Ilene, Jonathan, and Kathe Sackler are all listed as directors on the earliest (1991) report. Beverly, Mortimer, and Theresa all appear on the 1995 report.
[57] David Sackler affidavit.
[58] 1994-04-28 memo from Jonathan Sackler, PDD1701827936.
[59] *See, e.g.*, 2016-03-15 telebriefing by CDC Director Tom Frieden ("We know of no other medication that's routinely used for a nonfatal condition that kills patients so frequently … those who got the highest doses of opioids, more than 200 MMEs per day had a 1 in 32 chance of dying in just 21/2 years … almost all the opioids on the market are just as addictive as heroin.), *available at* https://www.cdc.gov/media/releases/2016/t0315-prescribing-opioids-guidelines html.
[60] 1995-10 Overall Conclusion to 1995 FDA review, Curtis Wright, #785793.1.
[61] 1997-02-27 email from Walter Wimmer, PDD1701346000.

OxyContin without strict controls. Kaiko warned: "I don't believe we have a sufficiently strong case to argue that OxyContin has minimal or no abuse liability." To the contrary, Kaiko wrote, "oxycodone containing products are still among the most abused opioids in the U.S." Kaiko predicted: "If OxyContin is uncontrolled, … it is highly likely that it will eventually be abused."[62] Richard responded: "How substantially would it improve your sales?"[63]

175. At the OxyContin launch party, Richard Sackler spoke as the Senior Vice President responsible for sales. He asked the audience to imagine a series of natural disasters: an earthquake, a volcanic eruption, a hurricane, and a blizzard. He said: "the launch of OxyContin Tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense, and white…."[64] Over the next twenty years, the Sacklers made Richard's boast come true. They created a manmade disaster. Their blizzard of dangerous prescriptions buried children and parents and grandparents across Massachusetts, and the burials continue.

176. From the beginning, the Sacklers were behind Purdue's decision to deceive doctors and patients. In 1997, Richard Sackler, Kathe Sackler, and other Purdue executives determined — and recorded in secret internal correspondence — that doctors had the crucial misconception that OxyContin was weaker than morphine, which led them to prescribe OxyContin much more often, even as a substitute for Tylenol.[65] In fact, OxyContin is more

[62] 1997-02-27 email from Robert Kaiko, PDD1701345999.
[63] 1997-03-02 email from Richard Sackler, PDD1701345999.
[64] PKY180280951.
[65] 1997-06-12 email from Richard Sackler, PDD8801141848 (Staff reported: "Since oxycodone is perceived as being a 'weaker' opioid than morphine, it has resulted in OxyContin being used much earlier for non-cancer pain. Physicians are positioning this product where Percocet, hydrocodone, and Tylenol with Codeine have been traditionally used. Since the non-cancer pain market is much greater than the cancer pain market, it is important that we allow this product to be positioned where it currently is in the physician's mind." Richard Sackler replied: "I think you have this issue well in hand. If there are developments, please let me know."); 1997-05-28 email from Richard Sackler PDD1508224773; 1997-04-23 email from Richard Sackler, PDD1701801141.

potent than morphine. Richard directed Purdue staff not to tell doctors the truth, because the truth could reduce OxyContin sales.[66]

177. From the start, the Sacklers were also the driving force behind Purdue's strategy to push opioids with the false promise that they create an enhanced "lifestyle." In 1998, Richard Sackler instructed Purdue's executives that OxyContin tablets provide more than merely "therapeutic" value and instead "enhance personal performance," like Viagra.[67]

178. Most of all, the Sacklers cared about money. Millions of dollars were not enough. They wanted billions. They cared more about money than about patients, or their employees, or the truth. In 1999, when employee Michael Friedman reported to Richard Sackler that Purdue was making more than $20,000,000 per week, Richard replied immediately, at midnight, that the sales were "not so great." "After all, if we are to do 900M this year, we should be running at 75M/month. So it looks like this month could be 80 or 90M. Blah, humbug. Yawn. Where was I?"[68]

179. In 1999, Richard Sackler became the CEO of Purdue.[69] Jonathan, Kathe, and Mortimer were Vice Presidents.[70] The company hired hundreds of sales representatives and taught them false claims to use to sell drugs.[71] Purdue managers tested the sales reps on the most important false statements during training at company headquarters. On the crucial issue of addiction, which would damage so many lives, Purdue trained its sales reps to deceive doctors that the risk of addiction was "less than one percent."[72] Purdue mailed thousands of doctors

---

[66] 1997-06-12 email from Richard Sackler, PDD8801141848; 1997-05-28 email from Richard Sackler PDD1508224773; 1997-04-23 email from Richard Sackler, PDD1701801141.
[67] 1998-09-28 email from Richard Sackler, PDD1701546497.
[68] 1999-06-17 email from Michael Friedman, #228728.1.
[69] [intentionally left blank]
[70] 2000-03-26, Peter Healy, Opening the Medicine Chest: Purdue Pharma prepares to raise its profile, #24865.1.
[71] 2003-12-23 GAO Report, pg. 19, PKY183266843 (increase from 771 reps in 1999 to 1,066 in 2001).
[72] Barry Meier, *Pain Killer* (1 ed. 2003) at 99.

promotional videos with that same false claim:

> "There's no question that our best, strongest pain medicines are the opioids. But these are the same drugs that have a reputation for causing addiction and other terrible things. Now, in fact, the rate of addiction amongst pain patients who are treated by doctors is much less than one percent. They don't wear out, they go on working, they do not have serious medical side effects."[73]

A sales representative told a reporter: "We were directed to lie. Why mince words about it? Greed took hold and overruled everything. They saw that potential for billions of dollars and just went after it."[74]

180. In 2000, the Sacklers were warned that a reporter was "sniffing about the OxyContin abuse story."[75] The Sackler family put the threat on the agenda for the next Board meeting and began covering their tracks. They planned a response that "deflects attention away from the company owners."[76]

181. In January 2001, Richard Sackler received a plea for help from a Purdue sales representative. The sales rep described a community meeting at a local high school, organized by mothers whose children overdosed on OxyContin and died. "Statements were made that OxyContin sales were at the expense of dead children and the only difference between heroin and OxyContin is that you can get OxyContin from a doctor."[77]

182. The next month, a federal prosecutor reported 59 deaths from OxyContin in a single state.[78] The Sacklers knew that the reports underestimated the destruction. Richard

---

[73] "I Got My Life Back" video, transcript, PDD9521403504.
[74] 2017-10-16, Christopher Glazek, "The Secretive Family Making Billions From The Opioid Crisis," *Esquire* Magazine (quoting Purdue sales representative Shelby Sherman).
[75] 2000-11-30 email from Michael Friedman, PDD1706196247.
[76] 2000-12-01 email from Mortimer D. Sackler, PDD1706196246. Defendant Mortimer Sackler's father, the late Mortimer D. Sackler, was also involved in Purdue Pharma during his lifetime.
[77] 2001-01-26 email from Joseph Coggins, #171855.1.
[78] 2001-02-08 email from Mortimer Sacker, PDD8801151727.

Sackler wrote to Purdue executives: "This is not too bad. It could have been far worse."[79] The next week, on February 14, a mother wrote a letter to Purdue:[80]

> "My son was only 28 years old when he died from Oxycontin on New Year's Day. We all miss him very much, his wife especially on Valentines' Day. Why would a company make a product that strong (80 and 160 mg) when they know they will kill young people? My son had a bad back and could have taken Motrin but his Dr. started him on Vicodin, then Oxycontin then Oxycontin SR. Now he is dead!"

A Purdue staff member noted: "I see a liability issue here. Any suggestions?"[81]

183. That same month, Richard Sackler wrote down his solution to the overwhelming evidence of overdose and death: blame and stigmatize people who become addicted to opioids. Sackler wrote in a confidential email: "we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals."[82] Richard followed that strategy for the rest of his career: collect millions from selling addictive drugs, and blame the terrible consequences on the people who became addicted. By their misconduct, the Sacklers have hammered Massachusetts families in every way possible. And the stigma they used as a weapon made the crisis worse.

184. Not long after the mother's February 14 letter, the Sacklers achieved a long-sought goal: the front page of the *New York Times* reported that "OxyContin's sales have hit $1 billion, more than even Viagra's." The same article noted that "OxyContin has been a factor in the deaths of at least 120 people, and medical examiners are still counting."[83]

185. When *Time* magazine published an article about OxyContin deaths in New England, Purdue employees told Richard Sackler they were concerned. Richard responded with

---

[79] 2001-02-08 email from Richard Sackler, PDD8801151727.
[80] 2001-02-14 email to Robin Hogen, #3072810.1.
[81] 2001-02-14 email from James Heins, #3072810.1.
[82] 2001-02-01 email from Richard Sackler, PDD8801133516.
[83] 2001-03-05 article in *New York Times*, PDD9316101737.

a message to his staff. He wrote that *Time*'s coverage of people who lost their lives to OxyContin was not "balanced," and the deaths were the fault of "the drug addicts," instead of Purdue. "We intend to stay the course and speak out for people in pain – who far outnumber the drug addicts abusing our product."[84]

186. That spring, Purdue executives met with the U.S. Drug Enforcement Agency ("DEA"). A senior DEA official sat across from Richard Sackler. Before the meeting ended, she leaned over the table and told Richard: "People are dying. Do you understand that?"[85]

187. As Purdue kept pushing opioids and people kept dying, the company was engulfed in a wave of investigations by state attorneys general, the DEA, and the U.S. Department of Justice. In 2003, Richard Sackler left his position as President of Purdue. After a few more years of investigation, Jonathan, Kathe, and Mortimer Sackler resigned from their positions as Vice Presidents. [86] But those moves were for show. The Sacklers kept control of the company. Their family owned Purdue. They controlled the Board. They paid themselves the profits. And, as alleged in detail below, they continued to direct Purdue's deceptive marketing campaign.

188. By 2006, prosecutors found damning evidence that Purdue intentionally deceived doctors and patients about its opioids. The Sacklers voted that their first drug company, the Purdue Frederick Company, should plead guilty to a felony for misbranding OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause adverse events and side effects than other pain medications. The Sacklers also voted on the Board that three Purdue

---

[84] 2001-01-08 letter from Richard Sackler, PDD1501720041.
[85] 2001 meeting described in *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* by Barry Meier, pg. 158 (2003). The DEA official was Laura Nagel, head of the DEA Office of Diversion Control.
[86] 2018-09-05 declaration of Jonathan Sackler; 2018-09-08 declaration of Kathe Sackler; 2018-09-06 declaration of Mortimer Sackler.

executives (Michael Friedman, Paul Goldenheim, and Howard Udell) — but no member of the Sackler family — should plead guilty as individuals.[87]

189. In May 2007, the Sacklers voted again to have their company plead guilty and enter a series of agreements that Purdue would never deceive doctors and patients about opioids again. The Purdue Frederick Company confessed to a felony and effectively went out of business.[88] The Sacklers continued their opioid business in two other companies: Purdue Pharma Inc. and Purdue Pharma L.P.

190. The Sacklers voted to admit in an Agreed Statement Of Facts that, for more than six years, supervisors and employees *intentionally* deceived doctors about OxyContin: "Beginning on or about December 12, 1995, and continuing until on or about June 30, 2000, certain Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."[89]

191. To remove any doubt, the Sacklers voted to enter into a plea agreement that stated: "Purdue is pleading guilty as described above because Purdue is in fact guilty."[90] Those intentional violations of the law happened while Richard Sackler was CEO; Jonathan, Kathe, and Mortimer were Vice Presidents; and Richard, Jonathan, Kathe, Mortimer, Ilene, Beverly, and Theresa Sackler were all on the Board.

192. The Sacklers also voted for Purdue to enter a Corporate Integrity Agreement with the U.S. government. The agreement required the Sacklers to ensure that Purdue did not deceive

---

[87] 2006-10-25 Board minutes, PKY183307486; 2006-10-25 agreement, PPLP004031281.
[88] 2007-05-03 Board minutes, PKY183307494.
[89] 2007-05-09 Agreed Statement of Facts, paragraph 20, *available at* https://www.documentcloud.org/documents/279028-purdue-guilty-plea.
[90] 2007-05-09 Plea Agreement.

doctors and patients again. The Sacklers promised to comply with rules that prohibit deception about Purdue opioids. They were required to complete hours of training to ensure that they understood the rules. They were required to report any deception. Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler each certified in writing to the government that he or she had read and understood the rules and would obey them.[91]

193. Finally, the Sacklers voted to enter into a Consent Judgment in this Court ("2007 Judgment"). The 2007 Judgment ordered that Purdue "shall not make any written or oral claim that is false, misleading, or deceptive" in the promotion or marketing of OxyContin. The judgment further required that Purdue provide fair balance regarding risks and benefits in all promotion of OxyContin. That judgment required fair balance about the risks of taking higher doses for longer periods and the risks of addiction, overdose, and death.[92]

194. The 2007 Judgment further required that Purdue establish and follow an abuse and diversion detection program to identify high-prescribing doctors who show signs of inappropriate prescribing, stop promoting drugs to them, and report them to the authorities:

> "Upon identification of potential abuse or diversion," Purdue must conduct an inquiry and take appropriate action, "which may include ceasing to promote Purdue products to the particular Health Care Professional, providing further education to the Health Care Professional about appropriate use of opioids, or providing notice of such potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities."[93]

195. The 2007 Judgment and related agreements should have ended the Sacklers' misconduct for good. Instead, the Sacklers decided to break the law again and again, expanding

---

[91] 2007-05-09 Plea Agreement; 2007-05-04 Associate General Counsel's Certificate, PDD1712900054.
[92] 2007-05-15 Consent Judgment, Commonwealth v. Purdue Pharma L.P. et al., No. 07-1967(B), Mass. Super. Ct.
[93] 2007-05-15 Consent Judgment, Commonwealth v. Purdue Pharma L.P. et al., No. 07-1967(B), Mass. Super. Ct.

their deceptive sales campaign to make more money from more patients on more dangerous doses of opioids.

**The Sacklers' Misconduct From The 2007 Judgment Until Today**

196. From the 2007 Judgment to 2018, the Sackler controlled Purdue's deceptive sales campaign. They directed the company to hire hundreds more sales reps to visit doctors thousands more times. They insisted that sales reps repeatedly visit the most prolific prescribers. They directed reps to encourage doctors to prescribe more of the highest doses of opioids. They studied unlawful tactics to keep patients on opioids longer and then ordered staff to use them. They asked for detailed reports about doctors suspected of misconduct, how much money Purdue made from them, and how few of them Purdue had reported to the authorities. They sometimes demanded more detail than anyone else in the entire company, so staff had to create special reports just for them. Richard Sackler even went into the field to promote opioids to doctors and supervise reps face to face.

197. The Sacklers' micromanagement was so intrusive that staff begged for relief. The VP of Sales and Marketing wrote to the CEO:

> "Anything you can do to reduce the direct contact of Richard into the organization is appreciated."[94]

198. The Sacklers' directions shot through the company with dangerous force. When the Sacklers berated sales managers, the managers turned around and fired straight at reps in the field. When Richard Sackler wrote to managers, "This is bad,"[95] to criticize the sales of Purdue's Butrans opioid, the managers in turn drafted a warning for employees:

---

[94] 2012-02-07 email from Russell Gasdia, PPLPC012000368569.
[95] 2012-02-07 email from Richard Sackler, PPLPC012000368430.

> "Just today, Dr. Richard sent another email, 'This is bad,' referring to current Butrans trends. I am quite sure that Dr. Richard would not be sympathetic to the plight of the Boston District."[96]

The manager then threatened to fire every sales rep in the Boston district:

> "I am much closer to dismissing the entire district than agreeing that they deserve a pass for poor market conditions."[97]

199. The Sacklers took special interest in promoting Purdue's opioids in Massachusetts. The Sacklers decided to spend millions of dollars to establish the *Massachusetts General Hospital Purdue Pharma Pain Program*. Similarly, the Sacklers and Purdue pursued an intense relationship with Tufts University, which named its School of Biomedical Sciences as the Sackler School of Graduate Biomedical Sciences, and created an entire degree program, the Master of Science in Pain Research, Education, and Policy, funded by Purdue. The Tufts program is also home of an annual Sackler Lecture, which Purdue sales managers arranged for Purdue sales reps to attend.[98] The Sacklers also tracked Purdue initiatives to promote opioids at Boston University, Northeastern University, and the Massachusetts College of Pharmacy.

200. The Sacklers cared most of all about money. From 2007 to 2018, they voted to direct Purdue to pay their family ***billions*** of dollars, including tens of millions of dollars from opioids sold in Massachusetts. These payments show the total control that the Sacklers exercised over Purdue. The payments were the motivation for the Sacklers' misconduct. And the payments were deliberate decisions to benefit from deception in Massachusetts, at great cost to patients and families.

201. As detailed below, the Sacklers' misconduct continued from the 2007 convictions through 2018.

---

[96] 2012-02-07 email from Windell Fisher, PPLPC012000368500.
[97] 2012-02-07 email from Windell Fisher, PPLPC012000368500.
[98] 2007-03-30 emails from Russell Gasdia and Windell Fisher, PPLPC012000137174; PPLPC012000137178.

## ❖ ❖ ❖ **2007** ❖ ❖ ❖

202. **In July 2007**, staff told the Sacklers that more than 5,000 cases of adverse events had been reported to Purdue in just the first three months of 2007. Staff also told the Sacklers that Purdue received 572 Reports of Concern about abuse and diversion of Purdue opioids during Q2 2007 — including several reports in Massachusetts. Staff reported to the Sacklers that they completed only 21 field inquiries in response. Staff also told the Sacklers that they received more than 100 calls to Purdue's compliance hotline during the quarter, which was a "significant increase," but Purdue did not report any of the hotline calls or Reports of Concern to the FDA, DEA, Department of Justice, or state authorities.[99]

203. Purdue's self-interested failure to report abuse and diversion would continue, quarter after quarter, even though the 2007 Judgment required Purdue to report "potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities." Instead of reporting dangerous prescribers, or even directing sales reps to stop visiting them, the Sacklers chose to keep pushing opioids to whoever prescribed the most.[100]

204. Staff also reported to the Sacklers that they continued to mail out thousands of deceptive marketing materials, including 12,528 publications in the first half of 2007. The single most-distributed material was volume #1 of Purdue's "*Focused and Customized Education Topic Selections in Pain Management*" (FACETS).[101] In FACETS, Purdue falsely instructed doctors and patients that physical dependence on opioids is not dangerous and instead improves patients' "quality of life" — just as Richard Sackler had been saying since the 1990s. In the same material, Purdue also falsely told doctors and patients that signs of addiction are actually

[99] 2007-07-15 Board report, pgs. 33, 41, 54, PWG000300817, -825, -838.
[100] For example, the Massachusetts prescribers described in paragraphs 112–153.
[101] 2007-07-15 Board report, pg. 34, PWG000300818.

"pseudoaddiction," and that doctors should respond by prescribing more opioids.[102] Staff told the Sacklers that another of the publications they had sent most often to doctors was "*Complexities in Caring for People in Pain*."[103] In it, Purdue repeated again its false claim that warning signs of addiction are really "pseudoaddiction" that should be treated with more opioids.[104]

205. Purdue sent both of those misleading publications to doctors in Massachusetts.[105]

206. At the same time, staff also reported to the Sacklers that Purdue was making more money than expected. A few months earlier, they had projected a profit of $407,000,000; now they expected more than $600,000,000.[106]

207. Staff reported to the Sacklers that "sales effort" was a key reason that profits were high.[107] Staff told the Sacklers that Purdue employed 301 sales reps to promote opioids and that sales reps were the largest group of Purdue employees by far. In comparison, Purdue employed only 34 people in drug discovery.[108]

[102] 2007-08 FACETS Vol. 1, pgs. 51-53, PTN000004691-693.
[103] 2007-07-15 Board report, pg. 34, PWG000300818.
[104] 2007 Complexities of Caring for People in Pain, pg. 2, PTN000016806.
[105] 2010-08-26 Medical Education Materials for HCPs, PWG000247083, PWG000247084.
[106] 2007-07-15 Board report, pg. 46, PWG000300830.
[107] 2007-07-15 Board report, pg. 46, PWG000300830.
[108] 2007-07-15 Board report, pg. 52, PWG000300836.

208. From the 2007 convictions until today, the Sacklers ordered Purdue to hire hundreds of sales reps to carry out their deceptive sales campaign.[109]




*AGO graphic based on Purdue documents*

---

[109] 2007-07-15 Board report, pg. 52, PWG000300836; 2007-10-15 Board report, pg. 58, PPLPC012000157459; 2008-01-15 Board report, pg. 22, PDD8901733995; 2008-10-15 Board report, pg. 26, PDD9316101027; 2009-04-16 Board report, pg. 28, PDD9316100624; 2009-07-30 Board report, pg. 19, PPLPC012000233249; 2009-10-22 Board

209. The impact of Purdue's sales reps in Massachusetts was direct and profound. From the 2007 felony conviction until 2018, Purdue sales reps visited Massachusetts prescribers and pharmacists more than 150,000 times.[111]

210. **In August**, Mr. Udell was still serving as Purdue's top lawyer, even after his criminal conviction. He wrote to Richard, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler: "Over the last week there have been numerous news stories across the nation reporting on the Associated Press's analysis of DEA data showing very large increases in the use of opioids analgesics (particularly OxyContin) between the years 1997 and 2005. Many of these articles have suggested that this increase is a negative development suggesting overpromotion and increasing abuse and diversion of these products."[112]

211. **In October**, staff told the Sacklers that Purdue received 284 Reports of Concern about abuse and diversion of Purdue's opioids in Q3 2007, and they conducted only 46 field inquiries in response. Staff reported to the Sacklers that they received 39 tips to Purdue's compliance hotline during the quarter, but Purdue did not report any of them to the authorities.[113]

212. Several of the troubling reports came from Massachusetts. The Reports of

---

report, pg. 21, PDD9316101599; 2010-02-01 Board report, pg. 4, PPLPC012000252778; 2010-04-21 Board report, pg. 20, PWG000423159; 2010-07-27 Board report, pg. 27, PWG000422503; 2010-10-25 Board report, pg. 26, PWG000421990; 2011-01-24 Board report, pg. 35, PWG000421582; 2011-05-02 Board report, pg. 36, PPLPC012000322461; 2011-08-03 Board report, pg. 42, PWG000420354; 2011-11-09 Board report, pg. 41, PWG000419343; 2012-01-25 Board report, pg. 48, PPLPC012000362291; 2012-04-30 Board report, pg. 33, PPLPC012000374823; 2012-07-23 Board report, pg. 44, PPLPC012000387112; 2012-11-01 Board report, pg. 54, PWG000414940; 2013-01-28 Board report, pg. 56, PPLPC012000407182; 2013-05-13 Board report, pg. 62, PPLP004367601; 2013-07-23 Board report, pg. 59, PPLPC012000433446; 2013-11-01 Board report, pg. 55, PPLPC002000186965; 2014-02-04 Board report, pg. 47, PPLPC002000181081; 2015-04-30 Sales & Promotion strategic plan, slide 9, PPLPC031001334002; 2015-10-15 commercial budget review, slide 28, PPLPC031001379856; 2016-05-11 10 year plan Sales and Promotions expenses, slide 3, PPLPC031001437901; 2016-10-11 commercial budget proposal, slide 12, PPLPC011000123475; 2017-06-22 executive committee pre-read, slide 28, PPLPC011000153311 ; 2017-03-23 executive committee pre-read, slide 26, PPLPC011000139412; 2017-06-22 executive committee pre-read, slide 28, PPLPC011000153311; 2017-11 Board budget, slide 51, PPLPC016000323215; 2017-11 Board budget, slide 51, PPLPC016000323215; 2018-02-07 email from Craig Landau, PPLPC016000325614.

[111] Exhibit 1

[112] 2007-08-30 email from Howard Udell, PPLPC012000153272.

[113] 2007-10-15 Board report, pgs. 36, 60, PPLPC012000157437, -461.

Concern included a doctor targeted by Purdue in Needham, Massachusetts. Purdue sales reps visited him to promote opioids 19 times, until the police arrived with a warrant and his license was suspended for improper prescribing of pain medications. Eight of his patients died.[114]

213. Staff told the Sacklers that Purdue had hired more sales reps and now employed 304. They also reported to the Sacklers that Purdue was succeeding at promoting its highest doses of opioids: "OxyContin 80mg is at Rx levels not seen in over 2 years."[115]

214. In preparation for an upcoming Board meeting, Richard Sackler instructed staff to give him the spreadsheets underlying their sales analysis, so that he could do his own calculations.[116] The spreadsheets showed that, in 2007, Purdue expected to collect more than half its total revenue from sales of 80mg OxyContin — its most powerful, most profitable, and most dangerous pill.[117]

215. **In November**, the Sacklers voted to spend $86,900,000 to employ sales reps in 2008 and another $1,000,000 to buy them laptops. The Sacklers also voted for a resolution regarding salary increases and bonus targets for the reps.[118] Every time the Sacklers voted to spend tens of millions of dollars on sales reps, they knew and intended that they were sending reps to promote opioids in Massachusetts.

---

[114] 2007-06-21 Purdue News Summary, PMA000283587; Exhibit 1.
[115] 2007-10-15 Board report, pgs. 4, 58, PPLPC012000157405, -459.
[116] 2007-10-28 email from Richard Sackler, PPLPC012000159168.
[117] 2007-10-28 attachment to email from Edward Mahony, PPLPC012000159170.
[118] 2007-11-01 Board minutes, PKY183212603-06; 2008 budget submission, pg. 20, PDD9273201033.

## ❖ ❖ ❖ <u>2008</u> ❖ ❖ ❖

216. **In January 2008**, staff told the Sacklers that Purdue still employed 304 sales reps and they were succeeding at the goal of promoting higher doses of opioids: "OxyContin 80mg continues to grow." Staff told the Sacklers that, in 2007, Purdue's net sales were just over $1 billion, almost "DOUBLE" what the company had planned. OxyContin was more than 90% of those sales.[119]

217. Staff also told the Sacklers that Purdue received 689 Reports of Concern about abuse and diversion of Purdue's opioids in Q4 2007, and they conducted only 21 field inquiries in response. Staff also reported to the Sacklers that they received 83 tips to Purdue's compliance hotline during the quarter, but Purdue did not report any of them to the authorities.[120]

218. Staff also told the Sacklers that they promoted Purdue opioids at the *Massachusetts General Hospital Purdue Pharma Pain Program* in Boston on November 1 and at a Tufts University course on opioid laws and policies in Boston on October 31.[121]

219. The Sacklers wanted more details on tactics for pushing sales. Richard Sackler wrote to Russell Gasdia, Vice President of Sales and Marketing (hereinafter "Sales VP"), demanding information about Purdue's opioid savings cards. Richard asked Gasdia how long the opioid savings cards lasted, how much savings they offered a patient, and whether there had been any changes since he had last been briefed on the opioid savings card scheme. Richard sent Gasdia a detailed hypothetical scenario to make sure he understood the sales tactic down to the

[119] 2008-01-15 Board report, pgs. 4, 22, 24, PDD8901733977, -995, -997.
[120] 2008-01-15 Board report, pg. 16, 24, PDD8901733989, -997.
[121] 2008-01-15 Board report, pg. 16, PDD8901733989.

smallest details.[122] Staff followed up with a presentation about opioid savings cards to the Sacklers at the next Board meeting.[123]

220. Meanwhile, when staff proposed a plan to get pharmacies to increase their inventory of OxyContin from 2 bottles to 3 bottles, Richard Sackler demanded to know why they couldn't get up to 4 bottles or more.[124]

221. The Sacklers didn't only sweat the small stuff. They also made the fundamental decision to hire a sales force, and then to expand it. At Purdue, hiring more sales reps was not a matter for middle management. Selling opioids door-to-door, in visits to doctor's offices and hospitals, was the core business of the company. The Sacklers themselves made the decisions about how big the sales force would be and what it would do.

---

[122] 2008-01-30 emails from Richard Sackler, PPLPC012000168321-322.

[123] 2008-02-09 email from John Stewart, PPLPC012000170262 (opioid savings cards "were singled-out for presentation since they are an extraordinary item in the budget and there is good data showing a positive impact on OxyContin utilization").

[124] 2008-02-19 email from Richard Sackler, PPLPC004000150467.

222. **In February**, the Sacklers used their power on the Board of Directors to order Purdue to "begin expanding the sales force by an additional 100 sales representatives beginning effective as of April 1, 2008."[125]

**PURDUE PHARMA INC.**

**Minutes of a Meeting of the Board of Directors**

**February 8, 2008**

RESOLVED that the Partnership be and it hereby is authorized and directed to begin expanding the sales force by an additional 100 sales representatives beginning effective as of April 1, 2008 at an additional cost in 2008 of $12.5 million, and in connection with the addition of such 100 sales representatives, to add 12 District Managers, 2 Regional Managers, 2 regional administrators, 2 trainers and 1 marketing/convention manager starting July 1, 2008; and further

223. The Sacklers knew and intended that, because of their orders, more sales reps would promote opioids to prescribers in Massachusetts. In preparation for the Sacklers' vote, staff told them that adding 100 sales reps would allow Purdue to make 12,000 more sales visits to prescribers every month.[126]

[125] 2008-02-08 Board minutes, PKY183212620. The Sacklers had long experience controlling the company's sales force. They voted to direct Purdue to hire 50 more sales reps in 1998, and directed the company to prepare for a 100-rep expansion in 2007. 1998-04-27 Board minutes, #618527.1; 2007-04-26 Board minutes, PPLP004415274.
[126] 2007-10-26 Sales & Marketing presentation, PPLPC012000159022.

224. From 2008 to the present, sales reps hired in the 2008 expansion promoted Purdue opioids to Massachusetts prescribers more than 13,000 times, including in:

Athol,
Auburn,
Barre,
Bourne,
Brewster,
Bridgewater,
Brimfield,
Brockton,
Brookfield,
Centerville,
Charlton,
Chatham,
Clinton,
Cotuit,
Dartmouth,
Dudley,
Easton,
Edgartown,
Fairhaven,
Fall River,
Falmouth,
Gardner,
Harwich,
Holden,
Hyannis,
Lakeville,
Lancaster,
Leicester,
Mansfield,
Marlborough,
Mashpee,
Middleborough,
Millbury,
Nantucket,
New Bedford,
North Dighton,
Northborough,
Norton,
Oak Bluffs,
Orange,
Orleans,
Osterville,
Oxford,
Palmer,
Raynham,
Rehoboth,
Rutland,
Sagamore Beach,
Sandwich,
Seekonk,
Shrewsbury,
Somerset,
South Dennis,
Southbridge,
Spencer,
Sterling,
Sturbridge,
Sutton,
Swansea,
Taunton,
Teaticket,
Uxbridge,
Vineyard Haven,
Ware,
Wareham,
Webster,
West Boylston,
Westborough,
Westport,
Whitinsville,
Whitman,
Winchendon,
Worcester, and
Yarmouth Port.

**Massachusetts Communities Targeted in Purdue's 2008 Sales Force Expansion**



225. Purdue managers determined that two sales reps hired in the 2008 expansion generated so many additional opioid prescriptions in Massachusetts that they were among Purdue's top performers. The company rewarded them with bonuses and all-expense-paid trips to tropical islands and used them as examples to motivate other reps to sell more opioids.[127]

226. The Sacklers also knew and intended that the sales reps would push higher doses of Purdue's opioids. That same month, Richard Sackler directed Purdue management to "measure our performance by Rx's by strength, giving higher measures to higher strengths."[128] He copied Jonathan and Mortimer Sackler on the instruction. The Sacklers knew higher doses put patients at higher risk. As far back as the 1990s, Jonathan and Kathe Sackler knew that patients frequently suffer harm when "high doses of an opioid are used for long periods of time."[129]

227. On Valentine's Day, the Sacklers voted to pay former CEO and criminal convict Michael Friedman $3,000,000.[130] It was one of several multi-million-dollar payments to the convicted executives to maintain their loyalty and protect the Sackler family.

228. By 2008, Purdue was working on a crush-proof reformulation of OxyContin to extend Purdue's patent monopoly.[131] The Sacklers learned that another company was planning clinical research to test whether crush-proof opioids are safer for patients.[132] Mortimer Sackler suggested that Purdue conduct similar studies to find out whether reformulated OxyContin was really safer *before* selling it to millions of patients. He wrote to Richard Sackler: "Purdue should be leading the charge on this type of research and should be generating the research to support

---

[127] 2018-02-18 deposition of Catherine Yates Sypek pg. 120; 2018-03-01 deposition of Timothy Quinn pg. 99.
[128] 2008-02-13 email from Richard Sackler, PPLPC012000170948-949.
[129] 1997-03-12 memo from John Stewart, PDD1701785443.
[130] 2008-02-14 Board minutes, PKY183212622.
[131] 2007-10-26 Sales & Marketing presentation, pg. 2, PPLPC012000159022.
[132] 2008-02-07 email from Robert Kaiko, PPLPC013000244844.

our formulation. Why are we playing catch up …? Shouldn't we have studies like this …?"[133] The Sacklers decided not to do the research because they wanted the profits from a new product, regardless of whether the deaths continued. Richard didn't want a paper trail, so he instructed Mortimer to call him, and CEO John Stewart met with his staff to plan how to phrase a carefully worded reply.[134] Later that month, Stewart wrote to Richard that reformulating OxyContin "will not stop patients from the simple act of taking too many pills."[135]

229. Meanwhile, staff gave Jonathan, Kathe, Mortimer and Richard Sackler projections indicating that OxyContin sales could plateau.[136] Mortimer demanded answers to a series of questions about why sales would not grow.[137] Richard chimed in at 8:30 p.m. to instruct the staff to find answers "before tomorrow."[138] Staff emailed among themselves about how the Sacklers' demands were unrealistic and harmful and then decided it was safer to discuss the problem by phone.[139]

---

[133] 2008-02-12 email from Mortimer Sackler, PPLPC013000244843-844.

[134] 2008-02-12 email from Richard Sackler, PPLPC013000244843 ("My sentiments exactly the first time I read it. But you should read it again. If you do and ask yourself what it means, I think you may come to a very different conclusion, as I now have … We should talk about it. Give me a call at home."); 2008-02-13 email from John Stewart, PPLPC013000244843.

[135] 2008-02-22 email from John Stewart, PPLPC012000172201. Five years later, Purdue published two studies about the crush-proof formulation. Neither concluded the crush-proof tablets lowered the risks of addiction, overdose and death associated with OxyContin use. One was a single-session research study conducted by three full-time Purdue employees and a paid Purdue consultant to assess "the attractiveness" of the crush-proof tablets to recreational drug users. Thirty recreational opioid users were interviewed by two researchers. "This study did not include safety, pharmacokinetic, or efficacy evaluations, and no drugs were administered." Participants' answers to "open-ended questions" indicated that the crush-proof tablets "might be less attractive to recreational opioid abusers" than original OxyContin. The study concluded that "among the available opioid products that we included in this study, recreational opioid users judged [crush-proof OxyContin tablets] to be the least attractive, the least valuable and the least desirable, with the least likelihood for tampering and the lowest street value." PTN000002031-2034. In the second study, by the same Purdue authors, 29 volunteers snorted OxyContin (original and crush-proof), oxycodone, and a placebo over a seven-day treatment phase and rated the drugs. The study concluded that "reformulated OxyContin has a reduced abuse potential compared to the original formulation upon intranasal administration." PTN000002031, -2044. Purdue amended its OxyContin label to reference these studies in 2013.

[136] 2008-02-26 email from Edward Mahony, PPLPC012000172585; attachment PPLPC012000172587.

[137] 2008-02-26 email from Mortimer Sackler, PPLPC12000172674.

[138] 2008-02-26 email from Richard Sackler, PPLPC12000172674.

[139] 2008-02-26 email from John Stewart, PPLPC012000172677.

230. **In March**, Richard Sackler dug into Purdue's strategy for selling more OxyContin. He directed sales and marketing staff to turn over thousands of pieces of data about sales trends, including data to distinguish the kilograms of active drug from the number of prescriptions, so he could analyze higher doses.[140] Staff delivered the data early Sunday morning; Richard responded with detailed instructions for new data that he wanted that same day.[141] An employee sent Richard the additional data only a few hours later and pleaded with Richard: "I have done as much as I can." The employee explained that he needed to attend to family visiting from out of town.[142] Richard responded by calling him at home, insisting that the sales forecast was too low, and threatening that he would have the Board reject it.[143] On Monday, staff emailed among themselves to prepare for meeting with Richard, highlighting that Richard was looking for results that could only be achieved by hiring more sales reps. Meanwhile, Richard met with John Stewart to discuss his analysis of the weekend's data and new graphs Richard had made.[144]

231. Sales VP Russell Gasdia was struggling to handle the pressure. When Richard Sackler sent Gasdia a list of seven sales questions to answer on a Saturday (and copied Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler), Gasdia wrote to John Stewart:

---

[140] 2008-03-09 email from David Rosen, PPLPC012000174478.
[141] 2008-03-09 email from Richard Sackler, PPLPC012000174477.
[142] 2008-03-09 email from David Rosen, PPLPC012000174204.
[143] 2008-03-09 email from David Rosen, PPLPC012000174202. A month earlier, when an employee did not answer a call from Richard Sackler during a Sunday morning church service, Richard immediately contacted the CEO to complain. 2008-02-17 email from Mike Innaurato, PPLPC012000171496. Richard then wrote that he expected answers from four different sales staff members the next day (President's Day) even though Purdue was closed. 2008-02-17 email from Richard Sackler, PPLPC012000171511. *See also* 2008-11-02 email from Mike Innaurato, PPLPC019000241631.
[144] 2008-03-10 emails from David Rosen and John Stewart, PPLPC012000174476.

> "John, I know it is tricky, but Dr. Richard has to back off somewhat. He is pulling people in all directions, creating a lot of extra work and increasing pressure and stress. I will draft a response but he is not realistic in his expectations and it is very difficult to get him to understand."[145]

232. Richard Sackler did not back off. Instead, he pushed staff to sell more of the highest doses of opioids and get more pills in each prescription. That same Saturday night, Richard sent Gasdia yet another set of instructions, directing him to identify tactics for "exceeding 2007 Rx numbers on an adjusted basis (adjusted for strength and average number of tablets per Rx)."[146] The very next day, Gasdia was writing up plans for how adding sales reps, opioid savings cards, and promoting more intermediate doses of OxyContin could help increase sales.[147]

233. Richard Sackler followed through on his weekend threat that he would have the Board reject the sales plan. Two days later, Richard circulated his own sales analysis to the Board, ordered the Secretary to "put this high in the Board agenda," and proposed that he and Mortimer Sackler oversee a redo of the annual plan as well as the 5-year plan for Purdue's opioids.[148]

234. At the same time, Jonathan, Kathe, and Mortimer Sackler were also pushing staff about sales. Staff told those three Sacklers that they would use opioid savings cards to meet the challenge of keeping OxyContin scripts at the same level in 2008 as in 2007, "in spite of all the pressures."[149] Kathe demanded that staff identify the "pressures" and provide "quantification of their negative impact on projected sales."[150]

[145] 2008-03-08 email from Russell Gasdia, PPLPC012000174127.
[146] 2008-03-08 email from Richard Sackler, PPLPC012000175157.
[147] 2008-03-09 email from Russell Gasdia, PPLPC012000174161.
[148] 2008-03-10 email from Richard Sackler, PPLPC023000164605.
[149] 2008-03-09 email from Edward Mahony, PPLPC012000175155-156.
[150] 2008-03-11 email from Kathe Sackler, PPLPC012000175155.

235. **In April**, staff told the Sacklers that Purdue employed 304 sales reps. Staff reported to the Sacklers that the reps had obtained data showing which pharmacies stocked higher strengths of OxyContin, which helped them convince area doctors to prescribe the highest doses. Staff also told the Sacklers that Purdue received 853 Reports of Concern about abuse and diversion of Purdue opioids in Q1 2008, and they had conducted only 17 field inquiries in response. Staff also reported to the Sacklers that they received 83 tips to Purdue's compliance hotline during the quarter, but did not report any of them to the authorities.[151]

236. Staff also told the Sacklers that they promoted Purdue's opioids at Tufts Health Care Institute's program on Opioid Risk Management in Boston on March 27.[152]

237. On April 18, Richard Sackler sent Kathe, Ilene, David, Jonathan, and Mortimer Sackler a secret memo about how to keep money flowing to their family. Richard wrote that Purdue's business posed a "dangerous concentration of risk." After the criminal investigations that almost reached the Sacklers, Richard wrote that it was crucial to install a CEO who would be loyal to the family: "People who will shift their loyalties rapidly under stress and temptation can become a liability from the owners' viewpoint." Richard recommended John Stewart for CEO because of his loyalty. Richard also proposed that the family should either sell Purdue in 2008 or, if they could not find a buyer, milk the profits out of the business and "distribute more free cash flow" to themselves.[153]

[151] 2008-03-15 Board report, pgs. 17, 23, 24, 27, PDD8901724450, -456, -457, -460.
[152] 2008-03-15 Board report, pg. 16, PDD8901724449.
[153] 2008-04-18 email and attached memo from Richard Sackler, PDD9316300629-631.

238. That month, the Sacklers voted to have Purdue pay their family $50,000,000. From the 2007 convictions until 2018, the Sacklers voted dozens of times to pay out Purdue's opioid profits to their family — in total ***more than four billion dollars***.[154]




*AGO graphic based on Purdue's internal Board documents*

239. When the Sacklers directed Purdue to pay their family, they knew and intended that they were paying themselves from opioid sales in Massachusetts. Purdue and the Sacklers tracked revenue from Massachusetts. For example, when the U.S. Centers for Disease Control

154 2008-04-18 Board minutes, PKY183212631-633; 2008-06-27 Board minutes, PKY183212647; 2008-09-25 Board minutes, PKY183212654; 2008-11-06 Board minutes, PKY183212662; 2009-03-05 Board minutes, PKY183212705; 2009-06-26 Board minutes, PKY183212742; 2009-09-23 Board minutes, PKY183212772; 2010-02-04 Board minutes, PKY183212818; 2010-04-01 Board minutes, PKY183212829; 2010-09-10 Board minutes, PKY183212844; 2010-12-02 Board minutes, PKY183212869-70; 2011-04-06 Board minutes, PKY183212896-97; 2011-06-24 Board minutes, PKY183212924-25; 2011-09-01 Board minutes, PKY183212927-28; 2012-07-27 Board report, pg. 44, PPLP004367403; 2012-03-05 email from Edward Mahony, PPLPC012000368627; 2013-11-01 Board report, pg. 3, PPLPC002000186913; 2014-12-03 November flash report, slide 8, PPLPC016000266403; 2015-06-05 mid-year strategic review, slide 55, PPLPC011000036000; 2017-09-14 10 year plan spreadsheet, page "CF – Internal," PPLPC021000904588.

warned that high doses of opioids endanger patients, staff reported to the Sacklers that Massachusetts prescriptions of Purdue's highest doses provided $23,964,122 per year, or 2.8% of Purdue's high-dose sales.[155] Similarly, prescription data on over 500,000 individual prescribers that Purdue tracked from 2007 to 2017 confirm that Massachusetts constituted approximately 2.8% of Purdue sales.[156] Since May 15, 2007, the Sacklers paid their family approximately $112,000,000 from Massachusetts.[157]

240. On April 18, the Sacklers voted to increase the 2008 budget for Sales and Promotion to $155,802,000.[158] Then, Richard Sackler sent Sales VP Russell Gasdia a series of questions about Purdue's efforts to get patients to take higher doses and stay on opioids for longer times. Richard wanted to know: how many Purdue patients had insurance that would let them take unlimited quantities of Purdue opioids; how many patients were limited to 60 tablets per month; and how many patients had any limit on the number of tablets or dose or number of tablets per day. He demanded that sales staff be assigned to answer his questions "by tomorrow morning."[159] When the sales staff pleaded for a few more hours to collect the data, Richard agreed to give them until the end of the day.[160]

241. **In May**, staff sent the Sacklers more ideas about ways to promote Purdue's opioids. The proposal matched the Sacklers' own plan, which Richard had written out as CEO: deflect blame from Purdue's addictive drugs by stigmatizing people who become addicted. "KEY MESSAGES THAT WORK" included this dangerous lie: "It's not addiction, it's abuse.

[155] 2016-04-13 Q1 2016 Commercial Update, slide 74, PPLPC016000286167.
[156] Purdue Drug Units Dispensed by HCP, Product, and Strength, PWG003984518–45.
[157] 2.8% of $4,000,000,000 is $112,000,000.
[158] 2008-04-18 Board minutes, PKY183212634-37.
[159] 2008-04-22 email from Richard Sackler, PPLPC012000179497.
[160] 2008-04-22 email from Richard Sackler, PPLPC012000179679.

It's about personal responsibility."[161]

242. **In June**, the Sacklers voted to appoint John Stewart as President and CEO of Purdue Pharma Inc. and Purdue Pharma LP. The appointment followed through on Richard Sackler's suggestion in his secret memo that the Sacklers should put a premium on loyalty to the family. On the same day, the Sacklers voted to pay their family $250,000,000.[162] The payment followed Richard Sackler's suggestion in the memo to "distribute more free cash flow" to themselves.

243. Meanwhile, Richard Sackler asked sales staff for more information about Purdue's opioid savings cards.[163] Staff reported to Richard, Jonathan, Kathe, and Mortimer Sackler that 67,951 patients had used Purdue's opioid savings cards, and that the cards provided a discount on a patient's first five prescriptions.[164]

244. After five prescriptions, many patients would face significant withdrawal symptoms if they tried to stop taking opioids. Staff told Richard, Jonathan, Kathe, and Mortimer Sackler that 27% of patients (more than 18,000 people) had used the cards for all five prescriptions.[165]

245. **In July**, Purdue's Fleet Department reported to the Sacklers that Purdue had bought one hundred new Pontiac Vibes for the expanded sales force. Staff also told the Sacklers that Purdue received 890 Reports of Concern regarding abuse and diversion of Purdue's opioids in Q2 2008 and had conducted only 25 field inquiries in response. Staff reported to the Sacklers that they received 93 tips to Purdue's compliance hotline during the quarter, but did not report

---

[161] 2008-05-16 email from Pamela Taylor, PPLPC012000183254; 2008-04-16 Executive Committee notes, PPLPC012000183256; 2008-04-16 presentation by Luntz, Maslansky Strategic Research, PPLPC012000183259.
[162] 2008-06-27 Board minutes, PKY183212646-647.
[163] 2008-06-14 email from Richard Sackler, PPLPC012000186396.
[164] 2008-06-16 email from Russell Gasdia, PPLPC012000186394-395.
[165] 2008-06-16 email from Russell Gasdia, PPLPC012000186395.

any of them to the authorities.[166]

246. Staff also told the Sacklers that they promoted Purdue opioids in Massachusetts in a presentation titled "*The Assessment and Management of Chronic Pain with an Emphasis on the Appropriate Use of Opioid Analgesics*" at Tufts University on April 25 and a presentation titled "*The Role of Urine Drug and other Biofluid Assays in Pain Management*," at the Tufts Health Care Institute on June 26 and 27.[167] Convincing Massachusetts doctors that Purdue opioids were the best way to manage chronic pain and that urine tests protected patients from addiction were both part of Purdue's unfair and deceptive scheme.

247. **In September**, the Sacklers voted to pay their family $199,012,182.[168]

248. **In October**, staff told the Sacklers that surveillance data monitored by Purdue indicated a "wide geographic dispersion" of abuse and diversion of OxyContin "throughout the United States." Staff told the Sacklers that "availability of the product" and "prescribing practices" were key factors driving abuse and diversion of OxyContin." On the same day, staff told the Sacklers that Purdue had begun a new "Toppers Club sales contest" for sales reps to win bonuses, based on how much a rep increased OxyContin use in her territory and how much the rep increased the broader prescribing of opioids — the same "availability of product" and "prescribing practices" factors that worsen the risk of diversion and abuse. In the same report, staff told the Sacklers that they received 163 tips to Purdue's compliance hotline during Q3 2008, but did not report any of them to the authorities.[169]

249. Staff also told the Sacklers that the Board-ordered sales force expansion had been

[166] 2008-07-15 Board report, pgs. 21, 28, 30, PPLP004367317, -324, -326.
[167] 2008-07-15 Board report, pg. 21, PPLP004367317.
[168] 2008-09-25 Board minutes, PKY183212654.
[169] 2008-10-15 Board report, pgs. 19, 24, 28, PDD9316101020, -025, 029.

implemented and Purdue now employed 414 sales reps.[170] The Sacklers' decision to expand the sales force caused the effect they intended in Massachusetts. During Q3 2008, the number of sales visits to Massachusetts prescribers increased by 20% to more than 1,800.[171]

250. **In November**, the Sacklers turned to expanding the sales force again. Purdue's 2009 budget identified expanding the sales force as the #1 sales and marketing objective.[172] The Sacklers voted to spend $112,400,000 on sales reps.[173] Staff told the Sacklers that their decision would pay an average sales rep salary of $89,708 and bonus of $43,470, and the sales reps would visit prescribers 518,359 times.[174]

251. That same month, the Sacklers voted to pay their family $325,000,000.[175] They also voted to pay $5,000,000 to Howard Udell — their lawyer and convicted criminal.[176] Like their Valentine's Day payment to Friedman, the Sacklers spent millions to keep the loyalty of people who knew the truth.

❖ ❖ ❖ **2009** ❖ ❖ ❖

252. **In February 2009**, Kathe Sackler instructed staff to report on Purdue's grants and donations. Staff reported that Purdue was spending $500,000 at Massachusetts General Hospital, $185,000 at Tufts University, and $6,000 at the Massachusetts College of Pharmacy.[177]

253. **In March**, the Sacklers voted to pay Purdue sales reps and sales managers bonuses of 103 percent of Purdue's target because they sold so many opioids in 2008. The

---

[170] 2008-10-15 Board report, pg. 26, PDD9316101027.
[171] Exhibit 1. 20% increase from Q3 2007.
[172] 2008-11 budget submission, pg. 10, PPLP004401590.
[173] 2008-11-06 Board minutes, PKY183212663, 66; 2008-11 budget submission, PDD9273201117 (Field Operations $112.4M).
[174] 2008-11 budget submission, pg. 104-106, PDD9273201186-88.
[175] 2008-11-06 Board minutes, PKY183212662.
[176] 2008-11-21 Board minutes, PKY183212680.
[177] 2009-02-17 email from Brad Griffin, PPLPC012000213086, and attachment, PPLPC012000213088.

Sacklers also voted to increase the base pay of sales staff for 2009. On the same day, the Sacklers voted to pay their family $200,000,000.[178]

254. **In April**, staff told the Sacklers that Purdue employed 412 sales reps and had made dramatic progress promoting higher doses: "for the first time since January 2008, OxyContin 80mg strength tablets exceeded the 40mg strength."[179] The Sacklers had a detailed conversation with Sales VP Russell Gasdia about the staffing of the sales force, how many sales reps the company should employ, and how many prescribers each rep would visit each year.[180] The Sacklers told sales executives to hire a new staff member who would contact prescribers electronically and would promote Purdue opioids through the deceptive website *Partners Against Pain*.[181]

255. Staff told the Sacklers that they received 122 tips to Purdue's compliance hotline during Q1 2009, and revealed one of them to an outside monitor. Staff reported to the Sacklers that the compliance problems included improper use of OxyContin marketing materials and opioid savings cards.[182]

256. **In May**, staff told the Sacklers that Purdue had violated its Corporate Integrity Agreement with the U.S. government by failing to supervise its sales reps.[183] Because sales reps lobbying doctors poses a high risk of misconduct (no witnesses, and the rep is paid to increase opioid sales), the United States required that Purdue managers supervise sales reps in person at least 5 days each year.[184] Purdue management disregarded that obligation and did not even set

---

[178] 2009-03-05 Board minutes, PKY183212703-711.
[179] 2009-04-16 Board report, pgs. 5, 28, PDD9316100601, -624.
[180] 2009-04-21 email from Russell Gasdia, PPLPC012000220948.
[181] 2009-04-30 email from Russell Gasdia, PPLPC012000221936.
[182] 2009-04-16 Board report, pgs. 24-25, PDD9316304336-337.
[183] 2009-05-08 corporate compliance quarterly report to the Board 1Q09, slide 6, PPLPC029000274906.
[184] Purdue Corporate Integrity Agreement section III.K.

up a system to track it.[185] Even though Purdue executives had ignored the requirement and not monitored it, they responded to the violation by firing three employees in the field and letting all the executives at headquarters keep their jobs.[186]

257. Staff also told the Sacklers that they were awaiting new regulations for drug marketing in Massachusetts.[187]

258. **In June**, Richard Sackler asked sales staff how a competing drug company had increased sales: "What is happening???"[188] Staff replied that it was all about sales reps:

> "They have 500 reps actively promoting to top decile MDs … Their messaging is 'we are not OxyContin,' alluding to not having the 'baggage' that comes with OxyContin.
>
> Interestingly, their share is highest with MDs we have not called on due to our downsizing and up until last year, having half as many reps. Where we are competing head to head, we decrease their share by about 50%."[189]

259. A few days later, staff reported to the Sacklers that Purdue had expanded its sales force at the Board's direction: "As approved in the 2009 Budget, 50 New Sales Territories have been created." Staff told the Sacklers the expansion was focused on the most prolific opioid prescribers, because "there are a significant number of the top prescribers" that Purdue had not been able to visit with its smaller force of sales reps.[190] Later that month, the Sacklers voted to pay their family $162,000,000.[191]

---

[185] 2009-05-08 corporate compliance quarterly report to the Board 1Q09, slide 6, PPLPC029000274906 ("Compliance was not monitoring against the 'five full days' requirement").
[186] 2009-07-30 Board report, pg. 16, PPLPC012000233246.
[187] 2009-05-08 corporate compliance quarterly report to the Board 1Q09, slide 14, PPLPC019000275103.
[188] 2009-06-12 email from Richard Sackler, PPLPC021000235124.
[189] 2009-06-13 email from Russell Gasdia, PPLPC021000235124.
[190] 2009-06-16 email from Pamela Taylor, PPLPC012000226604; 2009-05-20 Executive Committee notes, PPLPC012000226606.
[191] 2009-06-26 Board minutes, PKY183212742.

260. **In July**, staff told the Sacklers that Purdue employed 429 sales reps.[192] Richard Sackler told staff that he was not satisfied with OxyContin sales and demanded a plan to "boost" them. He asked for the topic to be added to the agenda for the Board.[193]

261. **In August**, Richard Sackler convened a meeting of Board members and staff about "all the efforts Sales and Marketing is doing and planning to do to reverse the decline in OxyContin tablets market." He emphasized that $200,000,000 in profit was at stake.[194] At the meeting, staff told the Sacklers that the 80mg OxyContin pill was far-and-away Purdue's best performing drug. Purdue sold many more kilograms of active ingredient in the 80mg dose than any other dose (about 1,000 kilograms: literally a ton of oxycodone).[195]

262. Staff also reported to the Sacklers about their newest OxyContin sales campaign, with the slogan: *Options*.[196] The *Options* campaign set the pattern that Purdue would follow for years: pushing doctors and patients up the ladder to higher doses. To make it easy for sales reps to promote higher doses, the campaign materials emphasized the "range of tablet strengths," provided a picture of each dose, and said: "You can adjust your patient's dose every 1 to 2 days." Staff told the Sacklers that they would advertise the *Options* campaign in medical journals reaching 245,000 doctors.[197]

---

[192] 2009-07-30 Board report, pg. 19, PPLPC012000233249.
[193] 2009-07-20 email from Richard Sackler, PPLPC012000232016.
[194] 2009-08-12 email from Richard Sackler, PPLPC012000234970-971; *see also* 2009-08-10 email from John Stewart, PPLPC012000234801 ("Richard has asked me about this at least 5 times over the past few weeks").
[195] 2009-08-19 Board slides, slide 7, PPLPC012000235543.
[196] 2009-08-12 email from Russell Gasdia, PPLPC012000235039.
[197] 2009-08-19 Board slides, slides 12, 16, PPLPC012000235543; *Options* marketing materials, PMA000189015.




*Purdue's 2009 marketing campaign 'Options'*

263. Staff also reported to the Sacklers that more than 160,000 patients had used Purdue's opioid savings cards, more than doubling the result reported to the Sacklers the summer before.[198] Staff also told the Sacklers that they would advertise OxyContin using a special television network: thousands of doctors would be given free digital video recorders for their home televisions, in exchange for watching advertisements for drugs.[199]

---

198 2009-08-19 Board slides, slide 12, PPLPC012000235543. Compare with 67,951 in June 2008. 2008-06-16 email from Russell Gasdia, PPLPC012000186394.

199 2009-08-19 Board slides, slide 19, PPLPC012000235543. Purdue spent approximately $100 for each doctor who watched the advertisement, but it made the money back when the doctors prescribed Purdue's opioids. 2009-04-27 email from Lindsay Wolf, PPLPC012000221091.

264. Immediately after meeting with sales staff, Richard Sackler asked for the raw data underlying their presentation. When staff had not responded within five minutes, he asked again.[200]

265. **In September**, the Sacklers voted to pay their family $173,000,000.[201] But Mortimer Sackler was concerned that staff were not selling Purdue's opioids aggressively enough. He demanded to know why staff predicted a decline in OxyContin sales when he believed the market should grow.[202]

266. **In October**, staff told the Sacklers that Purdue had expanded its sales force by 50 territories and now employed 475 sales reps.[203] Richard Sackler directed staff to send him weekly reports on OxyContin sales.[204] No one in the company received reports that often, so staff were not sure how to reply.[205] Staff considered telling Richard that there were no weekly reports, but they decided to make a new report just for him instead.[206] The CEO also instructed the Sales Department to report to the Sacklers with more explanation about its activities.[207]

267. That same month, the Sacklers and staff discussed federal sunshine legislation that would create a public database to disclose drug companies' payments to doctors. Purdue was paying many doctors to promote its opioids — including doctors in Massachusetts — but the

---

[200] 2009-08-19 emails from Richard Sackler, PPLPC023000236021-022.
[201] 2009-09-23 Board minutes, PKY183212770-772.
[202] 2009-09-28 email from Mortimer Sackler, PPLPC012000240032
[203] 2009-10-22 Board report, pgs. 4, 21, PPLPC016000007322, -339.
[204] 2009-10-08 email from Richard Sackler, PPLPC012000241516; *see also* PDD9316309168.
[205] 2009-10-08 email from Robert Barmore, PPLPC012000241515; *see also* PPLPC022000283453.
[206] 2009-10-08 email from David Rosen, PPLPC012000241515 ("Hi, guys … Someone needs to alert Dr. Richard that we no longer do a weekly report. Can either one of you help …); 2009-10-08 email from Dipti Jinwala, PPLPC012000241526 ("we have not been providing the OxyContin weekly report since May 09"); 2009-10-08 email from Richard Sackler, PPLPC012000241586 ("I'd like to have the weekly updates."); 2009-10-08 email from David Rosen, PPLPC012000241586 ("If we do as dr. richard requests, we will be adding work and providing him near worthless data"); 2009-10-08 email from Russell Gasdia, PPLPC012000241586 ("Tell her not to respond."); 2009-10-08 email from John Stewart, PPLPC012000241647; 2009-10-09 email from Rob Barmore, PPLPC022000283690 ("For the record, my concerns regarding workload and being able to meet demands of all the reporting, primary research, ad hocs while maintaining quality and reasonable levels of group morale remain.").
[207] 2009-10-20 email from John Stewart, PPLPC012000242813.

payments could often be kept secret. Some of the Sacklers were concerned that doctors would be "much less willing" to work for Purdue if the payments were disclosed.[208]

268. **In November**, the Sacklers voted to spend $121,628,000 to employ sales reps in 2010. Kathe and Richard Sackler were designated to review the sales projections.[209] They also voted to pay disgraced former employee Howard Udell up to another $1,000,000, and to pay $2,700,000 to settle personal injury claims by people harmed by Purdue's opioids.[210]

269. At the Board meeting that month, Kathe and Richard Sackler asked staff to "identify specific programs that Sales and Marketing will implement to profitably grow the OER [extended-release oxycodone] market and OxyContin in light of competition; provide analytics around why/how the proposed increase in share-of-voice translates into sales and profitability growth; clarify the situation with respect to OxyContin being used by 35% of new patients, but only retaining 30% of ongoing patients;" and give the Sacklers a copy of a report from McKinsey on tactics to increase OxyContin sales.[211] The McKinsey report instructed sales reps to maximize profits by "emphasizing [the] broad range of doses" — which was code for pushing the doses that were highest and most profitable.[212]

270. At the same meeting, Richard Sackler also asked staff, "What are OxyContin's clinical advantages vs. Opana ER, MS Contin, Kadian, Exalgo, Avinza, Nucynta and Duragesic? How are these differences communicated?" In response, staff reported to all the Sacklers a list of purported advantages of OxyContin over competing products, including that OxyContin purportedly reduces pain faster, has less variability in blood levels, and works for more pain

---

[208] 2009-10-19 email from John Stewart, PPLPC032000114702.
[209] 2009-11-03 Board minutes, PKY183212802-804; 2009-11 budget submission, pg. 12, PDD9273201222.
[210] 2009-11-20 Board minutes, PKY183212814; 2009-11-25 Board minutes, PKY183212815.
[211] 2009-11-02 budget presentation, PPLPC012000249328; 2009-12-22 email from Edward Mahony, PPLPC012000249327 ("a list of questions raised at the November Board meeting and answers or actions on each").
[212] 2009-10-26 steering committee meeting presentation by McKinsey, slide 19, PPLPC018000346294.

conditions than competing drugs.[213] These were all improper, unfair, and deceptive claims that Purdue had admitted were prohibited.

271. Richard Sackler also asked staff why Purdue's operating margin in 2010 was less than in 2009. Staff responded to all the Sacklers that one of the biggest reasons for the reduced margin was the cost of the expanded sales force that Sacklers had ordered.[214]

272. **In December**, Kathe and Richard Sackler met with sales staff to review plans for 2010. Staff warned the two Sacklers that, although OxyContin sales were at record-breaking levels (nearly $3 billion per year), the decade-long rise in the total kilograms of oxycodone prescribed in America was beginning to flatten.[215] Higher doses contain more of that active ingredient and are more profitable to Purdue.

❖ ❖ ❖

**The Massachusetts General Hospital Purdue Pharma Pain Program**

❖ ❖ ❖

273. In 2009, the Sacklers decided to renew Purdue's commitment to spend $3,000,000 in Massachusetts to fund the *Massachusetts General Hospital Purdue Pharma Pain Program*.[216]

274. The Sacklers had chosen to launch the *Massachusetts General Hospital Purdue Pharma Pain Program* in 2002 after due diligence, including review of OxyContin sales data, led staff to conclude that it would help Purdue sell more opioids in Massachusetts.[217] Staff commented positively on "MGH's commitment to OxyContin," citing OxyContin's 63.1% market share in MGH's zip code and the fact that "MGH also has a hospital owned pharmacy

---

[213] 2009-11-02 budget presentation, PPLPC012000249329.
[214] 2009-11-02 budget presentation, PPLPC012000249336.
[215] 2009-12-03 email from Mike Innaurato, PPLPC012000247640, attachment PPLPC012000247642.
[216] 2009-07-09 email from David Haddox, PPLPC023000228146; Health Policy Memorandum from David Haddox, PPLPC023000228147 at 48.
[217] 2001-11-14 email from James Lang, PPLPC012000041068; 2001-11-16 email from Phil Cramer, PPLPC014000021900.

which conservatively generates $25,000 per month in OxyContin sales."[218] Staff also noted:

> "MD accessibility is great … they come to us with any questions, and allow us to see them when we need to."[219]
>
> "Partner's Healthcare Group is MGH's arm all around Boston – MGH has significant impact on these members (mostly primary care). MGH also has significant influence through most of New England, simply because they are MGH."[220]

275. The agreement establishing the program gave Purdue the right to influence education of doctors in Massachusetts by proposing "areas where education in the field of pain is needed" and "curriculum which might meet such needs." Purdue was also entitled to appoint a voting member of the Educational Program Committee and an advisor to the program's Oversight Board.[221]

276. When the *Massachusetts General Hospital Purdue Pharma Pain Program* launched, Purdue made sure that Boston area sales reps and the Sacklers were poised to lever the partnership to Purdue's advantage.[222] Purdue staff planned a symposium and reception at the hospital's famous "Ether Dome" for which Purdue selected the speakers.[223] Purdue staff also prepared a guest list, including "key politicians," who could influence policy in Massachusetts, and "managed care administrators," who could decide whether Massachusetts insurance plans encouraged the use of Purdue's opioids.[224]

277. Although staff acknowledged that reactions to the launch had not *all* been positive — one medical journal threatened not to publish research that came out of the program because

---

[218] 2001-11-19 email from Dan Doucette, PPLPC012000041222.
[219] 2001-11-19 email from Russell Gasdia, PPLPC012000041186.
[220] 2001-11-19 email from James Lang, PPLPC012000041198.
[221] The Massachusetts General Hospital and Harvard Medical School Fund Agreement with Purdue Pharma L.P. Dated as of March 5, 2003, PPLPC021000425373-378.
[222] 2002-02-04 email from Windell Fisher, PPLPC024000063880; 2002-02-06 email from Robert Reder, PPLPC026000007351.
[223] 2002-03-16 email from James Lang, PPLPC025000034560.
[224] 2002-03-21 email from Merle Spiegel, PPLPC023000014497.

of the conflict of interest — staff told the Sacklers that funding the program was a valuable way to exert influence in Massachusetts. Staff told the Sacklers that the *Massachusetts General Hospital Purdue Pharma Pain Program* gave Purdue name recognition among medical students, residents, and the public, as well as political protection against efforts to address the opioid crisis.[225] Staff told the Sacklers:

> "There has been a great deal of legislative activity/debate in Massachusetts around the issues of whether or not OxyContin tablets should remain available to persons in the Commonwealth. Some legislators have suggested that the product should be classified as a banned substance under the Commonwealth's controlled substances regulation – in the same class as heroin and LSD – by introducing a total of five bills to this end …
>
> I fear that a termination of support might fuel the efforts of those already hostile to us, or reduce the willingness of those who have supported our positions to continue to do so."[226]

278. In late 2010 or early 2011, the Sacklers voted to continue funding the *Massachusetts General Hospital Purdue Pharma Pain Program*.[227] The Sacklers sent CEO John Stewart to Boston to network with MGH doctors who could prescribe opioids in Massachusetts.[228] Purdue paid MGH the full $3,000,000.[229] The Sacklers knew and intended that their sponsorship of the *Massachusetts General Hospital Purdue Pharma Pain Program* would contribute to their deceptive promotion of opioids in Massachusetts.

---

[225] 2009-07-09 memorandum from David Haddox, PPLPC023000228147-153.
[226] 2009-07-09 memorandum from David Haddox, PPLPC023000228149.
[227] 2011-11-14 memorandum to the Oversight Board, PPLPC021000425379.
[228] 2010-12-03 email from Paul Coplan, PPLPC017000258652.
[229] 2014-05-29 email from Bert Weinstein, PPLPC020000797947, noting two attachments – the 2009 memo to Stewart and the Board and a "Receipt for final 1MM."

❖ ❖ ❖

**The Sacklers, Purdue, and Tufts University**

❖ ❖ ❖

279. Massachusetts General Hospital was not the only place where the Sacklers cultivated influence over Massachusetts doctors. The Sackler family had long sent money to Tufts, a leading university, including a renowned medical school. In 1980, three Sackler brothers, through a very large payment, established the Sackler School of Graduate Biomedical Sciences. Later, in 1999, the Sackler family made a more targeted gift, establishing Tufts Masters of Science in Pain Research, Education, and Policy ("MSPREP Program").[230] Kathe Sackler co-presided over the decision to fund the MSPREP Program.[231] Richard Sackler attended the launch symposium in Boston and paid Tufts hundreds of thousands of dollars.[232] Purdue also sponsored the annual Sackler Lecture at Tufts on a topic in pain medicine.[233] For many years, Richard took a seat on the board of the Tufts University School of Medicine.

280. The Sacklers got a lot for their money. The MSPREP Program bought Purdue name recognition, goodwill in the local and medical communities, and access to doctors at Massachusetts hospitals like Brigham and Women's.[234] Purdue got to control research on the treatment of pain coming out of a prominent and respected institution of learning.[235] Staff told the Sacklers that Purdue employees regularly taught a Tufts seminar about opioids in Massachusetts as part of the MSPREP Program.[236] Staff sent the Sacklers a report showing that Tufts and its affiliated teaching hospital helped Purdue develop a publication for patients

---

[230] 1999-07-10 email from Richard Sackler, #212166.1; memorandum dated May 7, 2000, PPLPC013000048630.
[231] 1999-07-07 attendance list for the Meeting to discuss funding, PPLPC013000029936.
[232] 1999-10-13 email from Richard Sackler, #436363.1; 1999-03-11 Board decision, PDD1706191717.
[233] 2007-03-29 email from David Haddox, PPLPC012000137085.
[234] *See, e.g.*, 2016-10-04 email from Srdjan Nedeljkovic, PPLPC022000968264.
[235] 2002-07-31 email from David Haddox, #3065539.1.
[236] 2008-01-15 Board report, pg. 16, PDD8901733989.

entitled, "Taking Control of Your Pain."[237] The MSPREP Program was such a success for Purdue's business that the company considered it a model for influencing teaching hospitals and medical schools.[238]

281. A May 2000 Tufts site visit memorandum from Purdue staff, sent to Richard Sackler and others, listed many of the lasting benefits of the relationship Purdue had with Tufts. The purposes of the visit were, in part: to address a complaint the Sacklers had about the prominence and placement of the Purdue logo on the Tufts MSPREP materials; to "explore ways in which PPLP [Purdue Pharma L.P.] can contribute academically to the curriculum of the MSPREP Program;" and to find opportunities for Purdue to influence the work of Tufts in the Massachusetts medical marketplace and beyond.[239]

282. In a tour of Tufts Medical Center in Boston, Purdue and Tufts employees "discussed ways in which they could better coordinate their activities… to raise consciousness of better pain control," presented doctors with metrics developed by Purdue for "studies of analgesics that go beyond an acute observation," and discussed curriculum for training physicians. Purdue staff met with a Tufts nurse who was recruiting patients for a Purdue clinical project, toured the project lab, and discussed a research protocol that Purdue helped to write. Purdue staff told Tufts that "one way in which the Program could function better from the PPLP [Purdue Pharma LP] perspective was to have a designated contact person … to coordinate requests for preceptorships of PPLP employees." Tufts said that Purdue employees were welcome at its Boston-based medical school and its affiliated hospital in Western

[237] 2000 Budget Submission, pg. 58, PDD1701809250.
[238] 2000-05-30 email from Robert Kaiko, PPLPC013000048629; 2000-05-07 memorandum, PPLPC013000048630-634.
[239] 2000-05-07 memorandum, PPLPC013000048630.

Massachusetts.[240]

283. Purdue also obtained an agreement from Tufts to sponsor programs "in response to the situation in Maine."[241] Around the time of that visit, Purdue and the Sacklers knew of damning reports of addiction and overdose in Maine caused by Purdue's opioids.[242] Tufts ran a residency program for family practice physicians and agreed to help Purdue find doctors to attend an event where Purdue could defend its reputation.[243]

284. Richard Sackler communicated with the Director of the MSPREP Program, encouraged him to visit Purdue's offices, and offered to send Purdue marketing staff to visit him in Boston.[244] The MSPREP steering committee went to Purdue headquarters in 2009 to learn what Purdue would like to see in the MSPREP Program.[245]

285. Purdue regularly sent staff to Tufts, including in the years 2007, 2010, 2013, 2015, and 2017.[246] Tufts promoted a Purdue employee to Adjunct Associate Professor in 2011.[247] The Director of the MSPREP Program provided comments favorable to Purdue at FDA meetings in 2012 and 2013, and Purdue staff tracked it all in a grid.[248] Richard Sackler arranged for a Tufts professor to meet with Purdue staff in 2012.[249] In 2014, Purdue's medical liaison staff succeeded in getting two Purdue unbranded curricula approved for teaching to Tufts students — future residents, fellows, and clinicians. Purdue's New England accounts team

[240] 2000-05-07 memorandum, PPLPC013000048630-634.
[241] 2000-05-07 memorandum, PPLPC013000048634.
[242] 2000-10-04 Board report, pg. 3, PPLPC018000010647.
[243] 2000-05-07 memorandum, PPLPC013000048634.
[244] 2000-05-30 email from Robert Kaiko, PPLPC013000048629; 2004-08-18 email from David Haddox, #381773.1.
[245] 2009-10-09 email from Kristi Dover, PPLPC017000177863.
[246] 2007-03-29 email from David Haddox, PPLPC012000137085; 2010-08-27 email from David Haddox, PPLPC019000417292; 2013-01-29 email from David Haddox, PPLPC020000649740; 2015-10-27 email to David Haddox, PPLPC022000894451; 2017-01-19 email from David Haddox, PPLPC011000133242. Purdue staff taught a seminar via videoconference in 2016. 2016-10-04 email to David Haddox, PPLPC022000968264.
[247] 2012-02-03 Board report, pg. 28, PPLPC01200036286996.
[248] 2013-01-16 email from Pamela Bennett, PPLPC017000434836.
[249] 2012-05-18 email from Richard Sackler, PPLPC028000418291.

congratulated them for "penetrating this account."[250]

286. The marketing benefits that the Sacklers reaped from Tufts were so great that they offered to send Purdue's CEO to Massachusetts to sustain the courtship. As recently as November 2017, CEO Craig Landau wrote to Tufts' President to promote Purdue's contentions about opioids and offer to meet.[251]

287. The Sacklers' high-profile involvement at the Massachusetts General Hospital and Tufts University was part of their misconduct. These marquee projects also confirm the obvious truth that the Sacklers knew and intended that Purdue promoted opioids in Massachusetts.

## ❖ ❖ ❖ **2010** ❖ ❖ ❖

288. **In January 2010**, Richard Sackler started the year by asking sales staff for new customized reports.[252] Staff complained to each other until Sales VP Russell Gasdia asked CEO John Stewart to intervene: "Can you help with this? It seems like every week we get one off requests from Dr. Richard."[253] Neither Stewart nor anyone else could keep Richard out of sales.[254] Days later, Richard was writing to the sales employee on Saturday morning, ordering that his need to review the sales plan was "urgent" and should be satisfied "this weekend."[255]

289. **In February**, Purdue's Sales and Marketing Department told the Sacklers that a key objective for 2010 would be to "Meet or exceed total prescriber call targets of 545,000"

---

[250] 2014-04-09 email from Thomas Currier, PPLPC022000712807.
[251] 2017-11-13 letter from Craig Landau, PPLPC021000912691.
[252] 2010-01-05 email from Richard Sackler, PPLPC023000259671.
[253] 2010-01-05 email from Russell Gasdia, PPLPC023000259670.
[254] 2010-01-08 email from John Stewart, PPLPC023000259669 ("PS You are not alone in receiving requests for extraordinary analyses and reports.").
[255] 2010-01-16, email from Richard Sackler, PPLPC023000260293.

visits to prescribers to promote Purdue opioids. For the next four years or more, a key objective for the sales employees was to meet a quota of sales visits, and the Sacklers tracked their performance. The target rose from 545,000 prescriber visits in 2010, to 712,000 visits in 2011, 752,417 visits in 2012, and 744,777 visits in 2013.[256]

290. To achieve the target for sales visits, staff told the Sacklers that another sales force expansion ordered by the Board had been implemented and Purdue employed 490 sales reps.[257] That expansion was having the intended effect in Massachusetts. During Q4 2009, Purdue reps visited Massachusetts prescribers more than 2,800 times, a 25% increase over the same quarter the year before.[258]

291. Staff also told the Sacklers that McKinsey estimated that new tactics by Purdue sales reps would generate $200,000,000 to $400,000,000 more sales of OxyContin, and that sales reps had been practicing the new tactics in front of management.[259] McKinsey had reported to Purdue on opportunities to increase prescriptions by convincing doctors that opioids provide “freedom” and “peace of mind” and give patients “the best possible chance to live a full and active life.” McKinsey also suggested sales “drivers” based on the ideas that opioids reduce stress and make patients more optimistic and less isolated.[260] In fact, becoming addicted to opioids makes patients more stressed, more isolated, and less likely to survive.

292. The Sacklers voted to spend $226,000,000 on Sales and Promotion in 2010, and to pay their family $236,650,000.[261]

---

[256] 2010-02-01 Board report, pg. 23, PPLPC012000252797; 2011-05-02 Board report, pg. 3, PPLPC012000322428; 2012-04-30 Board report, pg. 3, PPLPC012000374793; 2013-05-13 Board report, pg. 7, PPLP004367546.
[257] 2010-02-01 Board report, pgs. 4, 19, PPLPC012000252778, -793.
[258] Exhibit 1.
[259] 2010-02-09 email from Pamela Taylor, PPLPC012000257443; 2010-01-20 Executive Committee notes, PPLPC012000257446.
[260] 2009-09-11 McKinsey presentation, PPLPC023000239858, slide 22.
[261] 2010-02-04 Board minutes, PKY183212818-820.

293. **In March**, Richard Sackler instructed sales staff to send him monthly reports on sales of OxyContin and its competitors. They complied within ten minutes.[262] The report showed that Purdue was selling more pills of its 80mg OxyContin (the highest dose) than any other dose, and that the highest dose pills were responsible for the greatest share of Purdue's revenue by far.[263]

294. Staff also told the Sacklers that a key selling point for OxyContin compared to a competitor's product was that OxyContin could be used by patients who had not taken opioids before.[264] Deceptively promoting opioids for opioid-naive patients who had not taken them before was one of the ways Purdue put patients at risk.

295. **In April**, the Sacklers voted to pay their family another $141,000,000.[265]

296. Meanwhile, staff told the Sacklers that they were pushing back against the "threat" of public health rules that would limit high doses of opioids. They told the Sacklers that Purdue would oppose precautions that asked doctors to consult with specialists before prescribing the highest doses.[266]

297. In Massachusetts, Purdue was pushing high doses with great success. At that moment, Purdue's top-paid physician spokesman in Massachusetts, Walter Jacobs, had a patient on *twenty-four* pills of 80mg OxyContin per day — almost a hundred times more drug that the starting dose on the label. For all of 2010, 73% of the OxyContin pills that Jacobs prescribed were the highest-dose 80mg pills. Purdue paid Jacobs to give presentations to other doctors so that his dangerous prescribing practices would spread.

---

[262] 2010-03-15 emails from Richard Sackler and Mike Innaurato, PPLPC012000262889.
[263] 2010-03-11 January 2010 OxyContin monthly report, slides 10, 15, PPLPC012000262892.
[264] 2010-03-17 Executive Committee notes, PPLPC012000267960.
[265] 2010-04-01 Board minutes, PKY183212829.
[266] 2010-04-21 Board report, pg. 16, PWG000423155.

❖ ❖ ❖

## The Sacklers' Control of Sales Visits

❖ ❖ ❖

298. That same month (April 2010), staff gave the Sacklers one of many detailed reports on sales reps' visits to prescribers. As with every reference to "the Sacklers" before July 2012, that includes Beverly, Ilene, Jonathan, Kathe, Mortimer, Richard, and Theresa Sackler.

299. The Sacklers required each rep to visit an average of 7.5 prescribers per day. In April 2010, staff reported that they were falling short. During Q1 2010, reps had averaged only 7.0 visits per day.[267] Staff promised to try harder. The Sacklers continued to set a target for daily sales visits for every sales rep, and they tracked the results, quarter by quarter, for at least the next four years. The results were always close to 7 visits per day.




*AGO graphic based on Purdue's internal Board documents*

[267] 2010-04-21 Board report, pg. 4, PWG000423143.

300. The Sacklers also set targets for the total number of sales visits by the entire sales force per quarter — huge numbers that were always more than a hundred thousand visits. Meeting those targets was a top priority for the entire company. For Q1 2010, the target was to visit prescribers 127,376 times. Staff told the Sacklers that Purdue employed 489 sales reps and that, during Q1 2010, they achieved the goal.[268] As with the daily visits per rep, the Sacklers tracked the total number of sales visits per quarter, every quarter, for at least the next four years.




*AGO graphic based on Purdue's internal Board documents*

[268] 2010-04-21 Board report, pgs. 4, 20, PWG000423143, -159. They exceeded the goal and visited prescribers 133,561 times.

301. During every quarter, sales reps visited prescribers in Massachusetts. Indeed, they visited every month, every week, and almost every day. During Q1 2010, Purdue sales reps visited Massachusetts prescribers more than 2,700 times.[269]

302. The Sacklers also tracked the cost of the sales visits. In April 2010, staff reported to the Sacklers that each visit to a prescriber cost Purdue $219, and they were working to lower the cost to a target of $201.[270] For the people of Massachusetts, the costs were far higher.

❖ ❖ ❖

303. **In June 2010**, staff gave the Sacklers an updated 10-year plan for growing Purdue's opioid sales. According to the plan, the Sacklers expected Purdue to pay their family at least $700,000,000 each year from 2010 through 2020. Beginning on page one, staff emphasized that selling as many opioids as the Sacklers wanted "will require significant salesforce support" so the plan detailed the "optimization" of sales visits and the number of reps they would require. Sales VP Gasdia wrote to the Sacklers that they planned for each rep to visit prescribers 1,540 times per year, so that 500 reps could make 770,000 visits at a cost of $212 per visit. He proposed to grow the sales force to 1,050 sales reps by 2015. To reach the Sacklers' expectations, Gasdia projected that Purdue would convince doctors to switch patients from Tylenol to Purdue's soon-to-be-released Butrans opioid, and Butrans would become a billion-dollar drug.[271]

304. **In July**, Richard Sackler emailed staff just before the July 4th holiday weekend to demand more details about sales and marketing. Richard directed them to send to the Board plans for "the marketing program" and "the sales program," with instructions to "get this out

---

[269] Exhibit 1.
[270] 2010-04-21 Board report, pg. 4, PWG000423143.
[271] 2010-06-24 Purdue Pharma 2010 10-Year Plan, pgs. 1-15, Key Assumptions pg. 6, PPLPC012000277155-169, -217.

before the weekend."[272] A despondent staff member wrote to the CEO: "Are you expecting us to provide the marketing plan by tomorrow?"[273] Staff came close to telling Richard Sackler no. Instead, they negotiated an extension and promised to provide full details about sales and marketing at the July Board meeting in Bermuda.[274] To enforce the deal, Kathe Sackler ordered staff to circulate materials before the meeting.[275]

305. By the Sacklers' choice, sitting on the Board of Purdue Pharma Inc. was a globe-trotting endeavor. The Sacklers held Board meetings for their U.S. drug company in a castle in Ireland, and in Bermuda, London, Portugal, Switzerland, New York, and Connecticut.[276]

306. In Bermuda, the Sacklers focused on sales tactics again. Staff presented plans for selling Purdue's new Butrans opioid. Staff reported that sales reps would try to switch patients to opioids from NSAIDs like ibuprofen and explained tactics for convincing doctors that patients needed the new drug. Staff told the Sacklers that they had identified 82,092 prescribers to target with the Butrans sales campaign. Staff reported that they planned to add 125 sales reps and increase the number of prescriber visits by 30%.[277]

307. Emails between staff and the Sacklers show that "the Board" (the Sacklers and at that point three other directors) responded with dozens of questions and orders about the sales campaign. The Board asked staff to determine whether sales would increase if they gave doctors free samples of opioids. The Board ordered staff to provide forecasts focused on higher doses of

---

[272] 2010-07-01 email from Richard Sackler, PPLPC012000277480.
[273] 2010-07-01 email from Russell Gasdia, PPLPC012000277480.
[274] 2010-07-06 email from John Stewart, PPLPC012000277864.
[275] 2010-07-09 email from Kathe Sackler, PPLPC012000278272.
[276] #618541.1 (Ireland 1998-06-25); PPLPC012000277864 (Bermuda 2010-07-22); #618564.1 (London 1998-11-20); PDD1715108129 (Portugal 1995-06-24); #2938358.1 (New York 2003-03-04); #618062.1 (Switzerland 1996-06-28); PKY183307494 (Connecticut 2007-05-03).
[277] 2010-07-22 Butrans Commercial Strategy Plan Board Presentation, slides 17, 66, 81, PPLPC018000404193; 2010-06-01 email from William Mallin, PPLPC012000273600.

opioids.[278] The Board demanded details about tactics Purdue sales staff used to influence doctors that Purdue viewed as "key opinion leaders," who could influence other doctors to prescribe more opioids: "Provide the Board with more information on the strategy/tactics with respect to KOL's, how they are identified, how do we plan to interact with them, how do we see them helping build appropriate utilization of Butrans - and any other relevant information that will/could influence the prescribing of the product."[279] In Massachusetts, the key opinion leaders that Purdue paid to influence opioid prescriptions included Dr. Walter Jacobs, who lost his medical license for dangerous prescribing.

308. The Board pushed staff about whether they were describing the benefits of opioids aggressively enough. Purdue was not legally allowed to say that Butrans was effective for 7 days, because the evidence did not show that, but the Board wanted to know why Purdue didn't claim 7 days of effectiveness in its marketing.[280]

309. Purdue was not legally allowed to say that Butrans was effective for osteoarthritis ("OA"), because the clinical trials testing Butrans for patients with osteoarthritis had failed, but the Board wanted to know if sales reps could sell more by remaining silent about the failed trial: "What can be said in response to a prescriber who asks directly or indirectly, 'can this product be prescribed for my patient with OA?' In responding are we required to specifically mention the failed trials in OA?"[281]

---

[278] 2010-07-22 questions during Board meeting, PPLPC012000283164 ("month by month sales forecast, decompose by strengths, show price and units as well by strength, show kg of Buprenorphine by strength").
[279] 2010-07-22 questions during Board meeting, PPLPC012000283165.
[280] 2010-07-22 questions during Board meeting, PPLPC012000283167 ("Why is there no reference to efficacy data in the marketing materials? … a specific reference or statement to Butrans providing efficacy for 7 days seems to be the desired statement … we may not have data that supports efficacy at that specific time point.").
[281] 2010-07-22 questions during Board meeting, PPLPC012000283167.

❖ ❖ ❖

### *Region Zero*

❖ ❖ ❖

310. At the July 2010 Board meeting in Bermuda, the Sacklers and other Board members asked staff about opioid sales generated by doctors who were suspected of diversion and abuse, which Purdue had collected on a list code-named *Region Zero*. Staff assured the Board that Purdue tracked prescriptions by *Region Zero* doctors, including the exact prescriptions, units, and dollars from each prescriber.[282] Staff then sent the data on those prescriptions to the Board. Staff told the Board that Purdue had identified twelve prescribers in Massachusetts as likely involved in diversion and abuse. Staff gave the Board a list of the specific problem prescribers by name, along with the exact number of prescriptions and dollars of revenue each provided to Purdue.[283]

311. For example, staff reported to the Board that Purdue suspected Dr. Michael Taylor, in New Bedford, Massachusetts, was prescribing opioids inappropriately. Staff reported to the Board that, in the past two years, Taylor had prescribed OxyContin more than five hundred times, and provided Purdue with $392,505.[284]

312. Staff reported to the Board that Purdue suspected Dr. Alvin Chua, in Brookfield, Massachusetts, was prescribing opioids inappropriately. Staff reported to the Board that, in the past two years, Chua had prescribed OxyContin more than a thousand times, and provided Purdue with $431,474.[285]

---

[282] 2010-07-22 questions during Board meeting, PPLPC012000283169, -170.
[283] 2010-08-16 email from William Mallin, PPLPC012000283162; 2010-08-11 *Region Zero* prescribers, PPLPC012000283175.
[284] 2010-08-11 *Region Zero* prescribers, PPLPC012000283175.
[285] 2010-08-11 *Region Zero* prescribers, PPLPC012000283175.

313. The reports of inappropriate prescribing that staff reported to the Board were accurate. No one knew more about prescribing of Purdue opioids than Purdue. A year after Purdue staff told the Board about Alvin Chua, the Massachusetts Board of Registration in Medicine took away his license for improper opioid prescribing.[286] Three years after Purdue told the Board about Michael Taylor, he lost his license and was convicted in Massachusetts court of prescribing opioids without a legitimate medical purpose.[287] By then, Purdue and the Sacklers had collected hundreds of thousands of dollars from their dangerous prescriptions. Far worse — four Massachusetts patients, who were prescribed Purdue opioids by Taylor and Chua, overdosed and died.

❖ ❖ ❖

314. At that same Board meeting in Bermuda, the Sacklers voted to expand the sales force by 125 more sales reps. They ordered that the hiring begin in September 2010 and be completed before the National Sales Meeting in January 2011. They also directed Purdue to hire 18 more managers to supervise the reps.[288]

---

[286] 2011-03-16 Indefinite Suspension, decision by the Massachusetts Board of Registration in Medicine.
[287] 2013-08-16 “Doctor Pleads Guilty to Illegally Prescribing Oxycodone,” mass.gov.
[288] 2010-07-22 Board minutes, PKY183212838 (“After discussion, and on motion duly made and seconded, it was unanimously decided … that the Partnership be and it is hereby authorized and directed to approve the following sales force expansion …”).

315. The Sacklers knew and intended that, because of their vote, more sales reps would promote opioids to prescribers in Massachusetts. From 2010 to the present, sales reps hired in the 2010 expansion promoted Purdue opioids to Massachusetts prescribers more than 4,000 times.[289]

**Massachusetts Communities Targeted in Purdue's 2010 Sales Force Expansion**



316. At the same meeting, the Sacklers voted to pay $10,000,000 to settle lawsuits by people injured by OxyContin.[290]

---

[289] In Ayer, Boston, Bourne, Brewster, Cambridge, Canton, Carver, Cataumet, Centerville, Charlestown, Chatham, Chelsea, Cotuit, Dartmouth, Dedham, Dennis, Dorchester, Everett, Falmouth, Fitchburg, Groton, Harwich, Hyannis, Hyde Park, Jamaica Plain, Lakeville, Leominster, Lunenburg, Marstons Mills, Mashpee, Middleboro, Milton, Nantucket, New Bedford, Norwood, Oak Bluffs, Orleans, Osterville, Pepperell, Plymouth, Revere, Roslindale, Sagamore Beach, Sandwich, Somerville, Vineyard Haven, Wareham, Wellfleet, West Roxbury, West Tisbury, Westminster, Winthrop, and Yarmouth Port.

[290] 2010-07-22 Board minutes, PKY183212838.

317. Later that month, staff told the Sacklers that Purdue employed 491 sales reps and that, during Q2 2010, they visited prescribers 135,824 times.[291] More than 2,500 of those visits were in Massachusetts.[292] Meanwhile, staff told the Sacklers that Purdue had paid their family $389,000,000 in the first six months of 2010.[293]

318. **In August**, the Sacklers continued to focus on the sales force. That month, they decided not to acquire a new insomnia drug because of the risk that promoting it could distract sales reps from selling Purdue's opioids. Richard Sackler concluded that "loss of focus" in sales reps' meetings with prescribers was too great a risk, and the Sacklers decided not to go through with the deal.[294]

319. A few days later, the Sacklers discussed abuse of OxyContin. Staff told them that the most common way of abusing oxycodone, by far, was swallowing it — which a crush-proof coating on OxyContin did not affect. Staff also reported to the Sacklers that data from the Massachusetts prescription monitoring program showed far higher rates of "doctor-shopping" for OxyContin prescriptions than for any other opioid.[295] The prescription monitoring program identifies "doctor-shopping" when a patient gets opioids from multiple prescribers — an indication that the patient is at risk of addiction, overdose, and death.

320. **In September**, staff reported to the Sacklers about the Board's July 2010 decision to hire more sales reps. Staff said they were working to implement the decision, adding 125

[291] 2010-07-27 Board report, pgs. 5, 27, PWG000422481, -503. Staff told the Sacklers that the target for visits was 142,657; that reps visited 7.0 prescribers per day, on average, compared to the target of 7.5; that the average cost of a visit was $219; and that they were still working to lower the cost to $201.
[292] Exhibit 1.
[293] 2010-07-27 Board report, pg. 18, PWG000422494.
[294] 2010-08-14 email from Richard Sackler, PPLPC012000283047.
[295] 2010-08-16 email from Stuart Baker, PPLPC012000283342-43; 2010-08-19 presentation by Paul Coplan, slides 7, 31, PPLPC012000283469.

sales territories.[296] Staff also told the Sacklers that 82% of prescriptions for OxyContin were to patients who were already on the drug — a key ingredient in Purdue's plans to keep patients on opioids longer.[297] The Sacklers voted to pay their family $240,000,000.[298]

321. **In October**, staff told the Sacklers that Purdue employed 506 sales reps and, during Q3 2010, they visited prescribers 141,116 times.[299] More than 2,600 of those visits were in Massachusetts.[300]

322. Meanwhile, staff told the Sacklers that Purdue had paid their family $629,000,000 in the first nine months of 2010.[301] The Sacklers voted to pay another $12,000,000 to settle claims of more patients injured by OxyContin.[302]

323. That same month, staff told the Sacklers that Purdue was promoting opioids at more than a dozen programs in Massachusetts, including:

- an $85,000 program on opioids at Tufts University;
- a $50,000 program on opioid prescribing for chronic pain at Boston University;
- a $50,000 program on customized opioid treatments at the Pri-Med Institute (a company specializing in continuing medical education) in Massachusetts;
- another $45,000 program on opioids for chronic pain at the Pri-Med Institute in Massachusetts;
- a $15,000 program on pain management at Northeastern University;
- a $10,000 program at the Massachusetts College of Pharmacy;

[296] 2010-09-15 Executive Committee notes, PPLPC012000290686.
[297] 2010-09-15 presentation by Russell Gasdia, slide 10, PPLPC012000290691.
[298] 2010-09-10 Board minutes, PKY183212844.
[299] 2010-10-25 Board report, pgs. 3, 26, PWG000421967, -990. Staff told the Sacklers the target was 144,414; reps visited 6.8 prescribers per day, on average, compared to the target of 7.5; each sales rep visit to a prescriber cost Purdue $219; and they were working to lower the cost to $201.
[300] Exhibit 1.
[301] 2010-10-25 Board report, pg. 15, PWG000421979.
[302] 2010-04-01 Board minutes, PKY183212854; draft meeting materials, PPLPC012000294206.

- a $9,400 program on pharmacological treatment of pain in Brockton, Massachusetts;
- a $4,400 program on pain treatment by pharmacists in Massachusetts;
- another $4,350 program on pharmacological treatment of pain in Brockton, Massachusetts;
- a $3,500 program on pain management at the Massachusetts College of Pharmacy;
- another $2,000 program on pain management at the Massachusetts College of Pharmacy;
- another $1,675 program on opioid pain therapy at the Massachusetts College of Pharmacy; and
- another $1560 program on pain management by nurses at the Massachusetts College of Pharmacy.[303]

324. **In November**, staff warned the Sacklers that doctors were not prescribing Purdue's highest dose and most profitable opioids as much as the company had expected, so it might be necessary to cut the family's quarter-end payout from $320,000,000 to $260,000,000 and distribute it in two parts: one in early December and one closer to the end of the month.[304] Mortimer Sackler objected to the decrease and the division into two payments, and he demanded answers from staff: "Why are you BOTH reducing the amount of the distribution and delaying it and splitting it in two?" "Just a few weeks ago you agreed to distribute the full 320 [million dollars] in November."[305]

[303] 2010-10-07 report attached to email by William Mallin, pgs. 3, 5, 10, 13, 16, 26, 28, 33, 34, PPLPC012000292676, -678, -683, -686, -689, -699, -701, -706, -707; 2010-10-07 Report attached to email by William Mallin, PPLPC012000292759-760.
[304] 2010-11-23 email from Edward Mahony, PPLPC012000302682-683.
[305] 2010-11-23 and 2010-11-24 emails from Mortimer Sackler, PPLPC012000299869-870.

325. Staff also told the Sacklers that the expansion of the sales force that the Sacklers had ordered was being implemented, including 125 new sales territories.[306] The Sacklers voted to spend $158,086,000 to employ sales reps in 2011.[307]

326. Staff also reported to the Sacklers that drug company leaders can be punished for breaking the law and "owners, officers, and managers will especially face even more serious scrutiny in the future."[308]

327. **In December**, the Sacklers voted to pay their family $260,000,000.[309]

❖ ❖ ❖ **2011** ❖ ❖ ❖

328. **In January 2011**, Richard Sackler met with sales reps for several days at the Butrans Launch Meeting and discussed how they would promote Purdue's newest opioid.[310] Richard quickly followed up with sales management to demand a briefing on how the sales visits were going in the field:

> "I'd like a briefing on the field experience and intelligence regarding Butrans. How are we doing, are we encountering the resistance that we expected and how well are we overcoming it, and are the responses similar to, better, or worse than when we marketed OxyContin® tablets?"[311]

329. Richard's interventions into sales tactics made employees nervous. When Richard followed up to ask for information "tomorrow," CEO John Stewart tried to slow things

[306] 2010-11-10 Executive Committee notes, PPLPC012000299854.
[307] 2010-11-03 Board minutes, 2011 budget, PKY183212865; 2010-11 budget submission, pg. 18, PDD9273201306.
[308] 2010-11-10 Executive Committee notes, PPLPC012000299855; 2010-11-10 Slideshow presentation by Bert Weinstein, slide 7, PPLPC012000299866.
[309] 2010-12-02 Board minutes, PKY183212869-70.
[310] 2011-01-21 email from Russell Gasdia, PPLPC012000308393.
[311] 2011-01-30 email from Richard Sackler, PPLPC021000352206.

down, warning staff that Richard's requests would be "never-ending."[312] Stewart was right about Richard, but wrong to think he could stand in the way.

330. Two hours after sending his request, Richard ordered Sales VP Russell Gasdia to call him, on a Sunday morning, on his cell phone.[313] Richard wanted to discuss "the resistance" and how Purdue's sales reps were "overcoming" it right away.

331. Richard Sackler kept pushing for more sales. After one week of prescriptions doubled Purdue's forecast, Richard wrote to the sales staff: "I had hoped for better results."[314] In a follow-up message, Richard asked staff to tell him the ratio of prescriptions per sales representative visit to a prescriber, divided out by the prescribers' specialties. He asked for a Board discussion of the barriers that sales reps were encountering during promotion.[315] After trying to answer Richard's questions and getting another dissatisfied response, sales staff wrote to the CEO to ask him to intervene.[316] In a later message, Richard wrote to the staff again: "What do I have to do to get a weekly report on Butrans sales without having to ask for it?"[317] One exasperated staff member begged another to respond.[318] The CEO announced that, from then on, staff would send a sales report to the Sacklers every week.[319] When staff sent the first weekly report, Richard responded immediately: "What else more can we do to energize the sales and grow at a faster rate?"[320] The next week, Richard wrote to the sales staff to ask about the performance of a specific sales rep.[321]

[312] 2011-01-31 email from John Stewart, PPLPC021000352205.
[313] 2011-01-30 email from Richard Sackler, PPLPC012000308371.
[314] 2011-02-15 email from Richard Sackler, PPLPC012000311654.
[315] 2011-02-25 email from Richard Sackler, PPLPC012000313544.
[316] 2011-02-28 email from Russell Gasdia, PPLPC012000313542.
[317] 2011-03-08 email from Richard Sackler, PPLPC012000314972.
[318] 2011-03-09 email from Mike Innaurato, PPLPC012000314972.
[319] 2011-03-09 email from John Stewart, PPLPC012000314985; PPLPC022000412102.
[320] 2011-03-16 email from Richard Sackler, PPLPC012000316128.
[321] 2011-03-22 email from Richard Sackler, PPLPC012000317190.

332. Mortimer Sackler jumped in, asking staff for more information about sales. When two days passed without an answer, Mortimer insisted: "Any answer to this yet?"[322] Staff rushed to prepare answers to share with all the Sacklers.[323]

333. The people who worked for the Sacklers knew their appetite for sales was extreme. When the launch of Purdue's Butrans opioid was on track to beat every drug in its class, Richard Sackler asked sales staff: "Do you share my disappointment?"[324] Sales VP Russell Gasdia replied privately to the CEO: "As far as his disappointment, I do not share that."[325]

334. Throughout that spring of 2011, the Sacklers kept up a drumbeat of aggressive sales tactics, multi-million-dollar payouts, and disregard for the law. In January, the Sacklers voted to pay the legal expenses of specific individuals if they were defendants or witnesses in investigations of Purdue, including several sales executives and John Crowley, Executive Director of Controlled Substances Act Compliance.[326] The Sacklers knew these employees were aware of misconduct because they had directed it. In September 2009, a Purdue sales manager had emailed Crowley that Purdue was promoting opioids to an illegal pill mill: "I feel very certain this is an organized drug ring," and "Shouldn't the DEA be contacted about this?" Purdue sat on the information and did not report it to the authorities *for more than two years*, until after the pill mill doctor had already been arrested and the Sacklers had arranged for lawyers in case Crowley was questioned.[327]

[322] 2011-04-05 and 2011-04-08 emails from Mortimer Sackler, PPLPC012000320102-103.
[323] 2011-04-08 email from Russell Gasdia, PPLPC012000320101.
[324] 2011-03-09 email from Richard Sackler, PPLPC012000315176.
[325] 2001-03-10 email from Russell Gasdia, PPLPC012000315176.
[326] 2011-01-20 Board minutes, PKY183212882-892.
[327] 2016-07-10 "More than 1 Million OxyContin Pills Ended up in the Hands of Criminals and Addicts. What the Drugmaker Knew," by Harriet Ryan, Lisa Girion, and Scott Glover, *Los Angeles Times*.

335. In January 2011, staff reported to the Sacklers that a key initiative in Q4 2010 had been the expansion of the sales force. Staff told the Sacklers that Purdue employed 590 sales reps and, during Q4 2010, they visited prescribers 125,712 times.[328] More than 2,900 of those visits were in Massachusetts.[329]

336. Staff told the Sacklers that Purdue paid their family $889,000,000 in 2010. But staff reported that Purdue's revenue was still hundreds of millions of dollars less than expected because doctors were prescribing less of Purdue's highest dose opioids.[330] Staff told the Sacklers that sales of the highest doses continued to fall below expectations, and the gap had cost the company $120,000,000 in the month of December 2010 alone.[331] The Sacklers faced the prospect that, if doctors did not prescribe more of the highest doses, their payouts would shrink.

337. **In February**, staff reported to the Sacklers that law enforcement was increasingly concerned about lawbreaking by drug companies and the resulting "danger to public safety."[332] Staff also told the Sacklers that Purdue was receiving a rising volume of hotline calls and other compliance matters, reaching an all-time high during Q4 2010. Staff reported to the Sacklers that sales reps had engaged in improper promotion of Purdue opioids, but the company had decided not to report the violations to the government. Staff also reported to the Sacklers about the risks of OxyContin, including that 83% of patients in substance abuse treatment centers began abusing opioids by swallowing pills, and that it took, on average, 20 months for a patient to get treatment. Staff reported to the Sacklers that Purdue tracked to individual zip codes the

---

[328] 2011-01-24 Board report, pgs. 4, 5, 35, PWG000421551, -552, -582. Staff told the Sacklers that, at the Board's direction, Purdue had hired 74 more sales reps and planned to hire 51 more. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 125,553 visits; and that reps visited 6.2 prescribers per day, on average, compared to a target of 7.5; and that each visit cost Purdue $219. They were still working to lower the cost to $201.
[329] Exhibit 1.
[330] 2011-01-24 Board report, pg. 22, PWG000421569.
[331] 2011-01-21 email from Sharon Salwan, PPLPC012000307015.
[332] 2001-02-03 Board meeting materials, slide 48, PDD8901468062.

correlation between poison control calls for OxyContin overdose, pharmacy thefts, and prescribers Purdue suspected of abuse and diversion in *Region Zero*.[333]

338. Staff even gave the Sacklers a map correlating dangerous prescribers in Massachusetts with reports of oxycodone poisonings, burglaries, and robberies.[334]




*Map presented to the Purdue Board in 2011*

339. **In March**, staff reported to the Sacklers on OxyContin sales and again focused on revenue from doctors in *Region Zero* — prescribers that Purdue suspected of improper prescribing but that Purdue had not reported to the authorities. Staff told the Sacklers that if

[333] 2011-02-03 presentation by Bert Weinstein, slides 22-24, 86, 94-95, PDD8901468036-038, -100, -108-109.
[334] 2011-02-03 presentation by Bert Weinstein, slide 95, PDD8901468109.

*Region Zero* doctors stopped prescribing opioids, Purdue would lose almost 10% of its sales.[335]

340. **In April**, the Sacklers met with Sales VP Russell Gasdia to talk about sales. He told them that OxyContin was the best-selling painkiller in America, with more than three billion dollars in annual sales —almost double the second-place drug.[336] The Sacklers voted to pay their family $189,700,000.[337]

341. **In May**, in response to the Sacklers' repeated requests, staff sent Richard, Jonathan, Kathe, Mortimer, and Theresa Sackler a report on the sales tactics reps were using to push Butrans. The first tactic reported to these Sacklers was focusing on a select "core" of physicians that Purdue calculated would be most susceptible to sales reps lobbying to prescribe more opioids.[338] In Massachusetts, the prescribers Purdue identified as "core" include Dr. Conrad Benoit, Dr. Yoon Choi, Dr. Fernando Jayma, and Dr. Fathalla Mashali.[339] Purdue sales reps repeatedly reported concerns that these doctors wrote inappropriate prescriptions, but Purdue ordered the reps to keep promoting opioids to these doctors anyway. Dozens of their patients overdosed and died.

342. The second tactic staff reported to Richard, Jonathan, Kathe, Mortimer, and Theresa Sackler in the May 25, 2011 email was "positioning of Butrans for specific patient types."[340] In Massachusetts, promotion for "specific patient types" meant pushing opioids for elderly patients with arthritis. Sales reps recorded in their notes that they urged Massachusetts doctors to prescribe opioids for elderly patients more than a thousand times in 2011. The reps

---

335 2011-03-01 2011 OxyContin Tablets Sales Trends and Projections, PPLP004405801, -809.
336 2011-04-14 Board presentation, PPLP004405866, -880.
337 2011-04-06 Board minutes, PKY183212896-897.
338 2011-05-25 email from Russell Gasdia, PPLPC012000326017.
339 *See, e.g.*, 2013 Q1 target list, PPLPC015000141319.
340 2011-05-25 email from Russell Gasdia, PPLPC012000326017.

even went to pharmacies to ask Massachusetts pharmacists to encourage doctors to prescribe opioids for the elderly.

343. A third tactic reported to these five Sacklers was getting prescribers to commit to put specific patients on opioids.[341] In Massachusetts, sales reps recorded in their notes that they asked doctors to commit to prescribe opioids more than a thousand times in 2011. Massachusetts sales reps repeatedly asked prescribers to commit to prescribe opioids without disclosing significant risks.

344. Jonathan Sackler was not satisfied that these tactics would be enough to boost sales. He wrote to John Stewart: "this is starting to look ugly. Let's talk."[342] Stewart and the sales team scrambled to put together a response and set up a meeting with Jonathan for the following week.[343]

345. That same month, staff reported to the Sacklers that Purdue had hired 47 more sales reps according to the Sacklers' orders. Staff told the Sacklers that Purdue employed 639 sales reps and, during Q1 2011, they visited prescribers 173,647 times.[344] More than 3,800 of those visits were in Massachusetts.[345]

346. Meanwhile, the Sacklers voted to pay $10,000,000 to try to settle a lawsuit by the Attorney General of Kentucky regarding Purdue's marketing of OxyContin.[346] The Sacklers were on notice that Purdue's unfair and deceptive marketing raised serious concerns. Staff also

---

[341] 2011-05-25 email from Russell Gasdia, PPLPC012000326017.
[342] 2011-05-25 email from Jonathan Sackler, PPLPC012000326194.
[343] 2011-05-25 email from John Stewart, PPLPC012000326193.
[344] 2011-05-02 Board report, pgs. 5, 6, 36, PPLPC012000322430, -431, -461. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 168,210 visits; and that reps visited 6.66 prescribers per day, on average, compared to a target of 7.0.
[345] Exhibit 1.
[346] 2011-05-20 Board minutes, PKY183212910.

told the Sacklers that they had received another 88 calls to Purdue's compliance hotline, but not reported any of them to the authorities.[347]

347. **In June**, staff reported to the Sacklers that Purdue's opioid sales were hundreds of millions of dollars less than expected and that a prime reason was that doctors were not prescribing enough of the highest doses.[348] The headline presented at the Board meeting read: "40 and 80mg tablet prescriptions have decreased significantly. The 10mg and 20mg tablet prescriptions initially increased, but given their lower value not enough to offset the higher strength decline." Staff told the Sacklers: "As a result of the change in prescriptions by strength, OxyContin brand Kgs dispensed are below mid 2010 levels." Staff reported to the Sacklers that Purdue would rely on sales rep visits and paid physician spokespersons to maintain demand. For a "Super Core" of "Very High Potential" opioid prescribers, Purdue would order its sales reps to make sales visits *every week*.[349]

348. The Sacklers immediately pushed to find ways to increase sales. Richard Sackler asked Sales VP Russell Gasdia to include him in a meeting with District Managers who were the day-to-day supervisors of the sales reps. Then, having missed the meeting, he engaged Gasdia again by email. Gasdia told Richard that Purdue had hired 147 new sales reps at the Board's direction. Gasdia told Richard that Purdue instructed the sales reps to focus on converting patients who had never been on opioids or patients taking "low dose Vicodin, Percocet, or tramadol" — all patients for whom Purdue's opioids posed an increase in risk.[350]

349. Sales reps reported to Purdue that they encouraged Massachusetts doctors to prescribe opioids to opioid-naive patients more than a thousand times in 2011.

---

[347] 2011-05-20 compliance report, PPLP004406033.
[348] 2011-05-12 Executive Committee notes, PPLPC012000327303.
[349] 2011-06-21 Mid-Year Update, PPLP004406102-123.
[350] 2011-06-16 email from Russell Gasdia, PPLPC012000329609.

350. Gasdia told Richard Sackler (again) that Purdue instructed sales reps to focus on the few highest-prescribing doctors in their territory and visit them over and over. Gasdia also told Richard that staff had initiated performance enhancement plans for sales reps who were not generating enough opioid prescriptions.[351] In Massachusetts, a sales rep was put on a performance enhancement plan and ordered to visit 10 specific prescribers twice every week and increase prescriptions by 43%.[352] Another Massachusetts rep was ordered to increase prescriptions by 62%.[353] Purdue issued a performance enhancement plan to another Massachusetts sales rep that said: "Anticipated Challenges: Dr. trying to cut down on opioid prescribing due to abuse." "Action Steps: Sell for patients they are willing to Rx opioids …(elderly)."[354] Purdue also ordered the rep to do a better job using gifts ("coffee, lunch") to buy time with Massachusetts prescribers and reminded her that Purdue had a budget for that purpose.[355]

351. Purdue put two other Massachusetts reps on probation and threatened to fire them because the doctors they visited did not put enough patients on opioids. Purdue told them that the only way they could keep their jobs was by generating more opioid sales.[356]

352. In response to Gasdia's message about the sales reps, Richard Sackler wrote back six minutes later and asked to meet with Gasdia without delay.[357] Gasdia scrambled to schedule

[351] 2011-06-16 email from Russell Gasdia, PPLPC012000329609.
[352] Performance Enhancement Plan, PPLPC014000231426 ("See Top 10 HCPs each Monday. See them again before end of same week.").
[353] Performance Enhancement Plan, PPLPC014000183394.
[354] Performance Enhancement Plan, PPLPC014000263371.
[355] Performance Enhancement Plan, PPLPC014000263373.
[356] 2011-11-18 letters from Roland Gustavson, PPLPC029000430006, PPLPC028000391912 ("You are being placed on probation due to your overall unsatisfactory sales performance … The ultimate measure of your probation outcome will be your ability to impact sales growth … You must demonstrate continuous and sustained performance both during and after the probationary period. Failure to do so may lead to additional disciplinary action up to and including termination of employment.").
[357] 2011-06-16 email from Richard Sackler, PPLPC012000329608.

a meeting about sales tactics with Richard for first thing the next morning.[358] Richard would not wait until the morning and instructed Gasdia to call him that same day.[359]

353. Richard Sackler continued the correspondence that day, criticizing Purdue's managers for allowing sales reps to target "non-high potential prescribers." "How can our managers have allowed this to happen?"[360] Richard insisted that sales reps push the doctors who prescribed the most drugs.

354. To make sure his orders were followed, Richard Sackler demanded to be sent into the field with the sales reps.[361] Richard wanted a week shadowing Purdue sales reps, two reps per day. In horror, Gasdia appealed to Purdue's Chief Compliance Officer, warning that Richard Sackler promoting opioids was "a potential compliance risk."[362] Compliance replied: "LOL."[363] To make sure the Sacklers' involvement in marketing stayed secret, staff instructed: "Richard needs to be mum and be anonymous."

---

[358] 2011-06-16 email from Russell Gasdia, PPLPC012000329607.
[359] 2011-06-16 email from Richard Sackler, PPLPC012000329621.
[360] 2011-06-16 email from Richard Sackler, PPLPC012000329706.
[361] 2011-06-16 email from Richard Sackler, PPLPC012000329706.
[362] 2011-06-16 email from Russell Gasdia, PPLPC012000329494 ("Based on our discussions, perhaps you could sit down with JS on your thoughts. Also, I haven't spoken to him about RS going to field with reps. Perhaps you could also say something to JS and indicate I came to you for counsel as I saw this as a potential compliance risk?").
[363] 2011-06-16 email from Bert Weinstein, PPLPC012000329722.

**To:** Gasdia, Russell[Russell.Gasdia@pharma.com]
**From:** Weinstein, Bert
**Sent:** Thur 6/16/2011 7:47:14 PM
**Subject:** Re: Feedback from District Manager Advisory Council - FYI

LOL - I told him you raised concerns with me. We agreed Richard needs to be mum and be anonymous

---

**From**: Gasdia, Russell
**To**: Weinstein, Bert
**Sent**: Thu Jun 16 17:08:15 2011
**Subject**: Fw: Feedback from District Manager Advisory Council - FYI

I spoke to John and he said Stuart cleared Dr Richard observing calls with reps. I told him I spoke with you and you have concerns...he said he'd speak with you.

---

**From**: Sackler, Dr Richard
**To**: Gasdia, Russell
**Cc**: JHS (US)
**Sent**: Thu Jun 16 16:45:56 2011
**Subject**: Re: Feedback from District Manager Advisory Council - FYI

Russ,
One more thing. Who have you chosen for me to go to the field with the week after the budget meetings? Where are they? Can we conveniently do two reps each day especially if I travel to get to the right place as I probably should do.

*Purdue internal emails*

355. A slew of executives, including the CEO, got involved in planning Richard Sackler's sales visits. All of them were worried. One wrote:

> "About 5 last night, John [Stewart, the CEO] was walking by my office – I yelled out to stop him – and said that you had mentioned to me that Richard wanted to go into the field, and that you had raised concerns with me. John seemed angry, and asked if I had concerns. I told him could be issues and Richard could be out on a limb if he spoke about product at all or got into conversations with HCPs, or identified himself, especially with FDA Bad Ad possibilities. John agreed Richard would have to be mum throughout, and not identify himself other than as a home office person."[364]

[364] 2011-07-17 email from Bert Weinstein, PPLPC012000329783.

356. Richard Sackler indeed went into the field to promote opioids to doctors alongside a sales rep. When he returned, Richard argued to the Vice President of Sales that a legally-required warning about Purdue's opioids wasn't needed. He asserted that the warning "implies a danger of untoward reactions and hazards that simply aren't there." Richard insisted there should be "less threatening" ways to describe Purdue opioids.[365]

357. Meanwhile, the Sacklers voted to pay their family $200,000,000.[366]

358. A few days later, sales and marketing staff scrambled to prepare responses to questions from the Sacklers. Mortimer Sackler asked about launching a generic version of OxyContin to "capture more cost sensitive patients." Kathe Sackler recommended looking at the characteristics of patients who had switched to OxyContin to see if Purdue could identify more patients to convert. Jonathan Sackler wanted to study changes in market share for opioids, focusing on dose strength.[367]

359. At the same time, sales staff were organizing more ways for Richard Sackler to oversee their work in the field. Gasdia proposed to Richard:

> "In addition to field contacts with representatives, you may want to consider attending one of the upcoming conventions where we will be attending. At each of the ones listed below, we will have a promotional booth for OxyContin & Butrans. In addition, we are sponsoring educational programs for Butrans and OxyContin in the form of a 'Product Theater.'
>
> This would provide you the opportunity to be on the convention floor, observing numerous presentations being provided by our representatives and see a wide range of interactions over the course of a day. In addition, we can arrange for one-on-one meetings with key opinion leaders who are attending, many of them are approved consultants/advisors for us and you can have some open conversations regarding the market, perceptions around Butrans

---

[365] 2011-07-20 email from Richard Sackler, PPLPC001000091102.
[366] 2011-06-24 Board minutes, PKY183212924-925.
[367] 2011-06-28 email from Edward Mahony, PPLPC012000331343; attachment PPLPC012000331345.

> and OxyContin. Finally, you could observe the Product Theaters we are implementing."[368]

360. **In July**, staff assured the Sacklers that Purdue prohibited sales reps from writing their sales pitches to prescribers in email.[369]

361. **In August**, staff told the Sacklers that Purdue employed 640 sales reps and, during Q2 2011, they visited prescribers 189,650 times.[370] More than 4,500 of those visits were in Massachusetts.[371]

362. Meanwhile, staff reported to the Sacklers that, in the first seven months of 2011, Purdue paid the family $411,000,000.[372]

363. **In September**, Richard Sackler directed staff to study a savings card program for a widely-used cholesterol medication (not an addictive narcotic) to learn how Purdue could use it for opioids.[373] That same month, the Sacklers voted to pay their family $140,800,000 more.[374]

364. **In November**, staff told the Sacklers that Purdue still employed 640 sales reps and, during Q3 2011, they visited prescribers 189,698 times.[375] More than 4,100 of those visits were in Massachusetts.[376] Looking ahead, the Sacklers voted to spend $162,682,000 to employ sales reps in 2012.[377]

365. Meanwhile, staff told the Sacklers that, in the first nine months of 2011, Purdue

---

[368] 2011-07-26 email from Russell Gasdia, PPLPC012000336250.
[369] 2011-07-21 Board meeting presentation, PPLP004406488-490.
[370] 2011-08-03 Board report, pgs. 6, 42, PWG000420318, -354. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 187,950 visits; and that reps visited 7.2 prescribers per day, on average, compared to a target of 7.0.
[371] Exhibit 1.
[372] 2011-08-03 Board report, pg. 29, PWG000420341.
[373] 2001-09-28 email from Richard Sackler, PPLPC012000345892.
[374] 2011-09-01 Board minutes, PKY183212927-928.
[375] 2011-11-09 Board report, pgs. 5, 41, PWG000419307, -343. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 189,525 visits; and that reps visited 7.2 prescribers per day, on average, compared to a target of 7.0.
[376] Exhibit 1.
[377] 2011-11-18 Board minutes, 2012 budget, PKY183212941-942; 2012 budget submission, pg. 22, PDD9273201436.

paid their family $551,000,000.[378]

## ❖ ❖ ❖ 2012 ❖ ❖ ❖

366. **In January 2012**, Jonathan Sackler started the year pressing Sales VP Russell Gasdia for weekly updates on sales.[379] A few days later, Richard Sackler jumped into the weeds with the sales staff, this time about advertising. Richard noticed that online ads appeared indiscriminately on webpages with content associated with the ad — regardless of whether the association was positive or negative.[380] Staff assured Richard that, when Purdue bought online advertising for opioids, it specified that the ads appear only on pages expressing positive views toward opioids, and would not appear with articles "about how useless or damaging or dangerous is our product that we are trying to promote."[381]

367. That same month, staff told the Sacklers that Purdue employed 632 sales reps and, during Q4 2011, they visited prescribers 165,994 times.[382] More than 3,600 of those visits were in Massachusetts.[383]

368. The Sacklers were not satisfied with the sales effort. **In February**, staff reported to the Sacklers that prescriptions had dropped, and that a decrease in sales rep visits to prescribers was a major driver of the decline. Staff asked the Sacklers to be patient, because reps had missed work for December holidays and the company's mandatory National Sales Meeting

[378] 2011-11-09 Board report, pg. 26, PWG000419328.
[379] 2012-01-09 email from Jonathan Sackler, PPLPC012000358983.
[380] 2012-01-22 email from Richard Sackler, PPLPC012000361065-066.
[381] 2012-01-26 email from Russell Gasdia, PPLPC012000361064.
[382] 2012-01-25 Board report, pgs. 7, 48, PPLPC012000362250, -291. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 166,315 visits; and that reps visited 7.03 prescribers per day, on average, achieving the target of 7.0.
[383] Exhibit 1.

in January.[384] Mortimer Sackler was not pleased. He suggested that, "in future years we should not plan the national sales meeting so close following the winter break as it extends the period of time since the doctor last saw our rep." Mortimer wrote: "Wouldn't it be better to have the reps get back to work for January and back in front of doctors."[385] Mortimer was agitated by the thought of doctors going too many days without a sales rep visiting to promote Purdue opioids. If Purdue rescheduled its meeting, "At least then the doctors will have gotten at least one reminder visit from our reps in the last month whereas now they might go two months without seeing one of our reps??" Staff replied to Mortimer, arguing for "balance."[386] Richard Sackler replied within minutes that, since the National Sales Meeting prevented sales reps from visiting doctors, "Maybe the thing to have done was not have the meeting at all."[387] Purdue's compliance officer forwarded the exchange to his staff, commenting: "Oh dear."[388]

369. Meanwhile, Richard Sackler interrupted sales staff many times a day, often in a hurry: "I had hoped you would have updated this," "Will I have it by noon?" "get to this ASAP."[389] Staff advised each other: "avoid as much e mail with dr. r as you can."[390] Sales VP Gasdia wrote to the CEO in exasperation: "I'm not sure what we can do about Dr. Richard."[391]

370. [intentionally blank] [392, 393, 394]

371. Throughout the spring, the Sacklers pressed staff to promote Purdue's opioids

---

384 2012-02-07 email from Russell Gasdia, PPLPC026000095656.
385 2012-02-07 email from Mortimer Sackler, PPLPC026000095656.
386 2012-02-08 email from Russell Gasdia, PPLPC026000095655.
387 2012-02-08 email from Richard Sackler, PPLPC026000095655.
388 2012-02-08 email from Bert Weinstein, PPLPC026000095655.
389 2012-02-02 and 2012-02-03 emails from Richard Sackler, PPLPC021000439058, PPLPC021000439090; *see also* 2012-02-22 emails from Richard Sackler, PPLPC021000443801.
390 2012-01-09 email from William Mallin, PPLPC028000396626.
391 2012-02-01 email from Russell Gasdia, PPLPC012000361862.
392 [intentionally blank]
393 [intentionally blank]
394 [intentionally blank]

more aggressively. In February, Gasdia wrote to sales staff that the Board of Directors ("BOD") was not satisfied with the money coming in: "Things are not good at the BOD level."[395] When sales dropped for one week on account of the Presidents' Day holiday, Richard Sackler wrote to sales management: "This is bad."[396] Gasdia forwarded Richard's message to his colleagues, asking how they could "create a greater sense of urgency at the regional management and district management level."[397]

372. The sales manager who reported to Gasdia had an immediate answer — aimed straight at Massachusetts. That same night, he drafted a message to the leader of Purdue's Boston district. He wrote: "the Boston District is failing." Then the sales manager went person by person through a list of Massachusetts sales reps and criticized them for not increasing opioid prescriptions enough. He emphasized that the pressure was coming from Richard Sackler himself:

> "Russ, as well as Mike and myself are constantly defending the launch of Butrans to BOD members. Just today, Dr. Richard sent another email 'This is bad,' referring to current Butrans trends. I am quite sure that Dr. Richard would not be sympathetic to the plight of the Boston District."

The manager ended his email by threatening to fire every sales rep in Boston:

> "I must tell you that I am much closer to dismissing the entire district than agreeing that they deserve a pass for poor market conditions." [398]

The manager sent his draft to Gasdia, who asked him to run it by someone in marketing. Gasdia agreed that they should consider firing the sales reps, because "that will send a message."[399]

373. Meanwhile, Gasdia pleaded with the CEO to defend him against Richard

---

[395] 2012-02-07 email from Russell Gasdia, PPLPC012000364017.
[396] 2012-02-07 email from Richard Sackler, PPLPC012000368430.
[397] 2012-02-07 email from Russell Gasdia, PPLPC012000368430.
[398] 2012-02-07 email from Windell Fisher, PPLPC012000368509.
[399] 2012-02-08 email from Russell Gasdia, PPLPC012000368509.

Sackler's micromanagement of sales: "Anything you can do to reduce the direct contact of Richard into the organization is appreciated."[400] A week later, Richard wrote to sales management again to criticize them for U.S. sales being "among the worst" in the world.[401]

374. **In March**, staff sent the Sacklers a revised 2012 budget that cut the proposed payout to their family from $472,500,000 to $418,200,000.[402]

375. On one Saturday morning, Richard Sackler wrote to marketing staff, demanding monthly data for all extended release pain medications for the past twelve years and an immediate meeting that Monday night.[403] Gasdia and Stewart stood by helpless, writing: "Do let us know how this goes."[404] Later that month, staff created for Richard a historical summary of key events determining OxyContin sales. Eleven of the key events in sales history were changes in the size of the Purdue sales force — all known to Richard because the Sacklers had ordered them.[405]

376. A few days later, staff sent Richard Sackler an assessment of recently-improved opioid sales. Staff told Richard that the increase in prescriptions was caused by tactics that Purdue taught sales reps: pushing opioids for elderly patients with arthritis ("proper patient selection") and encouraging doctors to use higher doses of opioids ("quick titration").[406] In the coming months, Purdue would study, document, and expand the use of higher doses to increase sales — a tactic that helped to kill people in Massachusetts.

377. Richard Sackler wrote that he was not satisfied with a report on sales and

---

[400] 2012-02-07 email from Russell Gasdia, PPLPC012000368569.
[401] 2012-02-10 email from Richard Sackler, PPLPC012000368823.
[402] 2012-03-05 email from Edward Mahony, PPLPC012000368627.
[403] 2012-03-17 email from Richard Sackler, PPLPC012000369328.
[404] 2012-03-18 email from Russell Gasdia, PPLPC012000369328.
[405] 2012-03-28 presentation, PPLPC012000371063.
[406] 2012-03-28 email from David Rosen, PPLPC012000371301.

instructed Gasdia to discuss it with him within a day.[407] Gasdia scrambled to schedule the meeting.[408] Then Richard raised the stakes and asked Gasdia to address both Butrans sales tactics and a decline in OxyContin sales and propose corrective actions.[409] John Stewart suggested that Richard's frustrations could be linked to dosing: he encouraged Gasdia to tell Richard that patients on lower doses seemed to stop taking opioids sooner, and that much of the profit that Purdue had lost had been from doctors backing off the highest dose of OxyContin (80mg).[410]

378. Richard Sackler was not satisfied. Days later, after sales did not increase, staff told him that they were starting quantitative research to determine why patients stay on opioids, so they could find ways to sell more opioids at higher doses for longer.[411]

379. **In April**, staff told the Sacklers that Purdue employed 630 sales reps and, during Q1 2012, they visited prescribers 179,554 times.[412] More than 3,800 of those visits were in Massachusetts.[413]

380. Meanwhile, Richard Sackler kept pushing the staff to increase sales. When the mandatory weekly report to the Sacklers showed that sales reps achieved 9,021 prescriptions in a week, Richard asked Sales VP Russell Gasdia for a commitment that the reps would get weekly prescriptions to 10,000: "Are you committed to breaking 10K/wk Rx's this month?"[414] A

---

[407] 2012-04-12 email from Richard Sackler, PPLPC012000372338-339.
[408] 2012-04-12 email from Russell Gasdia, PPLPC012000372338.
[409] 2012-04-15 email from Richard Sackler, PPLPC012000372585.
[410] 2012-04-16 email from John Stewart, PPLPC012000372620.
[411] 2012-04-20 email from David Rosen, PPLPC012000374532.
[412] 2012-04-30 Board report, pgs. 6, 33, PPLPC012000374796, -823. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 171,024 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.
[413] Exhibit 1.
[414] 2012-04-11 email from Richard Sackler, PPLPC012000372336.

colleague replied incredulously to Gasdia: “Is there any question of your commitment?”[415] Even for people who worked in sales, Richard’s conviction that sales reps should just make doctors prescribe opioids seemed crazy.

381. Gasdia tried to assure Richard Sackler that they were selling opioids aggressively: “Windell and the sales force, as well as Mike and the marketing team (initiatives being implemented) are focused and committed to accelerating the growth trend … everyone in the commercial organization is focused on exceeding the annual forecast.”[416] Richard wanted more. Richard wanted to know what tactics sales staff would use to get more prescriptions, and he wanted to talk about it right away. First he wrote: “give me the table of weekly Rx plan and the actual. Then show how you plan to make up the current shortfall.”[417] Then he asked for a meeting within 24 hours.[418] Then Richard didn’t want to wait that long: “Can we meet in person today?”[419] On Friday the 13th, sales and marketing staff met with Richard to review how they would sell more opioids.[420]

382. **In May**, executives emphasized to the managers overseeing Massachusetts sales reps that the Sacklers were tracking their efforts, and that Richard Sackler required weekly reports.[421] Staff gave the only reply that was acceptable at Purdue: “All our efforts are focused on attaining the objective” of increased opioid prescriptions that the Sacklers set.[422]

---

415 2012-04-11 email from David Rosen, PPLPC012000372240.
416 2012-04-12 email from Russell Gasdia, PPLPC012000372336.
417 2012-04-12 email from Richard Sackler, PPLPC012000372335-336.
418 2012-04-12 email from Richard Sackler, PPLPC012000372336.
419 2012-04-12 email from Richard Sackler, PPLPC012000372335.
420 2012-04-12 email from Russell Gasdia, PPLPC012000372335; 2012-04-13 invitation from Donna Condon, PPLPC012000372332.
421 2012-05-15 email from Mike Innaurato, PPLPC023000468013.
422 2012-05-15 email from Gary Lewandowski, PPLPC023000468016.

383. **In June**, the Sacklers discussed sales and marketing again.[423] Staff reported to the Sacklers that they had added 120,000 sales visits to drive sales of OxyContin.[424]

[423] 2012-05-29 email from John Stewart, PPLPC012000377890; attachment PPLPC012000377892.
[424] 2012-06-18 Mid Year Sales and Marketing Board Update, slide 10, PPLPC012000382119.

384. Staff also told the Sacklers that they expanded the opioid savings cards, because Purdue's latest data showed opioid savings cards led to 60% more patients remaining on OxyContin longer than 90 days. The Sacklers reviewed the results of Purdue's confidential studies showing that opioid savings cards kept more patients on opioids for 90 day, 120 days, 150 days, 180 days, 210 days, 240 days — even an entire year.[425]




*Purdue internal analysis about keeping patients on opioids longer*

Keeping patients on opioids for these lengths of time was especially dangerous for the patients and especially profitable for Purdue.

385. Staff also told the Sacklers that (as they had in 2009) they were again targeting prescribers for OxyContin promotion through a special television network.[426] Purdue selected physician targets to see the television program in Brockton, Chestnut Hill, Fitchburg, Holyoke,

[425] 2012-06-18 Mid Year Sales and Marketing Board Update, slides 11-12, PPLPC012000382119.
[426] 2012-06-18 Mid Year Sales and Marketing Board Update, slide 10, PPLPC012000382119.

Newburyport, North Dartmouth, Springfield, Webster, and Worcester.[427] The video featured a doctor paid by Purdue to promote opioids, and encouraged prescribers to use opioid savings cards.[428]

386. **In July**, David Sackler (Richard Sackler's son) took a seat on the Board. For events after July 2012, this Complaint includes David in "the Sacklers."

387. Staff told the Sacklers that Massachusetts now allowed drug companies to host dinners for doctors to promote their drugs.[429] Purdue hosted meals to promote opioids to doctors throughout Massachusetts — including in Barnstable, Boston, Brockton, Chelmsford, Dartmouth, Hingham, Kingston, Lawrence, Newton, Pittsfield, Swansea, Westport, and Worcester.[430] At one point, staff calculated that Purdue was spending more than $9,000,000 per year to buy food for doctors who prescribe opioids.[431]

388. Staff also told the Sacklers that Purdue employed 633 sales reps and, during Q2 2012, they visited prescribers 183,636 times.[432] More than 3,700 of those visits were in Massachusetts.[433]

389. **In August**, the Sacklers voted to direct Purdue to recruit an additional marketing executive and make candidates available to meet with members of the Board.[434]

390. **In November**, staff told the Sacklers the confidential results of a study of 57,000 patients that Purdue performed explicitly to determine how opioid dose "influences patient

---

[427] 2012-02-27 OxyContin Broadcast Summary Report, PPLPC023000526992.
[428] Video: "A Treatment Plan for Moderate to Severe Low Back Pain That Includes Converting to an Extended-Release Opioid Analgesic," PPLP003276093.
[429] 2012-07-23 Board report, pg. 39, PPLPC012000387107.
[430] Mass. HCP Payments, PMA000281466.
[431] 2014-06-16 budget information, PPLPC031001202294 ($9,119,250; food budget for each sales rep: $18,000).
[432] 2012-07-23 Board report, pgs. 6, 44, PPLPC012000387074, -112; 2012-07 Marketing and Sales report, PPLP004149354. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 190,662 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.
[433] Exhibit 1.
[434] 2012-08-16 Board minutes, PKY183212960.

length of therapy." The results showed that patients on the highest doses "are the most persistent." The "Recommended Actions" presented to the Sacklers included "additional workshops for the sales force" and "specific direction" to the sales representatives about using higher doses to keep patients on drugs longer. Staff told the Sacklers that encouraging higher doses "is a focal point of our promotion," and that sales reps would "emphasize the importance" of increasing patients' opioid doses, as soon as 3 days after starting treatment.[435]

391. That same month, the Sacklers voted to set Purdue's budget for Sales and Promotion for 2013 at $312,563,000.[436] Staff told the Sacklers that Purdue employed 622 sales reps and, during Q3 2012, they visited prescribers 180,723 times.[437] More than 3,600 of those visits were in Massachusetts.[438]

❖ ❖ ❖ **<u>2013</u>** ❖ ❖ ❖

392. **In January 2013**, in what was becoming a yearly ritual, Richard Sackler questioned staff about the drop in opioid prescriptions caused by Purdue sales reps taking time off for the holidays. Richard wasn't satisfied: "Really don't understand why this happens. What about refills last week? Was our share up or down?"[439] Staff assured Richard that doctors were "sensitive" to sales rep visits and, as soon as the reps got back into action, they would "boost" opioid prescriptions again.[440]

393. Staff told the Sacklers that they continued to reinforce the *Individualize The Dose*

---

[435] 2012-11-01 Board report, pgs. 18, 30, PPLPC012000396634, -646.
[436] 2012-11-16 Board minutes, 2013 budget, PKY183212995-998.
[437] 2012-11-01 Board report, pgs. 15, 54, PWG000414901, -940. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 199,466 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.
[438] Exhibit 1.
[439] 2013-01-07 email from Richard Sackler, PPLPC022000584388.
[440] 2013-01-07 email from David Rosen, PPLPC022000584388.

campaign, which the Sacklers knew and intended would promote higher doses. Staff also told the Sacklers that sales reps would place greater emphasis on the opioid savings cards, which the Sacklers knew and intended would keep patients on opioids longer. Staff reported to the Sacklers that Purdue had conducted a sensitivity analysis on the opioid savings cards to maximize their impact and, as a result, had increased the dollar value and set the program period to be *15 months* long. Staff also reported to the Sacklers that Purdue had created promotional materials to support these tactics and had distributed them to the sales force. Staff also told the Sacklers that Purdue showed an opioid promotional video to 5,250 physicians on the Physician's Television Network.[441] The video urged doctors to give patients Purdue's opioid savings cards.[442]

394. That same month, staff told the Sacklers that Purdue employed 609 sales reps and, during Q4 2012, they visited prescribers 153,890 times.[443] More than 2,900 of those visits were in Massachusetts.[444]

395. **In February**, the Sacklers met with staff about tactics for promoting Purdue's opioids. They discussed research on what influences prescriptions, how doctors had responded to Purdue's increased promotion, and sales force promotion themes.[445] On the same day, the Sacklers voted to award bonuses and salary increases to executives, including those involved in marketing Purdue's opioids.[446]

---

[441] 2013-01-28 Board report, pgs. 12-14, PPLPC012000407138-140.
[442] Butrans promotional video, PPLP003297185.
[443] 2013-01-28 Board report, pgs. 10, 56, PPLPC012000407136, -182. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 191,264 visits; and that reps visited 7.0 prescribers per day, on average, compared to a target of 7.1.
[444] Exhibit 1.
[445] 2013-01-30 email from William Mallin, PPLPC012000406335.
[446] 2013-02-13 Board minutes, PKY183213007.

396. **In March**, staff reported to the Sacklers on the devastation caused by prescription opioids. Staff told the Sacklers that drug overdose deaths had more than tripled since 1990 — the period during which Purdue had made OxyContin the best-selling painkiller. Staff told the Sacklers that tens of thousands of deaths were only the "tip of the iceberg." Staff reported that, for every death, there were more than a hundred people suffering from prescription opioid dependence or abuse.[447]

397. **In May**, staff reported to the Sacklers again that they were successfully using opioid savings cards to get patients to "remain on therapy longer." Staff told the Sacklers that they were using direct mail and email, as well as sales visits, to push the opioid savings cards.[448]

398. Staff reported to the Sacklers that, despite these sales efforts, they were not achieving the goals of getting enough patients on higher doses of opioids and getting doctors to prescribe more pills in each prescription. Staff told them that "there is an 'unfavorable' mix of prescriptions across strengths," and Purdue was losing tens of millions of dollars in revenue because sales of the highest doses (60mg and 80mg) were too low. Staff told the Sacklers that there was also a second problem: "lower average tablet counts per prescription." Because doctors were not prescribing enough pills during each patient visit, Purdue was losing tens of millions of dollars in revenue. Staff promised the Sacklers: "A deeper analysis is underway to determine the cause of the decline in the 30mg, 60mg, and 80mg tablet strengths, as well as the lower than budgeted average tablets per prescription. Once the analysis is complete, we will have a better sense of what tactics to implement to address both issues."[449]

[447] 2013-03-21 Board presentation, PPLP004409513-514.
[448] 2013-05-13 Board report, pg. 18, PPLP004367557.
[449] 2013-05-13 Board report, pg. 8, PPLP004367547.

399. The Sacklers met with Sales VP Russell Gasdia about the strategy for selling high doses. Gasdia told the Sacklers that "Titration up to higher strengths, especially the 40mg and 80mg strengths is declining." He analyzed the "Causes of OxyContin's Decline in Higher Strengths," and how Purdue would reverse that decline. He told the Sacklers that Purdue's #1 tactic to sell higher doses was sending sales reps to visit prescribers. The #2 tactic was a marketing campaign designed to promote high doses — Purdue's *Individualize The Dose* campaign. After that, Gasdia told the Sacklers, came opioid savings cards. After that, special focus on the most prolific opioid prescribers.[450]

400. Gasdia told the Sacklers that the staff would develop even more tactics to sell higher doses. They were using Purdue's data on thousands of doctors and patients to learn what made people willing to use high doses of opioids. They had started a study of physician characteristics and a "patient level analysis to determine what patient characteristics" were associated with "higher dose volume."[451]

401. That same month, staff told the Sacklers that Purdue employed 637 sales reps and, during Q1 2013, they visited prescribers 155,354 times.[452] More than 2,300 of those visits were in Massachusetts.[453]

402. **In July**, the Sacklers discussed "threats" to their business from data on long-term opioid use, as public health authorities reacted to the danger of keeping patients on opioids for longer periods of time.[454] Meanwhile, staff sent the Sacklers a "Flash Report" that OxyContin

---

[450] 2013-05 Board presentation by Russell Gasdia, PPLP004409727-728.
[451] 2013-05 Board presentation by Russell Gasdia, PPLP004409729.
[452] 2013-05-13 Board report, pgs. 12, 62, PPLP004367551, -601. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 172,788 visits; and that reps visited 6.8 prescribers per day, on average, compared to a target of 7.1. Staff assured the Sacklers that "call productivity is expected to increase towards the targeted goal throughout 2013."
[453] Exhibit 1.
[454] 2013-07-24 Communications and External Affairs Committee minutes, PPLPC012000433553.

sales had dropped $96,400,000 from the year before. Staff explained to the Sacklers that insufficient volume of sales rep visits to promote OxyContin to prescribers was an important reason for the dropping sales. Staff told the Sacklers that they would increase the number of sales visits and had hired McKinsey to study how to get doctors to prescribe more OxyContin.[455]

403. Staff also reported to the Sacklers that key priorities were to reverse "the decline in higher strengths" of Purdue opioids, and the decline in "tablets per Rx," which were reducing Purdue's profit. They told the Sacklers that Purdue staff were studying ways to fight these trends, and McKinsey would analyze the data down to the level of individual physicians.[456]

404. Mortimer Sackler asked for more detail on what was being done to increase sales.[457] Staff told the Sacklers that McKinsey would analyze whether sales reps were targeting the prescribers who were most susceptible to increasing opioid use. Staff told the Sacklers that McKinsey would study whether Purdue could use incentive compensation to push reps to generate more prescriptions. Making the sales reps' income depend on increasing prescriptions could be a powerful lever. Staff told the Sacklers that McKinsey would study using "patient pushback" to get doctors to prescribe more opioids: when doctors hesitated to prescribe Purdue opioids, Purdue could get patients to lobby for the drugs. Staff told the Sacklers that McKinsey would also study techniques for keeping patients on opioids longer, including the need for sales reps "to make a lot of calls on physicians with a high number of continuing patients."[458]

405. That same month, staff told the Sacklers that Purdue defeated legislation to restrict OxyContin in Massachusetts. Staff also told the Sacklers that Purdue was targeting Massachusetts prescribers with opioid savings cards: "Emails targeted towards HCPs practicing

---

[455] 2013-07-05 email from Edward Mahony, PPLPC012000431312-313.
[456] 2013-07-23 Board report, pg. 25, PPLPC012000433412.
[457] 2013-07-06 email from Mortimer Sackler, PPLPC012000431311.
[458] 2013-07-07 email from John Stewart, PPLPC012000431262; attachment PPLPC012000431266-278.

in Massachusetts were also developed to remind them that the use of patient savings cards are now permissible in Massachusetts and that they can download OxyContin Savings Cards at PurdueHCP.com."[459]

406. Staff also reported to the Sacklers that they had trained Purdue's sales reps to use new sales materials designed to get patients on higher doses of opioids for longer periods. Staff told the Sacklers that Purdue employed 634 sales reps and, during Q2 2013, they visited prescribers 177,773 times.[460] More than 2,400 of those visits were in Massachusetts.[461] Staff assured the Sacklers that they were trying to achieve even more sales visits by monitoring the reps.[462]

407. Before the month ended, the Sacklers met to discuss a report on sales tactics that McKinsey had prepared for them: *Identifying Granular Growth Opportunities for OxyContin: First Board Update*. McKinsey confirmed that Purdue's sales visits generated opioid prescriptions. They urged the Sacklers to demand more sales visits from sales reps, increasing each rep's annual quota from 1,400 towards 1,700. McKinsey also advised the Sacklers to control the sales reps' target lists more strictly, to make reps visit doctors who give the biggest payoff. Based on a review of data, McKinsey also suggested that the Sacklers should have staff emphasize opioid savings cards in neighborhoods with high concentration of Walgreens pharmacies. To allow even more targeted promotion of high doses, McKinsey asked the

---

[459] 2013-07-23 Board report, pgs. 17, 52, PPLPC012000433404, -439 ("Two specific concerns were Massachusetts HB 1786 which rescheduled OxyContin to a CI controlled substance and Mississippi HB 599 which set a 75 unit limit per RX on OxyContin. Both bills were defeated.").
[460] 2013-07-23 Board report, pgs. 11, 12, 59, PPLPC012000433398, -399, -446. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 191,184 visits; and that reps visited 6.9 prescribers per day, on average, compared to a target of 7.1.
[461] Exhibit 1.
[462] 2013-07-23 Board report, pgs. 10-11, PPLPC012000433397-398.

Sacklers to obtain "prescriber level milligram dosing data" so they could analyze the doses prescribed by individual doctors.[463]

408. Days later, staff told the Sacklers that Purdue paid their family $42,000,000.[464]

409. **In August**, the Sacklers met to discuss a new McKinsey report on sales tactics: *Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates*. McKinsey recommended that the Sacklers immediately order a series of actions to increase sales. McKinsey urged the Sacklers to direct sales reps to the most prolific opioid prescribers. The consultants told the Sacklers that prescribers in the more prolific group write "25 times as many OxyContin scripts" as less prolific prescribers. They also reported to the Sacklers that sales rep visits to these prolific prescribers cause them to prescribe even more opioids: if Purdue ordered reps to focus on the most prolific prescribers, it could increase sales.[465]

410. Second, McKinsey recommended that the Sacklers fight back against steps that the DEA, the U.S. Department of Justice, and others were taking to stop illegal drug sales. Two months earlier, the Walgreens pharmacy company admitted that it broke the law by filling illegitimate prescriptions, and it agreed to new safeguards to stop illegal prescribing.[466] McKinsey told the Sacklers that "deep examination of Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by 18%." Even worse for the Sacklers, the new safeguards were hurting sales of the highest doses: "the Walgreens data also shows a significant impact on higher OxyContin dosages" — specifically the 80mg dose. McKinsey urged the

---

[463] 2013-07-18 Identifying Granular Growth Opportunities for OxyContin: First Board Update, PPLP004409871.
[464] 2013-08-06 email from Edward Mahony, PPLPC012000435338.
[465] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, PPLP004409892.
[466] 2013 Walgreens agreement, https://www.justice.gov/sites/default/files/usao-sdfl/legacy/2013/06/19/130611-01.WalgreensMOA%26Addendum.pdf.

Sacklers to lobby Walgreens' leaders to loosen up. For the longer term, McKinsey advised the Sacklers to develop a "direct-to-patient mail order" business for Purdue opioids, so they could sell the high doses without pharmacies getting in the way.[467]

411. Third, McKinsey advised the Sacklers that they should use their power on the Board to insist on increasing sales, with monthly accountability: "Establish a revenue growth goal (*e.g.*, $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board." McKinsey knew what the Sacklers were looking for: they reported that "the value at stake is significant — hundreds of millions, not tens of millions." The consultants urged the Sacklers to make "a clear go-no go decision to 'Turbocharge the Sales Engine.'"[468]

412. **In September and October**, the Sacklers met again to discuss implementation of the sales tactics McKinsey had recommended. The Sacklers discussed DEA efforts to stop illegal dispensing of opioids at CVS and Walgreens and how Purdue could get around the new safeguards by shifting to mail-order pharmacies, specialty pharmacies, or Purdue distributing opioids to patients directly.[469]

---

[467] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, PPLP004409896-897.
[468] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, PPLP004409897-898.
[469] 2013-09-12 Board agenda, PPLP004409919; 2013-10-03 Board agenda, PPLP004409965-972.

413. Meanwhile, McKinsey kept reporting to Purdue on tactics to get more patients on higher doses of opioids.[470] McKinsey found that Purdue could drive opioid prescriptions higher by targeting the highest-prescribing doctors and sending sales reps to visit each prolific prescriber dozens of times per year. McKinsey pointed to a "true physician example" in Wareham, Massachusetts, who wrote 167 more OxyContin prescriptions after Purdue sales reps visited him.[471]




*Graphic from McKinsey presentation recommending targeting high prescribers*

414. **In October**, Mortimer Sackler pressed for more information on dosing and "the breakdown of OxyContin market share by strength."[472] Staff told the Sacklers that "the high dose prescriptions are declining," and "there are fewer patients titrating to the higher strengths from the lower ones."[473] In response to the Sacklers' insistent questions, staff explained that

---

470 2013-08-22 email from Russell Gasdia, PPLPC012000437344 (McKinsey interim report).
471 2013-08-22 McKinsey presentation, slide 10, PPLPC012000437356.
472 2013-10-28 email from Mortimer Sackler, PPLPC012000448835.
473 2013-10-28 email from David Rosen, PPLPC012000448832-833.

sales of the highest doses were not keeping up with the Sacklers' expectations because some pharmacies had implemented "good faith dispensing" policies to double-check prescriptions that looked illegal and some prescribers were under pressure from the DEA.[474] Staff promised to increase the budget for promoting OxyContin by $50,000,000, and get sales reps to generate more prescriptions with a new initiative to be presented to the Sacklers the following week.[475]

415. At the end of the month, the Sacklers met to discuss Purdue's budget for sales and marketing for 2014.[476] Looking back at sales tactics used in 2013, staff told the Sacklers that a relationship marketing program targeting Boston had increased opioid prescriptions by 959%.[477] Staff told the Sacklers (again) that Purdue's opioid savings cards kept patients on opioids longer.[478] Looking ahead at 2014, staff reported to the Sacklers that doctors shifting away from high doses and towards fewer pills per prescription could cost Purdue hundreds of millions of dollars in lost sales.[479] To fight against that threat, staff told the Sacklers the that they would increase the sales visits by each rep to 7.3 visits per day and visit prescribers 758,164 times in the year.[480]

416. **In November**, Richard Sackler complained that he was getting too much information about the dangers of Purdue opioids. Richard had set up a Google alert to send him news about OxyContin, and he objected to a Purdue Vice President: "Why are all the alerts about negatives and not one about the positives of OxyContin tablets?"[481] Staff immediately offered to

---

[474] 2013-10-28 email from David Rosen, PPLPC012000448833.
[475] 2013-10-23 email from Edward Mahony, PPLPC012000448840.
[476] 2013-10-28 email from Russell Gasdia, PPLPC012000448832; Sales & Marketing Board presentation, PPLP004409987.
[477] 2013-10-29 Analgesic Market Update presentation to the Board, PPLP004410015.
[478] 2013-10-29 OxyContin 2014 Budget Proposal to the Board, PPLP004410062.
[479] 2013-10-29 Sales & Marketing presentation to the Board, PPLP004409989.
[480] 2013-10-29 Sales Force 2014 Objectives presented to the Board, PPLP004409999.
[481] 2013-11-18 email from Richard Sackler, PPLPC023000633066.

replace Richard's alert with a service that provided more flattering stories.[482]

417. That same month, Richard Sackler alerted staff that the Massachusetts legislature was considering a bill to limit the length of prescriptions for the most addictive controlled substances.[483] The safeguard could help doctors prevent and treat addiction by requiring more frequent visits for patients on the most dangerous drugs. Staff promised Richard that they would review the legislation and get back to him to discuss a strategy for opposing it.[484]

418. Staff reported to the Sacklers that a key initiative during Q3 2013 was for sales reps to encourage doctors to prescribe OxyContin to elderly patients on Medicare.[485] In Massachusetts during 2013, sales reps reported to Purdue that they pushed opioids for elderly patients more than a thousand times. The sales reps did not disclose to doctors in Massachusetts that elderly patients faced greater risks of drug interactions, injuries, falls, and suffocating to death.

419. Staff also reported to the Sacklers that another key initiative during Q3 2013 was for sales reps to promote OxyContin for patients who had never taken opioids before.[486] In Massachusetts during 2013, Purdue sales reps did not disclose to doctors that opioid naive patients faced greater risks of overdose and death.

420. Staff also told the Sacklers that analysis conducted in July 2013 showed that opioid savings cards earned the Sacklers more money by keeping patients on opioids longer; specifically, more patients stayed on OxyContin longer than 60 days. Staff reported to the Sacklers that Purdue was pushing opioid savings cards in sales rep visits, through email to tens

---

[482] 2013-11-18 email from Raul Damas, PPLPC023000633066.
[483] 2013-11-11 email from Richard Sackler, PPLPC020000733992 (legislation would limit schedule II prescriptions to 15 days).
[484] 2013-11-11 email from Raul Damas, PPLPC020000733992.
[485] 2013-11-01 Board report, pg. 15, PPLPC002000186925.
[486] 2013-11-01 Board report, pg. 14, PPLPC002000186924.

of thousands of health care providers, and online.[487] In Massachusetts during 2013, sales reps reported to Purdue that they promoted opioid savings cards to prescribers more than a thousand times. The sales reps did not tell doctors in Massachusetts that savings cards led patients to stay on opioids longer than 60 days, or that staying on opioids longer increased the risk of addiction and death.

421. Staff reported to the Sacklers that Purdue paid their family $399,920,000 during January-September 2013. But staff told the Sacklers that, from January to September 2013, Purdue lost hundreds of millions of dollars in profits because some prescribers were shifting away from higher doses of Purdue opioids.[488]

422. Staff told the Sacklers that, in Q4 2013, sales reps would increase the number of visits to prescribers.[489] In Massachusetts, during those three months, sales visits increased by 30%.[490]

423. Staff also reported to the Sacklers that a key initiative in 2013 was to train sales reps to keep patients on Butrans opioids longer. They told the Sacklers that, at the same time as the initiative to keep patients on opioids longer, Purdue launched a new high dose of its Butrans opioid; sales reps began promoting the new high dose to physicians using new sales materials; and initial orders were double the company's forecasts. Staff reported to the Sacklers that marketing and sales activities generated 266,842 additional prescriptions and highlighted that opioid savings cards generate especially "high returns" by keeping patients on opioids longer.[491]

424. Staff reported to the Sacklers that Purdue had sent more than 880,000 emails to

---

[487] 2013-11-01 Board report, pgs. 15-16, 24-25, PPLPC002000186925-926, -933-934.
[488] 2013-11-01 Board report, pgs. 3, 6, PPLPC002000186913, -916.
[489] 2013-11-01 Board report, pg. 11, PPLPC002000186921.
[490] Exhibit 1.
[491] 2013-11-01 Board report, pgs. 11-13, 27, PPLPC002000186921-923, -937.

health care professionals to promote its Butrans opioid, and posted online advertising seen more than 5 million times for Butrans and nearly 4 million times for OxyContin. They told the Sacklers that hundreds of thousands of communications to prescribers nationwide presented the same "key selling messages" designed to get more patients on OxyContin at higher doses for longer periods of time, and specifically promoted Purdue's opioid savings cards.[492]

425. Staff reported to the Sacklers that they were working with McKinsey to study ways to sell more OxyContin. Staff also reported that they had direct access to physician level data to analyze prescriptions by individual doctors. Staff gave the Sacklers the latest results regarding how opioid savings cards led to patients staying on OxyContin longer.[493]

426. Staff also reported results from Purdue's marketing through the "OxyContin Physicians Television Network."[494] Purdue had selected doctors in nine Massachusetts communities as targets for that scheme.[495] Staff told the Sacklers that it increased opioid prescriptions.[496]

427. Staff also told the Sacklers that they would begin reviews of sales reps according to their sales ranking, with a focus on the bottom ten percent. Staff reported to the Sacklers that Purdue employed 637 sales reps and, during Q3 2013, they visited prescribers 179,640 times.[497] More than 2,200 of those visits were in Massachusetts.[498]

---

[492] 2013-11-01 Board report, pgs. 14, 16, PPLPC002000186924, -926.
[493] 2013-11-01 Board report, pgs. 20-23, PPLPC002000186930-933.
[494] 2013-11-01 Board report, pgs. 23-24, PPLPC002000186933-34.
[495] Target list, PPLPC023000526992; video, PPLP003297185.
[496] 2013-11-01 Board report, pgs. 23-24, PPLPC002000186933-34.
[497] 2013-11-01 Board report, pgs. 11, 52, 55, PPLPC002000186921, -962, -965. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 196,845 visits; and that reps visited 6.9 prescribers per day, on average, compared to a target of 7.1.
[498] Exhibit 1

428. **In December**, staff told Richard Sackler that Butrans sales were increasing, and they suspected the increase was caused by Purdue's improved targeting, in which sales reps visited the most susceptible prolific prescribers.[499]

429. Meanwhile, staff contacted Richard Sackler because they were concerned that the company's "internal documents" could cause problems if investigations of the opioid crisis expanded.[500] Early the next year, staff told Jonathan Sackler about the same concern. Jonathan studied collections of news reports and asked staff to assure him that journalists covering the opioid epidemic were not focused on the Sacklers.[501]

❖ ❖ ❖ **2014** ❖ ❖ ❖

430. **In January 2014**, staff reported to the Sacklers on how Purdue's program for complying with state and federal law compared to recent agreements between other drug companies and the government. Other companies had agreed that sales reps should not be paid bonuses based on increasing doctors' prescriptions, but Purdue still paid reps for generating sales. Other companies disclosed to the public the money they spent to influence continuing medical education, but Purdue did not. Other companies had adopted "claw-back" policies so that executives would forfeit bonuses they earned from misconduct; but Purdue had not. The Boards of other companies passed resolutions each quarter certifying their oversight of the companies' compliance with the law; but the Sacklers did not.[502]

---

[499] 2013-12-04 email from David Rosen, PPLPC012000454676.
[500] 2014-01-03 email from Burt Rosen, PPLPC020000748356 ("I spoke to Richard just before the year end and raised concerns over our internal documents.").
[501] 2014-01-02 email from Jonathan Sackler, PPLPC020000748356.
[502] 2014-01-16 quarterly compliance report to the Board, PPLP004410797.

431. **In February**, staff sent the Sacklers the final results from 2013.[503] Staff told the Sacklers that net sales were hundreds of millions of dollars below budget because doctors were not prescribing enough of the highest doses of opioids and were including too few pills with each prescription, and sales reps were not visiting doctors enough.[504] Sales VP Russell Gasdia wrote privately to a friend: "Our myopic focus on extended release opioids with abuse deterrent properties has not yielded the results people thought it would in the market. It's been hard to convince colleagues and the board that our success in this market is over."[505]

432. To get higher sales, staff told the Sacklers that they had tightened the requirements for sales reps' pay: from now on, sales reps would lose bonus pay if they did not visit "high value" prescribers often enough.[506] In Massachusetts, Purdue identified as "high value" doctors like Conrad Benoit, Yoon Choi, Fernando Jayma, and Fathalla Mashali — and managers ordered reps to keep promoting drugs to them even after reps warned Purdue that the doctors were involved in diversion and abuse.[507]

433. A few days later, staff told the Sacklers that Purdue's marketing had an immense effect in driving opioid prescriptions: according to Purdue's analysis, its sales and marketing tactics generated an additional 560,036 prescriptions of OxyContin in 2012 and 2013. Nevertheless, staff reported to the Sacklers that net sales for 2013 had been $377,000,000 less than budgeted. Staff again reported that Purdue was losing hundreds of millions of dollars in expected profits because prescribers were shifting away from higher doses of Purdue opioids and

---

[503] 2014-02-03 email from Edward Mahony, PPLPC020000756510.
[504] 2014-01-30 memo from Edward Mahony, PPLPC020000756512.
[505] 2014-02-27 email from Russell Gasdia, PPLPC012000466164.
[506] 2014-01-30 memo from Edward Mahony, PPLPC020000756513.
[507] 2013 Q1 target list, PPLPC015000141319; 2013-12-23 email from Garry Hughes, PPLP004367907 (with ZS target list).

including fewer pills per prescription. Staff told the Sacklers that a "Key Initiative" was to get patients to "stay on therapy longer."[508]

434. Staff also told the Sacklers that key sales priorities were again to encourage doctors to prescribe Purdue opioids for elderly patients and patients who had not taken opioids before. Staff reported to Sacklers again that sales reps were continuing the *Individualize The Dose* campaign.[509] As the Sacklers knew, Purdue designed that campaign to encourage higher doses.[510] Staff also told the Sacklers that Purdue's eMarketing campaign for OxyContin reached 84,250 health care providers during Q4 2013. Staff told the Sacklers that they found increasing compliance concerns with Purdue's speaker programs, in which the company paid doctors to promote Purdue opioids to other doctors.[511]

435. As in the past, staff reported to the Sacklers again about developments in Massachusetts. Staff told them that Massachusetts had introduced legislation concerning opioid prescriptions and Purdue staff were developing language to propose modifying the Massachusetts bill.[512]

436. Staff told the Sacklers that Purdue employed 632 sales reps and, during Q4 2013, they visited prescribers 176,227 times.[513] More than 2,900 of those visits were in Massachusetts.[514]

---

[508] 2014-02-04 Board report, pgs. 3, 5, 9, 22, PPLPC002000181037, -039, -043, 056.
[509] 2014-02-04 Board report pgs. 13-14, PPLPC002000181047-048.
[510] 2013-05-22 mid-year sales update, slides 4, 14, PPLPC012000424611, 21. *See* paragraph 670 below.
[511] 2014-02-04 Board report pgs. 15, 39-40, PPLPC002000181049, -073-074.
[512] 2014-02-04 Board report pg. 43, PPLPC002000181077. The report refers to legislation on "interchangeable" drugs that pharmacists dispense in some circumstances instead of the drug listed on a prescription.
[513] 2014-02-04 Board report, pgs. 9, 47, PPLPC002000181043, -081. Staff told the Sacklers that the sales rep visits compared to a target for the quarter of 183,960 visits; and that reps hit the target of visiting 7.1 prescribers per day, because managers reduced the target for visiting pharmacies to allow more visits to prescribers.
[514] Exhibit 1.

437. That February report was the last of its kind. After Q4 2013, Purdue abolished the detailed Quarterly Reports that had created a paper trail of targets for sales visits and been emailed among the Board and staff. In 2013, the City of Chicago served Purdue with a subpoena seeking internal documents about Purdue's marketing of opioids.[515] That provoked a flurry of activity, including discussion among the Sacklers.[516] Purdue fought the subpoena, and it was withdrawn.[517] For 2014, Purdue decided to limit many of its official Board reports to numbers and graphs, and relay other information orally. But the Sacklers continued to demand information about sales tactics, and their control of Purdue's deceptive marketing did not change.

438. **In March and April**, staff told the Sacklers that Purdue was achieving its goals of selling higher doses of OxyContin and more pills of OxyContin per prescription, but weekly prescriptions of Purdue's Butrans opioid were below expectations because of a reduced number of sales rep visits promoting that opioid.[518] The Sacklers had assumed prescriptions would fall, but staff were concerned that the effect could be greater than anticipated.[519]

439. **In May**, Purdue's CEO reported to the Sacklers on Purdue's work to influence legislation to maximize Purdue's sales in Massachusetts. He reported "a positive development in Massachusetts, a state from which we've seen significant anti-opioid activity in recent months. Yesterday, the Massachusetts Senate passed legislation that included a provision developed by

---

[515] 2015-11-20 email from Robert Josephson, PPLP004153099; 2013-04-24 email from Burt Rosen, PPLPC012000419813.
[516] 2013-05-07 Executive Committee agenda, PPLPC012000421973; 2013-05-03 Board agenda, PPLPC016000181375.
[517] 2015-11-20 email from Robert Josephson, PPLP004153099.
[518] 2014-03-07 email from Edward Mahony, PPLPC012000467494-495; 2014-04-06 email from Edward Mahony, PPLPC012000471641.
[519] 2014-04-14 Q1 summary of results, slide 7, PPLPC012000473131. Staff told the Sacklers that Purdue employed 643 sales reps. 2014-04-14 headcount summary, PPLPC012000473138.

Purdue."[520] Richard Sackler replied immediately to agree that the development in Massachusetts was good news.[521]

440. That same month, Richard and Jonathan's father, Raymond Sackler, sent David, Jonathan, and Richard Sackler a confidential memo about Purdue's strategy, including specifically putting patients on high doses of opioids for long periods of time. The memo recounted that some physicians had argued that patients should not be given high doses of Purdue opioids, or kept on Purdue opioids for long periods of time, but Purdue had defeated efforts to impose a maximum dose limit or a maximum duration of use. Raymond asked David, Jonathan, and Richard to talk with him about the report.[522]

441. **In June**, the Sacklers removed Russell Gasdia as Vice President of Sales and Marketing, and began pushing his replacement to sell more opioids faster.[523] Gasdia warned his replacement that Richard managed the sales operation intensely — "there are times this becomes a tennis match with Dr. Richard."[524] Sure enough, Richard told Gasdia's replacement that he would be given little time to show that he could increase opioid sales: "it is very late in the day to rescue the failed launch" of Butrans, which was not making as much money as Richard desired.[525] CEO Mark Timney tried to caution Richard that it was "a little early" to be attacking the new sales leader, since he'd been at Purdue only two weeks.[526]

---

[520] 2014-05-14 email from Mark Timney, PPLPC019000926225. The bill encouraged use of OxyContin by prohibiting a non-abuse-deterrent formulation from being dispensed if an abuse-deterrent formulation is available.
[521] 2014-05-14 email from Richard Sackler, PPLPC019000926225.
[522] 2014-05-05 email from Raymond Sackler, PWG000412141; 2014-05-04 attached memo from Burt Rosen, PWG000412143.
[523] 2014-06-10 email from Richard Sackler, PPLPC012000483200.
[524] 2014-06-10 email from Russell Gasdia, PPLPC012000483223.
[525] 2014-06-10 email from Richard Sackler, PPLPC012000483235.
[526] 2014-06-10 email from Mark Timney, PPLPC012000483235.

442. That same month, staff sent the Sacklers an "Update on L.A. Times mitigation effort" about tactics to discourage scrutiny of Purdue's misconduct.[527] Staff wrote to the Sacklers:

> As you may recall, one of our efforts to mitigate the impact of a potential negative *Los Angeles Times* (LAT) story involved assisting a competing outlet in marginalizing the LAT's unbalanced coverage by reporting the facts before the LAT story ran. The following *Orange County Register* story, developed in close coordination with Purdue, achieved this goal. This fact-based narrative robs the LAT account of its newsworthiness and contradicts many of the claims we expected that paper to make.[528]

In 2012, the *Los Angeles Times* had studied coroner's records and revealed that overdoses killed thousands of patients who were taking opioids prescribed by their doctors, refuting the Sacklers' lie that patients who are prescribed opioids don't get addicted and die.[529] The next year, the *Los Angeles Times* revealed that Purdue tracked illegal sales of OxyContin with a secret list of 1,800 doctors code-named *Region Zero*, but did not report them to the authorities.[530] The "mitigation effort" that the Sacklers ordered was not designed to protect patients from overdoses or from illegal prescribers, but instead to protect the Sacklers from reporters revealing the truth.

443. **In July**, Richard Sackler called staff to complain about studies that the FDA required for opioids and how they might undermine Purdue's sales. He emphasized that Purdue Board members felt the requirements to conduct studies were unfair. Staff tried to reassure

---

[527] 2014-06-30 email from Raul Damas, PPLPC022000741863. A few weeks after receiving the mitigation update, Richard Sackler demanded that the *L.A. Times* send him all the paper's correspondence with Purdue. 2014-08-14 email from Scott Glover, PPLPC024000872837.
[528] 2014-06-30 email from Raul Damas, PPLPC022000741863. Years earlier, the Sacklers had tried to influence the *New York Times* to be "less focused on OxyContin/Purdue." 2011-04-22 email from John Stewart, PPLPC019000517894.
[529] 2012-11-11 "Legal drugs, deadly outcomes," by Scott Glover and Lisa Girion.
[530] 2013-08-11 "OxyContin maker closely guards its list of suspect doctors," by Scott Glover and Lisa Girion.

Richard that the studies would take "several years to complete, thereby keeping our critics somewhat at-bay during this time."[531]

444. **In July** and again in **August**, **September**, and **October**, staff warned the Sacklers that two of the greatest risks to Purdue's business were "Continued pressure against higher doses of opioids," and "Continued pressure against long term use of opioids."[532]

**RISKS**

i. Continued pressure against higher doses of opioids,

ii. Continued pressure against long term use of opioids,

*Staff report to the Board on risks facing Purdue's business*

Staff told the Sacklers that Purdue's #1 opportunity to resist that pressure was by sending sales reps to visit prescribers; and, specifically, by targeting the most susceptible doctors, who could be convinced to be prolific prescribers, and visiting them many times.[533]

❖ ❖ ❖ ***Project Tango*** ❖ ❖ ❖

445. In September 2014, Kathe Sackler dialed in to a confidential call about *Project Tango*. *Project Tango* was a secret plan for Purdue to expand into the business of selling drugs to treat opioid addiction. In their internal documents, Kathe and staff wrote down what Purdue publicly denied for decades: that addictive opioids and opioid addiction are "naturally linked." They determined that Purdue should expand across "the pain and addiction spectrum," to become

---

[531] 2014-07-22 email from Todd Baumgartner, PPLPC002000187479-480.

[532] 2014-07-01 Board Flash Report, slide 5, PPLPC016000244173; 2014-08-05 Board Flash Report, slide 6, PPLPC016000250753; 2014-09-05 Board Flash Report, slide 6, PPLPC016000254916; 2014-10-15 Board Flash Report, slide 7, PPLPC016000259607.

[533] 2014-07-01 Board Flash Report, slide 5, PPLPC016000244173; 2014-08-05 Board Flash Report, slide 6, PPLPC016000250753; 2014-09-05 Board Flash Report, slide 6, PPLPC016000254916.

"an end-to-end pain provider." Purdue illustrated the end-to-end business model with a picture of a dark hole labeled "Pain treatment" that a patient could fall into — and "Opioid addiction treatment" waiting at the bottom.




*Purdue's secret "Project Tango"* [534]

[534] 2014-09-10 email from Brian Meltzer, PPLPC017000564600; 2014-09-12 presentation, PPLPC016000255303. "ADF" refers to Abuse-Deterrent Formulation, the crush-resistant version of OxyContin, which is no less addictive.

446. Kathe Sackler and the *Project Tango* team reviewed their findings that the "market" of people addicted to opioids, measured coldly in billions of dollars, had doubled from 2009 to 2014.




*Purdue's measure of the opioid addiction "market"*

Kathe and the staff found that the catastrophe provided an excellent compound annual growth rate ("CAGR"): "Opioid addiction (other than heroin) has grown by ~20% CAGR from 2000 to 2010."[535]

[535] 2014-09-10 presentation, slide 4, PPLPC017000564601. The Board discussed *Project Tango* in October 2014, but Purdue redacted all 32 pages of those Board materials. 2014-10-01 Board meeting materials, PPLP004411288.

447. Kathe Sackler and the staff revealed in their internal documents that Purdue's tactic of blaming addiction on untrustworthy patients was a lie. Instead, the truth is that opioid addiction can happen to anyone who is prescribed opioids:

> ▪ *"This can happen to any-one – from a 50 year old woman with chronic lower back pain to a 18 year old boy with a sports injury, from the very wealthy to the very poor"*

*Purdue's "Project Tango" patient and clinical rationale*

Kathe and the staff concluded that millions of people who became addicted to opioids were the Sacklers' next business opportunity. Staff wrote: "It is an attractive market. Large unmet need for vulnerable, underserved and stigmatized patient population suffering from substance abuse, dependence and addiction." The team identified eight ways that Purdue's experience getting patients *on* opioids could now be used to sell treatment for opioid addiction.[536]

448. Kathe Sackler instructed staff that *Project Tango* required their "immediate attention." She pressed staff to look into reports of children requiring hospitalization after swallowing buprenorphine — the active ingredient in both Purdue's Butrans opioid and the opioid addiction treatment that the Sacklers wanted to sell, through *Project Tango*, in a film that melts in your mouth.[537] Staff assured Kathe that children were overdosing on pills, not films, "which is a positive for *Tango*."[538]

449. In February 2015, staff presented Kathe Sackler's work on *Project Tango* to the Board. The plan was for a Joint Venture controlled by the Sacklers to sell the addiction medication suboxone.[539]

---

[536] 2014-09-10 presentation, slides 2, 4, PPLPC017000564601.
[537] 2014-09-16 email from Kathe Sackler, PPLPC020000834186.
[538] 2014-09-17 email from Mark Timney, PPLPC020000834185-186.
[539] 2015-02-20 email from Stuart Baker, PPLPC026000138391.

450. The *Tango* team mapped how patients could get addicted to opioids through prescription opioid analgesics such as Purdue's OxyContin or heroin, and then become consumers of the new company's suboxone. The team noted the opportunity to capture customers: even after patients were done buying suboxone the first time, 40-60% would relapse and need it again.[540]




*Purdue presentation explaining "Project Tango" patient flow*

451. The next month, *Project Tango* came to an end. Kathe, David, Jonathan, and Mortimer Sackler discussed the discontinuation of the project at their Business Development Committee meeting.[541] But the Sackler's efforts to sell addictive opioids continued.

❖ ❖ ❖

[540] 2015-02-24 *Project Tango* presentation, PPLPC002000208957.
[541] 2015-03-03 email from Stuart Baker, PPLPC011000016992.

452. **In October 2014**, staff sent the Sacklers a Proposed Operating Plan and Budget to be approved by the Board for 2015.[542] Staff told the Sacklers that a key tactic for 2015 would be to convert patients from short-acting opioids to OxyContin. Staff warned the Sacklers that prescribers were shifting away from the highest doses of Purdue's opioids, and toward fewer pills per prescription, and those shifts would cost Purdue $99,000,000 a year. Staff told the Sacklers that a key tactic to increase Butrans sales in 2015 would be for Purdue sales reps to push doctors to "titrate up" to higher doses. Staff likewise told the Sacklers that visits to doctors by sales reps would be a key tactic to launch Purdue's new Hysingla opioid: the company would: "Leverage Purdue's existing, experienced sales force to drive uptake with target HCPs" and "Add additional contract sales force capacity at launch to drive uptake."[543] Staff proposed that Purdue employ 519 sales reps, paid an average salary of $81,300 plus a bonus of up to an additional $124,600 based on sales.[544]

453. Meanwhile, sales staff exchanged news reports of a lawsuit accusing Purdue of deceptive marketing in Kentucky.[545] They quoted Purdue's own attorney and Chief Financial Officer stating that the company faced claims of more than a billion dollars that "would have a crippling effect on Purdue's operations and jeopardize Purdue's long-term viability."[546] Purdue's communications staff were delighted by the article, because it did not reveal the Sacklers' role in the misconduct. "I'm quite pleased with where we ended up. There's almost nothing on the Sacklers and what is there is minimal and buried in the back."[547]

---

[542] 2014-10-24 email from Edward Mahoney, PPLPC016000260660.
[543] 2015 Commercial Budget Review, slides 31, 38, 51, 67, PPLPC016000260706, -713, -726, -742.
[544] 2015 Budget Submission, slides 13, 56, PPLPC016000260845, -888.
[545] 2014-10-20 email from John Axelson, PPLPC014000279784.
[546] 2014-10-20 Bloomberg Businessweek report, PPLPC014000279786.
[547] 2014-10-20 email from Raul Damas, PPLPC017000579723.

454. **In November**, staff reported to the Sacklers that their sales tactics were working, and the shift away from higher doses of OxyContin had slowed.[548] Staff also told the Sacklers that Purdue had helped to pass a law that would encourage OxyContin sales in Massachusetts.[549]

455. **In December**, staff told the Sacklers that Purdue would pay their family $163,000,000 in 2014 and projected $350,000,000 in 2015.[550]

456. On New Year's Eve, Richard Sackler told staff that he was starting a confidential sales and marketing project on opioid prices and instructed them to meet with him about it on January 2.[551]

❖ ❖ ❖ **2015** ❖ ❖ ❖

457. Early in the morning of **January 2**, staff began scrambling to collect sales data for Richard Sackler.[552] They didn't move quickly enough. Days later, Richard demanded a meeting with sales staff to go over plans for selling the highest doses. Richard asked for an exhaustive examination to be completed within 5 days, including:

> "unit projections by strength, mg by strength … pricing expectations by strength … individual strength's market totals and our share going backward to 2011 or 12 and then forward to 2019 or 2020 … the same information for Hysingla … [and] the history of OxyContin tablets from launch to the present."[553]

---

548 2014-11 OxyContin Brand Strategy and Forecast for 2015, PPLP004411419 ("Strength mix shifting toward lower strengths has slowed with 40-80mg share going from 29% in the 10 Year Plan to 33% in the Budget").
549 2014-11 Executive Summary by Mark Timney, PPLP004411374 ("Helped pass nation's first pro-ADF law in Massachusetts," encouraging abuse-deterrent formulations like OxyContin.).
550 2014-12-03 email from Edward Mahoney, PPLPC016000266402; attached report slide 8, PPLPC016000266403.
551 2014-12-31 email from Richard Sackler, PPLPC021000713329-330.
552 2015-01-02 email from Saeed Motahari, PPLPC021000713328.
553 2015-01-07 email from Richard Sackler, PPLPC022000797067-068.

The CEO stepped in to say the work would take 3 weeks.[554] Richard let him know that wasn't a great response — "That's longer than I had hoped for" — and directed marketing staff to start sending him materials immediately.[555]

458. That same month, the Sacklers voted to evaluate employees' 2014 performance on a scorecard that assigned the greatest value to the volume of Purdue opioid sales. Employees were expected to generate more than one-and-a-half billion dollars. The Sacklers also voted to establish the company's scorecard for 2015: once again, the biggest factor determining employees' payout would be the total amount of Purdue opioid sales.[556]

459. **In April**, staff told the Sacklers that sales of Purdue's highest dose 80mg OxyContin were down 20% and that the average prescription had declined by eight pills since 2011.

460. The Sacklers voted to expand the sales force by adding another 122 reps.[557] As with every reference to "the Sacklers" after July 2012, that includes Beverly, David, Ilene, Jonathan, Kathe, Mortimer, Richard, and Theresa Sackler.

461. Staff told the Sacklers the additional reps would increase net sales of opioids by $59,000,000.[558]

---

[554] 2015-01-08 email from Mark Timney, PPLPC022000797067.
[555] 2015-01-08 email from Richard Sackler, PPLPC022000797067. Mark Timney had started as CEO a year earlier with the idea that he could "separate Board interaction from the organization" so the Sacklers would stop directing sales staff. 2014-01-29 email from Mark Timney, PPLPC012000461846. That effort failed.
[556] 2015-01-16 Board minutes, PPLP004416118-121.
[557] 2015-04-21 Board materials, PPLPC011000025707 ("It was decided to move forward with an expansion of the sales force by 122 reps"); 2015-05-04 Strategic Plan Update, slide 5, PPLPC017000623090; 2015-04-21 Board decision, PPLP004417512.
[558] 2015-04-21 Board materials, PPLPC011000025703.

462. The Sacklers knew and intended that, because of their vote, more sales reps would promote opioids to prescribers in Massachusetts. From 2015 to the present, reps hired in the 2015 expansion promoted Purdue opioids to Massachusetts prescribers more than 4,000 times.[559]

**Massachusetts Communities Targeted in Purdue's 2015 Sales Force Expansion**



463. **In October**, Purdue executives identified avoiding investigations of Purdue's opioid marketing as a "Key Activity" in the company's Operational Plan.[560]

---

[559] In Athol, Attleboro, Auburn, Boston, Bourne, Braintree, Brewster, Bridgewater, Brockton, Burlington, Cambridge, Carver, Cataumet, Charlestown, Chatham, Chelmsford, Chestnut Hill, Chicopee, Cotuit, Dartmouth, Dennis, Dighton, Duxbury, Easton, Edgartown, Fairhaven, Falmouth, Franklin, Gardner, Halifax, Hanover, Harwich, Holliston, Hyannis, Jamaica Plain, Kingston, Lakeville, Lancaster, Lowell, Ludlow, Lynn, Lynnfield, Malden, Mansfield, Marshfield, Mashpee, Melrose, Middleborough, Milford, Natick, Needham, New Bedford, Newton, Norfolk, Norton, Norwell, Norwood, Oak Bluffs, Orleans, Osterville, Peabody, Pembroke, Plainville, Plymouth, Randolph, Raynham, Salem, Sandwich, Scituate, Southbridge, Springfield, Stoneham, Sturbridge, Taunton, Tewksbury, Vineyard Haven, Wakefield, Waltham, Wareham, Wellfleet, Whitman, Winchendon, Woburn, Worcester, and Yarmouth.

[560] 2015-10-27 Executive Operating Committee presentation, slide 16, PPLPC011000065538.

464. **In November**, the Sacklers voted on the budget for Purdue for 2016.[561] Staff warned the Sacklers that public concern about opioids could get in the way of Purdue's plans and told them that Massachusetts, specifically, was one of two states considering legislation that worried Purdue. Staff again told the Sacklers that two of the most significant challenges to Purdue's plans were doctors not prescribing enough of the highest strength opioids and including too few pills in each prescription. Staff told the Sacklers that declining prescriptions of the highest doses and fewer pills per prescription would cost Purdue $77,000,000.[562]

465. Staff proposed to the Sacklers that, for 2016, Purdue would plan for prescribers to average 60 pills of Purdue opioids per prescription. They told the Sacklers that they would aim to make enough of those pills be high doses to make the average per pill 33 milligrams of oxycodone.[563] That way, Purdue could hit its target for the total kilograms of oxycodone it wanted to sell.

466. To make sure Purdue hit the targets, staff told the Sacklers that sales reps were visiting prescribers 21% more often than before. Staff told the Sacklers that they had aggressively reviewed and terminated reps who failed to generate prescriptions. Staff reported to the Sacklers that, in 2015 alone, Purdue replaced 14% of its sales reps and 20% of its District Managers for failing to create enough opioid sales.[564]

467. Looking ahead, staff told the Sacklers that "the 2016 investment strategy focuses on expanding the Sales Force." They reported that the proposed budget for sales and promotion was $11,600,000 higher than 2015, "primarily due to the Sales Force expansion." The top priority for the sales reps would be to visit the highest-prescribing doctors again and again. Staff

---

[561] 2015-11-21 email from Stuart Baker, PPLPC011000069947.
[562] 2015-11 budget for 2016, slides 16, 28, 44, PPLPC011000069967, -979, -995.
[563] 2015-11 budget for 2016, slide 41, PPLPC011000069992.
[564] 2015-11 budget for 2016, slides 7, 39, PPLPC011000069958, -990. Purdue fired 107 sales reps in 2015.

proposed to the Sacklers that the #1 overall priority for 2016 would be to sell OxyContin through "disproportionate focus on key customers." They told the Sacklers that sales reps would also target prescribers with the lowest levels of training, physician's assistants and nurse practitioners, because they were "the only growing segment" in the opioid market.[565] Purdue executives expected that, each quarter, the sales reps would visit prescribers more than 200,000 times and would get 40,000 new patients onto Purdue opioids.[566]

468. **In December**, staff prepared to address wide-ranging concerns raised by the Sacklers. Kathe and Mortimer Sackler wanted staff to break out productivity data by indication versus prescriber specialty for each drug. Richard Sackler sought details on how staff was calculating 2016 mg/tablet trends. Jonathan Sackler sought a follow-up briefing on how public health efforts to prevent opioid addiction would affect OxyContin sales.[567]

469. Before the year ended, the Sacklers were invited to a "Beneficiaries Meeting" where Purdue staff reported to Sackler family members about the company's efforts to sell opioids.[568]

---

[565] 2015-11 budget for 2016, slides 24, 26, 49, PPLPC011000069975, -69977, -70000.
[566] 2015-11-03 email from Zach Perlman, Executive Committee materials, slide 36, PPLPC011000065030.
[567] 2015-12-09 email from Zach Perlman, PPLPC011000073228 attaching Executive Committee presentation, slides 12-13, PPLPC011000073230.
[568] 2015-10-28 email from Stuart Baker, PPLPC011000063897; *see also* November 2013 Beneficiaries Meeting, PPLP004410528.

## ❖ ❖ ❖ 2016 ❖ ❖ ❖

470. **In 2016**, the Sacklers met with the Board in January, March, April, June, August, October, November, and December.[569]

471. **In April**, the Sacklers considered exactly how much money was riding on their strategy of pushing higher doses of opioids. The month before, the U.S. Centers for Disease Control announced guidelines to try to slow the epidemic of opioid overdose and death. The CDC urged prescribers to avoid doses higher than 30mg of Purdue's OxyContin twice per day. The CDC discouraged twice-a-day prescriptions of all three of Purdue's most profitable strengths — 40mg, 60mg, and 80mg. Staff studied how much money Purdue was making from its high dose strategy and told the Sacklers that $23,964,122 was at risk in Massachusetts each year.[570]

472. **In May**, Richard Sackler told staff to circulate a *New York Times* story reporting that opioid prescriptions were dropping for the first time since Purdue launched OxyContin twenty years earlier. The *Times* wrote: "Experts say the drop is an important early signal that the long-running prescription opioid epidemic may be peaking, that doctors have begun heeding a drumbeat of warnings about the highly addictive nature of the drugs." The only person quoted in favor of *more* opioid prescribing was a Massachusetts professor whose program at Tufts University was funded by the Sacklers.[571]

[569] 2016-05-19 Executive Committee pre-read, PPLPC011000096794 (Board schedule for 2016).
[570] 2016-04-13 Q1 2016 Commercial Update, slide 74, PPLPC016000286167.
[571] 2016-05-21 email from Richard Sackler, PPLPC021000841074; 2016-05-20 "Opioid Prescriptions Drop for First Time in Two Decades," by Abby Goodnough and Sabrina Tavernise. The opioid advocate was Dr. Daniel B. Carr, director of Tufts Medical School's program on pain research education and policy.

473. **In June**, the Sacklers met to discuss a revised version of *Project Tango* — another try at profiting from the opioid crisis. This time, they considered a scheme to sell the overdose antidote NARCAN. The need for NARCAN to reverse overdoses was rising so fast that the Sacklers calculated it could provide a growing source of revenue, tripling from 2016 to 2018.




*Board presentation showing potential sales from acquiring NARCAN*

Like *Tango*, Purdue's analysis of the market for NARCAN confirmed that they saw the opioid epidemic as a money-making opportunity and that the Sacklers understood — in private, when no one was watching — how Purdue's opioids put patients at risk. The Sacklers identified a "strategic fit" because NARCAN is a "complementary" product to Purdue opioids. They specifically identified patients on Purdue's prescription opioids as the target market for NARCAN. Their plan called for studying "***long-term script users***" to "better understand target end-patients" for NARCAN. Likewise, they identified the same doctors who prescribed the most Purdue opioids as the best market for selling the overdose antidote; they planned to "leverage the current Purdue sales force" to "drive direct promotion to targeted opioid prescribers." Finally,

they noted that Purdue could profit from government efforts to use NARCAN to save lives, including specifically in Massachusetts.[572]

474. That same month, staff presented the 2016 Mid-Year Update. They warned the Sacklers that shifts in the national discussion of opioids threatened their plans. The deception that Purdue had used to conceal the risks of opioids was being exposed. Staff summarized the problems on a slide:[573]

Critical Shifts in The National Discussion about Pain And Opioids

| From | To |
|---|---|
| Undertreatment of Pain | Opioid Epidemic |
| Abuse | Addiction |
| Criminal | Victim |
| FDA | CDC |
| Benefits Outweigh Risks | Lack of Long-Term Evidence |
| ADFs as Part of Solution | ADF Value Unproven |

PURDUE CONFIDENTIAL | 18

*2016 Mid-Year Board Update*

475. *First*, to convince doctors to prescribe dangerous opioids, Purdue promoted its drugs as the solution to "undertreatment of pain." Richard Sackler made sure that Purdue bought the internet address 5thvitalsign.com so it could promote pain as the "fifth vital sign" (along with

[572] 2016-05-27 email from Stuart Baker, PPLPC011000099222; 2016-06 Board Book slides 46-49, 114, PPLPC011000099280-283, -348. They planned to "Segment opioid patients to better understand target end-patients (e.g., long-term script users)."
[573] 2016-06-08 Mid-Year Update, slide 18, PPLPC011000099783. "ADF" on the slide refers to abuse-deterrent formulations of opioids, such as Purdue's crush-resistant OxyContin, which do not prevent addiction.

temperature, blood pressure, pulse, and breathing rate) to expand the market for opioids.[574] But now, staff reported to the Sacklers, doctors and patients were starting to worry more about the epidemic of opioid addiction and death.[575]

476. *Second*, to conceal the danger of addiction, Purdue falsely blamed the terrible consequences of opioids on drug abuse. One of Purdue's key messages argued: "It's not addiction, it's abuse."[576] But now, staff reported to the Sacklers, doctors and patients were realizing that *addiction* was a true danger.[577]

477. *Third*, to avoid responsibility for Purdue's dangerous drugs, the Sacklers chose to stigmatize people who were hurt by opioids, calling them "junkies" and "criminals." Richard Sackler wrote that Purdue should "hammer" them in every way possible.[578] But now, staff reported to the Sacklers, Americans were seeing through the stigma and recognizing that millions of families were victims of addictive drugs. Staff told the Sacklers that nearly half of Americans reported that they knew someone who had been addicted to prescription opioids.[579]

478. *Fourth*, the Sacklers had long sought to hide behind the approval of Purdue's drugs by the FDA. But FDA approval could not protect the Sacklers when their deceptive marketing led thousands of patients to become addicted and die. The U.S. Centers for Disease Control ("CDC") reported that opioids were, indeed, killing people. The CDC Director said: "We know of no other medication that's routinely used for a nonfatal condition that kills patients

---

[574] 1999-06-14 email from Richard Sackler, PDD1706189908.
[575] 2016-06-08 Mid-Year Update, slide 18, PPLPC011000099783.
[576] 2008-05-16 email from Pamela Taylor, PPLPC012000183254; 2008-04-16 Executive Committee notes, PPLPC012000183256; 2008-04-16 presentation by Luntz, Maslansky Strategic Research, slide 28, PPLPC012000183259.
[577] 2016-06-08 Mid-Year Update, slide 18, PPLPC011000099783.
[578] 2001-02-01 email from Richard Sackler, PDD8801133516 ("we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals.").
[579] 2016-06-08 Mid-Year Update, slides 18, 20, PPLPC011000099783.

so frequently."[580] The 2016 Mid-Year Update warned that the truth was threatening Purdue.

479. Staff also told the Sacklers that Massachusetts was one of four states to pass laws limiting opioid prescriptions.[581] In the face of this pressure, staff told the Sacklers that the sales team was focusing on the doctors who prescribe the most opioids.[582]

480. **In November**, staff prepared statements to the press denying the Sacklers' involvement in Purdue. Their draft claimed: "Sackler family members hold no leadership roles in the companies owned by the family trust."[583] That was a lie. Sackler family members held the controlling majority of seats on the Board and, in fact, controlled the company. A staff member reviewing the draft knew what was up and commented with apparent sarcasm: "Love the … statement."[584] Staff eventually told the press: "Sackler family members hold no management positions."[585]

481. Some employees worried about the deception. When journalists asked follow-up questions about the Sacklers, communications staff deliberated about whether to repeat the "no management positions" claim. They double-checked that Purdue's top lawyers had ordered the statement. Then they arranged for one of the Sacklers' foreign companies to issue it, so U.S. employees would not be blamed: "The statement will come out of Singapore."[586]

482. **In December**, Richard, Jonathan and Mortimer Sackler had a call with staff about another revised version of *Project Tango*. The new idea was to buy a company that treated

---

580 2016-03-15 briefing by CDC Director Tom Frieden.
581 2016-06-08 Mid-Year Update, slide 21, PPLPC011000099783. Massachusetts required prescribers to record a reason if they included more than 7 days of opioids in a patient's first opioid prescription.
582 2016-06-08 Mid-Year Update, slide 26, PPLPC011000099783 ("Protect OxyContin share among high decile HCPs").
583 2016-11-03 email from Robert Josephson, PPLPC023000914978.
584 2016-11-03 email from Raul Damas, PPLPC023000914978 ("Love the second statement" – it was the second of two statements in the draft).
585 2016-11-28 email from Robert Josephson, PPLPC019001332704.
586 2016-12-01 emails from Robert Josephson and Raul Damas, PPLPC020001075830.

opioid addiction with implantable drug pumps.[587] The business was a “strategic fit,” because Purdue sold opioids and the new business treated the “strategically adjacent indication of opioid dependence.”[588] The Sacklers kept searching for a way to expand their business by selling both addictive opioids and treatment for opioid addiction.

## ❖ ❖ ❖ 2017 ❖ ❖ ❖

483. **In 2017**, the Sacklers met with the Board in February, March, April, June, July, August, October, November, and December.[589]

484. **In May 2017**, staff told the Sacklers that an independent nonprofit had concluded that Purdue’s reformulation of OxyContin was not a cost-effective way to prevent opioid abuse.[590] Theresa Sackler asked staff what they were doing to fight back to convince doctors and patients to keep using the drug.[591]

485. That same month, the Sacklers were looking for a new CEO. Long-time employee Craig Landau wanted the job and prepared a business plan titled “SACKLER PHARMA ENTERPRISE.” Landau was careful to acknowledge their power: he acknowledged that Purdue operated with “the Board of Directors serving as the ‘de facto’ CEO.” He proposed that Purdue should take advantage of other companies’ concerns about the opioid epidemic through an “opioid consolidation strategy” and become an even more dominant opioid seller “as other companies abandon the space.”[592] The Sacklers made him CEO a few weeks later.

[587] 2016-12-22 email from Elliott Ruiz, PPLPC022000980230.
[588] 2016-12-22 Braeburn Pharmaceuticals: Structuring Analysis, slide 3, PPLPC022000980233.
[589] 2017 heavily redacted Board minutes, PPLP004416457-502; 2017-01-02 Governance Calendar, PPLPC011000131500.
[590] 2017-05-06 email from Gail Cawkwell, PPLPC011000147096.
[591] 2017-05-06 email from Theresa Sackler, PPLPC011000147096.
[592] 2017-05-02 Landau presentation, PPLPC020001106306.

486. **In June**, staff told the Sacklers that getting doctors to prescribe high doses of opioids and many pills per prescription were still key "drivers" of Purdue's profit. Purdue's management was concerned that the CDC's efforts to save lives by reducing doses and pill counts would force the company "to adjust down our revenue expectations."[593]

487. Staff told the Sacklers that Purdue's opioid sales were being hurt by cultural trends such as the HBO documentary, "*Warning: This Drug May Kill You*."[594] HBO's film was a problem for Purdue because it showed actual footage from Purdue's misleading advertisements next to video of people who overdosed and died.[595]

488. Staff felt the pressure of the opioid epidemic, even if the billionaire Sacklers did not. In one presentation, staff came close to insubordination and told the Sacklers: "Purdue Needs a New Approach." Their suggestion for a new direction was: "A New Narrative: Appropriate Use."




[593] 2017-06 Board of Directors: Purdue Mid-Year Pre-Read, slides 2, 152, PPLPC011000151189.
[594] 2017-06 Board of Directors: Purdue Mid-Year Pre-Read, slide 6, PPLPC011000151189.
[595] 2017-05-01 "*Warning: This Drug May Kill You* Offers a Close-Up of the Opioid Epidemic," https://www.theatlantic.com/entertainment/archive/2017/05/warning-this-drug-may-kill-you-opioid-epidemic-hbo/524982/.

The Sacklers led Purdue so far into the darkness that employees proposed "appropriate use" of drugs to reinvent the company. Staff also suggested that the Sacklers create a family foundation to help solve the opioid crisis.[596]

489. The Sacklers did not redirect the company toward appropriate use or create the suggested family foundation. Instead, they decided to sell harder. For 2018, the Sacklers approved a target for sales reps to visit prescribers 1,050,000 times — almost double the number of sales visits they had ordered during the heyday of OxyContin in 2010.[597]

490. **In October**, Richard Sackler learned that insurance company Cigna had cut OxyContin from its list of covered drugs and replaced it with a drug from Purdue's competitor, Collegium. Richard read that Collegium had agreed to encourage doctors to prescribe lower doses of opioids, and Collegium's contract with Cigna was designed so Collegium would earn *less* money if doctors prescribed high doses. Cigna announced that opioid companies influence dosing: "While drug companies don't control prescriptions, they can help influence patient and doctor conversations by educating people about their medications." Richard's first thought was revenge. He immediately suggested that Purdue drop Cigna as the insurance provider for the company health plan.[598]

491. On October 17, Beverly Sackler served her last day on the Board.[599] It was the beginning of the end for the Sackler family. A week later, the *New Yorker* published an article entitled "The Family That Built an Empire of Pain."[600] The story quoted a former FDA

---

[596] 2017-06 Board of Directors: Purdue Mid-Year Pre-Read, slides 36-38, PPLPC011000151189.
[597] 2017-06 Board of Directors: Purdue Mid-Year Pre-Read, slide 147, PPLPC011000151189.
[598] 2017-10-07 email from Richard Sackler, PPLPC016000317635.
[599] Declaration of Beverly Sackler dated September 5, 2018.
[600] 2017-10-23 email from Robert Josephson, PPLPC016000318910.

Commissioner: "the goal should have been to sell the least dose of the drug to the smallest number of patients." The reporter concluded: "Purdue set out to do exactly the opposite."[601]

492. **In November**, Jonathan Sackler suggested that Purdue launch yet another opioid.[602] Staff promised to present a plan for additional opioids at the next meeting of the Board.[603] At the Board meeting that month, the remaining Sackler Board members (Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa) voted to cut the sales force from 582 reps to 302 reps. They knew sales reps would continue to promote opioids in Massachusetts. Staff even gave Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler a map of where the remaining sales reps worked, with Massachusetts shaded to show that Purdue would keep visiting prescribers here.[604]



*Purdue internal map of planned sales rep territories for 2018*

[601] 2017-10-23 email from Robert Josephson, PPLPC016000318910.
[602] 2017-11-21 email from Jonathan Sackler, PPLPC016000321334.
[603] 2017-11-21 email from Craig Landau, PPLPC016000321333.
[604] 2017-11 Board budget, slides 47, 51, PPLPC016000323215.

## ❖ ❖ ❖ 2018 ❖ ❖ ❖

493. **In January 2018**, Richard Sackler received a patent for a drug to treat opioid addiction — his own version of *Project Tango*. Richard had applied for the patent in 2007. He assigned it to a different company controlled by the Sackler family, instead of Purdue. Richard's patent application says opioids *are* addictive. The application calls the people who become addicted to opioids "junkies" and asks for a monopoly on a method of treating addiction.[605]

494. In January, Richard Sackler also met with Purdue staff about the sales force again. They discussed plans to cut the force to 275 reps. In February, Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler decided to lay off 300 sales reps.[606]

495. **By April**, staff were scared. Richard Sackler was again asking questions about sales. Staff prepared a presentation for the Board of Directors ("BoD"). One employee suggested that they add more information about the company's problems. Another cautioned against that:

> "I think we need to find a balance between being clear about what reality looks like - which I certainly support in [this] situation - and just giving so much bad news about the future that it just makes things look hopeless. Let's not give the BoD a reason to just walk away."[607]

496. **On May 3** and again on **June 6 and 8**, all seven remaining Sacklers attended meetings of the Board: Richard, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa.[608]

---

[605] 2018-01-09, U.S. Patent No. 9,861,628 ("a method of medication-assisted treatment for opioid addiction"); 2007-08-29, international patent publication no. WO 2008/025791 Al.

[606] 2018-01-18 email from Jon Lowne, PPLPC016000323973; 2018 budget, PPLPC016000323996; 2018-02-07 email from Craig Landau, PPLPC016000325614; 2018-02-01 entirely redacted Board minutes, PPLP004416509.

[607] 2018-04-10 email from Paul Medeiros, PPLPC023000979571.

[608] 2018-05-03 heavily redacted Board minutes, PPLP004416514-520 (all present in person); 2018-06-06 heavily redacted Board minutes, PPLP004416521-524; 2018-06-08 heavily redacted Board minutes, PPLP004416525.

497. **On June 12, 2018**, the Massachusetts Attorney General filed this suit to hold the Sacklers as well as Purdue accountable. Just as their employees predicted, the Sacklers tried to run. Richard Sackler was the first to go: he resigned from the Board in July. David Sackler quit in August. Theresa Sackler served her last day in September. As of the date of this filing, Ilene, Jonathan, Kathe, and Mortimer remain.[609]

[609] 2018-09-05 declaration of David Sackler; 2018-09-07 declaration of Theresa Sackler.

### B. Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, and Ralph Snyderman

498. After the 2007 Judgment and criminal convictions, the Sacklers began to consider a strategy to protect themselves from the "dangerous concentration of risk" they created at Purdue. Their protection strategy, which was recorded in a secret memo by Richard Sackler and Peter Boer, involved: installing John Stewart as CEO because he would be loyal to the family; pumping up the cash flow from opioid sales; and creating "the perception of a sound long-term plan and effective management." The Sacklers believed that, if they created that perception, Purdue could be "sold to a strategic buyer," making the Sacklers one of the richest families in the world.[610]

499. Starting in 2008, the Sacklers asked five additional defendants to join them on the Board:

- Peter Boer was a Director from April 2008 to the present;
- Judith Lewent was a Director from March 2009 to December 2013;
- Cecil Pickett was a Director from January 2010 to the present;
- Paulo Costa was a Director from April 2012 to January 2018; and
- Ralph Snyderman was a Director from August 2012 to October 2017.

500. These defendants did not act independently from the Sacklers. Together with the Sacklers, they controlled the unfair and deceptive sales and marketing tactics Purdue used to sell its opioids in Massachusetts.

501. They voted with the Sacklers on every single one of the hundreds of votes that came before them during their respective Board tenures.

[610] 2008-04-12 memorandum to Richard Sackler from Peter Boer, PDD9316314309.

502. They voted with the Sacklers to hire hundreds more sales reps to carry out Purdue's unfair and deceptive sales tactics, including in Massachusetts.[611]

503. They voted with the Sacklers to implement incentive compensation policies that aggressively drove opioid sales, by placing outsized emphasis on prescription volume rather than compliance, including in Massachusetts.[612]

504. They voted with the Sacklers to pay billions of dollars to the Sackler family, knowing that the funds came from Purdue's unlawful deception, including in Massachusetts.[613]

505. They voted with the Sacklers to spend tens of millions of dollars to settle lawsuits by individuals alleging they were harmed by OxyContin and a lawsuit by the Kentucky Attorney General alleging illegal marketing of OxyContin.[614]

506. They voted with the Sacklers to pay out millions of dollars to convicted criminals Michael Friedman and Howard Udell to help the Sacklers keep their loyalty.[615]

507. They never stopped voting with the Sacklers during their respective tenures on the Board.

508. Not after learning about hundreds of Reports of Concern regarding abuse and diversion of Purdue's opioids, which the company was not investigating.[616]

---

[611] 2009-03-05 Board minutes, PKY183213138.
[612] 2013-01-15 Board minutes, PKY183213441; 2013-02-13 Board minutes, PKY183213449.
[613] 2008-04-18 Board minutes, PKY183213041; 2008-09-25 Board minutes, PKY183213077; 2008-11-06 Board minutes, PKY183213086; 2009-03-05 Board minutes, PKY183213139; 2009-06-26 Board minutes, PKY183213174; 2009-09-23 Board minutes, PKY183213211; 2010-02-04 Board minutes, PKY183213263; 2010-04-01 Board minutes, PKY183213274; 2011-04-06 Board minutes, PKY183213339; 2011-06-24 Board minutes, PKY183213363; 2011-09-01 Board minutes, PKY183213366.
[614] 2008-11-04 Board minutes, PKY183213083; 2009-06-26 Board minutes, PKY183213178; 2009-11-25 Board minutes, PKY183213249; 2010-07-22 Board minutes, PKY183212838; 2010-10-15 Draft Board of Directors Meeting Agenda, PPLPC012000294197; 2010-10-21 Board minutes, PKY183212854; 2011-05-20 Board minutes, PKY183212910.
[615] 2008-09-25 Board minutes, PKY183213077; 2008-11-07 Board minutes, PKY183213091; 2008-11-21 Board minutes, PKY183213103.
[616] 2008-07-15 Board report, pg. 21, PPLP004367317.

509. Not after seeing reports that Purdue received scores of tips to its compliance hotline and didn't refer them to the authorities.[617]

510. Not after learning about Purdue's secret *Region Zero* — a list of doctors suspected of improper prescribing, including in Massachusetts, whose sales Purdue tracked but who Purdue did not report to authorities.[618]

511. Not after receiving reports of compliance failures by Purdue sales staff, including improper use of OxyContin promotional materials and opioid savings cards.[619]

512. Not after receiving reports that Purdue sales managers violated Purdue's Corporate Integrity Agreement by failing to supervise sales reps during their visits to prescribers.[620]

513. Throughout their Board tenures, Boer, Lewent, Pickett, Costa, and Snyderman learned all these things and engaged with staff on many of them. They participated in many of the same meetings as the Sacklers. They provided their votes for many of the same decisions as the Sacklers, and always voted in lock-step when they did. And they continued to direct sales and marketing conduct aimed at increasing opioid prescribing and sales, despite knowing that that conduct was contributing to the epidemic of addiction, overdose and death. In all this misconduct, these five defendants shared responsibility with the Sacklers, including as detailed below.

---

[617] 2008-07-15 Board report, pg. 28, PPLP004367324.

[618] 2010-07-22 Response to Questions from Board Meeting, PPLPC012000283169; 2011-02-03 presentation by Bert Weinstein, slides 94-95, PDD8901468108-109.

[619] 2009-04-16 Board report, pgs. 24-25, PDD9316304336-337.

[620] 2009-07-30 Board report, pg. 15, PPLPC012000233246. To avoid being excluded from U.S. healthcare programs, Purdue agreed that its District Managers would observe and supervise each sales rep for five days each year. Corporate Integrity Agreement section III.K. In the second year of the agreement, staff reported to the Board that they failed to provide five days' of supervision for 23 sales reps.

## ❖ ❖ ❖ 2007 - 2008 ❖ ❖ ❖

514. Peter Boer was no stranger to Purdue or the Sacklers when he joined Purdue's Board. He had been serving on the board of the Sacklers' Rhode Island-based opioid manufacturing company, Rhodes Technologies, directing Purdue's oxycodone pipeline there for a decade, and he had been overseeing the supply of drug ingredients to Purdue as a director of the Sackler's U.K.-based pharmaceuticals company, Bard Pharmaceuticals, since 2002.[621]

515. Boer attended a corporate retreat with Richard, Kathe, Jonathan, and Mortimer Sackler in September 2007.[622] By December 2007, Boer and Richard Sackler were having detailed discussions about Purdue's management and operations.[623] In April 2008, Boer discussed the possibility of selling Purdue with Jonathan and Richard Sackler, and Boer and Richard Sackler exchanged drafts of their secret memo—for Board eyes only, and not to be shared with Purdue management.[624]

516. On April 18, 2008, Boer became a director, and Richard Sackler circulated the memo to Kathe, Ilene, David, Jonathan, and Mortimer Sackler.[625]

517. In June, following through on the suggestion in the secret memo, Boer voted with the Sacklers to appoint John Stewart as President and CEO of Purdue Pharma Inc. and Purdue Pharma LP.[626] This was one of scores of votes that Boer would make along with the Sacklers over the next ten years, always in alignment with them.

518. In July, staff told Boer, as well as the Sacklers, that Purdue received 890 Reports of Concern regarding abuse and diversion of Purdue's opioids in the second quarter of 2008, and

---

[621] 2003-07-18 memorandum by Peter Boer, #153960.1; 2002-05-10 Shareholders Meeting notes, #273916.1.
[622] 2007-09-12 email from Richard Sackler, PDD9316102848.
[623] 2008-04-12 memorandum by Peter Boer to Richard Sackler, PDD9316314309; 2008-03-28 emails from Richard Sackler and Peter Boer, PDD9316304944.
[624] 2008-04-12 memorandum to Richard Sackler from Peter Boer, PDD9316314309.
[625] 2008-04-18 email from Richard Sackler, PDD9316300629.
[626] 2008-06-27 Board minutes, PKY183212646.

they had conducted only 25 field inquiries in response. This was one of scores of reports that Boer would receive, along with the Sacklers, over the next decade. Staff reported to Boer that they received 93 tips to Purdue's compliance hotline during the quarter, but did not report any of them to the authorities.[627]

519. Staff also told Boer that they promoted Purdue opioids in Massachusetts in two presentations: an April presentation at Tufts University concerning use of opioids to manage chronic pain and a June presentation at the Tufts Health Care Institute concerning use of urine screens in pain management.[628] Convincing Massachusetts doctors that opioids were the best way to manage chronic pain and that urine tests protected patients from addiction were both part of Purdue's unfair and deceptive scheme.

520. In October, staff told Boer that surveillance data monitored by Purdue indicated a "wide geographic dispersion" of abuse and diversion of OxyContin "throughout the United States." Staff told Boer that "availability of the product" and "prescribing practices" were key factors driving abuse and diversion of OxyContin." On the same day, staff told Boer that Purdue had begun a new "Toppers Club sales contest" for sales reps to win bonuses, based on how much a rep increased OxyContin use in her territory and how much the rep increased the broader prescribing of opioids — the same "availability of product" and "prescribing practices" factors that worsen the risk of diversion and abuse. In the same report, staff told Boer that they received 163 tips to Purdue's compliance hotline during the third quarter of 2008, but did not report any of them to the authorities.[629]

---

[627] 2008-07-15 Board report, pgs. 21, 28, PPLP004367317, -324.
[628] 2008-07-15 Board report, pg. 21, PPLP004367317.
[629] 2008-10-15 Board report, pgs. 19, 24, 28, PDD9316101020, -025, -029.

521. Staff also told Boer that the Board-ordered sales force expansion had been implemented and Purdue now employed 414 sales reps. The Board's decision to expand the sales force had its intended effect in Massachusetts. During the third quarter of 2008, the number of sales visits to Massachusetts prescribers increased by 20% to more than 1,800.[630]

❖ ❖ ❖ **2009** ❖ ❖ ❖

522. Defendant Judith Lewent joined the Board in March 2009.[631]

523. In April, staff told Boer and Lewent that Purdue employed 412 sales reps and had made dramatic progress toward their goal of promoting higher doses: "for the first time since January 2008, OxyContin 80mg strength tablets exceeded the 40mg strength tablets during December 2008."[632]

524. Staff also told Boer and Lewent that they received 122 tips to Purdue's compliance hotline during the first quarter of 2009, and revealed one of them to an outside monitor. Staff told Boer and Lewent that the compliance problems included improper use of OxyContin promotional materials and opioid savings cards.[633]

525. In June, staff reported to Boer and Lewent that Purdue had expanded its opioid sales force at their direction: "As approved in the 2009 Budget, 50 New Sales Territories have been created." Staff told them that the expansion was focused on visiting doctors who prescribe the most, because "there are a significant number of the top prescribers" that Purdue had not been able to visit with its smaller force of sales reps."[634]

[630] 2008-10-15 Board report, pg. 26, PDD9316101027; Exhibit 1 (20% increase from Q3 2007).
[631] Judy Lewent declaration.
[632] 2009-04-16 Board report, pgs. 5, 28, PDD9316100601, -624.
[633] 2009-04-16 Board report, pgs. 24-25, PDD9316304336-337.
[634] 2009-06-16 email from Pamela Taylor, PPLPC012000226604; 2009-05-20 Executive Committee notes, PPLPC012000226606.

526. In September, Boer and Lewent voted themselves onto Purdue's Compensation Committee, which set compensation for executives in sales and marketing.[635]

❖ ❖ ❖ **2010** ❖ ❖ ❖

527. Defendant Cecil Pickett joined the Board in January 2010.[636]

528. That month, staff updated Boer, Lewent, and Pickett on the collaboration between Purdue's sales and marketing staff and McKinsey. Purdue was training its sales force on tactics for a new "physician segmentation" initiative, which McKinsey predicted would generate $200,000,000 to $400,000,000 more sales of OxyContin. This major initiative sought to target the most prolific prescribers who could be persuaded to put the most patients on opioids, at the highest doses, for the longest time.[637]

529. In February, Purdue's Sales and Marketing Department reported to Boer, Lewent, and Pickett that a key objective for 2010 was meeting a prescriber sales call quota of 545,000. Sales call quotas remained a priority over the next four years, and the Board tracked the sales force's performance on at least a quarterly basis as the quota rose from 545,000 prescriber visits in 2010, to 712,000 visits in 2011, 752,417 visits in 2012, and 744,777 visits in 2013.[638] Boer, Lewent, Pickett, Costa, and Snyderman all received regular updates on these quotas throughout their terms on the Board.

530. Boer, Lewent, and Pickett also received regular updates on Purdue's efforts to intensify its OxyContin promotion. In April, staff reported to Boer, Lewent, and Pickett that

---

[635] 2009-09-23 Board minutes, PKY183212777.

[636] Cecil Pickett declaration.

[637] 2010-01-20 email from Pamela Taylor, pg. 3, PDD8901041368; 2010-02-09 email from Pamela Taylor, PPLPC012000257443; 2010-01-20 Executive Committee notes, PPLPC012000257446; 2010-02-01 Board report, pgs. 4, 19, PPLPC012000252778, -793.

[638] 2010-02-01 Board report, pg. 23, PPLPC012000252797; 2010-04-21 Board report, pg. 3, PWG000423141; 2011-05-02 Board report, pg. 3, PPLPC012000322428; 2012-04-30 Board report, pg. 3, PPLPC012000374793; 2013-05-13 Board report, pg. 7, PPLP004367546.

they were working in 2010 to increase the average number of daily prescriber visits from the previous year's 6.9 and to decrease the cost-per-visit from $219.[639]

531. In July, Boer, Lewent, and Pickett joined the Sacklers and sales and marketing staff for a Board meeting in Bermuda. Staff presented plans for selling Purdue's new Butrans opioid and reported that sales reps would try to switch patients to Purdue opioids from NSAIDs like ibuprofen. Staff told Boer, Lewent, and Pickett that they had identified 82,092 prescribers to target with the Butrans sales campaign. Staff reported that they planned to add 125 sales reps and increase the number of prescriber visits from 574,000 to 750,000 per year.[640]

532. The Board responded with dozens of questions and demands about the sales campaign. They asked staff to determine whether sales would increase if they gave doctors free samples of opioids, ordered staff to provide forecasts focused on higher doses of opioids, and demanded details about tactics Purdue sales staff used to influence doctors that Purdue viewed as "key opinion leaders," who could influence other doctors to prescribe more opioids.[641] In Massachusetts, the key opinion leaders that Purdue paid to influence opioid prescriptions included Dr. Walter Jacobs, who lost his medical license for dangerous prescribing.

533. The Board probed whether staff were describing the benefits of opioids aggressively enough. Purdue was not legally allowed to say that Butrans was effective for 7 days, because the evidence did not show that, but the Board wanted to know why Purdue didn't claim 7 days of effectiveness in its promotion.[642]

534. Purdue was not legally allowed to say that Butrans was effective for osteoarthritis

---

[639] 2010-04-21 Board report, pg. 4, PWG000423143.
[640] 2010-07-22 Butrans Commercial Strategy Plan Board Presentation, slides 17, 66, 81, PPLPC018000404193; 2010-06-01 email from William Mallin, PPLPC012000273600.
[641] 2010-07-22 questions during Board meeting, PPLPC012000283164-165.
[642] 2010-07-22 questions during Board meeting, PPLPC012000283167 ("Why is there no reference to efficacy data in the marketing materials? … a specific reference or statement to Butrans providing efficacy for 7 days seems to be the desired statement … we may not have data that supports efficacy at that specific time point.").

("OA"), because the clinical trials testing Butrans for patients with osteoarthritis had failed, but Boer, Lewent, and Pickett, together with the Sacklers, wanted to know if sales reps could sell more by remaining silent about the failed trial: "What can be said in response to a prescriber who asks directly or indirectly, 'can this product be prescribed for my patient with OA?' In responding are we required to specifically mention the failed trials in OA?"[643]

535. The Board asked staff about opioid sales generated by doctors who were suspected of diversion and abuse, which Purdue had collected on a list code-named *Region Zero*.[644] Staff told the Board that Purdue had identified twelve prescribers in Massachusetts as likely involved in diversion and abuse and gave the Board a list of the specific problem prescribers by name, along with the exact number of prescriptions and dollars of revenue each provided to Purdue.[645]

536. For example, staff reported to the Board — including Boer, Lewent, and Pickett — that Purdue suspected Dr. Michael Taylor, in New Bedford, Massachusetts, was prescribing opioids inappropriately. In response to the Board's request, staff reported that, in the past two years, Taylor had prescribed OxyContin more than five hundred times, and provided Purdue with $392,505.[646]

537. Likewise, in response to the Board's request, staff reported to Boer, Lewent, and Pickett and the other directors that Purdue suspected Dr. Alvin Chua, in Brookfield, Massachusetts, was prescribing opioids inappropriately. Staff told them that, in the past two years, Chua had prescribed OxyContin more than a thousand times, and provided Purdue with

[643] 2010-07-22 questions during Board meeting, PPLPC012000283167.
[644] 2010-07-22 questions during Board meeting, PPLPC012000283169, -170.
[645] 2010-08-16 email from William Mallin, PPLPC012000283162; 2010-08-11 *Region Zero* prescribers, PPLPC012000283175.
[646] 2010-08-11 *Region Zero* prescribers, PPLPC012000283175.

$431,474.[647]

538. A year after Purdue staff told the Board about Alvin Chua, the Massachusetts Board of Registration in Medicine took away his license for improper opioid prescribing. Three years after Purdue told the Board about Michael Taylor, he lost his license and was convicted in Massachusetts court of prescribing opioids without a legitimate medical purpose. By then, Purdue and the Sacklers had collected hundreds of thousands of dollars from their dangerous prescriptions. Far worse — four Massachusetts patients, who were prescribed Purdue opioids by Taylor and Chua, overdosed and died.

539. The Board — including Boer, Lewent, and Pickett — asked about the revenue from these doctors in order to make sure Purdue was maximizing its profits, and continued Purdue's policy of not disclosing *Region Zero* to patients, insurers, or the authorities.

540. At that same Board meeting in Bermuda, Boer, Lewent, and Pickett voted with the Sacklers to hire 125 more sales reps by January 2011.[648] Boer, Lewent, and Pickett knew and intended that the expanded sales force was promoting opioids in Massachusetts. In fact, Purdue sales reps visited Massachusetts prescribers more than 2,700 times during the last quarter of 2009 alone.[649]

541. Purdue's aggressive sales strategy to target high prescribers worked. Purdue's top-paid physician consultant in Massachusetts at the time, Walter Jacobs, had a patient on *twenty-four* pills of 80mg OxyContin per day. In 2010, 72% of the OxyContin pills that Jacobs prescribed were the highest-dose 80mg pills.

542. In October, staff reported to Boer, Lewent, and Pickett that Purdue would

---

[647] 2010-08-11 *Region Zero* prescribers, PPLPC012000283175.
[648] 2010-07-27 Board report, pg. 19, PWG000422495; 2010-07-22 Board minutes, PKY183212838.
[649] Exhibit 1.

promote opioids at more than a dozen speaking events in Massachusetts, including an $85,000 program on opioids at Tufts University and a $50,000 program on opioid prescribing for chronic pain at Boston University.[650]

543. In November, staff cautioned Boer, Lewent, and Pickett that drug company "owners, officers, and managers will especially face even more serious scrutiny in the future."[651]

❖ ❖ ❖ **2011** ❖ ❖ ❖

544. In February 2011, staff informed Boer, Lewent, and Pickett that Purdue was using individual zip codes to track the correlation between poison control calls for OxyContin poisoning, pharmacy thefts, and *Region Zero* prescribers; gave Boer, Lewent, and Pickett a map of dangerous prescribers in Massachusetts; and briefed Boer, Lewent, and Pickett on a study showing that the financial penalties imposed on drug companies for illegal marketing were "relatively small" when "compared to the perpetrating companies' profits."[652]

545. At the same meeting, staff gave the Board data showing that 83% of patients admitted to substance abuse treatment centers began abusing opioids by swallowing pills, and that it commonly takes 20 months for patients to get treatment.[653]

546. Later in February, staff told Boer, Lewent, and Pickett that Massachusetts lawmakers had introduced legislation to ban extended-release oxycodone, including Purdue's OxyContin.[654]

547. In early 2011, Purdue launched Butrans. Over the next few years, Boer, Lewent,

---

[650] 2010-10-07 report attached to email by William Mallin, pgs. 3, 5, 10, 13, 16, 26, 28, 33, 34, PPLPC012000292676, -678, -683, -686, -689, -699, -701, -706, -707, -759, -760.
[651] 2010-11-10 Executive Committee notes, PPLPC012000299855; 2010-11-10 presentation by Bert Weinstein, slide 7, PPLPC012000299866.
[652] 2011-02-03 Board of Directors Meeting Agenda, pgs. 48, 94, 95, PDD8901468062, -108-109.
[653] 2011-02-03 Board of Directors Meeting Agenda, pg. 86, PDD8901468100.
[654] 2011-02-23 email from Pamela Taylor, PPLPC012000312664; 2011-01-26 Executive Committee notes, PPLPC012000312667-668.

and Pickett, and later, Costa and Snyderman too, received weekly reports on sales metrics and tactics for Butrans. As it did to promote OxyContin, Purdue identified and targeted for more frequent promotion a "super core" of physicians who prescribed the most opioids.[655]

548. Staff went on to detail how, after identifying their "super core" of target prescribers, sales reps were instructed to "improve specific patient focus and effective positioning of Butrans for specific patient types."[656] In Massachusetts, promotion for "specific patient types" translated in many cases to pushing opioids for elderly patients with ailments such as arthritis. Purdue sales reps recorded in their notes that they pitched prescribing opioids to elderly patients to Massachusetts providers more than a thousand times in 2011.[657]

549. Boer, Lewent, and Pickett were also briefed on Purdue's tactics for "closing" a sale — getting prescribers to commit to putting specific patients on opioids.[658] This strategy was common to Purdue's opioid sales pitches, and Massachusetts prescribers reported to the Attorney General that Purdue sales reps had asked them on multiple occasions to commit to prescribing Purdue opioids without disclosing significant risks.

❖ ❖ ❖ **2012** ❖ ❖ ❖

550. Defendant Paulo Costa joined the Board in April 2012.[659]

551. Soon after joining the Board, Costa began discussing Purdue's sales and

---

655 2011-05-25 email from Russell Gasdia, PPLPC012000326017.
656 2011-05-25 email from Russell Gasdia, PPLPC012000326017.
657 Exhibit 1.
658 2011-05-25 email from Russell Gasdia, PPLPC012000326017.
659 Paulo Costa declaration for September 2018 motion to dismiss.

marketing strategy with staff, including Sales VP Russell Gasdia, and questioned whether, despite its aggressive expansion, Purdue was still underfunding its OxyContin promotion.[660] Staff sent Costa an advance copy of the mid-year sales and marketing report, which included research showing that higher dosages and savings cards are factors contributing to longer duration of opioid use.[661]

552. For five days in June, Boer, Lewent, Pickett, and Costa attended the mid-year meeting of the Board.[662] Sales staff told them that Purdue had added 120,000 sales visits devoted to the promotion of OxyContin. To further drive OxyContin sales, staff reported that they expanded the opioids savings cards and eMarketing programs and promoted opioids on the Professional Television Network.[663]

553. In August, Defendant Ralph Snyderman joined the Board.[664]

554. That month, Boer, Lewent, Pickett, Costa, and Snyderman voted to direct Purdue to hire an additional marketing executive and to make candidates available to meet with members of the Board.[665]

555. By the fall of 2012, Costa proposed a plan to Purdue staff to target patients on Medicaid as a strategy to revive declining OxyContin sales. Sales staff held a series of meetings to consider Costa's idea. Costa met with John Stewart and Russell Gasdia to discuss threats and opportunities in the opioid market.[666]

556. In November, staff provided Boer, Lewent, Pickett, Costa, and Snyderman with

---

[660] 2012-06-04 email from Paulo Costa, PPLPC012000378550.
[661] 2012-06-11 email from Mike Innaurato, PPLPC012000382120; 2012-06-11 sales and marketing update, slides 11-12, 15-16, PPLPC012000382121.
[662] 2012-05-25 email from Stuart Baker, PPLPC012000377890-891.
[663] 2012-06-18 Mid Year Sales and Marketing Board Update, slide 10, PPLPC012000382119.
[664] Snyderman declaration.
[665] 2012-08-16 Board minutes, PKY183212960.
[666] 2012-11-03 email from Paulo Costa, PPLPC012000396834; 2012-10-29 email from Paulo Costa, PPLPC012000396447; 2012-10-30 email from Russell Gasdia, PPLPC012000396469.

the confidential results of a study of 57,000 patients that Purdue performed explicitly to determine how opioid dose "influences patient length of therapy." The results showed that patients on the highest doses stay on opioids longer. The "Recommended Actions" for the Board included "additional workshops for the sales force" and "specific direction" to the sales representatives about using higher doses to keep patients on drugs longer. Staff told Boer, Lewent, Pickett, Costa, and Snyderman, together with the Sacklers, that encouraging higher doses "is a focal point of our promotion," and that sales reps would "emphasize the importance" of increasing patients' opioid doses, as soon as 3 days after starting treatment.[667]

**❖ ❖ ❖ 2013 ❖ ❖ ❖**

557. At the start of 2013, at the request of Boer, Lewent, Pickett, Costa, and Snyderman, staff provided the Board with examples of political and third-party support for Purdue's "abuse deterrent" formulations, including in their report five Massachusetts legislators who had written favorable letters to the FDA.[668] The Board directed staff to obtain such letters, despite knowing that there was no actual evidence that Purdue's reformulated OxyContin helped prevent opioid abuse and that, to the contrary, it did nothing to prevent the most common method of opioid abuse, by oral ingestion.

558. In January, the decline in high-dose opioid prescribing remained a preoccupation for Purdue's sales and marketing staff. Staff updated Boer, Lewent, Pickett, Costa, and Snyderman on Purdue's *Individualize The Dose* campaign to promote higher doses. Staff also responded to Costa's recommendation to target managed care

[667] 2012-11-01 Board report, pgs. 18, 30, PPLPC012000396634, -646.
[668] 2013-01-15 email from Burt Rosen, PPLPC032000255061; 2013-01-15 attachment to email by Burt Rosen, PPLPC032000255064.

organizations, including Medicare Part D. Staff also reported that Purdue had increased the dollar value of opioid savings cards and set the program period to be *15 months* long, in response to research showing the cards kept patients on opioids longer. Boer, Lewent, Pickett, Costa, and Snyderman also learned that Purdue was pushing the opioid savings cards through mass-mailings and emails.[669]

559. Sales reps reported to Purdue that, during 2013, they promoted opioid savings cards to Massachusetts doctors more than a thousand times. The sales reps did not tell doctors that savings cards led patients to stay on opioids longer, or that staying on opioids longer increased the risk of addiction and death.

560. In February, staff informed Boer, Lewent, Pickett, Costa, and Snyderman of the ever-growing public concern about the dangers of opioids. A presentation on the opioid marketing environment noted an “increase in media reports questioning the use, and safety, of opioids for non-cancer pain.” Staff told Boer, Lewent, Pickett, Costa, and Snyderman about “family members of overdose victims featured in these stories” who have “testified in support of restricting the use of opioids.” Staff also warned the Board members about the rise of state task forces, pill mill legislation, and state-level initiatives to limit opioid prescribing and increase the utilization of prescription monitoring programs. The presentation characterized the growing public concern over opioid safety and the opioid crisis as due to a “lack of interest by reporters to provide balanced reporting” and promised that Purdue would push back.[670]

561. In March, staff reported to Boer, Lewent, Pickett, Costa, and Snyderman on the devastation caused by prescription opioids. Staff told Boer, Lewent, Pickett, Costa, and Snyderman that drug overdose deaths had more than tripled since 1990 — the period during

---

[669] 2013-01-28 Board report, pgs. 13-14, PPLPC012000407139-140.
[670] 2013-02-13 business condition report to Board, slides 38-40, PPLPC012000408089-091.

which Purdue had made OxyContin the best-selling painkiller—and that tens of thousands of deaths were only the "tip of the iceberg." Staff reported that, for every death, there were more than a hundred people suffering from prescription opioid dependence or abuse.[671]

562. Although the *Individualize The Dose* tactics discussed in January were proving effective, staff stressed to Boer, Lewent, Pickett, Costa, and Snyderman in May that Purdue needed to get even more patients on higher doses and larger prescriptions of opioids to meet its sales goals. Staff told Boer, Lewent, Pickett, Costa, and Snyderman that Purdue was still $16,800,000 below budget due to insufficient sales of the highest doses of OxyContin and that prescribers writing "lower average tablet counts per prescription" was exacerbating this issue.[672]

563. Staff told Boer, Lewent, Pickett, Costa, and Snyderman that they were undertaking "[a] deeper analysis…to determine the cause of the decline in the 30mg, 60mg, and 80mg tablet strengths, as well as the lower than budgeted average tablets per prescription. Once the analysis is complete, we will have a better sense of that tactics to implement to address both issues."[673]

564. Both "the decline in higher strengths" of Purdue opioids, and the decline in "tablets per Rx," remained topics of Board discussion throughout 2013.[674] To address it, staff informed Boer, Lewent, Pickett, Costa, and Snyderman that Purdue continued adding more prescriber visits and had commissioned McKinsey to actively monitor the number and size of opioid prescriptions written by individual doctors to whom Purdue

[671] 2013-03-21 Abuse Deterrent Strategy Presentation to the Board, slides 38-39, PPLP004409513-514.
[672] 2013-05-13 Board report, pg. 8, PPLP004367547.
[673] 2013-05-13 Board report, pg. 8, PPLP004367547.
[674] 2013-07-23 Board report, pg. 25, PPLPC012000433412.

marketed.[675]

565. Staff updated Boer, Lewent, Pickett, Costa, and Snyderman on Purdue's successful lobbying against state legislation to impose safety restrictions on OxyContin, including a defeated bill in Massachusetts. Boer, Lewent, Pickett, Costa, and Snyderman also learned that Purdue had begun email promotion of opioid savings cards specifically in Massachusetts.[676]

566. In 2013, Purdue also increased its targeting of managed care organizations and insurance companies, including Medicaid and Medicare plans. In June and July, Paulo Costa strategized with Purdue staff, including Sales VP Russell Gasdia, to market Purdue opioids directly to insurance companies and managed care formularies. Under the plan, Purdue would try to convince them to cover opioids with data that the FDA had never approved. And Costa recommended Purdue's CEO promote opioids directly to the insurance company CEOs.[677] Over the coming months, acting on Costa's recommendations, Purdue continued to refine its approach to marketing to managed care patients.[678]

567. In July and August, Boer, Lewent, Pickett, Costa, and Snyderman met, together with the Sacklers, to discuss the analyses that they had hired McKinsey to do, titled *Identifying Granular Growth Opportunities for OxyContin.* McKinsey recommended that they immediately order a series of actions to increase sales. McKinsey urged them to direct sales reps to visit the highest opioid prescribers, because prescribers in the most prolific group wrote 25 times more OxyContin scripts than the less prolific prescribers. McKinsey reported that sales rep visits to

---

[675] 2013-07-05 email from Edward Mahony, PPLPC012000431312-313; 2013-11-01 Board report, pg. 20, PPLPC002000186930; 2013-07-23 Board report, pg. 25, PPLPC012000433412.
[676] 2013-07-23 Board report, pgs. 17, 52, PPLPC012000433403, -439.
[677] 2013-06-25 meeting with Paulo Costa notes, PPLPC0021000577371.
[678] 2013-07-11 email from Tim Richards, PPLPC012000431842; 2013-07-15 email from Tim Richards, PPLPC012000432169; 2013-07-31 email from Jon Lowne, PPLPC012000434831.

these prolific prescribers cause them to prescribe even more opioids.[679]

568. Second, McKinsey urged Boer, Lewent, Pickett, Costa, and Snyderman, together with the Sacklers, to fight back against steps that the DEA, the U.S. Department of Justice, and others were taking to stop illegal drug sales. In June, the Walgreens pharmacy company admitted that it broke the law by filling illegitimate prescriptions, and it agreed to new safeguards to stop illegal prescribing.[680] McKinsey told Boer, Lewent, Pickett, Costa, and Snyderman that, as a result, Walgreens had cut down on opioid prescriptions: "Walgreens has reduced its units by 18%" and had significantly cut back on the highest and most profitable OxyContin dosages. McKinsey urged Boer, Lewent, Pickett, Costa, and Snyderman to lobby Walgreens' leaders to loosen up. For the longer term, McKinsey advised the Board to develop a "direct-to-patient mail order" business for Purdue opioids, so they could sell the high doses without pharmacies getting in the way.[681]

569. Third, McKinsey advised the Board — including Boer, Lewent, Pickett, Costa, and Snyderman — that they should use their authority to insist on increasing sales, with monthly accountability: "Establish a revenue growth goal (*e.g.*, $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board." The consultants urged the directors to decide whether Purdue would "Turbocharge the Sales Engine."[682]

570. Later that month, McKinsey told Boer, Lewent, Pickett, Costa, and

[679] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, PPLP004409892.
[680] 2013 Walgreens agreement, https://www.justice.gov/sites/default/files/usao-sdfl/legacy/2013/06/19/130611-01.WalgreensMOA%26Addendum.pdf.
[681] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, pgs. 3-5, PPLP004409894-896.
[682] 2013-08-08 Identifying Granular Growth Opportunities for OxyContin: Addendum to July 18th and August 5th Updates, pgs. 6-7, PPLP004409897-898.

Snyderman, along with the Sacklers, that a "true physician example" of sales reps driving prescriptions was a doctor in Wareham, Massachusetts, who wrote 167 more OxyContin prescriptions after Purdue sales reps started visiting him often.[683]

571. Stewart identified Costa to sales staff as "a champion for our moving forward with a comprehensive 'turbocharge' process," as McKinsey had proposed.[684] Purdue continued to follow-up on Costa's recommendations in the following months, as Purdue rebranded the *Turbocharge* campaign internally to *Evolve to Excellence* (or *E2E*).[685]

572. In September and October, Boer, Lewent, Pickett, Costa, and Snyderman met with the Sacklers again to discuss implementation of the sales tactics McKinsey had recommended. They again discussed DEA efforts to stop illegal dispensing of opioids at CVS and Walgreens and how Purdue could get around the new safeguards by shifting to mail-order pharmacies, specialty pharmacies, or Purdue distributing opioids to patients directly.[686]

573. In October, staff informed Boer, Lewent, Pickett, Costa, Snyderman, and the Sacklers of a correlation between "DEA pressures" and the "declining trend[s]" in sales of both extended release opioids and higher dose opioid pills.[687] Staff promised to include DEA enforcement and "increasingly restrictive opioid prescribing guidelines and regulations" in shaping their ongoing strategy to increase opioid sales, as well as to more than double the portion of the sales budget spent on promoting OxyContin through the *E2E* initiative.[688]

574. Staff continued to update Boer, Lewent, Pickett, Costa, and Snyderman on the new sales force tactics as they ramped up their implementation through the final quarter of 2013,

---

[683] 2013-08-22 McKinsey presentation, slide 10, PPLPC012000437356.
[684] 2013-08-15 email from John Stewart, PPLPC012000436626.
[685] 2013-09-19 email from Edward Mahony, PPLPC012000441854; 2013-09-19 email from Edward Mahony, PPLPC012000441858, 2013-09-23 email from Russell Gasdia, PPLPC012000442736.
[686] 2013-09-12 Board agenda, PPLP004409919; 2013-10-03 Board agenda, pg. 8, PPLP004409965.
[687] 2013-10-28 email from Russell Gasdia, PPLPC012000448832-833.
[688] 2013-10-23 email from Edward Mahony, PPLPC012000448839-840.

during which period sales visits in Massachusetts increased by 30%.[689]

575. In November, staff reported to Boer, Lewent, Pickett, Costa, and Snyderman that key initiatives during the third quarter of 2013 were getting doctors to prescribe OxyContin to opioid-naive patients and elderly patients on Medicare. Staff showed Boer, Lewent, Pickett, Costa, and Snyderman how Purdue's tactic of using opioid savings cards to keep patients on OxyContin longer was working, and that Butrans sales had been above Purdue's forecasts. Nevertheless, staff told the Board that Purdue's 2013 profits were still hundreds of millions of dollars below target, and this shortfall was almost entirely due to the ongoing decline in high-dose and high-volume OxyContin prescriptions.[690]

576. Staff also reported to Boer, Lewent, Pickett, Costa, and Snyderman, that a key initiative in 2013 was training sales reps to keep patients on Butrans longer. Staff told them that Purdue's launch of a new, high dose form of Butrans that, after being included in the *E2E* marketing push, had received initial orders double what the company had forecast. Staff reported that marketing and sales activities generated 266,842 additional Purdue opioid prescriptions and again highlighted opioid savings cards as a promotional coup.[691]

577. Staff reported to Boer, Lewent, Pickett, Costa, and Snyderman that Purdue had sent more than 880,000 emails to health care professionals to promote its Butrans opioid, and posted online advertising seen more than 5 million times for Butrans and nearly 4 million times for OxyContin. Staff told them that this national campaign presented the same "key selling messages" designed to get more patients on OxyContin

[689] 2013-11-01 Board report, pg. 11, PPLPC002000186921; Exhibit 1.
[690] 2013-11-01 Board report, pgs. 6, 11-15, PPLPC002000186916, -921-925.
[691] 2013-11-01 Board report, pgs.11-13, 27, PPLPC002000186921-923, -937.

at higher doses for longer periods of time, and specifically promoted Purdue's opioid savings cards.[692] Boer, Lewent, Pickett, Costa, and Snyderman understood and intended that the sales campaign hit Massachusetts.

**❖ ❖ ❖ 2014 ❖ ❖ ❖**

578. In early 2014, staff told Boer, Lewent, Pickett, Costa, and Snyderman that again, the company's promotion of its opioids was working, and had generated an additional 560,036 prescriptions of OxyContin in 2012 and 2013, but this increase was still drastically below the number of opioids Purdue wanted to sell.[693] Like before, this gap was attributed to "continued pressure against higher doses [and] long term use of opioids," as well as new FDA labeling language instructing prescribers to prescribe OxyContin only to patients for whom alternative therapies were inadequate.[694]

579. At 2014's first Board meeting in February, staff presented Boer, Lewent, Pickett, Costa, and Snyderman with samples of new opioid messaging and sales analysis on further methods to "maximize revenue and profitability for both Butrans and OxyContin." Staff also reviewed plans to continue Purdue's core marketing tactics, including the "Key Initiative" to cause patients to "stay on therapy longer," the *Individualize The Dose* campaign, opioid savings cards, and the campaigns targeting elderly and opioid naive patients.[695]

580. Staff also told the Board that Purdue's OxyContin eMarketing campaign had reached 84,250 health care providers during the fourth quarter of 2013.[696]

581. As in the past, staff informed Boer, Lewent, Pickett, Costa, and Snyderman, about

---

[692] 2013-11-01 Board report, pgs. 14, 16, PPLPC002000186924, -926.
[693] 2014-02-04 Board report, pgs. 3, 5, 22, PPLPC002000181037, -039, -056.
[694] 2014-03-31 Q1 2014 financial results presentation, slide 5, PPLPC012000473131.
[695] 2014-02-04 Board report, pgs. 9-10, 20, PPLPC002000181043-044, -054.
[696] 2014-02-04 Board report pg. 15, PPLPC002000181049.

specific developments in Massachusetts. Staff reported to them that Purdue was developing language to modify Massachusetts legislation on opioid prescriptions.[697]

582. Staff also noted an unusually high number of compliance concerns with the content of Purdue's speaker programs, in which the company paid doctors to promote Purdue opioids or messaging to other doctors, causing Purdue to mail out corrective letters to attendees in some cases.[698]

583. In April, staff reported to Boer, Lewent, Pickett, Costa, and Snyderman, together with the Sacklers, that Purdue employed 643 sales reps.[699] Staff told them that visits by sales reps to doctors were essential to drive prescriptions of Purdue opioids: a drop in sales visits had reduced Butrans prescriptions, underscoring how crucial prescriber visits were to Purdue's profits.[700]

584. In July, staff told Boer, Lewent, Pickett, Costa, and Snyderman, yet again, that Purdue's OxyContin business was threatened by "[c]ontinued pressure against higher doses of opioids," and "[c]ontinued pressure against long term use of opioids."[701]

585. In October, staff sent Boer, Lewent, Pickett, Costa, and Snyderman a Proposed Operating Plan and Budget for 2015, which cited "key tactics" of inducing doctors to convert patients from short-acting opioids to OxyContin, and moving patients taking Butrans to higher doses.[702] The budget predicted that prescribers' continued shift away from the highest doses and larger prescriptions of OxyContin would now cost

---

[697] 2014-02-04 Board report pg. 43, PPLPC002000181077 (bill concerned interchangeability of prescriptions).
[698] 2014-02-04 Board report pgs. 39-40, PPLPC002000181073-074.
[699] 2014-04-14 financial report to Board, pg. 7, PPLPC012000473138.
[700] 2014-03-31 results of operations report, slide 7, PPLPC012000473131.
[701] 2014-07-01 Board Flash Report, slide 5, PPLPC016000244173.
[702] 2014-10-24 email from Edward Mahoney, PPLPC016000260660; 2015 Commercial Budget Review, slides 31, 51, PPLPC016000260706-726.

Purdue $99,000,000 that year.[703]

586. The budget also explained Purdue's plans to continue sales force expansion to promote the launch of its new opioid Hysingla.[704]

587. On December 31, Judith Lewent resigned from the Board.

❖ ❖ ❖ **2015** ❖ ❖ ❖

588. Purdue's efforts to overcome the decline in high-dose and high-volume opioid prescribing through aggressive sales calls continued in 2015. In April, staff told Boer, Costa, Pickett, and Snyderman that sales of Purdue's highest dose of OxyContin were down 20% and that the average number of tablets per prescription had declined by eight tablets since 2011. Staff reported that Purdue employed 508 sales reps and another 57 as contract workers. Boer, Costa, Pickett, and Snyderman voted to expand the sales force by adding another 122 reps, based on a prediction that this would increase net sales of opioids by $59,000,000.[705]

589. In December, Boer, Costa, and Snyderman demanded more information on sales and marketing tactics. Boer asked for an update on the *Region Zero* prescribers Purdue had flagged as possible illegal diverters, which included prescribers in Massachusetts. Costa sought a briefing on adjustments made to the distribution of sales territories throughout the country. Snyderman directed staff to break out sales data by indication versus prescriber specialty for each drug. Snyderman also wanted more information about the impact of Purdue's sales force on prescriptions.[706]

---

703 2015 Budget Submission, slide 6, PPLPC016000260845.
704 2015 Commercial Budget Review, slide 67, PPLPC016000260742.
705 2015-05-21 Board materials, pgs. 23, 32, 35, 39, PPLPC011000025691, -700, -703, -707.
706 2015-12-09 Executive Committee presentation, slides 12-14, PPLPC011000073230.

❖ ❖ ❖ **2016** ❖ ❖ ❖

590. In 2016, Boer, Costa, Pickett, and Snyderman participated in Board meetings with the Sacklers in January, March, April, June, August, October, November, and December.[707] As of the date of this Amended Complaint, Purdue has not disclosed the records of those meetings, although it has promised to disclose them in the coming days.

❖ ❖ ❖ **2017 - 2018** ❖ ❖ ❖

591. In 2017, Boer, Costa, Pickett, and Snyderman participated in Board meetings with the Sacklers in January, March, April, June, August, and October.[708]

592. In October 2017, Snyderman resigned from the Board.[709]

593. In January 2018, Costa resigned from the Board.[710]

594. Boer and Pickett remained.

595. Boer, Lewent, Pickett, Costa, and Snyderman each collected hundreds of thousands of dollars from Purdue, including thousands of dollars from opioid sales in Massachusetts. In exchange for the money, Boer, Lewent, Pickett, Costa, and Snyderman did what the Sacklers wanted every step of the way. They each knowingly, intentionally, and repeatedly directed Purdue's unfair and deceptive sales and marketing campaign in Massachusetts, to the great cost of patients and families.

[707] 2016-05-19 Executive Committee pre-read, pg. 3, PPLPC011000096794.
[708] 2017-03-23 Executive Committee presentation, slide 3, PPLPC011000139651.
[709] Ralph Snyderman declaration.
[710] Paulo Costa declaration.

**C. John Stewart, Russell Gasdia, Mark Timney, and Craig Landau**

596. The Sacklers relied on four key executives to get more patients in Massachusetts to take more opioids at higher doses for longer periods of time. These executives — John Stewart, Russell Gasdia, Mark Timney, and Craig Landau — are personally liable for their role in the unlawful scheme.

**JOHN STEWART**

597. As CEO from 2007 to 2013, John Stewart headed up Purdue's unfair and deceptive campaign to get more Massachusetts residents to take more opioids at higher doses for longer periods of time. The Sacklers found Stewart, a long-time veteran of Purdue, to be "very (favorably) strong" in his loyalty to the family.[711]

598. Stewart knowingly and intentionally sent sales reps to promote opioids in Massachusetts. At his direction, Purdue's sales reps visited Massachusetts prescribers more than 70,000 times.[712] Stewart, in collaboration with sales executives like Russell Gasdia, recommended that Purdue increase the size of the sales force several times, more than doubling the number of sales reps during his tenure. After the Sacklers approved each expansion, Stewart ensured that the additional sales reps were deployed to sell opioids to prescribers in Massachusetts and beyond.

599. Stewart, a long-time employee of Purdue prior to becoming CEO, sent a memo to Jonathan and Kathe Sackler in 1997, which showed that he knew then that when people use high doses of opioids for longer periods, they are more likely to suffer adverse effects.[713] Despite this

[711] 2008-04-18 memo from Richard Sackler, PDD9316300631.
[712] Exhibit 1.
[713] 1997-04-12 memo from John Stewart, PDD1701785443.

knowledge, as CEO, Stewart led Purdue's strategy to drive patients to take opioids at higher doses for longer periods of time to meet the Sacklers' sales goals.

600. Stewart knew and intended that the sales reps in Massachusetts would increase opioid sales by misleading doctors and concealing the true risks of Purdue's opioids.

601. Stewart also knew and intended that Purdue staff reporting to him would engage in thousands of additional deceptive acts in Massachusetts, including sending misleading publications to Massachusetts doctors and engaging in deceptive promotion of Purdue opioids at Boston University, Massachusetts General Hospital, and Tufts University.

602. Stewart knowingly and intentionally sought to conceal his misconduct.

❖ ❖ ❖ **2007** ❖ ❖ ❖

603. In May 2007 — immediately after the 2007 convictions — Stewart began planning to expand Purdue's sales force in Massachusetts and across the country. Even though Purdue sales reps were already visiting Massachusetts prescribers more than 1,000 times each month, Stewart and Sales VP Russell Gasdia worked to quantify the "market impact" that adding sales reps would have.[714]

604. In June, Stewart met with Purdue's sales managers, including the Massachusetts district and regional managers, to present his vision for selling opioids.[715]

605. In July, Stewart received the first of more than twenty reports he would receive during his tenure as CEO, detailing the number and breadth of Purdue's sales reps across the country, including in Massachusetts. Staff also told Stewart that Purdue received 572 Reports of

[714] 2007-05-29 email from John Stewart, PPLPC012000143430.
[715] 2007-06-11 email from Russell Gasdia, PPLPC012000145260.

Concern about abuse and diversion of Purdue opioids during Q2 2007 — including several reports from Massachusetts.[716]

606. Staff told Stewart that Purdue had mailed 12,528 marketing pieces to prescribers and others in the first half of 2007. The most-distributed item was volume #1 of Purdue's "*Focused and Customized Education Topic Selections in Pain Management*" (FACETS),[717] which falsely instructed doctors and patients that physical dependence on opioids is not dangerous and instead improves patients' "quality of life." FACETS also falsely told doctors and patients that signs of addiction are actually "pseudoaddiction," and that doctors should respond by prescribing more opioids.[718] Staff told Stewart that another of the publications they had sent most often to doctors was "*Complexities in Caring for People in Pain*."[719] In it, Purdue repeated again its false claim that warning signs of addiction are really "pseudoaddiction" that should be treated with more opioids.[720]

607. Under Stewart's oversight, Purdue sent both of those misleading materials to doctors in Massachusetts hundreds of times.[721]

608. In September, Stewart approved distributing the deceptive book *Responsible Opioid Prescribing*, sponsored by Purdue, which reinforced Purdue's deceptive message that the clear majority of patients were "trustworthy," meaning that they were not vulnerable to addiction.[722]

[716] 2007-07-15 Board report, pg. 33, 52, PWG000300817-836.
[717] 2007-07-15 Board report, pg. 34, PWG000300818.
[718] 2007-08-29 "Focused and Customized Education Topic Selections in Pain Management", Vol. 1, pgs. 51, 53, PTN000004691, -693.
[719] 2007-07-15 Board report, pg. 34, PWG000300818.
[720] 200709-03 "Complexities of Caring for People in Pain", pg. 8, PTN000005318.
[721] 2010-08-26 Medical Education Materials for HCPs, PWG000247083, -084.
[722] 2007-09-06 email from John Stewart, PWG000184869.

609. As Stewart continued to work to expand the sales force, he knew that the national Blue Cross/Blue Shield association instructed its members, including Blue Cross/Blue Shield of Massachusetts, to not partner with Purdue, because the association was "concerned about what [Purdue's] sales people were telling doctors."[723]

610. In October, Stewart reported to the Board that Purdue received 284 Reports of Concern about abuse and diversion of Purdue's opioids in the most recent quarter and 39 tips to Purdue's compliance hotline.[724] Nevertheless, staff told Stewart and the Board that they should authorize a sales force expansion because the existing force was "unable to cover a large percentage of high prescribers."[725]

**❖ ❖ ❖ <u>2008</u> ❖ ❖ ❖**

611. In January 2008, staff told Stewart that, in 2007, Purdue's net sales were just over $1 billion, almost "DOUBLE" what the company had planned with OxyContin making up more than 90% of those sales. Staff also told Stewart that they represented Purdue at the Massachusetts General Hospital Purdue Pharma Pain Center in Boston on November 1 and at a Tufts University course on "Pain Policy: Opioid Laws and Policies" in Boston on October 31.[726]

612. In February, the Board approved Stewart and Gasdia's proposal to expand the sales force.[727] As a result, Stewart knew and intended that more sales reps would promote opioids to prescribers in Massachusetts by misleading doctors and concealing the true risks of Purdue's opioids. In fact, sales reps newly hired in the 2008 expansion promoted Purdue opioids

---

[723] 2007-09-30 email from Russell Gasdia, PPLPC012000156284.
[724] 2007-10-15 Board report, pgs. 36, 60, PPLPC012000157437, -461.
[725] 2007-10-26 email from Russell Gasdia, PPLPC012000159020; 2007-10-25 Sales & Marketing presentation, slide 4, PPLPC012000159022.
[726] 2008-01-15 Board report, pgs. 16, 24, PDD8901733989, -997.
[727] 2008-02-08 Board minutes, PKY183212620.

to Massachusetts prescribers more than 13,000 times.[728]

613. Stewart wrote to Richard Sackler that Purdue's reformulated OxyContin with so-called abuse-deterrent properties "will not stop patients from the simple act of taking too many pills."[729] Still, Stewart worked to include abuse-deterrent claims in the label of reformulated OxyContin and heralded the reformulation of OxyContin as a solution to the problems caused by opioid abuse, misleadingly focusing on crushing and injecting even though he knew that swallowing intact pills is the most common form of abuse.[730]

614. In March, Stewart presented the details of the OxyContin savings card program to the Board. He explained that offering savings cards increased the share of patients who use branded OxyContin by fifteen percent.[731]

615. In April, staff told Stewart they promoted Purdue's opioids in Massachusetts at Tufts Health Care Institute's program on Opioid Risk Management in Boston on March 27.[732]

616. In July, staff told Stewart that Purdue had bought one hundred new Pontiac Vibes to shuttle around the expanded Sales Force he had proposed. Staff also told Stewart that they promoted Purdue's opioids to clinicians, fellows, and medical residents in Massachusetts in a presentation titled "*The Assessment and Management of Chronic Pain with an Emphasis on the Appropriate Use of Opioid Analgesics*" at the Tufts University MSPREP Program in Boston on April 25; and in a presentation titled "*The Role of Urine Drug and other Biofluid Assays in Pain Management,*" at the Tufts Health Care Institute's program on Opioid Risk Management in

[728] Exhibit 1.
[729] 2008-02-22 email from John Stewart, PPLPC012000172201.
[730] 2010-10-27 email from John Stewart, PDD8901374440; 2010-04-28 email from John Stewart, PDD8901562111; 2011-09-28 presentation by John Stewart, slides 9-11, PWG000245725-727; 2011-09-28 presentation by John Stewart, slides 23-30, PWG000245754-761; 2012-03-06 speech by John Stewart, PWG000245479.
[731] 2008-03-07 email from John Stewart, PPLPC012000173909; 2008-03-07 board agenda, PPLPC012000173911, -950-970.
[732] 2008-04-15 Board report, pg. 16, PDD8901724449.

Boston on June 26 and 27.[733] Convincing Massachusetts doctors that Purdue opioids were the best way to manage chronic pain and that urine tests protected patients from addiction were both part of Purdue's deceptive scheme.

617. In October, staff told Stewart that the sales force expansion had been implemented and Purdue now employed 414 sales reps — an increase of more than 100 reps.[734] The expansion of the sales force that Stewart had recommended had its intended effect in Massachusetts: during the third quarter of 2008, Purdue sales reps visited Massachusetts prescribers more than 1,800 times — a 20% increase compared to the same period in 2007.[735]

❖ ❖ ❖ **2009** ❖ ❖ ❖

618. In March 2009, Stewart and Richard Sackler discussed a decline in OxyContin's market share. Both men wanted more. Stewart stressed that it would not be enough merely to get patients onto Purdue opioids, but that they needed to get patients onto the most profitable prescriptions: "the key consideration is more likely to be Purdue's share of the $ market (as opposed to Rx's)."[736] Both men knew that the most profitable prescriptions were those for the highest doses.

619. In April, staff told Stewart that Purdue had increased prescribers' use of high dose opioids: "for the first time since January 2008, OxyContin 80mg strength tablets exceeded the 40mg strength tablets during December 2008." Staff also told Stewart that Purdue received 122 tips to its compliance hotline during first quarter 2009, including tips regarding improper use of OxyContin marketing materials and opioid savings cards.[737]

---

[733] 2008-07-15 Board report, pgs. 21, 30, PPLP004367317, -326.
[734] 2008-10-15 Board report, pg. 26, PDD9316101027.
[735] Exhibit 1.
[736] 2009-03-18 email from John Stewart, PPLPC012000216786.
[737] 2009-04-16 Board report, pgs. 5, 24-25, PDD9316304317, -336-337.

620. In June, Stewart chaired a meeting of the Executive Committee, at which the recent expansion of the sales force was discussed. The Executive Committee explained that "there are a significant number of the top prescribers of Oxycodone ER" that Purdue had not been able to visit with its previously smaller force of sales reps."[738]

621. In October, staff told Stewart and the Board: "The Sales Force expanded by an additional 50 territories as of July 2009," and Purdue had hired even more sales reps since, to total 475 sales reps in all. Staff reinforced earlier reports that a nationwide review of District Managers in the sales force had required extensive corrective action, but Stewart did not follow up that report with any discipline for executives.[739]

622. In November, following a question from Richard Sackler, staff told Stewart and the Board that Purdue promoted OxyContin as reducing pain faster, having less variability in blood levels, and working for more pain conditions than competitor products.[740] Stewart knew that there was no support for these claims in OxyContin's FDA-approved labeling.

623. That same month, Stewart sought Board approval to resume funding the *Massachusetts General Hospital Purdue Pharma Pain Program* to promote Purdue's opioids in Massachusetts.[741]

624. In December, Stewart prepared 2010 objectives for the sales and marketing team, including how many times sales reps should visit prescribers to promote opioids and how managers should supervise the reps. Stewart wrote that the target for face-to-face promotion to

[738] 2009-05-20 Executive Committee notes, PPLPC012000226606.
[739] 2009-10-20 email from John Stewart, PPLPC012000242813; 2009-10-22 Board report, pgs. 4, 16, 21, PPLPC016000007322, -334, -339.
[740] 2009-11-02 budget presentation, PPLPC012000249329.
[741] 2009-11-02 budget presentation, PPLPC012000249337.

prescribers would be 540,000 sales visits, and staff would have to report the number of sales visits, compared to the target and compared to the prior year, at the end of every quarter.[742]

## ❖ ❖ ❖ **2010** ❖ ❖ ❖

625. In January 2010, Stewart informed staff about the Board's decision to increase the sales target to $3.1 billion in sales, more than $100 million more than in 2009.[743]

626. In February, staff reported to the Board Stewart's sales objective of at least 545,000 visits to prescribers to promote Purdue opioids in year 2010.[744] That target rose to 712,000 visits in 2011, 752,417 in 2012, and 744,777 in 2013.[745]

627. At Stewart's urging, the Board voted to increase the number of sales reps again, so that Purdue employed 490 sales reps nationwide, including 14 in Massachusetts.[746]

628. Staff regularly told Stewart exactly how many times Purdue sales reps visited prescribers to promote opioids in the most recent three months, how that total compared to the budget, how many prescribers an average rep visited on an average day, and what Purdue staff were doing to increase the number of opioid sales visits.

629. Stewart and his staff discussed new sales techniques that McKinsey had developed. McKinsey estimated that new sales tactics would increase OxyContin sales by $200-400 Million annually.[747] Stewart wanted control over any further work by McKinsey, and required his personal approval for any additional work orders with them. He later approved

[742] 2009-12-22 email from John Stewart, PPLPC012000249344; 2009-12-22, 2010 Objectives, PPLPC012000249345.
[743] 2010-01-27 email from John Stewart, PPLPC012000252171; 2010-01-26 Executive Committee notes, PPLPC012000252176.
[744] 2010-02-01 Board report, pg. 23, PPLPC012000252797.
[745] 2011-05-02 Board report, pg. 3, PPLPC012000322428; 2012-04-30 Board report, pg. 3, PPLPC012000374793; 2013-05-13 Board report, pg. 7, PPLP004367546.
[746] 2010-02-01 Board report, pgs. 4, 19, PPLPC012000252778, -793; Exhibit 1.
[747] 2010-01-20 Executive Committee notes, PPLPC012000257446.

another McKinsey project on how to increase OxyContin sales even more.[748]

630. In March, Stewart requested a report about the Massachusetts OxyContin and Heroin commission, which the legislature had formed in 2008 to understand the thousands of opioid-related deaths. The commission reported, among other things: "Addiction to the powerful painkiller, OxyContin, became evident almost immediately following FDA approval of the drug in 1995."[749]

631. That same month, Stewart met with staff who told him that a key selling point for OxyContin (compared to a competitor) was that OxyContin could be used by patients who had not taken opioids before.[750] Stewart knew and intended that Purdue sales reps encouraged Massachusetts doctors to prescribe OxyContin for patients who had never taken opioids.

632. In April, Stewart formally approved the sales target of 545,000 OxyContin calls on prescribers for the year 2010.[751]

633. That same month, staff reported to Stewart and the Board that OxyContin was so risky Purdue could not get product liability insurance for it. Staff told Stewart that they were pushing back against the "threat" of public health rules that would limit high doses of opioids. They told Stewart that Purdue would oppose measures that asked doctors to consult with pain specialists before putting patients on high doses of opioids.[752]

---

[748] 2010-02-16 Executive Committee notes, PPLPC012000258759; 2014-07-07 email from John Stewart, PPLPC012000431279.
[749] https://archives.lib.state.ma.us/bitstream/handle/2452/46748/ocn466141823.pdf?sequence=1&isAllowed=y
[750] 2010-03-17 Executive Committee notes, PPLPC012000267960.
[751] 2010-04-06 email from John Stewart, PPLPC012000266606; 2010-04-06 Marketing & Sales draft for Board report, PPLPC012000266607.
[752] 2010-04-21 Board report, pgs. 15-16, PWG000423154-155. 2010-10 budget submission, pg. 29, PDD9273201317. In November 2010, staff reported to the Board that Purdue had collected $343,800,000 in liability insurance payments, including $151,700,000 for settlements and $192,100,000 for legal fees.

634. In June, Stewart presented the Board with the projected number of sales reps to promote each Purdue product over the next 10 years.[753] Stewart approved the mix of products the sales force was already promoting and applauded their progress on meeting targets.[754]

635. In July, Stewart invited sales and marketing managers to attend the board meeting and strategize even more sales force expansion.[755] Stewart knew and intended that, because of this undertaking, more sales reps would promote opioids to prescribers in Massachusetts. In fact, new sales reps hired in the 2010 expansion promoted Purdue opioids to Massachusetts prescribers more than 4,000 times.[756]

636. In September, Stewart and Gasdia discussed how sales reps should talk to doctors about reformulated OxyContin. In the wake of 770 calls in one week from patients, caretakers, and prescribers to Purdue for concerns like adverse events, Stewart told Gasdia to have sales reps stay on message. He told Gasdia that there was no need to have sales reps say more on these issues with prescribers. [757] Stewart frequently made decisions about what sales reps should say to doctors, and sales reps in Massachusetts used the words and phrases that Stewart chose.

637. In October, staff told Stewart that Purdue employed 506 sales reps and that, during the third quarter 2010, they visited prescribers 141,116 times.[758] More than 2,600 of those visits were in Massachusetts.[759]

638. Staff reported to Stewart and the Board that Purdue would promote opioids at more than a dozen programs in Massachusetts.[760]

---

[753] 2010-06-15 email from John Stewart, PPLPC012000275713.
[754] 2010-06-22 email from John Stewart, PPLPC012000276415.
[755] 2010-07-22 Board minutes, PKY183212838; 2010-07-20 email from John Stewart, PPLPC012000279588.
[756] Exhibit 1.
[757] 2010-09-08 email from John Stewart, PPLPC012000286538.
[758] 2010-10-25 Board report, pgs. 3, 26, PWG000421967, -990.
[759] Exhibit 1.

639. That same month, Stewart and other executives discussed the ongoing implementation of the latest sales force expansion, including staffing 125 new sales territories.[761]

640. Stewart also heard a presentation stating that drug company leaders can be punished for misconduct and "owners, officers, and managers will especially face even more serious scrutiny in the future."[762]

641. In November, Stewart traveled to Massachusetts to promote Purdue's opioids. He met with Massachusetts General Hospital to discuss Purdue's grant.[763] Ultimately, Stewart would obtain for MGH an additional $500,000 per year for three years from the Board, with the goal of increasing prescriptions of opioids, including OxyContin.[764] MGH produced a Purdue-funded program called "Advances in Managing Chronic Pain."[765]

642. In December, Stewart informed the Board that "region 0 accounts for much of the [prescription] decline at the regional level" after the reformulation of OxyContin.[766] *Region Zero* was Purdue's list of suspicious prescribers, which it stopped promoting to, but continued to profit from, by failing to report them to authorities.

643. On Christmas Eve, Stewart reviewed printed marketing materials and sales rep training for Butrans, including the titration guide which Purdue trained its sales reps to use to push doctors to prescribe higher and more profitable doses.[767]

---

[760] The programs were at Massachusetts institutions Tufts University, Boston University, Pri-Med Institute, Northeastern University, Massachusetts College of Pharmacy, and American Health Resources. 2010-10-07 report attached to email by William Mallin, pgs. 3, 5, 10, 13, 16, 26, 28, 33, 34, PPLPC012000292676, -678, -683, -686, -689, -699, -701, -706-707; 2010-10-07 Report attached to email by William Mallin, PPLPC012000292759-60.
[761] 2010-11-10 Executive Committee notes, PPLPC012000299854.
[762] 2010-11-10 Executive Committee notes, PPLPC012000299855; 2010-11-10 Slideshow presentation by Bert Weinstein, slide 7, PPLPC012000299866.
[763] 2010-11-19 email from David Haddox, PTN000018983.
[764] 2011-06-13 Budget spreadsheet, PPLPC012000329085
[765] 2011-07-11 email from Teri Toth PPLPC017000311119–120.
[766] 2010-12-01 presentation by John Stewart, slide 4, PPLPC012000300458.
[767] 2010-12-24 email from John Stewart, PPLPC012000304469; 2010-12-23 proposed Butrans titration guide, PPLPC002000086956.

## ❖ ❖ ❖ **2011** ❖ ❖ ❖

644. In January 2011, staff told Stewart and the Board that Purdue employed 590 sales reps and that, during the most recent quarter, they visited prescribers 125,712 times.[768] More than 2,900 of those visits were in Massachusetts.[769]

645. Staff also reported to Stewart that Purdue had completed one of its key initiatives that Stewart had proposed; it hired 74 more sales reps during Q4 2010 and planned to hire 51 more reps during Q1 2011.[770]

646. In February, staff gave Stewart and the Board a map correlating dangerous prescribers in Massachusetts with reports of oxycodone poisoning, burglaries, and robberies. Staff told Stewart and the Board that the company was receiving a steadily rising volume of hotline calls and other compliance matters, reaching an all-time high during October, November, and December 2010.[771] Staff also presented an analysis of penalties imposed on pharmaceutical companies for illegal marketing. That analysis concluded that penalties for breaking the law are "relatively small . . . compared to the perpetrating companies' profits."[772]

647. Later that month, Stewart met with Gasdia, Landau, and others to discuss legislation that had been introduced in Massachusetts to ban extended-release oxycodone, including Purdue's OxyContin.[773]

648. In March, Richard Sackler asked Stewart and others to explain to the Board the barriers that sales reps were encountering in their promotion and "what [was] being done to

[768] 2011-01-24 Board report, pgs. 4, 35, PWG000421551, -582.
[769] Exhibit 1.
[770] 2011-01-24 Board report, pg. 4, PWG000421551.
[771] 2011-02-03 presentation by Bert Weinstein, slides 23, 95, PDD8901468038, -109.
[772] 2010-12-16 study by Public Citizen's Health Research Group, pg. 2, PDD8901468062.
[773] 2011-01-26 Executive Committee notes, PPLPC012000312667-668.

overcome them.[774] In April, Stewart met with Gasdia to form a plan to reverse declining Butrans sales.[775] Stewart tracked sales numbers and sought to head off problems by aggressive marketing. In May, Stewart co-authored Purdue's plans to increase targeting of high prescribers, which included further expanding the sales force.[776]

649. When Jonathan Sackler complained to Stewart about sales ("This is starting to look ugly"), Stewart turned around and ordered Sales VP Russell Gasdia to increase prescriptions.[777] Stewart gave Gasdia 48 hours to deliver a comprehensive plan:

> "the action plan should have elements specifically directed at: sales force call targeting; sales force prescriptions by representative (range from high to low, and what 'performance improvement plans' are being put in place for those in the lowest deciles; key questions/obstacles being identified from the field and medical services, and how they are being addressed; what other information the sales force feels will help boost sales; the current situation with each of the major MCOs [managed care organizations], and the plan and targets going forward (with specific dates); and key marketing activities and their start date that by themselves may help boost sales."[778]

650. That same month, staff told Stewart and the Board that Purdue had hired 47 more sales reps in the most recent expansion and now employed 639. Staff told Stewart and the Board that, during the first quarter of 2011, the sales reps visited prescribers 173,647 times during.[779] More than 3,800 of those visits were in Massachusetts.[780]

651. In June, Stewart, in discussion with Landau and others, recognized that Purdue's opioid sales were hundreds of millions of dollars less than expected, in part, because doctors

---

[774] 2011-02-25 email from Richard Sackler, PPLPC012000313544.
[775] 2011-04-20 email from John Stewart, PPLPC012000321001.
[776] 2011-05-01 email from John Stewart, PPLPC012000322363; 2011-05-01 Purdue business strategy draft, PPLPC012000322364.
[777] 2011-05-25 email from Jonathan Sackler, PPLPC012000326097.
[778] 2011-05-25 email from John Stewart, PPLPC012000326096.
[779] 2011-05-02 Board report, pgs. 5-6, 36, PPLPC012000322430-431, -461.
[780] Exhibit 1.

were prescribing the highest doses less often.[781] Those decreases in prescribing included reductions of $300 million by prescribers who had been placed in *Region Zero*.[782]

652. Continuing in June, Gasdia told Stewart that early Butrans sales were trending up, and that the next strategy to sell even more Butrans was "increasing call frequency to the highest prescribers."[783]

653. In August, Stewart informed Gasdia that lower-than-expected OxyContin sales were due to decreased demand for the highest strengths — setting the stage for another push to get doctors to prescribe higher doses.[784]

654. In September, Stewart gave a speech titled *Providing Relief, Preventing Abuse* in Connecticut, which deceptively blamed the addiction, overdose, and death on "abuse"— deploying Richard Sackler's time-worn strategy to "hammer on the abusers in every way possible" — to draw attention away from how dangerous Purdue opioids were for everyone.[785]

655. In October, Stewart pushed Gasdia for information on the Butrans sales projections and threatened to cut Purdue's marketing and sales investment if Gasdia couldn't turn Butrans sales around.[786]

---

[781] 2011-05-12 Executive Committee notes, PPLPC012000327303.
[782] 2011-06-15 memo from Kim Gadski, PPLPC012000329460.
[783] 2011-06-03 email from Russell Gasdia, PPLPC012000327538-541.
[784] 2011-08-12 email from John Stewart, PPLPC012000338554.
[785] 2011-09-28 presentation by John Stewart, PWG000245717; 2001-02-01 email from Richard Sackler, PDD8801133516.
[786] 2011-10-12 email from John Stewart, PPLPC012000347134.

## ❖ ❖ ❖ **2012** ❖ ❖ ❖

656. In January 2012, Stewart had his staff report to the Board that Purdue employed 632 sales reps.[787] In the fourth quarter of 2011, they visited Massachusetts prescribers more than 3,600 times.[788]

657. In February, staff told Stewart that patients on higher doses of Butrans stayed on that opioid longer, and that sales reps would press doctors to move patients to higher doses rapidly to keep them on Butrans longer. This reinforced Stewart's strategy to promote higher doses. [789]

658. In March, Gasdia pleaded with Stewart to try to trim back Richard Sackler's micromanagement of sales. Stewart replied that "I work on this virtually every day," and asked Gasdia to continue to "spur me to get involved directly." [790]

659. That same week, Stewart gave another *Providing Relief, Preventing Abuse* speech making the same misleading statements as before: that pain is undertreated and that patients are to blame for addiction, overdose, and death because of "abuse." Stewart used these tactics to draw attention away from how dangerously addictive Purdue's opioids were for everyone.[791]

660. In March, Stewart also created another 10-year projection, emphasizing that "one-on-one interactions between healthcare professionals and the company's Sales and Marketing staff will be the primary driver" of prescriptions. Stewart also planned for Purdue to continue to push under-treatment of pain as a major message. Finally, the plan highlighted that sales could be increased by falsely convincing doctors that they could and should prescribe more to patients

[787] 2012-01-25 Board report, pg. 48, PPLPC012000362291.
[788] Exhibit 1.
[789] 2012-02-12 email from David Rosen, PPLPC012000364028-029.
[790] 2012-02-07 email from John Stewart, PPLPC012000368569.
[791] 2012-04-09 email from Joseph Pisani, PWG000217342.

deemed to have low risk of addiction and that patients who were at risk of addiction were really just illegal drug users.[792]

661. In April, Stewart continued his focus on higher doses. He wrote to Gasdia that Richard Sackler's frustrations about both Butrans and OxyContin could be linked to dosing. He encouraged Gasdia to tell Sackler that patients on lower doses seemed to stop taking opioids sooner, and that much of the profit that Purdue had lost had been from doctors backing off the highest dose of OxyContin (80mg).[793]

662. In May, Stewart reiterated to Gasdia the importance of getting prescribers to use higher doses and doing so "faster than the projections indicate." He told Gasdia that the lowest dose of Butrans should be "considered more of a starter dose" from which Purdue would encourage almost everyone to move up. This would enable Purdue to collect "more $ value per script." Stewart told Gasdia that he would join Gasdia's team in their detailed Butrans performance review to get their sales strategy straight for the mid-year meeting with the Board.[794]

663. In June, Stewart directed one of his staff to attend the International Conference on Opioids, which was held at Harvard Medical School in Boston that month. Staff reported that people at the conference compared Purdue to the tobacco companies.[795]

664. In July, Stewart directed his staff to hire McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales." Following interviews with doctors and sales reps, McKinsey recommended doubling down on Purdue's strategy of targeting high prescribers for even more sales calls, highlighting an analysis of a Massachusetts

[792] 2012-03-27 business strategy plan, pgs. 8, 10, 30, PWG000164127, -129, -149.
[793] 2012-04-16 email from John Stewart, PPLPC012000372620.
[794] 2012-05-16 email from John Stewart, PPLPC012000376527.
[795] 2012-06-11 email from Russell Gasdia, PPLPC012000380788.

prescriber to make their case.[796] The following year, Purdue's sales reps called on one of the highest-prescribing Massachusetts doctors more than a hundred times.[797]

665. That month, Stewart reported to the Board that Massachusetts now allowed drug companies to use copay savings cards and to host dinners for doctors to promote their drugs.[798]

666. In August, Stewart reported to the Board that he had commissioned a study to "determine if [Butrans] patients who are titrated up have longer persistence," and planned to use the results to "inform targeting and messaging." Stewart also reported on completed studies which showed the average new OxyContin patient remains on OxyContin for 125 days, and that OxyContin sales would increase with additional sales calls on "select high ROI targets."[799] One of those "high ROI targets" in Massachusetts, Walter Jacobs, lost his license due to unlawful overprescribing in 2012, after years of being Purdue's paid spokesman and top prescriber in the Commonwealth.

667. Stewart knew how sales visits influenced prescribing. In October, Stewart and Gasdia discussed directing the sales force to focus more on OxyContin and less on Butrans because the increase in OxyContin sales would be greater than the reduction in Butrans sales.[800]

668. That same month, Stewart directed his staff to draft an email, that he then reviewed and edited, briefing the Board on Purdue's objections to proposals by Physicians for Responsible Opioid Prescribing which sought to limit the number of patients on opioids, their

---

[796] 2012-06-15 email from John Stewart, PPLPC012000383032; 2012-06-14 memo on McKinsey project, PPLPC012000382450; 2012-07-12 email from John Stewart, PPLPC012000383138; 2013-09-05 McKinsey report, pg. 41, PPLPC002000156120.
[797] Exhibit 1.
[798] 2012-07-23 Board Report, pg. 39, PPLPC012000387107.
[799] 2012-08-05 email from John Stewart, PPLPC012000388080; 2012-07-11 overview of studies for Board report, PPLPC012000388087-088.
[800] 2012-10-10 email from John Stewart, PPLPC012000394639.

doses, and the duration of use.[801]

❖ ❖ ❖ **2013** ❖ ❖ ❖

669. In early 2013, Stewart and his staff continued to reinforce the *Individualize The Dose* campaign, which Stewart knew and intended would promote higher doses. Stewart and his sales staff also focused on promoting use of the opioid savings cards, including giving cash bonuses to sales reps for driving their use, which Stewart knew and intended would keep patients on opioids longer.[802]

670. In February, Stewart drafted proposed sales scripts around the abuse-deterrent formulation of OxyContin, such as:

> "Reflecting the depth of its commitment to drug safety and patient health, Purdue Pharma has introduced an abuse-deterrent formulation of OxyContin tablets - that is difficult to manipulate for the purpose of intentional abuse, misuse, and diversion."[803]

Although Stewart knew the reformulation would not deter abuse by swallowing pills — the most common route of abuse — the sales scripts did not disclose that. Rather, they focused on crushing and dissolving to deceive doctors into believing that the reformulation was safe.[804] Stewart and the team débuted these messages to the sales force in May, and sales reps began using them thereafter.

671. In May, Stewart continued writing sales pitches for the abuse-deterrent formulation of OxyContin.[805] Again, none of those statements disclosed that swallowing pills is most common form of abuse.[806] Stewart discussed his sales pitches with top executives, and the

---

[801] 2012-10-03 email from John Stewart, PWG000415151.
[802] 2013-01-28 Board report, pg. 13, PPLPC012000407139.
[803] 2013-02-19 email from John Stewart, PPLPC012000409154; 2013-02-19 draft of proposed communicates, PPLPC012000409160.
[804] 2013-02-19 draft of proposed communicates, PPLPC012000409156.
[805] 2013-05-03 email from John Stewart, PPLPC012000421593.
[806] 2013-05-03 guidance for sales reps, PPLPC012000421798.

team planned to roll them out to the sales force later that month.[807] In the second half of 2013, Purdue's sales reps used Stewart's misleading sales messages at least 100 times in Massachusetts.

672. Stewart hand-edited a presentation explaining that the decrease in high dose prescriptions was causing declining revenue, and that Purdue would respond by: making more OxyContin sales calls, pressing forward with the *Individualize The Dose* campaign, and promoting opioid savings cards. Stewart intended that these initiatives would get patients on higher doses for longer periods.[808]




*Stewart's notes on a slide identifying the problem of lower sales in higher doses*




*Stewart's notes on a slide with Purdue's plan to address the problem*

---

[807] 2013-05-03 email from Ronald Cadet, PPLPC012000421795.
[808] 2013-05-22 mid-year sales update, slides 4, 14, PPLPC012000424611, -621.

673. Meanwhile, staff reported to Stewart and the Board that they were continuing to use opioid savings cards to get patients to "remain on therapy longer." Staff told Stewart that they were now using direct mail and email, as well as in person sales visits, to push the opioid savings cards.[809]

674. Despite these sales efforts, Stewart knew that Purdue was losing tens of millions of dollars in revenue because fewer patients were being prescribed higher doses of opioids and patients were being prescribed fewer pills in each prescription. Staff told Stewart: "there is an 'unfavorable' mix of prescriptions across strengths," and sales of the highest doses were too low. Staff reminded Stewart of the second problem: "lower average tablet counts per prescription."[810]

675. In July, Stewart directed Gasdia to develop a way to "identify consistently low performers" in the sales force. He also instructed Gasdia to tell the sales force that they should be doing half of their calls on OxyContin, half on Butrans.[811]

676. That same month, staff told Stewart and the Board that OxyContin sales had dropped $96,400,000 from the year before because Purdue had fewer sales reps selling OxyContin to doctors.[812] Stewart explained to Mortimer Sackler that he had hired McKinsey consultants to study how to get doctors to prescribe more OxyContin.[813]

677. Meeting with his External Affairs Committee, Stewart discussed concerns about "threats" from "data on long term use of opioids."[814] Stewart knew in 1997 that long term use leads to more adverse events and he was worried that the public was figuring it out.[815]

[809] 2013-05-13 Board report, pg. 18, PPLP004367557.
[810] 2013-05-13 Board report, pg. 8, PPLP004367547.
[811] 2013-07-11 email from John Stewart, PPLPC012000435411.
[812] 2013-07-05 email from Edward Mahony, PPLPC012000431149; 2013-07-05 email from Edward Mahony, PPLPC012000431312.
[813] 2013-07-07 email from John Stewart, PPLPC012000431262.
[814] 2013-07-24 Communications and External Affairs Committee minutes, PPLPC012000433553.
[815] 1997-03-12, memo from John Stewart, PDD1701785443.

678. Stewart and his staff continued to focus on “the decline in higher strengths” of Purdue opioids, and the decline in “tablets per Rx,” which were reducing Purdue’s profit. One “specific concern” for Purdue had been Massachusetts legislation to essentially ban OxyContin in Massachusetts, which Purdue had advocated against and defeated.[816] Stewart knew and intended that Purdue was promoting and selling OxyContin in the Commonwealth.

679. Staff also reported to Stewart that they had trained Purdue’s sales reps to use new sales materials designed to get patients on higher doses of opioids for longer periods. Purdue employed 634 sales reps and, during the second quarter of 2013, they visited prescribers 177,773 times. Staff assured Stewart that they were trying to increase sales visits by increasing communication to sales representatives and monitoring sales reps more closely.[817] During that quarter, Purdue sales reps visited Massachusetts prescribers more than 2,400 times.[818]

680. In August, Stewart presented to the Board about OxyContin growth opportunities. He identified diminished use of the highest doses as a major factor in declining sales and explained that OxyContin prescriptions would increase with more sales calls.[819]

681. That same month, the McKinsey consultants Stewart hired reported back to Purdue on tactics to get more patients on higher doses of opioids.[820] McKinsey recommended that Purdue could drive opioid prescriptions higher by targeting the highest-prescribing doctors and sending sales reps to visit each top prescriber dozens of times per year. McKinsey pointed to

[816] 2013-07-23 Board report, pgs. 25, 52, PPLPC012000433412, -439.
[817] 2013-07-23 Board report, pgs. 10-12, 59, PPLPC012000433397-398, -446.
[818] Exhibit 1.
[819] 2013-08-14 presentation by John Stewart and Russell Gasdia, slides 2, 4, PPLPC012000436355.
[820] 2013-08-22 email from Russell Gasdia, PPLPC012000437344 (McKinsey interim report).

a "true physician example" of a doctor in Wareham, Massachusetts, who wrote 167 more OxyContin prescriptions after Purdue sales reps increased their visits to him.[821]

682. In September, Stewart initiated *Project Turbocharge*, based on recommendations from McKinsey to drastically increase OxyContin sales calls and change the way Purdue targets prescribers.[822] This initiative was renamed *E2E: Evolve to Excellence* and would be the theme of the 2014 National Sales Meeting.[823]

683. Also in September, Stewart told the Board he was working to oppose the incorporation of 90-day limits into the FDA's pain management guidelines or regulations.[824] Stewart knew that patients who stay on opioids longer have more adverse events, but that they were also more profitable for Purdue.[825] In fact, in Massachusetts, patients who use opioids for longer than 90 days are thirty times more likely to die of opioid-related overdoses than the general population.

684. Later that month, Stewart criticized Gasdia and other staff for being "overly conservative" in their communications with doctors. Stewart directed that sales reps should promote Purdue's opioids for "moderate persistent pain" even though the FDA had removed the word "moderate" from the drugs' indications.[826]

685. In October, Stewart and Gasdia addressed concerns in the budget relating to the slowing growth in Butrans sales. Their new scheme to boost Butrans sales was to target

[821] 2013-08-22 McKinsey presentation, slide 10, PPLPC012000437356.
[822] 2013-09-16 email from John Stewart, PPLPC012000441611; 2013-09-11 memo from McKinsey Corporation, PPLPC012000441614.
[823] 2013-09-23 email from Russell Gasdia, PPLPC012000442736; 2013-09-18 near term implementation plant, slide 5, PPLPC012000441799.
[824] 2013-09-11 email from John Stewart, PPLPC002000159015.
[825] 1997-03-12, memo from John Stewart, PDD1701785443.
[826] 2013-09-30 email from John Stewart, PPLPC012000444465-466.

"specific populations (e.g. the elderly)."[827] Stewart was instrumental in Purdue's strategy to target especially vulnerable patients.

686. In November, staff reported to Stewart that a key initiative during the third quarter of 2013 was for sales reps to promote OxyContin for patients who had never taken opioids before.[828] In Massachusetts during 2013, Purdue sales reps reported to Purdue that they pushed opioids for opioid-naive patients dozens of times. The sales reps did not disclose to doctors that opioid naive patients faced greater risks of overdose and death.

687. Staff reported to Stewart and the Board that another key initiative was for sales reps to encourage doctors to prescribe OxyContin to elderly patients on Medicare.[829] In Massachusetts during those three months, sales reps reported to Purdue that they pushed opioids for "elderly" or "Medicare" patients more than 300 times. The sales reps did not consistently disclose to doctors that elderly patients faced greater risk of drug interactions, injuries, falls, and suffocating to death by taking OxyContin. Some sales reps even made claims that OxyContin did the opposite, for example, that it reduced the risk of falls. At least 23 Massachusetts patients aged 65 and older who were prescribed Purdue opioids later died of opioid-related overdoses.

688. Staff also told Stewart and the Board that analysis conducted in July showed that opioid savings cards earned the company more money by keeping patients on opioids longer; specifically, more patients stayed on OxyContin longer than 60 days. Staff reported that Purdue was pushing opioid savings cards through Purdue sales reps, through email to tens of thousands of health care providers, and online.[830]

---

[827] 2013-11-12 email from John Stewart, PPLPC012000451664; 2013-10-29 budget presentation, PPLPC012000451665.
[828] 2013-11-01 Board report, pg. 14, PPLPC002000186924.
[829] 2013-11-01 Board report, pg. 15, PPLPC002000186925.
[830] 2013-11-01 Board report, pg. 15, PPLPC002000186925.

689. During 2013, Purdue sales reps promoted opioid savings cards to Massachusetts doctors thousands of times. The sales reps did not tell doctors that savings cards led patients to stay on opioids longer than 60 days, or that staying on opioids longer increased the risk of addiction and death.

690. Staff explained to Stewart and the Board that in the fourth quarter of 2013, sales reps would increase the number of visits to prescribers.[831] In Massachusetts, during those three months, sales visits increased by 30%.[832]

691. Staff also reported to Stewart that a key initiative in 2013 was to train sales reps to keep patients on Butrans longer. They told Stewart that, at exactly the same time as the initiative to keep patients on opioids longer, Purdue launched a new high dose of its Butrans opioid. Sales reps began promoting the new high dose to physicians and initial orders were double the company's forecasts. Staff also reported to Stewart that marketing and sales activities generated 266,842 additional prescriptions and opioid savings cards generated especially "high returns" by keeping patients on opioids longer.[833]

692. Staff reported to Stewart and the Board that Purdue had sent more than 880,000 emails to health care professionals to promote its Butrans opioid, and posted online advertising garnering more than 5 million views for Butrans and nearly 4 million views for OxyContin. Staff told Stewart that these hundreds of thousands of communications pitched doctors with messages designed to get more patients on OxyContin at higher doses for longer periods of time.[834]

---

[831] 2013-11-01 Board report, pg. 11, PPLPC002000186921.
[832] Exhibit 1.
[833] 2013-11-01 Board report, pgs. 11-13, 27, PPLPC002000186921-23, -937.
[834] 2013-11-01 Board report, pgs. 14, 16, PPLPC002000186924, -926.

693. Staff also told Stewart and the Board that they would begin reviews of sales reps according to their sales ranking, with a focus on the bottom ten percent. They reported to Stewart that Purdue employed 637 sales reps and, during third quarter of 2013, they visited prescribers 179,640 times.[835] More than 2,200 of those visits were in Massachusetts.[836]

694. In December, Stewart informed Kathe Sackler and Gasdia that *Evolve 2 Excellence* — the aggressive sales strategy — was already increasing prescriptions and revenue. Stewart knew and intended that these changes in sales practices would drive increased prescriptions, including in Massachusetts.[837]

695. Stewart resigned from Purdue at the end of 2013.[838]

696. Stewart has collected substantial revenue from the sale of Purdue opioids in Massachusetts, as detailed in Exhibit 2.

697. While Stewart was Purdue's chief executive, at least 247 Massachusetts patients died of opioid-related overdoses after taking the drugs he sold.

[835] 2013-11-01 Board report, pgs. 11, 52, 55, PPLPC002000186921, -962, -965.
[836] Exhibit 1.
[837] 2013-12-02 email from John Stewart, PPLPC012000454422.
[838] John Stewart declaration.

**RUSSELL GASDIA**

698. Russell Gasdia worked at the heart of Purdue's deceptive sales campaign. From 2007 until 2014, Gasdia was Purdue's Vice President of Sales and Marketing. He was responsible for getting more patients on opioids, at higher doses, for longer periods of time. By breaking the law, he enjoyed the privileges of life as a top Purdue executive, and he exposed families across Massachusetts to addiction, overdose, and death.

❖ ❖ ❖

699. Gasdia worked for Purdue for three decades, from 1985 until his retirement at the end of 2014.[839] He started as a sales rep and ascended to District Sales Manager, Regional Sales Manager, National Sales Manager, Director of Sales, and, by 2007, Vice President of Sales and Marketing ("Sales VP").[840]

700. Gasdia had his hands on every part of Purdue's deceptive sales campaign: from the fundamentals of getting more patients on opioids at higher doses for longer periods; to the targeting of prolific opioid prescribers; to paying doctors to promote Purdue opioids; to concealing Purdue's list of problem doctors codenamed *Region Zero*; to deciding what would get a sales rep hired or fired. Gasdia was intimately involved with the Sacklers — carrying out hundreds of orders from Richard Sackler and others. And he took a special interest in promoting Purdue opioids in Massachusetts.

701. Because of his central role, much of Gasdia's misconduct has been described above. Those allegations are hereby realleged together with the allegations that follow.

[839] 2014-12-09 email from Russell Gasdia, PPLPC012000508727.
[840] 2008-06-01 deposition of Russell Gasdia, page 6:16-7:5, PWG003803377.

**More Patients**

702. Gasdia made sure Purdue sales reps visited Massachusetts prescribers tens of thousands of times. From 2007 to 2014, Gasdia oversaw Purdue's regional sales managers and sales reps, including in Massachusetts. He was also responsible for Purdue's training and marketing departments and its forecasting, sales administration, and contracting.[841]

703. Managing up, Gasdia told the Sacklers how many times sales reps would visit prescribers each day, each quarter, and each year.[842] Managing down, Gasdia tracked his subordinates' adherence to his targets and assigned them grades that determined their pay.[843]

704. Gasdia understood that sending sales reps to promote opioids would get more patients on opioids.[844] A detailed analysis he ordered showed Purdue opioid prescriptions by each doctor increasing from less than one per month to more than forty per month as sales reps visited doctors more often.[845]

705. Accordingly, Gasdia worked to expand the sales force, over and over, from around 300 sales reps in 2007 to more than 600 sales reps in 2014. In a 2008 presentation to the Board, Gasdia explained that adding 50 new sales reps would enable Purdue to reach 5,400 more prescribers and collect millions of dollars more profit.[846]

706. Then, he drove the sales reps to visits prescribers more often. Gasdia was Richard Sackler's voice in the field. When sales rep presentations to doctors and nurses fell, Gasdia ordered reps to visit prescribers more often to increase opioid use:

---

[841] 2012-02-04 email from Russell Gasdia, PPLPC012000362995.
[842] 2012-01-17 Sales and Marketing Board report, PPLPC012000359667.
[843] 2012-01-22 email from Russell Gasdia, PPLPC012000360275; 2013-03-10 email from Russell Gasdia, PPLPC012000412627.
[844] 2014-01-07 email from Russell Gasdia, PPLPC012000458541.
[845] 2008-10-05 email from Russell Gasdia, PPLPC021000200047; 2008-10-04 presentation attached to email from Russell Gasdia, PPLPC021000200048.
[846] 2008-01-17 email from Russell Gasdia, PPLPC012000166723; 2008-07-17 presentation to the Board, slide 2, PPLPC012000190563.

> "We are nowhere near the number of [sales] presentations required to meet our objective … which is unacceptable and a significant concern. I can't impress upon you enough the significant concerns at the Board level as well as senior management with regards to the OxyContin sales trends. We have assured the BOD that with an increase in [sales] presentations, we should see a lift in Rxs."[847]

707. Gasdia knew how sales reps increased prescriptions. He wrote scripts used to train Purdue sales reps — including, for example, the plan to use fake patient profiles to encourage prescribers to prescribe Butrans to patients who were not on opioids.[848] Gasdia directed the sales campaign down to the vocabulary reps used in their sales pitches. When staff edited a sales script to remove a question about the target doctor's patients, Gasdia ordered them to put it back in. He directed his subordinates that it was important to use real world language to motivate doctors, and that sales reps should ask specifically which patients the doctor would put on Purdue opioids.[849]

708. Gasdia reported to Richard Sackler "physicians more often than not commit to prescribing for a specific patient type" when they are visited by a Purdue sales rep.[850]

**Higher Doses**

709. Gasdia paid particular attention to selling higher doses. Analyzing results for 2011, he discovered that sales of most doses of OxyContin grew by $180,820 per sales rep from the year before. But sales of the especially profitable and dangerous 40mg and 80mg doses dropped by $321,826 per sales rep — wiping out all the gains.[851] From that point on, Gasdia devoted himself to getting more patients on higher doses of opioids.

---

[847] 2012-02-27 email from Russell Gasdia, PPLPC012000366690.
[848] 2010-07-05 email from Russell Gasdia, PPLPC012000277833-834; 2011-02-16 email from Russell Gasdia, PPLPC012000311888-889. Some of the profiles also promoted Butrans for osteoarthritis without disclosing that Purdue conducted a failed study of Butrans in osteoarthritis patients. See paragraphs 63–66, above.
[849] 2011-03-25 email from Russell Gasdia, PPLPC001000081969.
[850] 2011-02-07 email from Russell Gasdia, PPLPC012000309664; 2011-02-07 Butrans launch update, slide 7, PPLPC012000309665.
[851] 2012-03-08 email from Russell Gasdia, PPLPC012000368599.

710. In 2013, Gasdia told the CEO that the total kilograms of active ingredient sold by Purdue was dropping, "driven by the 40mg and 80mg strengths." He reported that Purdue was losing millions of dollars in sales each month because doctors were prescribing lower doses of opioids and fewer pills in each prescription than Purdue desired. Gasdia emphasized that doctors were hesitating before making the key move in Purdue's high-dose strategy: "titrating" patients up to higher doses of opioids. "Titration up to higher strengths, especially the 40mg and 80mg strengths is declining."[852]

711. Gasdia led Purdue's campaign of "corrective actions" to push doctors and patients back to higher doses. First, Gasdia sent sales reps to promote the high doses to doctors. Purdue had studied sales rep records and prescription data, and Gasdia knew that sales rep visits drove high-dose prescriptions: "High dose prescribing grew in physicians we began calling over the last year." (Purdue used the term "calling" to refer to its face-to-face sales visits). Second, Gasdia implemented marketing initiatives aimed at promoting higher doses, including the *Individualize The Dose* campaign. In the confidential plan that he presented to the CEO, Gasdia wrote that his sales employees would "place greater emphasis on appropriate titration" in "all promotional initiatives."[853] In a directive to his subordinates, Gasdia emphasized that Purdue had created a new feature for its opioid savings cards to encourage higher doses: "Patients can be titrated 'on us.'"[854] In a message to the CFO, Gasdia wrote that Purdue's financial forecast should assume doctors would prescribe higher doses of opioids because sales reps were launching tactics to encourage them.[855]

712. Gasdia knew that higher doses put patients in danger. The same presentation that

---

[852] 2013-05-24 Sales & Marketing presentation, slides 4, 8, 11, 15, 16, PPLPC004000358097.
[853] 2013-05-24 Sales & Marketing presentation, slides 4, 8, 11, 15, 21, PPLPC004000358097.
[854] 2012-03-13 email from Russell Gasdia, PPLPC012000369074.
[855] 2013-04-30 email from Russell Gasdia, PPLPC012000420967.

explained Gasdia's sales plan listed public health efforts that Gasdia believed were responsible for the drop in high-dose, high-profit sales.[856] Indeed, Purdue knew more about the dangers than the authorities did. Purdue had studied confidential prescription data and determined that higher doses kept patients on opioids longer: "There is a direct relationship between OxyContin LoT [length of therapy] and dose."[857] By promoting both higher doses and longer periods on opioids, Gasdia exposed patients to two sources of higher risk.

713. Gasdia knew and intended that the sales reps would not warn doctors that higher doses put patients at greater risk — Purdue's strategy of promoting "high dose prescribing" would collapse if reps told doctors they were harming their patients. Gasdia directed sales reps to use marketing materials that did not disclose the risk of higher doses.[858] A Massachusetts sales rep testified that he didn't even know that higher doses posed higher risk.[859] As Gasdia intended, Purdue sales reps in fact promoted higher doses to Massachusetts prescribers and did not disclose the higher risk.

714. In 2014, Gasdia proposed revising Purdue's compensation system to pay sales reps more when the doctors they targeted prescribed higher doses of opioids. Gasdia noted that, for many years, Purdue paid sales reps "based on 20mg equivalents," so a sales rep who convinced a doctor to move a patient from 40mg to 80mg OxyContin would double his credit. But recently Purdue was treating all prescriptions the same: "right now, an Rx has the same value on the incentive plan, when each Rx has different values to the company." Gasdia admitted (in private, in his email to his colleagues) that Purdue's tradition of paying reps more for higher doses posed an inherent risk of "reps inappropriately promoting the 'higher doses.'"

[856] 2013-05-24 Sales & Marketing presentation, slides 11, 15, PPLPC004000358097.
[857] 2012-07-27 OxyContin presentation, slide 22, PPLPC018000702766.
[858] 2013-08-06 email from Russell Gasdia, PPLPC012000435415; 2013-08-06 visual aid, PPLPC028000497109.
[859] Paragraph 73 above.

But he recommended that Purdue consider it anyway.[860]

715. That same year, Gasdia proposed that Purdue reintroduce 160mg OxyContin — a super-high dose that Purdue had sold for less than a year in 2000-2001 before it was pulled from the market due to safety concerns.[861] The 160mg had earned the nickname "Oxy-Coffin." Gasdia suggested bringing it back to increase sales.

**More Pills In Each Prescription**

716. Just as he promoted higher doses, Gasdia encouraged doctors to prescribe more pills in each prescription. In 2010, Gasdia used Purdue's checkbook to push an insurance company not to limit large prescriptions of OxyContin. United Healthcare told Gasdia that they were moving to cap each OxyContin prescription at 93 pills to prevent diversion of the drugs and illegal sales. Gasdia threatened to reduce the "rebate" that Purdue paid to United Healthcare on OxyContin prescriptions. Days later, Gasdia told his sales staff that the insurance company had caved: they would keep collecting Purdue's "rebate" and would not reduce the size of OxyContin prescriptions.[862] Staff reported back to Gasdia that defeating limits on large prescriptions "has huge implications on our ability to achieve [the] forecast" that the Sacklers had set.[863]

**Longer Time**

717. Gasdia also led Purdue's efforts to increase profit by keeping patients on opioids for longer periods of time. In 2012, Gasdia and his staff studied Purdue's confidential data on "length of therapy" and developed sales tactics to extend it.[864] They prepared a presentation for the Board on this strategy, reporting that, because of Purdue's marketing: "More patients remain

[860] 2014-06-06 email from Russell Gasdia, PPLPC012000483965.
[861] 2014-02-14 email from Russell Gasdia, PPLPC012000464424.
[862] 2010-07-23 email from Russell Gasdia, PPLPC012000280312.
[863] 2010-07-23 email from David Rosen, PPLPC012000280312.
[864] 2012-02-02 email from Russell Gasdia, PPLPC012000363328.

on therapy at 90 days" and "Patients remain on therapy 41 days longer." They told the Board that keeping patients on opioids longer was so profitable that the Return On Investment for the marketing was 4.28 — Purdue collected an extra $4,280,000 for every $1,000,000 it spent.[865] That analysis did not take into account the cost to patients and families from addiction, overdose, and death.

718. Gasdia also drove the sales tactic of using higher doses to keep patients on opioids longer. In 2012, when analysis of Butrans prescriptions showed that doctors were not keeping patients on the drug as long as Purdue wanted, Gasdia re-emphasized the importance of increasing doses as a way to keep patients on opioids: "So, teach physicians how to titrate effectively and persistency increases?" He collected specific information about "which docs are titrating and which ones aren't" so he could target the promotion of higher doses where it would have the greatest influence on sales.[866]

719. Gasdia knew and intended that the sales reps would not warn doctors that keeping patients on opioids longer put patients at greater risk — the scheme of promoting "persistence" on opioids would fall apart if reps told doctors they were harming their patients. Gasdia directed sales reps to use marketing materials that did not disclose the risk of taking opioids for longer periods of time.[867] As Gasdia intended, Pursue sales reps promoted using opioids for longer periods in Massachusetts and did not disclose the higher risk.

**Targeting Prolific Prescribers**

720. In 2002, staff sent Gasdia an email identifying four Massachusetts OxyContin prescribers believed to be the subjects of a federal investigation. The urgency of the message

---

[865] 2012-10-24 email from Russell Gasdia, PPLPC012000396054; slide 19, PPLPC012000396055.
[866] 2012-08-16 emails from Russell Gasdia and Robert Barmore, PPLPC012000389032.
[867] 2013-08-06 email from Russell Gasdia, PPLPC012000435415; 2013-08-06 visual aid, PPLPC028000497109.

was explicit: "This is most urgent."[868] Gasdia did not steer Purdue reps away from the doctors. Instead, he did the opposite and ordered reps to focus on them as highly-profitable "Super Core" targets. Under Gasdia's direction, sales reps visited those specific doctors hundreds of times.[869]

721. For one of the four doctors on the "urgent" investigation list, Gasdia went further. Sales staff had selected Dr. Walter Jacobs in North Andover, Massachusetts, as a "thought leader" and paid Purdue spokesperson, and Gasdia signed and renewed contracts to pay Jacobs tens of thousands of dollars.[870] Gasdia sent a bulletin to Purdue's entire sales staff about a Purdue-sponsored conference at Boston's Hynes Convention Center where Jacobs was speaking. Gasdia instructed sales reps to encourage their doctors to attend.[871]

722. In October 2010, Gasdia signed one of several contracts with Jacobs to pay him to promote Purdue opioids:[872]



| PURDUE PHARMA L.P. | WALTER H. JACOBS, MD |
|---|---|
| By: | By: |
| Name: Russell J. Gasdia | Name: Walter H. Jacobs, MD |
| Title: Vice President, Sales and Marketing | |

723. Weeks earlier, Jacobs had admitted in disciplinary proceedings before the Massachusetts Board of Registration in Medicine that he continuously prescribed narcotics to patients, ignored the risk of addiction, and kept prescribing narcotics even after his patients overdosed.[873] But Purdue's data showed that Jacobs was a top prescriber of Purdue opioids.[874]

---

868 2002-10-18 email from James Lang, PPLPC012000053294.
869 Exhibit 1; 2013-04-03 list of targeted prescribers, PPLP004367823.
870 2001-06-25 spreadsheet attached to email from Kathy Doran (re Thought Leaders), PPLPC012000038726; 2010-10-06 Consultant Services Agreement signed by Russell Gasdia and Walter Jacobs, PPLP003479945.
871 2002-10-01 email from Russell Gasdia, #319184.1.
872 2010-10-06 contract, PPLP003479951.
873 2010-09-17 stipulation.
874 Monthly prescription data by prescriber, PWG003984534.

So Purdue paid him to encourage other doctors to prescribe Purdue's drugs.

724. Gasdia kept Jacobs on Purdue's payroll, using him as a spokesperson at programs in Massachusetts, Maine, and New Hampshire. Gasdia extended Jacobs' paid spokesperson contract multiple times, including in 2012, the same year Jacobs lost his license.[875] From 2008 until he lost his medical license in 2012, Jacobs prescribed more than 347,000 pills of Purdue opioids — enough for Purdue to collect more than $3,000,000.

725. The four prescribers that staff warned Gasdia about in the "most urgent" email were profitable for Purdue. But they were deadly for Massachusetts patients. Since 2009, they prescribed Purdue opioids to 14 patients who overdosed and died.

726. The four doctors in the "urgent" email were only a few examples of the prolific doctors that Gasdia systematically targeted for intense promotion as "Core" or "Super Core." Gasdia set the rules for sales visits, including that reps should visit "Super Core" prescribers at least twice a month.[876]

727. Gasdia tracked the implementation and effect of his targeting and reported on them to the other individual defendants. In 2011, Gasdia wrote to CEO John Stewart that "Core and Super Core have combined for just under 90% of all Rxs the past few weeks … I am digging deeper to see how many [Super Cores] have been seen 6 times in first three months as well as those seen more and those seen less."[877]

728. In 2013, Gasdia sent staff a series of emails raising "serious concern[s]" about sales reps' failure to call on the most prolific prescribers. He demanded an explanation for why

[875] 2010-10-06 Consultant Services Agreement signed by Russell Gasdia and Walter Jacobs, PPLP003479945; 2011-04-19 Amendment to 2010 Consultant Services Agreement, PPLP003481935; 2012-04-02 Statement of Work signed by Russell Gasdia and Walter Jacobs, PPLP003485089.
[876] 2011-04-28 email from Russell Gasdia, PPLPC012000322209.
[877] 2011-04-28 email from Russell Gasdia, PPLPC012000322209.

some prescribers that sales reps had targeted were "off list," noting "we have 46% of reps who didn't follow direction and don't have the correct # of COREs/SUPER COREs."[878] Gasdia reproached his team, noting: "Our management team needs to get on this ASAP. We are not getting the job done and when sales targets aren't hit, this first step is to have the right targets. It appears as if the reps have missed the boat."[879]

729. To enforce focus on the prolific prescribers, Gasdia changed the compensation plan to pay larger bonuses for increased prescribing by Core and Super Core prescribers.[880] For example, the *First Quarter 2014 Incentive Program* provided a quarterly bonus of up to $11,655 for OxyContin prescriptions by "Selected Prescribers" — Cores and Super Cores — and up to $4,995 for OxyContin prescriptions by "All Other Prescribers." The memo announcing the incentive program explained: "[t]his incentive gives you the opportunity to earn a greater bonus for the Selected Prescribers with whom you have the greatest ability to appropriately influence prescribing patterns."[881]

730. Sales reps who encouraged the most prolific and dangerous prescribers won Purdue's top bonuses and prizes. Staff told Gasdia that a rep won Purdue's "Toppers" contest year after year "largely on the prescriptions of 3-4 doctors."[882]

731. Their patients were the losers. Across the nation, dozens of the "Core" and "Super Core" prescribers that Gasdia pushed his sales reps to target have been convicted of crimes for their prescribing.[883] In Massachusetts, for example, Gasdia and his staff targeted Dr. Fathalla Mashali and Dr. Fernando Jayma as "Super Core." Mashali was sentenced to eight

---

[878] 2013-02-07 email from Russell Gasdia, PPLPC012000407757; 2013-02-07 Q1 Butrans Core/Super Core Assignment Profile, PPLPC012000407759.
[879] 2013-02-12 email from Russell Gasdia, PPLPC012000408436.
[880] 2013-09-26 Fourth Quarter 2013 Incentive Program, PPLP003579152.
[881] 2013-12-23 First Quarter 2014 Incentive Program, PPLP003579166.
[882] 2014-01-24 email from Windell Fisher, PPLPC012000461545.
[883] 2012-12-22 ASF Q1 2013Aligned TL.xlsx, PPLP004367823.

years in prison for 27 counts of health care fraud, and Jayma was convicted of illegally prescribing controlled substances, and was sentenced to two-and-a-half years in the house of correction. Seventeen patients who were prescribed Purdue opioids by Mashali died of opioid overdoses. Purdue's sales reps visited Mashali and Jayma more than 195 times, and Purdue management ordered the reps to keep promoting opioids to them, even after reps warned Purdue that they were dangerous prescribers.[884]

732. Compared to Massachusetts doctors and nurses who prescribed Purdue opioids without lobbying from sales reps, Purdue's top one hundred targets in Massachusetts wrote far more dangerous prescriptions. Under Gasdia's targeting method, Purdue's top targets prescribed Purdue opioids to more of their patients, at higher doses, and for longer periods of time. Compared to Massachusetts doctors and nurses who prescribed Purdue opioids without seeing reps, Purdue's top targets were ***at least ten times more likely*** to prescribe Purdue opioids to patients who overdosed and died.

***<u>Region Zero</u>***

733. Gasdia also kept track of another list of profitable prescribers who were as dangerous as the Super Cores — Purdue's secret *Region Zero.* Purdue did not want to be blamed for those doctors' prescriptions, so it did not send sales reps to visit them. But Purdue still tracked dollar-by-dollar its profits from their prescriptions, and those profits were large, and Purdue did not report the doctors to the authorities.

734. For years, Gasdia helped to decide which doctors went into *Region Zero*. For example, in 2003, Gasdia refused a request from staff to place in *Region Zero* a profitable Massachusetts prescriber who had been fired by his practice. Gasdia did not want to take a

[884] Exhibit 1.

doctor off the sales target list unless he had lost his license or was already under investigation by the authorities. Gasdia directed the staff member: "Let's discuss one-on-one."[885] Eleven years and many prescriptions later, the Massachusetts Board of Registration in Medicine suspended the doctor's license in 2014 — after he prescribed Purdue opioids to a patient who overdosed and died.

735. In 2010, the Board asked for an update on opioid sales generated by *Region Zero* prescribers. Together with three other executives, Gasdia prepared a report that told the Board exactly which doctors were suspected of illegitimate opioid prescribing, and each one's prescriptions, by units and dollars.[886] That list included Massachusetts prescribers in Brookfield, Buzzards Bay, Holyoke, Lawrence, Leominster, New Bedford, Northampton, Orleans, Springfield, Stoneham, Waltham, and Worcester.[887]

736. In 2012, as more patients got addicted and died, a staff member made a plea to Gasdia that Purdue should tell insurance companies the names of doctors in *Region Zero* so that insurance companies could double-check their prescriptions for signs of illegal prescribing. In language that stands out from many of the other Purdue emails, the employee wrote that "it just seems like the right and ethical thing to do." He wrote:

> "it seems to make sense for a number of reasons for us to share the information on Region 0 doctors with payers. At a basic level, it just seems like the right and ethical thing to do. Doing so could help those companies identify those physicians that may be of a concern, not just with respect to our products, but also other CII and CIII therapies. As a result, if it reduces abuse and diversion of opioids then it seems like something we should be doing."[888]

---

[885] 2003-02-24 email from Russell Gasdia, PPLPC012000057576.
[886] 2010-07-22 Purdue Pharma Shareholders and Board Meeting Actions and Notes, PPLPC012000282808-809.
[887] 2010-08-11 Prescriber List, PPLPC012000282813.
[888] 2012-10-02 email from Yoni Falkson, PPLPC012000392932.

Gasdia rejected the suggestion, and *Region Zero* remained secret.[889]

**Firing Reps Who Don't Get Enough Patients On Opioids**

737. The employee who wrote about the "ethical thing to do" left Purdue one month later. Gasdia didn't fire him. But Gasdia was the dominant force behind disciplining and firing sales reps who failed to generate enough opioid sales.

738. In 2009, Gasdia wrote to sales managers that the Board had complained to him about insufficient opioid sales: "we added 100 more reps, Russ, wouldn't they be having a more positive impact?" Gasdia told managers to evaluate the prescriptions generated by every sales rep at Purdue and push reps who were not generating enough sales.[890]

739. In March 2012, Gasdia wrote to Purdue's top sales staff that they would be paid at 69% of target because they did not sell enough drugs. For the lowest-level sales reps, the consequences were more severe: Gasdia wrote that his staff was "addressing poor performance with PEP [performance enhancement plans], probations, and terminations." He wrote that many sales rep resignations were firings in disguise. Gasdia wrote that employees' jobs depended on meeting the Sacklers' expectations for opioid sales: "We must achieve forecast for Butrans and OxyContin."[891]

---

[889] 2012-10-02 email from Russell Gasdia, PPLPC012000392932.
[890] 2009-04-16 email from Russell Gasdia, PPLPC012000220513.
[891] 2012-03-06 email from Russell Gasdia, PPLPC004000315750.

740. Two days later, Gasdia escalated his demands. Because Richard Sackler wrote that sales results were "bad," Gasdia and his Director of Sales considered firing all the sales reps in the Boston District to send a message.[892] Although they did not fire all the Boston reps, Gasdia saw to it that sales reps who failed to meet their sales objectives were placed on probation or on performance improvement plans ("PIPs").[893] As explained in paragraph 350 above, one sales rep was put on a performance improvement plan and ordered to visit 10 specific prescribers twice every week and increase prescriptions by 43%.[894] Another rep was ordered to increase prescriptions by 62%.[895] Purdue issued a performance enhancement plan to another sales rep that said: "Anticipated Challenges: Dr. trying to cut down on opioid prescribing due to abuse." "Action Steps: Sell for patients they are willing to Rx opioids …(elderly)." Purdue also ordered the rep to do a better job using gifts ("coffee, lunch") to buy time with prescribers and reminded her that Purdue had a budget for that purpose.[896]

741. Gasdia emailed staff requesting "a report on probations as well as PIP for representatives within the [sales force]." Gasdia stated: "I am appalled by some of the poor performance with Butrans with some very veteran reps as well as some newer reps." "We need to make some tough decisions the next few months and start moving individuals out of the sales organization if they have failed to demonstrate the ability to succeed."[897]

742. Because Gasdia started his career selling drugs in Massachusetts, he was emphatic about increasing opioid sales here. When the sales manager for Massachusetts did not increase

---

[892] 2012-03-08 email from Russell Gasdia, PPLPC012000368509.
[893] 2012-06-12 June PEP Status Report, PPLPC012000382165. Purdue also referred to Performance Improvement Plans as Performance Enhancement Plans ("PEPs").
[894] 2013-12-06 Performance Enhancement Plan, PPLPC014000231426 ("See Top 10 HCPs each Monday. See them again before end of same week.").
[895] 2012-08-28 Performance Enhancement Plan, PPLPC014000183394.
[896] 2014-07-18 Performance Enhancement Plan, PPLPC014000263371-373.
[897] 2012-06-05 email from Russell Gasdia, PPLPC012000378676.

prescriptions fast enough, Gasdia snapped: "Doug is simply losing his effectiveness. He can blame it on Massachusetts, but that is BS."[898]

**Firing Reps Who Email**

743. To limit the evidence of its misconduct, Purdue tried to discourage email.

744. When staff emailed Gasdia a detailed report of illegal OxyContin trafficking, he responded: "These should not be on email. Tell [District Managers] and Reps to use fax."[899] When the Northeast Regional Manager emailed Gasdia about the arrest of a profitable "core physician" in Massachusetts, Gasdia ordered: "Discontinue use of email on this subject."[900] When sales staff emailed each other about how to "push" doctors, Gasdia instructed: "Please take this off line. I would prefer a face to face discussion on this."[901]

745. Purdue's most severe policy against email prohibited sales reps from writing down in emails their sales pitches to doctors. By insisting that sales reps discuss opioids only in face-to-face oral conversations, Purdue tried to avoid discoverable evidence of its misconduct. As the top sales and marketing executive in the company, Gasdia personally enforced that rule with a vengeance. When Gasdia learned that a sales rep had sent a doctor email about Purdue opioids, he ordered: "Fire her now! We can't afford this."[902]

746. Gasdia never fired a sales rep because a patient became addicted, or overdosed, or died.

---

[898] 2012-03-06 email from Russell Gasdia, PPLPC012000368278 (criticizing regional sales manager Douglas Wheeler).
[899] 2000-05-28 email from Russell Gasdia, PPLPC012000014212.
[900] 2001-06-19 email from Russell Gasdia, PPLPC012000034110 (staff noted that the arrested doctor "writes approximately $25,000/mo. of OxyContin").
[901] 2011-04-19 email from Russell Gasdia, PPLPC004000278046.
[902] 2011-09-30 email from Russell Gasdia, PPLPC012000345726.

**Accomplishing the Sacklers' Scheme**

747. Year after year, Gasdia helped the Sacklers accomplish their dangerous scheme. Gasdia was in the audience at the OxyContin launch party when Richard Sackler called for a blizzard of opioid prescriptions that would bury the nation, and he helped to make that boast come true. Gasdia carried out orders from Richard and the other Sackler defendants hundreds of times. When they wanted to promote higher doses, he did it. When they wanted to know how much Purdue was earning from prescribers in *Region Zero*, he told them. When Richard Sackler wanted to go into the field with sales reps, Gasdia arranged it. When the Sacklers wanted something, Gasdia did it.

748. Gasdia reported to the other individual defendants in methodical detail.[903] He kept the Board and the CEO informed about how the sales staff were getting more patients on opioids, at higher doses, for longer periods of time.

**Special Interest in Massachusetts**

749. Gasdia took a special interest in promoting opioids in Massachusetts. Many times, he left Purdue's headquarters in Connecticut and came to Massachusetts to promote Purdue's drugs at conferences, trade shows and district sales meetings.[904] At a Boston District Meeting in 2011, Gasdia offered to buy dinner for the entire sales team if one of them finished in the top 15% of sales of Purdue opioids nationwide.[905] The next month, when one Boston sales rep made it to the top 15%, Gasdia wrote to the Boston District Manager, asking her to tell the

---

[903] 2012-03-12 email from Russell Gasdia, PPLPC012000369769; 2008-03-09 email from Russell Gasdia, PPLPC012000174202; 2011-05-10 email from Russell Gasdia, PPLPC012000323493; 2012-01-09 email from Jonathan Sackler, PPLPC012000358983; 2012-02-01 email from Russell Gasdia, PPLPC012000361862; 2011-04-28 email from Russell Gasdia, PPLPC012000322051.

[904] 2009-07-31 email from Russell Gasdia, PPLPC012000234801; 2011-01-05 email from Russell Gasdia, PPLPC012000305135; 2011-08-29 email from Russell Gasdia, PPLPC012000340744.

[905] 2011-01-05 email from Russell Gasdia, PPLPC012000305135.

sales rep "I'm watching him closely."[906]

750. Gasdia attended to Purdue's marquee relationships in Massachusetts, as well as the individual reps. He oversaw Purdue's negotiations with Massachusetts insurers and tracked Massachusetts regulations to ensure a growing market for opioids.[907] At the outset of the *Massachusetts General Hospital Purdue Pharma Pain Center*, it was Gasdia who relayed to the then-head of sales that Massachusetts General Hospital's "outpatient pharmacy is averaging about $26,000 a month."[908]

❖ ❖ ❖

751. In July 2014**,** in the aftermath of the Butrans launch that Richard Sackler regarded as a failure, the Sacklers removed Gasdia as Sales VP.[909] For the rest of 2014, he continued to participate in Purdue's misconduct as Head of Strategic Initiatives. As one of the strategic initiatives, he planned a call center from which Purdue staff could telephone prescribers, including in Massachusetts, to promote opioids using the same pitches that sales reps used face to face.[910] On December 31, 2014, Gasdia retired from Purdue.[911]

752. Selling Purdue opioids was a winning move for Gasdia if he measured it in money. From 2007 to 2014, Purdue paid Gasdia millions of dollars.

753. In the seven years Gasdia oversaw Purdue's sales campaign, more than 300 Massachusetts patients died of opioid-related overdoses after taking the drugs he sold.

---

906 2011-02-11 email from Russell Gasdia, PPLPC012000311084.

907 2008-01-30 email from Russell Gasdia, PPLPC012000168213; 2008-04-22 email from Russell Gasdia, PPLPC012000179563; 2014-06-06 presentation by Russell Gasdia, PVT0028342; 2008-05-22 email from Russell Gasdia; PPLPC012000184138.

908 2001-11-19 email from Russell Gasdia, PPLPC012000041186.

909 2014-12-05 email from Russell Gasdia, PPLPC012000508248; 2014-06-10 email from Richard Sackler, PPLPC012000483201.

910 2014-09-15 Commercial Strategic Initiatives by Russell Gasdia, slides 10-19, PPLPC012000494427.

911 2014-12-05 email from Russell Gasdia, PPLPC012000508248.

**MARK TIMNEY**

754. In January 2014, just a few months before Massachusetts declared the opioid epidemic a public health emergency, Timney picked up as CEO where John Stewart left off, directing and overseeing the sale and marketing of Purdue's opioids and the expansion of the sales force, including in Massachusetts. Timney directed Purdue sales reps to target Massachusetts doctors to prescribe opioids to more patients, at higher doses, for longer periods of time.

755. When some health care systems stopped allowing sales reps to visit doctor's offices, Timney developed a work-around. Under his direction, Purdue created a call center where sales reps telephoned doctors and hospitals, including facilities with "no-see" policies, to encourage them to prescribe more opioids.

756. Timney received near-daily reports of opioid-related abuse, diversion, and overdoses, including in Massachusetts.

757. Rather than work to address the opioid epidemic, Timney devoted his tenure to preserving the Sacklers' narrative that addiction was the fault of abusers: promoting OxyContin as abuse-deterrent, without disclosing that the reformulation had no effect on the most common form of abuse — swallowing pills.

758. Starting in January and continuing for his entire time at Purdue, Timney regularly received internal reports — sometimes multiple times a day — that summarized media coverage of opioid-related issues. The reports included articles about doctors over-prescribing opioids, stories of people overdosing, drug abuse chatroom chatter, and more. After receiving these reports, Timney often followed up with requests to his staff to dig deeper on an item in that day's

summary.[912]

759. As CEO, Timney continued John Stewart's aggressive sales strategy known as *Evolve 2 Excellence* or *E2E*. In an updated presentation to Timney, consultants from McKinsey emphasized that to increase profits, Purdue must increase the number of visits to high-volume and "high-value" prescribers.[913] Timney knew and intended that Purdue sales reps aggressively target prolific prescribers.

760. Timney's *Evolve 2 Excellence* sales strategy also brought an increased focus on OxyContin, requiring sale reps to allocate two thirds of sales efforts to OxyContin and one third to Butrans, instead of the previous 50/50 split.[914]

761. In February, as a competitor prepared to launch another opioid, Timney directed that Purdue "target KOLs who would respond" with data showing why Purdue's opioids "should be used in certain patients first."[915]

762. In March¸ Timney received updates from sales staff about the *Evolve 2 Excellence* sales strategy.[916] Sales staff wrote among themselves that Timney had "requested regular updates" on the *E2E* project and that "[t]here will continue to be a great deal of focus on the activity of the Sales Force as a measurement of whether we are making the necessary progress during 2014."[917]

763. At the same time, Timney created a new way to reach physicians who did not allow sales reps in their clinics (no- and limited-access prescribers). Timney directed staff to set up a call center, where sales reps would call restricted-access prescribers and promote Purdue's

---

[912] 2016-11-23 email from Mark Timney, PPLPC023000922832-836.
[913] 2014-01-17 Evolve to Excellence Presentation by Mark Timney, slide 7, PPLPC012000459931.
[914] 2014-01-17 Evolve to Excellence Presentation by Mark Timney, slide 13, PPLPC012000459931.
[915] 2014-02-26 email from Mark Timney, PPLPC012000465939.
[916] 2014-03-11 Presentation meeting with Mark Timney, PPLPC014000242643.
[917] 2014-03-11 email from Windell Fisher, PPLPC014000242642.

opioids over the phone. Timney oversaw this and other initiatives to reach those prescribers, including email and digital marketing.[918]

764. In April, Timney worked with McKinsey to advise the Board on Purdue's sales strategy to increase prescriptions and profit.[919]

765. In May, Timney reported to the Board about how, under his direction, Purdue had successfully lobbied for legislation in Massachusetts that prohibited a non-abuse deterrent formulation from being dispensed if an abuse deterrent formulation of that drug was available. Timney touted this as a "positive development" "in a state from which we've seen significant anti-opioid activity in recent months" and "closely aligned with our commercial strategy."[920]

766. When Richard Sackler expressed displeasure at the poor commercial performance of Butrans, Timney assured him "We are turning over every opportunity with every product we have."[921]

767. Later that month, Timney told the Board about the new sales initiative to target no- and limited-access prescribers through the call center and to target hospital networks, which had policies restricting sales rep visits.[922] The initiative called for Purdue to focus on four "high value geographies" one of which was Massachusetts, including the Partners and Steward hospital systems.[923] Timney assured the Board that through these efforts, the sales force continued to target the highest volume prescribers and increase sales of Purdue's opioids.

768. In August, Timney sent the entire company a 100-days strategy update that keyed into his vision for how Purdue would sustain profitable growth for the Sacklers, by "Competing,

---

[918] 2014-03-11 Presentation for meeting with Mark Timney, slides 2, 23, 50, PPLPC014000242643.
[919] 2014-04-17 email from McKinsey, PPLPC012000473723.
[920] 2014-05-14 email from Mark Timney, PPLPC019000926225.
[921] 2014-06-10 email from Mark Timney, PPLPC012000483200.
[922] 2014-05-23 Board Update Memo from Mark Timney, PPLPC021000656750.
[923] 2014-06-06 Sales and Marketing Update Presentation, slide 16, PVT0028327.

Winning, and Growing." The memo included an update specific to Massachusetts, noting the passage of legislation that reflected "public policies championed by Purdue."[924] Timney touted the Massachusetts legislation in a memo to the Board that month as well, while noting that staff from Corporate Affairs were coordinating the response to a developing Bloomberg / BusinessWeek story on the Sackler family.[925]

769. In September, as the launch date for Purdue's new opioid Hysingla approached, Timney directed staff to prepare a "detailed, full blown, launch plan" that he could review in detail.[926]

770. In October, at the direction of Timney, staff sent the Board advance copies of the 2015 proposed operating budget. [927] The materials included Timney's strategic plan of "Compete, Win, Grow." Timney presented to the Board on "Optimizing the Pain Portfolio," again highlighting how Purdue had "[h]elped pass [the] nation's first pro-ADF law in Massachusetts."[928] Timney repeatedly trumpeted this legislative change (as he did in May and August) because it encouraged the sale of Purdue's opioids in Massachusetts.

771. After receipt of the proposed budget, Mortimer Sackler wrote to Timney saying "Not a pretty picture. Is that really the best we can do next year?" Timney tried to temper Mortimer's fears by assuring him "everything within control of the team is improving." [929]

---

[924] 2014-08-11 email from Raul Damas, PPLPC023000708275.
[925] 2014-08-01 memo from Mark Timney, PPLPC018001080173.
[926] 2014-09-22 email from Mark Timney, PPLP004141433.
[927] 2014-10-24 email from Ed Mahony, PPLPC016000260660.
[928] 2014-10-24 Mark Timney's 2015 Budget Summary, slide 6, PPLPC016000260672.
[929] 2014-10-25 email from Mortimer Sackler, PPLPC021000696384, -385.

772. In November, Timney sent his congratulations to the regulatory team upon FDA approval of Hysingla ER, Purdue's newest opioid which came in strengths of up to 120 milligrams. [930]

773. In February 2015, Timney gave an internal presentation about Purdue's strategy for continuing to profit from the sale of opioids.[931] Timney acknowledged that the abuse deterrent properties of OxyContin do "not address overconsumption" orally —i.e., the most common mode of abuse—and that "abusers are likely to find a way around the ADP technology."[932] At the same time, Timney directed Purdue's sales reps to promote OxyContin's abuse deterrent properties—without disclosing these critical facts.

774. In late November, Timney reported to the Board that authorities were increasing efforts to restrict access to opioids and noted concern over potential legislation in Massachusetts. Still, Timney told the Board that Purdue's sales visits and market share were increasing, and the 2016 strategy sought to "expand[] the Sales Force," "protect OxyContin against competition and grow Butrans & Hysingla ER."[933]

775. In January 2016, Timney attended the national sales meeting with hundreds of Purdue sales reps, including those from Massachusetts.[934]

776. In March, Timney received an email from a mother whose daughter was in treatment for opioid addiction. The mother asked Purdue to fund a recovery treatment center. Timney forwarded the email to his colleagues and the mother received a form letter in response,

[930] 2014-11-20 email from Mark Timney, PPLPC1000189109.
[931] 2015-02-24 emails from Mark Timney and Gail Cawkwell, PPLPC011000015125.
[932] 2015-03-10 Oxycodone and Buprenorphine Combination Product Presentation, slide 3, PPLPC011000014785.
[933] 2015-11-30 2016 Budget Presentation, slide 24, PPLPC011000069975.
[934] 2016-01-08 email from Eric Kizior, PPLP003569274.

listing various things Purdue had done to "help solve" the opioid crisis. [935]

777. In April, as public pressure against opioids grew, Timney sent an email to staff titled, "Urgency and Intensity." Expressing serious concern about the future of the business, Timney demanded staff calculate Purdue's potential losses, develop strategies to mitigate them, and focus on improving the effectiveness of the sales force.[936]

778. In September, Purdue received recommendations from a consultant on how to "[c]ontain and mitigate the reputational harm to Purdue Pharma and the Sackler family as a result of multiple investigations and litigation." Rather than working on actual solutions to the opioid epidemic, the report recommended that Purdue "shift attention [from OxyContin] to fentanyl and other opioids." The report recommended that Timney be deployed "to humanize the Company."[937] Timney's focus continued to be Purdue's profits and reputation, not the health and welfare of patients, including in Massachusetts, who continued to overdose and die due to Purdue's dangerous drugs.

779. By November, Timney was executing this strategy of humanizing Purdue. He wrote a letter to the editor of the *Boston Globe* commenting on an article written about Purdue. Rather than taking responsibility for Purdue's role in fueling the opioid crisis, Timney asserted that, "the *Globe* should recognize the impactful efforts companies like Purdue have taken to address the opioid epidemic."[938]

780. Later that month, Timney gave an internal presentation demonstrating the inadequacies of Purdue's "system" for tracking prescribers that were prescribing opioids inappropriately. The presentation made clear that as late as 2016, Purdue's Abuse and Diversion

[935] 2016-03-22 email from a mother to Mark Timney, PPLPC017000696223.
[936] 2016-04-15 email from Timney to Executive Committee, PPLPC011000092068.
[937] 2016-09-16 Communications Strategy Recommendations Presentations, slides 2, 11, PPLPC021000863236.
[938] 2016-11-01 letter from Mark Timney, PPLPC011000126443.

Detection system consisted of *ad hoc*, manual reviews of sales reps' call notes, media reports, internet searches, and prescribing records to identify opioid abuse and adverse events. Purdue had no system capable of providing meaningful deterrence, a full nine years after the 2007 convictions and settlement required one.[939]

781. In January 2017, Timney sent staff member David Haddox to Massachusetts to attend a closed-door meeting on the opioid crisis at Tufts.[940]

782. In advance of a meeting with Jonathan Sackler and a United States Senator, Timney suggested, "this is a good time to tell the story about setting the new standard, and the future of Purdue."[941] Timney and Jonathan were eager to deflect from their role in the creation of the opioid crisis and build alliances with powerful people who could protect them.

783. Timney monitored opioid-related developments in Massachusetts and around the country. In February, staff alerted Timney that Massachusetts Governor Charlie Baker had attended a White House event about the opioid epidemic.[942]

784. Timney continued his public relations campaign to make the public believe Purdue was trying to fight the crisis. In April, staff reported to Timney that Purdue had contacted the CDC, following the issuance of the new CDC guidelines, listing Purdue's efforts to educate prescribers.[943] Purdue did not tell the CDC that Purdue's sales reps were continuing to target prescribers and push them to prescribe Purdue's opioids.

785. In April, the executive in charge of sales and marketing (who had replaced Russell Gasdia) resigned. Timney notified every employee at Purdue that he would eliminate the

[939] 2016-11-09 Executive Committee pre-read, slide 34, PPLPC011000127202.
[940] 2017-01-19 email from David Haddox, PPLPC011000133242.
[941] 2017-01-24 email from Mark Timney, PPLPC011000133807, -808.
[942] 2017-02-28 email from Robert Josephson, PPLPC011000137163.
[943] 2017-04-06 email from Gail Cawkwell, PPLPC011000141097.

middleman and communicate directives to the Sales and Marketing teams himself: “I will assume responsibility for our Sales, Marketing, New Product Planning and OTC [over-the-counter] functions.”[944]

786. In May, Timney reviewed a report from an independent non-profit organization on the effectiveness of abuse deterrent opioids that concluded the benefit of abuse deterrent formulations was “inconclusive.” He directed staff to react, and staff scrambled to institute a “robust action plan” to deal with the fallout.[945]

787. In June, Timney resigned from Purdue.[946]

788. Timney has collected substantial revenue from the sale of Purdue opioids in Massachusetts, as detailed in Exhibit 2.

789. Timney’s personal wealth came at immense cost to others. While Timney was Purdue’s chief executive, more than 350 Massachusetts patients died of opioid-related overdoses after being prescribed Purdue opioids.

---

[944] 2017-04-10 email from Mark Timney, PPLPC024001002179.
[945] 2017-05-05 email from Gail Cawkwell, PPLPC001000254479.
[946] 2017-06-22 Internal Press Release, PPLPC024001006343.

**CRAIG LANDAU**

790. Craig Landau has been selling Purdue opioids for nearly twenty years. He joined Purdue in 1999, was Chief Medical Officer from 2007 to 2013, and has been CEO since 2017. Landau participated in and directed a significant part of Purdue's misconduct from the 2007 convictions until today.

791. In each of his positions, Landau worked to get more Massachusetts patients on opioids at higher doses for longer periods of time. As Chief Medical Officer, he helped to develop the sales strategy and materials and instruct reps in how to sell Purdue's drugs. As CEO, he oversaw the whole sales scheme.

792. As Chief Medical Officer, Landau received each Board report regarding Purdue's misconduct in 2007 through 2011, and the reports sent in April and November 2012.[947] As CEO, Landau himself reported directly to the Board.

793. Landau repeatedly targeted Massachusetts. As detailed below, he analyzed and reported on a study of doctor-shopping in Massachusetts. He promoted opioids at public and private meetings in Massachusetts. He promoted opioids through a grant to a Massachusetts hospital and in correspondence to a Massachusetts university. He tracked Massachusetts opioid legislation to protect Purdue's sales.

❖ ❖ ❖

[947] 2007-07-15 Board report, PWG000300817; 2007-10-15 Board report, PPLPC012000157437; 2008-01-15 Board report, PDD8901733995; 2008-04-15 Board report, PDD8901724456; 2008-07-15 Board report, PPLP004367297; 2008-10-15 Board report, PDD9316101020; 2009-04-16 Board report, PDD9316100624; 2009-07-30 Board report PPLPC012000233246; 2009-10-22 Board report, PPLPC016000007322; 2010-02-1 Board report, PPLPC012000252797; 2010-04-21 Board report, PWG000423141; 2010-07-27 Board report, PWG000422495; 2010-10-25 Board report, PWG000421990; 2011-01-24 email from David Long, PWG000421546; 2011-05-02 Board report, PPLPC012000322461; 2011-08-03 Board report, PWG000420354; 2011-11-09 Board report, PWG000419343; 2012-04-30 Board report, PPLPC012000374793; 2012-11-01 Board report, PWG000414933.

794. In September 2007, Landau directed a staff member to visit Boston for a conference on opioid risk management.[948]

795. He also worked with Sales VP Russell Gasdia on training for new hires about how to sell OxyContin.[949]

796. In January 2008, Landau addressed the entire sales force at the National Sales Meeting. He explained that he put a commercial representative on every research team, to orient research in ways that will sell more opioids.[950] He was a guest at a table full of sales reps, and expressed that he was "pumped" for the meeting.[951]

797. In January 2009, Landau attended the National Sales Meeting again, and once again sat with a table full of sales reps.[952] He addressed the entire national team and emphasized that R&D depended on the sales force to sell its products to physicians.[953]

798. In March, Landau inked a deal with Massachusetts-based Analgesic Research for the company and its principal—a Massachusetts doctor—to analyze documents, draft and edit submissions, and engage in related meetings and teleconferences for Purdue's New Drug Application for Butrans to the FDA.[954]

799. Later that month, Landau informed a staff member that he was working with Massachusetts opioid maker Collegium Pharmaceuticals on a strategy to position extended-release and long-acting opioids as safer than immediate release opioids.[955]

---

[948] 2007-09-13 email from Craig Landau, PPLPC013000167104.
[949] 2007-09-10 email from Craig Landau, PPLPC012000154114.
[950] 2007-12-29 script for speech by Craig Landau, National Sales Meeting, PPLPC012000164977.
[951] 2008-01-02 email from Craig Landau, PPLPC012000165438.
[952] 2009-01-05 email from Craig Landau, PPLPC012000207974.
[953] 2009-01-09 email from Russell Gasdia, PPLPC012000208460; 2009-01-09 speech by Craig Landau, National Sales Meeting, PPLPC012000208461.
[954] 2009-03-03 Statement of Work #2 signed by Craig Landau and Nathaniel Katz, PPLPC002000042402-403.
[955] 2009-03-06 email from Craig Landau, PPLPC020000230433.

800. In June, Landau had a strategy meeting with staff and consultants from McKinsey. The team planned how to "counter the emotional messages from mothers with teenagers that overdosed in [sic] OxyContin" by rounding up some pain patients to imply that controlled-release is needed.[956] As Landau knew at all relevant times, controlled or extended release opioids do not substantially control pain better than lower-dose, immediate release opioids. Rather, steering patients to high-dose OxyContin was a key part of Purdue's deceptive marketing strategy.

801. Landau knew there was a high rate of oxycodone misuse in Massachusetts. Indeed, in April 2010, Landau edited and approved a presentation to the Board showing that the rate of "doctor shopping" in Massachusetts was far higher for oxycodone products than for other opioids. He reiterated this information in August.[957]

802. In October, Landau received reports from internet chat rooms where abusers shared how to defeat OxyContin's new formulation. Landau passed this information on to John Stewart and Russell Gasdia.[958]

803. In January 2011, Landau drafted goals and objectives for the new year that included supporting approval of OxyContin for children.[959] In Massachusetts, one Purdue patient was given OxyContin for months starting at age 14, and died at age 21.[960]

---

[956] 2009-06 emails from Pasha Sarrai, Craig Landau, and Laura Nelson Carney, PDD8901645846.

[957] 2010-04-29 email from Craig Landau, PDD8901035911; 2010-04-09 presentation by Paul Coplan, PDD8901035916; 2010-08-18 email from Stuart Baker, PPLPC012000283467; 2010-08-09 presentation by Paul Coplan, slide 31, PPLPC012000283469.

[958] 2010-10-05 email from Craig Landau, PDD8901437962; 2010-09-30 Inflexxion Report, PDD8901437965.

[959] 2011-01-05 email from Craig Landau, PPLPC013000286366; 2011-01-05 Draft Objectives by Craig Landau, PPLPC013000286367.

[960] Another child in Massachusetts was prescribed OxyContin at 16 and died when he was 18 years old.

804. Landau worked as part of the team that created *In the Face of Pain*, a marketing campaign which deceived doctors and patients by presenting misleading prescriber testimonials about the use of opioids to treat pain.[961]

805. Later that month, Landau met with the executive committee to discuss legislation that had been introduced in Massachusetts to ban extended-release oxycodone, including Purdue's OxyContin.[962]

806. In February, Landau sent his recommendations for the 10-year plan to John Stewart.[963] Landau suggested Stewart include action items focused on convincing more prescribers to treat pain in their practices. In his recommendation, Landau noted that the new formulation had no benefit to patients, but still told Stewart that Purdue would profit from a "balloon effect" where prescribers would switch patients away from non-abuse-deterrent formulations.[964] Landau knew and intended that Purdue would trick doctors and patients into believing the new formulation was less addictive.

807. In March, Landau approved a plan to send sales reps to the Military Healthcare Convention & Conference to promote Purdue's opioids as part of Purdue's strategy to target vulnerable patient population such as veterans.[965]

808. In June, Landau and other executives discussed how Purdue's opioid sales were hundreds of millions of dollars less than expected, in part because doctors were prescribing the highest doses less often.[966]

809. In July, Landau emailed a staff member, flagging "publications calling into

[961] 2011-01-21 Corporate Reputation & Visibility strategic plan, pgs. 1, 4, 26, PWG000387272, -275, -297.
[962] 2011-01-26 Executive Committee notes, PPLPC012000312667-668.
[963] 2011-02-22 email from Craig Landau, PDD8901221579.
[964] 2011-02-07 draft Purdue business strategy with notes by Craig Landau, PDD8901221586-590.
[965] 2011-03-03 email from Craig Landau, PPLPC012000314663.
[966] 2011-05-12 Executive Committee notes, PPLPC012000327303.

question the benefit of opioid therapy for chronic non/malignant pain," including a publication from Massachusetts General Hospital. These publications were funded, in part, by Purdue, and Landau wanted to make sure they in turn were supporting Purdue's opioids.[967]

810. Landau knew by 2011 that many experts considered opioids unsafe for long durations of use, and discussed the fact that one of Purdue's paid Key Opinion Leaders, Russell Portenoy, had recently admitted it.[968]

811. In June 2012, Landau traveled to Massachusetts to attend the International Conference on Opioids.[969]

812. In February 2013, Landau signed another contract with Massachusetts-based Analgesic Research to work on Purdue's Hysingla opioid.[970]

813. In March, Landau compiled a meta-analysis of studies of chronic opioid use, writing that most studies showed only "mild to moderate improvement" in function, that some studies suggested that "long-term opioid therapy is associated with negative outcomes," and noting that there is a "critical need for additional studies to determine the long-term safety and efficacy of chronic opioid therapy for durations longer than 1 year."[971]

814. In June, Landau was a co-presenter at the International Conference on Opioids in Boston, Massachusetts.[972] He presented on long-term use of opioids for chronic non-cancer pain — exactly what led so many Massachusetts patients to addiction, overdose, and death.

815. From 2013 to 2017, Landau was the CEO of Purdue Pharma Canada.

---

[967] 2011-07-11 email from Craig Landau, PPLPC017000311115.
[968] 2011-07-12 email from Craig Landau, PTN000022181.
[969] 2012-03-06 email from Craig Landau, PPLPC001000103145.
[970] 2009-03-03 Nathaniel Katz Consultant Services Agreement, PPLPC002000042402.
[971] 2013-03-18 Systematic Review of the Efficacy and Safety of Long-Term Opioid Therapy in the Management of Chronic Noncancer Pain, PDD8013708195.
[972] 2013-03-18 Scientific Communications Document Review Form, PPLP003878021.

816. In the summer of 2017, Landau returned to the United States as CEO of Purdue Pharma L.P. and Purdue Pharma Inc.

817. To convince the Sacklers to make him CEO, Landau wrote a plan that he titled: "SACKLER PHARMA ENTERPRISE." He started by admitting that the Sacklers in fact controlled the company like chief executive officers. The family ran "the global Sackler pharmaceutical enterprise … with the Board of Directors serving as the 'de-facto' CEO."[973]

818. Landau confirmed that Purdue's profits were driven "almost exclusively by opioid sales," and noted that the Sacklers made a deliberate decision to pay themselves instead of investing in research. "The planned and purposeful de-emphasis and deconstruction of R&D has left the organization unable to innovate." He admitted that Purdue had lost its credibility: "Our relationship and credibility with FDA review has deteriorated." As a preview of what would eventually cause the Sacklers to walk away from the company, Landau wrote: "The U.S. business is in a state of decline and will soon no longer be able to fund investments across IACs [the Sackers' affiliated companies] or distributions" to the Sacklers.[974]

819. Landau proposed that Purdue should take advantage of the public concern about opioids to become an even more dominant opioid seller "as other companies abandon the space." Purdue would pursue an "opioid consolidation strategy" and be the last one standing.[975]

820. With Landau as CEO, Purdue's misconduct in Massachusetts continued. While Landau was the chief executive, Purdue sales reps visited Massachusetts prescribers more than 5,000 times. Now it was Landau who ensured that the sales staff met their targets for prescriber visits and opioid sales. Now it was Landau who made misleading statements to defend Purdue

---

[973] 2017-05-02 email from Craig Landau, PPLPC020001106305; 2017-05-01 Presentation by Craig Landau, PPLPC020001106306.
[974] 2017-05-02 Presentation by Craig Landau, PPLPC020001106307-308.
[975] 2017-05-02 Presentation by Craig Landau, PPLPC020001106313.

against its critics. Now it was Landau who tried to please the Sacklers with plans to expand their opioid business even more.

821. In August, Landau edited Purdue's contribution to the Biotechnology Innovation Organization's Opioid Working Group. In it, Landau continued to push the deceptive idea that so-called "abuse deterrent" opioids are safe.[976] In fact, abuse deterrent opioids have no effect on the most common form of abuse: swallowing pills.

822. In September, Landau held a series of meetings with staff about opioid promotion by Purdue's sales reps.[977]

823. In October, Landau instructed staff to investigate deceptive promotion of opioids by Purdue's Massachusetts-based competitor, Collegium.[978] He asked about Collegium sales reps doing what Purdue had done for decades: visiting doctors to make false claims that their product was safer than other opioids. Then Landau directed staff to draft a letter for him to send to insurers accusing other opioid companies of misconduct to distract from Purdue's.[979]

824. In November, Landau wrote to the President of Tufts University, long-time recipient of the Sacklers' payments, to rebut "recent news coverage of the Sackler family and Purdue Pharma." In his letter, Landau falsely claimed that Purdue's misconduct ended "sixteen years ago," and Purdue had "worked tirelessly" since then to disclose the risks of its drugs. In fact, Landau and others at Purdue worked to conceal the risks — getting more patients on higher doses for longer periods, without disclosing that patients on high doses are likely to stay on opioids longer and overdose and die. Landau wrote to Tufts that Purdue "encourage[d]

[976] 2017-08-31 email from Craig Landau, PPLPC001000259772; 2017-08-22 Questionnaire - Purdue Response, PPLPC020001132365; 2017-08-30 BIO Opioid Mission, PPLPC001000259761.
[977] 2017-09-01 email from Craig Landau, PPLPC016000315550.
[978] 2017-10-11 email from Craig Landau, PPLPC005000263817.
[979] 2017-10-20 email from Craig Landau, PPLPC016000318811.

physicians to prescribe fewer opioids."[980] That same month, in the privacy of face-to-face sales visits, Purdue sales reps kept pushing Massachusetts doctors to prescribe more opioids, just as they had all along. And Purdue, under Landau as CEO, continued to evaluate sales reps based on how much they increased opioid sales.[981]

825. A week after Landau wrote to Tufts that Purdue wanted fewer people on opioids, Jonathan Sackler suggested to Landau that Purdue launch yet another opioid to expand the market. Landau replied that he was already working on it and promised to present a proposal to the Sacklers within two weeks.[982]

826. In December, Landau took out an ad in major newspapers, including *USA Today*, *The Wall Street Journal*, and *The New York Times*. Landau knew and intended that the ad would reach tens of thousands of Massachusetts subscribers. In the ad, Landau emphasized the so-called abuse deterrent properties of Purdue's drugs, without disclosing that they provide no protection against the most common form of abuse — simply swallowing the pills.[983]

827. In January 2018, staff alerted Landau to a recent publication by the FDA showing that "multiple studies clearly indicate an increasing risk of serious adverse health outcomes associated with increasing opioid analgesic dose." Landau was not surprised, because his own analysis five years earlier — in 2013 — showed the same thing.[984] Nonetheless, for years after Landau wrote that analysis, he pushed higher doses to make more money.

---

[980] 2017-11-13 letter from Craig Landau, PPLPC021000912689.
[981] Exhibit 1.
[982] 2017-11-21 emails from Jonathan Sackler and Craig Landau, PPLPC016000321333, -334.
[983] 2017-12-14 email from Craig Landau, PPLPC001000264824, -826-827.
2018-01-25 email from Craig Landau, PPLPC002000292391; 2013-03-18 Systematic Review of the Efficacy and Safety of Long-Term Opioid Therapy in the Management of Chronic Noncancer Pain, PDD8013708195.

828. In February, when the Sacklers told him to, Landau laid off 300 sales reps. The next month he laid off another 125 Purdue employees.[985] He kept his job and his salary.

829. Since the 2007 Judgment, Landau has collected substantial revenue from the sale of Purdue opioids in Massachusetts, as detailed in Exhibit 2.

830. While Landau was CEO, at least 51 Massachusetts patients who had been prescribed Purdue opioids overdosed and died.

[985] 2018-02-07 email from Craig Landau, PPLPC016000325614; 2018-03-14 email from Craig Landau, PPLPC020001163155.

## Conclusion

831. Holding the defendants accountable is important because of the people they hurt in Massachusetts and because of the defendants' selfish, deliberate choice to break the law. Purdue's leaders knew more than anyone about their addictive drugs. They knew how to get people addicted, how to keep people addicted, and how to collect the most money from the patients who were trapped on their opioids. They used the powers of a billion-dollar corporation to engineer an opioid epidemic.

832. As Purdue's scheme unraveled, in the fall of 2017, Purdue CEO Landau wrote down notes about the opioid crisis. He wrote:

> ***"There are:***
>
> ***Too many Rxs being written***
>
> ***Too high a dose***
>
> ***For too long***
>
> ***For conditions that often don't require them***
>
> ***By doctors who lack the requisite training in how to use them appropriately."***[986]

833. Craig Landau knew he was building an epidemic the whole time. He joined Purdue in 1999. He helped make OxyContin a billion-dollar drug. His life's work is getting too many people on opioids, at doses that are too high, for far too long.

834. The opioid epidemic is not a mystery to the people who started it. The defendants knew what they were doing.

---

[986] 2017-09-18 email from Craig Landau, PPLPC021000904935.

## XI. DISCOVERY RULE AND TOLLING

835. The defendants' unfair and deceptive conduct continued from this Court's 2007 Judgment through 2018.

836. The defendants' unfair and deceptive conduct was well concealed. The defendants deliberately conducted much of their deception through in-person sales visits, in order to avoid a potentially discoverable paper trail. Purdue prohibited its sales reps from emailing doctors. After this Office notified Purdue of our investigation, Purdue changed its decade-old procedure so that sales reps would not write down descriptions of their conversations with doctors for every sales visit, even in Purdue's internal records. The defendants concealed from the public and from the Commonwealth their internal documents about their deceptive scheme, including their plans to hook more patients on higher doses for longer periods; their findings that higher doses were a way to hook patients onto treatment for longer periods; and their knowledge of inappropriate prescribing by high-prescribing doctors that they targeted to prescribe their drugs. The individual defendants further concealed their participation in the deception and did not reveal to the Commonwealth the fact that they were directing and profiting from the deceptive scheme.

837. Discovering the nature and extent of the defendants' unfair and deceptive conduct required a costly and complex investigation. As part of the investigation, the Attorney General's Office has collected more than a million pages of evidence regarding the defendants' deception.

838. Because of the defendants' deception, any statutes of limitation otherwise applicable to any claims asserted herein against all defendants have been tolled by the discovery rule and rules regarding fraudulent concealment.

839. In addition to the tolling provided by common law, Purdue Pharma Inc., Purdue Pharma L.P., and the Commonwealth entered into a written agreement tolling any applicable

statutes of limitation during the period from August 3, 2016 through May 18, 2018.

## XII. JURISDICTION AND VENUE

840. This Court has jurisdiction over the subject matter of this suit pursuant to General Laws chapter 93A section 4 and chapter 214 section 1.

**General Jurisdiction Under M.G.L. Chapter 223A § 2**

841. The Court has general jurisdiction over Russell Gasdia pursuant to General Laws chapter 223A section 2.

**Specific Jurisdiction Under M.G.L. Chapter 223A § 3(a)**

842. The Court has specific jurisdiction over all defendants pursuant to General Laws chapter 223A section 3(a), because this action arises from each defendant acting directly and through agents to transact business in Massachusetts.

843. In the 2007 Judgment entered in civil action no. 07-1967, Purdue Pharma Inc. and Purdue Pharma L.P. admitted the jurisdiction of this Court.

844. Purdue Pharma Inc. is incorporated with its official purpose as manufacture, sales, distribution, and research and development with respect to pharmaceutical, toiletry, chemical and cosmetic products, directly or as the general partner of a partnership engaged in those activities. It controls Purdue Pharma L.P. and transacts business in Massachusetts, under section 3(a) of the Massachusetts Long-Arm Statute, M.G.L. c. 223A, §3, both on its own and through Purdue Pharma L.P.

845. Purdue Pharma L.P. employed scores of sales reps in Massachusetts to promote Purdue's opioids in Massachusetts and sold more than $500,000,000 of opioids in Massachusetts.

846. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent,

Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau voted for and/or ordered sales reps to go door-to-door, making thousands of visits to doctors in Massachusetts to implement the deceptive scheme described in this Complaint.

847. Despite being warned in writing that it was a high-risk activity, Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau directed payments to Massachusetts doctors such as Walter Jacobs in exchange for the doctors' promotion of Purdue drugs.

848. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau directed and/or managed efforts to advance favorable legislation and block unfavorable lawmaking in Massachusetts that would impact Purdue's sales in the Commonwealth. These individuals knew and intended that Massachusetts was an important market for Purdue's dangerous drugs.

849. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau directed the dissemination of tens of thousands of copies of unfair or deceptive marketing materials to health care providers throughout the Commonwealth to get more and more patients on Purdue's drugs for longer and longer periods of time at high and higher doses. Although they did not lick the stamps themselves, these individuals directed and/or managed a

chain-of-command causing these mailings in Massachusetts because they meant increased sales and profits for the Sacklers and their executives.

850. Through targeted funding and programming, Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau unfairly and deceptively promoted opioids at Massachusetts medical institutions including Tufts University and Massachusetts General Hospital. Their votes for and/or management of funding and programming at these institutions encouraged more no- or limited-access doctors to prescribe Purdue's dangerous drugs at higher doses for longer periods and made the Sacklers and their executives more money.

851. John Stewart traveled to Boston to network with and influence MGH doctors who could prescribe opioids in Massachusetts. Craig Landau signed multiple work orders with a Massachusetts-based consultant for work related to the approval for sale of Purdue's dangerous drugs, presented on opioids for chronic pain at the International Conference on Opioids in Boston, and offered to meet with Tufts' President in person to maintain the business advantages that relationship provided. Russell Gasdia traveled throughout Massachusetts to promote Purdue's opioids, including at conferences, trade shows, and district sales meetings. Richard Sackler had a Tufts professor meet with Purdue staff.

**<u>Specific Jurisdiction Under M.G.L. Chapter 223A § 3(c)</u>**

852. The Court also has specific jurisdiction over all defendants pursuant to General Laws chapter 223A section 3(c), because this action arises from each defendant acting directly and through agents to cause tortious injury by acts and omissions in Massachusetts.

853. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt,

Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau directed sales reps to go door-to-door, making thousands of visits to doctors in Massachusetts. Although they did not knock on the doors to clinics and family practices themselves, these individuals voted for and/or ordered sales reps to deceptively promote Purdue's dangerous drugs in person, as a central facet of their deceptive marketing scheme that killed hundreds of people in Massachusetts.

854. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau voted for and/or directed payments to Massachusetts doctors to promote Purdue's drugs.

855. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau voted for, directed, and/or managed unfair and deceptive efforts to advance favorable legislation and block unfavorable lawmaking in Massachusetts that would impact Purdue's sales in the Commonwealth. These individuals knew and intended that Massachusetts was an important market for Purdue's dangerous drugs.

856. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau all directed the dissemination of tens of thousands of copies of unfair or deceptive

marketing materials to doctors and other health care providers throughout the Commonwealth for the purpose of getting more and more prescribers to put their patients on Purdue's drugs for longer and longer periods of time at high and higher doses. These individuals voted for and/or managed a chain-of-command causing these mailings in Massachusetts because they meant increased sales and profits for the Sacklers and their executives.

857. By ordering and/or managing targeted funding and programming, Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau unfairly and deceptively promoted opioids at Massachusetts medical institutions including Tufts University and Massachusetts General Hospital. These individuals got more and more no- or limited-access doctors to prescribe Purdue's dangerous drugs at higher and higher doses for longer and longer periods of time and made the Sacklers and their executives more and more money.

858. In addition, Richard Sackler, Beverly Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler (directors in 2007) voted for and caused Purdue Pharma L.P. to enter into a Settlement Agreement with the Commonwealth of Massachusetts to address Purdue's liability from the last time it deceived doctors and patients about its opioids.

859. In addition, Richard Sackler, Beverly Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler (directors in 2007) voted for and caused Purdue Pharma Inc. and Purdue Pharma L.P. to enter into the 2007 Judgment issued by this Court, which required that: (a) Purdue not deceive doctors and patients about its opioids; and

(b) when Purdue found evidence of improper prescribing by its target doctors, Purdue stop promoting opioids and contact the authorities.

860. Subsequently, as described in this Complaint, Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau directed or caused Purdue to violate the 2007 Judgment of this Court.

861. This misconduct caused tortious injury in Massachusetts by killing hundreds of people and injuring many more.

**Specific Jurisdiction Under M.G.L. Chapter 223A § 3(d)**

862. The Court also has specific jurisdiction over all defendants pursuant to General Laws chapter 223A section 3(d), because:

- This action arises from each defendant acting directly and through agents to cause tortious injury in Massachusetts by acts and omission outside Massachusetts; and

- Each defendant also regularly does or solicits business in Massachusetts, or engages in other persistent courses of conduct in Massachusetts, or derives substantial revenue from goods used or consumed or services rendered in Massachusetts.

*This action arises from each defendant causing tortious injury in Massachusetts*

863. The first element of the section 3(d) jurisdictional test is satisfied for every individual defendant because this action arises from Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau causing tortious injury in Massachusetts. As described in this Complaint, each individual defendant voted for, directed, and/or managed

Purdue's misconduct, which killed hundreds of people in Massachusetts.

*Each defendant derives substantial revenue from goods used in Massachusetts*

864. The second element of the section 3(d) jurisdictional test is also satisfied for every individual defendant because each defendant derived substantial revenue from goods used or consumed in Massachusetts. Indeed, the defendants acquired the revenue through their tortious misconduct.

865. Purdue Pharma L.P. and Purdue Pharma Inc. collected approximately 2.8% of their revenue from Massachusetts. The Sacklers, as well as Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau, tracked this revenue as it came in to Purdue from the Commonwealth. The defendants made no effort to segregate Massachusetts revenue, or withhold it from money they directed Purdue to pay them. Instead, the defendants included Massachusetts revenue in payments to all of Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Russell Gasdia, Mark Timney, and Craig Landau.

866. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler paid their families billions of dollars from opioid sales, including approximately $120,000,000 from Massachusetts from 2007 to the present. This list of payments is likely incomplete and not exhaustive.

**Sackler Defendants Revenue From Massachusetts**

| Date | Payments | MA Share (2.8%) |
|---|---:|---:|
| April 2008 | $50,000,000 | $1,400,000 |
| June 2008 | $250,000,000 | $7,000,000 |
| September 2008 | $199,012,182 | $5,572,341 |
| November 2008 | $325,000,000 | $9,100,000 |
| March 2009 | $200,000,000 | $5,600,000 |
| June 2009 | $162,000,000 | $4,536,000 |
| September 2009 | $173,000,000 | $4,844,000 |
| February 2010 | $236,650,000 | $6,626,200 |
| April 2010 | $141,000,000 | $3,948,000 |
| September 2010 | $240,000,000 | $6,720,000 |
| December 2010 | $260,000,000 | $7,280,000 |
| April 2011 | $189,700,000 | $5,311,600 |
| June 2011 | $200,000,000 | $5,600,000 |
| September 2011 | $140,800,000 | $3,942,400 |
| Jan-Jun 2012 | $129,000,000 | $3,612,000 |
| Jul-Dec 2012 | $289,200,000 | $8,097,600 |
| 2013 | $399,000,000 | $11,172,000 |
| 2014 | $163,000,000 | $4,564,000 |
| 2015 Budget | $349,985,000 | $9,799,580 |
| 2016 | $176,142,000 | $4,931,976 |
| **Total** | **$4,273,489,182** | **$119,657,697** |

867. The directors paid themselves handsomely for their positions on the Board. Mr. Snyderman reported to the government some of what Purdue paid him. Purdue paid him at least $32,972 for a few months of 2013; $166,119 in 2014; $168,887 in 2015; and $124,360 in 2016.

868. Each director defendant was on the board for at least five years (and in many cases for twenty years). In exchange for sitting on the board, Purdue paid each director defendant more than $600,000, including approximately $16,800 (*i.e.*, 2.8% of the total) from

Massachusetts.

869. John Stewart has collected substantial revenue from the sale of Purdue opioids in Massachusetts, as detailed in Exhibit 2.

870. Russell Gasdia has collected millions of dollars from Purdue since the 2007 Judgment, including tens of thousands of dollars (*i.e.*, 2.8% of the total) from the sale of Purdue opioids in Massachusetts.

871. Mark Timney has collected substantial revenue from the sale of Purdue opioids in Massachusetts, as detailed in Exhibit 2.

872. Craig Landau has collected substantial revenue from the sale of Purdue opioids in Massachusetts, as detailed in Exhibit 2.

*Many defendants also do regular business and engage in a persistent course of conduct in Massachusetts*

873. In addition, the disjunctive second element of the section 3(d) jurisdictional test is independently satisfied for many defendants because they regularly do business or engage in a persistent course of conduct in Massachusetts, through agents and instrumentalities as described above, and in person as described below.

**Due Process**

874. Jurisdiction over all defendants is also proper under the Due Process Clause. Constitutional due process requires that: 1) the defendants purposefully availed themselves of the privilege of conducting activities in Massachusetts or purposefully directed their conduct into Massachusetts; 2) the Plaintiff's claim relates to or arises out of the defendants' contact with Massachusetts; and 3) the exercise of jurisdiction is reasonable. Each of those requirements is satisfied.

875. The exercise of jurisdiction over each of the individual defendants is reasonable

because the burden on each defendant to defend suit in Massachusetts is minimal while the interests of the Commonwealth in adjudicating the dispute in this forum are significant.

876. The Commonwealth has a compelling interest in adjudicating this dispute and obtaining relief for its citizens. The Commonwealth has, since declared by then Governor Deval Patrick in 2014, been operating under a state of a public health emergency due to an epidemic of opioid addiction and death. As the Commonwealth's lawyer and chief law enforcement officer, the Attorney General has an interest in protecting the people of Massachusetts.

877. All the individual defendants are at least millionaires and, in some cases, billionaires, and they can afford to travel to the Commonwealth to defend this lawsuit.

878. All the individual defendants are represented by sophisticated counsel in a state abutting Massachusetts. Their counsel routinely litigate throughout the United States.

879. Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Paulo Costa, Russell Gasdia, Mark Timney, and Craig Landau all live in or retain a primary or secondary residence in states abutting Massachusetts.

880. **Richard Sackler** has served on the Board of Advisors of a major medical school and a school of graduate biomedical sciences in Massachusetts during every year from 2011 to the present. He regularly visited Massachusetts to transact business and make decisions for schools with thousands of Massachusetts employees. Richard was also an advisor to a research institute at another major university in Massachusetts, at least from 2012 to 2015, and visited Massachusetts to advise work there. Richard is also a major investor in a privately-held biotech company in Boston. From 1998 until at least 2014, Richard served as a director of the Raymond and Beverly Sackler Foundation, Inc., which registered to do business in Massachusetts.

881. **Beverly Sackler** served, from 1998 until at least 2014, as a director and both Treasurer and Secretary of the Raymond and Beverly Sackler Foundation, Inc., which registered to do business in Massachusetts. She signed the certificate submitted to the Commonwealth of Massachusetts stating that the corporation conducts medical research in Massachusetts.

882. **David Sackler** invested $100 million in a hedge fund based in Boston in 2014. The investment is to last until at least 2021. On information and belief, David Sackler regularly transacts business in Massachusetts in connection with the fund, and visits Massachusetts for meetings related to the fund.

883. **Jonathan Sackler** served, from 2004 until at least 2014, as a director and President of the Raymond and Beverly Sackler Foundation, Inc., which registered to do business in Massachusetts. Each year, he signed the annual reports of the corporation, submitted to the Commonwealth of Massachusetts, describing the corporation's business in Massachusetts.

884. **Mortimer Sackler** lived in Massachusetts at least during the period from 1991 through 1999. He owned a condominium at 950 Massachusetts Ave., Unit PH2, Cambridge, Massachusetts, 02139.

885. **Judith Lewent** is as a lifetime member of the governing board of a major university in Massachusetts; attends meetings in Massachusetts at least 4 times each year; and makes decisions for one of the most significant employers in our state. She became a member of that governing board in 1994; she has served on its Executive Committee and chaired the Visiting Committee of the university's School of Management. She is also currently a director of a significant company, which has been registered with the Massachusetts Secretary of State since 1960. Ms. Lewent's address on the company's 2017 annual report is 168 Third Ave., Waltham, Massachusetts 02451. She is also a member of an academy headquartered in

Massachusetts, and, on information and belief, she visits Massachusetts to attend meetings there.

886. **Cecil Pickett** rented a residence at 75 Cambridge Pkwy, Unit 307, Cambridge, Massachusetts 02142, at least for the period from 2007 to 2009. He was the President and a director from 2006 to 2008 for a company located at 14 Cambridge Center, Cambridge, MA 02142. He was also the President of an institute located in Boston, MA. The institute was registered in Massachusetts from 2005 to 2007. He is a director of another company in Massachusetts. He attends meetings in Massachusetts and makes decisions for a team of Massachusetts scientists with more than $45 million in funding.

887. **Ralph Snyderman** co-founded a healthcare technology company in Newton, Massachusetts, in 2004. For more than a decade, he has served as a director of the company and chairman of the board. The company registered with the Commonwealth of Massachusetts from at least 2010 to 2012. On information and belief, Snyderman attends meetings in Massachusetts, sends and receives hundreds of business communications to and from Massachusetts, and makes decisions for the company, which is "a leading developer of personalized decision support technologies for oncology and cardiology" in Massachusetts.

888. [intentionally blank].

889. Venue in the Suffolk County Superior Court is proper under G.L. c. 93A § 4 and G.L. c. 214 § 5.

## XIII. CAUSES OF ACTION

**COUNT ONE**
**UNFAIR AND DECEPTIVE ACTS AND PRACTICES**
**IN VIOLATION OF G.L. c. 93A § 2**

890. The Commonwealth realleges each allegation above.

891. G.L. c. 93A, § 4 authorizes the Attorney General to bring an action to enjoin a defendant from engaging in a method, act, or practice that violates G.L. c. 93A, § 2.

892. On May 8, 2018, the Attorney General notified Purdue Pharma Inc. and Purdue Pharma L.P. of her intention to file this suit and offered them an opportunity to confer, in conformance with G.L. c. 93A.

893. On June 1, 2018, the Attorney General notified Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Mark Timney, and Craig Landau of her intention to file this suit and offered them an opportunity to confer, in conformance with G.L. c. 93A.

894. On November 28, 2018, the Attorney General notified Russell Gasdia of her intention to name him as a defendant in this Amended Complaint and offered an opportunity to confer, in conformance with G.L. c. 93A.

895. Through their conduct, including as described in this Complaint, in the course of marketing and promoting its opioids in Massachusetts, both directly and through third parties whom the defendants knew were acting in Massachusetts, each defendant engaged in unfair and deceptive acts and practices in Massachusetts in the conduct of trade or commerce in violation of G.L. c. 93A, including by making false and misleading claims and failing to disclose material risks to get more patients on its opioids at higher doses for longer time, and to steer patients away from safer alternatives. Through their unfair and deceptive conduct, the defendants

succeeded in getting many Massachusetts doctors to prescribe and Massachusetts patients to take and remain on Purdue opioids.

896. Each defendant also violated G.L. c. 93A by targeting medical practices where they knew or should have known that Purdue's opioids were prescribed dangerously and patients were harmed.

897. By means of their unfair and deceptive acts, the defendants collected hundreds of millions of dollars.

898. Because of the defendants' unfair and deceptive acts, the Commonwealth and its residents suffered ascertainable injuries and losses of billions of dollars.

899. Each defendant knew or should have known they were committing unfair and deceptive acts in violation of G.L. c. 93A, § 2.

900. Each unfair or deceptive act was a distinct violation of G.L. c. 93A.

**COUNT TWO**
**PUBLIC NUISANCE**

901. The Commonwealth realleges each allegation above.

902. Under Massachusetts common law, a defendant is liable for the tort of public nuisance when their conduct causes an unreasonable interference with a right common to the general public, such as interference with the public health, public safety, public peace, and public comfort and convenience.

903. The Massachusetts Attorney General is empowered to bring a *parens patriae* action on behalf of the Commonwealth for abatement of a public nuisance.

904. Through their conduct, including as described in this Complaint, each defendant was a substantial participant in creating and maintaining a public nuisance of addiction, illness, and death that significantly interferes with the public health, safety, peace, comfort, and

convenience.

905. Specifically, each defendant engaged in a campaign of deceptive marketing leading directly to an epidemic of opioid addiction, which resulted in substantial public injuries.

906. The injuries that the defendants caused in Massachusetts have been significant and long-lasting, for both the Commonwealth and the public, including: (a) opioid addiction, overdose, and death; (b) health care costs for individuals, children, families, employers, the Commonwealth, and its subdivisions; (c) loss of productivity and harm to the economy of the Commonwealth; and (d) special public costs borne solely by the Commonwealth in its efforts to abate the nuisance and to support the public health, safety, and welfare.

907. The Commonwealth has spent at least hundreds of millions of dollars on special treatment, prevention, intervention, and recovery initiatives to abate the harms of the opioid epidemic, including appropriating $134 million in FY 2016, $173 million in FY 2017, $185.3 million in FY 2018, and more than $200 million in FY 2019. The Commonwealth intends to seek reimbursement from the defendants for its expenses abating the harms they caused.

908. The Commonwealth has a special relationship with, and responsibility to its residents, including its responsibility to uphold the public health, safety, and welfare. Each defendant had reason to know of this relationship at all times.

909. Each defendant, at all times, had reason to know of the public nuisance created by their ongoing conduct.

910. The defendants' deceptive conduct was unreasonable in light of the lack of scientific support for their claims and was negligent and reckless with regard to the known risks of Purdue's drugs.

## XIV. PRAYER FOR RELIEF

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief after a trial on the merits:

a. Determine that all defendants engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A, §2, and the regulations promulgated thereunder;

b. Permanently enjoin all defendants from engaging in unfair and deceptive acts and practices;

c. Order all defendants to disgorge all payments received as a result of their unlawful conduct;

d. Order all defendants to pay full and complete restitution to every person who has suffered any ascertainable loss by reason of their unlawful conduct;

e. Order all defendants to pay civil penalties of up to $5,000 for each and every violation of G.L. c. 93A, § 2;

f. Award the Commonwealth costs and attorney's fees, pursuant to G.L. c. 93A, § 4;

g. Determine that all defendants created a public nuisance;

h. Order all defendants to abate the nuisance, to reimburse the cost of the Commonwealth's abatement efforts, and to pay compensatory damages for harms caused by the nuisance; and

i. Grant all other relief as the Court may deem just and proper.

## XV. JURY DEMAND

The Commonwealth demands a trial by jury on all issues properly so tried.

Dated: January 31, 2019

Respectfully submitted,
COMMONWEALTH OF MASSACHUSETTS
By its Attorney,
MAURA HEALEY
ATTORNEY GENERAL

Sydenham B. Alexander III, BBO # 671182
Gillian Feiner, BBO # 664152
Eric M. Gold, BBO # 660393
Jeffrey Walker, BBO # 673328
Jenny Wojewoda, BBO # 674722

Assistant Attorneys General
Health Care & Fair Competition Bureau
Office of the Attorney General
One Ashburton Place
Boston, Massachusetts 02108
617-727-2200
sandy.alexander@state.ma.us

**Commonwealth v. Purdue Pharma et al.,**
**Civil Action No. 1884-cv-01808 (BLS2)**

**Exhibit 1**

**Sales Visits By Purdue In Massachusetts**

Filed in the Court file on CD.

Available to the public at https://www.mass.gov/doc/exh1-salesvisitsbypurdueinmassachusetts.

**Commonwealth v. Purdue Pharma et al.,**
**Civil Action No. 1884-cv-01808 (BLS2)**

## Exhibit 2

## Compensation of Defendants John Stewart, Mark Timney, and Craig Landau

911. Since 2007, Defendant John Stewart has collected more than $25,000,000 from Purdue.[986] The portion of his payout from Massachusetts opioid sales (more than $700,000) is more than most Massachusetts families earned during the seven years he was CEO.[987]

912. Since 2007, Defendant Mark Timney has collected more than $27,000,000 from Purdue.[988] More than $750,000 of that was derived from opioid sales in Massachusetts.

913. Since 2007, Defendant Craig Landau has collected more than $8,600,000 from Purdue in the U.S., not including what he received from Purdue Canada.[989] At least $240,000 of that money was derived from sales of Purdue opioids in Massachusetts. Landau's personal payouts from Massachusetts continue. Landau's salary is approximately $5,000,000 per year, of which over $140,000 is derived from Massachusetts.[990]

---

[986] 2008-06-27 John Stewart Employment Agreement, 2013 Total Compensation Program, tax forms and statements SAG00000023-00002233.

[987] Purdue tracked revenue from Massachusetts, and Purdue's data show that Massachusetts provided approximately 2.8% of Purdue's overall sales. *See* 2016-04-13 Q1 2016 Commercial Update, slide 74, PPLPC016000286167; Purdue Drug Units Dispensed by HCP, Product, and Strength, PWG003984518–45. The U.S. Census Bureau reports that median household income in Massachusetts was approximately $70,954 per year from 2012 to 2016. *See* QuickFacts: Massachusetts, https://www.census.gov/quickfacts/fact/table/ma/INC110216.

[988] 2013-11-22 Mark Timney Employment Agreement, TIMNEY-00000011; 2016 Executive Long-Term Incentive Compensation Statement for Mark Timney, TIMNEY-00000026; 2017 Executive Compensation Statement for Mark Timney, TIMNEY-00000039.

[989] 2007 W-2 Wage and Tax Statement for Craig Landau, LANDAU-00000011; 2008 Annual Bonus Summary, LANDAU-00000001.

[990] In half of 2017, Landau collected $2,500,000.

**CERTIFICATE OF SERVICE**

I, Sydenham B. Alexander III, Assistant Attorney General, hereby certify that I have this day, Thursday, January 31, 2018, served the foregoing document upon all parties by email as well as by mailing a copy, first class, postage prepaid to:

Timothy C. Blank, BBO # 548670
DECHERT LLP
One International Place, 40th Floor
100 Oliver Street
Boston, MA 02110-2605
timothy.blank@dechert.com
*Counsel for Defendants Purdue Pharma LP and Purdue Pharma Inc.*

Joan A. Lukey, BBO # 307340
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 02110
joan.lukey@choate.com
*Counsel for Defendants Richard Sackler, Theresa Sackler, Kathe Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Peter Boer, Paulo Costa, Cecil Pickett, Ralph Snyderman, and Judith Lewent*

James R. Carroll, BBO # 554426
Maya P. Florence, BBO # 661628
SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
james.carroll@skadden.com
maya.florence@skadden.com
*Counsel for Defendants Craig Landau, John Stewart, and Mark Timney*

Juliet A. Davison, BBO # 562289
DAVISON LAW, LLC
280 Summer St., 5th Floor
Boston, MA 02210
juliet@davisonlawllc.com
porter@spplawyers.com
*Counsel for Defendant Russell J. Gasdia*

Sydenham B. Alexander III
Assistant Attorney General