DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.*, | |
| Plaintiffs, | **Adv. Pro. No. 19-08289 (RDD)** |
| v. | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.*, | |
| Defendants. | |

**DECLARATION OF JESSE DELCONTE
IN SUPPORT OF DEBTORS' MOTION FOR A PRELIMINARY INJUNCTION**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

I, Jesse DelConte, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I submit this declaration ("**Declaration**") in support of the Debtors' *Motion for a Preliminary Injunction*, filed contemporaneously herewith.

2. The statements in this Declaration are, except where specifically stated, based on: (a) my personal knowledge of the Debtors' operations and finances based on my work as an employee of AlixPartners, LLP ("**AlixPartners**"), the financial advisor to the Debtors; (b) my review of relevant documents; (c) information provided to me by employees of AlixPartners working under my supervision; (d) information provided to me by, or discussions with, the members of the Debtors' management team, their employees, or their other advisors; and/or (e) my general experience and knowledge.

3. I am a Director at AlixPartners, a corporate advisory and restructuring firm that has its principal office at 909 3rd Ave, New York, New York 10022. I specialize in providing leadership to troubled and underperforming companies and advising senior executives, boards of directors, and creditors. I have approximately 15 years of experience working with distressed companies across numerous industries, including pharmaceuticals, retail/apparel, technology, energy, automotive, industrial and business services, and industrial manufacturing. I have provided advisory services to debtors, secured creditors, unsecured creditors, equity holders, and trustees, in out-of-court and in-court scenarios.

4. Before AlixPartners purchased Zolfo Cooper, LLC ("**Zolfo Cooper**") in 2018, I was employed by Zolfo Cooper, a financial advisory and interim management company that provided restructuring services to companies and their stakeholders, for ten years. During the last three years that I was employed by Zolfo Cooper, I served as a Senior Director. During my time at Zolfo Cooper, I advised numerous companies through successful in-court and out-of-

2

court restructurings. These companies include Sabine Oil & Gas Corp., Avaya Inc., Cenveo Inc., and Fullbeauty Brands. During these engagements I was responsible for critical aspects of the restructuring, including cash flow forecasting, business plan development, lender negotiations, and U.S. Trustee and court reporting requirements. Prior to my time at Zolfo Cooper, I spent approximately five years as an analyst at Seneca Financial Group, Inc., where I provided restructuring advisory services to companies and lenders, as well as litigation support services to various litigants. I received a B.S. with a concentration in commerce from the University of Virginia in 2003 and hold the Chartered Financial Analyst designation.

5. Since March 5, 2019, AlixPartners has been one of the principal advisors to the Debtors' main operating entity, Purdue Pharma L.P. ("**Purdue Pharma**," and together with all Debtors, "**Purdue**" or the "**Debtors**"), and today, to all of the Debtors. As an advisor to the Debtors, I am actively involved in the Debtors' operations and have been working cooperatively with PJT Partners and Davis Polk & Wardwell LLP ("**Debtors' Other Restructuring Advisors**," collectively with AlixPartners, "**Debtors' Restructuring Advisors**") to advise the Debtors on decisions related to the Debtors' business operations and the impacts of the Debtors' ongoing restructuring activities.

6. In the six months that my team and I have been working with the Debtors, we have assisted management and the Debtors' Other Restructuring Advisors on a number of different work streams. I, and the members of my team, work closely with the Debtors' management and employees. In any given week, I typically work three or four days at Purdue Pharma's headquarters in Stamford, Connecticut. In the course of my work I have frequent conversations—often multiple times a day—with the Debtors' employees and senior

3

management, including Purdue Pharma's chief financial officer. Work streams on which my colleagues and I have assisted include:

- Preparing the Debtors' first day pleadings to ensure a seamless transition to operating on a post-petition basis, including with respect to any post-petition reporting requirements;

- Developing potential cost reduction strategies, business plans, and growth initiatives related to the integration of the businesses of Rhodes Pharmaceuticals L.P. and Rhodes Technologies in order to maximize the go-forward profitability of the Debtors' business and the value of the Debtors' estate;

- Assisting management and the Debtors' Other Restructuring Advisors in evaluating potential funding needs and potential financing sources;

- Working with the Debtors' Other Restructuring Advisors to prepare materials for the Debtors' Board of Directors ("**Board**") and Board committees, including the Special Committee; and

- Reviewing and advising on operational decisions and their impact on the Debtors' restructuring strategy.

