DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.*, | |
| Plaintiffs, | **Adv. Pro. No. 19-08289 (RDD)** |
| v. | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.*, | |
| Defendants. | |

**DECLARATION OF JAMIE O'CONNELL
IN SUPPORT OF DEBTORS' MOTION FOR A PRELIMINARY INJUNCTION**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

I, John James O'Connell III, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1. I am a partner in the Restructuring and Special Situations Group (the "**Restructuring Group**") of PJT Partners LP ("**PJT**"), which serves as the investment banker for Purdue Pharma L.P. ("**Purdue Pharma**") and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, "**Purdue**" or the "**Debtors**").

2. PJT is an investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017. PJT was spun off from The Blackstone Group L.P. ("**Blackstone**") on October 1, 2015. Upon the consummation of the spin-off, the Restructuring Group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT. The professionals at PJT have extensive experience in the reorganization and restructuring of distressed companies, both out of court and in chapter 11 proceedings. PJT has over 650 employees located in New York, San Francisco, Boston, Chicago, London, Sydney, Hong Kong, and Madrid. PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

3. Prior to joining PJT, I was a Senior Managing Director at Blackstone, where I worked in the Restructuring and Reorganization Group from 2004 to 2015. Before that, I worked at Dolphin Equity Partners and in the Corporate Recovery Services Group of Arthur Andersen.

4. I hold a Bachelor of Business Administration degree *magna cum laude* in Accountancy from the University of Notre Dame and a Master of Business Administration degree with honors in Finance and Strategic Management from the Wharton School of the University of Pennsylvania.

5.      I have over 20 years of corporate restructuring experience and have served as a financial advisor in numerous restructurings, both in court and out of court. With respect to chapter 11 matters, I have advised debtors, creditors or sponsors in the following cases, among others: Aegean Marine Petroleum Network, Inc.; Central European Distribution Corporation; Excel Maritime Carriers, Inc.; Genco Shipping & Trading Limited; Mrs. Fields Original Cookies, Inc.; Nautilus Holdings Limited; New World Pasta Company; Overseas Shipholding Group Inc.; Simmons Bedding Company; Solutia Inc.; Stearns Holdings, LLC; TGHI, Inc. (Targus Holdings); Toisa, Inc.; Ultrapetrol Bahamas Limited; and Winn-Dixie Stores, Inc.

6.      More specific to this matter, I have advised companies in situations involving potential mass tort liability. These companies include The Babcock & Wilcox Company, Dow Corning Corporation, Specialty Products Holding Corp. (parent of Bondex International), and W. R. Grace & Co.

7.      Except as otherwise indicated herein, the facts set forth in this declaration ("**Declaration**") are based upon my personal knowledge, my discussions with the Debtors' management and their other advisors, and other members of the PJT team involved in this matter, my review of relevant documents, information provided by the Debtors, and my experience and familiarity with the Debtors' assets, business, operations, and financial conditions. If called upon to testify, I can and will testify competently as to the facts set forth herein.

## Background

8.      PJT was initially retained on or around November 13, 2017 as Purdue faced mounting litigation related to its opioid medications. The scope of PJT's initial work, which lasted approximately three months, focused primarily on assessing Purdue Pharma's business plan. In connection with this assessment, Purdue Pharma decided to scale back certain

3

functions, including sales initiatives, research and development investment, and pipeline product development.

9. Several months later, beginning on or around May 1, 2018, PJT started a second engagement with Purdue Pharma. The scope of this assignment included the analysis of intercompany relationships with Rhodes Technologies and Rhodes Pharmaceuticals L.P. ("**Rhodes Pharma**"),[2] the evaluation of manufacturing arrangements, the analysis of the financial impact of potential settlement and restructuring options and the assessment of business risks resulting from an ever-increasing number of lawsuits. These risks included, among others, a substantial reduction in the amount of cash on hand as a result of significant legal defense and related indemnification expenses and potential business interruption resulting from suppliers and vendors requiring more onerous trade terms.

10. The third phase of PJT's engagement began on or around April 1, 2019 and has included the ongoing evaluation of the business plan, the support of Debtors' counsel in negotiations with advisors to various litigants and the preparation of the Debtors' chapter 11 bankruptcy filing.

