**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                          :        Chapter 11
                                                                :
PURDUE PHARMA L.P., *et al.*,                                   :        Case No. 19-23649 (RDD)
                                                                :
        Debtors.                                  :        (Jointly Administered)
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PURDUE PHARMA L.P., *et al.*,                                   :
                                                                :
        Plaintiffs,                               :
                                                                :
    v.                                                      :        Adv. Pro. No. 19-08289 (RDD)
                                                                :
COMMONWEALTH OF MASSACHUSETTS, et al.,                          :
                                                                :
        Defendants.                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STATE OF WASHINGTON'S MEMORANDUM OF LAW IN OPPOSITION TO PURDUE'S MOTION FOR A PRELIMINARY INJUNCTION

Matthew J. Gold
Robert M. Tuchman
KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
551 Fifth Avenue, 18th Floor
New York, New York  10176

Laura K. Clinton (admitted *pro hac vice*)
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF
WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, Washington  98104

*Attorneys for the State of Washington*

Dated:  October 4, 2019

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ................................................................................. 1

**THE WASHINGTON POLICE POWER ACTION** ................................................ 4

**ARGUMENT** .......................................................................................................... 7

    I.    The Washington Police Power Action Should Not Be Enjoined................................. 7

        A.    As a Police Power Action Brought to Protect the Health and Welfare of Washington's Residents, the Action Is Exempt from the Automatic Stay. .............................................................................................. 7

        B.    The Action is Nearly Trial-Ready, and It Should Be Permitted To Continue........................................................................................ 8

        C.    Permitting the Action to Continue Keeps the Litigation Before the Proper Court................................................................................ 10

        D.    Washington and Its Residents Have Strong Interests in a Public Trial That Should Not Be Frustrated by a Stay. .......................................... 12

        E.    The Ongoing Harms To Washington and Its Residents Tips the Balance Against Purdue.................................................................... 17

**CONCLUSION** .................................................................................................... 21

## TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*Allied Daily Newspapers v. Eikenberry,*
    121 Wn.2d 205 (1993) ...........................................................................13

*In re Baleine, LP,*
    No. 14-cv-02513, 2015 BL 338573 (C.D. Cal. Oct. 13, 2015)...................... 20-21

*Benjamin ex rel. Credit General Ins. Co. v. Richmond (In re Nucorp, Ltd.),*
    328 B.R. 785 (Bankr. D. Minn. 2005) .........................................................10

*California v. PG & E Corp. (In re Pac. Gas & Electric Co.),*
    281 B.R. 1 (Bankr. N.D. Cal. 2002) ............................................................10

*City of New York v. Exxon Corp.,*
    932 F.2d 1020 (2d Cir. 1991)......................................................................20

*City of Seattle v. McKenna,*
    172 Wn.2d 551 (2011) ................................................................................4

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ..................................................................................12

*Dix v. ICT Group, Inc.,*
    160 Wn.2d 826 (2007) ...............................................................................13

*In re Forster,*
    146 B.R. 383 (Bankr. N.D. Ohio 1992) .......................................................10

*In re Friedman & Shapiro, P.C.,*
    185 B.R. 143 (S.D.N.Y. 1995)....................................................................10

*Frye v. United States,*
    293 F. 1013 (D.C. Cir. 1923) .....................................................................12

*Gaspar v. Peshastin Hi-Up Growers,*
    131 Wash. App. 630 (2006).........................................................................13

*In re Gen. Motors LLC Ignition Switch Litig. (People v. Gen. Motors LLC),*
    69 F. Supp. 3d 404 (S.D.N.Y. 2014).......................................................10, 11

*Grant v. Boccia,*
    133 Wn. App. 176 (2006) ...........................................................................12

*Hunt v. Rite Aid Hdqtrs. Corp.*,
No. 15-cv-2087, 2016 BL 336120 (M.D. Pa. Oct. 7, 2016) .............................................8

*Landmark Comm., Inc. v. Virginia*,
435 U.S. 829 (1978).............................................................................................................16

*In re Melly*,
No. 18-26036-RG, 2019 BL 157166 (Bankr. D.N.J. Apr. 29, 2019) ................................8

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
488 F.3d 112 (2d Cir. 2007)................................................................................................10

*In re Rabzak*,
79 B.R. 966 (Bankr. E.D. Pa 1987) .................................................................................10

*Reese v. Stroh*,
128 Wn. 2d 300 (1995) .........................................................................................................12

*In re Rombkowski*,
No. 16-33856, 2017 BL 88405 (Bankr. N.D. Ohio Mar. 21, 2017) ...................................8

*In re Sakhari*,
No. 5-34286, 2006 BL 169275 (Bankr. D.N.J. Jan. 20, 2006) .........................................20

*In re SCO Group, Inc.*,
395 B.R. 852 (Bankr. D. Del. 2007) ...................................................................................9

*Seattle Times Co. v. Ishikawa*,
97 Wn.2d 30 (1982) ...........................................................................................................16

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
907 F.2d 1280 (1990).............................................................................................................8

*State v. Bone-Club*,
128 Wn.2d 254 (1995) .......................................................................................................16

*State v. Copeland*,
130 Wn.2d 244 (1996) .......................................................................................................12

*State v. Kaiser*,
161 Wn. App. 705 (2001) ...................................................................................................12

*State v. LG Elecs., Inc.*,
186 Wn.2d 1 (2016) .............................................................................................................5

*In re TK Holdings Inc.*,
No. 17-11375 (BLS) (Bankr. D. Del. Aug. 16, 2017) ........................................................9

iii

*Walsh v. West Virginia (In re Security Gas & Oil, Inc.),*
    70 B.R. 786 (Bankr. N.D. Cal. 1987) ............................................................................20

