Hearing Date:  October 11, 2019 at 10:00 am (Prevailing Eastern Time)
Related to: Adversary Proceeding Docket No. 2

GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI  53703
Katherine Stadler
Erin A. West (*pro hac vice* approved)
Brady C. Williamson (*pro hac vice* approved)
Telephone: (608) 284-2654
Facsimile:  (608) 257-0609
E-mail:  kstadler@gklaw.com, ewest@gklaw.com, bwilliam@gklaw.com

*Attorneys for the Arkansas
and Tennessee Municipalities*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re:<br>Purdue Pharma L.P., et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-23649 (RDD)<br><br>(Jointly Administered) |
| Purdue Pharma L.P., et al.,<br><br>Plaintiffs,<br>v.<br><br>Commonwealth of Massachusetts, et al.,<br><br>Defendants. | Adv. Pro. No. 19-08289 (RDD) |

---

## LIMITED OBJECTION AND RESPONSE OF ARKANSAS AND TENNESSEE PUBLIC OFFICIALS IN OPPOSITION TO DEBTORS' MOTION FOR A PRELIMINARY INJUNCTION

---

[1] The Debtors in these cases, along with the last for digits of each Debtor's registration number in the applicable jurisdiction, are as follows:  Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnic Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY ............................................................................................................................... 1

PROCEDURAL BACKGROUND ............................................................................................. 5

    The Tennessee Actions ......................................................................................................... 5

    The Arkansas Action ............................................................................................................ 6

    Coordination of the State Court DDLA Actions and MDL Proceedings .............................. 7

ARGUMENT ............................................................................................................................. 8

**I.    INJUNCTIONS AGAINST POLICE POWER REQUIRE A HEIGHTENED
SHOWING, PARTICULARLY FOR NON-DEBTORS** .................................................. **9**

    Debtors Have Not Even Tried to Establish the Financial Link to the Related Parties to
Justify Extraordinary Injunctive Relief .............................................................................. 12

    The Debtors Are Not Likely to Succeed on the Merits, Nor Will They Suffer Irreparable
Harm Without the Injunction ............................................................................................. 15

**II.    THE STATE COURT DDLA ACTIONS ARE LAW ENFORCEMENT
ACTIONS NOT SUBJECT TO THE AUTOMATIC STAY** ............................................ **19**

    The Tennessee and Arkansas Municipalities are Governmental Units ................................ 19

    The Respondents Bring the State Court DDLA Actions in the Exercise of Their Police
Power ................................................................................................................................. 20

    The Second Circuit Recognizes that Consumer Protection Actions are Excepted from the
Automatic Stay .................................................................................................................. 22

**III.    IF THE AUTOMATIC STAY APPLIES, THE COURT SHOULD LIFT IT AS
TO THE RELATED PARTIES FOR "CAUSE"** .......................................................... **24**

    Respondents Have Standing to Move for Relief from Stay ................................................. 24

    "Cause" Exists to Lift the Automatic Stay ......................................................................... 25

CONCLUSION / RELIEF REQUESTED ................................................................................ 29

## TABLE OF AUTHORITIES

**Cases**

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.1986) .......................................................... 10

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc*., 502 U.S. 32 (1991)........................ 24

*Cal. ex rel. Brown v. Villalobos,* 453 B.R. 404 (D. Nev. 2011) .................................................. 22

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) ........................................... 23, 24

*EEOC v. CTI Global Sols., Inc.*, 422 B.R. 49 (D. Md. 2010).......................................................... 23

*Effler v. Purdue Pharma L.P.,* No. E2018-01994-COA-R3-CV, 2019 WL 4303050 (Tenn. Ct. App. Sept. 11, 2019) ................................................................................................................ 6

*Fout v. State,* 4 Tenn. 98 (1816) ..................................................................................................... 22

*In re Aegean Marine Petroleum Network Inc.,* 599 B.R. 717 (Bankr. S.D.N.Y. 2019) ... 16, 17, 18

*In re Brennan,* 198 B.R. 445 (D.N.J. 1996)..................................................................................... 10

*In re Brown Transp. Truckload, Inc.*, 118 B.R. 889 (Bankr. N.D. Ga. 1990) .............................. 25

*In re Commonwealth Cos.*, 913 F.2d 518 (8th Cir. 1990) .............................................................. 24

*In re Dow Corning Corp.,* 280 F.3d 648 (6th Cir. 2002).................................................................. 17

*In re FirstEnergy Sols. Corp.*, No. 18-50757, 2019 WL 4127191 (Bankr. N.D. Ohio Aug. 29, 2019) ................................................................................................................................... 17, 19

*In re Gen. Motors LLC Ignition Switch Litig.*, 69 F. Supp. 3d 404 (S.D.N.Y. 2014)............. 21, 22

*In re Go West Entm't, Inc.*, 387 B.R. 435 (Bankr. S.D.N.Y. 2008).............................................. 21

*In re Hughes,* 166 B.R. 103 (Bankr. S.D. Ohio 1994) .................................................................... 26

*In re Insys Therapeutics*, No. 19-11292(KG) at Adversary Proceeding No. 19-50261 (Bankr. D. Del. Jul. 12, 2019).......................................................................................................................... 11

*In re Int'l Oriental Rug Ctr.*, 165 B.R. 436 (Bankr. N.D. Ill. 1994)............................................ 25

*In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992) ............................................................ 24

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.,* 488 F.3d 112, 132-33 (2nd Cir. 2007) ........................................................................................................................................ 21

*In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) ............................................ 9

*In re Missouri,* 647 F.2d 768 (8th Cir. 1981) ................................................................................. 21

*In re National Prescription Opiate Litigation*, MDL No. 2804 .............................................. 5, 7

*In re Ngan Gung Rest., Inc.*, 183 B.R. 689 (Bankr. S.D.N.Y. 1995)............................................ 4

*In re PG&E Corp.,* No. BR 19-30088-DM, 2019 WL 3889247 (Bankr. N.D. Cal Aug. 16, 2019) .................................................................................................................................................. 26

*In re Pro Football Weekly, Inc.*, 60 B.R. 824 (N.D. Ill. 1986) ...................................................... 26

*In re Quigley Co.,* 676 F.3d 45 (2d Cir. 2012)................................................................................ 9

*In re Residential Capital, LLC,* No. 12-12020 MG, 2013 WL 1553799 (Bankr. S.D.N.Y. Apr. 12, 2013) ........................................................................................................................................ 26

*In re Sonnax Indus.,* 907 F.2d 1280 (2d Cir. 1990) ...................................................................... 26

*In re Vitanza*, No. 98-19611DWS, 1998 WL 808629 (Bankr. E.D. Pa. Nov. 13, 1998)............. 28

*Johns–Manville Corp. v. Asbestos Litigation Group (In re Johns–Manville Corp.)*, 26 B.R. 420 (Bankr. S.D.N.Y. 1983) ............................................................................................................ 10

*Lockyer v. Mirant Corp.*, 398 F.3d 1098 (9th Cir. 2005) .............................................................. 21

*McCartney v. Integra National Bank North*, 106 F.3d 506 (3d Cir.1997) ................................... 10

*Midatlantic Nat'l. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986)................... 21

*Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267 (3d Cir. 1984)......................................... 23

*Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014)................................................. 9

*Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282 (2d Cir. 2003) ......................................................... 10

*SEC v. Brennan,* 230 F.3d 65 (2d Cir. 2000)............................................................................ 22, 23

*Stiller v. State*, 516 S.W.2d 617 (Tenn. 1974) .............................................................. 19

*TK Holdings, Inc. v. Hawaii*, No. 11375, Adv. No. 17-50880
(Bankr. D. Del. Aug. 16, 2017)................................................................ 10, 11, 14

*United States v. Apex Oil Co.*, 579 F.3d 734, (7th Cir. 2009) ...................................... 23

*United States v. Colasuonno*, 697 F.3d 164 (2d Cir. 2012) ......................................... 23

*United States v. Troxler Hosiery Co.*, 41 B.R. 457, 459 (M.D.N.C. 1984) .................. 23

**Statutes**

11 U.S.C. § 101(27) ......................................................................................................... 19

11 U.S.C. § 101(40) ......................................................................................................... 19

11 U.S.C. § 105 ...................................................................................................... 2, 8, 9, 19

11 U.S.C. § 105(a) ................................................................................................... 9, 10, 11

11 U.S.C. § 1103(c)(2) .................................................................................................... 15

11 U.S.C. § 1109(b) ........................................................................................................ 24

11 U.S.C. § 362 ........................................................................................................... 8, 26

11 U.S.C. § 362(a) .......................................................................................................... 24

