DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.*, | |
| **Plaintiffs,** | **Adv. Pro. No. 19-08289 (RDD)** |
| **v.** | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.*, | |
| **Defendants.** | |

**DEBTORS' OMNIBUS REPLY BRIEF IN FURTHER SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...............................................................................................................4

I.    This Court Should Enjoin the Active Governmental Actions .............................4

    A.    The Police Powers Exception to the Automatic Stay Does Not Limit
Application of Section 105(a) to Stay the Governmental Actions ..........5

    B.    The Requirements of Section 105(a) Are Amply Satisfied ....................9

II.    This Court Should Enjoin the Related Party Claims .........................................27

    A.    The Court Has Jurisdiction to Enjoin Prosecution of the Related Party
Claims ..................................................................................................28

    B.    The Related Party Claims Should Be Stayed........................................30

    C.    The Equities and Public Interest Favor Enjoining the Related Party Claims ........41

III.    The Objectors Misstate the Record of the Opioid Litigations ..........................43

    A.    Purdue's Prescription Medications Are Approved by the FDA for Long-
Term Opioid Treatment of Pain...........................................................43

    B.    Purdue Fully Complied With the Terms of the 2007 Corporate Integrity
Agreement and the Consent Judgments with State Attorneys General ................45

    C.    No Finder of Fact Has Ruled on the Merits of the Objecting States' Claims
in the Underlying Litigation.................................................................46

CONCLUSION............................................................................................................48

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re Aegean Marine Petroleum Network Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) .................................................................. 33

*A.H. Robins Co. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) .............................................................................38

*In re Alert Holdings, Inc.*,
  148 B.R. 194 (Bankr. S.D.N.Y. 1992) ................................................................... 7

*In re Barney's, Inc.*,
  200 B.R. 527 (Bankr. S.D.N.Y. 1996) .................................................................. 36

*In re Best Payphones, Inc.*,
  No. 01-15472, 2016 WL 164900 (Bankr. S.D.N.Y. Jan. 13, 2016) ........................................ 8

*In re Bldg. 62 Ltd. P'ship*,
  132 B.R. 219 (Bankr. D. Mass. 1991) ................................................................. 12

*In re Caesars Entm't Operating Co.*,
  561 B.R. 441 (Bankr. N.D. Ill. 2016) ............................................................. 39, 40

*In re Calpine Corp.*,
  No. 06-1757 (BRL) 2007 WL 1302604 (Bankr. S.D.N.Y. Apr. 30, 2007) ........................... 34

*In re Calpine Corp.*,
  365 B.R. 401 (S.D.N.Y. 2007) ................................................................... *passim*

*In re Chateaugay Corp.*,
  115 B.R. 28 (Bankr. S.D.N.Y. 1988) ..................................................................... 8

*Chicago Title Ins. Co. v. Lerner*,
  435 B.R. 732 (S.D. Fla. 2010) ......................................................................... 32

*City & Cty. of San Francisco v. PG&E Corp.*,
  433 F.3d 1115 (9th Cir. 2006) .......................................................................... 8

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30, 35 n.4 (2d Cir. 2010) ..................................................................... 9

*City of New Haven v. Purdue Pharma L.P.*,
  No. X07HHDCV176086134S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019) ..................... 8

*Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.*,
  54 B.R. 353 (Bankr. W.D. Wis. 1985) .................................................................. 10

*EEOC v. Le Bar Bat*,
  274 B.R. 66 (S.D.N.Y. 2002) ................................................................. 9

*EEOC v. Consol. Freightways Corp. of Del.*,
  312 B.R. 657 (W.D. Mo. 2004) ............................................................... 19

*EEOC v. Rath Packing Co.*,
  787 F.2d 318 (8th Cir. 1986) .................................................................. 18

*In re First Alliance Mortg. Co.*,
  264 B.R. 634 (C.D. Cal. 2001) ............................................................... 22

*In re FirstEnergy Sols. Corp.*,
  No. 18-50757, 2019 WL 4127191 (Bankr. N.D. Ohio Aug. 29, 2019) ................................ 33

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*,
  2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006) .............................................. 38, 42

*Hunt v. Rite Aid Hdqtrs. Corp.*,
  2016 WL 5870996 (M.D. Pa. Oct. 7, 2016) .................................................... 20

*In re Ionosphere Clubs, Inc.*,
  111 B.R. 423 (Bankr. S.D.N.Y. 1990) ...................................................... 35

*Law v. Siegel*,
  571 U.S. 415 (2014) ............................................................................. 5

*In re Lion Capital Grp.*,
  44 B.R. 690 (Bankr. S.D.N.Y. 1984) ........................................................ 35

*In re Lomas Fin. Corp.*,
  117 B.R. 64 (S.D.N.Y. 1990) .................................................................. 34

*In re Lyondell Chem. Co.*,
  402 B.R. 571 (Bankr. S.D.N.Y. 2009) ........................................... 9, 10, 12, 18

*Matter of Brennan*,
  198 B.R. 445 (D.N.J. 1996) ..................................................................... 7

*Matter of Rickel Home Ctrs.*,
  199 B.R. 498 (Bankr. D. Del. 1996) ......................................................... 26

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005) ................................................................... 33

*In re Patriot Coal Corp.*,
  482 B.R. 718 (Bankr. S.D.N.Y. 2012) ..................................................... 8, 23

*Penn Terra, Ltd. v. Dep't of Envtl. Res., Commw. of Pa.*,
  733 F.2d 267 (3d Cir. 1984) ............................................................ 6, 7, 26

*Picard v. Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014) ............................................ 28

*Queenie, Ltd. v. Nygard Int'l*,
   321 F.3d 282 (2d Cir. 2003) ............................................ 36

*In re Quigley Co.*,
   676 F.3d 45 (2d Cir. 2012) ............................................ 28

*In re SCO Grp., Inc.*,
   395 B.R. 852 (Bankr. D. Del. 2007) ............................................ 20

*In re Sec. Gas & Oil, Inc.*,
   70 B.R. 786 (Bankr. N.D. Cal. 1987) ............................................ 11

*In re Smart World Techs., LLC*,
   423 F.3d 166 (2d Cir. 2005) ............................................ 37

*Solow v. PPI Enters. (U.S.) Inc.*,
   150 B.R. 9 (S.D.N.Y. 1992) ............................................ 36

*In re Sonnax Indus., Inc.*,
   907 F.2d 1280 (2d Cir. 1990) ............................................ 20

*In re Soundview Elite Ltd.*,
   543 B.R. 78 (Bankr. S.D.N.Y. 2016) ............................................ 11, 26

*State of North Dakota ex rel. Wayne Stenehjem v. Purdue Pharma L.P.*,
   No. 08-2018-cv-1300, 2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) ............................................ 12

*In re Steven P. Nelson, D.C., P.A.*,
   140 B.R. 814 (Bankr. M.D. Fla. 1992) ............................................ 12

*In re TK Holdings Inc.*,
   No. 17011375 (BLS) (Bankr. D. Del. Aug. 16, 2017) ............................................ *Passim*

*Toibb v. Radloff*,
   501 U.S. 157 (1991) ............................................ 7

*In re Tribune Co. Fraudulent Transfer Conveyance Litig.*,
   818 F.3d 98 (2d Cir. 2016) ............................................ 4

*In re United Health Care Org.*,
   210 B.R. 228 (S.D.N.Y. 1997) ............................................ 11, 39

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
   484 U.S. 365 (1988) ............................................ 12

*In re Worldcom, Inc. Sec. Litig.*,
   293 B.R. 308 (S.D.N.Y. 2003) ............................................ 29

*In re W.R. Grace & Co.*,
   386 B.R. 17 (Bankr. D. Del. 2008) ................................................................. 11, 43

## STATUTES & RULES

11 U.S.C. § 105 .................................................................................................... *passim*

11 U.S.C. § 362 .................................................................................................... *passim*

21 U.S.C. § 355 ............................................................................................................44

21 C.F.R. § 314.125 ....................................................................................................44

## OTHER AUTHORITIES

2 Collier on Bankruptcy ¶ 105.03 .............................................................................11

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .......................4, 5

## PRELIMINARY STATEMENT

In their Moving Brief,[2] the Debtors demonstrated that a stay of the Pending Actions against the Debtors and the Related Parties is critical to the two elemental objectives of the Bankruptcy Code and these cases: preserving the value of the Debtors' estates and ensuring equitable distribution of that value to valid claimholders. Without a stay, the Debtors would continue to bleed millions of dollars of legal fees each week, and the "mad dash" to dozens of courthouses would continue unabated as the lawsuits race forward in various fora around the country.

Although 245 pages of objections have been filed, the basic facts remain uncontested: Purdue Pharma L.P., spends an average of over $2 million per week in legal and professional costs directly related to defending the Pending Actions. The Pending Actions impose relentless pressure on the business and its employees, and force the Debtors to divert their and their employees' efforts from managing their businesses to address the Pending Actions. And the value destruction wrought by the Pending Actions is contrary to the best interests of all estate stakeholders. This unprecedented governmental mass tort bankruptcy—where some governments are fighting one another almost as assiduously as they are pursuing the Debtors—is a paradigmatic case for a section 105(a) injunction. Staying the Pending Actions against the Debtors and the Related Parties will give the Debtors—and all parties—a respite from the tidal wave of litigation that would otherwise drown the Debtors and most certainly frustrate their successful reorganization.

---

[2] Unless otherwise set forth herein, capitalized terms have the meanings ascribed to them in the Debtors' Memorandum of Law in Support of Motion for a Preliminary Injunction, dated Sept. 18, 2019 (ECF No. 3) ("**Moving Brief**").

In apparent recognition of the risks to the Debtors, the value of their estates, and these reorganization cases, the vast majority of adversary defendants that have filed objections ("**Objectors**") have <u>not</u> opposed the requested stay of litigation against the Debtors.  Only 25 States and the District of Columbia ("**Objecting States**") and certain counties and municipalities in Nevada[3] object to the stay of actions against the Debtors.  And even they do not dispute that these cases present a basic conflict between prosecution of the Pending Actions and the goals of bankruptcy.  Rather, they argue, first, that the Pending Actions are "police power" actions immune from bankruptcy or that cannot be enjoined without showing a "heightened standard," and second, that a stay can be granted only if and when the Debtors have a fully-baked confirmable plan of reorganization on the table.  This is not the law.  Congress has made crystal clear that section 105(a) empowers courts to enjoin police power actions where, as here, such suits threaten successful reorganizations and undermine core bankruptcy principles.  Unable to seriously contest the massive, debilitating, and continuous drain on the Debtors to date, the Objecting States—with no evidence of their own—instead assert that the Debtors' cost projections are inflated, insupportably claiming that allowing the Objecting States to proceed with their suits will not impose significant costs and burdens on the Debtors and will not cause other parties to resume litigation to avoid being left behind.

With respect to the Related Parties, most of the Objectors concede, either explicitly or implicitly, that litigation against Related Parties other than the members of the Sackler Families should be stayed.  And despite the reams of objections directed toward the stay of litigation against the Sackler Related Parties, the following facts remain uncontroverted:

---

[3] Because these municipalities' core arguments focus exclusively on the requested Related Party injunction and the arguments they advance in opposition to the requested injunction of litigation against the Debtors overlap with those proffered by the Objecting States, the Debtors do not independently address their contentions.

2

First, litigation against the Sackler Related Parties is litigation against the Debtors. Full stop. All of the allegations directed at the Sackler Related Parties occurred in connection with those individuals' involvement in the business of the Debtors. As a result, the Related Party proceedings are unequivocally and unavoidably against Purdue *in absentia*. This means: (1) the overwhelming majority of the relevant evidence, including documents, witnesses, and data, resides with the Debtors and would have to be gathered and prepared by the Debtors; (2) a finding of liability against the Related Parties is by definition a finding of liability against Purdue, and as fiduciaries of the estates, the Debtors would have no choice but to participate fully in these actions to defend their interests; and (3) the Sackler Related Parties can demand indemnification from Purdue for legal fees and for any judgments. As a result, permitting the Related Party Claims to go forward will cause irreparable harm to the Debtors' estates by depleting assets, diverting management and employee attention (including that of Purdue's current CEO, Dr. Craig Landau, and current CFO, Mr. Jon Lowne)—and will strike at the very pillars of the Bankruptcy Code. Because the Related Party Claims are inextricably intertwined with the claims against the Debtors, there will be one inevitable result in the event that the injunction in favor of the Debtors is granted but denied as to the Related Parties: yet another avalanche of claims will be filed against the Related Parties in the coming days, weeks, and months, and the frenetic races to the courthouses will be back on in full force.

