DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.,* | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.,* | |
| **Plaintiffs,** | **Adv. Pro. No. 19-08289 (SHL)** |
| v. | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.,* | |
| **Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO (I) EXTEND THE
MEDIATION; AND (II) EXTEND THE PRELIMINARY INJUNCTION
AND ASSOCIATED DEADLINES INCLUDING TOLLING**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**TABLE OF CONTENTS**

P<small>AGE</small>

INTRODUCTION ..................................................................................................................2

ARGUMENT........................................................................................................................2

     I.       The Debtors' Prospects of a Successful Reorganization Are Reasonable......................3

    II.       The Estates Would Be Irreparably Harmed if the Preliminary Injunction is Lifted.......6

    III.     The Balance of Harms and Public Interest Weigh Strongly in Favor of the Requested
             Extension ...................................................................................................................11

CONCLUSION....................................................................................................................12

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re The 1031 Tax Grp., LLC*,
   397 B.R. 670 (Bankr. S.D.N.Y. 2008) .............................................................. 10-11

*In re Ionosphere Clubs, Inc.*,
   111 B.R. 423 (Bankr. S.D.N.Y. 1990) *aff'd in part*, 124 B.R. 635 (S.D.N.Y. 1991) ...... 10-11

*In re Purdue Pharms. L.P.*,
   619 B.R. 38 (S.D.N.Y. 2020) .................................................................... 3-4, 10-11

*In re Purdue Pharma L.P.*,
   633 B.R. 53 (Bankr. S.D.N.Y. Sept. 17, 2021)........................................................ 3

*In re Soundview Elite Ltd.*,
   543 B.R. 78 (Bankr. S.D.N.Y. 2016) ..................................................................... 3

*In re SVB Fin. Grp.*,
   2023 WL 2962212 (Bankr. S.D.N.Y. Apr. 14, 2023) ............................................. 4

### STATUTES & RULES

11 U.S.C. § 105(a) ................................................................................................ 6-7
11 U.S.C. § 362(b)(4) ............................................................................................. 7

The Mediation is at a fluid and critical juncture.  While the Debtors would have preferred to await further developments before filing this Extension Motion, there were procedural concerns associated with not filing this Motion today, requiring the Debtors to balance on the one hand the upcoming expiration of the Preliminary Injunction on November 1, and, on the other hand, the need to provide all parties in interest with proper notice.  The Mediators have thus asked the Debtors to request the Limited Extension based on the expectation that the Mediation will continue to be productive.  The Mediators believe that the Limited Extension is necessary to preserve the material progress that has been achieved to date and to give the Mediators time to work towards broader consensus.[2]  As such, the Debtors respectfully request that the Court enter orders as set forth in the Debtors' Motion to (I) Extend the Mediation And (II) Extend the Preliminary Injunction and Associated Deadlines Including Tolling (the "**Extension Motion**") being filed contemporaneously herewith (1) extending the Mediation for 35 days, through and including Friday, December 6, 2024 at 11:59 p.m., as set forth in Exhibit A to the Extension Motion; and (2) extending the Preliminary Injunction and associated deadlines including for claim tolling as set forth in Exhibit B to the Extension Motion for a coterminous 35 days (the "**Limited Extension**").[3] This request, however, rests on the assumption that the Mediation will remain productive.  The Debtors reserve the right to reduce the extension sought

---

[2] The Mediators plan to file a status report in advance of the hearing on the Extension Motion, and will be available to answer any questions from the Court.

[3] "**Mediation**," "**Mediators**," and "**Mediation Parties**" have the meaning ascribed to them in the Second Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions of Mediation (the "**Second Amended Mediation Order**"), In re Purdue Pharms. L.P., No. 19-23649 (SHL) (Bankr. S.D.N.Y. September 27, 2024) [ECF No. 6749].  Otherwise, capitalized terms used but not defined herein have the meaning ascribed to them in the Extension Motion.

1

or withdraw the Extension Motion should developing circumstances in the Mediation warrant such an adjustment.

## INTRODUCTION

The Debtors remain steadfast in their commitment to pursuing a value maximizing plan of reorganization with broad creditor support achieved through Mediation.  Consistent with the new legal landscape following the Supreme Court's decision, that plan will of course not include nonconsensual third-party releases.  This goal is shared by the vast majority of parties in these cases, and, crucially, by the Mediators.  It is a testament to the progress toward this goal made in Mediation to date that the Mediators have asked the Debtors to request the Limited Extension. Lifting the Preliminary Injunction with a productive mediation ongoing would jeopardize the material progress made in Mediation towards broad support for a plan of reorganization that delivers billions of dollars for victim recovery and opioid abatement, all in a manner consistent with the Supreme Court's decision.

