**Hearing Date: October 31, 2024 at 11:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: October 29, 2024 at 5:00 p.m. (Prevailing Eastern Time)**
**Reply Deadline: October 30, 2024 at 12:00 p.m. (Prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.*, | |
| **Plaintiffs**, | **Adv. Pro. No. 19-08289 (SHL)** |
| v. | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.*, | |
| **Defendants.** | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO EXTEND THE
MEDIATION AND EXTEND THE PRELIMINARY INJUNCTION
AND ASSOCIATED DEADLINES INCLUDING TOLLING**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## PRELIMINARY STATEMENT[2]

The Preliminary Injunction should be extended for 35 days (or such shorter period as the Debtors may orally request after discussion with key constituencies in the next 23 hours) to preserve and build upon the substantial progress made to date in the Mediation.[3] The Mediators have authorized the Debtors to inform the Court that the parties have made substantial progress thus far, including material incremental progress since this Court's most recent extension of the Preliminary Injunction. The Multi-State Governmental Entities Group (the "**MSGE**"), which represents over 1,200 municipal creditors of the Debtors, supports the request. And many more of the Debtors' key stakeholders have not objected to the Preliminary Injunction. Standing against this group of creditors—the parties closest to the Mediation—are the same four objectors,[4] yet again recycling arguments that this Court has soundly rejected,[5] which are premised upon the same misreading of applicable law and mischaracterizations of the record of these cases.

---

[2] ECF numbers reference docket entries in this adversary proceeding unless otherwise noted.

[3] All capitalized terms used but not defined herein have the meanings ascribed to them in the Debtors' *Memorandum of Law in Support of Motion to (I) Extend the Mediation; and (II) Extend the Preliminary Injunction and Associated Deadlines Including Tolling* ("**Opening Brief**") [ECF No. 569].

[4] The four non-*pro se* objecting parties (the "**Objecting Parties**") are the State of Washington [ECF No. 573, the "Washington Objection"]; the State of Rhode Island [ECF No. 574, the "Rhode Island Objection"], the County of Nassau [Main Docket, ECF No. 6894, the "Nassau County Objection"], and the State of Maryland [ECF No. 576, the "Maryland Objection"]. A small number of *pro se* individuals also filed statements in response to the Extension Motion. (*See* Objection of Frederick Hill to Debtors' Motion to Extend [ECF No. 572]; Objection of Maria Ecke to Mediation, In re Purdue Pharms., L.P., No. 19-23649 (Bankr. S.D.N.Y. Oct. 28, 2024) [ECF No. 6885]; Objection of Ronald Bass, Sr. to Mediation, In re Purdue Pharms., L.P., No. 19-23649 (Bankr. S.D.N.Y. Oct. 24, 2024) [ECF No. 6879].) Because the Court has already fully addressed the arguments advance in those pleadings, no further response is necessary here.

[5] In fact, a blackline of Nassau County's current objection against its prior objection to the Thirty-Eighth Amended Preliminary Injunction Order [ECF No. 543] shows that Nassau County has edited exactly three sentences—each about the procedural posture of this adversary proceeding—none of which address the substance of Nassau County's bases for objection. Accordingly, the Court should reject Nassau County's current objection in its entirety for the

When the Debtors first asked this Court to enter the Preliminary Injunction in the fall of 2019, the Debtors presented hundreds of pages of evidence and testimony demonstrating that (i) continued prosecution of civil cases against the Debtors, and civil cases against the Related Parties that were also cases against the Debtors in all but name, would irreparably injure the Estates and frustrate a successful reorganization; (ii) absent that injury, the Debtors had reasonable prospects of a successful reorganization; and (iii) the balance of equities and public interest favored an injunction.  *See* Oct. 11, 2019 Hr'g Tr. 253:19-254:8 [ECF No. 108].  While some objectors generically claim that evidence from 2019 is "stale," no objector points to any evidence in the record now—or at any point in the past five years—that shows that the evidence this Court has relied on in support of the Preliminary Injunction is any less valid today.

To the contrary, the Preliminary Injunction continues to serve its purpose.  Maryland's assertion, which it makes without citation to any evidence, that the history of these cases demonstrates why the Preliminary Injunction is unnecessary and untethered to reality.  That mediation of one of the most complex cases ever to be brought under Chapter 11 requires slightly more time to reach a resolution consistent with the new legal landscape is no basis to vacate the Preliminary Injunction.  Support from the Mediators and the Debtors, the non-objection of the overwhelming majority of the Debtors' stakeholders, and the history of successful mediation in these cases weighs strongly in favor of granting a 35-day extension.

---

same reasons it did so at the September 23 hearing.  *See* Sept. 23, 2024 Hr'g Tr. 94:16-20 [ECF No. 560].

**ARGUMENT**

I.    **This Court's Jurisdiction to Issue and Extend the Preliminary Injunction Is Clear and Undisturbed**

This Court's jurisdiction to temporarily enjoin the prosecution of claims against Related Parties is both settled law and law of the case that has been reaffirmed at every single stage of the appellate process.  Maryland nonetheless chooses to recycle its argument that subject matter jurisdiction is lacking, (*see* Maryland Objection at 3 n.2 (incorporating by reference the arguments advanced in Maryland's motion to dismiss Count II of the Adversary Complaint)), requiring the Debtors to, yet again, review why this Court unquestionably has "related to" subject matter jurisdiction under 28 U.S.C. § 1334.