7. Both before and after AlixPartners began advising the Debtors in March 2019, certain of the Debtors[2] have been subject to a massive volume of litigation related to the Debtors' marketing and sale of opioid-related medications ("**Pending Actions**"). The Pending Actions, which currently total more than 2,600 lawsuits, tie up a great deal of the Debtors' operational resources and management's time. Indeed, in the course of performing my duties at Purdue, I have observed that certain employees are, at times, unable to respond to AlixPartners' requests in connection with the above-mentioned work streams because activities related to the Pending Actions require their attention. As described below, the Pending Actions require the

---

[2] Although I understand that only certain of the Debtors (Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Purdue Transdermal Technologies L.P.; Purdue Pharmaceutical Products L.P.; Purdue Pharma of Puerto Rico; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; and Avrio Health L.P.) are defendants in the litigations, I use the term "Debtors" for ease of reference.

4

Debtors' management team to devote significant attention to these litigations rather than to maximizing the value of the Debtors' businesses.

8. To address the Pending Actions, the Debtors have worked with over 60 law firms and consulting firms. The time and resources required to monitor and manage the various work streams for these firms and to oversee and manage the Pending Actions, and any responses thereto, is enormous. Altogether, the Pending Actions require a significant amount of the available time and resources of management and of the Board and divert them from their core tasks of managing the business and maximizing its value.

9. Since March 2019, the Debtors have found it necessary to hold Board meetings multiple times every month. Before March 2019, the Debtors typically held board meetings on a monthly basis. Since March 2019, the primary topic of discussion at Board meetings, and the reason that these meetings have been held so frequently, is not operational aspects of the business but rather the status of the Pending Actions and strategic responses to those suits. Purdue's General Counsel, Marc Kesselman, devotes a substantial portion of his time to matters related to the Pending Actions, and Purdue has a number of employees whose sole or primary responsibility is to help manage the Pending Actions. In addition, many senior employees of Purdue must devote significant time and efforts to litigation-related matters.

10. Discovery, in particular, consumes substantial management and employee time, as the Pending Actions impose onerous discovery demands upon the Debtors. For example, Jon Lowne, the chief financial officer of Purdue Pharma was recently deposed in *State of Rhode Island, ex rel. Peter F. Neronha, Attorney General v. Purdue Pharma L.P., et al.*, C.A. No. PC2018-4555 (R.I.) in the capacity of a corporate representative. That deposition lasted approximately a full day and required approximately 30 hours of Mr. Lowne's time to prepare.

5

11. To date, there have been many depositions of the Debtors' present or former directors, officers, or employees in the Pending Actions, requiring current management and employees to sit through many more hours of preparation time. Many of these employees, in fact, have sat for multiple days of depositions. It is expected that some, and perhaps all, of these current employees and managers, as well as potentially others, will be called for depositions in the future.

12. Depositions are not the only discovery device that requires the attention of the Debtors' management and employees. Purdue has been responding to written discovery demands in cases across the country. These consist of interrogatories, requests for production of documents, and requests for admission. Plaintiffs typically serve dozens of individual questions in their interrogatories, and often serve more than one set of interrogatories. Many of these questions require Purdue employees to conduct a significant amount of research, sometimes relating to information dating back 20 years. Although a team of outside counsel is responsible for drafting initial answers, employees at Purdue must be involved to assist counsel in researching and providing answers and verifying the accuracy of proposed responses. In many cases, this requires Purdue employees to gather large volumes of documents, data, or other information.