11. As a result of this work, I have personal knowledge of the Debtors' financial affairs, business operations, and other related material information.

---

[2] At this time, Rhodes Pharma was under a different ownership chain than Purdue (although Rhodes and Purdue Pharma, I understand, have always shared the same ultimate owners). In May 2019, Rhodes Pharma was contributed to Purdue Pharma, becoming a Purdue Pharma subsidiary.

4

**Benefits of the Automatic Stay**

12.     Absent a stay of the active opioid-related litigations currently pending against certain of the Debtors,[3] Purdue's limited funds will continue to be depleted by the massive legal expenses arising from the active opioid-related litigations, a condition that is exacerbating Purdue's already deteriorating cash flow.  The legal expenses associated with these litigations—which are likely to remain constant if not increase in the years to come—may imperil a successful bankruptcy because they threaten to exhaust value that would otherwise be available for distribution upon resolution of these bankruptcy cases.

13.     Indeed, not enjoining the active litigation against the Debtors in this case would undermine the purpose of filing for chapter 11 relief.  In my experience as a financial advisor in chapter 11 bankruptcies with alleged mass tort liabilities, the automatic stay has proven to be a necessary and critical feature that enables claimants and corporate defendants to work successfully towards global resolutions or otherwise ultimately resolve their tort liabilities in the context of the bankruptcy.  Without application of the automatic stay, those cases would have resulted in additional litigation, expense, and uncertainty, challenging the ability of those debtors to forge consensus with their claimants while continuing to expend their financial resources.  Similarly here, absent a stay of active litigation, the increased expense, uncertainty, and roadblocks to reaching consensus that currently face the Debtors will continue.  A stay will prevent a scenario in which the Debtors must coordinate and defend multiple litigations that are impeding the Debtors' ability reach a global resolution.  Allowing the litigation to continue

---

[3] Although I understand that only certain of the Debtors (Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Purdue Transdermal Technologies L.P.; Purdue Pharmaceutical Products L.P.; Purdue Pharma of Puerto Rico; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; and Avrio Health L.P.) are defendants in the Pending Actions, I use the term "Debtors" for ease of reference.

5

would reduce the overall distributable value to all claimants, thereby effectively acting as a value transfer away from claimants.

14. The need for the automatic stay is amplified in this situation because—unlike other debtors that I have advised in chapter 11 mass tort bankruptcies—Purdue faces material business risks. These risks include a significant decline in sales of opioid medications; a limited product portfolio outside of opioid medications; a pipeline of medications in development which, while promising in management's view, is limited and will require significant investment; and the possibility of further contraction in cash flow related to working capital.

### Purdue Faces Significant Legal Defense Expenses

15. I understand that there are more than 2,600 civil lawsuits against the Debtors and other defendants in federal and state courts around the United States relating to the marketing and sale of opioid medications (the "**Pending Actions**"). I understand further that approximately 2,200 of these lawsuits are consolidated in a federal multidistrict litigation pending in the United States District Court for the Northern District of Ohio.

16. Though the Debtors' unrestricted cash balance as of August 31, 2019 of approximately $1.2 billion may appear significant, without a stay of the active Pending Actions, the cash balance will be diminished by legal expenditures that the Debtors will bear as a result of the Pending Actions.[4] Purdue Pharma is the Debtors' main operating entity. Purdue Pharma is forecasted to pay approximately $121 million in 2019 for its own legal defense costs in connection with the Pending Actions. Notably, this amount does not include, among other expenses, (1) legal fees incurred in the ordinary course of business, such as fees in connection

---

[4] Restricted cash as of August 31, 2019 was $215 million.

6

with regulatory and patent matters, (2) legal and other professional fees incurred in connection with this chapter 11 case, and (3) indemnification costs for current and former directors, officers, employees or others.[5] In total, Purdue Pharma is forecasted to spend approximately $263 million on legal expenditures in 2019.

17. In the first six months of this year, Purdue Pharma paid approximately $63 million for legal representation, expert fees, and other expenses in connection with the Pending Actions.[6] Rhodes Pharma, a Purdue subsidiary, also incurred approximately $2 million in litigation expenses associated with the Pending Actions in the first six months of this year.