**Other Authorities**

*Addressing the Opioid Use Public Health Crisis,*
    Executive Order 16-09 (Oct. 7, 2016) ..........................................................................14

ESHB 1427, 65th Leg., Reg. Sess., Laws of 2017, ch. 297, § 1 .......................................14

RCW 7.48 ..............................................................................................................................4

RCW 19.86 ............................................................................................................................4

RCW 43.10.030 .....................................................................................................................4

RCW 69.50 ............................................................................................................................5

21 U.S.C. § 801 .....................................................................................................................5

28 U.S.C. § 1452 .................................................................................................................10

WA. Const. art. I § 10 .........................................................................................................13

iv

The State of Washington ("Washington" or the "State") opposes the Motion for a Preliminary Injunction filed by the above-captioned debtors (collectively, "Purdue") on September 18, 2019 (Dkt. # 2) (the "Motion" or "Mot.") for all of the reasons set forth at length in the States' Coordinated Objections to Purdue's Motion to Stay Police Power Actions Against Purdue filed concurrently herewith (the "Coordinated Objections"), which Washington joins in full and incorporates by reference herein.    Washington respectfully submits this separate memorandum of law, together with the accompanying Declaration of Assistant Attorney General Laura K. Clinton dated October 4, 2019 (the "Clinton Decl."),[1] in order to address factual and legal issues specific to Washington that further support the continued prosecution of Washington's action against Purdue Pharma L.P., Purdue Pharma Inc. and the Purdue Frederick Company that is currently scheduled for trial in Washington state court in early 2020 (the "Washington Police Power Action" or, where unambiguous, simply the "Action").[2]

## PRELIMINARY STATEMENT

The opioid epidemic has devastated communities across the State of Washington. Following a lengthy investigation, the State determined that Purdue, through its aggressive marketing of prescription opiates, particularly the drug OxyContin, bore substantial responsibility for the drug epidemic within the State.    Accordingly, in September 2017, the State brought suit against Purdue under its consumer protection and public nuisance laws, and to hold Purdue responsible for its negligence in observing the compliance obligations it had agreed to undertake when it entered into a prior consent judgment in 2007.

---

[1]    Ms. Clinton is the Section Chief for the Complex Litigation Division's Seattle Office and one of the lead attorneys in the Washington Police Power Action (as herein defined). (*Id.*, at ¶ 1.)

[2]    The full caption of the Action is *State of Washington v. Purdue Pharma L.P., Purdue Pharma Inc., the Purdue Frederick Company, Does 1 through 99 and Doe Corporations 1 through 99*, No. 17-2-25505-0 SEA (Super. Ct. King. Cnty.), and it is identified on page 5 of Exhibit A to Purdue's Complaint (Dkt. # 1) in this Adversary Proceeding (the "Complaint" or "Compl.") as among the state actions that Purdue seeks to stay.  (*See* Mot., at 24; Compl., at 45 (Wherefore clause (a)) & Ex. A p.5.)

The State has several related goals for the Action:  (i) to enjoin Purdue, which continues to manufacture opiates that are shipped into Washington, from further violations of its laws designed to protect the health and welfare of the State's residents; (ii) to create a public record of how Purdue undermined and exploited Washington's medical and pharmaceutical systems; (iii) to stigmatize such wrongful conduct in order to deter other contributors to the opioid crisis; and (iv) to obtain restitution on behalf of the State's residents and their public programs.

These goals are particularly important because discovery in the Action has confirmed extensive, continuing misconduct on the part of Purdue.  Notwithstanding the 2007 consent judgment in which Purdue committed to cease its deceptive marketing claims and to create an effective abuse and diversion program, Purdue continued to employ its resources to ensure the flow of opiates into Washington, mislead prescribers, fund third-party groups to work against the regulation of opioid prescriptions, and even extend its influence to local police departments in order to redirect attention away from the company.  Purdue ran its compliance program within its legal department using lawyers to cloak its failure to report the abuse and diversion of its drugs in the mantle of attorney-client privilege.  When the Washington court rejected Purdue's unfounded privilege claims, the ensuing discovery demonstrated that Purdue used its compliance program to hide its complete failure to do anything that would interrupt the accumulation of profit.

Since Washington commenced this Police Power Action over two years ago, both sides have litigated the Action aggressively.  By the September 16, 2019 close of discovery, the State had spent thousands of hours and millions of dollars prosecuting its case, with Purdue having done substantially the same.  Many threshold legal issues have been resolved:  the State defeated Purdue's motion to dismiss over a year ago and Purdue has conceded the vast majority

2

of its defenses.  Many of the remaining unresolved issues are the subject of a pending summary judgment motion on Purdue's few intact affirmative defenses that will be heard on November 1, 2019—less than a month's time.   Apart from final dispositive motion practice and expert testimony challenges that are due in mid-October and will be heard in December 2019, very little remains to be done before the five-week jury trial scheduled to begin in February 2020, for which the State Court is holding open its calendar.

Facing trial in Washington, Maryland and the multi-district litigation currently pending in the Northern District of Ohio (the "MDL"), Purdue has reprised its strategy and moved it to the Bankruptcy Court.  Rather than endure a public trial, Purdue proposes to resolve all claims against it without disclosure of the damning facts that civil litigation exposes to public view.  The proposed injunctive relief purports to completely block the Objecting States' efforts to daylight the pervasive ways in which Purdue manipulated an entire profession, and it should be rejected.