11 U.S.C. § 362(b)(4) ................................................................................................ passim

11 U.S.C. § 362(d)(1) ......................................................................................... 24, 25, 26

28 U.S.C. § 1334(e) ........................................................................................................ 18

28 U.S.C. § 157(b)(2)(B) ................................................................................................ 27

28 U.S.C. § 157(b)(5) ..................................................................................................... 27

Ark. Code Ann. § 14-14-102 .......................................................................................... 20

Ark. Code Ann. § 14-37-102 .......................................................................................... 20

Ark. Code Ann. § 16-106-101 ..................................................................................... 3, 22

Ark. Code Ann. § 16-124-104(a) ..................................................................................... 6

Ark. Code Ann. § 16-124-112(a) ..................................................................................... 6

Tenn. Code Ann. § 20-38-116 ........................................................................................ 20

Tenn. Code Ann. § 29-38-101 ........................................................................................ 20

Tenn. Code Ann. § 29-38-105(a) ..................................................................................... 5

Tenn. Code Ann. § 29-38-106 ........................................................................................ 20

Tenn. Code Ann. § 29-38-106(5)(b)(1) .......................................................................... 18

Tenn. Code Ann. § 29-38-106(b)(1) ................................................................................. 3

Tenn. Code Ann. § 29-38-108 ............................................................................... 3, 14, 18

Tenn. Code Ann. § 29-38-116 ........................................................................................ 25

Tenn. Code Ann. § 29-38-116(a) ..................................................................................... 5

**Other Authorities**

1870 Tennessee Const., article VI, section 5 .................................................................. 19

1978 U.S.C.C.A.N. 5787 ............................................................................................ 4, 23

Ark. Const. article 12, section 3 ..................................................................................... 20

H.R. Rep. No. 95-595 (1977)............................................................................................ 4

S. Rep. No. 95–989 (1978) ............................................................................................. 23

**Rules**

Bankruptcy Rule 4001(a)(3) ........................................................................................... 30

Fed. R. Bankr. P. 7004(a)(1)............................................................................................. 2

Fed. R. Bankr. P. 7012(b) ................................................................................................. 2

Fed. R. Civ. P. 12(b)(5)..................................................................................................... 2

Fed. R. Civ. P. 4(j)(2) ....................................................................................................... 2

**Treatises**

3 *Collier on Bankruptcy* (Richard Levin & Henry J. Sommer eds., 16th ed. 2019)................. 4, 24

Barbara J. Houser*, Chapter 11 As a Mass Tort Solution*, 31 Loy. L.A. L. Rev. 451 (1998)........ 30

## PRELIMINARY STATEMENT

With their *Motion for a Preliminary Injunction* [Adversary Dkt. No. 2] (the "Motion"), the plaintiffs and debtors-in-possession ("Debtors"), including Purdue Pharma L.P. ("Purdue Pharma"), seek the extraordinary remedy of a preliminary injunction—not only to shield the corporate Debtors for nine months but also to protect 76 alleged "Related Parties."[2] They seek immunity from the sovereign governments investigating the Debtors' and Related Parties' unlawful conduct.  The court should deny the requested relief for the Related Parties.

## SUMMARY

More than 230 named defendants in this adversary proceeding (the "Tennessee and Arkansas Municipalities" or "Respondents"), [3,4,5] by their undersigned counsel, present this

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Memorandum of Law in Support of Motion for a Preliminary Injunction* [Adversary Dkt. No. 3] (the "Debtors' Brief").

[3] The "Tennessee Municipalities" are defined as the following Tennessee District Attorneys General for, collectively, 36 counties in Tennessee devastated by the opioid epidemic:  Tennessee District Attorneys General Barry Staubus, Tony Clark, and Dan Armstrong are the District Attorney Plaintiffs in Case No. C-41916 pending against the Debtors—among other defendants—in the Circuit Court for Sullivan County at Kingsport, Tennessee (the "Staubus v. Purdue Action"); Tennessee District Attorneys General Jared Effler, Charme Allen, Dave Clark, Russell Johnson, Stephen Crump, and Jimmy Dunn are the District Attorney Plaintiffs in Case No. 16596 pending against the Debtors—among other defendants—in the Circuit Court for Campbell County at Jacksboro, Tennessee (the "Effler v. Purdue Action"); District Attorneys General Bryant C. Dunaway, Jennings H. Jones, Robert J. Carter, Brent A. Cooper, and Lisa S. Zavogiannis are the District Attorney Plaintiffs in Case No. CCI-2018-CV-6347 pending against the Debtors—among other defendants—in the Circuit Court for Cumberland County at Crossville, Tennessee (the "Dunaway v. Purdue Action" and, together with the Staubus v. Purdue Action and the Effler v. Purdue Action, the "Tennessee Actions" and, together with the Arkansas Action, the "State Court DDLA Actions"). The Tennessee actions appear at lines 292-294 of Exhibit A to the *Complaint for Injunctive Relief* [Adversary Dkt. No. 1] (the "Complaint"). The complaints in the Tennessee Actions are attached to the accompanying *Declaration of Katherine Stadler in Support of Limited Objection and Response of Arkansas and Tennessee Public Officials in Opposition to Debtors' Motion for Preliminary Injunction* ("Stadler Decl") Exhs. 1, 2, and 3.

[4] The "Arkansas Municipalities" are defined as the State of Arkansas, *ex rel*. Scott Ellington, the duly elected Second Judicial Circuit Prosecuting Attorney, and the following 72 Arkansas counties and 15 Arkansas cities, collectively plaintiffs in Case No. CV-2018-268 pending against the Debtors—among other defendants—in the Circuit Court of Crittenden County, Arkansas (the "Arkansas Action"):  (i) 72 Arkansas counties of: Arkansas, Ashley, Baxter, Benton, Boone, Bradley, Calhoun, Carroll, Chicot, Clark, Clay, Cleburne, Cleveland, Columbia, Conway, Craighead, Crawford, Crittenden, Cross, Dallas, Desha, Faulkner, Franklin, Fulton, Garland, Grant, Greene, Hempstead, Hot Spring, Howard, Independence, Izard, Jackson, Johnson, Lafayette, Lawrence, Lee, Lincoln, Little River, Logan, Lonoke, Madison, Marion, Miller, Mississippi, Monroe, Montgomery, Nevada, Newton, Ouachita, Perry, Phillips, Pike, Poinsett, Polk, Pope, Prairie, Randolph, St. Francis, Saline, Scott, Searcy, Sebastian, Sevier, Sharp, Stone, Union, Van Buren, Washington, White, Woodruff, and Yell; and (ii) 15 Arkansas
*footnote continued on next page…*

limited objection to the virtually unlimited scope of the injunctive relief the Debtors and Related Parties seek. The Debtors seek protection from an avalanche of state and federal litigation for themselves and for a litany of non-debtor "Related Parties" at the crossroads of the national opioid epidemic. This extraordinary request subverts the police powers exception to the automatic stay and contradicts two recent decisions, including one from the U.S. Bankruptcy Court for this district, that restate a core principle of the bankruptcy code: Chapter 11 was not designed to protect non-Debtors.

This dispute, at least the one to be heard on October 11, 2019, could be framed as a choice between the Bankruptcy Code's general provision in section 105 and the specific provisions exempting, in most circumstances, governments protecting health and safety from the reach of the automatic stay. For purposes of this limited objection, the Respondents do not object to an injunction that benefits any Debtor.[6] The breadth of the protection sought for the Related Parties, however, is fundamentally at odds with the Bankruptcy Code, well-established precedent, and the balance of equities.[7] In particular, Richard Sackler is named individually as a defendant in *Dunaway v. Purdue*, brought pursuant to Tennessee's Drug Dealer Liability Act

---

cities of: Benton, Bentonville, Conway, Fort Smith, Hot Springs, Jacksonville, Jonesboro, Little Rock, Monticello, North Little Rock, Pine Bluff, Rogers, Sherwood, Springdale, and Texarkana. The Arkansas Action appears at line 66 of Exhibit A to the Complaint. The complaint in the Arkansas Action is attached to the Stadler Decl. as Exhibit 7.

[5] To date, Debtors have failed to achieve service of the summons and complaint in this adversary proceeding on all of the Respondents as required by Fed. R. Bankr. P. 7004(a)(1), incorporating Fed. R. Civ. P. 4(j)(2). Notwithstanding the Respondents' opposition to Debtors' Motion, the Respondents do not waive service and reserve their rights to assert insufficient service of process under Fed. R. Bankr. P. 7012(b), incorporating Fed. R. Civ. P. 12(b)(5).