For all of these reasons, and for the reasons set forth more fully below and in the Debtors' Moving Brief, the Debtors respectfully request that the Court issue the Proposed Order enjoining the litigation against the Debtors and Related Parties and entering the Voluntary Injunction against the Debtors.

## ARGUMENT[4]

### I.    This Court Should Enjoin the Active Governmental Actions

The Debtors established in their Moving Brief that, unless stayed, the over 2,625 Pending Actions will derail this reorganization from the outset. (Moving Br. at 28.) It is therefore not surprising that **the vast majority of adversary defendants agree and either support, or do not oppose, the requested stay of actions against the Debtors**. And even those who do object—primarily the Objecting States[5]—do not really contest the devastation that continuing to litigate the Governmental Actions will have on the Debtors' estates. Instead, the Objecting States claim that their so-called police power actions are immune from section 105(a) relief and that, in any event, the requisite preliminary injunction factors do not weigh in favor of a stay. Their

---

[4] The Debtors received eight objections to their Motion for a Preliminary Injunction, totaling 245 pages (exclusive of declarations and exhibits). To streamline the presentation to the Court, the Debtors submit this omnibus reply memorandum of law in further support of their Motion, which addresses all arguments that the Debtors believe have relevance to the requested relief. Should it become necessary, the Debtors expressly reserve the right to address any additional arguments at the preliminary injunction hearing scheduled for October 11, 2019, or in supplemental briefing if the Court should so request.

[5] On October 7, 2019, one of the States that had initially agreed to support the Settlement Structure submitted an opposition to the Debtors' Motion, claiming that "[a]t nearly every turn during the course of subsequent negotiations, Debtors have sought to undermine material terms of the deal." (Obj. & Resp. of the State of Arizona to Debtors' Mot. Prelim. Inj. ("**Ariz. Opp'n**") (Oct. 7, 2019) (ECF No. 51) at 2.) That is false. With respect to Arizona's action pending in state court, Arizona adopts the arguments advanced by the Objecting States (*id.*), which should be rejected for all of the reasons set forth herein. Arizona devotes the remainder of its objection to arguing that it should be permitted to pursue fraudulent conveyance claims asserted in its Petition to File a Bill of Complaint in the United States Supreme Court. (*Id.* at 3-6.) This Arizona cannot do. Section 544(b) of the Bankruptcy Code vests the Debtors with exclusive authority to pursue any fraudulent conveyance claims Arizona may have had on account of transfers of the Debtors' property. *See, e.g.*, *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 111, 114 (2d Cir. 2016). Accordingly, Arizona has no right to pursue such claims, and the Debtors reserve the right to seek further relief if Arizona seeks to further interfere with the Debtors' exclusive right to pursue these claims.

4

argument is premised on a fundamental misreading of the Bankruptcy Code, is inconsistent with

the prevailing case law, and should be rejected.

### A. The Police Powers Exception to the Automatic Stay Does Not Limit Application of Section 105(a) to Stay the Governmental Actions

The Objecting States' opposition to the Debtors' request for a stay of Governmental

Actions rests on a fundamentally flawed premise. Time and again, the Objecting States argue

that Congress's decision to create the police and regulatory power exception of section 362(b)(4)

means that Congress has elevated the exercise of police and regulatory powers over the bedrock

bankruptcy goals of estate preservation and equitable distribution. (*See, e.g.*, The States'

Coordinated Opp'n to Debtors' Mot. Prelim. Inj. of State Enf't Actions Against Purdue

("**Objecting States' Debtors Opp'n**") ¶¶ 41, 82 (Oct. 4, 2019) (ECF No. 42).) This is simply

not so.

In creating the police and regulatory power exception, Congress concluded that by

default, and in the ordinary case, a police and regulatory power action against a debtor could

proceed. But, by the same token, the Bankruptcy Code empowers courts to grant a stay of police

and regulatory power actions pursuant to section 105(a), meaning that the effect of the exception

is to change the default rule: "[b]y excepting an act or action from the automatic stay, the

[Bankruptcy Code] simply requires that the [debtor] move the court into action, rather than

requiring the stayed party to request relief from the stay."[6] *See* H.R. Rep. No. 95-595, at 342

(1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6298. Accordingly, the power to stay actions—

---

[6] The Objecting States cite to *Law v. Siegel*, 571 U.S. 415, 421 (2014) for the proposition that a bankruptcy court "may not contravene specific statutory provisions" when exercising its statutory authority under section 105(a) or its inherent powers. (Objecting States' Debtors Opp'n ¶ 42.) This rule has no application here as bankruptcy courts' statutory authority to stay actions not <u>automatically</u> stayed is complementary to, not in contravention of, the automatic stay of section 362 of the Bankruptcy Code.

including police power actions—not subject to the automatic stay is a core statutory purpose of

section 105(a).  Legislative history makes this crystal clear:  "[t]he effect of [section 362(b)(4)] is

not to make the action immune from injunction.  The court has ample other powers to stay

actions not covered by the automatic stay.  Section 105 . . . grants the power to issue [such an

injunction]."  *Id.*  Accordingly, the Objecting States' halfhearted attempt to argue that police

power actions are categorically immune from section 105(a) injunctions is belied by the many

cases cited in the Moving Brief in which bankruptcy courts stayed governmental actions using

section 105(a) and by Congress itself.  (*See* Moving Br. at 16-17.)

       For the same reasons, the Objecting States' argument that the Debtors must meet a

heightened standard to stay a police power action under section 105(a) is both incorrect and

irrelevant.  It is incorrect because the Third Circuit decision upon which the Objecting States

rely, *Penn Terra v. Dep't of Env. Res. Com. of Pa.*, 733 F.2d 267 (3d Cir. 1984) (Objecting

States' Debtors Opp'n ¶ 41), did not create a "heightened standard" for section 105 injunctions.

*Penn Terra* considered only whether a certain regulatory action was within the scope of the

police power exception; no section 105(a) injunction was sought or reviewed.  733 F.2d at 279

n.14.  Rather, in the course of addressing the scope of the police and regulatory power exception,

the panel explained that section 105(a) acted to balance the goals of the Code against the effects

of the exception, because in "some individual situations" police power actions "may run so

contrary to the policy of the Bankruptcy Code that [they] should not be permitted."  *Id.* at 273.

In doing so, the panel did not purport to establish a heightened standard for the issuance of a

section 105 injunction.  *Id.*  To the contrary, the *Penn Terra* panel repeatedly noted that where—

exactly as here—a police power action "results in an impermissible dilution of federal

bankruptcy policy, then the bankruptcy court may always issue an injunction tailored to fit those

6

circumstances . . . <u>based on traditional equitable standards</u>."  *Id.* at 274 (emphasis added); *see also id.* at 273 ("The bankruptcy court, in its discretion, may issue an appropriate injunction, even if the automatic stay is not operative.").[7]  *Penn Terra* thus confirms that where, as here, a police power action (or thousands) undermines fundamental bankruptcy policy, section 105(a) is a readily available tool allowing Bankruptcy Courts to enjoin such actions.

The Objecting States' argument that *Penn Terra* establishes a heightened standard for section 105(a) injunctions is also irrelevant.  First, even if *Penn Terra* is read (erroneously) to establish a heightened requirement to stay police power actions in the Third Circuit, such a heightened standard has not been adopted in the Second Circuit.  In the Second Circuit, injunctions staying collateral litigation are appropriate "[w]here there is a showing that the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganizational proceedings or if the stay is necessary to preserve or protect the debtor's estate and reorganizational prospects."  *In re Alert Holdings, Inc.*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992).

Second, even if *Penn Terra* did require some type of elevated showing to stay a police power action under section 105(a), it is hard to imagine a better example of a case in which continued litigation of supposed police power actions would run so contrary to fundamental bankruptcy policy than the one presently before this Court.  The fundamental goal of this, and any, chapter 11 bankruptcy is to maximize the value of the bankruptcy estate and ensure the equal treatment of similarly situated creditors for the benefit of all stakeholders.  *See Toibb v.*

---

[7] The Objectors also rely on *Matter of Brennan*, 198 B.R. 445, 450 (D.N.J. 1996), which purports to follow *Penn Terra* and to hold that injunctions of police power actions can issue only where "there is a serious conflict between the exercise of state power and the policy of the bankruptcy code." (Objecting States' Debtor Opp'n ¶ 41.)  Putting aside that *Brennan* mistakenly reads *Penn Terra* to require such an analysis (it does not), *Brennan* has not been followed by any court in the Second Circuit.

7

*Radloff*, 501 U.S. 157, 163 (1991) ("Chapter 11 . . . embodies the general [Bankruptcy] Code policy of maximizing the value of the bankruptcy estate."); *In re Patriot Coal Corp.*, 482 B.R. 718, 722 (Bankr. S.D.N.Y. 2012) ("[Bankruptcy] is a collective proceeding in which the Bankruptcy Court is charged with applying the Bankruptcy Code and other applicable law to achieve the overarching goal of chapter 11—to maximize the value of the Debtors' estates for the benefit of all stakeholders . . . .").  Continued prosecution of over 2,625 litigations, the overwhelming majority of which are brought by governmental entities that have claimed, or are likely to claim, reliance on the police powers exception, would ensure that the value of the estate would continue to be eroded through massive legal fees and risk that similarly situated creditors would receive wildly disparate claims.  Simply put, permitting the deluge of litigation to continue unabated would pose an existential threat to the success of these reorganization proceedings right out of the gate, and simply cannot be squared with fundamental bankruptcy principles.

Finally, the Objecting States have also failed to demonstrate that their actions qualify for the police powers exception to the automatic stay, which, as noted above, is a fundamental premise of their arguments.  It is blackletter law that the party asserting an exception to the automatic stay bears the burden of proving that the exception applies.  *See, e.g.*, *In re Best Payphones, Inc.*, No. 01-15472, 2016 WL 164900, at *11 (Bankr. S.D.N.Y. Jan. 13, 2016); *In re Chateaugay Corp.*, 115 B.R. 28, 31 (Bankr. S.D.N.Y. 1995).  As set forth in the Debtors' Moving Brief, and as the Objecting States do not dispute, resolving whether the Objecting States' claims are excepted from the automatic state would require the Court and the parties to engage in an action-by-action—and potentially count-by-count—analysis of the nature of the entity pursuing the suit and the object of the claims pursued.  *See City & Cty. of San Francisco v.*

8

*PG & E Corp.*, 433 F.3d 1115, 1124 (9th Cir. 2006) (when analyzing whether litigation falls

within "police and regulatory power" exception, holding that courts must "analyze[] the

individual claims, not the . . . actions as a whole"); *see also EEOC v. Le Bar Bat*, 274 B.R. 66, 71

(S.D.N.Y. 2002) ("[D]etermining whether the § 362(b)(4) exception applies is a fact-intensive

inquiry.").  This the Objecting States have entirely failed to do:  despite asserting more than 90

different counts in at least 25 separate complaints, the Objecting States address only scattershot

examples of categories of causes of actions that they assert fall within the police power

exception.  These assertions are not enough to determine that the exception applies to each

action—let alone that the exception applies to each cause of action asserted.

### B.    The Requirements of Section 105(a) Are Amply Satisfied

The Debtors respectfully submit that there is no more paradigmatic case for a section

105(a) injunction than the one at hand.  The requested injunction is necessary to stem the deluge

of litigation that threatens to drown the Debtors and destroy this reorganization, and the standard

for such an injunction has been amply met.  The Objecting States' arguments to the contrary are

without merit.[8]

### 1.    *These Chapter 11 Cases Are Likely to Be a Success*

An injunction is appropriate in this case because the Debtors are likely to successfully

accomplish the goal of these chapter 11 proceedings:  to preserve estate assets by halting the

---

[8] The Objecting States' argument that a heightened standard applies because the requested stays "alter the status quo" (Objecting States' Debtors Opp'n ¶ 44) is without merit.  Injunctions staying the prosecution of litigation are prohibitory injunctions not subject to any heightened standard that may apply to mandatory injunctions.  *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (holding that a motion to enjoin FINRA arbitration was not seeking a "mandatory" injunction subject to a heightened standard); *In re Lyondell Chem. Co.*, 402 B.R. 571, 588 (Bankr. S.D.N.Y. 2009) (granting 105(a) injunction preventing creditors from pursuing remedies, including initiation of involuntary insolvency proceedings, under a traditional preliminary injunction standard).

drain on the Debtors' estates, to ensure equality of distribution among valid claimants by centralizing claims against the Debtors and using the tools uniquely available in bankruptcy to determine whether and to what extent such claims are valid (if necessary), and to construct a confirmable plan of reorganization around the Settlement Structure for the benefit of the American public.