## ARGUMENT

The extensive legal and factual bases for the Preliminary Injunction set forth by this Court most recently on September 23, 2024 amply support the relief requested herein.[4]  The Debtors and key stakeholders at this time remain intensely focused on developing and finalizing a settlement framework that will undergird a maximally consensual plan of reorganization.  In light of the additional material progress in Mediation since the September 23 hearing, the Debtors continue to have reasonable prospects of a successful reorganization.  The Preliminary Injunction remains essential to protecting a productive Mediation and ensuring that the work of

---

[4] The Debtors incorporate by reference the arguments they advanced and the extensive evidentiary record developed in prior motions and memoranda in support of extensions and enforcement of the Preliminary Injunction.

crafting a consensual and value maximizing plan can continue.  All four of the preliminary

injunction factors continue to weigh strongly in favor of a 35 day extension.

## I.    The Debtors' Prospects of a Successful Reorganization Are Reasonable

"[D]ebtors need not present proof of the uncertain in order to demonstrate a *reasonable*

likelihood of a successful reorganization."  *See In re Purdue Pharms. L.P.*, 619 B.R. 38, 58

(S.D.N.Y. 2020) (hereinafter "*Dunaway*") (internal quotation marks and citation omitted).

Indeed, "[c]ourts do not demand certainty of a successful reorganization; they expect only

reasonable prospects of such."  *See, e.g.*, *In Re Soundview Elite Ltd.*, 543 B.R. 78, 119 (Bankr.

S.D.N.Y 2016).

Here, the parties have made continued and material progress in Mediation toward a

consensual resolution of what then-Judge Drain described as "the most complex [Chapter 11

case] . . . that I have handled, and frankly that the courts under Chapter 11 have handled."  *In re*

*Purdue Pharma L.P.*, 633 B.R. 53, 106 (Bankr. S.D.N.Y. Sept. 17, 2021).  Progress in Mediation

and support for the extension from the Mediators demonstrates that the Debtors continue to have

reasonable prospects of successful reorganization.

Consistent with the confidentiality provisions of the Mediation Order, the Debtors cannot

reveal the details of the developments in the Mediation.  *See* Second Amended Mediation Order

¶¶ 11-14.  The Debtors would not be making this Motion without further material progress

having been made and the Mediators having asked the Debtors to seek this extension.  The

Mediators intend to file a mediation report outlining in appropriate detail the extensive efforts of

the parties who have engaged constructively in the Mediation working toward a consensual

resolution.  This all "provide[s] strong evidence of the Debtors' prospects for success coming out

of the mediation." Sept. 5, 2024 Hr'g Tr. 60:2-4 [ECF No. 534][5]; *see also Dunaway*, 619 B.R. at

59 ("the fact that discussions are continuing provides support for the finding that continuing the

injunction increases the likelihood of a successful reorganization"). As the Court recently held,

the simple fact is that "the best chance of achieving the greatest recovery is through continued

negotiations and mediation among the key constituencies in these bankruptcy cases." Sept. 23,

2024 Hr'g Tr. 89:23-25 [ECF No. 560].

As the Court has aptly recognized, the Mediators are "in the best position to know what

will assist in the mediation" process. Sept. 23, 2024 Hr'g Tr. 88:25-89:3, 90:1-7 [ECF No. 560]

(finding that the Mediators "have their fingers on the pulse of the mediation and are really in the

best position to know what works and what doesn't"). Support from the Mediators, together

with the history of successful mediation in these Chapter 11 cases, provide strong evidence that

continued mediation will be beneficial. *See id.* at 89:16-19 (finding that the requested relief was

appropriate in light of "the prior history in this case where this preliminary injunction led to

significant progress and indeed a settlement").[6]

There is also no serious dispute that "the Debtors are substantially more likely to

reorganize with the injunction in place." *Dunaway*, 619 B.R. at 59 (internal quotation marks and

citation omitted); *see also In re SVB Fin. Grp.*, 2023 WL 2962212, at *7 (Bankr. S.D.N.Y. Apr.

14, 2023) (stating same). As the Court held, "the breathing room provided by the requested

injunction is critical to the parties' mediation efforts" and "not extending the injunction would

---

[5] ECF numbers reference docket entries in this adversary proceeding unless otherwise noted.