*First,* subject matter jurisdiction under section 1334 extends to third-party claims that "might have any conceivable effect on the bankrupt estate."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339-40 (2d Cir. 2018) (quoting *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011)); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) (bankruptcy courts' jurisdiction extends to any civil claim that "could conceivably have any effect on the estate being administered in bankruptcy" (emphasis, quotation marks, and internal citation omitted)).  That jurisdiction encompasses "suits between third parties."  *SVP Osus*, 882 F.3d at 340 (quoting *Celotex*, 514 U.S. at 307 n.5).

*Second*, this Court, the District Court, and the Second Circuit have each held that there is subject matter jurisdiction over the creditor claims against the Sacklers which are subject to the Preliminary Injunction because those claims could have conceivable effects on the Debtors' Estates.  *In Re Purdue Pharma L.P.*, 69 F.4th 45, 71-72 (2d Cir. 2023); *In re Purdue Pharma, L.P.*, 635 B.R. 26, 83 (S.D.N.Y. 2021); *In re Purdue Pharms. L.P.* ("*Dunaway*"), 619 B.R. 38, 48 (S.D.N.Y. 2020); Modified Bench Ruling at 105-11, *In re Purdue Pharma L.P., et al.*, No.

19-23649-RDD (Bankr. S.D.N.Y. Sept. 17, 2021) [ECF No. 3786]; July 9, 2024 Hr'g Tr. 90:3-11 [ECF No. 511]. These rulings are binding law of the case. *See Arizona v. California*, 460 U.S. 605, 618 (1983) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) ("[A] decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."). And the factual record now—as in 2019—amply demonstrates that litigating the claims subject to the Preliminary Injunction would have far more than a "conceivable" effect on the Estates, but instead would work an actual and irreparable harm on the Estates and their reorganization. *See infra* at Section III.B.

## II.     The Preliminary Injunction Is Comfortably Within This Court's Statutory Authority

The Court's statutory authority to temporarily enjoin creditors from prosecuting suits against non-debtors is well established. Despite this Court's repeated rulings to the contrary, certain Objecting Parties continue to argue—without any support—that "the Bankruptcy Code provides no statutory basis for enjoining claims against non-debtors[.]" *Compare* Rhode Island Objection at ¶ 1, and Nassau County Objection at ¶¶ 23-24, *with* July 9, 2024 Hr'g Tr. 86:4-10 [ECF No. 511] ("Section 105(a) is to be construed liberally to enjoin suits that might impede[] the reorganization process," including "[i]n certain circumstances, . . . actions against non-debtors"); Sept. 5, 2024 Hr'g Tr. 58:8-13 [ECF No. 534] ("In appropriate circumstances, Section 105 has been used to enjoin actions [] that were brought by non-debtors -- against non-debtors[.]"); Sept. 23, 2024 Hr'g Tr. 83:19-24 [ECF No. 560] ("Section 105(a) may be used to enjoin creditors' lawsuits against third parties where the injunction plays an important part in the debtor's reorganization plan or the action to be enjoined will have an immediate adverse

economic consequence for the debtor's estate."). Longstanding and binding precedent holds

that, upon satisfying the four traditional preliminary injunction factors, a bankruptcy court may

temporarily enjoin creditor suits against non-debtors pursuant to Section 105(a).

Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions" of the

Bankruptcy Code, and provides bankruptcy courts with broad equitable powers to ensure orderly

bankruptcy proceedings. 11 U.S.C. § 105(a). For decades, the Second Circuit has held that "the

Bankruptcy Court has authority under section 105 broader than the automatic stay provisions of

section 362 and may use its equitable powers to assure the orderly conduct of the reorganization

proceedings." *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985); *see also,

e.g.*, *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988) (holding that

section 105(a) provides "[a]dditional authority" to enjoin lawsuits "that might impede the

reorganization process"); *In re Bernard L. Madoff Inv. Secs., LLC*, 512 F. App'x 18, 19-20 (2d

Cir. 2013) ("Section 105(a) is to be 'construed liberally to enjoin suits that might impede the

reorganization process.'") (quoting *MacArthur*, 837 F.2d at 93).[6]

---

[6] Decisions in at least the Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits are in accord.
*See, e.g.*, *In re Caesars Ent. Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015) (section
105(a) permits bankruptcy courts to issue injunction if it is "likely to enhance the prospects for a
successful resolution of the disputes attending its bankruptcy"); *In re Canter*, 299 F.3d 1150,
1155 (9th Cir. 2002) (holding that "[s]ection 105(a) contemplates injunctive relief in precisely
those instances where parties are pursuing actions pending in other courts that threaten the
integrity of a bankrupt's estate" (internal quotation marks and citation omitted)); *Chao v. Hosp.
Staffing Servs., Inc.*, 270 F.3d 374, 384 n.5 (6th Cir. 2001) (holding that even if the automatic
stay does not apply, "[t]he bankruptcy court has ample other powers to stay" an action against
the debtors "including the discretionary power under [section] 105(a)" (internal quotation marks
and citation omitted)); *Carlton v. Firstcorp, Inc.*, 967 F.2d 942, 944 n.4 (4th Cir. 1992) (Section
105 "includes the power to enjoin the continuation of ongoing judicial and administrative
proceedings which are excepted from the automatic stay"); *Browning v. Navarro*, 743 F.2d 1069,
1084 (5th Cir. 1984) ("A bankruptcy court has the power to enjoin proceedings excepted from a
§ 362 stay under [section 105]."); *Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa.*, 733 F.2d