13. For example, Purdue Pharma's Controller spends a significant amount of time on matters related to the Pending Actions, which include reading and verifying responses to interrogatories, preparing financial schedules in response to discovery-related requests, and analyzing historical sales and profit data to provide supporting detail. Purdue Pharma's Treasurer and Director of Business Development Finance also spends a significant amount of time on matters related to the Pending Actions, including providing financial analyses and

responding to questions in connection with written discovery. Other employees in various financial roles are also required to provide support for these activities.

14. In addition to written discovery, the Debtors have been subject to extensive document discovery. The Debtors have produced millions of documents in connection with the Pending Actions, including millions of documents in the MDL alone. Setting aside the immense vendor costs associated with managing this discovery—in 2019, the Debtors have spent approximately $1 million per month on discovery vendors—the processes of collecting, reviewing, and approving productions inevitably distracts management and other employees from their core business responsibilities.

15. In addition to the time and resources spent by those employed by the Debtors, the Pending Actions have exacted significant human capital costs. In particular, the Pending Actions have created a state of uncertainty, volatility, and doubt regarding the Debtors' future. This has manifested in two important respects.

16. First, uncertainty is frustrating, and is likely thwarting, the Debtors' efforts to retain talent. Since 2018, several of the Debtors' key employees have resigned, including: the Chief Medical Officer; Vice President, Head of Research & Development; Head of Clinical Research Operations; and Vice President, Chief Business Officer, among others. These resignations have complicated the Debtors' efforts to operate the business and manage the ongoing litigation.

17. Second, uncertainty over the future of the Debtors' business is making recruiting new talent difficult across business functions. The Debtors' inability to recruit new talent also impacts their ability to maximize the value of the estates for their stakeholders. A stay

of active Pending Actions will help to relieve the pressure on the Debtors, and focus employees' efforts on the productive tasks of preserving and improving the business while in bankruptcy.

18. The Pending Actions have also taken their toll on the Debtors' ongoing business. Counterparties are wary of dealing or cooperating with the Debtors because of the uncertainties and risks associated with the Pending Actions and their drain on the Debtors' financial and human resources. For example, negative public sentiment led multiple financial institutions to refuse to work with Purdue, requiring management to spend precious time—months in fact—securing replacement services. While staying active Pending Actions will probably not ameliorate all concerns in this regard, it would at least help to assure counterparties that the Debtors will have the financial and operational resources to focus on running their business, rather than having to continue defending against the barrage of lawsuits while in bankruptcy.

19. Decreasing all of the burdens discussed above is particularly important at the outset of this proceeding because the Debtors' Board and the Debtors' Restructuring Advisors will need to devote the substantial majority of their attention to operating the business efficiently, ensuring that all bankruptcy reporting requirements are met, and negotiating with appropriate estate stakeholders toward a resolution of the Pending Actions and, ultimately, a plan of reorganization. The needs of the bankruptcy cases will likely impose even greater demands on the Debtors' management's time than there had ever been before. Moreover, it is possible that presently unknown challenges will arise during the course of the restructuring that may require significant attention from management. In short, in order to allow the Debtors to devote the requisite time and attention to these ongoing restructuring efforts, those Pending Actions that are diverting management's attention and resources need to be stayed. Staying active Pending

Actions would allow the Debtors' management to focus on maximizing the value of the Debtors' estate for the benefit of all stakeholders.

20. To the extent that litigation is not stayed, not only will management's time be diverted from focusing on the Debtors' restructuring, but the Debtors will also continue to face crippling litigation costs that siphon value away from more productive uses. For example, to the extent that Purdue is converted into a public benefit corporation to pursue development of opioid overdose rescue medications, all of the value currently being diverted to pay litigation-related costs is value that could be preserved for the benefit of appropriate estate stakeholders, including, in that scenario, the American public.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

New York, New York
September 18, 2019

*[signature]*

Jesse DelConte
Director
AlixPartners, LLP