18. Legal expenses have escalated significantly compared to past years. For example, in 2015, when the Pending Actions against the Debtors consisted of only a few cases, Purdue Pharma's total legal expenses (including general corporate and patent-related expenses) were approximately $48 million. By the end of 2018, when the Pending Actions consisted of approximately 1,800 cases, Purdue Pharma's total legal expenses (including general corporate and patent-related expenses) were approximately $128 million, before escalating to approximately $263 million projected in 2019.

19. If Purdue Pharma's Pending Action-related expenditures remain at the projected 2019 level, they will constitute one of the largest annual expenses on Purdue Pharma's income statement for the foreseeable future. For 2019, legal costs in connection with the

---

[5] In the first six months of 2019, Purdue Pharma paid approximately $14 million in legal expenses for former directors, officers, and employees. Purdue Pharma is forecasted to pay a total of $26 million for such indemnification expenses in 2019. I understand that, as of earlier this year, indemnification payments are no longer being made for the benefit of any shareholder or ultimate owner of the Debtors.

[6] The legal defense costs do not include Purdue Pharma's settlement to resolve the opioid-related litigation brought by the State of Oklahoma (the "**Oklahoma Settlement**"). The Oklahoma Settlement required Purdue Pharma to make cash payments of approximately $175 million. The Oklahoma Settlement also required Purdue Pharma to make an in-kind payment in the form of addiction treatment medication valued at approximately $20 million.

7

Pending Actions are expected to be higher than Purdue Pharma's entire projected general and administrative spend and its entire projected research and development budget.[7]

20. Moreover, Purdue Pharma's expenses associated with the Pending Actions are likely to increase beyond 2019 as some of the Pending Actions proceed to trial. In 2020, Purdue Pharma's projected cash flow, *before* accounting for estimated Pending Action-related legal expenses, is forecasted to be approximately negative $92 million.[8]

21. Furthermore, not only would the deterioration of Purdue Pharma's cash position reduce the value available for any future distributions, it also would impact Purdue Pharma's ability to execute on its nonprofit public health initiative ("**Public Health Initiative**"). As part of the Public Health Initiative, Purdue Pharma is currently developing opioid overdose rescue medications (nalmefene and intranasal naloxone) and an opioid addiction treatment medication (buprenorphine/naloxone) that it plans to donate or sell at cost in the future to benefit communities and individuals affected by the opioid crisis.

22. In sum, without a stay of the active Pending Actions, the Debtors' legal expenses will remain elevated and likely increase, further depleting the Debtors' cash reserves. Given that Purdue faces challenging business prospects (some of which are explored in more detail below), the overall cash drain caused by the Pending Actions, if left unchecked, will likely hinder Purdue's ability to resolve its liabilities in bankruptcy as the value for any allowed claimants and estate stakeholders will have been reduced.

---

[7] In total, the Debtors' projected legal costs in connection with Pending Actions are expected to be approximately 95% of Purdue's entire projected general and administrative spend and approximately equivalent to Purdue's entire research and development budget.

[8] In total, the Debtors' projected cash flow, before accounting for estimated Pending Action-related legal expenses, is forecasted to be approximately negative $118 million for 2020. Cash flow for Purdue Pharma and the Debtors excludes the impact of movements in restricted cash. Purdue Pharma cash flow also excludes the impact of projected Rhodes Pharma funding.

**Sales of Opioid Medications Have Decreased Significantly**

23.     The vast majority of Purdue Pharma's revenues are generated from the sales of prescription opioid medicines. In 2018, approximately 92% of Purdue Pharma's revenues were derived from the sale of opioid medications, with 75% of total sales coming from a single opioid-related medication, OxyContin, and the remaining opioid-related sales coming from Butrans (12%) and Hysingla (5%).

24.     Purdue Pharma's sales of opioid medications have fallen sharply in recent years. As a point of comparison, in 2010, Purdue Pharma generated opioid-related sales of approximately $2.2 billion; by 2018, that number had dropped by over half, to approximately $975 million. The graph below illustrates this trend on an annual basis from 2010 to 2018:



25.     The negative trend in opioid-related medication sales is not expected to improve in the near term. As a result, Purdue Pharma is forecasting total sales of opioid medications of $644 million in 2019, a 34% reduction from the 2018 sales level of $975 million. Moreover, Purdue Pharma expects that number to drop to $82 million by 2024.