Like the actions asserted by the Objecting States, Washington brought its Police Power Action pursuant to the State's statutory authority to protect its residents from deceptive and unfair business practices.  The Action is therefore exempt from the automatic stay under section 362(b)(4).  Further, there is no legitimate basis for Purdue's requested injunction, clearly designed to circumvent the statutory exemption.  Purdue has failed to satisfy its burden to prove any of the required prongs:  (i) likelihood of success on the merits; (ii) imminent irreparable harm; (iii) a balance of harms in favor of Purdue; and (iv) the public interest – as the Objecting States amply demonstrate in their papers.

For all the reasons set forth in those Coordinated Objections, Purdue's request for a preliminary injunction should be denied outright as to every one of the Objecting States' police power actions.  Washington, which has one of the cases closest to trial, writes separately to

3

highlight the factual and legal issues specific to its Action that demonstrate why an injunction is particularly unwarranted. The Washington Police Power Action is nearly trial-ready, and staying it at this juncture would further tax—rather than conserve—the resources of both sides. Moreover, permitting the Action to continue in front of the state court appropriately vests the remaining, unresolved legal issues—issues of state law that are not amenable to consolidated resolution, and that cannot be removed to this Court in any event—before a judge with years of experience presiding over the Action. Further, allowing the Action to proceed will substantially expedite the State's efforts to protect its residents from further harm and reduce the possibility that such abuses of the medical system can continue.

For all of these reasons, Purdue's Motion should be denied in all respects, and the Washington Police Power Action should be permitted to continue to trial.

## THE WASHINGTON POLICE POWER ACTION

Washington filed its Police Power Action in September 2017 in the Superior Court for King County. In its complaint, as amended on May 4, 2018, the State asserts claims under Washington's Consumer Protection Law (Rev. Code Wash. ("RCW") 19.86), Nuisance Law (RCW 7.48), and common law of negligence. (Amended Complaint, *available at* https://www.mass.gov/lists/state-lawsuits-against-purdue-pharma and incorporated by reference herein ("Am. Compl."), at pp. 114-21.) These claims are based upon, among other things, the State's express statutory authority to "restrain and prevent the doing of any act … prohibited or declared to be unlawful" under its Consumer Protection Law ("CPA"). RCW 19.86.080(1); *see also* RCW 43.10.030(1), as interpreted by, among other cases, *City of Seattle v. McKenna*, 172 Wn.2d 551, 562 (2011) (confirming authority of State Attorney General to "act in any court, state or federal, trial or appellate, on a matter of public concern"); RCW 19.86.085 (establishing Attorney General as CPA law enforcement agency). The State's CPA claims are brought "on

4

behalf of persons residing in the state" to restrain Purdue's misconduct, which has injured consumers in every county. RCW 19.86.080; *State v. LG Elecs., Inc.*, 186 Wn.2d 1, 15 (2016) ("[A]lthough consumers may benefit from restitution, the legislature clearly intended for the attorney general's enforcement under [the CPA] to benefit the public generally."). Similarly, the State's nuisance claim, by definition, addresses a public nuisance "which affects equally the rights of [the entire Washington] community." RCW 7.48.130.

The State alleges that, notwithstanding Purdue's obligations,[3] Purdue has been engaged—for years—in a pattern of marketing tactics that constitute unfair and deceptive trade practices under the State's consumer protection statute. (*See* Clinton Decl., at ¶¶ 18-28.) For example, rather than remedying its prior misstatements, Purdue capitalized on its prior misleading marketing and invested hundreds of millions of dollars in creating marketing campaigns intended to manipulate providers into writing more opioid prescriptions. (*Id.*) Purdue's in-person marketing campaigns were designed to minimize medical professionals' concerns over addiction and adverse events, emphasize the need for pain relief, and overstate the efficacy of opioids in relieving pain and improving function. (*Id.*) The State alleges that these marketing efforts were successful, and that Washington prescribers wrote more opioid prescriptions than they would have in their absence. (*Id.*)

All of these allegations have been borne out through the substantial discovery in the Action, which has now largely concluded. Documents produced by Purdue reveal that, among other things (described at length in the Clinton Declaration), Purdue directly marketed its drugs to more than 11,000 individual Washington prescribers and facilities, while trying to

---

[3]    Purdue's obligations existed prior to and independent of the 2007 Consent Judgment. Both the federal Controlled Substances Act and Washington's Uniform Controlled Substances Act obligate pharmaceutical manufacturers such as Purdue to establish effective controls to prevent diversion and to detect, report, and stop shipment of suspicious drug orders. 21 U.S.C. § 801 *et seq.*; Chapter 69.50 RCW.

411451.8 - 10/04/19

influence regulators, advocacy groups, and professional organizations in an extensive and

sophisticated campaign that ensured that the State's opioid crisis would worsen in the decade

following the 2007 Consent Judgment. (Clinton Decl. ¶¶ 21-64.)  As summarized by one of the

State's experts, Dr. Leslie Enzian, MD:

> Purdue Pharma's promotion of OxyContin changed the landscape
> of opioid prescribing.  Purdue Pharma spent an unprecedented
> amount of money on direct-physician marketing and sales-based
> bonuses for sales representatives.  Physicians who prescribed more
> opioid pain medication and primary care providers who had less
> time to evaluate pain, amidst the myriad of primary care issues,
> were targeted for marketing.

(Clinton Decl. Ex. 8, at 5.)

In asserting and prosecuting the Police Power Action, the State's overriding

concern has been to protect the health and welfare of its residents.  Accordingly, the State seeks

substantial equitable relief designed to ameliorate the harm caused by Purdue and to prevent

Purdue—and others in the pharmaceutical trade—from continuing to violate the State's

consumer protection laws.  (*See* Am. Compl., at 121-22 (Prayer for Relief).)  In addition to

injunctive remedies, the State seeks restitution, statutory penalties, disgorgement, and other

monetary relief.  (*Id.*)

Since filing its Police Power Action in 2017, both sides have spent thousands of

hours and millions of dollars in litigation.  (Clinton Decl., at ¶ 69.)  The parties have exchanged

millions of pages of documents—almost 15,000,000 pages in total—including hundreds of

thousands of documents produced by Purdue that are specific to Washington State.  (*Id.*, at ¶ 71.)