[6] Notwithstanding, the Respondents do not concede that § 362(b)(4) should not apply to the Respondents, and the arguments supporting that provision with respect to the Related Parties apply with equal force to the Debtors. *See* § II, *infra.*

[7] Though the arguments here apply to all Related Parties, this Limited Objection focuses on three Related Parties: The Purdue Frederick Company Inc. ("Purdue Frederick") and Rhodes Technologies Inc. ("Rhodes Technologies"), named in the Arkansas and Tennessee Actions, and Richard Sackler ("Sackler") named in the *Dunaway v. Purdue* Tennessee Action. *See* Exhibit B to the Complaint at line items 151 and 377-379.

("TDDLA"), which implicates personal strict liability and prohibits third party indemnification of individuals liable under the act. *See* Tenn. Code Ann. §§ 29-38-106(b)(1) and 29-38-108.[8] Mr. Sackler, in particular, does not warrant the benefit of any stay because of his freestanding liability under the TDDLA, reinforced by the Debtors' strenuous insistence that, other than their ownership interest, the Sackler family's business and the Debtors' are no longer intertwined, "full stop." *See, e.g.,* Tr. September 17, 2019 [Dkt. No. ___] ("First Day Hearing Transcript") at p. 22, lines 6-7; p. 95, lines 3-6 ("No [wages or indemnity] payments will be made to or for the benefit of a Sackler family member"); p. 135, lines 19-23 (indemnity payments ceased March 1, 2019); *but see* p. 31, lines 6-14 (88 undescribed contracts with "non-Purdue Sackler entit[ies]" remain in place).

While the Debtors produced a document data room and two witnesses for deposition to support the Motion, they have presented *no* evidence of the legal or financial relationship of the Related Parties to the Debtors, notwithstanding the implicit suggestion that the Related Parties all have valid indemnification and contribution claims against the estate. *See* Debtors' Brief at 32. Both the Sackler family's personal counsel and the Debtors' counsel assert that Sackler is irrelevant to their Motion, though he is one of the requested injunction's primary beneficiaries. Simultaneously, the Debtors assert that the family's contribution to the Settlement Structure at the core of their proposed plan framework is "essential." *See id.* at 33.[9] The Court should not accept the Related Parties' threat to "kill the deal"—at least not without robust disclosure and full discovery of: 1. the basis for any claimed right of contribution or indemnification; 2. the nature and amount of any estate claims against the Related Parties; 3. their ability to contribute,

---

[8] Arkansas' statute is nearly identical to Tennessee's, *see* Ark. Code Ann. § 16-124-101 *et seq.* ("ADDLA"), and both are based on the American Legislative Exchange Council's Model Drug Dealer Liability Act.

[9] To date, no term sheet or any documents outlining the Settlement Structure have been placed in the record.

financially or otherwise, to a successful reorganization; and 4. the extent of the releases they will seek.

Although the Debtors propose to subject themselves to the Voluntary Injunction [Adversary Dkt. No. 2-1], that protection does not by its terms extend to any of the Related Parties.  The Debtors assert that "[a]ny need for [injunctive] relief is addressed by the unprecedented Voluntary Injunction that the Debtors ask this Court to enter against them." Yet, by its silence, the Motion asks that the Related Parties be allowed to continue profiting from their own and the Debtors' illegal conduct without consequence while enjoining the Respondents from policing that same conduct.

"[T]he bankruptcy court is not a haven for wrongdoers."  *See* 3 *Collier on Bankruptcy* ¶ 362.05[5][a] (Richard Levin & Henry J. Sommer eds., 16th ed. 2019).  "[W]here a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay."  *In re Ngan Gung Rest., Inc.*, 183 B.R. 689, 691 (Bankr. S.D.N.Y. 1995) (citing H.R. Rep. No. 95-595, at 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6299).  Here, the Respondents, acting in their official capacities as representatives of governmental units, seek judicial affirmation of this statutory principle to allow them, at the least, to continue enforcing state laws against the Related Parties to protect the health, welfare, and safety of the people they represent. The Respondents wish to continue the state court DDLA Actions against Related Parties because

their resolution, without overstatement and—borrowing a phrase from the Debtors' own

counsel—has lives as well as dollars at stake.  First Day Hearing Transcript at 13:3.[10]

## PROCEDURAL BACKGROUND

### *The Tennessee Actions*

1.      Unique among the plaintiff-creditor constituencies that have identified themselves

in these proceedings so far, the State of Tennessee, in enacting the TDDLA, has codified its deep

concern for communities that suffer as a result of illegal drug use.  The law makes anyone who

"knowingly participates in the illegal drug market within [Tennessee] . . . liable for civil

damages…" Tenn. Code Ann. § 29-38-105(a). The Tennessee Actions are civil suits brought by

the Tennessee Municipalities[11] as law enforcement officials pursuant to the TDDLA to protect

the health, safety, and welfare of the people in 36 counties in Tennessee.  They also seek to allow

city and county social and law enforcement services to recover even a small portion of the

resources expended to cope with the crisis that the Debtors and Related Parties knowingly

precipitated.

2.      The Tennessee Actions' plaintiffs are a group of prosecutors with explicit

authority under the TDDLA to assert claims on behalf of the state, cities, and counties harmed by

the opioid epidemic.  *See* TDDLA at Tenn. Code Ann. § 29-38-116(a); *see also Effler v. Purdue*

---

[10] The Debtors begin their brief with a quotation from the federal judge supervising the MDL Proceedings.  Last week, he also said this, after noting the state litigation filed to date:  "the opioid epidemic is historic, one of the greatest tragedies of our time. . . .The human toll is staggering, and the continuing economic burden on governments at all levels is extreme." *In re National Prescription Opiate Litigation*, No. 17-MD-2804, slip op. at 2-3 (N.D. Ohio Sept. 26, 2019).  The Court should not allow the Debtors bemoaning the onslaught of litigation to eclipse the scope and severity of the crisis propelled, in part, by the Debtors' and Related Parties' willful, malicious, and in some cases criminal conduct.

[11] Several "Baby Does" born with Neonatal Abstinence Syndrome are co-plaintiffs with the Tennessee Municipalities in the Tennessee Actions.  The claims of the Baby Does may not qualify for the section 362(b)(4) exception to the automatic stay and, therefore, the Respondents stipulate that the Baby Doe causes of action against the Debtors (but not the Related Parties) in the Tennessee Actions are subject to the automatic stay.

*Pharma L.P.,* No. E2018-01994-COA-R3-CV, 2019 WL 4303050, at *8 (Tenn. Ct. App. Sept. 11, 2019). This group of public officials has observed, first hand, the devastation wrought by the intentional marketing of opioids intended for illegal use. The Tennessee Actions named the Debtors and two Related Parties to address the past, present and future cost of treatment and rehabilitation, medical and support expenses, and other pecuniary and non-economic losses under the TDDLA.

3.        The Tennessee Actions, beginning with *Staubus v. Purdue*, would be among the first state actions against the Related Parties ready for trial.[12] Discovery, in coordination with the MDL Proceedings, is ongoing.[13]

***The Arkansas Action***

4.        The ADDLA, like the TDDLA, provides a civil remedy "for damages caused by use of an illegal drug by an individual." Ark. Code Ann. § 16-124-104(a). The ADDLA imposes market liability on those who participate in illegal drug distribution that causes damage. *See First Am. Compl.*, Arkansas Action ¶ 485 (Stadler Decl. Exh.4).

5.        The Arkansas Municipalities are comprised of a prosecuting attorney, 72 (of 78) counties and 15 cities, all acting on behalf of the State of Arkansas, and represented by the Association of Arkansas Counties and the Arkansas Municipal League. The Arkansas Municipalities are authorized to bring the ADDLA claims against the Debtors and two Related Parties on behalf of the State of Arkansas pursuant to Ark. Code Ann. § 16-124-104(a). The constituencies the Arkansas Municipalities represent are burdened with an insurmountable

---

[12] "The state court actions include those asserted by the attorneys general of 46 states; they are not part of the Ohio MDL." Debtors' Brief, at p. 7.

[13] The plaintiffs in the Tennessee Actions have agreed, subject to a ruling on the Motion, to postpone noticed depositions of Debtors and Related Parties.

demand on their resources to meet the medical, public health, and law enforcement needs of their

communities as a result of the Debtors' and the Related Parties' unlawful conduct.