In response, the Objecting States first argue that the Debtors must show a likelihood that the Debtors will prevail <u>in the litigations sought to be enjoined</u> (Objecting States' Debtors Opp'n ¶ 45) even though they concede, in their concurrently filed opposition to the Debtors' request for a stay of litigation against Related Parties, that the inquiry focuses on reasonable likelihood <u>of a successful reorganization</u>.  (The States' Coordinated Opp'n to Debtors' Mot. Prelim. Inj. of States' Law Enforcement Actions Against the Sacklers ("**Objecting States' Related Parties Opp'n**") at 11-12 & n.35 (Oct. 4, 2019) (ECF No. 41).)  The Objecting States attempt to reconcile this inconsistency by arguing that a different standard applies to injunctions seeking a stay of an action subject to the police and regulatory power exception (Objecting States' Debtors Opp'n ¶ 45).  But the law is just the opposite:  Section 105(a) stays—including stays of police and regulatory power actions—are intended to address suits that threaten a reorganization, and courts are loath to intrude into the merits of the underlying actions.  *See In re Lyondell Chem. Co.*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009) (finding that it is "plainly right" that the standard is a "reasonable likelihood of a successful reorganization"); Kaminetzky Decl. Ex. D (*In re TK Holdings*, Hr'g Tr.) at 25 (holding that "the proper focus is on the debtors'

prospects for a successful reorganization and whether the conduct to be enjoined threatens that

reorganization").[9]

The Objecting States next make the almost frivolous claim that the Debtors cannot

demonstrate a reasonable likelihood that these reorganization proceedings will succeed because

the Debtors have not—only three weeks into these cases—submitted a plan of reorganization

(Objecting States' Debtors Opp'n ¶ 49(a)), shown that there is currently sufficient creditor

support to confirm a plan (*id.* ¶¶ 49(b)-(c)), or submitted evidence concerning the value of the

various components of Settlement Structure (*id.* ¶¶ 49(d)-(f)).

No authority conditions a debtor's entitlement to a section 105(a) injunction on a

showing that the debtor has in hand a confirmable plan and the votes necessary for confirmation.

Indeed, the Objecting States fail to cite a single case that has denied a preliminary injunction

under section 105(a) because the debtors had not presented evidence on their ability to confirm a

plan.  And once again, the relevant case law is to the contrary:  "Courts do not demand certainty

of a successful reorganization; they expect only reasonable prospects of such."  *In re Soundview*

*Elite Ltd.*, 543 B.R. 78, 119 (Bankr. S.D.N.Y. 2016).  Accordingly, courts have found that a

---

[9] *See also In re W.R. Grace & Co.*, 386 B.R. 17, 33 (Bankr. D. Del. 2008) (noting that
"prevail[ing] on the merits . . . is not the test in a bankruptcy reorganization case"); *In re Calpine
Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (explaining that the "likelihood of success" prong is
"modified to fit the bankruptcy context"); *In re United Health Care Org.*, 210 B.R. 228, 233
(S.D.N.Y. 1997) (holding that considering the "*reasonable* likelihood of a successful
organization" is the "approach [that] is most faithful to the basic purposes of the Bankruptcy
Code and § 105 itself" (emphasis added)); *In re Sec. Gas & Oil, Inc.*, 70 B.R. 786, 793 n.3
(Bankr. N.D. Cal. 1987) ("In the context of an action seeking relief under section 105, the
likelihood of success on the merits logically must refer to whether the debtor can show that
enforcement of the state laws will unduly interfere with the bankruptcy adjudication."); *see also*
2 Collier on Bankruptcy ¶ 105.03[1][a] (2019) ("In connection with the 'likelihood' argument,
many courts have looked to the purpose of the requested injunction.  In chapter 11 cases, the
typical request will be for an injunction to preserve the status quo until reorganization can
occur.").

reasonable likelihood of success is shown where the debtors, like the Debtors here, "[we]re proceeding on track, and there [was] no reason to believe or suspect that their reorganization will fail—unless, of course, the acts sought to be enjoined *cause* it to fail." *In re Lyondell Chem. Co.*, 402 B.R. at 590. In particular, courts refuse to require Debtors to present a confirmable plan and requisite creditor support when their restructuring proceedings, like those here, are in their embryonic stages. *Id.* at 589-90; *Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.*, 54 B.R. 353, 359 (Bankr. W.D. Wis. 1985) ("In the early stages of bankruptcy when it is uncertain if reorganization is feasible or not the bankruptcy court must have broader latitude in determining whether to grant injunctive relief."); *In re Steven P. Nelson, D.C., P.A.*, 140 B.R. 814, 816-17 (Bankr. M.D. Fla. 1992) ("This Chapter 11 case is still in an embryonic stage and it is clearly unreasonable to require the Debtor at this early stage of the case to make detailed projections of the terms or anticipated feasibility of its plan of reorganization."). The Objecting States' proposed standard would, in effect, require the Debtors to make the showing required to confirm a plan simply to obtain a preliminary injunction—which would, in turn, "make it essentially impossible to protect the debtors' ability to reorganize in all but the simplest or most predictable chapter 11 cases." *In re Lyondell Chem. Co.*, 402 B.R. at 590.[10]

---

[10] Rather than addressing the standards governing section 105(a) injunctions, the Objecting States largely rely on case law interpreting an entirely different provision of the Code that governs relief from the automatic stay. (*See* Objecting States' Debtors Opp'n ¶ 49 (citing 11 U.S.C. § 362(d)(2)(B) (providing for relief from stay in appropriate circumstances where certain "property is not necessary to an effective organization").) Even if the case law cited by the Objecting States was germane to section 105(a)—and the Objectors have not explained why it could be—the cited authority nonetheless supports the Debtors' argument that the stringent standard that they seek to have applied here is inappropriate at this early stage of a complex chapter 11 proceeding. *See In re Bldg. 62 Ltd. P'ship*, 132 B.R. 219, 220 (Bankr. D. Mass. 1991) (recognizing that under section 362(d)(2)(B), "the burden on the debtor" "to establish the prospects for an effective reorganization at an early stage in the proceedings . . . is not as great as it would be in the later stages of the proceedings"); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376 (1988) ("[T]he bankruptcy courts demand less

In tacit recognition of the compelling authority against their position, the Objecting States strain to distinguish Judge Shannon's ruling in *In re TK Holdings*. The Objecting States assert that "Takata had a plan," whereas, here, the Debtors "have no plan," have "provided nothing to the Court but the loose details of the Settlement Structure," and have not "even suggested[] that the Settlement Structure will eliminate the opioid crisis." (Objecting States' Debtors Opp'n ¶ 53.) This is simply wrong. Contrary to the Objecting States' flat-out mischaracterization, no plan of reorganization had been filed in *In re TK Holdings* at the time the court issued the injunction. (Kaminetzky Decl. Ex. D (Hr'g Tr.) at 9 ("No plan of reorganization has been filed at this point.").) And it almost goes without saying that the Objecting States' suggestion that the Debtors are not likely to successfully reorganize because Purdue cannot singlehandedly and through a chapter 11 plan "eliminate the opioid crisis" in the United States (Objecting States' Debtors Opp'n ¶ 53), dramatically overstates the purpose and function of these reorganization proceedings—and the Debtors' burden. Most importantly, however, the Objecting States entirely ignore the *In re TK Holdings* court's rationale in determining that the first prong of the preliminary injunction standard had been satisfied: "The debtor's prospect for a successful reorganization are clearly enhanced if at this critical juncture early in these cases they and their largest customers and other stakeholders are afforded the opportunity to focus on the reorganization efforts." (Kaminetzky Decl. Ex. D (Hr'g Tr.) at 26.)

Exactly as in *In re TK Holdings*, the "[D]ebtors . . . need . . . a breathing spell to focus the attention of all stakeholders on the reorganization process." (*See* Kaminetzky Decl. Ex. D (Hr'g Tr.) at 19.) The Debtors have more than succeeded at these early stages in showing a path forward so as to warrant the time-limited injunction they seek. After months of arduous

---

detailed showings during the four months in which the debtor is given the exclusive right to put together a plan . . . .").

negotiation, the Debtors last night reached agreement on a term sheet with a core group of

constituencies on the structure for resolving the Pending Actions.  This group includes 23 State

attorneys general, analogous officials from all five inhabited U.S. territories, and the court-

appointed PEC in the Ohio MDL, which consists of lawyers at firms that represent over 1,000

counties, municipalities, Native American tribes, individuals, and third-party payors.  (*See, e.g.*,

Debtors' Informational Brief, *In re Purdue Pharma L.P. et al.*, No. 19-23649 (RDD) (Bankr.

S.D.N.Y. Sept. 16, 2019) (ECF No. 17) ("**Debtors' Informational Br.**") at 3-4; Moving Br. at

19-23.)  The Debtors do not argue that these proceedings are reasonably likely to succeed just

because they need "time without expense," as the Objectors somewhat disparagingly claim.

(Objecting States' Debtors Opp'n ¶ 54.)  To the contrary, the Debtors' prospects of success are

rooted in the progress made in reaching agreement on the Settlement Structure, and the fact that

this Settlement Structure—agreed to by key constituencies who represent well over half of the

U.S. population[11]—presents a viable path forward for continued negotiations.  By providing a

collective process that ensures equal treatment of similarly situated claimants and the finality that

is an essential part of any comprehensive settlement, bankruptcy and the tools uniquely available

within it will enable the parties in interest to progress towards a comprehensive and equitable

resolution.

        2.     *The Debtors Will Suffer Irreparable Harm Unless the Active*
            *Governmental Actions Are Stayed*

      The Debtors established in their Moving Brief that, absent a stay of the active litigation

against them, both their estates and their prospects of successful reorganization will suffer

---

[11] The Objecting States' suggestion that they represent 53% of the U.S. population (Objecting
States' Debtors Opp'n ¶ 9 n.8), is misleading because it fails to account for the fact that the PEC,
which represents a substantial number cities and counties with large populations within each
state, supports the Settlement Structure.

irreparable injury.  Many millions of dollars will be squandered, the Debtors' dwindling number

of employees will be forced to dedicate ever-increasing time to defending the litigation, and the

Settlement Structure, unless already collapsed, will be undermined at every turn by plaintiffs'

endless jockeying for leverage and races to the courthouse.  Simply put, every party in interest—

whether it supports the Settlement Structure, opposes it, or is on the fence—will lose if the value-

destroying and inequitable dynamic that reigned pre-bankruptcy continues.

The Objecting States struggle to rebut the elementary point that the expense, burden, risk,

and distraction posed by the extraordinary litigation facing the Debtors will cause immense harm

to the estates and their prospects of reorganization.  They do not, and cannot, controvert

testimony demonstrating that Purdue spends an average of $2 million per week defending the

Pending Actions.  (O'Connell Decl. ¶ 16.)  The Objecting States ultimately settle on a

remarkable position:  that this Court should ignore the entire litigation history and landscape

facing the Debtors, and focus solely on the expense and distraction caused by the Objecting

States' actions.  (*See, e.g.*, Objecting States' Debtors Opp'n ¶ 7 ("[T]he Court should evaluate

the Motion based on the State Police Power Actions of the States.").)  As a result, they argue that

the Debtors' projections are overstated—even though these projections are entirely consistent

with the Debtors' historical expenses—because the Debtors "do[] not acknowledge the vast

majority of actions against it . . . have been effectively stayed, whether voluntary or otherwise."

(*Id.* ¶ 58.)  Ironically, taking as true *arguendo* the Objecting States' claim that the vast majority

of actions are "effectively stayed" only highlights the extreme inequity of allowing the

obverse—the recalcitrant small minority—to continue.

But back to reality.  For, in fact, the Debtors' experience over the short life of these

chapter 11 cases proves that the Objecting States are entirely wrong:  the Debtor's legal expenses

15

prepetition are an excellent proxy for their post-petition expenses because, unless stayed, the costly litigation against the Debtors will continue unabated, as if these chapter 11 cases were never filed.