[6] In fact, even most of the parties who objected to the Debtors' prior request to extend the
Preliminary Injunction did so without objecting to further extension of the Mediation. *See, e.g.*,
Limited Objection of the State of Maryland at 1 [ECF No. 545]; Objection of the State of
Washington at 2 [ECF No. 544]; Limited Objection of the State of Rhode Island at 1 [ECF No.
548]; Sept. 23, 2024 Hr'g Tr. 95:16-18 [ECF No. 560] (finding that "[n]o one has challenged the
wisdom of seeking to mediate these cases given their history and the important issues at stake").

then present a more difficult job for the mediators" in facilitating the parties' negotiations.  Sept.

23, 2024 Hr'g Tr. 87:1-10, 90:1-7 [ECF No. 560] (finding that "a return to litigation at this time

could at a minimum unnecessarily complicate mediation at this critical juncture").

It is not a surprise and it in no way undermines the case for the Limited Extension that

achieving success in Mediation requires more time.  Mere months ago, "the case returned from

the Supreme Court with an entirely new legal landscape to consider." *Id.* at 95:10-11.  Even if

the issues were relatively straightforward, thoughtful mediation takes time given the sheer

number of parties involved.  But nothing here is simple, the number of parties involved is

substantial, and the resolution of "complex and important matters such as this one can often be a

lengthy process" but the extensive evidentiary record shows that "the [D]ebtors and various

stakeholders have successfully mediated complex and related settlements" in the past, and can do

so again.[7] *Id.* at 86:4-6, 95:12-13.  As the Court observed, resolving a complex web of claims

---

[7] As Debtors have previously articulated, this remains equally true in the wake of the Supreme Court's decision.  Neither the Debtors' prospects of reorganization nor the Preliminary Injunction's purpose were ever dependent upon the availability of third-party releases.  *See* Oct. 11, 2019 Hr'g Tr. 264:20-24 [ECF No. 108] ("I am far from approving any sort of permanent injunction and release with respect to third parties in this case.  In fact, the purposes -- one of the main purposes of the preliminary injunction is to enable the parties to analyze whether they would support such a plan."); July 9, 2024 Hr'g Tr. 91:13-16 [ECF No. 511] ("While the Supreme Court's decision precludes consummation of a plan of reorganization that contains non-consensual third-party releases, it does not preclude a successful reorganization in these cases.").  In light of the Supreme Court decision, any new plan the Debtors put forward of course will not include nonconsensual third-party releases.

This case, where continued material progress in mediation demonstrates the prospects of a successful reorganization, thus stands in stark contrast to cases where mediation had repeatedly failed and in which only a nonconsensual third-party release—now unavailable—could have produced a largely-consensual plan.  *Cf The Diocese of Buffalo, N.Y. v. JMH 100 Doe, et al. (In re The Diocese of Buffalo, N.Y.)*, 2024 WL 4488459 (Bankr. W.D.N.Y. Sept. 30, 2024) (denying injunction because, among other reasons "[f]or more than three years, skilled mediators have tried without success to facilitate an agreement," "the debtor and the Official Committee of Unsecured Creditors now report a breakdown in negotiations," and the court had stayed litigation "to enable the parties to negotiate a plan that would include a channeling injunction.").

involving countless parties "always takes time" and discrediting the process on that basis

unreasonably asks "all federal courts to write mediation out of [their] playbook." *Id.* at 41:10-14.

Critically, the requested 35 day extension to December 6, 2024 strikes a necessary balance, as

the previous extensions have, between ensuring that the parties have time to remain solely

focused on the Mediation while also ensuring that the Preliminary Injunction can be revisited in

relatively short order should the Mediation fail to continue to progress. Each time the Debtors

have calibrated an extension request that they believe to be appropriate under the then-existing

circumstances. This time is no different, and the Debtors believe that the continued material

progress in Mediation warrants the requested extension.[8]

## II.    The Estates Would Be Irreparably Harmed if the Preliminary Injunction is Lifted

Absent extension of the Preliminary Injunction, two weeks from today 1,188 proceedings

against the Debtors and their Related Parties would recommence, causing substantial monetary

and nonmonetary harm to the Estates, and materially decreasing the Debtors' prospects for a

successful reorganization. *See* Thirty-Eighth Amended Order Pursuant to 11 U.S.C. § 105(a)

Granting Motion for a Preliminary Injunction [ECF No. 557].[9] 513 of these cases are actions

commenced by governmental entities against the Debtors, that the Debtors would of course be

required to actively defend. *See id.*, Appendix II. The other 675 enjoined actions are against the

Debtors' Related Parties, including the Sacklers. *Id.*, Appendix III. Prosecution of those actions

---

[8] The Debtors' decision to make this motion on shortened time, rather than under the normal
noticing timetable reflects an effort to avoid distracting the parties to the Mediation with a
request for an extension of the Injunction that they might find premature while also providing all
parties in interest with fair notice of the request in advance of a hearing on the Extension Motion.