There is nothing at all novel about a federal court using its injunctive powers to protect its jurisdiction. The Supreme Court long ago recognized that the authority to enjoin third-party litigation to protect federal courts' bankruptcy jurisdiction predates the Bankruptcy Code; it flows from the predecessor Bankruptcy Act, the traditional authority of courts of equity, and is rooted in the All Writs Act. *See Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & Pacific Railway Co.*, 294 U.S. 648, 675-77 (1935) (holding that "[t]he power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is [] inherent in a court of bankruptcy, as it is in a duly established court of equity" and is also sourced in the All Writs Act and the predecessor to Section 105(a) of the Bankruptcy Code); *see also In re Bush Terminal Co.*, 78 F.2d 662, 665 (2d Cir. 1935) (citing *Continental Illinois* and Section 105(a)'s predecessor, Section 2(15), recognizing that "[a] court of equity or bankruptcy may enjoin any action which would tend to defeat or impair it jurisdiction"); *In re Chanticleer Assocs., Ltd.*, 592 F.2d 70, 73-74 (2d Cir. 1979) (citing Section 2(15) for the principle that "the court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupt estate is fundamental to the scheme of the Bankruptcy Act.").[7]

---

267, 273 (3d Cir. 1984) (holding that a "bankruptcy court, in its discretion, may issue an appropriate injunction, even if the automatic stay is not operative"); *State of Mo. v. U.S. Bankr. Ct. for E. D. of Arkansas*, 647 F.2d 768, 777 (8th Cir. 1981) ("[T]he bankruptcy court possesses power [under section 105] in its discretion to enjoin state courts, officials, and agencies[.]").

[7] The All Writs Act, dating to the Judiciary Act of 1789, authorizes all federal courts to issue injunctions necessary to carry out their statutory jurisdiction. 11 U.S.C. § 1651(a) ("[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions."); Judiciary Act of 1789 Section 14, 1 Stat. 81-82 ("[A]ll the before-mentioned courts of the United States shall have power to issue writs . . . which may be necessary for the exercise of their respective jurisdictions."). Congress built upon this authority in Section 2(15) of the Bankruptcy Act, which, like its successor, authorized the issuance of "such orders . . . as may be necessary for the enforcement of the provisions of this Act." 55 Stat. 546 (1898).

This is also consistent with the legislative history of Section 105, which makes crystal-clear that Congress intended Section 105(a) to be used to enjoin suits <u>not subject to the automatic stay</u> when necessary to ensure an orderly reorganization:

> The court has ample . . . powers to stay actions not covered by the automatic stay. Section 105 . . . grants the power to issue orders necessary or appropriate to carry out the provisions of title 11.  The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity . . . .  Stays or injunctions issued under these other sections will not be automatic upon commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions . . . .

> Thus, the court will have to determine whether a particular action which may be harming the estate should be stayed. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine whether a particular action which may be harming the estate should be stayed.

S. Rep. No. 989, 95th Cong., 2d Sess. 51 (1978), reprinted in App. Pt. 4(e)(i) *infra*; H. Rep. No. 595, 95th Cong., 1st Sess. 341-42 (1977), reprinted in App. Pt. 4(d)(i) *infra*.[8]

Consequently, this Court—and every other court to address the issue since *Harrington*—have concluded that nonconsensual third-party releases are "legally distinct" from the temporary injunctive relief Debtors seek here, and *Harrington* does not implicate, let alone eliminate, a bankruptcy court's statutory authority to issue temporary relief in the form the Debtors seek

---

[8] Courts have also recognized a bankruptcy court's authority under the Anti-Injunction Act, in conjunction with the All Writs Act, as a basis to issue injunctive relief to protect its jurisdiction. *See, e.g.*, 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State Court *except as expressly authorized by Congress*, or *where necessary in aid of its jurisdiction*" (emphasis added)); *In re Joint E. & S. Districts Asbestos Litig.*, 120 B.R. 648, 656 (E.D.N.Y. 1990) ("Whether viewed as an affirmative grant of power . . . or an exception to the Anti-Injunction Act, the All-Writs Act permits courts to . . . stay pending federal and state cases brought on behalf of class members."); *In re Fundamental Long Term Care, Inc.*, 527 B.R. 497, 513 (Bankr. M.D. Fla. 2015) ("If an injunction falls within one of the three exceptions set forth in the Anti-Injunction Act, then it is authorized under the All Writs Act[].").

under Section 105(a).  *See, e.g.*, July 9, 2024 Hr'g Tr. 95:7 [ECF No. 511]; *In re Coast to Coast Leasing, LLC*, 661 B.R. 621, 624 (Bankr. N.D. Ill. 2024) (holding that *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024) did not preclude a Section 105(a) injunction of creditor claims against non-debtor third parties); *In re Parlement Techs., Inc.*, 661 B.R. 724 (Bankr. D. Del. 2024) ("The Court concludes that *Purdue Pharma* does not preclude the entry of [ ] a preliminary injunction" against non-debtor third parties); *In re Onyx Site Servs., LLC*, 2024 WL 4132150, at *2 (Bankr. M.D. Fla. Aug. 22, 2024) (granting Section 105(a) injunction of claims against non-debtor principal of the debtor); *In re The Diocese of Buffalo, N.Y.*, 2024 WL 4488459, at *3 (Bankr. W.D.N.Y. Sept. 30, 2024) ("Nothing in the Supreme Court's [*Harrington*] decision expressly prohibits a temporary stay of litigation against [non-debtor] parishes and affiliates.").  That Certain Objecting Parties ask that this Court be the first to depart from decades of Supreme Court and Circuit precedent, over 230 years of federal law, legislative history, and the Supreme Court's explicit admonition that its holding was "confin[ed] to the question presented," whether the Bankruptcy Code authorizes a permanent release and injunction under a plan "without the consent of affected claimants" *Harrington*, 144 S. Ct. at 2088,[9] is on its own sufficient basis to reject that faulty contention yet again.