9

26. Rhodes Pharma, a subsidiary of Purdue, operates the Debtors' generic prescription business. Rhodes Pharma is forecasting total sales of opioid medications of $122 million in 2019, a 12% reduction from the 2018 sales level of $138 million. Annual sales of opioid medications are expected to decline to $84 million by 2023 before increasing to $126 million in 2024.

### The Debtors' Remaining Product Portfolio

27. As noted, approximately 92% of Purdue Pharma sales in 2018 were generated by the sale of opioid medications. The remaining 8% of Purdue Pharma's 2018 revenues were derived from consumer over-the-counter ("**OTC**") products (collectively 7%), Symproic (<1%), Intermezzo (<1%), and a small amount of royalty income (<1%).

28. The Debtors' domestic OTC business, run by Purdue subsidiary Avrio Health L.P. ("**Avrio**"), sells non-opioid products including Betadine, Senekot, Colace and SlowMag. In 2018, Avrio generated $74 million of revenue and $15 million of operating profit.

29. Symproic, a non-opioid medication developed through a joint venture between Purdue Pharma and Shionogi and Co., Ltd. ("**Shionogi**") was approved for sale in the United States in 2017. Symproic generated $6 million of revenue for Purdue Pharma in 2018. However, the partnership between Purdue Pharma and Shionogi was terminated in June 2018, and Shionogi has regained full rights to the drug in the United States. Accordingly, Purdue Pharma is no longer generating revenue from Symproic.

30. Intermezzo, another non-opioid medication, lost sales exclusivity in 2016 when the patent for the drug was successfully challenged. Intermezzo generated $2 million of revenue in 2018 and is not expected to generate revenue for Purdue Pharma going forward.

31.     Separately, Adhansia, a non-opioid medication which just recently launched, is expected to generate $4 million of revenue in 2019 and $18 million in 2020.

32.     Rhodes Pharma generated $12 million of revenue in 2018 from Aptensio XR, a non-opioid medication, and $16 million in revenue from other non-opioid generics.

### The Debtors' New Product Pipeline

33.     Purdue Pharma's pipeline of medications in development, while promising in management's view, will require significant investment over time. The development stage pipeline medications include:

   a. two early-stage preclinical drugs

   b. one phase I clinical trial drug

   c. two phase II clinical trial drugs

   d. one phase III-ready clinical trial drug

None of the development stage pipeline medications, assuming they receive FDA approval, is expected to generate revenue before 2022.

34.     In addition to the new product development pipeline mentioned above, Purdue Pharma has also initiated development of two overdose rescue medications and one addiction treatment medication, as previously noted. Each of these medications is expected to have launched by 2022, but are not expected to be positive contributors to Purdue Pharma's operating cash flows, as the medications are intended to be either donated or sold at cost in the future.[9]

35.     Avrio and Rhodes Pharma are also developing additional products. Over the course of 2019 and 2020, Avrio's consumer OTC products in development are forecasted to

---

[9] Buprenorphine/naloxone is currently in development by Rhodes Pharma and is expected to generate less than $1 million in total gross profit in 2019 and 2020 combined.

11

generate $15 million in gross profit, and Rhodes Pharma's generic medications in development are forecasted to generate $18 million in gross profit.

### Conclusion

36. As discussed in the sections above, the Debtors' current financial status is challenged. The Pending Actions have required and will continue to require large cash outflows for legal defense. The cash outflows from the Pending Actions exceed the Debtors' cash-generating capabilities and will result in a net decrease to the Debtors' available cash balance over time. Absent a stay of the active Pending Actions, the massive volume of lawsuits will greatly diminish the assets and value of Purdue and threaten Purdue's ability to reach and to implement a global settlement that benefits all estate constituents. A stay of the active Pending Actions would help preserve Purdue's value and facilitate a resolution of Purdue's liabilities in bankruptcy.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

New York, New York
September 18, 2019

_____
John James O'Connell III
Partner
PJT Partners LP