Together, the parties have conducted over 30 depositions, and have retained more than 25

experts, all of whom have issued reports and many of whom also have been deposed.  (*Id.*, at

¶ 70.)  The parties also have engaged in substantial motion practice, with the State having

successfully defeated Purdue's motion to dismiss in early 2018 (*id.*, at ¶ 16 & Exs. 6 & 7), and recently reduced the vast majority of Purdue's affirmative defenses (*id.*, at ¶¶ 65-68).

Indeed, very little is left to be done before the Action is ready for trial. Aside from final pre-trial motions and a few outstanding discovery matters, essentially all that remains is the State's pending and fully briefed motion for summary judgment on Purdue's handful of intact affirmative defenses, which is set for hearing on November 1, 2019, and limited remaining expert discovery that was underway when Purdue filed its petition. (Clinton Decl., at ¶ 65.) Given the Action's substantially progressed state, the State Court is holding open dates for a five-week jury trial to begin in February 2020. (*Id.*, at ¶ 72.) A successful resolution of the Action will vindicate a number of vital public interests that cannot be addressed in this proceeding.

## ARGUMENT

I. **The Washington Police Power Action Should Not Be Enjoined.**

A. **As a Police Power Action Brought to Protect the Health and Welfare of Washington's Residents, the Action Is Exempt from the Automatic Stay.**

The Washington Police Power Action, like each of the actions asserted by the Objecting States, was brought pursuant to the State's police and regulatory powers and is therefore expressly exempt from the automatic stay. (*See* Coordinated Objections ("Coord. Objs."), at Section III.A.)[4] Like the other Objecting States, Washington asserts claims under its consumer protection and public nuisance laws, and seeks to expose Purdue's inadequate compliance programs via its negligence claim. (*See* Am. Compl., at 114-21.) The Washington Police Power Action is a straightforward exercise of its "police and regulatory power" within the

---

[4]    Because this Memorandum may be filed prior to the filing of the Coordinated Objections, it is possible that the paragraph numbers in the citations to the Coordinated Objections may have slightly changed.

7

meaning of section 362(b)(4) and "falls within the police-power exception." (Coord. Objs., at ¶ 35 (citation omitted).) Washington concedes that the enforcement of any judgment for monetary damages will be the province of this Court as long as the bankruptcy proceeding continues.

**B.    The Action is Nearly Trial-Ready, and It Should Be Permitted To Continue.**

As demonstrated by the Objecting States, Purdue has failed to meet its burden of proving that it would suffer irreparable harm absent the requested stay. (*see* Coord. Objs., at Section III.B.) For example, among other things, Purdue has failed to prove that the expense of defending against the exempt, non-settled actions would sufficiently interfere with its efforts to reorganize. (*See id.*, at ¶¶ 43-53.) This is especially true with respect to the Washington Police Power Action, which, because of its advanced state, will require fewer resources in order to complete than would be required by a nine-month stay and resumption. Where, as here, the "non-bankruptcy litigation has reached an advanced state," considerations of judicial economy counsel in favor of allowing the outside litigation to continue. *In re Rombkowski*, No. 16-33856, 2017 BL 88405, at *3 (Bankr. N.D. Ohio Mar. 21, 2017) ("When stayed non-bankruptcy litigation has reached an advanced state, courts are willing to lift the stay to allow the litigation to proceed."); *see also, e.g., Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (1990) (interests of judicial economy and the degree to which the parties are trial-ready are factors to be considered in assessing whether a non-bankruptcy litigation should be allowed to continue); *In re Melly*, No. 18-26036-RG, 2019 BL 157166, at **4-6 (Bankr. D.N.J. Apr. 29, 2019) (granting relief from automatic stay to allow substantially progressed outside litigation to continue to trial); *Hunt v. Rite Aid Hdqtrs. Corp.*, No. 15-cv-2087, 2016 BL 336120, at *7 (M.D. Pa. Oct. 7, 2016) ("The fact that the state court action was nearing trial weighs in favor of the Bankruptcy Court's decision to [lift the] stay.").

8

Purdue has not even attempted to satisfy its burden in this regard, as it has not proffered any evidence of the cost of proceeding with the Action if other actions are stayed.  A stay here will not conserve Purdue's resources—to the contrary, allowing the Action to continue would be cost-effective.  In light of the immense resources that the parties have expended to prepare the Action for trial, "longer the trial is delayed, the more burdensome it [would be] to both parties to ready themselves again."  *In re SCO Group, Inc.*, 395 B.R. 852, 858 (Bankr. D. Del. 2007) (lifting stay of litigation that had been pending for four years in nonbankruptcy forum and that was ready for trial before the bankruptcy filing).  Accordingly, a stay of the Washington Action would have the perverse effect of *adding* to Purdue's financial burdens.

The cases on which Purdue relies confirm that these facts favor Washington.  For example, in *In re TK Holdings Inc., et al.*, No. 17-11375 (BLS) (Bankr. D. Del. Aug. 16, 2017), a transcript of which is attached to the declaration of Benjamin S. Kaminetzky (Dkt. # 4) as Exhibit D ("*TK Holdings* Tr."), the court enjoined, for a period of 90 days, certain lawsuits brought by state governments, as Purdue correctly notes.  *TK Holdings* Tr., at 17.  But Purdue ignores that the court in *TK Holdings* declined to stay a multi-district litigation that at the time had been pending for three years and was "well advanced," with the presiding judge having expressed his intention to commence trials the following spring.  *Id.*, at 20:2-21.  So too here, where the Action has been pending since 2017 and the State stands ready to proceed to trial.