6.    The Arkansas Action is readying for trial, scheduled to commence on October 19,

2020.  Discovery in the Arkansas Action is ongoing, conducted in coordination with the MDL

Proceedings.[14]

***Coordination of the State Court DDLA Actions and MDL Proceedings***

7.    Separately, dozens of federal actions against the Debtors and Related Parties are

pending before the U.S. District Court for the Northern District of Ohio in *In re National*

*Prescription Opiate Litigation*, MDL No. 2804 (the "MDL Proceedings"), with many other

federal cases pending transfer.  The MDL Proceedings—although they involve some common

questions of facts—differ from the State Court DDLA Actions because the latter are based on

unique state statutes and seek specific relief not generally or otherwise available to the plaintiffs

in the MDL Proceedings (the "MDL Plaintiffs").

8.    The court in the MDL Proceedings has acknowledged that it has no jurisdiction

over the State Court DDLA Actions or other state court proceedings.  *See* MDL Proceedings,

*Case Mgmt. Order No. 1*, sec. 7, MDL Dkt. No. 232.  However, to avoid duplication, the MDL

Court entered a discovery protocol governing the coordination of written discovery and

depositions between the parties to the MDL Proceedings and the state court litigants, including

the Respondents.  *See* MDL Proceedings, *Protocol for State and Federal Court Coordination*,

MDL Dkt. No. 1029.

---

[14] The Arkansas Municipalities have suspended discovery relating to the Debtors and Related Parties pending this Court's ruling on the Motion.

## **ARGUMENT**

9.      The Debtors have failed to meet their heavy burden—on the facts or the law—to establish extraordinary circumstances warranting an extension of the stay to the Related Parties. Indeed, the witnesses and documents offered in support of the Motion lack any reference to or evidence of the financial condition or relationship of the Related Parties,[15] except to note that they indirectly own the Debtors and they no longer receive indemnification payments. *Declaration of Jamie O'Connell in Support of Debtors' Motion for a Preliminary Injunction* ("O'Connell Decl.") at ¶ 16 n.5.[16] The Debtors' organizational chart does not contain any reference to the Related Parties, making their relationships to the Debtors in many cases unclear. *See* Exh. A to *Purdue Pharma L.P. Voluntary Petition for Non-Individuals Filing for Bankruptcy* [Dkt. No. 1], and *Debtors' Informational Brief*, Exh. A [Dkt. No. 17].

10.      The force and reach of section 362's automatic stay—and its exceptions—are not in doubt. This Court's challenge is to balance this fundamental component of the Bankruptcy Code's debtor protections with the limited scope of section 105. When it enacted section 362(b)(4), Congress chose to expressly except actions like the Tennessee and Arkansas Actions, recognizing that the uninterrupted exercise of police powers is essential. Moreover, in chapter 11 cases Congress explicitly chose to limit the stay in section 362 to the debtor, providing no automatic and broad protection to non-debtors.

11.      The extraordinary injunction the Debtors now request should rarely be entertained, and if it is, only where the debtor shows exceptional circumstances. Notwithstanding the sweeping Related Party promises reported at the first day hearings, the

---

[15] The Related Parties are identified by name only in the Complaint ¶ 15.

[16] Whether a corresponding indemnification *obligation* still exists, however, remains undisclosed. *See* Deposition of Jamie O'Connell ("O'Connell Dep.") 193:4-197:7 Sept. 27, 2019 (Stadler Decl. Exh. 6).

Debtors have failed to present any evidence of extraordinary circumstances warranting extension of the stay to non-debtors. The Debtors have limited discovery on this Motion to their voluntary offerings, none of which address the legal or financial relationships of the Related Parties to the Debtors. Further, the Debtors have explicitly refused to allow any non-Debtor discovery.[17]

## I.    INJUNCTIONS AGAINST POLICE POWER REQUIRE A HEIGHTENED SHOWING, PARTICULARLY FOR NON-DEBTORS

12.    Section 105 of the Bankruptcy Code states, in relevant part, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As the Second Circuit has recognized, section 105 does not create substantive rights not otherwise found in the Bankruptcy Code. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005).

13.    Under Second Circuit precedent, bankruptcy courts have "the power pursuant to section 105(a) to enjoin claims against a non-debtor third party where those claims are derivative, or otherwise 'pose the specter of direct impact on the *res* of the bankruptcy estate.'" *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 211 (2d Cir. 2014) (citations omitted). "The question is, essentially, 'whether the direct result of a suit against a third party will be the removal of assets from the bankruptcy estate.'" *Id.* (citing *In re Quigley Co.,* 676 F.3d 45, 58 (2d Cir. 2012)). This is a threshold jurisdictional issue, because bankruptcy courts only have "related to" jurisdiction over third-party non-debtor claims directly affecting the *res* of the bankruptcy estate. 676 F.3d at 53. The Debtors have often repeated, but failed to substantiate with evidence, the impact on the *res* of litigation against the Related Parties. Accordingly, the

---

[17] Counsel for the Respondents met and conferred, by telephone, with counsel for the Debtors on September 25, 2019. The Debtors made clear that they would resist any discovery efforts involving the Related Parties on the request for injunctive relief. An information request made to the Sackler family's counsel was referred directly to the Debtors' counsel.

Debtors have not made the initial showing to confer jurisdiction for the Related Parties. *See*
O'Connell Dep. 167:5-9.

14.     Even if the Debtors could establish that the Court has jurisdiction to enter a
preliminary injunction protecting non-debtors from police power, the Debtors must then establish
that they are otherwise entitled to the injunctive relief sought.

15.     Courts have found a stay extension to non-debtors warranted under
section 105(a): for claims to establish an obligation of which the debtor is a guarantor,
*McCartney v. Integra National Bank North*, 106 F.3d 506, 510–11 (3d Cir.1997), for claims
against the debtor's insurer, *Johns–Manville Corp. v. Asbestos Litigation Group (In re Johns–
Manville Corp.)*, 26 B.R. 420, 435–36 (Bankr. S.D.N.Y. 1983) (on rehearing), or where "there is
such identity between the debtor and the third-party defendant that the debtor may be said to be
the real party defendant …. ," *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.1986);
s*ee also Queenie, Ltd. v. Nygard Int'l.*, 321 F.3d 282, 287-88 (2d Cir. 2003).  Yet the DDLA
makes the Related Parties real party defendants in their individual capacities, independent of
their relationship to the Debtors.

16.     Even if it complicates reorganization, an injunction protecting non-debtor parties
from state enforcement action should be the rare exception, not the rule.  Unlike private actions,
"injunctions of state regulatory actions are a rare remedy, appropriate only . . . where the state
regulatory action seriously threatens the bankruptcy process." *In re Brennan*, 198 B.R. 445, 451
(D.N.J. 1996)*.*  The Debtors have not demonstrated exigent circumstances justifying a rare
remedy for the Related Parties.

17.     Debtors rely heavily on Judge Shannon's decision in *TK Holdings, Inc. v. Hawaii
("Takata")* , *see* Debtors' Brief at pp 20-22,  but that case serves to reinforce the principle that

bankruptcy courts should protect non-parties from police and regulatory actions only in rare

cases. Takata manufactured defective airbags that car manufacturers ("OEMs") installed in

automobiles sold throughout the United States (*Decl. of Benjamin S. Kaminetzky in Supp. of Mot.

for Prelim. Inj.*, [Adversary Dkt. No. 4], Ex. D ("Kaminetzky Decl.") (Hr'g Tr., *TK Holdings,*

*Inc. v. Hawaii*, No. 11375, Adv. No. 17-50880 (Bankr. D. Del. Aug. 16, 2017), at 7-8)). When

the airbags failed, drivers and passengers were injured or killed. *Id.* at 7. The National Highway

Traffic Safety Administration ("NHTSA") issued a mandatory recall, during which Takata filed

a Chapter 11 petition. *Id.* at 23. Takata proposed to sell substantially all its assets to an

unrelated third party while retaining assets and operations related to manufacturing replacement

airbag kits to remedy the defects under NHTSA's direct supervision. *Id.* In the oral ruling, the

*Takata* court discussed section 362(b)(4) police powers' exception and recognized that

section 105(a) injunctions should be uncommon. *Id.* at 22-23. Ultimately, the *Takata* court

found exceptional circumstances in the ongoing recall under NHTSA's supervision. Without a

short 90-day stay (the debtors had asked for 180 days), Takata's ability to continue

manufacturing the replacement kits as part of the recall process would be jeopardized. *Id.* at 28-

29.[18]

    18.    Here, the Debtors characterize their Voluntary Injunction proposal as analogous

to the comfort that NHTSA oversight provided to the court in *Takata*. But the self-imposed

restraint the Debtors promise is a poor substitute for the NHTSA's expansive police power to

supervise a large-scale product recall. Even if the cases were equivalent, Debtors have provided

---

[18] The stipulated injunction in the *Insys* case, on which the Debtors also rely, can be terminated by any party on
seven days' notice. *See* Debtors' Brief at p. 20, *but see In re Insys Therapeutics*, No. 19-11292(KG) at Adversary
Proceeding No. 19-50261, Dkt. No. 59 (Bankr. D. Del. Jul. 12, 2019 at ¶¶ II(5) (termination provision) ("the Parties
agree that they intend for the stay…to extend for a period of not less than 60 days…") (Stadler Decl. Exh. 5).

no reassurance—and no evidence—that the *Related Parties* have any plans to cease their

activities in continuing to profit from an illegal drug trade.