(i)    There Is No Reason to Believe That Only the Objecting States' Actions Will Continue If No Injunction Issues

For one, the Objecting States are simply wrong in their premise that the Debtors' historical costs "dramatically overstate[]" the Debtors' expected future costs because some governmental plaintiffs that support the Settlement Structure have currently suspended their litigation while this injunction motion is pending.[12]  (Objecting States' Debtors Opp'n ¶ 25.) These actions will likely resume if no stay issues.  In that scenario, those parties that have voluntarily suspended litigation to focus on the Settlement Structure will face a classic "prisoner's dilemma."  They prefer to stand down and preserve estate value for the benefit of all stakeholders.  But as long as some parties remain able to pursue litigation against the Debtors (and, as discussed further below, the Related Parties) in disparate fora, all litigants—settlement supporters or not—will likely be forced to choose to resume litigating in courts across the country to avoid being left behind, even though that strategy threatens to substantially deplete the value of the estates to the detriment of all stakeholders.  For example, even though Utah supports the Settlement Structure, it has stated in court and on the record that it does not want to "lose

---

[12] The Objecting States also flatly mischaracterize the deposition testimony of one of the Debtors' declarants, John James O'Connell III.  They state that Mr. O'Connell "acknowledged that Purdue had been severed from the MDL cases (representing about 2,200 cases against Purdue)."  (Objecting States' Debtors Opp'n ¶ 59.)  That is not accurate.  Mr. O'Connell made clear in his deposition, "what I said was that the debtors were severed from the [October] MDL trial."  (*See* Suppl. Decl. of Benjamin S. Kaminetzky in Supp. of Mot. Prelim. Inj. (Oct. 8, 2019) ("**Suppl. Kaminetzky Decl.**") Ex. A (Sept. 27, 2019 Tr. of Dep. of John James O'Connell III), at 215:2-16.)  And as this Court—and the Objectors—surely know, the mere fact that Purdue has been severed from a single Track 1 bellwether <u>trial</u> scheduled for October 2019 does not mean that Purdue has been severed from the Ohio MDL entirely, or that active litigation in the Ohio MDL against Purdue will not resume if the Settlement Structure falls apart.

additional time" and plans to resume litigation immediately if these actions are not stayed.

(Declaration of Hayden A. Coleman ("**Coleman Decl.**") ¶ 44.)  The Objecting States' claim—

that the Debtors will not experience any material litigation cost savings in the absence of a

stay—is both unsupported and unsupportable.

(ii)      The Objecting States' Cases Will Impose Irreparable Harm on the
Debtors Even If They Are Considered in Isolation

To the extent the Objecting States mean to suggest that proceeding with their actions

alone will not unduly burden the Debtors or be costly, that contention is flatly refuted by the

conduct of the Objecting States since the petition date.  At the First Day Hearing, the Court

stated:

> Generally speaking, the person who may be violating the stay should act with
> caution to seek relief from the stay before doing it, as opposed to shooting and
> then aiming. . . .  And that applies to everyone, including governments.  The
> Supreme Court on down has ruled. . . .  I would expect governments to act
> responsibly over the next two to three weeks.

(Supp. Kaminetzky Decl. Ex. B (Sept. 17, 2019 Hr'g Tr. at 120:19-121:4).)  Unfortunately, this

has not proven to be the case, as the Objecting States have continued, and many have

accelerated, their litigation against the Debtors in the face of this Court's admonition.  For

example, Washington insisted that its case proceed against Purdue post-petition, forcing Purdue

to take and defend a number of fact and expert witness depositions around the country while

simultaneously preparing an opposition to Washington's motion for partial summary judgment.

(Coleman Decl. ¶ 6.)  While the Washington court has now "paused" that case, if this Court

denies the instant motion, a hearing on the State's motion for summary judgment against Purdue

will be scheduled, depositions will be rescheduled, and, on October 14, 2019, the parties must

file their dispositive motions and motions to exclude expert witnesses.  (*Id.* ¶ 40.)  Similarly,

Maryland argued, on September 30, 2019, that a hearing on a dispositive motion should proceed

17

notwithstanding the Debtors' chapter 11 filing and pending motion. (*Id.* ¶ 12.) That hearing

took place, and that motion was argued, on October 3. And many other states have asked their

state courts to proceed in the face of the Debtors' bankruptcy petition. (*Id.* ¶ 14.)

The Objecting States' contention that the Court cannot assess the injury to the Debtors of

letting only their actions proceed is refuted by the vignette supplied by the State of Washington.

According to a declaration submitted by the Washington Attorney General's Section Chief for

the Complex Litigation Division's Seattle Office, the Washington Attorney General's office "has

spent millions of dollars and thousands of hours litigating the state case" and believes that

"Purdue has devoted at least a similar amount of resources to the [a]ction." (Decl. of Laura K.

Clinton in Supp. of the State of Wash. Opp'n to Purdue's Mot. Prelim. Inj. ("**Clinton**

**Decl.**") ¶ 69). According to the declaration, the parties have taken over 30 depositions, retained

more than 25 experts, and have each produced millions of pages of documents. (Clinton Decl.

¶¶ 70-71.) <u>All of this was undertaken in just **one** of the 25 Objecting States' actions</u>.

Extrapolating from Washington's example, it is hardly speculation to conclude that even if

"only" the Objecting States' actions were to proceed the Debtors would find themselves subject

to crushing legal expenses and significant diversion of the Debtors' time and resources that

"threaten[] the reorganization process" itself. *In re Calpine*, 365 B.R. 401, 409 (S.D.N.Y. 2007);

*see also In re Lyondell Chem. Co.*, 402 B.R. at 590 (noting that second prong is satisfied where

actions to be enjoined would "impede the reorganization proceedings or if the stay is necessary

to preserve or protect the debtor's estate or reorganization prospects").[13]

---

[13] The cases relied on by the Objecting States for their incorrect claim that "the resources needed to respond to litigation do not amount to irreparable harm warranting a discretionary stay" (Objecting States' Debtors Opp'n ¶ 62) are so far afield from the present circumstances so as to underscore the dearth of authority in support of their position. *See EEOC v. Rath Packing Co.*,

The State of Washington's case is also a perfect example of the value-destructive litigation dynamic and plaintiffs' attempts to jump to the head of line that will continue even if only the Objecting States are permitted to proceed.  The State of Washington—a member of the Objecting States—filed a separate brief to argue that its action is <u>particularly</u> deserving of going forward.  (*See generally* State of Wash. Memo. Law Opp'n to Purdue's Mot. Prelim. Inj. ("**Wash. Opp'n**") (Oct. 4, 2019) (ECF No. 38).)  Washington argues that the Court should give it such preferential treatment because its case against Purdue is "nearly trial-ready" and that "very little is left to be done before the Action is ready for trial."  (Wash. Opp'n at 4, 7.)  That assertion is demonstrably untrue.  Although Washington represents that discovery in its action closed on September 16, 2019 (*see id.* at 2), it omits the fact that this date came and went and discovery is far from complete.  Among other things, there are:

- **35 depositions** that have been requested or noticed have yet to be taken, including pivotal fact witnesses from the State and 10 State experts;

- **2.5 million pages** of documents from the State of Washington that need to be reviewed, which are contained on hard drives the State still has not sent to Purdue; and

- **Summary judgment motions** and **motions to exclude experts** that need to be filed.[14]

Nor is Washington correct that there are unique factual and legal issues specific to its action that justify it moving forward.  Washington's complaint alleges substantively identical conduct as other states.  (*See id.* at 1 (claiming that Purdue bears responsibility for the alleged opioid epidemic because of Purdue's "marketing of prescription opiates, particularly the drug OxyContin").)  Washington all but concedes this point when it states that "[l]ike the other

---

787 F.2d 318, 322 (8th Cir. 1986) (single EEOC action against debtor); *EEOC v. Consol. Freightways Corp. of Del.*, 312 B.R. 657, 661 (W.D. Mo. 2004) (same).

[14] *See* Coleman Decl. ¶¶ 49-58.

Objecting States, Washington asserts claims under its consumer protection and public nuisance

laws … [and a] negligence claim." (*See id.* at 7.)  Because its claims are akin to those asserted

by most of the plaintiffs in the Pending Actions, there is nothing unique about Washington's case

that should permit it to proceed notwithstanding the Debtors' bankruptcy—a point that is all the

more true in light of the significant amount of work that still needs to be done in the case.[15]

Nonetheless, Washington's attempted one-upmanship serves as a prime example of plaintiffs'

endless, relentless jockeying outside of these bankruptcy proceedings.  Unless the Debtors are

granted relief from all active Governmental Actions, including the Objecting States' actions,

such jockeying will continue and worsen.

> (iii)    The Debtors Will Be Irreparably Harmed by Management
>           Distraction and Other Non-Financial Costs of Litigation

The Objecting States' specious argument that the Debtors will not be injured by ongoing

litigation also ignores—perhaps tactically—the irretrievable loss of significant estate value due

---

[15] The legal authority cited by Washington fully supports the Debtors' position.  For example, in
*In re Sonnax Indus., Inc.,* the Second Circuit affirmed the district court's order denying a request
for relief from a stay in order to pursue a separate action against the debtor in a state court action.
907 F.2d 1280, 1282 (2d Cir. 1990).  Finding that the issues before the state court were
"inextricably intertwined" with the issues before the bankruptcy court, the Second Circuit
concluded that the stay advanced "the interests of judicial economy and the speedy and
economical resolution of litigation" by centralizing all litigation before the bankruptcy court
which would "provide a single, expeditious forum for resolution." *Id.* at 1287.  Conversely, in *In
re SCO Group, Inc.*, the bankruptcy court ordered relief from the stay because the parties were
only one business day from trial in a case that had been pending for four years when the debtor
filed for bankruptcy "on the eve of trial." 395 B.R. 852, 856-58 (Bankr. D. Del. 2007).
Similarly, in *Hunt v. Rite Aid Hdqtrs. Corp.*, the district court affirmed the bankruptcy court's
order of relief from a stay because the state court case was "mere days from trial."  2016 WL
5870996, at *6 (M.D. Pa. Oct. 7, 2016).  The state court case in *Hunt* had also been pending for
four years and the debtor filed for bankruptcy just three business days before trial. *Id.* at *2.
Washington also attempts to garner support from *In re TK Holdings*, noting that the court
declined to stay a multi-district litigation that was "well advanced." (Wash. Opp'n at 9.)  But
Washington omits the fact that the MDL was automatically stayed as to the debtors and the court
only denied the stay in the MDL as to certain unrelated non-debtors.  (*See* Kaminetzky Decl. Ex.
D (Hr'g Tr.) at 5-6, 20-21.)  Further, the court specifically "enjoin[ed] the state actions [brought
by Hawaii, New Mexico and the U.S. Virgin Islands] as they relate[d] to the debtors." (*Id.* at 5.)

to management diversion from core business tasks.  They assert, without a tinge of irony, that the

Debtors are not operationally burdened by the litigation because the Debtors' Chief Financial

Officer spends "only a day or two a week"—20-40% of a standard work week—"on litigation"

rather than his primary responsibility managing the Debtors' finances.  (Objecting States'

Debtors Opp'n ¶ 62.)  Even if Mr. Lowne were the only employee so burdened—and the

Objectors have no response to the ample evidence that other employees are also significantly

burdened (*see* DelConte Decl. ¶¶ 13-14; *see also, e.g.*, Suppl. Kaminetzky Decl., Ex. C (Sept. 26,

2019 Tr. of Dep. Of Jesse DelConte) at 159:3-160:10, 180:6-180:25), such significant levels of

management distraction amply warrant an injunction.  *See In re Calpine*, 365 B.R. at 411

(finding irreparable harm where a single employee involved in restructuring efforts had to devote

substantial time to litigation outside bankruptcy); *see also* Kaminetzky Decl. Ex. D (*In re TK*

*Holdings* Hr'g Tr.) at 26-27 (finding irreparable harm on the basis that "the task of monitoring

hundreds of lawsuits . . . [is] a material[] risk for these debtors").

Finally, the Objecting States argue that the Debtors ignore that the requested stay will not

obviate the time and expense necessary to litigate in bankruptcy.  (Objecting States' Debtors

Opp'n ¶ 63.)  That argument misses the mark.  These bankruptcy cases will of course require the

expenditure of legal fees and place some burden upon the estate.  But, contrary to the Objecting

States' unsubstantiated suggestions, there is simply no disputing that far greater costs will be

required if no stay issues.  The Debtors would then bear the costs of litigating more than 2,600

cases in various fora across the nation for years on end to final judgment by way of bench or jury

trials.  And they would then potentially <u>repeat</u> the process in this Court if parties that receive

disparate litigation outcomes dispute the treatment of the resulting disparate proofs of claim.[16]

### 3.    *The Balance of Harms Weighs Heavily in Favor of an Injunction*

The Debtors established in their Moving Brief that the certain harm facing the Debtors,

their estates, and the reorganizational process in the absence of a stay far outweighs the prejudice

that the Governmental Defendants would suffer if this Court were to stay the Governmental

Actions.  (Moving Br. at 28-29.)