[9] It is unknown how many new actions against the Debtors and their Related Parties would be
initiated, but as Washington's overruled objection to the last extension motion evidences, this
number would only increase without the Preliminary Injunction. *See* Objection of the State of
Washington to Motion for an Extension of Injunction at 2-3 [ECF No. 544].

would not only inevitably place discovery and related burdens on the Debtors, but would also

jeopardize the Estates' "most valuable asset"—that is the Estates' own claims against the

Sacklers.  Sept. 23, 2024 Hr'g Tr. 87:11-12 [ECF No. 560]. Prosecution of these actions would

also inevitably require creditors to compete with each other rather than collaboratively working

to maximize total available value.  In short, absent the Preliminary Injunction, "it's very clear

that the value destructive litigation dynamic that prevailed prepetition would most certainly

resume."  Sept. 5, 2024 Hr'g Tr. 62:5-7 [ECF No. 534].

First, without the Preliminary Injunction, the Debtors would be forced to litigate the

extent to which any of the 513 enjoined governmental actions fall within the so-called police

power exception to the automatic stay.  *See* 11 U.S.C. § 362(b)(4).  This would drag the Debtors

into a time-and-resource depleting lawsuit-by-lawsuit and potentially claim-by-claim

adjudication of the applicability of the police power exception (which the Debtors do not

concede).[10]  And if any actions *do* fall within the police power exception to the automatic stay,

such actions would proceed, and the Debtors would be forced to defend them.  The evidentiary

record in these cases is clear that subjecting the Debtors to hundreds of pending lawsuits would

cause substantial harm to the Estates.  *See, e.g.*, Oct. 11, 2019 Hr'g Tr. at 265:6-12 [ECF No. 87]

---

[10] *See, e.g.*, Statement in Response to Debtors' Motion to Extend the Preliminary Injunction at 2-
3 [ECF No. 493] (New York arguing, on behalf of 47 states and territories, that the bankruptcy
court's constraint of their police powers claims must be limited); Response of the State of New
York to Debtors' Motion at 2 [ECF No. 520] (New York, on behalf of the AG Negotiating
Committee Mediation Party, asserting that "we do not believe the states' enforcement suits may
be properly enjoined"); State of Maryland's Renewed Limited Objection to Debtors' Motion at 3
[ECF No. 545] (arguing that "the states' claims are unique instruments to provide special
enforcement of state law and to protect the health, safety, and welfare of the public"); Rhode
Island's Limited Objection to Debtors' Motion at 6 [ECF No. 548] (arguing that "the critical
watchdog roles that states perform in police power enforcement proceedings, have been stayed
for far too long"); Objection of the State of Washington to Motion for an Extension of Injunction
at 4 [ECF No. 544] (noting that the States' enjoined actions "are enforcement actions brought by
state authorities under their police powers").

(noting that Debtors were "subject to well over 2,600 lawsuits and growing"); Declaration of

Hayden A. Coleman in Supp. Debtors' Motion for Preliminary Injunction ("Coleman Decl.") ¶¶

4-14, 38-44 [ECF No. 61] (detailing wave of state litigation against Debtors and onerous

discovery burdens associated therewith, and noting that states were ready to proceed with

litigation absent an injunction).

Second, lifting the Preliminary Injunction would threaten the Estates' most valuable

assets and jeopardize creditor recoveries. Just three weeks ago, this Court found that allowing

litigation against the Sacklers to proceed "would put at risk the estate's claims against the

Sacklers" which are "the estate's most valuable assets." Sept. 23, 2024 Hr'g Tr. 91:8-92:11

[ECF No. 560]. The Estates' involvement in hundreds of suits across jurisdictions would "drain

the value that should be reserved for opioid abatement and victim compensation to fund

ballooning litigation costs." Id.; see also id. at 35:9-17 ("I haven't seen an argument made . . .