---

[9] Further, the principles that Section 105(a) cannot be used to *create* a substantive right not found in other law, *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003), or that it cannot be used to contravene the express provisions of the Code, *Law v. Siegel*, 571 U.S. 415, 421 (2014), have no application here.  The Preliminary Injunction does not create any substantive right at all; it is a basic exercise of the court's inherent power to ensure orderly bankruptcy proceedings and protect its jurisdiction to reorganize the Debtors' estates under Chapter 11 of the Code.  As Congress made clear, those equitable powers are complementary to, not in contravention of, the automatic stay of Section 362.

**III.    The Preliminary Injunction Factors Continue to Weigh Strongly in Favor of the Debtors' Requested Extension**

The Objecting Parties' do not rebut the Debtors' clear showing that each of the four factors supporting the Limited Extension is satisfied here.  *See* Opening Brief at 3-12.  The Mediators—who are best situated to assess the impact of the Mediation on the Debtors' likelihood of successful reorganization—believe that the Debtors and their major creditor constituents are making material progress.  *Id.* at 1, 3; *see also* Sept. 23, 2024 Hr'g Tr. 88:16-89:3 [ECF No. 560] ("And of course mediators would in fact be in the best position to know what will assist in the mediation and they have asked the Debtors to make the request that's before the Court today.").  Mediation remains "the best chance of achieving the greatest recovery . . . in these bankruptcy cases," and the Preliminary Injunction is "critical to the parties' mediation efforts."  Sept. 23, 2024 Hr'g Tr. 86:15-87:14, 89:23-25 [ECF No. 560].  With the continued support of the Mediators, certain key creditor constituencies and the non-objection of others, the Debtors have requested a short, calibrated extension of the Preliminary Injunction designed to keep the Mediation pressurized and avoids expending critical Estate resources and distracting key Mediation Parties from (hopefully) concluding the negotiations on a broadly consensual plan of reorganization.

**A.    The Debtors Have Demonstrated Reasonable Prospects of a Successful Reorganization**

The Debtors have demonstrated reasonable prospects of a successful reorganization based on the progress made in Mediation to date.  As an initial matter, this Court has found—as recently as September 23, 2024—that "the history of these cases provides strong evidence of the Debtors' prospects for success coming out of mediation."  Sept. 23, 2024 Hr'g Tr. 86:1-10 [ECF No. 560].  The progress made in Mediation since September 23 further demonstrates the prospect of the Debtors' successful reorganization.

10

Mediation confidentiality limits the Debtors ability to report in detail on developments in the Mediation.  Washington repeats its recently rejected objection that the Debtors "hide behind mediation confidentiality as a justification for an injunction."  (Washington Objection at ¶ 11.) Respecting and complying with a court order—whose entry Washington supported—is most assuredly not "hiding."  And its obverse would be contempt of court.  Washington's assertion is inconsistent with the law of this Circuit and this Court's prior decisions, which recognize that such confidentiality is an "important feature of the mediation . . . process[]."  *In re Teligent, Inc.*, 640 F.3d 53, 57 (2d. Cir. 2011); Sept. 23, 2024 Hr'g Tr. 89:4-19 [ECF No. 560] (noting that the Court will "not fault the debtors or the mediators for not sharing more information" and observing that "Washington particularly is asking the debtors and mediators to . . . either never ask[] for this kind of relief or shar[e] all sorts of confidential information . . . mak[ing] it virtually impossible for a mediator in this case . . . to actually talk candidly with the parties").

What the Debtors can note, however, is the support of the Mediators for the extension and the following:  when the Debtors, supported by many other parties, requested that the Court extend the Preliminary Injunction to cover a 60-day mediation period, numerous parties made it clear that they would support no further injunction and seek to restart litigation against the Sacklers if the Mediation failed.  (Statement in Response to Debtors' Motion to Extend the Preliminary Injunction at 2 [ECF No. 493]); July 9, 2024 Hr'g Tr. 43:9-16 [ECF No. 511] (the Official Committee representing that "if mediation does not result in a resolution satisfactory to the creditors," "all of the various creditors" will restart litigation).  Among the parties with a front-row seat to Mediation, only a tiny number of repeat objectors oppose the relief the Debtors are seeking today at the Mediators' direction.

That, too, is ample evidence from which to infer that material progress continues to be made and that the Debtors' reorganization is at least reasonably likely to succeed. [10]  *See Dunaway*, 619 B.R. at 58 (finding that "debtors need not present proof of the uncertain in order to demonstrate a reasonable likelihood of a successful reorganization") (internal quotation and citation omitted).

Similarly, this Court should again reject any assertions that a successful reorganization here is somehow contingent on the ultimate availability of a nonconsensual third party release. The record amply demonstrates that this contention is false.[11]  Any Plan that the Debtors ultimately propose will not include any non-consensual third-party release and will be consistent with *Harrington*.

Against the backdrop of the Supreme Court's decision, the parties have made further material progress in the Mediation, and "the Debtors are substantially more likely to reorganize

---

[10] Notably, the objections of Washington, Maryland, and Rhode Island do not contest the Mediators' assessment that there has been material progress in the Mediation.  Only Nassau County asserts that there has been "no showing of progress made in mediation," which it cannot possibly know if its statement that it has "not been invited to participate in the ongoing mediation" is true.  (Nassau County Objection at 3, 7.)  That Nassau then incorrectly stated the Debtors "spent most of those eighteen days negotiating a second request for an extension"— outdated language from one of its prior objections (Nassau County Objection at 10)—suggests Nassau County could not be bothered to support their objection with the current state of the record.