The balance of harms does not favor Purdue in this regard.  Washington will gain no competitive advantage vis-à-vis other states, because Washington will still be stayed from enforcing any monetary judgment against Purdue or its assets.  And the entire bankruptcy process will benefit from the continuation of the Action as it will educate all parties, and this Court, regarding the nature and scope of Purdue's behavior and the strength (or weakness) of many of the defenses proffered by Purdue.  Purdue should not be permitted to trumpet the lack of

9

verdicts against it (*see* Purdue's Mem. of Law in Support of Mot. for P.I. ("Purdue Mem."), Dkt. # 3, at 9), while simultaneously asking the Court to prevent any adverse verdicts from occurring.

      **C.**    **Permitting the Action to Continue Keeps the Litigation Before the Proper Court.**

Purdue has utterly failed to demonstrate a likelihood of success on the merits of the Action, or that the bankruptcy forum is an appropriate venue for resolving the police power actions. Instead, permitting the Action to continue appropriately places the remaining unresolved legal issues before a court with years of experience presiding over the Action—a court within the State whose residents will be dramatically affected by the Action's resolution. The Washington state court is well positioned to address issues of state law competently and quickly. Indeed, it is the *only* court thus positioned, notwithstanding Purdue's suggestion of "omnibus hearings"(*see* Purdue Mem., at 21-22), as the Action is not removable to federal court. *See* 28 U.S.C. § 1452(a) ("A party may remove any claim or cause of action in a civil action ***other than … a civil action by a governmental unit to enforce such governmental unit's police or regulatory power*** ….") (emphasis added).; *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 133-34 (2d Cir. 2007); *In re Gen. Motors LLC Ignition Switch Litig. (People v. Gen. Motors LLC)*, 69 F. Supp. 3d 404, 412 (S.D.N.Y. 2014); *In re Friedman & Shapiro, P.C.*, 185 B.R. 143, 144-45 (S.D.N.Y. 1995) (core proceeding could not be removed); *California v. PG & E Corp. (In re Pac. Gas & Electric Co.)*, 281 B.R. 1, 10-13 (Bankr. N.D. Cal. 2002); *Benjamin ex rel. Credit General Ins. Co. v. Richmond (In re Nucorp, Ltd.)*, 328 B.R. 785, 788 (Bankr. D. Minn. 2005); *In re Forster*, 146 B.R. 383, 384-386 (Bankr. N.D. Ohio 1992); *In re Rabzak*, 79 B.R. 966, 967-969 (Bankr. E.D. Pa 1987). Of particular interest is the opinion of the district court in the *GM Ignition Switch Litigation*, in which it noted that notwithstanding "the natural temptation to find federal jurisdiction every time a [high] dollar

case with national implications arrives at the doorstep of a federal court," and what the court considered "the federal courts['s undoubted] advantages over their state counterparts when it comes to managing a set of substantial cases filed in jurisdictions throughout the country," such considerations are overridden by the clear terms of the statute: "this Court is not free to disregard or evade the limits upon federal jurisdiction, whether imposed by the Constitution or by Congress." *Gen. Motors LLC Ignition Switch Litig.*, *supra*, at 415-16 (quotation marks, alterations and citation omitted).  Just as years ago Purdue could not remove the Washington or other police power actions for purposes of consolidating them into the MDL (*see* Clinton Decl., at ¶ 15), it cannot remove the Washington Police Power Action to this Court as a matter of law.

The public interest also favors continuation of the Action because it will lead to a more speedy resolution.  The Washington state court is poised to hold a public, jury trial and rule on the State's claims in the Police Power Action within the nine months during which Purdue asks that the Action be stayed.  (Clinton Decl., at ¶ 72.)  Many of the issues that Purdue calls to be resolved at "omnibus hearings" already have been adjudicated—adversely to Purdue—in the Washington Police Power Action.  For example, the State defeated Purdue's motion to dismiss— which centered on federal preemption issues—over a year ago.  (*See* Clinton Decl. Exs. 6 & 7.) Statute of limitations and most presumption defenses likewise have been resolved in the Washington Police Power Action, as Purdue has conceded them.  (Clinton Decl., at ¶ 16.)  What defenses remain are subject to a pending motion for summary judgment that is fully briefed and ready to be heard.  (*Id.*, at ¶¶ 65-68.)

Purdue's effort to shoehorn the various police power actions into a single set of "omnibus hearings" completely ignores the advanced posture of the Action and the limited remaining issues at play.  For example, Purdue argues it will be "of particular importance" to address "the issue of causation, i.e., whether the Debtors can be held liable for any harms caused

11

by individuals' opioid abuse" in "consolidated hearings and trials." (Purdue Mem., at 21-22.)

But this issue is irrelevant to Washington's claim under the State's Consumer Protection Act,

which does not require the State to prove causation or injury at all. *See State v. Kaiser*, 161 Wn.

App. 705, 719 (2001) (State must prove only (1) an unfair or deceptive act or practice; (2) in

trade or commerce; (3) that affects the public interest); RCW 19.86.080. Purdue's contention

that the issue of expert testimony admissibility is amenable to consolidated adjudication (Purdue

Mem., at 22), fails for similar reasons, as Washington has declined to adopt the test articulated

by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and

continues to use standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *See*

*State* v. *Copeland*, 130 Wn.2d 244, 261 (1996); *Reese v. Stroh*, 128 Wn. 2d 300 (1995); *Grant v.*

*Boccia*, 133 Wn. App. 176, 179 (2006). Accordingly, consolidated hearings in this Court—even

if jurisdictionally available—would be ill-suited to resolving police power actions, which turn on

issues of state-specific law.