### Debtors Have Not Even Tried to Establish the Financial Link to the Related Parties to Justify Extraordinary Injunctive Relief

19.    The Debtors describe the Related Parties, generally, as "former or current owners

(including any trusts and their respective trustees and beneficiaries), directors, officers,

employees, and associated entities of the Debtors." Debtors' Brief at 5-6. They include, among

others, "Purdue Pharma's current CEO, two current directors, and members of the Sackler

Families," *id*., but the Motion does not otherwise distinguish among the Related Parties, let alone

provide an evidentiary basis inextricably linking them to the Debtors' restructuring aspirations.

20.    The current CEO and directors (arguably entitled to Debtor indemnification as a

matter of common law) are not of the same ilk as the passive family owners and founders who,

the Court has been told, have no role in the Debtors' operations or restructuring. No one knows

if the Debtors still legitimately owe indemnity to any individual family member, or if they ever

did since some of the allegations involve intentional, malicious, and even criminal conduct. *See*

Deposition of Jesse DelConte ("DelConte Dep.") 142:13 – 145:6, Sept. 26, 2019 (Stadler Decl.

Exh. 7). The Motion and its supporting materials do not identify the "trustees and beneficiaries"

other than by name and do not delineate each Related Party's role (or the absence of a role) in

either the restructuring or the conduct at issue. Readers are to presume, however, that all Related

Parties are so inextricably linked to the reorganization process and to the thousands of pending

lawsuits that their legal and financial connections cannot even be disclosed, much less untangled.

21.    The Debtors generically assert that the "Related Parties are essential to [the]

success" of the Debtors' reorganization for four main reasons: (1) litigation against the Related

Parties will diminish the Debtors' resources because it will divert "critical management focus

and attention;" (2) the litigation against the Related Parties will require the Debtors to expend

estate resources to pay the Related Parties' litigation expenses because of indemnification or

contribution obligations; (3) "if forced to bear the risk of adverse money judgments, the Related

Parties may be unwilling—or unable—to make" the promised contribution of $3 billion over

seven years towards the Settlement Structure; and (4) the estate will be diminished if the

Government and Private Defendants—rather than the estate itself—are permitted to pursue

fraudulent transfer, veil-piercing, or alter ego claims against the Related Parties.  Debtors' Brief

at 33-37.

22.    These arguments are neither persuasive nor sufficiently detailed for an opposing

party to test their veracity.  For example, the Debtors themselves have stated that no member of

the Sackler family has any ongoing role in the operation of the company.  *See* First Day Hearing

Transcript at 21:6-7.  The Court is to presume, nonetheless, that each Related Party is, and will

be for the next 270 days, critically focused on the restructuring effort, which does not involve

restructuring any debt or repairing an out-of-kilter balance sheet.

23.    The Court is to presume, too, that the Debtors probably owe equal

indemnification or contribution obligations to each Related Party without exception or

reservation.  The origin and scope of any such obligation remains unidentified and undefined.[19]

Does the obligation extend to willful, malicious, intentional, or even criminal conduct?  Does the

obligation exist now, or only in the past?  If past, when did the indemnification obligation start

and end relative to the conduct at issue?  Is the indemnification period the same for all of the

---

[19] The Debtors have referenced Purdue Pharma L.P.'s Fifth Amended and Restated Partnership Agreement dated
June 20, 2019, *Declaration of Jon Lowne in Support of the Debtors' Chapter 11 Petitions* [Dkt. No. 3] at 37-38; and
a shareholder agreement governing Purdue Pharma, Inc., Debtors' Informational Brief at pp. 14, 16; but none of
those documents is in this record, nor do they appear in the Debtors' pre-hearing production set.

Related Parties?  The Debtors refuse to share these essential details.  *See* DelConte Dep. 143:2-145:14; *see also* O'Connell Dep. 192:6-197:7.

24.    The Debtors declare that, without the injunction, the Related Parties may be "unwilling or unable to make the contribution of $3 billion" to finance the reorganization.  *See* Debtors' Brief at 36.  The Debtors have not provided balance sheets, statements of financial affairs, or other documentation sufficient to establish that the Related Parties have the resources to contribute $3 billion; nor have they established that the Related Parties lack the resources to contribute any *more* than $3 billion.  *See* O'Connell Dep. 256:22-258:11.

25.    Moreover, the Court is to accept on faith, notwithstanding the Debtors' extraordinary burden, that $3 billion over seven years is a firm commitment, that the resources are or will be there, and that it is "enough."  Unlike *Takata*, where the non-debtor OEMs had cross-claimed against the debtors at every turn, in the Tennessee and Arkansas Actions, at least, no Related Parties have cross-claimed against any Debtor.  The TDDLA, in fact, *prohibits* indemnification for liability under the act.[20]  Tenn. Code Ann. § 29-38-108.  Further, the Debtors' witnesses had no knowledge of any efforts by the Debtors or their advisors to investigate the collectability of the Sacklers.  *See* DelConte Dep. 135:9-136:8; *see also* O'Connell Dep. 256:22-258:11; 312:24-322:13.

26.    Unanswered questions abound here.  The Debtors have referenced an exhaustive investigatory effort to uncover potential estate claims against the Debtors, *see* Debtors' Informational Brief at p. 16, but have not identified a single potential avoidance, claw-back, or veil-piercing claim.  *See* DelConte Dep. 31:14-42:23.  The Debtors' schedules or SOFA required

---

[20] The ADDLA holds that third parties and insurance companies "shall not be required" to indemnify damages.  Ark. Code Ann. § 16-124-103(c)(2).

to identify these claims will not be filed until after the Court has ruled on the Motion.  The

current management and board (including three Related Parties) will continue to investigate

themselves, apparently, without interference.[21]  The witnesses produced by the Debtors in

support of the Motion could not identify whether any Purdue employees expend time or efforts

related to litigation against the Sacklers, nor what, if any, impact the Debtors would experience

from continued litigation against the Sacklers outside of bankruptcy. *See* DelConte Dep. 167:5-9,

189:12-190:17; *see also* O'Connell Dep. 251:12-252:8.  Nevertheless, the Debtors assert, the

potential impairment of unidentified claims against Related Parties will undoubtedly diminish

the value of the estate.

27.     These and many more legal and evidentiary holes in the record should be enough

to preclude an extraordinary remedy for the non-debtors.

***The Debtors Are Not Likely to Succeed on the Merits, Nor Will They Suffer Irreparable Harm
Without the Injunction***

28.     The first 24 pages of the Complaint lists the defendants.  *See* Complaint pp. 1-24.

The next 20 pages conclude with several pages written on behalf of the Related Parties after

listing them in paragraph 15.  *Id.* ¶¶ 1-15.  The Complaint includes a naked threat:  "If forced to

bear the risk of adverse money judgments, the Related Parties may be unwilling—or unable—to

make the billions of dollars of contributions contemplated by the Settlement Structure." *Id.* ¶ 54;

*accord* Debtors' Brief at 36.

29.     The Complaint makes much of the "staggering direct and indirect costs of

litigation" against the Debtors, Complaint ¶ 2, noting the "tidal wave of litigation that will drown

the Debtors." *Id.* ¶ 4.  But they make little, if any, effort to justify the wholesale injunction in

---

[21] It is unclear whether the Debtors will oppose any effort by an official or unofficial committee to investigate
potential estate claims.  *See* 11 U.S.C. § 1103(c)(2).

favor of the Related Parties other than the same mantra used to justify the Debtors' request for an injunction generally.  In fact, the cost of litigation borne by the Debtors, even if a factor in this Court's analysis, should have no bearing on the Related Parties: at least with respect to the Sackler family, the Debtors' counsel repeatedly assured this Court that the Debtors are no longer paying those costs.  First Day Hearing Transcript 105:18-21.[22]

30.    Indeed, the Debtors assert, staying the claims against Related Parties would preserve the estates' assets and facilitate an equitable resolution of claims in the bankruptcy.  *See* Complaint ¶ 55.  To support that sweeping statement, the Debtors have effectively offered ***no*** evidence.