The Objecting States offer a response that is long on rhetoric but short on any specifics of

the "irreparable harm" that they assert that they will suffer if their actions are temporarily stayed.

At the outset, the Debtors reiterate that they do not seek this Court's protection, and do not seek a

stay of Governmental Actions, to "evade justice," to "shield themselves from the consequences

of their misconduct," or to "go unpunished," as the Objecting States hyperbolically assert.  (*See*

Objecting States' Debtors Opp'n ¶¶ 66, 76.)  This Court is not a refuge for wrongdoing, and the

time-limited stay the Debtors seek offers no such shield.  Quite the opposite.  The requested self-

injunction <u>against the Debtors</u> and the Settlement Structure that <u>gives 100% of the Debtors to</u>

<u>these claimants</u> is hardly an attempt to continue alleged misconduct or to escape claimants—it is

a vehicle to run into their arms.

---

[16] *In re First Alliance Mortg. Co.*, 264 B.R. 634, 656 (C.D. Cal. 2001), on which the Objecting
States rely, is not to the contrary.  There, the Debtors "presented no evidence" of what the
litigation costs would be if multiple actions proceeded separately.  *Id.*  Moreover, the court
recognized that "courts have enjoined regulatory or police powers actions on the grounds that the
costs of defending the actions at issue, both in terms of money spent on lawyers' fees and time
taken away from focusing on reorganization, were so high in comparison to the assets of the
estate that allowing the actions to continue constituted a 'threat' to the estate." *Id.* at 655.
Unlike in *First Alliance*, the Debtors have established that legal fees in connection with the
Pending Actions comprise one of Purdue's largest expenditures.  (*See, e.g.*, O'Connell Decl.
¶ 19.)

22

The Objecting States do not identify any specific relief they seek which would be impeded by the stay, or any specific and concrete injury—beyond the generalized harm of not proceeding in their chosen fora as if Purdue had not filed for bankruptcy.[17] They do not seriously contest that their litigations overwhelmingly concern the Debtors' past conduct, and do not credibly argue that the stay sought will impede prospective efforts to stop any ongoing misconduct. Although their brief is littered with vague references to "stop[ping] Purdue's unlawful conduct" (*e.g.*, *id.* ¶ 22), the Objecting States struggle mightily to identify any ongoing and purportedly unlawful conduct—so much so that they at one point claim, nonsensically, that Purdue's past misconduct constitutes current unlawful conduct. (*Id.* ¶ 20 ("To be clear, Purdue's unlawful conduct continues to this day in the form of continued sales based on deceptive and unfair marketing Purdue engaged in for over a decade.").) Nor do the Objecting States seriously dispute that they seek, in substantial part, monetary relief. They even agree that the ultimate result of any litigation they are permitted to pursue will be a money judgment that they cannot enforce. (*See id.* ¶ 31 (citing 11 U.S.C. § 362(b)(4)).) Having conceded this, the Objecting States also have no answer to the point that if they litigate outside bankruptcy they will have forced the expenditure of millions upon millions of dollars in defense costs and bought nothing more than a round-trip ticket back to this very Court.

The Objecting States also flounder in their attempt to explain why the Debtors' proposed Voluntary Injunction is insufficient to address potential concerns about the Debtors' continuing conduct or the Objecting States' stated goal of "protect[ing] the public from deceptive marketing practices that pose a substantial risk to public health and safety." (*Id.* ¶ 66.) This is particularly

---

[17] Should the Objecting States intend to imply that this Court would be less protective than state courts of the health and welfare of those States' citizens, that contention should be rejected "in the strongest possible terms," just as Judge Chapman rejected a similar contention in the *Patriot Coal* bankruptcy. *In re Patriot Coal Corp.*, 482 B.R. at 743.

true in light of the fact that in February 2018, Purdue voluntarily stopped promoting opioid pain

medications to prescribers through sales representatives and via other channels.  The Objecting

States do not dispute that the Voluntary Injunction addresses the conduct at the heart of their

cases—the allegedly false and misleading marketing of opioid products.  The Voluntary

Injunction—unprecedented in its breath and scope—bans the Debtors from "engag[ing] in

Promotion of Opioids or Opioid Products," with Promotion defined as essentially any effort to

induce prescription or purchase of the Debtors' products.  (Proposed Order at 8.)[18]  They instead

offer only a handful of cursory objections to the proposed terms, without any citation or analysis.

At least several of these appear to be directly contradicted by the plain language of the Proposed

Order.[19]  Further, the Objecting States make no attempt to explain how any conduct they allege

may not be covered by the Voluntary Injunction is wrongful.  Their inability to describe with

---

[18] The Proposed Order exempts certain limited activities such as "maintain[ing] corporate
websites" and "provid[ing] information or support the provision of information as expressly
required by law . . . ." that are necessary for the Debtors to continue to operate their
business.  (Proposed Order at 9-10.)  The Objecting States do not identify any exemptions with
which they take issue.

[19] For example, the Objecting States' claim that there is "no ban on funding third parties who
may, through 'educational' programs promote the use of opioids or the treatment of pain through
the use of opioids" (Objecting States' Debtors Opp'n at ¶ 74) is captured by the Voluntary
Injunction's prohibition that Debtors "shall not engage in Promotion of Opioids or Opioid
Products . . . by Sponsoring, or otherwise providing financial support or In-Kind Support to
medical education programs for the Promotion of Opioids or Opioid Products," (Proposed Order
at 9), and by the Voluntary Injunction's prohibition that the Debtors "shall not, either through
[the Debtors] or through Third Parties, provide financial support or In-Kind Support to any Third
Party for Promotion of Opioids or Opioid Products," (*id.* at 11).  And while the Objecting States
claim that the Debtors are not banned "from promotion of the treatment of pain in a manner that
encourages the use of opioids," (Objecting States' Debtors Opp'n ¶ 74), such conduct would
plainly be covered by the aforementioned ban on the "Promotion of Opioids and Opioid
Products" more generally.  (Proposed Order at 8-9.)

specificity any ongoing harm that the Voluntary Injunction fails to prevent or remedy is fatal to their argument.[20]

All in all, the Debtors do not deny that the police and regulatory power exception to the automatic stay reflects a <u>general</u> interest in allowing such actions to proceed, that the Objecting States have preference for litigating in their chosen home courts, or that the Objecting States have a legitimate interest in public disclosure—which will be met as this Court, with the eyes of the Nation on it, is the most public forum in which any settlement or plan of reorganization will be weighed.  The point of the limited stay the Debtors seek—and what the Objecting States overlook—is that in <u>this specific case</u>, the Objecting States' general interest in pressing their claims in their chosen fora are far outweighed by the overriding Bankruptcy Code interests in preserving the value of the estates and ensuring equality of distribution among valid claimants, for the benefit of all.

4.      *The Requested Relief Is in the Public Interest*

This Preliminary Injunction Motion presents a stark choice:  on the one hand, temporarily staying active litigation against the Debtors will provide the Debtors and all stakeholders with a breathing spell during which the Debtors can work to build consensus for and attempt to finalize a global resolution.  On the other hand, not staying the active litigation will almost certainly have severe consequences for all estate constituents.  Prosecuting these actions on a fragmented basis will continue to devour the estate—regardless of the ultimate structure of the Debtors' emergence from chapter 11.  (Moving Br. at 23-28.)  Pursuing a global settlement and stemming

---

[20] The States' claim that this Court "would be granting itself jurisdiction over police and regulatory action by the States" were it to grant the Voluntary Injunction (Objecting States' Debtors Opp'n ¶ 71) is false.  The Court would simply be exercising its well-established jurisdiction over the Debtors before it.   Whatever claims for injunctive relief the Objecting States may have in the Governmental Actions will remain to be litigated when the stay ends.

needless value destruction is, unquestionably, in the public interest. *See Matter of Rickel Home Ctrs., Inc.*, 199 B.R. 498, 501 (Bankr. D. Del. 1996) ("[T]here is a strong public interest in promoting a successful Chapter 11 reorganization."); *see also In re Soundview Elite Ltd.*, 543 B.R. at 118 n. 210 ("There is a strong public interest in avoiding the dissipation of corporate assets that rightfully should go to creditors or other stakeholders.").

In response to the clear public interest in preserving estate value for the benefit of all, the Objecting States again argue—erroneously—that the existence of the police and regulatory power exception to the automatic stay means that the basic bankruptcy principles of estate preservation and equitable distribution must take a back seat to the Objecting States' police powers. For the reasons elaborated above, both Congress and the courts have explained that section 105(a) authorizes courts to grant stays so that the police and regulatory power exception does <u>not</u> cause "an impermissible dilution of federal bankruptcy policy." *See Penn Terra,* 733 F.2d at 274. (See Part I.A, *supra*.) And this is especially true where all of the conduct at issue ceased many months ago, the Debtors' opioid medication sales force has been eliminated, an unprecedented self-injunction is sought, and the Debtors announced on the Petition Date their plan to give themselves—lock, stock, and barrel—to the claimants.

Finally, and perhaps in tacit recognition of the public interest in advancing the Bankruptcy Code's goals of estate preservation and equal distribution, the Objecting States argue that the Governmental Actions present no risk of inconsistent judgments or unequal recoveries. (*See* Objecting States' Debtors Opp'n ¶ 80.) According to the Objecting States, any inconsistent judgments would result only from variations in state law, which are inherent in a federal system. (*See id.*) State-law variations are fine as far as they go, but do not account for the more troubling reality that disparate judgments may reflect differences in fora and timing far more than simple

26

differences in governing law.  The idea advanced by the Objecting States that there is no

prospect of an enhanced recovery by being first in line because any judgment against the Debtors

may not be enforced is belied by the conduct of the States and other Governmental Defendants.

If the Governmental Defendants truly perceived no benefit from liquidating their claims first, one

would expect not to see the kind of jockeying for position and line-jumping that has

characterized these cases and that has continued even after the filing of the chapter 11 cases.  As

in *In re TK Holdings*, the Debtors' reorganization "cries out for a coordinated approach to

address the crisis that these debtors and other parties face."  (Kaminetzky Decl. Ex. D (Hr'g Tr.)

at 28-29.)  The requested stay avoids wasting millions of dollars and many years of protracted

litigation, and will maximize the estate value.  The requested stay also facilitates forming the

Settlement Structure into a global resolution.  A global resolution, rather than the protracted,

piecemeal litigation that the Objecting States seek to pursue, offers the speediest path to

distributing billions of dollars and critical resources to communities across the country trying to

cope with the opioid crisis.  Accordingly, the requested injunction is squarely in the public

interest.

## II.    This Court Should Enjoin the Related Party Claims

The Debtors' Moving Brief established that a time-limited stay of the Related Party

Claims is also necessary to prevent irreparable damage to the Debtors' estates and these

reorganization efforts.  To be clear, contrary to the Objectors' assertions, the Debtors do <u>not</u> seek

a stay of the Related Party Claims out of a desire to protect or benefit any Related Party[21]—

---

[21] The opposition submitted by the Multi-State Governmental Entity Group contends that the
Debtors have failed to "coherently define the scope of the preliminary injunction they seek" and
that it is "impossible to know . . . exactly whom the Debtors think should be protected and why."
(Multi-State Governmental Entities Group Opp'n to Debtors' Mot. Prelim. Inj. ("**MSGE
Opp'n**") (Oct. 3, 2019) (ECF No. 37) at 16-17.)  The Related Parties are identified by name in
both paragraph 15 of the Complaint and footnote 7 of the Debtors' Moving Brief, and

27

including any member of the Sackler Families.  The Debtors instead seek to avoid the irreparable

injury that the Related Party Claims impose <u>on the Debtors</u> by creating significant litigation costs

and burdens, risking record taint, diminishing the value of estate assets, and threatening <u>billions</u>

<u>of dollars</u> in Related Party contributions that are the cornerstone of the Settlement Structure

agreed to by 23 states, five U.S. territories, and the court-appointed Plaintiffs' Executive

Committee and Co-Lead Counsel in the Ohio MDL.  The requested Related Party injunction is

essential to providing the Debtors with the breathing room necessary to work towards a

resolution of these chapter 11 cases.  Indeed, these reorganization proceedings are likely to be

successful if—and only if—the Related Party Claims are stayed.

### A.     The Court Has Jurisdiction to Enjoin Prosecution of the Related Party Claims

Most of those who object to the requested Related Party injunction do not dispute that

this Court has the jurisdiction to issue such an injunction.  For good reason.  A bankruptcy court

has jurisdiction to enjoin any suit that "might have <u>any conceivable effect</u> on the bankruptcy

estate."  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 211 (2d Cir. 2014) (emphasis added)

(internal quotations omitted); *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) (holding

that a suit against a non-debtor need not allege liability derivative of a debtor's conduct in order

to "affect the bankruptcy *res*" because "the touchstone for bankruptcy jurisdiction remains

whether its outcome might have any conceivable effect on the bankruptcy estate" (citations and

quotations omitted)).