[that] one party pursuing the Sacklers categorically can have no impact on . . . cases [the

Debtors] might have against the Sacklers."). To take just one example, a comparison of

Maryland's complaint to the draft complaint exhibited in the UCC's Standing Motion, In re

Purdue Pharms. L.P., No. 19-23649-SHL (Sept. 6, 2024) [ECF No. 6685], demonstrates that the

allegations underlying the Estates' causes of action substantially overlap with the allegations

underlying the claims subject to the Preliminary Injunction:

| UCC Complaint | Maryland |
|---|---|
| Redacted Amended Draft Complaint, *Purdue Pharms. L.P., et al., by and through The Official Committee of Unsecured Creditors v. Sackler*, No. 19-23649 (SHL) (Bankr. S.D.N.Y. Sept. 6, 2024) | Amended Statement of Charges, *Consumer Protection Div. v. Sackler*, CPD Case No. 19-023-311366 (Md. Consumer Protective Div. May 29, 2019) |
| ¶ 2: Under the **Sackler's yoke**, **Purdue's**. . . aggressive and **deceptive marketing** of opioid products . . . set the opioid epidemic ablaze and stoked it for decades. | ¶ 65: **The Sackler Respondents** were chief architects and beneficiaries of **Purdue's false marketing and deception** and failure to report suspicious orders. |

8

| UCC Complaint | Maryland |
|---|---|
| ¶ 3: [A]t the **Sacklers' direction**, Purdue spread the **lie that its opioids were safe, not addictive**, and appropriate for a **wide range of new patients and pain symptoms.** | ¶ 45: **Richard Sackler** also personally directed his sales reps **not to tell doctors the truth about Respondents' opioids** because the truth could hurt sales.<br><br>¶ 258: The **Sackler Respondents** oversaw the promotional claims representatives used during sales visits.  The directors and CEO, reviewed reports that Purdue sales representatives were **deceptively** promoting opioids as an **appropriate treatment for minor pain, among hundreds of other examples** of unlawful marketing techniques in need of correction. |
| ¶ 3: **The Sacklers'** scheme succeeded, leading predictably to a **rapid surge in medically unnecessary opioid prescriptions** and the widespread diversion and abuse of the drug. | ¶ 44: [**Richard Sackler**] said, "the launch of OxyContin Tablets will be followed by a **blizzard of prescriptions** that will bury the competition.  The prescription blizzard will be so deep, dense, and white." |
| ¶ 10: **[T]he Sacklers** also failed to ensure **Purdue's** compliance with its anti-diversion duties . . . including by maintaining a suspicious order monitoring ("SOM") system . . . **Purdue**, however, **failed to maintain an effective SOM system** . . . | ¶ 28: **Purdue** was required by state and federal law to report and halt **suspicious orders** it received for opioids.  **Under the direct supervision of the Sackler Respondents** . . . Purdue utterly **failed to do so.** |
| ¶ 284: In 2014, the Business Development team, led by **Kathe Sackler**, pitched **"Project Tango"—a plan to expand** across "the pain and addiction spectrum" **to become an "end-to-end pain provider" by treating addiction** with Suboxone.  **Purdue illustrated this marketing strategy internally with a picture of a funnel guiding patients down the funnel from pain treatment to opioid addiction treatment**. | ¶ 51: In September 2014, **Kathe Sackler** dialed in to a confidential call about *Project Tango*, **which was a secret plan for Purdue to expand into the business of selling drugs to treat opioid addiction.**  In their now publicly disclosed internal documents, Kathe and staff wrote down what Purdue had publicly denied for years: that addictive opioids and opioid addiction are "naturally linked."  They determined that **Purdue should expand across "the pain and addiction spectrum," to become "an end-to-end pain provider."** |
| ¶ 308: The **Sacklers** understood and **intended to use the trust structure to attempt to shield those assets from the Debtors' creditors**. | ¶ 230: The **Sackler Respondents** were thus aware of potential liability for Purdue since at least 1999 due to OxyContin's addictive nature.  **Around this time, the Sackler Respondents began to transfer profits from Purdue to their own private trusts and** |

| UCC Complaint | Maryland |
|---|---|
| | **accounts in order to shield their funds from creditors**. |
| ¶ 308: **Richard Sackler** summed up the purpose of the trusts in a letter to his children in **2015**, stating that **they use "Trustees *as a liability shield* - if there is a personal or business litigation and a huge judgment is leveled, you have the freedom of going bankrupt without having to draw into these trusts**.  This is useful to keep as much in the trusts as you can for liability's sake." Kathe Sackler, in an October 4, 2001 email to Mortimer Sackler Sr., similarly described the trusts of which descendants of Mortimer Sackler Sr. are beneficiaries . . . as "layers and layers that would have to be penetrated" before litigation could threaten the "vast fortune" the family had built. | ¶ 230: In **2015**, for example, the **Sackler Respondents** removed $700 million from their privately held companies, two-thirds of which came from Purdue.  These **transfers of ill-gotten gains were done for the purpose of protecting the money from any civil or criminal judgment** against Purdue for its participation in the opioid crisis.  These transfers also left Purdue undercapitalized and potentially unable to compensate for the staggering injuries that its illegal conduct has created. |