[11] The Debtors have repeatedly explained that the Preliminary Injunction has <u>never</u> been issued as a prelude to, or depended on the availability of, nonconsensual third-party releases.  *See* Oct. 11, 2019 Hr'g Tr. 264:20-265:1 [ECF No. 108] ("I am far from approving any sort of permanent injunction and release with respect to third parties in this case. In fact, the purposes -- one of the main purposes of the preliminary injunction is to enable the parties to analyze whether they would support such a plan."); Dec. 29, 2021 Hr'g Tr. 16:10-19 [ECF No. 315] (extending injunction following Judge McMahon's decision vacating confirmation to avoid a "haphazard, disorganized race to the courthouse" which would "deal a fatal blow to the Debtors' progress towards reorganization").  This Court has already found that "[w]hile the Supreme Court's decision precludes consummation of a plan of reorganization that contains non-consensual third-party releases, it does not preclude a successful reorganization in these cases."  July 9, 2024 Hr'g Tr. 91:13-16 [ECF No. 511].

with the injunction in place." *Dunaway*, 619 B.R. at 59 (internal citation and quotation marks

omitted). The purpose of the Preliminary Injunction is to negotiate a broadly consensual lawful

plan of reorganization. Should that effort fail, the Objecting Parties, like all creditors, will be

free to pursue their litigation against the Sacklers. But they should not be permitted to derail the

settlement effort while it is still underway and with many key parties making material progress.

### B.    The Estates and Their Creditors Would Be Irreparably Harmed if the Preliminary Injunction Were Lifted Now

This Court has repeatedly found, based upon extensive evidence, that allowing

prosecution of the thousands of claims subject to the Preliminary Injunction, including claims

against the Debtors' Related Parties such as the Sacklers, (i) threatens to undermine the

Mediation; (ii) threatens to irreparably injure the value of the Estates' most valuable assets—

claims against the Sacklers; and (iii) would burden the Estates with material monetary and non-

monetary costs. Bereft of any evidence to the contrary, certain Objecting Parties assert that the

evidence supporting the injunction is "stale"—without actually disputing the veracity of a single

factual finding or piece of evidence in support of the injunction. (*See* Washington Objection at

3.) In reality, the evidence before the Court relates to events that are <u>ongoing</u>—*i.e.*, the

Mediation—and that predate the Petition Date. Sept. 23, 2024 Hr'g Tr. 90:14-19 [ECF No. 560]

("I reject the notion that the record is inappropriately stale for me to rule on this motion today.").

And the facts are obvious, and judicial notice can also be taken of many of them.

For the same reasons supporting a finding of irreparable harm, the record is clear that

active litigation of the temporarily enjoined actions would interfere with this Court's broad

jurisdiction over the *res* sufficient to permit the Court's exercise of its Section 105(a) statutory

authority to issue the Preliminary Injunction. Just as they cannot credibly challenge a finding of

irreparable harm, neither can the Objecting Parties dispute that litigation of the enjoined actions

would threaten this Court's "fairly capacious" jurisdiction over any claim that "could conceivably have any effect on the estate being administered in bankruptcy." *SPV Osus Ltd.*, 882 F.3d at 340 (internal citation omitted); *Celotex Corp.*, 514 U.S. at 308 n.6 (internal citation omitted).

### 1.      *Lifting the Injunction Threatens to Upend the Mediation*

Allowing litigation to restart during this critical phase of Mediation would delay—or destroy—the prospects of a maximally consensual resolution through Mediation. For one, litigation will divert the parties' efforts from Mediation to litigation, as this Court has found on July 9 and September 5. July 9, 2024 Hr'g Tr. 93:11-16 [ECF No. 511]; Sept. 5, 2024 Hr'g Tr. 60:24-61:3 [ECF No. 534]. In addition, developments in such litigation could alter the complex balance regarding the allocation of value <u>among</u> creditors, greatly frustrating Mediation efforts that must not only reach settlements with the Sacklers but also secure agreement among the broadest possible coalition of the Debtors' creditors. The Objecting Parties have offered no answer to any of these basic facts, other than the breezy assertion that perhaps the Mediation would not collapse, and that risk should be taken. (Nassau Objection at 10.) But the Debtors— and vast majority of parties in interest—are not willing to gamble with such a disastrous outcome given the current facts and circumstances.

### 2.      *Lifting the Injunction Threatens to Irreparably Injure the Value of the Estates' Most Valuable Assets*

Lifting the injunction would also put at risk the Estates' claims against the Sacklers, recognized by this Court over and over as the Estates' most valuable assets. *See* July 9, 2024 Hr'g Tr. 93:14-16 [ECF No. 511] ("And in fact resuming litigation would threaten the estate's most valuable asset; that is the estate's claims against the Sacklers"); Feb. 1, 2023 Hr'g Tr. 31:2 [ECF No. 409] (identifying the claims against the Sacklers as the "most valuable asset" of the

Estates); *In re Purdue Pharma L.P.*, 633 B.R. 53, 109 (Bankr. S.D.N.Y. Sept. 17, 2021) (the

Estate claims "probably would have the best chance of material success among all of the claims

against the shareholder released parties."). Contrary to Washington's bald assertions

(Washington Objection at ¶ 8), the allegations underlying the various causes of action asserted

against the Related Parties that are subject to the Preliminary Injunction substantially overlap

with the allegations underlying Estate causes of action against the Sacklers.  *See, e.g.*, *Dunaway*,

619 B.R. at 51 (finding the *Dunaway* action "like so many other cases brought against the

Debtors and the Sackler family – rests on the theory that Purdue and its employees committed

misconduct at the direction of Dr. Sackler and others who controlled the corporation and its

actions.  It follows that Purdue's conduct and related liability 'will remain at the heart' of any

further litigation against" the Sacklers (internal citation omitted)).  This overlap is, for example,

clearly illustrated by comparing the allegations in Maryland's state-court complaint against the

allegations asserted in the UCC's draft complaint, filed in connection with its standing motion to

prosecute the Estates' claims.  *See* Opening Brief at 8-10.