      **D.**     **Washington and Its Residents Have Strong Interests in a Public Trial That Should Not Be Frustrated by a Stay.**

      Purdue's request for an injunction does not further the public interest, as the

Action demonstrates. The contrary, an injunction would subvert Washington's public policy and

the need for public accountability for violations of state law. Purdue has caused untold damage

to communities throughout Washington. It should not be allowed to use bankruptcy to avoid a

full public accounting of its misconduct—misconduct that Purdue continues to deny (*see* Purdue

Mem., at 9-10, 21-22), and that the requested relief would continue to shield. Instead, the people

of Washington deserve to know exactly what Purdue did in their communities, and all

participants in Washington's healthcare system would benefit from a thorough airing and

detailed examination of what is permissible and what is prohibited in Washington. Washington's

12

pending jury trial is essential to Washington's interest in ensuring that justice be dispensed in public. This Court should not allow Purdue to evade public accountability for its actions.

Washington's State Constitution mandates that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." WA. Const. art. I § 10. This constitutional mandate protects not only the litigants' rights to open public process, but also the independent rights of the public to observe the government's enforcement of the law. Indeed, the Washington Supreme Court's "consistent position of strictly protecting the public's and the press's right to view the administration of justice" is reflected in numerous judicial opinions:

> We adhere to the constitutional principle that it is the right of the people to access open courts where they may freely observe the administration of civil and criminal justice. Openness of courts is essential to the courts' ability to maintain public confidence in the fairness and honesty of the judicial branch of government as being the ultimate protector of liberty, property, and constitutional integrity.

*Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 211 (1993). This public policy extends to the enforcement of the CPA. *See Dix v. ICT Group, Inc.*, 160 Wn.2d 826, 837 (2007) (any "forum selection clause that seriously impairs a plaintiff's ability to bring suit to enforce the CPA violates the public policy of this state" because of "the importance of … enforce[ing] the CPA for the protection of all the citizens of the state"). "There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." *Gaspar v. Peshastin Hi-Up Growers*, 131 Wash. App. 630, 637 (2006) (quoting *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 132 (1981)).

The public's constitutional right to open proceedings is particularly acute here, because Washington's claims were brought on behalf of its residents to vindicate critical public rights and interests, and to address a matter of overwhelming public concern. Washington's opioid epidemic is among the most significant issues currently facing the State. In addition to

13

this case, it has been the subject of substantial legislative and executive action. *See*, *e.g.*, ESHB 1427, 65th Leg., Reg. Sess., Laws of 2017, ch. 297, § 1 ("The legislature . . . finds that medically prescribed opioids intended to treat pain have contributed to the opioid epidemic and . . . more needs to be done to ensure proper prescribing and use of opioids and access to treatment."); Addressing the Opioid Use Public Health Crisis, Executive Order 16-09 (Oct. 7, 2016), *available at* https://www.governor.wa.gov/sites/default/files/exe_order/eo_16-09.pdf (describing Washington's opioid epidemic as a "public health crisis" that "continues to affect communities, devastate families, and overwhelm law enforcement, health care, and social service providers" and ordering State agencies to implement Washington's opioid response plan).

A public trial should be held.  Because there was no trial when Purdue entered into the 2007 consent judgment, all states, including Washington, missed the opportunity to examine how aggressive pharmaceutical marketing manipulates well-meaning medical providers and the public.  All jurisdictions, including Washington, need to fully understand how Purdue's marketing was effective at perverting the practice of medicine in such profoundly dangerous ways so that government regulators can take effective measures to prevent future marketing manipulations.[5]  Washington, and the courts, need full transparency about how the 2007 Consent Judgment failed to appropriately align Purdue's profit motive with the safe use of opioids. Washington, and its sister states, needs to expose how industry regulations and public programs can be influenced by pharmaceutical money.  And, because the opioid industry will continue after this round of national litigation resolves, there is a pressing public health need for a close examination of how Purdue's compliance programs failed to achieve the stated goals of reducing

---

[5]      *See*, *e.g.*, Office of the Inspector General, Review of the Drug Enforcement Administration's Regulator and Enforcement Efforts to Control the Diversion of Opioids, September 2019 (examining federal regulatory and enforcement issues concerning opioid abuse) available at https://oig.justice.gov/reports/2019/a1905.pdf.

abuse and diversion.  Washington supports the rational division of Purdue's assets to begin to salve some of the harms of this manmade crisis.  But if anything is to be learned about how to avoid the next such crisis, a public trial is necessary.

Separate and in addition to the public health benefit, a public trial is necessary to develop legal precedents necessary for Washington's common law system to function.  In its motion to dismiss the State's lawsuit, and throughout the course of the litigation, Purdue has characterized the action as "unprecedented."[6]  Already in the Action, the court has ruled on the interaction between federal regulation and state police powers, the parameters of a state's public nuisance lawsuit, and the application of attorney/client privilege within a corporate regulatory program.  Currently pending are questions about the contours of the State's legal duties, and the parties are set to begin dispositive briefing that is likely to raise additional legal issues.  Both for governmental and private litigants, this case should continue to allow the development of appropriate legal precedent.