31.    The Complaint also makes much of the "agreement in principal [sic] with critical and important constituencies …."  *Id*. ¶ 28.  The description of the Settlement Structure omits any reference to the non-debtor releases that no doubt will also be part of the "price" of the settlement.  *See* O'Connell Dep. 254:3-25.  Also absent from the Motion is any acknowledgement of two significant recent decisions, including one from this district, that disfavor the use of third party releases and, by extension, stay relief.

32.    The Related Party injunctive relief requested by the Debtors is admittedly part of a larger "Settlement Structure," which, if successfully negotiated by the Debtors, will undoubtedly lead to proposed plan releases of the Related Parties.  *See* O'Connell Dep. 254:3-25.  Other debtors have recently tried—and failed—in this very strategy, including in this district. *See In re Aegean Marine Petroleum Network Inc.,* 599 B.R. 717 (Bankr. S.D.N.Y. 2019).  The rationale for denying broad non-consensual third-party releases adopted by the court in *Aegean*

---

[22] The Debtors' repeated recitation of the burden of their own professional fees for themselves omits any reference to their $1.2 billion cash balance—free from secured debt.  *See* O'Connell Decl. at ¶16.  Even at the Debtors' current $2 million per week rate, the Debtors could continue funding litigation for more than eleven years with cash resources.

*Marine* and, more recently, in *FirstEnergy Solutions Corp.*, applies both to the Debtors'

end-game and their first step toward that end—this injunction.  *See In re FirstEnergy Sols.*

*Corp.*, No. 18-50757, 2019 WL 4127191 (Bankr. N.D. Ohio Aug. 29, 2019).

33.    In *FirstEnergy*, the debtors, their non-debtor affiliates, the committee and *ad hoc*

creditor groups entered into a settlement agreement early in the proceeding.  *FirstEnergy* at *4.

A component of the settlement called for the non-debtor affiliates to contribute millions towards

the debtors' plan in exchange for releases of the non-debtors from claims, including

environmental claims of government entities.  *Id.*  The proposed plan later filed by the debtors

included a broad non-consensual third party release of the non-debtor affiliates.  *Id*. at *6.  The

court in *FirstEnergy* court recognized that the nonconsensual release of third-party claims

against non-debtors through an injunction is a "dramatic measure to be used cautiously" and only

in unusual circumstances.  *Id.* at *10 (citing *In re Dow Corning Corp.,* 280 F.3d 648, 658 (6th

Cir. 2002)).  The Court found the plan non-confirmable on its face. *Id.* at *20.

34.    One of the facts compelling the court in *FirstEnergy* to deny approval—at the

disclosure statement phase—of such a broad third-party injunction was its application to claims

in which the non-debtors—rather than the debtors—were the primary obligors.  *FirstEnergy*

at *12.  This fact pattern was juxtaposed with cases where permanent third-party injunctions

were permitted, those involving a debtor as the "primary obligor of the claims being resolved in

its reorganization plan, with other parties with plausible secondary obligations obtaining their

releases so as to foreclose the possibility of contribution claims by those parties against the

debtor."  *Id.*

35.    The facts at issue here closely track those in *FirstEnergy* and, similarly, warrant

denial of the broad preliminary injunction—and the anticipated permanent injunction and

discharge the Debtors will seek for the Related Parties. *See* O'Connell Dep. 254:3-25. Notably, the Related Parties are themselves primarily liable and statutorily barred from obtaining indemnification from the Debtors on Respondents' DDLA claims. *See* Tenn. Code Ann. §§ 29-38-106(5)(b)(1) and 29-38-108. These facts raise a jurisdictional concern: The direct and personal liability of the Related Parties under the DDLA to Respondents can pose no risk of diminishing the bankruptcy estate over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(e).

36.    In *Aegean Marine*, the court noted with concern the need to pause "for a minute to note just what an extraordinary thing it is for a court to impose an involuntary third-party release and how different that is from what courts ordinarily do." *Aegean Marine*, 599 B.R. at 723. The judge also emphasized that a non-debtor's contributions to a reorganization plan cannot alone be the basis to justify their nonconsensual third-party release. *Id*. at 726-27.

37.    The court in *Aegean Marine* was particularly troubled by the breadth and lack of specificity in such permanent injunction requests, finding that they "are not supposed to be granted unless barring a particular claim is important in order to accomplish a particular feature of the restructuring." *Id*. at 727. Equally troubling here is the lack of detail on any concrete and actual impact on the bankruptcy estate from the Related Parties. The Debtors baldly assert the estate will be drained by indemnification costs yet fail to identify any specific indemnification obligations, admit they ceased reimbursing legal expenses of some Related Parties well prior to the Petition Date, and outright ignore the statutory prohibition on indemnification to the Related Parties in statutes such as the TDDLA. *See* Tenn. Code Ann. § 29-38-108. Neither a preliminary nor a permanent release is appropriate with such scant evidence of relatedness.

## II.   THE STATE COURT DDLA ACTIONS ARE LAW ENFORCEMENT ACTIONS NOT SUBJECT TO THE AUTOMATIC STAY

38.    This Court can decide to defer or avoid any decision about the inherent tension between section 362(b)(4) and the generic provisions of section 105—for the Debtors.  But it should not avoid or defer that decision with respect to the Related Parties.  The use of section 105 to justify an injunction against the Debtors may be subject to legitimate dispute.  The use of section 105 to shelter the Related Parties should not be.  "[N]ondebtors should not be able simply to buy their own release or quasi-discharge without themselves being bankruptcy debtors." *FirstEnergy*, 2019 WL 4127191, at *17.

***The Tennessee and Arkansas Municipalities are Governmental Units***

39.    The Bankruptcy Code provides for "the commencement or continuation of an action or proceeding by a governmental unit … to enforce such governmental unit's or organization's police or regulatory power."  11 U.S.C. § 362(b)(4).

40.    A "governmental unit" is defined as: "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."  11 U.S.C. § 101(27).  A "municipality" is a "political subdivision or public agency or instrumentality of a State."  11 U.S.C. § 101(40).

41.    The Tennessee Municipalities' District Attorneys General are elected constitutional officers, provided for in article VI, section 5 of the 1870 Constitution, possessing "not only [the] solemn obligations to espouse the causes of the meritorious petitioner, but also to protect and promote the public welfare by standing in unalterable opposition to the unworthy." *Stiller v. Tennessee*, 516 S.W.2d 617, 620 (Tenn. 1974).  The constitutional and statutory duties

of the Tennessee Municipalities' District Attorneys General include—among others—the prosecution of criminal statutes and other actions "for the protection of the state or the public interest."

42.    In prosecuting the Tennessee Actions, the Tennessee Municipalities act in their official capacities, representing each of their counties, cities within those counties, and the State of Tennessee's interests pursuant to Tenn. Code Ann. §§ 29-38-106 and 29-38-101. The Tennessee Municipalities are expressly authorized to bring suit to enforce the DDLA under Tenn. Code Ann. § 20-38-116.  That provision gives enforcement authority to the district attorneys to act on behalf of the state and its political subdivisions and populace, the affected counties the Tennessee Municipalities represent, and their residents.

43.    Accordingly, the Tennessee Municipalities, acting in their official capacities, constitute a department, agency, or instrumentality that falls within the definition of the governmental unit exception under section 362(b)(4).

44.    The Arkansas Municipalities are 72 counties, each a political subdivision of the State of Arkansas pursuant to Ark. Code Ann. § 14-14-102, and 15 cities, each a municipal corporation pursuant to Ark. Const. article 12, section 3 and Ark. Code Ann. § 14-37-102.

45.    The Arkansas Municipalities, acting in their official capacities, constitute a department, agency, or instrumentality of a municipality well within the definition of the governmental unit exception under section 362(b)(4).

### The Respondents Bring the State Court DDLA Actions in the Exercise of Their Police Power

46.    In deciding whether actions fall within the police power exception, courts have held that "the term 'police or regulatory power' refers to the enforcement of state laws affecting health, welfare, morals, and safety, but not regulatory laws that directly conflict with the control of the *res* or property by the bankruptcy court." *In re Methyl Tertiary Butyl Ether ("MTBE")*

*Prod. Liab. Litig.,* 488 F.3d 112, 132-33 (2d Cir. 2007) (citing *In re Missouri,* 647 F.2d 768, 776

(8th Cir. 1981)).  "There can be no dispute that '[w]here a governmental unit is suing a debtor to

prevent or stop violation of fraud, environmental protection, safety, or similar police or

regulatory laws, or attempting to fix damages for violation of such a law, the action or

proceeding is not stayed under the automatic stay.'"  *In re Go West Entm't, Inc.*, 387 B.R. 435,

439 (Bankr. S.D.N.Y. 2008) (citing *Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S.