---

meticulously cataloged on an action-by-action basis in Exhibit B to the Complaint.  The
Objectors' confusion on this point as to who the Related Parties are is a reflection of the
haphazard nature in which many plaintiffs have named those parties as defendants in the
underlying actions, not a lack of "careful consideration" as to the "concept of 'Related Parties'"
on the part of the Debtors.  (*Id.*)

The bar is a low one.  "An action is related to bankruptcy if the outcome could alter the

debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and

which in any way impacts upon the handling and administration of the bankrupt estate."  *In re*

*WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 317 (S.D.N.Y. 2003) (quoting *Celotex Corp. v.*

*Edwards*, 514 U.S. 300, 308 n.6 (1995)).  Accordingly, "[t]he existence of strong

interconnections between the third party action and the bankruptcy has been cited frequently by

courts in concluding that the third party litigation is related to the bankruptcy proceeding."  *Id.* at

321 (holding jurisdiction exists over claims against the debtor's former officers and directors

where "despite its absence as a party, [the debtor's] conduct will remain at the heart of the . . .

litigation").  Here, as discussed in more detail below, the claims against the Related Parties are

inextricably intertwined with the claims against the Debtors and arise solely from the Related

Parties' various affiliations with the Debtors—a point not seriously contested.  Simply put, the

Court has the power to enjoin the Related Party claims, and courts routinely issue injunctions

staying related party litigation against non-debtors.  *See, e.g., In re Calpine*, 365 B.R. at 408

(enjoining actions against non-debtor where the debtor "would suffer irreparable harm if [an

employee] were distracted from his responsibilities in order to participate" in the ongoing

litigation); *see also* Moving Br. at 31-32.[22]

---

[22] Certain Massachusetts municipalities appear to suggest that the Debtors have claimed that
jurisdiction exists solely because of certain Related Parties' commitment to make a financial
contribution in accordance with the Settlement Structure, which is simply not accurate.  (Opp'n
by Consortium of Some Mass. & Other Municipalities to Mot. Prelim. Inj. In Favor of the
Sackler Family Non-Debtors (the "**Mass. Municipalities Opp'n**") (Oct. 2, 2019) (ECF No. 31)
at 6.)  These same municipalities also contend that "this Bankruptcy Court lacks the authority to
issue the requested preliminary injunctions" because they have not filed a proof of claim.  (*Id.* at
9.)  Filing a proof of claim, however, is not a prerequisite to this Court's exercise of jurisdiction
or power to issue a preliminary injunction temporarily enjoining litigation.

**B.      The Related Party Claims Should Be Stayed**

Applying the familiar four-part standard discussed above, the Related Party Claims

should be stayed.  The Objectors' arguments to the contrary, which are primarily, if not

exclusively, directed at the requested injunction of claims against members of the Sackler

Families,[23] are without merit.

*1.      The Debtors Are Likely to Successfully Reorganize*

The Debtors' likelihood of successful reorganization has been covered in great detail

above and in the Debtors' Moving Brief, and need not be repeated.  The Debtors here address a

number of additional claims made by those who object to the Related Party injunction in some

form.

The Objecting States contend that enjoining the actions as to certain Related Parties—

members of the Sackler Families—"would make successful reorganization <u>less</u> likely."

(Objecting States' Related Parties Opp'n at 11 (emphasis in original).)  In service of this

argument, the Objecting States first assert that a stay of claims against members of the Sackler

Families would impede a successful reorganization because it would "deprive the parties of

information that is necessary to consider the global resolution that Purdue has proposed."

(Objecting States' Related Parties Opp'n at 11-12.)  This assertion, however, does not withstand

scrutiny.

The Objecting States and others have sought to hold members of the Sackler Families

liable on the same facts, under the same legal theories, and for the same harm as that is alleged to

---

[23] The Objecting States "agree that their claims against current Purdue employees or directors
should be treated like the States' claims against Purdue," and thus their objection is focused on
the Sackler Families and other former officers or directors.  (Objecting States' Related Parties
Opp'n at 1 n.3.)

have been caused by the Debtors[24]—from whom they have received **millions of documents** and taken other discovery. That the litigation against members of the Sackler Families is nothing more than litigation against Purdue by proxy is plainly evident from the complaints filed by the Objecting States. For example, Delaware filed its complaint against members of the Sackler Families on September 9, 2019—a year and a half after commencing action against Purdue and just six days before Purdue's bankruptcy filing. In its complaint, Delaware states:

> Certain of the allegations included in this Complaint **mirror** those filed in the First Amended Complaint in *State of Delaware, ex rel. Kathleen Jennings v. Purdue Pharma L.P.* . . . . the State's pending action against Purdue and other members of the prescription opioid industry for the harms the State has suffered due to the opioid epidemic. These allegations have been included for context and clarity, and to put the Sackler Defendants on notice of the pertinent facts underlying the various claims asserted against them.

Compl., *Delaware v. Sackler*, No. N19C-09-062 MMJ CCLD, at 15 n.20 (Del. Super. Ct. Sept. 9, 2019) (emphasis added). Delaware is no outlier. As detailed in the Declaration of Hayden Coleman—and as illustrated by the side-by-side charts in that Declaration—numerous complaints against members of the Sackler Families are simply "copy and pastes" of allegations contained in complaints filed against the Debtors. (*See, e.g.*, Coleman Decl. ¶ 22 (New Hampshire); ¶ 23 (Rhode Island); ¶¶ 24-26 (Illinois); ¶ 29 (Virginia); ¶ 30 (Minnesota).)

Ironically, the Objecting States tout in their objection a court's statement that their pleadings against members of the Sackler Families "are notable for their level of detail including . . . citation to and quotations from Purdue's own internal communications." (Objecting States Related Parties Opp'n at 8-9 (internal quotations omitted).) The Objecting States cannot have it both ways: They cannot simultaneously trumpet the <u>wealth</u> of information in their possession

---

[24] For example, the Objecting States assert that the Sackler Families "drove *Purdue's decision* to deceive doctors and patients," that they "direct[ed] *Purdue's* deceptive marketing campaign," and they "directed *Purdue* to downplay the risk of addiction." (Objecting States' Related Parties Opp'n at 3-5 (emphasis added).)

while claiming that they <u>lack</u> information such that a stay of the Related Party Claims would imperil the reorganization—particularly where the claims against members of the Sackler Families are indisputably and inextricably intertwined with the claims against the Debtors.

The Objecting States' second assertion—that the time-limited stay the Debtors seek for Related Party Claims would somehow "provoke doubt about the justice of this proceeding that will undermine reorganization" (*id.* at 11, 13-15)—is even more perplexing (and offensive).[25] The injunction would not "cut off law enforcement" (*id.* at 14) against members of the Sackler Families or, for that matter, any other Related Party.  Instead, the injunction would provide a temporary breathing spell from litigation for the parties to work towards a resolution that has the potential to bring enormous benefits to the claimants in these chapter 11 proceedings and the American public more broadly.  Nor are the Objecting States correct in their bold contention that "[i]f the States' cases against the Sacklers are to be resolved in a reorganization, that should occur only after the merits and worth of the cases have been made obvious through state court proceedings and decisions."  (*Id.* at 14.)  As is obvious and explained further below, permitting the Related Party Claims to proceed in disparate fora throughout the country risks derailing this entire reorganization at the outset and would, irrespective of outcome, waste hundreds of millions of dollars of estate value.

---

[25] The case that the Objecting States' rely on for this proposition, *Chicago Title Ins. Co. v. Lerner*, 435 B.R. 732, 736 (S.D. Fla. 2010), has no bearing whatsoever on the case at hand. There, the court observed that "there are certain circumstances where postponement itself is an injustice, such as where a party specifically bargains for the concession of a personal guaranty so as to ensure timely payment of a debt, or, as in this case, clear title to real property." *Id.* The court stated that "[i]n that case, the guarantor will have induced the creditor to extend credit or purchase that property on the basis of an express promise that its debt would be paid or title cleared without delay irrespective of the debtor's ability to do so." *Id.* This case has no application to the present circumstances.

Finally, the Objecting States' assertion that the Related Party injunction would only "delay progress on reorganization while [the] States wait out the 270-day injunction, oppose Purdue's attempts to shield the Sacklers, and then re-start their . . . actions" (*id.* at 11), is nothing more than a frank admission of bad faith.  It underscores the Debtors' desperate need for a time-limited injunction to protect these reorganization proceedings, in the absence of which the Objecting States (and potentially others) will endlessly and relentlessly try to hamstring this bankruptcy and destroy the Debtors in the process.  And the Objecting States' contention that a stay would "halt progress on [their] claims, pushing resolution further away" must be viewed in light of the fact that <u>twenty-five percent</u> of the Objecting States' suits against the Sackler Families were filed within **days** of the commencement of these chapter 11 proceedings. (Coleman Decl. ¶ 31.)  The Objecting States should not be rewarded for pursuing dilatory, value-destroying tactics that threaten the success of these proceedings.[26]  The race to the courthouse could scarcely be more transparent.

---

[26] Certain Objectors contend that the requested Related Party injunction should be denied because the Debtors have not satisfied the criteria established in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005).  (*See* Mass. Municipalities Opp'n at 9-11.) *Metromedia*, however, is inapposite, because it addresses the propriety of non-debtor releases contained in a plan of reorganization.  *In re Metromedia*, 416 F.3d at 141-42.  So too with *In re FirstEnergy Sols. Corp.*, No. 18-50757, 2019 WL 4127191, at *5-7 (Bankr. N.D. Ohio Aug. 29, 2019), and *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720, 722 (Bankr. S.D.N.Y. 2019), which are cited by certain Arkansas and Tennessee plaintiffs and also address third-party releases contained in a plan of reorganization.  (Ltd. Obj. & Resp. Ark. & Tenn. Pub. Officials Opp'n to Debtors' Mot. Prelim. Inj. (the "**Ark. & Tenn. Opp'n**") (Oct. 4, 2019) (ECF No. 39) at 15-18.)  As other Objectors have observed, "it would be premature and improvident for the Court" to address the issue of non-debtors releases that might be included in an eventual plan of reorganization at this time, because no plan of reorganization is before this Court." (MSGE Opp'n 11.)  The narrow issue before this Court is whether a time-limited preliminary injunction of the Related Party Claims should issue under the standards addressed at length in the body of this brief.

33

2.    *The Related Party Claims Will Irreparably Harm the Debtors' Estates and Reorganizational Prospects*

Permitting the Related Party Claims to go forward will cause irreparable harm to the Debtors' estates by depleting assets, diverting management and employee attention (including that of Purdue's CEO and CFO), and striking at the very pillars of the Bankruptcy Code and the Settlement Structure.  Because the Related Party Claims are inextricably intertwined with (if not the same as) the claims against the Debtors, every single Related Party proceeding will be a trial of Purdue *in absentia*—of course forcing the Debtors to participate.  All of this will inevitably lead to one result:  there will be yet another avalanche of claims filed against the Related Parties in the coming days, weeks, and months, and the races to the courthouses will be back on.

The Objectors employ a number of different approaches in their attempt to minimize the obvious and irreparable harm facing the Debtors—some of which are at cross purposes.  But one common thread in many of the objections is that they disaggregate the harms that the Debtors identified, isolate them from the larger context, and then claim that each, standing alone, does not justify an injunction.[27]  The proper inquiry, however, is the one that takes account of the cumulative effects on the Debtors, in view of the unprecedented situation they confront.  *See, e.g.*, *In re Calpine Corp.*, No. 06-1757 (BRL), 2007 WL 1302604, at *3-4 (Bankr. S.D.N.Y. Apr. 30, 2007) (enjoining a non-debtor action where a range of factors would impede the debtors' reorganization); *In re Lomas Fin. Corp.*, 117 B.R. 64, 67 (S.D.N.Y. 1990) (affirming injunction of non-debtor litigation where collateral estoppel concerns "underscored" the risk of significant

---

[27] *See, e.g.*, Objecting States Related Parties Opp'n at 17-23 (disaggregating the burdens of third party discovery, adverse decisions, and the reduction of funds available to the estates and arguing that each is individually insufficient, but failing to address the cumulative impact of these burdens); (MSGE Opp'n at 13) (arguing that a stay is not justified "solely because of" the risk of collateral estoppel (quotations and citation omitted)); Opp'n of Nev. Ctys. & Municipalities to Mot. Prelim. Inj. (Oct. 2, 2019) (ECF No. 33) at 16 (arguing that indemnification "is not, in and of itself, grounds for extension of the automatic stay").)

distraction, contravening the intended the intended purpose of the automatic stay to "give[] the

debtor a breathing spell from his creditors"); *In re Lion Capital Grp.*, 44 B.R. 690, 702-04

(Bankr. S.D.N.Y. 1984) (enjoining actions against debtors' principals where "various concerns,"

including potential adverse judgments, extensive discovery required by debtor, and the need for

economy of judicial administration, "all counsel[ed] in favor of staying" non-debtor actions).