<u>Third</u>, the Debtors would face potential indemnification and contribution claims if litigation against the Debtors' former directors and officers were allowed to continue.  The Debtors' governing organizational documents provide for indemnification to the fullest extent of the law for current and former directors and officers of Purdue and its subsidiaries.  *See* Coleman Decl., Ex. S.  Litigating the applicability of that obligation would distract the Debtors from the crucial task of Mediation.  And any successful claim for contribution or indemnification could drain the Estates to the detriment of creditors.  *See Dunaway*, 619 B.R. at 59; *In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 685 (Bankr. S.D.N.Y. 2008) (granting preliminary injunction where there was a "substantial risk that the Debtors face liability for indemnification" absent the injunction); *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (granting preliminary injunction where suits to be enjoined would burden the estates with discovery, inevitably involve the debtors in litigation, divert the attention of the debtors away from

reorganization, and potentially trigger indemnification rights) *aff'd in part*, 124 B.R. 635 (S.D.N.Y. 1991).

Finally, and critically, as this Court has found time and again, lifting the Injunction would threaten to upend the Mediation process.  *See* Sept. 23, 2024 Hr'g Tr. 88:3-6 (finding it is "very clear on the record" that "full-blown litigation will cause significant harm to the estate and impair the mediation efforts"); Sept. 5, 2024 Hr'g Tr. 60:25-61:1 [ECF No. 534] ("the breathing room provided by the requested injunction is critical to the parties' mediation efforts"); July 9, 2024 Hr'g Tr. 93:11-16 [ECF No. 511] ("resuming litigation would impose a tremendous burden on the estates that would distract and hamper efforts at a mediated resolution to these cases that preserves value.").  If the Debtors are forced to actively litigate hundreds of cases, and be involved in hundreds more, they will be unable to devote their full attention and resources to Mediation. Key stakeholders whose active participation in the Mediation is critical to its success would also be unable to maintain their intense and admirable focus on the Mediation if they are forced to resume active litigation lest they be prejudiced for their efforts to maximize value for all. If successful, Mediation could unlock potentially billions of dollars for creditor recoveries and opioid abatement programs.  Jeopardizing that goal by lifting the Preliminary Injunction would irreparably harm the Estates and their many stakeholders.

## III.    The Balance of Harms and Public Interest Weigh Strongly in Favor of the Requested Extension

The balance of the equities weighs strongly in favor of granting the requested Extension. The Preliminary Injunction has enabled the Mediation Parties to focus all energy and resources on negotiating a consensual resolution to these cases that will provide the greatest possible recoveries to individuals, entities, and governments alike.  Any harm that opponents of the injunction may suffer from maintenance of the Status Quo for 35 additional days is clearly

outweighed by the immediate harm to the Debtors and their prospects of successful reorganization that would ensue if the Injunction were lifted now.

Finally, the public interest demands that the Preliminary Injunction continue while Mediation is ongoing.  Sept. 23, 2024 Hr'g Tr. 88:8-15 [ECF No. 560] ("[M]ediation is the best path forward at this time and [ ] the requested extension is an equitable result and in the public interest for that reason.").  There are billions of dollars at stake for the benefit of the American people.  Success in Mediation will unlock desperately needed funds for opioid abatement and victim compensation, but failure would mean those funds are squandered in an internecine creditor-against-creditor race to courthouses across the nation.  *See* Dec. 29, 2021 Hr'g Tr. 16:10-19 [ECF No. 315] (extending injunction following district court's decision vacating confirmation to avoid a "haphazard, disorganized race to the courthouse" which would "deal a fatal blow to the Debtors' progress towards reorganization").  The victims of the opioid crisis deserve every opportunity to receive the compensation and closure that has eluded them for so many years.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in prior pleadings in support of the Preliminary Injunction, the Debtors respectfully request that this Court enter the orders extending the Mediation and extending the Preliminary Injunction and associated deadlines including for claim tolling.

Dated:   October 21, 2024
         New York, New York

By:  */s/ Eli J. Vonnegut*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors*
*and Debtors in Possession*