This Court has similarly found, time and again, that because creditor claims against the

Sacklers are premised on the same conduct that underlies the Estates' claims, the Sacklers would

"raise the same defenses" to creditor's claims "as they would to the estate's claim[s]."  July 9,

2024 Hr'g Tr. 93:20-21 [ECF No. 511].  That would make whichever case proceeds first into a

"test case for the debtors' claims, making any potential success by the Sacklers an impairment of

the debtors' claim."  Feb. 1, 2023 Hr'g Tr. 31:13-24 [ECF No. 409].  While Washington argues

that "the short time frame of the requested extension renders vacuous any fear that any

judgments of significance will be handed down in that time," (Washington Objection at ¶ 29),

that entirely misses the point.  Litigation developments that could diminish the value of the

Estates' claims can occur long before any judgment, such as rulings on motions to dismiss. Moreover, if an objector did obtain a judgment against the Sacklers, "that judgment would diminish the amount of money the Sacklers have to perform their obligations under the current settlement, any future settlement, or pay any judgment on a litigation claim that is owned by the debtor." Feb. 1, 2023 Hr'g Tr. 32:11-16 [ECF No. 49]. The Court should not permit whichever of the thousands of claimants outruns the rest of the litigation pack to jeopardize a potentially multi-billion dollar settlement while progress continues in Mediation.

**3.    *Lifting the Injunction Will Burden the Estates with Monetary and Non-Monetary Costs***

Finally, disorderly third-party litigation of claims against the Sacklers will greatly burden the Estates, draining value that should be reserved for opioid abatement and victim compensation.

To take one example, Rhode Island asserts that it is "prepared to resume litigating its case against . . . the Sacklers filed prior to Purdue's bankruptcy and this Court's injunction." (Rhode Island Objection at ¶ 3.) As the Debtors demonstrated through a detailed chart submitted in support of their initial motion to extend the Preliminary Injunction, Rhode Island's complaint "asserted against the Sackler defendants all the same allegations that it asserted against Purdue." (Declaration of Hayden A. Coleman in Supp. Debtors' Motion for Preliminary Injunction ("Coleman Decl.") ¶ 22 [ECF No. 61].) This substantive overlap does not go away just because Rhode Island is now also prepared "to advance additional direct claims against the Sacklers." (Rhode Island Objection at ¶ 3.) Moreover, the evidence of monetary and non-monetary harm to the Debtors in support of the Preliminary Injunction included costs related to demands from states like Rhode Island, which "moved to compel a deposition of a Purdue corporate representative on topics that had already been subject to depositions in the MDL." (Coleman

Decl. ¶ 36.)  Rhode Island argued that "[e]ven if the States' requested deposition was duplicative of deposition testimony in another case by other plaintiffs (which it is not), that is not a reason to restrain the State from seeking discovery in this case."[12]  (*Id.* (internal quotation, citation, and emphasis omitted.)  Once again, nothing in Rhode Island's objection indicates that its position, including that it is entitled to duplicative, costly, and distracting discovery from the Debtors, has changed.[13]

Washington baldly and incorrectly asserts that the States' actions against the Sacklers will "raise very different issues" from the Estates' claims against the Sacklers and that "[t]he complaints filed by other states (not Washington) pre-petition show nothing to the contrary." (Washington Objection at ¶¶ 21-23.)  This Court has repeatedly found that Washington is flatly wrong:  the creditor claims against the Sacklers substantially overlap with the Estates' claims. *See supra* at Section III.B.2.  Notably, while certain of the Estates' claims have been set forth in great detail in the UCC's draft complaint, Washington does not even try to explain what claims it might bring that do not overlap in whole or part with the claims and allegations set forth in the draft complaint.  And, even if Washington somehow could bring claims entirely unrelated to the

---

[12] By way of further example, a single deposition of the former chief financial officer of Purdue Pharma "lasted approximately a full day and required approximately 30 hours of [the CFO's] time to prepare."  (Declaration of Jesse DelConte in Support of Debtors' Motion for Preliminary Injunction ("DelConte Decl.")  ¶¶ 10, 12 [ECF No. 5] (detailing burdens on Debtors associated with written discovery demands)); Oct. 11, 2019 Hr'g Tr. 167:3-10 [ECF No. 108] (rejecting the non-consenting States' argument that the Debtors relied only on risk of collateral estoppel, rather than the substantial evidentiary record of massive and sustained burdens on the Estates).