Finally, but equally important, Washington has unique and substantial experience with Purdue's resistance to public disclosure.  From the beginning of the Action, Purdue has taken extraordinary measures to keep internal Purdue documents and information out of the public eye.  Indeed, the parties have litigated the need for a public trial from the inception of the lawsuit:  originally forced to file a complaint redacted to reflect Purdue's confidentiality designations, Washington moved to file an unredacted version detailing the State's allegations.  Purdue resisted the motion, arguing that decades-old call notes of sales representatives, Purdue internal investigations of Washington providers, prescriber-level data Purdue used for its business planning, testimony from corporate executives about marketing strategies, and other similar materials had to be filed under seal.  (Clinton Decl., at ¶ 14 & Ex. 6.)

---

[6]    Wash. Dkt. # 74, p.1 (Purdue's Reply in Support of Defendant's Motion to Dismiss).

But Purdue's desire for secrecy runs afoul of the Washington constitutional guaranty of open proceedings. Because the courts are presumptively open, the party seeking to restrict access to filings bears the heavy burden of justifying sealing or redaction. *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37 (1982); *see also Landmark Comm., Inc. v. Virginia*, 435 U.S. 829, 839 (1978) ("[O]perations of the courts and judicial conduct of judges are matters of utmost public concern."). In Washington, restrictions on access to information and proceedings by the public are to be granted only in rare circumstances. *See State v. Bone-Club*, 128 Wn.2d 254, 258 (1995) ("[P]rotection of this basic constitutional right clearly calls for a trial court to resist a closure motion except under the most unusual circumstances.").

As a result, the State Court rejected Purdue's claims, allowing the State to file an unredacted version of the complaint. (Clinton Decl. ¶ 14.) In subsequent motions, the State has had to litigate repeatedly over Purdue's confidentiality designations—the State Court has not upheld a single one under Washington law. (*See, e.g.*, Clinton Decl. Ex. 6.) Likewise, in the litigation, Washington exposed Purdue's attempts to use "attorney-client privilege" to shield from public scrutiny the operations of its ADD Program. Through this putative anti-diversion program, Purdue's in-house lawyers received extensive information about glaring signs of reckless prescribing behavior and drug dispensing in Washington, but repeatedly directed sales representatives to continue calling on unscrupulous providers and decided not to report them to law enforcement. Washington ultimately demonstrated to the Court that the ADD Program "was not engaged in the provision of legal advice and its siting in the Office of General Counsel did not change the nature of its work." (Clinton Decl. ¶ 40 & Ex. 18.) As a result, Purdue was forced to disclose hundreds of thousands of pages reflecting Purdue's knowledge and decision making regarding Washington prescribers who enabled abuse and diversion, and its decisions to continue profiting from these prescribers rather than reporting them. (*Id.*, at ¶ 43.) As the Court

16

ruled: "Corporations can't shield[] their business transactions from discovery simply by funneling their communications through a licensed attorney." (*Id.*, at ¶ 42 & Ex. 18.) The Court ordered Purdue to produce unredacted copies of every single document on its ADD privilege logs. (*Id.*) Washington's motion also forced Purdue to agree to search the Law Department custodial files. (*Id.*)

### E.    The Ongoing Harms To Washington and Its Residents Tips the Balance Against Purdue.

The ADD Program documents produced as a result of Washington's efforts reveal that, although the ADD program regularly surfaced troubling information about Washington prescribers, Purdue directed its sales force to continue detailing those  prescribers and decided not to report them to law enforcement. (Clinton Decl., at ¶ 44.) Even when Purdue did decide to stop detailing particular providers, it affirmatively chose not to report them to law enforcement authorities (which meant it could continue to profit from drugs they prescribed). (*Id.*)

The failure of Purdue's compliance program had real world consequences.  For example, ARNP Kelly Bell was a particularly lethal opioid prescriber in Vancouver, Washington, where she ran a pain clinic with two other nurse practitioners. (*Id.*, at ¶ 45.) At least seven of her patients overdosed and died from 2007-2008, while Purdue detailed her regularly. (*Id.*, Ex. 20.) Although Purdue received at least a dozen reports of concern about Kelly Bell and the other prescribers at her Payette Clinic between April 2008 and March 2009, it did not stop detailing these prescribers until after the DEA raided the Payette Clinic and shut it down for prescribing "excessive quantities of controlled substances" and facilitating diversion, and amidst news reports of the overdose death of a high school student from Payette-linked pills. (*Id.*, at ¶ 46 & Exs. 21 & 22.)

411451.8 - 10/04/19

For an entire year prior to the DEA raid, Purdue continued detailing Bell regularly, despite knowing that Bell was inappropriately prescribing opioids in high doses and amounts (*id.*, at ¶¶ 48-49 & Ex. 21 (ROCs dated 4/3/08, 5/6/08, 11/11/08, 11/14/08, 12/10/08, 3/5/09, 3/19/09)); that patients appeared to be selling their prescriptions on the black market (*id.* (ROCs dated 11/11/08, 11/12/08, 11/14/08, 11/24/08, 12/8/08)); and that the Payette Clinic was under investigation (*id.* (ROCs dated 4/24/08, 11/12/08, 11/24/08, 12/8/08, 12/10/08, 3/5/09, 3/17/09, 3/19/09)).  Twice in 2008, sales representative Gene Snook opined that Purdue should "not contact the [Payette] office" about an ongoing DEA investigation, while he kept detailing Bell and the other Payette prescribers.  (*Id.*)  That same year, Bell wrote over 2,000 individual OxyContin prescriptions—one of the highest yearly totals ever prescribed in Washington—while Snook received a performance-based bonus of $59,000 on top of his six-figure base income, his highest bonus ever.  (*Id.*, Ex. 22.)

There is no evidence that Purdue reported Bell or the Payette Clinic to any authorities at any point. Meanwhile, Purdue repeatedly praised and rewarded Snook for his high sales numbers, which he achieved by implementing Purdue's strategy of targeting the highest prescribers.  (Clinton Decl., at ¶ 50 & Exs. 23 & 24.)