494, 504 (1986)).

47.    For the police-power exception, courts typically apply the "pecuniary purpose"

test, asking "whether the governmental action relates primarily to the government's pecuniary

interest in the debtor's property … or to matters of safety and welfare...."  *MTBE Prod. Liab.

Litig.*, 488 F.3d at 133.  In addition, courts often apply the "public policy" test, asking "whether

the government seeks to effectuate public policy or to adjudicate private rights."  *In re Gen.

Motors LLC Ignition Switch Litig.*, 69 F. Supp. 3d 404, 410 (S.D.N.Y. 2014) (quoting *Lockyer v.

Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005)).  "Although the Second Circuit has never

ruled on the validity of these tests, it has found them to be met when cases 'relate primarily to

matters of public health and welfare, and the money damages sought will not inure, strictly

speaking, to the economic benefit of the states,' but rather, are brought to further 'significant

area[s] of state policy.'"  *Id.* (citation omitted).

48.    Rather than looking to the subjective merits or intent of a governmental unit's

police power, courts objectively examine the purpose of the law that the state seeks to enforce.

69 F. Supp. 3d at 411-12.  The pursuit (though not enforcement) of a monetary judgment alone

does not make an action "primarily [for] the protection of the government's pecuniary interest"

in a way that removes it from the police powers exception.  *Cal. ex rel. Brown v. Villalobos,* 453

B.R. 404, 414 (D. Nev. 2011) (citation omitted).  Instead, courts recognize that the pursuit of

civil penalties is a well-established "means of securing obedience to statutes validly enacted

under the police power."  *Id.* at 413 (citation omitted).  Civil penalties, including those primarily

punitive in nature, are a recognized part of the enforcement of consumer protection laws through

deterrence.  *Id.; see also In re Gen. Motors,* 69 F. Supp. 3d at 412.

49.     The DDLA specifically authorizes the Respondents to institute civil actions to

attack illegal drug markets root and branch, from producers to street-level drug dealers.  Under

Tennessee law, it is the Tennessee Municipalities obligation "to judge of circumstances, and,

according to their true complexion, to combine the public welfare and the safety of the citizens,

preserving both, and not impairing either…."  *Fout v. Tennessee,* 4 Tenn. 98, 99 (1816).  So, too,

in Arkansas, the plaintiffs bring the Arkansas Action "in favor of the State [of Arkansas] and in

the name of the State [of Arkansas]," representing the state in its sovereign capacity pursuant to

Ark. Code Ann. § 16-106-101.

50.     The State Court DDLA Actions seek, among other things, to enforce their

respective state laws, prevent further ongoing illegal conduct, punish wrongful conduct and deter

the unlawful marketing of opioids and other dangerous consumer products.  The Respondents act

pursuant to the "police and regulatory powers" to defend public—not private—interests and to

protect the public at large from the widespread illegal opioid sale and distribution in their states.

***The Second Circuit Recognizes that Consumer Protection Actions are Excepted from the Automatic Stay***

51.     The police or regulatory power exception "prevent[s] a debtor from 'frustrating

necessary governmental functions by seeking refuge in bankruptcy court.'" *SEC v. Brennan,* 230

F.3d 65, 71 (2d Cir. 2000) (quoting *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1024 (2d

Cir. 1991)).  Where a governmental unit uses its police and regulatory power to protect the public by "curb[ing] certain behavior," the exception applies with full force.  *Id.* at 72.

52.      The provision's text and legislative history confirm that the exception applies to actions in which "a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws." S.  Rep. No. 95–989, at 52 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5838; *accord United States v. Troxler Hosiery Co.*, 41 B.R. 457, 459 (M.D.N.C. 1984) (concluding that, as used in the predecessor to section 362(b)(4), "police or regulatory power" refers to the administration and enforcement of state laws affecting health, welfare, morals, and safety).

53.      Most courts have concluded that the Bankruptcy Code allows a state court or regulatory board to enforce consumer protection laws provided no attempt is made to actually collect a monetary judgment for violations.  *See*, *e.g.*, *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 278 (3d Cir. 1984).  An injunction requiring the debtor to incur costs prospectively—for example, costs attributable to remedying Debtors' ongoing participation in the illegal opioids market—is not the same as enforcing a "money judgment."  *See, e.g., United States v. Apex Oil Co.,* 579 F.3d 734, 737 (7th Cir. 2009) (debtor's obligation to remediate a contaminated site not dischargeable because it was not a "right to payment").  "Likewise, the fact that the state action requires the debtor to make an expenditure does not necessarily mean that the regulatory exception is inapplicable."  *EEOC v. CTI Global Sols., Inc.*, 422 B.R. 49, 52 (D. Md. 2010).

54.      The Second Circuit has "previously applied this exception in the context of civil and administrative enforcement actions." *See United States v. Colasuonno,* 697 F.3d 164, 179 (2d Cir. 2012) (*citing SEC v. Brennan*, 230 F.3d at 67 ("money judgment" exclusion in section

362(b)(4) barred enforcement of repatriation order in civil fraud proceeding)); *City of New York v. Exxon Corp.*, 932 F.2d at 1022 (§ 362(b)(4) allowing action by city seeking reimbursement of environmental cleanup costs); *see also Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 39–40 (1991) (proceeding by Federal Reserve alleging unsafe banking practices fit "squarely within § 362(b)(4)"); and 3 *Collier on Bankruptcy* ¶ 362.05[5][b][i] (discussing cases applying the police power exception in "employment discrimination actions, labor law enforcement proceedings, rent regulation enforcement, the enforcement of the minimum wage laws and enforcement of water quality control standards")).  The State Court DDLA Actions not only qualify for the police power exception, they epitomize the need for it.

## III.    IF THE AUTOMATIC STAY APPLIES, THE COURT SHOULD LIFT IT AS TO THE RELATED PARTIES FOR "CAUSE"

55.    In the event the Court concludes that the automatic stay bars the State Court DDLA Actions from proceeding against the Related Parties, it may—after notice and a hearing—terminate, modify or condition the section 362(a) automatic stay "for cause, including the lack of adequate protection of an interest in property" of the party seeking relief.  11 U.S.C. § 362(d)(1).  The decision to lift the automatic stay rests within the discretion of the bankruptcy court, but its legal conclusions are subject to *de novo* review.  *In re Commonwealth Cos.*, 913 F.2d 518, 521 (8th Cir. 1990).

***Respondents Have Standing to Move for Relief from Stay***

56.    "[A]nyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains."  *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992).  Thus, section 1109(b)'s party in interest definition "must be interpreted broadly to allow persons affected by a Chapter 11 case to appear and be heard."  *In re Int'l Oriental Rug Ctr.*, 165 B.R.

436, 439 (Bankr. N.D. Ill. 1994) (citation omitted).  Furthermore, the DDLA itself delegates to

District Attorneys General the power to enforce the statute on behalf of the state and

governmental subdivisions.  *E.g.,* Tenn. Code Ann. § 29-38-116.

57.    While some courts have limited the availability of stay relief primarily to

creditors, "the better approach is to recognize that any party affected by the stay should be

entitled to move for relief."  3 *Collier on Bankruptcy* ¶ 362.07[2].

58.    This avoids "the anomalous situation in which a party is subject to the automatic

stay, but is unable to seek relief even when damage may result from [the stay's] continuance."

*Id*. (*citing, e.g*., *In re Brown Transp. Truckload, Inc*., 118 B.R. 889, 893 (Bankr. N.D. Ga.

1990)).  In *Brown Transp.*, the debtor's competitor sought relief from the stay to continue an

action before the Tennessee Public Service Commission to revoke the debtor's authority to

operate as a trucking company.  118 B.R. at 891.  Although the competitor held no conventional

monetary claim, the court allowed the competitor to object, concluding that allowing

party-in-interest standing only for monetary creditors would leave any other party without

recourse in any venue.  *Id*. at 893.

59.    Here, Respondents have a legally-protected and protectable interest to the extent

their ability to actively pursue legal proceedings involving the Related Parties may be limited by

the automatic stay.  The Respondents' rights are directly affected by the commencement of this

Chapter 11 case, and this Court should explicitly recognize their party in interest status, allowing

them to seek relief from the stay to continue the State Court DDLA Actions against Related

Parties—whether separately or in response to the Motion.

***"Cause" Exists to Lift the Automatic Stay***

60.    The Bankruptcy Code does not define "cause" for purposes of section 362(d)(1).

It is a "broad and flexible concept," however, "that must be determined on a case-by-case basis."

*In re Residential Capital, LLC*, No. 12-12020, 2013 WL 1553799, at *3 (Bankr. S.D.N.Y. Apr. 12, 2013).