The cumulative effect of the crushing burdens on the Debtors from the Related Party Actions

irreparably harms the prospects for a reorganization.  Accordingly, a temporary injunction is

warranted.

**The Debtors will be forced to participate in actions in which they are the party in**

**interest in all but name**.  The Related Party Claims are inextricably intertwined with—if even

separate at all from—those asserted against the Debtors, imposing on the Debtors a substantial

risk that findings of fact or law with respect to the Related Party Claims would, at a minimum,

create an adverse record against the Debtors, and could embolden plaintiffs to argue that they are

entitled to collateral estoppel.  Even the most cursory glance at the claims against the Related

Parties demonstrates that the Related Parties' liability is entirely dependent on acts or omissions

they are alleged to have made in their roles at Purdue.  The Related Parties are not alleged to

have engaged in some kind of unrelated wrongdoing.  The complaints against the Related Parties

read as a litany of things Purdue is alleged to have done "at the direction" of the Related Parties.

(Coleman Decl. at ¶¶ 25, 27.)  The Objecting States themselves describe their claims against the

Related Parties as based on allegedly "direct[ing] Purdue to downplay the risk of addiction . . . ."

(Objecting States' Related Parties Opp'n at 5.)  These very real risks will compel the Debtors to

participate in the Related Party actions to protect their interests, with all of the associated cost

and distraction that such participation would entail.  *In re Ionosphere Clubs*, 111 B.R. 423, 435

(Bankr. S.D.N.Y. 1990) (enjoining third-party claims because, *inter alia*, "a finding of liability as to [the debtor]'s codefendants *may be* extended to [the debtor], and collateral estoppel *may* bar [the debtor] from litigating factual and legal issues critical to its defense" (emphasis added)); Moving Br. at 35 (collecting authority for the same).[28]

Recognizing these risks and attempting to minimize them, the Objecting States claim that they "will not contend that a judgment in their . . . actions against the Sacklers is binding on Purdue." (Objecting States Related Parties Opp'n at 18.) This offer is cold comfort to Debtors who face over 2,600 actions nationwide brought by plaintiffs for whom the Objecting States do not speak.[29] And the Objecting States have no answer to the point that continued litigation against Related Parties would both massively burden and create an adverse record for the Debtors, other than to assert that "[t]he Sacklers are motivated and equipped to defend themselves"—without explaining how that might ameliorate the obvious prejudice facing the Debtors. (*Id.* at 19.)

---

[28] Some of the objectors cite *Queenie, Ltd. v. Nygard Int'l*, 321 F. 3d 282 (2d Cir. 2003), for the proposition that a stay cannot be applied to a non-debtor solely because of an apprehended later use against the debtor of collateral estoppel or the precedential effect of an adverse decision. (*See, e.g.*, Objecting States' Related Parties Opp'n at 18). Their reliance on *Queenie* is misplaced. First, as set forth above, the Debtors here do not rely <u>solely</u> on the risk of collateral estoppel and record taint as a basis for the Related Party injunction. Second, *Queenie* addressed whether the automatic stay was applicable to a non-debtor, and made its observation in that limited context. *Id.* at 287-88. Indeed, the Second Circuit distinguished another case that had enjoined non-debtor claims because of, among other things, potential collateral estoppel on the basis that the court's authority in that case, like here, had been invoked under section 105, which the Second Circuit stated "grants broader authority" to stay cases. *Id.* at 288.

[29] Neither *In re Barney's Inc.*, 200 B.R. 527 (Bankr. S.D.N.Y. 1996), nor *Solow v. PPI Enters. (U.S.) Inc.*, 150 B.R. 9 (S.D.N.Y. 1992), "eliminates the concern about an adverse record." (Objecting States Related Parties Opp'n at 18.) Both cases involved narrow bilateral contractual relationships with the debtors, and the party that agreed to waive collateral estoppel in exchange for continued prosecution of claims against related parties was the only entity that could have conceivably invoked the preclusive effect of decisions on those issues to the debtors' detriment.

The Multi-State Governmental Entities Group, for its part, asserts that the Debtors have already "conceded liability to the creditor group as a whole" and thus that "it is hard to understand what actual prejudice Debtors could or would suffer by any adverse record." (MSGE Opp'n at 13.) That is absolutely false. Although the Debtors and their current shareholders believe that speedy implementation of the Settlement Structure is in the best interests of all stakeholders and the American public and avoids the unthinkable destruction likely of billions of dollars, they have never and do not concede liability. Unless and until a satisfactory global resolution is reached and approved by this Court, the Debtors have a fiduciary duty to maximize the value of the estates. *In re Smart World Tech., LLC*, 423 F3d 166, 175 (2d. Cir. 2005) ("[T]he Code not only authorizes the chapter 11 debtor to manage the estate's legal claims, but in fact requires the debtor to do so in a way that maximizes the estate's value."). This clearly includes an obligation to prevent possible collateral estoppel and record taint in litigation against the Related Parties. It also includes a duty to minimize indemnity liability that could arise from a judgment against the Related Parties. Such claims could arise because Purdue's governing documents entitle a number of the Related Parties—including members of the Sackler Families—to seek indemnification for defense costs and adverse judgments.[30] As a result, judgments against an indemnified Related Party on causes of action that do not require findings of knowing or intentional misconduct, such as actions based in negligence or under certain consumer protection laws, could give rise to indemnification claims against the Debtors.

**The Debtors will be the subject of costly and burdensome discovery requests if the Related Party Claims proceed**. Because the Related Party Claims are inextricably intertwined with those against the Debtors and arise from allegations concerning the Related Parties' conduct

---

[30] See Coleman Decl., Ex. S (Minutes of a Meeting of the Board of Directors, Purdue Pharma Inc., dated Nov. 19, 2004).

37

while employed by or otherwise affiliated with the Debtors, the Debtors possess the bulk of the

documents, evidence, and even witnesses that are relevant to the Related Party Claims.  Indeed,

the Multi-State Governmental Entities Group has all but made this argument.  That group does

not oppose an injunction of actions against the Debtors, so long as they remain permitted to seek

"third-party discovery from the Debtors."[31]  (MSGE Opp'n at 6.)

The costs and burdens associated with such discovery are severe and far from

hypothetical.  To take one recent example, Utah has demanded that Dr. Craig Landau, Purdue's

current CEO, submit to a deposition on October 17, 2019 in the event that this Court does not

enjoin the Related Party Claims.  (Coleman Decl. ¶ 32.)  Dr. Landau is not a defendant in the

Utah action, but the plaintiff is seeking to depose him in furtherance of its claims against two

members of the Sackler Families.  (Coleman Decl. ¶¶ 4, 32.)  If the Related Party Claims are

permitted to proceed, these requests and their associated burdens can be expected to proliferate

exponentially.  For example, proving allegations that members of the Sackler family were

"directing staff to make misrepresentations . . . about the risk of opioid addiction" will require

depositions of the Purdue employees who were allegedly so directed.  (Coleman Decl. ¶ 25.)

The law is clear that burdens of this nature justify the requested stay "to provide the debtor and

its executives with a reasonable respite from protracted litigation."  *A.H. Robins Co., Inc. v.

Piccinin*, 788 F.2d 994, 998 (4th Cir. 1986); *see also In re Calpine*, 365 B.R. at 412 (enjoining

actions against a non-debtor where the debtor "would suffer irreparable harm if [a key employee]

were distracted from his responsibilities in order to participate" in ongoing litigation); *Haw.*

---

[31] On this point, the Multi-State Governmental Entities Group is directly at odds with the
Objecting States, which suggest that this Court enter a protective order "to protect Purdue from
unfairly burdensome discovery requests while the bankruptcy proceeds."  (Objecting States
Related Parties Opp'n at 17.)  This is a transparent ploy by the Objecting States to evade the case
law that holds that the burden of such discovery supports an injunction.  (*Id.* (claiming that their
proposal "eliminates the concern" animating the injunctions in these cases).)

38

*Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, 2006 WL 3755175, at *5 (S.D.N.Y. Dec. 20, 2006) (affirming the injunction of actions against a non-debtor where "the logistical stress on [the debtor] from attempting to simultaneously undertake a massive reorganization while monitoring and producing documents in the [s]tate [c]ourt [a]ction threatened to irreparably impair the company's reorganization process").[32]

**Continued litigation of the Related Party Claims threatens to topple the Settlement Structure**.  As the Debtors stated in their Moving Brief, there simply would be no Settlement Structure without the existing shareholders' willingness to agree in principle, as part of a global resolution, to voluntarily relinquish all of their equity interests in the Debtors, to consent to the transfer of the Debtors' enterprise to a trust or similar post-emergence structure, and to contribute billions of dollars in additional funds.  "Bankruptcy courts have often enjoined litigation against a non-debtor . . . who intends to contribute financially to the Debtors' reorganization."  *In re Caesars Entm't Operating Co.*, 561 B.R. 441, 451-52 (Bankr. N.D. Ill. 2016); *see also, e.g., In re United Health Care Org*., 210 B.R. at 232 (enjoining suit against non-debtors because the debtors "would be adversely effected [*sic*] because the [pending actions] would prevent the non-debtor from contributing funds to the reorganization").

In response, the Objectors offer only unpersuasive and unsupported speculation that massive continued litigation against the Related Parties that are contributing to the Settlement Structure does not imperil this bankruptcy.  The Objecting States' contention that the parties can hazard the risks of ongoing litigation because the precise dollar value of the Sackler Families' wealth in relation to the claims against them is uncertain misses a critical point:  The plaintiffs

---

[32] For all of these reasons, the Objectors' assertions that the fact that no member of the Sackler Families currently is employed by Purdue or sits on its Board eliminates the diversion of management attention or other burdens associated with the pursuit of claims against the Sackler Families is entirely without merit.  (*See* MSGE Opp'n at 3; Ark. & Tenn. Opp'n ¶ 22.)

assert claims against the Sackler Families that they allege are worth billions of dollars.[33]  Under

these circumstances, the point that continued litigation against them risks imperiling their ability

to contribute to the Settlement Structure is obvious.  The Objecting States also make much of the

fact that the *Caesars* court found no need to enjoin an action that was "not on the eve of trial."

(Objecting States Related Parties Opp'n at 19.)  But the scope, breadth, and volume of the

Related Party Actions here—many of which involve a host of claims and are on the precipice of

significant discovery—are beyond comparison to the handful of actions at issue in that case.  *See*

*In re Caesars*, 561 B.R. at 441, 450, 456 (N.D. Ill. 2016) (continuing the debtors' motion to stay

a single trial where fact discovery had already concluded; and, with the debtors' agreement,

continuing the debtors' motion to stay two other actions).  At bottom, Objectors propose that the

Debtors gamble that the Sackler Families, which have agreed to (1) relinquish all of their equity

interests in the multi-billion dollar Debtors; (2) engage in a sale process for their ex-U.S.

pharmaceutical companies; and (3) contribute a minimum of $3 billion over seven years, with

the hope of substantial further contemplated contributions—possibly billions—from the sales of

their ex-U.S. pharmaceutical businesses, will remain willing to make these contributions if

litigation continues just as usual.  Perhaps this is a risk the Objecting States are happy to take—

their goal is to undermine the Settlement Structure.  But it is not a risk that the Debtors, as

fiduciaries for the estates, can willingly bear.

---

[33] *See, e.g.*, Kaminetzky Decl. Ex. B (Mass. Compl.) ¶ 398 (alleging "ascertainable injuries and losses of billions of dollars"); Suppl. Kaminetzky Decl. Ex. D (*State of North Carolina, ex rel. Joshua H. Stein, Attorney General v. Sackler*, No. 19-CV-012396 (N.C. Super. Ct. Wake Cty. Sept. 17, 2019)) at 1, 54 (seeking disgorgement of "billions of dollars in profits" from the Sackler Families, among other relief); *id.* Ex. E (*State of New York v. Purdue Pharma L.P.*, No. 40016/2018 (N.Y. Sup. Ct. Suffolk Cty. Mar. 28, 2019)) ¶ 420 at p. 112, ¶¶ 8-9 at p. 250 (alleging that the Sackler Families received $4 billion in profits from Purdue's opioid sales and seeking, among other things, disgorgement of "all profits").)