[13] As a result, as was true on the Petition date, Debtors would be the target of significant, costly discovery in this and countless other actions because they possess a bulk of the documents and evidence relevant to the claims at issue in those actions.  *See* (Coleman Decl. ¶¶ 31-37); Oct. 11, 2019 Hr'g Tr. 59:20-60:18 [ECF No. 108]; *see also* (Declaration of Jamie O'Connell in Supp. Debtors' Motion for Preliminary Injunction ("O'Connell Decl.") ¶ 16 [ECF No. 6] (finding, at the time of filing the Petition, Debtors were spending millions of dollars per week on legal and professional costs in connection with the thousands of opioid-related lawsuits across the country).

Estate's claims, Washington still fails to state that it will refrain from seeking discovery of the

Debtors in support of the claims it intends to assert against the Sacklers.  As with Rhode Island,

the evidence that the Debtors offered in support of the Preliminary Injunction clearly showed that

"just after this Court rules, Washington could immediately resume a flood of depositions and

motion practice if this Court does not grant a preliminary injunction."  (Coleman Decl. ¶ 39.)

Those deposition requests included nine former Purdue employees, and corporate representative

testimony for Purdue.  (*Id.* ¶¶ 50-52.)  In addition, in the month leading up to Purdue's

bankruptcy filing, Washington served Purdue with substantial written discovery.  (*Id.* ¶ 55.)

Extensive evidence of such burdens—and this is just one lawsuit of <u>thousands</u>—is what formed

the basis for the preliminary injunction.  Oct. 11, 2019 Hr'g Tr. 256:6-12 [ECF No. 108].

Nothing has changed, and resuming litigation would impose the same, or worse, crippling burden

on the Debtors that existed when the Preliminary Injunction was first issued.

      Washington's assertion that potential indemnification obligations constitute insufficient

harm to justify the Preliminary Injunction is flatly contradicted by the law of this case.

(Washington Objection at ¶ 24.)  Judge McMahon concluded that the possibility of an

indemnification obligation, paired with the Debtors' litigation expenses in dealing with same,

was sufficient to justify imposition of the Preliminary Injunction.  *Dunaway*, 619 B.R. at 59.

Washington points to the Second Circuit's observation that the Indemnification Agreement bars

indemnification obligations flowing from the Debtors if the Sacklers are found to have acted in

bad faith (Washington Objection at ¶ 24), but fails to acknowledge the Circuit's immediately

subsequent recognition that "the question of bad faith in this case is hotly disputed," and Judge

McMahon's finding that the issue of indemnification "will be vigorously litigated."[14]  *See In re Purdue Pharms., L.P.*, 69 F.4th 45, 72 (2d Cir. 2023);  *In re Purdue Pharms., L.P.*, 635 B.R. 26, 88-89 (S.D.N.Y. 2021).  And of course there is shared insurance, yet another potential material impact.

The Debtors can ill afford such a distraction now, facing significant employee attrition over the past five years and continuing challenges with attracting new personnel.  *See* Motion of Debtors for Entry of an Order Authorizing Implementation of 2024 Key Employee Incentive Plan and 2024 Key Employee Retention Plan at Ex. B ¶ 11, *In re Purdue Pharma LLP*, No. 19-23649-SHL (Bankr. S.D.N.Y. Mar. 27, 2024) [ECF No. 6279].  Essentially, "cumulative attrition during earlier periods of these Chapter 11 Cases left the remaining employees with high workloads" where "the remaining employees must continue to operate a complex pharmaceutical business in the midst of these protracted Chapter 11 Cases." *Id.* at ¶ 18 (citing DelConte Decl. ¶ 11.)  Such a distraction now, when the Debtors have fewer employees carrying greater responsibilities, would undoubtedly jeopardize achieving the best possible resolution of these chapter 11 cases.

---

[14] Washington's continued efforts to rely on *In re Parlement Techs., Inc.*, 661 B.R. 722 (Bankr. D. Del. 2024) are unavailing.  (Washington Objection at ¶¶ 15, 19, 29.)  This Court previously agreed with the *Parlement* court's conclusion that "a preliminary injunction may still be granted if the Court concludes that (a) providing the debtor's management a breathing spell from the distraction of other litigation is necessary to permit the debtor to focus on the reorganization of its business *or* (b) because it believes the parties may ultimately be able to negotiate a plan that includes a consensual resolution of the claims against the non-debtors," and found that the facts of this case clearly fall into bucket (a).  *Parlement*, 661 B.R. at 724; Sept. 5, 2024 Hr'g Tr. 65:13-66:3 [ECF No. 534] (applying *Parlement*'s standard and holding "the preliminary injunction [] here, I think it's pretty clear, that it satisfies the requirements").  Nothing has changed to disturb that finding.

**C.    The Balance of Harms and the Public Interest Weigh Strongly in Favor of the Debtors' Modest Request**

Achieving a value-maximizing resolution to these cases through Mediation is in the public interest, as well as in the best interests of the Estates and its creditors, which include States, Native American Tribes, thousands of municipalities, school districts, hospitals, and victims. Most of the Objecting Parties concede that mediation provides the best path forward for achieving a broadly consensual plan of reorganization. (*See* Washington Objection at ¶ 2; Maryland Objection at 1-2; Rhode Island Objection at ¶ 6.) Casting aside the immense record, and not even attempting to engage with the Court's extensive contrary findings, the Objecting Parties baldly (and irrationally) assert that the resumption of the value-destructive prepetition litigation chaos would not impact the Mediation. *See Dunaway*, 619 B.R. at 59-60. That position is untenable, and the Court should reject it yet again. *See* Sept. 23, 2024 Hr'g Tr. 88:16-20 [ECF No. 560] ("So some objectors challenge the premise that the preliminary injunction is helpful for the mediation process . . . .  But that view isn't supported by the record here."); *id.* 86:24-87:3 [ECF No. 560] (holding that "the breathing room provided by the requested injunction is critical to the parties' mediation efforts").