Another example of Purdue's Washington detailing:  Purdue regularly detailed a doctor named Delbert Whetstone even when it was "obvious that something was seriously wrong" with his medical practice—and indeed, not long after Purdue finally ceased detailing him, Dr. Whetstone pled guilty to criminal drug distribution and was sentenced to three years in federal prison.  (*Id.*, at ¶ 56 & Exs. 27 & 28.)  From 2007-2008, Purdue learned a number of exceedingly troubling facts while detailing Whetstone: that he had a strict "cash for services" policy, that his malpractice insurance premiums had "skyrocketed," that he had a safe in his office and a security camera in his reception area, that he did not require patient urinalysis, that

18

his signature had been forged on a prescription pad, and that some pharmacists refused to fill his prescriptions. (*Id.*, at ¶¶ 58-59 & Ex. 29.) Purdue continued detailing Whetstone for a year and a half after learning of the first red flags. (*Id.*) Even after Purdue stopped detailing Whetstone, it continued to hear about alarming red flags from pharmacists and other prescribers throughout 2010, but decided not to report him to law enforcement. (*Id.*)

Washington sales manager John Axelson complained in 2010 that "I have reported this provider [to Purdue] many times and have kept Joan Zooper apprised on this situation. Something more needs to be done." (Clinton Decl., at ¶ 60 & Ex. 27.) But nothing ever was: Axelson was simply told to "be patient." (*Id.*) Purdue failed to report Whetstone to any authorities until after he had already been arrested in October 2010—more than three years after Purdue learned of his "cash for services" policy and other red flags. (*Id.*, Ex. 29.)

Similarly, in Seattle, a pain management specialist, Dr. Frank Danger Li, operated a series of clinics under the name the Seattle Pain Clinic. (Clinton Decl., at ¶ 61.) Between 2010 and 2015, 60 patients from the Seattle Pain Center died, many from overdoses. (*See id.* (citing Am. Compl., at ¶ 4.248, ¶ 4.286).) At one of the locations, "you would open the door to go— you know after you go to from the waiting room and you—you know, you open the door to go down the hallway to the—to the rooms, there would be people sometimes sleeping in the hallway. It was—it was—I've never seen anything like it." (*Id.*, at ¶¶ 62-63 & Ex. 30.) Ms. Deane, a nurse practitioner who worked for the Seattle Pain Centers, confirmed that Purdue sale representatives would have seen those patients sleeping in the hallways waiting for an appointment. (*Id.*) The provider testified as well that patients told her that would patients would show up without scheduled appointments and pay $250 to get a prescription. (*Id.*) Purdue was aware of these red flags; Purdue's call notes documented as early as October 2010 that the Seattle Pain Center was standing room only. (*Id.*, at ¶ 64 (citing Am. Compl. at ¶ 4.244).) In the

19

Action, Purdue has produced no evidence that it took any action other than to continue marketing to the Seattle Pain Center from 2010 until the Medical Commission suspended Dr. Li's license in 2016. (*Id.*)

Continued proceedings before the state court will most effectively and expeditiously implement both Washington's public policy and the policies embodied in section 362(b)(4) and 28 U.S.C. § 1452. Allowing the Washington Police Power Action to continue will allow the State to effectuate one of its chosen strategies for addressing the opioid epidemic and bring the State's residents closer to a public trial and an order protecting them against Purdue's continuing misconduct. *See Walsh v. West Virginia (In re Security Gas & Oil, Inc.),* 70 B.R. 786, 796 (Bankr. N.D. Cal. 1987) (in deciding whether to issue a section 105 stay of a state police power action, the "Bankruptcy Court must consider the immediacy, severity, and certainty of danger to the public" as well as the State's "interest in seeing that its laws are obeyed"); *see also City of New York v. Exxon Corp.,* 932 F.2d 1020, 1024 (2d Cir. 1991) (the continuation of state police power actions notwithstanding the pendency of a bankruptcy case "furthers the purpose of the automatic stay's regulatory exemption" by encouraging "a quick response to [public health] crises by a government"). Bankruptcy courts have not hesitated to permit the continued progress of actions in other venues in just such circumstances. *See*, e.g., *In re Sakhari*, No. 5-34286, 2006 BL 169275, at **2-3 (Bankr. D.N.J. Jan. 20, 2006) (granting relief from automatic stay based on nonbankruptcy court's "prolonged involvement … in the underlying litigation, and its familiarity with the legal issues and the contentions raised by the many competing parties"). Particularly "given the advanced stage of the [Washington Police Power Action,] … it stands to reason that judicial economy would be well served by permitting the State Court Action to reach resolution [of the state court issues] before addressing the bankruptcy

issues" in this Court.  *In re Baleine, LP*, No. 14-cv-02513, 2015 BL 338573, at *13 (C.D. Cal.

Oct. 13, 2015).

**<u>CONCLUSION</u>**

For the foregoing reasons, as well as those set forth in the Coordinated Objections

incorporated in full by reference herein, the State of Washington respectfully submits that its

Police Power Action should not be stayed but rather should be permitted to continue to trial

without delay.

Dated:  October 4, 2019

**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: _____/s/ Matthew J. Gold_____
                    Matthew J. Gold
                    Robert M. Tuchman

551 Fifth Avenue, 18th Floor
New York, New York 10176
Tel:  (212) 986-6000
Fax:  (212) 986-8866
E-mail:  MGold@kkwc.com
             RTuchman@kkwc.com

OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON
Laura K. Clinton
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, Washington  98104
Tel:  (206) 464-7745
E-mail:  laurac5@atg.wa.gov

*Attorneys for the State of Washington*

411451.8 - 10/04/19