61.     Section 362's "for cause" provision and the government regulatory exception of section 362(b)(4) are directly related.  Precisely because federal and state agencies have the statutory authority and mandate to regulate, supervise and respond to Debtors and their non-Debtor affiliates under the exception, Respondents have "cause" to continue those proceedings, even if they are subject to the automatic stay.

62.     Relief from or modification of the automatic stay always may be granted "for cause" to permit proceedings in another forum.  *See*, *e.g*., *In re Pro Football Weekly, Inc*., 60 B.R. 824, 827 (N.D. Ill. 1986).  Bankruptcy courts have granted relief from the stay for cause, for example, when they find that another proceeding is the most appropriate forum.  *See In re Hughes*, 166 B.R. 103 (Bankr. S.D. Ohio 1994); *In re PG&E Corp.,* No. 19-30088, 2019 WL 3889247, at *2 (Bankr. N.D. Cal. Aug. 16, 2019) (finding cause to permit litigation on debtor's liability for a wildfire to continue "on a parallel track" with the bankruptcy proceedings in state court, which is suited for a proceeding consisting entirely of state law issues).

63.     In the Second Circuit, "[t]he burden of proof on a motion to lift or modify the automatic stay is a shifting one."  *In re Sonnax Indus.,* 907 F.2d 1280, 1285 (2d Cir. 1990). Section 362(d)(1) requires an initial showing of "cause" by the movant that, once established, shifts the burden of proof to the debtor.  *Arnott*, 512 B.R. at 753.

64.     In determining whether litigation should be permitted to continue in a forum other than bankruptcy court, the Second Circuit has applied a multi-factor test.  *Sonnax Indus.*, 907 F.2d at 1286.  Not all of the *Sonnax* factors are relevant in every case.  *Residential Capital,* 2013 WL 1553799*,* at *3.  Here, a number of relevant factors should guide the Court's analysis.

65.     The first factor (whether relief would result in a partial or complete resolution of the issues) weighs in favor of granting relief from stay.  A complete resolution of the issues is not even possible in this Court because it cannot ultimately adjudicate the merits of the DDLA and other state law claims.  *See* 28 U.S.C. § 157(b)(2)(B)  and 157(b)(5).

66.     Other factors (lack of connection or interference with the bankruptcy case; interests of judicial economy and the expeditious and economical resolution of litigation) all weigh in the Respondents' favor.  The DDLA claims against Related Parties arise under Tennessee and Arkansas state law and lack any financial connection to the bankruptcy case. Permitting the State Court DDLA Actions to continue against Related Parties would not interfere with this bankruptcy case, conversely, because those actions are on the verge of trial, and allowing them to proceed would offer a more expeditious resolution of the merits of the Respondents' claims against non-debtors, allowing this Court to focus on the orderly administration of the estate and the ultimate distribution of the Debtors' assets.

67.     Another factor (whether litigation in another forum would prejudice the interests of other creditors) weighs in favor of the Respondents as well.  Trial and discovery in the State Court DDLA Actions are coordinated with the MDL Proceedings.  The first "Track One" cases in the MDL Proceedings are set for trial in October.  If the State Court DDLA Actions are stayed as to the Related Parties, the other creditors who are parties in the MDL Proceedings, as well as other creditors who are parties to non-MDL state court actions, will be prejudiced because they rely on coordinated discovery and trial efforts.

68.     The fourth factor (whether a specialized tribunal with the necessary expertise has been established) weighs heavily in favor of granting relief from stay.  The Tennessee and Arkansas state court systems are the appropriate tribunals with the necessary expertise to hear the

DDLA claims that arise exclusively under Tennessee and Arkansas Law.  Additionally, the connection of the State Court DDLA Actions to the coordinated tribunal established in the MDL Proceedings for discovery also favors granting relief to allow these coordinated proceedings to continue—as the MDL will, notwithstanding the Debtors' Bankruptcy.

69.     Finally, the last factor (impact of the stay on the parties and the balance of harms) also supports stay relief.  The public interest weighs heavily in favor of the Respondents that have the constitutional mandate to protect their citizens through enforcement of consumer protection laws like the DDLA.

70.     Issues of public health or safety generally tip the balance in favor of relief from the stay to proceed with civil enforcement.  For example, in *In re Vitanza*, the court granted a lessor's motion for relief from the stay to commence a state court action for injunctive relief on the ground that hazardous conditions on the premises required immediate attention.  *In re Vitanza*, No. 98-19611, 1998 WL 808629, at *6 (Bankr. E.D. Pa. Nov. 13, 1998).

71.     So too here. The narcotics industry can never operate free of state oversight, and Respondents already have demonstrated a direct participatory duty to provide that oversight.  *See generally*, ¶¶ 1-6, *supra*.  Public health and safety generally as well as Tennessee and Arkansas state law require it.  Respondents have standing under those laws to enforce statutory compliance and, if necessary, mandate that compliance through the administrative and legal process.

72.     The prejudice Respondents will suffer if relief from stay is not granted far outweighs any prejudice to the Debtors.  Respondents have devoted considerable time and expense to analyzing real, and particularly to the Related Parties, potential violations—of state law—that led to the actions and in pre-petition advocacy in the public interest.

73.     The State Court DDLA Actions are central to the discovery protocol in the MDL

Proceedings.  On the other hand, the Debtors' bankruptcy proceedings are at a very early stage,

and any adverse effect stemming from the continuance of the State Court DDLA Actions cannot

appreciably threaten the efforts to reorganize.

74.     The specific public policy goals underlying consumer protection and the

importance of Respondents' responsibilities also outweigh any burden on the Debtors, and

especially on the Related Parties.  The Bankruptcy Code not only allows but requires public

safety and welfare proceedings to continue, and state consumer protection laws always remain in

effect.

### CONCLUSION / RELIEF REQUESTED

The State Court DDLA Actions do not implicate primarily pecuniary interests—whether

for the government or anyone else—in the Debtors' property.  Rather, their purpose is to protect

the public health and safety through enforcement of consumer protection laws and procedures

involving the assurance and ultimate completion of the Debtors' obligations, including

remediation of the harms caused by the Debtors' and Related Parties' ongoing violations of the

DDLA.  For the foregoing reasons, the Respondents respectfully request the entry of an Order

declaring that, with respect to the Related Parties, the Respondents and the State Court DDLA

Actions in which they are involved qualify for the "police power" exception of 11 U.S.C.

§ 362(b)(4).  In the alternative, Respondents request the entry of an Order: (1) lifting or

modifying the automatic stay to allow their pending State Court DDLA Actions against Related

Parties to continue; (2) directing that relief from the automatic stay be effective immediately

upon entry of an order granting this request; and (3) providing that the 14-day stay in Bankruptcy

Rule 4001(a)(3) not apply.[23]

Dated:  October 4, 2019.    Respectfully submitted,
Madison, Wisconsin

             */s/ Katherine Stadler*
             Katherine Stadler
             Erin A. West (*pro hac vice* approved)
             Brady C. Williamson (*pro hac vice* approved)
             GODFREY & KAHN, S.C.
             One East Main Street, Suite 500
             P.O. Box 2719
             Madison, WI  53701-2719
             Telephone: (608) 284-2654
             Facsimile:  (608) 257-0609
             E-mail:  bwilliam@gklaw.com,
             kstadler@gklaw.com, ewest@gklaw.com

---

[23] The Debtors note, appropriately, Judge Houser's observation that, where allegedly defective products are involved, "the automatic stay of all litigation is an enormous benefit."  Debtors' Brief at 25, quoting Barbara J. Houser, *Chapter 11 As a Mass Tort Solution*, 31 Loy. L.A. L. Rev. 451, 452 (1998).  So enormous a benefit that it should not be extended to non-Debtors who do not carry the burdens, nor deserve the benefits, of the Bankruptcy Code.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 4, 2019, a true and correct copy of this document has been duly served upon all counsel or parties of record by the Court's ECF notification system.

For additional information, and to download all documents filed in the Debtors' chapter 11 cases free of charge, please visit **https://restructuring.primeclerk.com/purduepharma**.

I further certify that I caused this document to be served by Federal Express, Priority Overnight on the following:

> Judge Robert D. Drain
> United States Bankruptcy Court
> Southern District of New York
> 300 Quarropas Street
> White Plains, NY 10601-4140
> Via Federal Express
>
> Paul Schwartzberg
> Office of the United States Trustee
> U.S. Federal Office Building
> 201 Varick Street, Suite 1006
> New York, NY 10014
> Via Federal Express

By:    */s Katherine Stadler*
       Katherine Stadler

21036726.23