**Pursuit of the Related Party Claims risks diminishing the value of estate claims**

**and frustrates equitable distribution of the estate**. For essentially the same reasons, continued

prosecution of the Related Party Claims risks diminishing the assets from which any fraudulent

transfer, veil-piercing, or alter ego claims that Debtors might bring could be settled or satisfied.

The result would be that assets that would otherwise be distributed fairly and equitably through

these cases would be taken for the sole benefit of the plaintiffs that won the race to judgment—to

the detriment of these chapter 11 estates and all other creditors.  To tolerate that result would

undermine the purpose and effect of these proceedings.  (*See* Kaminetzky Decl. Ex. D (Hr'g Tr.)

at 23-24 (noting that facts giving rise to the numerous claims by governmental entities "present[]

a substantial and identical risk in all 50 states and the U.S. territories," whereas "any relief

obtained by those entities in the state actions will necessarily be to the detriment of the citizens

of other states").)

### C.    The Equities and Public Interest Favor Enjoining the Related Party Claims

The Objectors would suffer comparatively little harm if the Related Party Claims were

enjoined.  The Debtors only seek a stay of the Related Party Claims for a time-limited period,

and the Objectors fail to articulate any persuasive rationale for why a delay in litigation—

including numerous cases that began just weeks ago in September 2019—would cause any harm,

let alone cause injustice.  Moreover, to the extent that some of the Objectors have speculated that

a Related Party injunction would permit members of the Sackler Families to "frustrate collection

of their assets,"[34] the Debtors and the Ad Hoc Committee have already procured the agreement

of the Sackler Families that a court order will prohibit various shareholder parties from "tak[ing]

any action with respect to any material amount of his, her, or its property that is located inside or

---

[34] (Mass. Municipalities Opp'n at 12 ("[W]hile the proposed preliminary injunction holds the
Sacklers' creditors at bay, the Sacklers are free to . . . frustrate collection of their assets.").)

41

outside the United States with the intent or material effect of frustrating enforcement of any

potential judgment of this Court in these cases or any other actions pending against them."  And

the Debtors continue to work with the Sackler Families and the Official Committee of Unsecured

Creditors on language to yet further address these issues.

The lack of concomitant harm to the Objectors by way of delay is even starker when

compared to the certain harm that will befall the Debtors by failing to enjoin the Related Party

Claims—namely, the depletion of assets, the diversion of management attention, and the

potential loss of the Settlement Structure.  *Haw. Structural*, 2006 WL 3755175, at *6

(recognizing that "if the injunction does not issue, the debtor will suffer real harm" and that

"[t]here is no concomitant harm that will befall the . . . plaintiffs[] in a delay of the [non-debtor

litigation]").  A stay will allow all relevant parties to focus their efforts on, and preserve their

resources for, this restructuring.  (Kaminetzky Decl. Ex. D (Hr'g Tr.) at 26 ("The debtors'

prospect for a successful reorganization are clearly enhanced if at this critical juncture early in

these cases they and their largest . . . stakeholders are afforded the opportunity to focus on the

reorganization efforts.").)

Staying the Related Party Claims would also be in the public interest.  Exactly as in *In re

TK Holdings*, another complex national mass tort case, "this reorganization process cries out for

a coordinated approach to address the crisis that these debtors and other parties face" and will

inure to the benefit of the public at large, as opposed to a subset of Objectors.  (*Id*. at 28-29.)

The Debtors' requested stay does not impair the Objectors' interests in enforcing their laws or

assigning accountability for the opioid epidemic.  That is because, as this Court well knows, a

stay does not extinguish the Objectors' claims.  It simply pauses them to give the Debtors, the

Related Parties, and the various stakeholders an opportunity to explore and hopefully reach a

42

settlement and reorganize in a manner that benefits the American people. *See W.R. Grace*, 386

B.R. at 36 (noting in an action enjoining claims against non-debtors that "due to the volume of

claims, jurisdictional spread, and numerous controversies" enjoining the non-debtor actions and

"completing the reorganization process . . . serves the public interest by resolving thousands of

claims in a uniform and equitable manner"). Accordingly, enjoining the Related Party Claims

would protect, not harm, the public interest.[35]

## III.   The Objectors Misstate the Record of the Opioid Litigations

The merits of the Objectors' underlying claims against the Debtors and the Related

Parties are ultimately irrelevant to this motion, as described above. Nonetheless, the Objectors

have dedicated pages of their briefs to inflammatory claims about the Debtors and the opioid

medications they sell. While these allegations have no bearing on the Debtors' requests for

relief—and the Court need not consider them at all when evaluating the Debtors' motion—the

Debtors wish to correct the record.

### A.   Purdue's Prescription Medications Are Approved by the FDA for Long-Term Opioid Treatment of Pain

The Objecting States' inflammatory claims against the Debtors are centered on the false

notion that OxyContin is "one of the deadliest drugs of all time." (Objecting States' Related

Parties Opp'n at 3.) Since 1995, the FDA has approved OxyContin as safe and effective for

long-term opioid treatment. Purdue received federal approval to sell its opioids only after the

---

[35] Certain Arkansas and Tennessee plaintiffs ask that the Court lift the automatic stay as to the Related Parties to the extent that the stay applies. (Ark. & Tenn. Opp'n at 24-30.) This Court need not and should not address this request. It is entirely improper to request affirmative lift-stay relief by way of a section of an objection to the Debtors' motion for a preliminary injunction. The Debtors reserve the right to oppose such a motion if and when it is properly filed.

FDA reviewed the clinical data and determined that these medications were "safe and effective," meaning the FDA found "substantial evidence that the drug will have the effect it purports or is represented to have," the benefits of the medications outweigh its risks, and the labeling is not "false or misleading in any particular."[36]  Purdue's opioid medications, including OxyContin, remain on the market to this day.

According to the FDA, Purdue's opioid medications serve an important public health role: "When prescribed and used properly, opioids can effectively manage pain and alleviate suffering—clearly a public health priority. Chronic pain is a serious and growing public health problem: it 'affects millions of Americans: contributes greatly to national rates of morbidity, mortality, and disability, and is rising in prevalence.'"[37]  The FDA reaffirmed these principles earlier this year:

> It is important to consider the potential repercussions of well-meaning attempts to address the opioid crisis without adequate scientific evidence to support such actions. Inadequately treated chronic pain has consequences, and in general, the use of higher doses of opioid analgesics often occurs in the setting of chronic pain, as patients titrate to an effective dose. Robust evidence supports that chronic pain itself, regardless of type, is an important independent risk factor for suicidality, as chronic pain patients are at least twice as likely to report suicidal behaviors or to complete suicide.[38]

Purdue's medications have significant benefits but also well-known risks such as addiction, abuse potential, overdose, and death.  Warnings of these risks have always been

---

[36] 21 U.S.C. § 355(d)(5), (7) (2018); *see also* 21 C.F.R. § 314.125(b)(5), (6) (2018).

[37] Letter from FDA to Andrew Kolodny, MD, President of Physicians for Responsible Opioid Prescribing, at 2 (Sept. 10, 2013), https://www.regulations.gov/document?D=FDA-2012-P-0818-0793 (internal citations omitted).

[38] U.S. Food and Drug Admin., FDA Briefing Document, Joint Meeting of the Drug Safety and Risk Management (DSaRM) Advisory Committee and Anesthetic and Analgesic Drug Products Advisory Committee (AADPAC), at 10 (June 11-12, 2019), https://www.fda.gov/media/127780/download.

prominent in the prescribing information provided to healthcare professionals.  Since 2001,

OxyContin's prescribing information has included the strongest warning for FDA-approved

medications, known as a "black box" warning.  The current black box warns:



Purdue's prescription opioid medications are an important treatment for chronic pain,

when prescribed by a licensed healthcare professional and used appropriately.  In a non-litigation

context, the Objecting States acknowledge as much.  The Objecting States reimburse prescription

opioids like OxyContin through state-funded health insurance plans.[39]

### B.    Purdue Fully Complied with the Terms of the 2007 Corporate Integrity Agreement and the Consent Judgments with State Attorneys General

The Objecting States acknowledge that in 2007, Purdue Frederick and three executives of

Purdue Frederick pleaded guilty to violations of federal law in connection with the marketing of

---

[39] *See, e.g.*, MassHealth Brand Name Preferred Over Generic Drug List, *available at* https://masshealthdruglist.ehs.state.ma.us/MHDL/pubdownloadpdfcurrent.do?id=4981.

OxyContin. (Objecting States' Debtors Opp'n ¶ 17; *see also* Debtors' Informational Br. at 32.)

Purdue Pharma agreed to enter into a five-year Corporate Integrity Agreement (CIA), which

required Purdue to make annual reports to the Office of Inspector General over a five-year

period, to hire an independent monitor, and to implement new policies and procedures to deter

improper promotion of Purdue's products. (Objecting States' Debtors Opp'n ¶ 18; *see also*

Debtors' Informational Br. at 33.) At the same time, Purdue Frederick, Purdue Pharma, and PPI

also entered consent judgments with the attorneys general of 26 states and the District of

Columbia to resolve allegations of unfair and deceptive marketing. (Objecting States' Debtors

Opp'n ¶ 18; *see also* Debtors' Informational Br. at 33-34.)

The Objecting States fail to mention that Purdue completed the five-year CIA with no

significant adverse findings. For a three-year period, Purdue submitted annual compliance

certifications to a multistate group of attorneys general, of which each attorney general had the

right to obtain detailed information regarding the results of Purdue's Abuse and Diversion

Detection in their state, without incident. The Objecting States' contentions—that Purdue

"continued its deceptive scheme" (Objecting States' Debtors Opp'n ¶ 20), or that the Sacklers

"led a continuing illegal marketing campaign" (Objecting States' Related Parties Opp'n at 5)—

are meritless.

### C.   No Finder of Fact Has Ruled on the Merits of the Objecting States' Claims in the Underlying Litigation.

The Objecting States are wrong that "every decision" in nationwide opioid litigation has

found consumer protection and unfair trade practices claims "valid as a matter of law."

(Objecting States' Debtors Opp'n ¶ 24).[40] At the motion-to-dismiss stage, the courts evaluated

---

[40] Two courts have dismissed all claims against Purdue. *See State of North Dakota ex rel. Wayne Stenehjem v. Purdue Pharma L.P*, No. 08-2018-cv-1300, 2019 WL 2245743 (N.D. Dist. Ct. May

46

the pleadings, assumed the truth of factual allegations, and did not weigh the merits of the

Objecting States' claims.  It simply is inaccurate for the Objecting States to suggest that all

courts to have considered these claims has blessed them as "valid" or found them to have

"substantial merit."  (*Id.*)  The Minnesota court, for example, denied Purdue's motion to dismiss

while noting that "Purdue may or may not have done something wrong.  This decision is driven

by the Minnesota Rules of Civil Procedure and no one should read anything deeper into this

decision . . . . [E]ven though this may not be an easy case for the State to prove causation, at this

procedural stage, dismissing the State's claims would be improper."[41]  And the New Hampshire

court warned that "the State will seemingly shoulder a heavy burden at trial" to prove

causation.[42]  Purdue continues to dispute the validity of the Objecting States' claims and

vigorously contests the inaccurate, incomplete, and slanted narrative that underlies them.

---

10, 2019); *City of New Haven v. Purdue Pharma L.P.*, No. X07HHDCV176086134S, 2019 WL
423990 (Conn. Super. Ct. Jan. 8, 2019).  Appeals are pending in both cases.

[41] *State of Minnesota, v. Purdue Pharma L.P.*, District Court, County of Hennepin, Fourth
Judicial District, 27-Cv-18-10788 (Jan. 4, 2019).

[42] *New Hampshire v. Purdue Pharma Inc.*, 2018 WL 4566129 (N.H. Super. Ct. Sept. 18, 2018).

## CONCLUSION

For the above reasons, and those stated in the Moving Brief, the Debtors respectfully

request that this Court (i) preliminarily enjoin the continued prosecution of the active

Governmental Actions and Related Party Claims; and (ii) enter the Voluntary Injunction against

the Debtors.

Dated:    October 8, 2019
    New York, New York

By: /s/ Benjamin S. Kaminetzky
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy


*Proposed Counsel to the Debtors
and Debtors in Possession*

48