Further, certain objectors' insinuation that the Preliminary Injunction curbs their criminal investigative powers similarly reflects a misunderstanding (or mischaracterization) of the operation of the Preliminary Injunction. The Preliminary Injunction has <u>never</u> enjoined any criminal claim that any governmental entity has pursued, and the injunction only applies to bar the commencement or continuation of actions "alleging substantially similar facts or causes of action as those alleged in actions" subject to the injunction. Thirty-Eighth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction at 14 [ECF No.

557]; *see also* Sept. 23, 2024 Hr'g Tr. 93:17-19 [ECF No. 560] ("The preliminary injunction has never enjoined any criminal cases that any governmental entity has pursued or could pursue[.]").

In short, the Objecting Parties identify no compelling harm that will result from a 35-day extension of the Preliminary Injunction and fail to rebut the Debtors' showing of the substantial risks and harms to the Estates that would result. Because all four of the preliminary injunction factors are met, this Court should grant the Limited Extension.

## IV.    Neither Judicial Estoppel Nor Equitable Estoppel Bars Extension of the Preliminary Injunction

Finally, Maryland makes the extraordinary argument that the Debtors are judicially or equitably estopped from seeking to extend the Preliminary Injunction because the Debtors sought and obtained a two-week extension in the briefing schedule for Maryland's appeal of the now-expired Thirty-Seventh Amended Order. The settled standards for judicial and equitable estoppel demonstrate that these doctrines do not bar the relief the Debtors seek.

Maryland does not appear to dispute that judicial estoppel applies where (1) "the party to be judicially estopped is now taking a position clearly inconsistent with its earlier position;" (2) the earlier position was "adopted in some manner by the court;" and (3) the party to be estopped gained "a significant unfair advantage." *In re Adelphia Recovery Tr*., 634 F.3d 678, 697-98 (2d Cir. 2011); *see also New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). Equitable estoppel applies where the party to best estopped (i) has engaged in conduct that "amounts to a false representation or concealment of material facts;" (ii) intends that "that such conduct will be acted upon by the other party;" and (iii) "knowledge of the real facts*." In re Vebeliunas*, 332 F.3d 85, 93-94 (2d Cir. 2003). And the party asserting estoppel must show (a) "lack of knowledge . . . of the true facts;" (b) "reliance upon the conduct of the party to be estopped;" and (c) "prejudicial changes in their positions." *Id.* at 94.

Not one of these elements is met.

First, the Debtors are not taking a "clearly inconsistent" position that would justify judicial estoppel and have certainly not misrepresented or concealed any facts.  Maryland says Debtors' counsel "told the district court they were unable to prepare their appellate brief" in a letter request for an extension of the briefing schedule on Maryland's appeal of the Thirty-Seventh Amended Order.  (Maryland Objection at 3.)  That is false.  What the Debtors told the District Court is what is set forth in the letter attached to Maryland's objection:  that the Debtors sought an extension due to "scheduling constraints posed by the mediation ordered by the Bankruptcy Court, motions to be heard by the Bankruptcy Court on October 29, 2024, multiple days of religious observances that fall in the next two weeks, and long-scheduled foreign travel for several critical partners."  (Maryland Objection, Ex. A at 1.)  The fact that the Debtors also were constrained to seek the instant extension of the Preliminary Injunction during this period is entirely consistent with the Debtors' representations to the District Court that they faced serious scheduling conflicts during this period and sought an extension to lessen those conflicts.

Second, the District Court did not "adopt" the Debtors' position by granting the Debtors' request, nor can Maryland show any kind of "reliance" on an imagined representation that no further extension would be sought.  While the District Court granted the Debtors' request—extending the schedule by only 17 days—it did not state any specific reason for its decision.  Moreover, Maryland voluntarily consented to the Debtors' request (Maryland Objection, Ex. A at 8), and later sought a further extension of the same briefing schedule.  (See Supplemental Letter Motion, *In re Purdue Pharms., L.P.*, No. 24-7042 (S.D.N.Y. Oct. 25, 2024) [ECF No. 13].)

Third, the Debtors did not obtain any kind of "unfair advantage" from a two-week extension of the appellate briefing schedule. The Debtors told Maryland, and the District Court, that they "respect Maryland's right to appeal the Preliminary Injunction orders" (*id.*, Ex. A at 1), and even preemptively agreed to consolidate any later appeal Maryland might take "to allow that appeal to be litigated in the context of a live case or controversy, and against the relevant legal and factual record." (*Id.*, Ex. A at 1.) And, had the schedule not been extended, Maryland's appeal would have been argued on Monday, October 28, giving ample reason to doubt its appeal would be decided before this Court hears the instant motion on October 31.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in prior pleadings in support of the Preliminary Injunction, the Debtors respectfully request that this Court overrule the objections, and enter the Limited Extension as set forth herein.[15]

---

[15] The Debtors will be making an oral motion at the October 31, 2024 hearing on this Extension Motion for permission to exceed the page limit under the Case Management Order by three pages given that the Debtors only had 19 hours between the objection deadline and the reply deadline to file this brief and the Debtors alone are responsible for the review of nine pleadings by various parties, three of which—yet again including Maryland's—were filed after the 5:00 p.m. deadline on August 31, yet further shortening the Debtors' response time.

Dated:    October 30, 2024
          New York, New York

By: */s/ Marshall S. Huebner*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:     (212) 450-4000
Facsimile:     (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors*
*and Debtors in Possession*